Case Nos. 24-7032 24-7037, 24-7265, 24-7300, 24-7304, 24-7312

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

IN RE SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY
PRODUCTS LIABILITY LITIGATION

THE PEOPLE OF THE STATE OF CALIFORNIA, et al.,

*Plaintiffs – Appellees,*

– v. –

META PLATFORMS INC., et al.,

*Defendants – Appellants.*

Appeal from the United States District Court
for the Northern District of California, Oakland Division
Hon. Yvonne Gonzalez Rogers
Case No. 4:23-cv-05448 (MDL No. 3047)

## OPENING-ANSWER BRIEF OF THE STATE ATTORNEYS GENERAL

PHILIP J. WEISER
Attorney General of Colorado
SHANNON STEVENSON
Solicitor General
 *Counsel of Record*
MICHAEL MCMASTER
DANNY RHEINER
Assistant Solicitors General
JENNA BAKER
Assistant Attorney General Fellow

Colorado Department of Law
1300 Broadway, 10th Floor
Denver, Colorado 80203
Telephone: (720) 508-6000
Email: Shannon.Stevenson@coag.gov

ROB BONTA
Attorney General of California
BERNARD A. ESKANDARI
Supervising Deputy Attorney General
 *Counsel of Record*
MEGAN M. O'NEILL
MARISSA ROY
Deputy Attorneys General

California Department of Justice
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
Telephone: (213) 269-6348
Email: Bernard.Eskandari@doj.ca.gov

*(Additional counsel on signature page)*

June 23, 2025

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT................................viii

GLOSSARY.................................................................................ix

STATEMENT OF JURISDICTION........................................................1

STATEMENT OF THE ISSUES.............................................................2

INTRODUCTION.................................................................................3

STATEMENT OF THE CASE AND FACTS.............................................5

   I.    Meta operates two of the country's largest social media platforms—Facebook and Instagram.....................................................5

   II.   The State AGs sued Meta for engaging in unfair business acts and practices and deceiving the public about the risks and harms of its platforms. ....................................................................7

      A.    Meta employs features designed to manipulate and addict young users. ...................................................................9

      B.    Meta made deceptive representations about its platforms, the harms they cause, and its own actions related to the safety of users. ...................................................................17

   III.  Based on Section 230, the district court granted Meta's motion to dismiss certain aspects of the State AGs' unfairness claims..............19

   IV.  Meta appealed the district court's non-final order partially denying its motion to dismiss. .................................................24

STANDARD OF REVIEW....................................................................25

SUMMARY OF THE ARGUMENT ........................................................26

ARGUMENT .....................................................................................28

   I.    The Court should dismiss this entire appeal, or, in the alternative, exercise jurisdiction over both appeals.............................28

A. The Court lacks jurisdiction over Meta's appeal of a non-final judgment. ........................................................................ 28

B. If this appeal is not dismissed, the Court has pendent jurisdiction to consider the State AGs' cross-appeal. ..................... 42

II. The district court erred in partially dismissing the State AGs' unfairness claims under Section 230. ................................................. 45

A. Meta's Section 230 defense fails because the State AGs' unfairness claims do not seek to hold Meta liable as a publisher or speaker of third-party information. ................................................. 46

B. The district court erred in concluding that Section 230 provided Meta a defense to the State AGs' unfairness claims with respect to certain of its design features. ......................................... 55

III. Section 230 does not preclude the State AGs' deception claims. ................................................................................................. 66

A. Section 230 has no bearing on the State AGs' deception claims. ................................................................................................. 67

B. To the extent that some misrepresentations reference features that form the basis of unfairness claims, Section 230 does not preclude deception claims as to those misrepresentations. ........... 75

CONCLUSION ........................................................................................ 79

STATEMENT OF RELATED CASES ................................................... 86

# TABLE OF AUTHORITIES

## Cases

*Arc of California v. Douglas*, 757 F.3d 975 (9th Cir. 2014) .............. 43, 45

*Barnes v. Yahoo!, Inc.,* 570 F.3d 1096 (9th Cir. 2009) ................... passim

*Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003) ...................................... 40

*Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003).. 35, 52

*Chi. Lawyers' Comm. for Civil Rts. Under Law, Inc. v. Craigslist, Inc.*,
519 F.3d 666 (7th Cir. 2008) ................................................................. 32

*Childs v. San Diego Family Hous. LLC*, 22 F.4th 1092 (9th Cir. 2022) 38

*Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949) ........ 1, 29, 41

*Commonwealth of Massachusetts v. Meta Platforms Inc., et al.,* No. 23-
2397-BLS1 (Mass. Super. Ct., Oct. 17, 2024) ..................................... 54

*Dig. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863 (1994) ........ 29, 32

*Dist. of Columbia v. TikTok, Inc.,* No. 2024-CAB-006377 (Super. Ct.
D.C., Feb 25, 2025) ................................................................................. 54

*Dist. of Columbia v. Meta Platforms Inc., et al.*, No. 2023-CAB-6550
(D.C. Super. Ct., Sept. 9, 2024) ........................................................... 54

*Doe v. Grindr*, 128 F.4th 1148 (9th Cir. 2025) ...................................... 77

*Doe v. Internet Brands, Inc.*, 824 F.3d 846 (9th Cir. 2016)............. passim

*Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093 (9th Cir. 2019) .. 53

*Est. of Bride ex rel. Bride v. YOLO Techs., Inc.*, 112 F.4th 1168 (9th Cir.
2024) ............................................................................................... passim

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC,*
521 F.3d 1157 (9th Cir. 2008)........................................... 35, 36, 53, 78

*Fed. Trade Comm'n v. LeadClick Media, LLC*, 838 F.3d 158 (2d Cir. 2016) ................................................................................ 78

*Figueroa v. United States*, 7 F.3d 1405 (9th Cir. 1993) ........................ 28

*Force v. Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019) .......................... 35, 57

*Gen. Steel Domestic Sales, L.L.C. v. Chumley*, 840 F.3d 1178 (10th Cir. 2016) ........................................................................... passim

*Guerrero v. RJM Acquisitions LLC*, 499 F.3d 926 (9th Cir. 2007) ......... 37

*HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676 (9th Cir. 2019) ................................................................................ 55

*In re Martinez*, 721 F.2d 262 (9th Cir. 1983) ..................................... 25

*In re Mortg. Elec. Registration Sys., Inc.*, 754 F.3d 772 (9th Cir. 2014) 75

*In re Rega Props., Ltd.*, 894 F.2d 1136 (9th Cir. 1990) ........................ 28

*Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 407 (6th Cir. 2014) ................................................................................ 36

*Jones v. Dirty World Entm't Recordings LLC*, No. 12-5133, 2012 WL 13418361 (6th Cir. May 9, 2012) ................................... 29, 38, 40

*Kimzey v. Yelp! Inc.*, 836 F.3d 1263 (9th Cir. 2016) ...................... 53, 65

*Klayman v. Zuckerberg*, 753 F.3d 1354 (D.C. Cir. 2014) ..................... 36

*Lemmon v. Snap, Inc.*, 995 F.3d 1085 (9th Cir. 2021) .................. passim

*Midland Asphalt Corp. v. United States*, 489 U.S. 794 (1989) .............. 32

*Miranda B. v. Kitzhaber*, 328 F.3d 1181 (9th Cir. 2003) ................ 31, 41

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250 (4th Cir. 2009) ................................................................................ 36

*Nevada v. Tiktok, Inc.*, No. A-24-886127-B (Nev. Dist. Ct., Sept. 24, 2024) ................................................................................ 54

*Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 711 F.3d 1136 (9th Cir. 2013) ........................................................................... passim

*P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139 (1993) ................................................................................ 40

*Poulos v. Caesars World, Inc.*, 379 F.3d 654 (9th Cir. 2004) ...... 43, 44, 45

*Republican Nat'l Comm. v. Google, Inc.*, No. 2:22-CV-01904-DJC-JBP, 2023 WL 5487311 (E.D. Cal. Aug. 24, 2023)........................................ 36

*SolarCity Corp. v. Salt River Project Agric. Improvement & Power Dist.*, 859 F.3d 720 (9th Cir. 2017) ................................................. 29

*South Carolina v. TikTok, Inc.*, No. 2024-CP-40-06018 (Ct. of Com. Pleas S.C., May 6, 2025) ....................................................... 54

*Special Invs. Inc. v. Aero Air Inc.*, 360 F.3d 989 (9th Cir. 2004) ............ 25

*State of Illinois v. TikTok Inc., et. al*, No. 2024CH09302 (Cook Cty. Cir., June 21, 2025) ................................................................ 54

*State of Vermont v. Meta Platforms, Inc.*, No. 23-CV-4453 (Vt. Super. Ct., July 28, 2024) ............................................................. 54

*State of Washington v. TikTok, Inc., et. al.*, No. 24-2-23100-5 SEA (Super. Ct. Wash., Mar. 28, 2025) ............................................ 54

*Utah Div. of Consumer Prot. v. Tiktok, Inc.*, No. 230907634 (Utah Dist. Ct., Nov. 12, 2024)............................................................ 54

*Utah Div. of Consumer Prot. v. TikTok, Inc.*, No. 240904292 (Utah Dist. Ct., Feb. 20, 2025) ............................................................ 54

*Will v. Hallock*, 546 U.S. 345 (2006) ....................................... 30, 37, 38, 40

*Williams v. Gerber Prods. Inc.*, 552 F.3d 934 (9th Cir. 2008)................. 68

*Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169 (9th Cir. 2009) ........ 35

*Zeran v. Am. Online, Inc.*, 129 F.3d 327 (4th Cir. 1997)........................ 35

*Zuffa, LLC v. Justin.tv, Inc.*, 838 F. Supp. 2d 1102 (D. Nev. 2012) ....... 36

**Statutes**

28 U.S.C. § 1291 (2025) ...................................................................1, 28

47 U.S.C. § 230(b)(1) (2025) ...............................................................34

47 U.S.C. § 230(b)(2) (2025) ...............................................................34

47 U.S.C. § 230(b)(3) (2025) ...............................................................34

47 U.S.C. § 230(b)(4) (2025) ...............................................................34

47 U.S.C. § 230(c)(1) (2025) ...............................................................46

47 U.S.C. § 230(c)(2) (2025) ...............................................................32

47 U.S.C. § 230(e)(3) (2025) ...........................................................33, 46

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellees submit that oral argument would assist the

Court in evaluating this appeal.

/s/ *Shannon Stevenson*
Shannon Stevenson

# GLOSSARY

"Meta" refers collectively to Defendants Meta Platforms, Inc.; Instagram, LLC; Meta Payments, Inc.; and Meta Platforms Technologies, LLC.

"State Attorneys General" or "State AGs" refers to Plaintiffs, the State Attorneys General of California, Colorado, Connecticut, Delaware, Illinois, Indiana, Kansas, Kentucky, Louisiana, Minnesota, Nebraska,[1] New Jersey, New York, North Carolina, Pennsylvania, South Carolina, Virginia, and Wisconsin.

"Private Plaintiffs" refers to the personal injury and school district plaintiffs.

"COPPA" refers to the Children's Online Privacy Protection Act of 1998.

---

[1] Nebraska and Virginia did not join the State AGs' cross-appeal and only join the portions of this brief responding to Meta's opening brief.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over the underlying cases in this multidistrict litigation pursuant to 28 U.S.C. §§ 1331 and 1367(a).

As explained below, *infra* Section I(A), this Court lacks jurisdiction over Meta's appeal because it concerns a non-final judgment and the collateral order doctrine does not apply. *See* 28 U.S.C. § 1291; *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546–47 (1949). Nevertheless, if the Court holds otherwise, the Court would necessarily have jurisdiction over the State AGs' conditional cross-appeal because the questions raised are inextricably intertwined with, and necessary to ensure meaningful review of, the issues in Meta's appeal. *See infra* Section I(B).

The district court partially granted and partially denied Meta's motion to dismiss the State AGs' claims on October 15, 2024. 1-ER-48. Meta filed a notice of appeal on November 14, 2024. 6-ER-1418. Pursuant to Federal Rule of Appellate Procedure 4(a)(3), the State AGs timely filed a conditional notice of cross-appeal on November 27, 2024. 3-SER-489.

## STATEMENT OF THE ISSUES

Section 230 of the Communications Decency Act protects internet platforms from liability only with respect to claims that seek to hold a platform liable as a publisher of third-party content.

(1) Based on Section 230, Meta sought to dismiss consumer protection claims brought against it by the State AGs. The district court partially denied Meta's motion to dismiss. Does this Court lack jurisdiction to review this non-final order?

(2) The State AGs brought unfairness claims against Meta based on its own platform design features, not based on content provided by any other user. Does Section 230 shield Meta from liability for these claims?

(3) The State AGs brought deception claims against Meta based on its own deceptive statements and omissions about its platforms, the harms caused by those platforms, and its own actions related to the safety of users. Does Section 230 shield Meta from liability for these claims?

2

## INTRODUCTION

Meta asks this Court to shield it from liability for the business decisions that have made it the most powerful social media company in the world at the direct and known expense of children. In 1996, Congress passed the Communications Decency Act for the primary purpose of protecting children from harmful content on the internet. Section 230 of the Act, in particular, was designed to protect internet platforms from liability for third-party content in order to encourage them to proactively remove harmful material.

Meta now seeks to use Section 230 to immunize itself from liability for its own decisions that are separate from third-party content. In this action, eighteen state attorneys general bring unfairness claims asserting that teens and children are suffering immense harm—not from third-party content on Meta's social media platforms—but from the highly sophisticated features and overall design of the platforms, which trap young users for the maximum amount of time possible. The harms from these features—long known to Meta—are now well-established: compulsive and addictive use, distraction from school and sleep, depression and anxiety. And not only

3

does Meta want immunity for its own design features, but from its own deceptive and misleading statements and omissions about its platforms and the harms they cause.

Sidestepping the ordinary course of appellate review, Meta seeks an unwarranted expansion of Section 230 from this Court. As a threshold matter, the Court should dismiss this appeal entirely for lack of jurisdiction. Section 230 is a defense to liability—not an immunity of the type that is proper for appeal under the narrow collateral order doctrine. The Court should reject Meta's attempt to convert Section 230 into a basis for online platforms to immediately appeal any unsuccessful motion to dismiss and upset the ordinary course of litigation.

But if the Court reaches the merits, it should hold that the State AGs' consumer protection claims survive Meta's motion to dismiss in their entirety. These claims do not seek to hold Meta liable for the content provided by any third party, or indeed for any *content* at all. Rather, they seek to hold Meta responsible for its own unfair and deceptive acts and practices that have resulted in massive harm to young people, all in furtherance of its astronomical revenues. As this

Court's jurisprudence confirms, Section 230 was never intended to afford social media platforms blanket immunity for their own conduct, and this case should proceed to trial.

## STATEMENT OF THE CASE AND FACTS[2]

### I. Meta operates two of the country's largest social media platforms—Facebook and Instagram.

Meta's platforms, Facebook and Instagram, are social media platforms that connect users through a website or app. *See* 2-SER-255 ¶23. "An estimated 62% of teens in the United States regularly use Instagram." 2-SER-255 ¶29. The platforms provide users with various tools, including the ability to post and share content, interact with other users' posts, and engage in commerce. 2-SER-256 ¶35, 2-SER-259 ¶50, 2-SER-311 ¶385. Meta delivers content on a user's "Main Feed," which is "the scrolling presentation of content immediately visible upon opening" Facebook or Instagram, as well as through the "Explore Feed," "another scrolling presentation of . . . content." 2-SER-276 ¶153.

---

[2] The facts in this section are taken from the State AGs' complaint. On review of the district court's order on Meta's motion to dismiss, this Court views these facts in the light most favorable to the State AGs. *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1087 (9th Cir. 2021).

Although users are not charged a monetary fee to use Meta's platforms, Meta charges its users "by collecting their data and time." 2-SER-258 ¶46. Meta's business model is based on maximizing the time that users spend on its Social Media Platforms. 2-SER-250 ¶3, 2-SER-260 ¶54. Specifically, "Meta is financially motivated to attract and retain young users on its Social Media Platforms" because, as one employee explained, "[y]ou want to bring people to your service young and early." 2-SER-262 ¶68. "Meta targets young users and incentivizes its employees to develop ways to increase the time that young users spend on its Platforms." 2-SER-250 ¶3. "The more time young users spend on Instagram and Facebook, the more Meta earns by selling advertising targeted to those users." *Id*. "Meta generates most of its revenue from advertisers, who are able to use targeted advertising based on the personal data Meta collects for each user." 2-SER-260 ¶55. "When Meta succeeds in maintaining a user's interest through its recommendation algorithms [and other features]—thus keeping the user on a Platform for a longer time—Meta can collect more data on the user and serve the user more advertisements." 2-SER-260 ¶56.

## II. The State AGs sued Meta for engaging in unfair business acts and practices and deceiving the public about the risks and harms of its platforms.

The State AGs sued Meta, alleging myriad violations of state consumer protection statutes and COPPA. As alleged in their complaint, "[o]ver the past decade, Meta—itself and through its flagship Social Media Platforms Facebook and Instagram"—"has harnessed powerful and unprecedented technologies to entice, engage, and ultimately ensnare youth and teens." 2-SER-249 ¶1. "Its motive is profit." *Id*. "[I]n seeking to maximize its financial gains, Meta has repeatedly misled the public about the substantial dangers of its Social Media Platforms" and "concealed the ways in which these Platforms exploit and manipulate its most vulnerable consumers: teenagers and children." *Id*. "And it has ignored the sweeping damage these Platforms have caused to the mental and physical health of our nation's youth." *Id*.

As relevant to this appeal, the State AGs brought two types of state consumer protection claims.[3] *First*, the State AGs alleged that

---

[3]    Only a subset of the State AGs' consumer protection claims are at issue in this appeal, and the State AGs' COPPA claims are not at issue.

Meta engaged in unfair business acts and practices by crafting its platforms to induce compulsive use in young users to the detriment of their health and well-being ("unfairness claims").[4] These claims seek to hold Meta accountable for "knowingly designing its Social Media Platforms" "to be psychologically and physically harmful to users." 2-SER-392 ¶847(a).

*Second*, the State AGs alleged that Meta deceived the public about the real risks and harms of its platforms ("deception claims").[5] These claims allege that Meta represented that its platforms are less harmful and addictive than they are, downplayed its profit motive, deceived the public about its research on harm caused by its platforms, misled the public about its age-gating policies, misrepresented how it exploits user data to fuel compulsive use, and hid the risks and harmful effects of its platforms from the public. 2-SER-391–392 ¶846(a)–(f).

---

[4]     Unfairness claims, which are authorized by state consumer protection statutes, generally challenge unfair and unconscionable business acts and practices, which may harm consumers or violate public policy.

[5]     Deception claims, which are authorized by state consumer protection statutes, target false or misleading statements or omissions.

## A. Meta employs features designed to manipulate and addict young users.

Consistent with its business model of maximizing ad revenue, "Meta has developed and refined a set of psychologically manipulative Platform features designed to maximize young users' time spent on its Social Media Platforms." 2-SER-250 ¶4. "Meta [i]s aware that young users' developing brains are particularly vulnerable to certain forms of manipulation." *Id.* "[I]t [has] chose[n] to exploit those vulnerabilities through targeted features such as: (a) dopamine-manipulating recommendation algorithms; (b) 'Likes' and social comparison features known by Meta to harm young users; (c) audiovisual and haptic alerts that incessantly recall young users to Meta's Social Media Platforms while at school and during the night; (d) visual filter features known to promote young users' body dysmorphia; and (e) content-presentation formats, such as infinite scroll [and autoplay], designed to discourage young users' attempts to self-regulate and disengage with Meta's Platforms." *Id.* "The[se] features create a feedback loop that is integral to Meta's current business model." 2-SER-315 ¶413.

"[T]he effect of these use-inducing mechanisms is cumulative because they act in concert." 2-SER-315 ¶411. "By creating and

refining these features, Meta has succeeded in making it difficult for young users to resist spending extended time on its Platforms." 2-SER-315 ¶412. These features "make it difficult for young users to cease engagement with Meta's Platforms—*independent of the content with which the users interact.*" 2-SER-310 ¶373 (emphasis added). "Meta knows that it continues to harm young users because Meta's design features have clear and well-documented harms to young users." 2-SER-318 ¶431.

> **1. Meta's recommendation algorithms maximize the time young users spend on Meta's platforms.**

"Meta employs Recommendation Algorithms universally across its Social Media Platforms." 2-SER-276 ¶153. "Meta's Recommendation Algorithms were designed with its business purpose in mind, namely, to capture users' attention and keep them engaged on the Platforms." 2-SER-261 ¶64.

"These algorithms *do not promote any specific message* by Meta." 2-SER-261 ¶65 (emphasis added). "Rather, the algorithms function on a user-by-user basis, detecting the material each individual is likely to engage with and then increasingly displaying similar material to

maximize the time spent (and user data collected) on the Platforms."
*Id.* The algorithms accomplish this goal by "us[ing] data points, or
'signals,' harvested from individual users to choose and/or arrange each
new piece of content to display to a user." 2-SER-276 ¶152. "Such
signals include, but are not limited to, overt actions like Liking a post
or following a page as well as such unconscious actions such as
lingering on—but not otherwise engaging with—certain content or
visiting but not following another user's page." *Id.* As a result of this
data harvesting, "Meta's algorithm alters users' experiences on the
Platform and draws unwitting users into rabbit holes of
algorithmically curated material." 2-SER-261 ¶66.

Meta designed its recommendation algorithms to encourage
compulsive use among young users. 2-SER-276 ¶154. The algorithms
accomplish this goal by "present[ing] material to young users in an
unpredictable sequence rather than displaying posts chronologically."
2-SER-276 ¶155. This method of serving content to young users, which
is "referred to by psychologists as 'variable reinforcement schedules' or
'variable reward schedules,'" "can lead to 'addiction.'" 2-SER-276 ¶156,
2-SER-277 ¶159. "By algorithmically serving content to young users

according to variable reward schedules, Meta manipulates dopamine releases in its young users, inducing them to engage repeatedly with its Platforms—much like a gambler at a slot machine." 2-SER-278 ¶161.

### 2. Infinite scroll and autoplay trap young users on Meta's platforms.

"Infinite scroll is characterized by the partial display of additional content at the bottom of the user's screen, such that the user is typically unable to look at a single post in isolation (without seeing the top portion of the next post in their Feed)." 2-SER-268 ¶92. "The 'teasing' of yet-to-be-viewed content continues indefinitely." 2-SER-268 ¶93. "This 'teasing' feature is intended to keep young users of the Platform engaged and continuing to scroll to the new content." 2-SER-268 ¶94.

Infinite scroll "makes it difficult for young users to disengage because there is no natural end point for the display of new information." 2-SER-310 ¶377. "Instead, the Platform displays new content and suggests relevant information that has yet to be viewed, provoking" Fear of Missing Out ("FOMO") in young users. *Id.*

"Meta also deploys the autoplay feature to keep young users engaged on its Platforms." 2-SER-310 ¶379. "Much like infinite scroll, the autoplay feature encourages young users to continuously engage on the Platform because it provides them with an ongoing supply of content." 2-SER-311 ¶381.

### 3. Meta designed ephemeral content features to addict young users.

"Meta also sought to increase engagement through making certain content available to users only temporarily—with notifications and visual design cues indicating that the content would soon disappear forever (ephemeral content)." 2-SER-269 ¶97. "Ephemeral content leads young users to more frequently open Meta's Social Media Platforms so they do not 'miss out' on any new content." 2-SER-269 ¶98.

"Meta designed ephemeral content features in its Social Media Platforms to induce this sense of FOMO in young users." *Id.* For example, Meta introduced the "Stories" feature to Instagram and Facebook, which is "designed to show images and narratives for only a short amount of time before disappearing." 2-SER-269 ¶99. "The

purpose of this feature was in large part to help drive teen engagement." 2-SER-269 ¶100.

Another example is "Live," which "allows users to create video content in real time that their followers can watch and react to, often called 'going Live.'" 2-SER-269 ¶¶102, 104. "When an account goes Live, the Instagram Platform sends out a notification." 2-SER-269 ¶105. "Unlike content delivery systems which permit a user to view existing posts on a schedule convenient for the user, content released through Live is only available in real-time—such that a young user's failure to quickly join the livestream when it begins means that the user will miss out on the chance to view the content entirely." 2-SER-312 ¶390.

### 4.   Meta uses notifications to persistently lure young users back to its platforms.

"Push notifications are auditory and visual cues to alert users when accounts they follow add new content." 2-SER-268 ¶95. "Instagram employs a range of notifications when the application is installed on a smartphone" including "haptic alerts (vibration or pulse), banner notifications, sound notifications, badge notifications (persistently displayed red indicator encircling a number representing

14

certain events that have not yet been viewed by the user), and email notifications." 2-SER-299 ¶301.

"Push notifications allow[] Instagram to draw its users back to the Platform at any time of day." 2-SER-268 ¶96. "These notifications are disruptive for all users but are especially intrusive and harmful for young users, who are particularly vulnerable to distraction and psychological manipulation." 2-SER-299 ¶302. "By sending notifications to young users, Meta . . . distract[s] from and interfere[s] with young users' education and sleep." 2-SER-301 ¶315.

"Instagram does not offer users a setting to permanently disable all notifications on Instagram at once." 2-SER-303 ¶325. "At most, users can opt to pause all notifications for up to 8 hours at a time." *Id*. "Users seeking to permanently disable all notifications must disable each category of notifications one by one." *Id*. "After users disable notifications, Meta pressures such users to reinstate notifications when they use Instagram." 2-SER-303 ¶326. For example, after a user disables notifications, Meta periodically sends them a nudge message encouraging them to turn notifications back on. *Id*.

15

### 5. Despite knowing they harm young users' mental health, Meta continues to display Like counts.

"Likes are a quick way for users to express validation or approval of other users' photos or videos, by clicking or tapping a heart icon or the iconic thumbs-up icon." 2-SER-289 ¶227. "[V]isible Like counts" are "connected to higher advertising revenues." 2-SER-294 ¶267.

"Extensive internal studies have made Meta aware that the quantification and public display of Like counts on its Social Media Platforms is harmful to young users' mental health." 2-SER-289 ¶228. "[T]he quantification and display of Like counts on each piece of content on Instagram and Facebook" "exacerbate[s] social comparison," where "someone feels bad about themselves after comparing themselves with others." 2-SER-285 ¶203, n.12, 2-SER-289 ¶226. "Meta is aware that negative social comparison is a problem for teens, and that seeing high Like counts on others' posts makes users feel worse." 2-SER-292 ¶255.

In 2020, Meta conducted an experiment called Project Daisy, 2-SER-291–292 ¶¶240–250, which demonstrated that hiding Like counts successfully reduced negative social comparison, 2-SER-291 ¶¶246–

247. Despite this knowledge, "Meta did not remove the default display of Like counts for content viewed by young users on its Social Media Platforms." 2-SER-292 ¶249. Instead, "users who wish to hide Like counts from posts in their Instagram or Facebook Feeds must navigate submenus of preferences to affirmatively opt in." 2-SER-292 ¶252.

### B. Meta made deceptive representations about its platforms, the harms they cause, and its own actions related to the safety of users.

Through public messaging—including but not limited to public appearances, statements to the media, and statements to lawmakers—Meta's top executives have conveyed that Meta's platforms are designed to be safe and suitable for young users and that Meta prioritizes safety. 2-SER-272–273 ¶¶120–133. Further, "[i]n promoting and marketing [platform] features to young users, Meta deceptively represented that the features were *not* manipulative; that its Social Media Platforms were *not* designed to promote young users' prolonged and unhealthy engagement with social media; and that Meta had designed and maintained its Social Media Platforms to ensure safe experiences for young users." 2-SER-250 ¶5 (emphasis in original).

17

Despite making these statements, Meta was aware that its recommendation algorithms and others features "promote[d] young users' compulsive social media use in a sophisticated and individualized manner and [we]re designed to capture and retain young users' attention—often to the detriment of their mental and physical health." 2-SER-283 ¶193, 2-SER-289 ¶228, 2-SER-301 ¶314–315, 2-SER-312 ¶395.

Similarly, Meta denied that it seeks to maximize young users' time spent on its platforms. 2-SER-273–274 ¶¶134–138. "These representations were false and misleading." 2-SER-274 ¶139. As discussed above, "one of Meta's key goals is to induce young users to spend ever-increasing amounts of time on its Social Media Platforms." *Id.*

"[T]o assuage public concerns about harms to young users on Meta's Social Media Platforms, Meta routinely publishe[s] profoundly misleading reports purporting to show impressively low rates of negative and harmful experiences by users of its Platforms." 2-SER-250 ¶6. For example, "Meta regularly publishes Community Standard Enforcement Reports (CSER or Reports) that boast very low rates of its

community standards being violated." 2-SER-322 ¶460. "Meta often amplifies the reach of the Reports . . . by announcing them through press releases." 2-SER-322 ¶462. "At the same time, Meta secretly maintained a parallel set of internal data showing shockingly *high* rates of harms experienced by users of its Social Media Platforms." 2-SER-250 ¶6 (emphasis in original). "Meta uses several surveys to measure the experiences of its users on its Platforms." 2-SER-323 ¶468. "Two of these surveys are the Tracking Reach of Integrity Problems Survey (TRIPS) and the Bad Experiences & Encounters Framework (BEEF)." *Id.* "Both are rigorous surveys used by Meta to poll users about their exposure to and interactions with negative or harmful aspects of the Platforms." *Id.* These surveys indicate that users have negative or harmful experiences on the platforms "at high rates." 2-SER-324 ¶470.

## III. Based on Section 230, the district court granted Meta's motion to dismiss certain aspects of the State AGs' unfairness claims.

The State AGs filed their enforcement action directly into ongoing multidistrict litigation in the Northern District of California between

19

Private Plaintiffs and social media company defendants, including
Meta.

Based on the facts alleged above, the State AGs brought both
unfairness and deception claims under their respective state consumer
protection laws as well as COPPA claims. The Private Plaintiffs raised
similar factual allegations to the State AGs, but primarily advanced
tort theories like negligence, product liability, and failure to warn. In
contrast, the State AGs exclusively relied on state consumer protection
theories and COPPA. *Compare* 4-ER-889–908 ¶¶832–955 *with* 2-SER-
391–446 ¶¶846–1171. Relying on Section 230, Meta first moved to
dismiss the Private Plaintiffs' tort claims. The district court held that
Section 230 barred the Private Plaintiffs' tort claims based on some
features but not others. The district court held that designing infinite
scroll, autoplay, ephemeral content, notifications about third-party
content, and the algorithms were functions that Meta engaged in in its
role as a publisher, and thus barred certain claims based on those
features. 5-ER-943–946.

However, the district court held that Section 230 did not bar
claims about Meta's failure to age-gate, notifications about its own

content, or appearance-altering filters because these features could be fixed without altering the way Meta publishes third-party content. 5-ER-941–943.

Despite dismissing the Private Plaintiffs' tort claims with respect to certain features, the district court held that the Private Plaintiffs' failure-to-warn claims could proceed with respect to all features because those claims sought to hold Meta liable not for its publication of content but for its "knowledge, based on public studies and internal research, of the ways that [its] products harm children." 5-ER-947.

After the district court ruled on the Private Plaintiffs' tort claims, Meta moved to dismiss the State AGs' consumer protection claims. Meta argued that the district court's conclusion—that Section 230 barred the Private Plaintiffs' tort claims as to certain features—should apply to the State AGs' unfairness claims insofar as they addressed the same features. 1-SER-145–149.

The district court applied its previous ruling—that Section 230 barred claims based on infinite scroll, autoplay, ephemeral content, notifications for third-party content, and the algorithms—to the State AGs' unfairness claims. 1-ER-72–76. In reaching this conclusion, the

district court held "that its prior analysis of Meta's platform features under a products liability theory leads to the same result under the States' unconscionability and unfairness theories for the purposes of Section 230." 1-ER-72, n.21. The district court's order on the Private Plaintiffs' tort claims had not specifically addressed whether claims regarding the quantification and display of Likes were barred by Section 230. 1-SER-34. However, the district court held that its prior ruling on notifications also covered Likes, and so dismissed the State AGs' unfairness claims based on the Like feature. 1-ER-73–74.

Meta's arguments largely conflated the Private Plaintiffs' failure-to-warn claims with the State AGs' deception claims. Although the State AGs did not bring a failure-to-warn cause of action, Meta argued that Section 230 barred failure-to-warn claims based on the features the district court had found to be publishing functions. Yet in its motion to dismiss, Meta identified only one allegation in the State AGs' complaint as supposedly articulating a failure-to-warn claim: a paragraph in which the State AGs stated that, in a blog post on Instagram's website explaining how the algorithms worked, Meta did not provide "warnings disclosing that the Recommendation Algorithms

. . . suggest content that is dangerous or harmful for young users." 1-SER-149–150. Meta did not identify any other allegations it believed constituted failure-to-warn claims.

Instead, Meta argued that the statements that formed the basis of the State AGs' deception claims constituted puffery, did not meet the pleading requirements of Rule 9(b), were immaterial, and implicated the *Noerr-Pennington* doctrine. 1-SER-151–163. Meta provided a 22-page appendix identifying these purported defects in 75 statements underlying the State AGs' deception claims. 1-SER-197–218. Throughout its motion and appendix, however, Meta raised no Section 230 concerns as to any of these statements.

Although the State AGs did not advance a failure-to-warn cause of action, the district court nevertheless held that failure-to-warn claims based on omissions about the challenged features were not barred by Section 230. 1-ER-78–83. With respect to the deception claims, it further noted that "as long as the [State AGs] have alleged *one* actionable misrepresentation, the deceptive acts and practices claims survive." 1-ER-84. The district court found that the State AGs had alleged not one, but many, actionable misrepresentations, and it

rejected Meta's arguments as to puffery, improper pleading under Rule 9, materiality, and the *Noerr-Pennington* doctrine. 1-ER-84–92.

## IV. Meta appealed the district court's non-final order partially denying its motion to dismiss.

The district court's order on Meta's motion to dismiss the State AGs' claims was a non-final, non-appealable order. Nevertheless, Meta appealed that order "to the extent [the district court] denied the Meta Defendants' motions to dismiss claims for failure to warn of alleged risks relating to certain platform features as barred by statutory immunity from suit pursuant to Section 230." 6-ER-1420. Because the order was not a final order, the State AGs moved to dismiss the appeal for lack of jurisdiction. No. 24-7032, Dkt. 36. At the same time, the State AGs noticed a conditional cross-appeal to preserve their rights to seek review of the district court's application of Section 230 to their unfairness claims, as this issue is inextricably intertwined with the issue Meta raised on appeal. 3-SER-490. A motions panel denied the motion to dismiss without prejudice to renewing the jurisdictional arguments and referred the case to a merits panel. No. 24-7032, Dkt. 82.

## STANDARD OF REVIEW

The State AGs' arguments on appeal are preserved. 1-SER-2–101, 1-ER-48–149.

This Court determines its own jurisdiction de novo. *Special Invs. Inc. v. Aero Air Inc.*, 360 F.3d 989, 992 (9th Cir. 2004). Jurisdiction must be established as a threshold matter, and "a federal court is duty-bound to determine its proper jurisdiction." *In re Martinez*, 721 F.2d 262, 264 (9th Cir. 1983).

A district court's decision to grant or deny a motion to dismiss is reviewed de novo. *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1090 (9th Cir. 2021). Courts "accept as true the allegations contained in the [complaint] and view them in the light most favorable to the [nonmoving party]." *Id.* at 1087. If the complaint "states 'a plausible claim for relief,' *i.e.*, if it permits 'the reasonable inference that the defendant is liable for the misconduct alleged,'" then the complaint will survive the motion to dismiss. *Id.* at 1090 (cleaned up).

## SUMMARY OF THE ARGUMENT

This Court should reject Meta's attempts to expand the reach of Section 230—both with respect to jurisdiction and with respect to the scope of defense it provides.

As a threshold matter, Section 230 does not afford the Court jurisdiction to consider Meta's appeal. The collateral order doctrine allows review of a non-final order only where an order (1) would not be effectively reviewable on final judgment and (2) is separate from the merits of the case. Meta can establish neither of these prerequisites.

If, however, this Court decides to hear Meta's appeal, it necessarily should also hear the State AGs' cross-appeal. The Court may exercise pendent appellate jurisdiction over issues when it is necessary to ensure meaningful review of, and the issues are inextricably intertwined with, the predicate appeal. Here, the State AGs' appeal meets both criteria.

If this Court reaches the merits, it should reverse the district court's dismissal of the State AGs' unfairness claims and affirm the district court's denial of dismissal of the State AGs' deception claims.

A Section 230 defense is available only as to claims that seek to hold the defendant liable for content provided by a third party. Because the State AGs' unfairness claims do not seek to hold Meta liable as a publisher or speaker of information provided by a third party, Section 230 does not apply. The unfairness claims allege that Meta designed and employed a suite of features for the purpose of addicting young users to its platforms, while knowing the harms these features would cause them. These claims do not depend in any way on the nature of the content that the challenged features feed to young users, but on the design and operation of the features themselves.

Regardless of whether Section 230 prohibits the State AGs' unfairness claims, it has no bearing on their deception claims. Meta mischaracterizes the State AGs' deception claims, conflating them with the Private Plaintiffs' failure-to-warn claims. However, because deception claims are based on a company's own misleading misconduct, they are not precluded by Section 230. Even where the State AGs' deception claims reference features addressed by their unfairness claims, the deception claims do not seek to hold Meta accountable as a publisher of information provided by a third party. Instead, those

27

claims arise from Meta's own knowledge of the safety risks of its platforms' features.

## ARGUMENT

I. **The Court should dismiss this entire appeal, or, in the alternative, exercise jurisdiction over both appeals.**

A. **The Court lacks jurisdiction over Meta's appeal of a non-final judgment.**

Meta asks this Court to break from well-established appellate procedure: to hold that online platforms are entitled to immediate appeal every time they lose a motion to dismiss based on Section 230. No court has *ever* held that Section 230 requires such a broad exception to the final judgment rule, and Meta provides no reason why the Court should hold otherwise here.

 Orders denying motions to dismiss are non-final orders. *See, e.g.*, *Figueroa v. United States*, 7 F.3d 1405, 1408 (9th Cir. 1993) ("Ordinarily, the denial of a 12(b)(6) motion is not a reviewable final order[.]"). Accordingly, courts of appeal almost never have jurisdiction over interlocutory appeals from these non-final decisions. 28 U.S.C. § 1291; *see also In re Rega Props., Ltd.*, 894 F.2d 1136, 1138 n.4 (9th Cir. 1990). The final judgment rule, which limits appellate jurisdiction

to orders fully disposing of cases in the district court, promotes judicial economy and efficiency. Indeed, "[i]f non-final decisions were generally appealable, cases could be interrupted and trials postponed indefinitely as enterprising appellants bounced matters between the district and appellate courts." *SolarCity Corp. v. Salt River Project Agric. Improvement & Power Dist.*, 859 F.3d 720, 723 (9th Cir. 2017).

As an end-run around this clear rule, Meta attempts to shoehorn its appeal into the collateral order doctrine. No. 24-7032, Dkt. 71, at 1, 6 (citing *Cohen*, 337 U.S. at 546). Yet, every court of appeals to have considered this issue has rejected Meta's position and held that the collateral order doctrine does not allow accelerated, piecemeal appellate review of decisions regarding Section 230 defenses. *See Gen. Steel Domestic Sales, L.L.C. v. Chumley*, 840 F.3d 1178, 1181–82 (10th Cir. 2016); *see also Jones v. Dirty World Entm't Recordings LLC*, No. 12-5133, 2012 WL 13418361 (6th Cir. May 9, 2012). This is for good reason, considering the Supreme Court's "repeated[]" admonitions that "the 'narrow' exception" of the collateral order doctrine "should stay that way." *Dig. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994). Meta's flawed reasoning to the contrary would render virtually

29

every action against an online platform immediately appealable, as of right, after that platform loses a motion to dismiss.

To fit within the strict confines of the collateral order doctrine, a non-final order must satisfy three requirements: the order must (1) "conclusively determine the disputed question"; (2) "resolve an important issue completely separate from the merits of the action"; and (3) "be effectively unreviewable on appeal from a final judgment." *Will v. Hallock*, 546 U.S. 345, 349 (2006). The district court's order plainly fails at least the second and third requirement.

## 1. The District Court's order is effectively reviewable upon final judgment.

Meta can effectively seek review of the district court's denial of its Section 230 defense after final judgment for two reasons: *first*, Section 230 provides a defense from liability, rather than an immunity from suit; and *second*, allowing the case to proceed to trial does not "imperil a substantial public interest." *Will*, 546 U.S. at 349, 353.

### a. Section 230 provides a defense to liability, not an immunity from suit.

As the Tenth Circuit has squarely held, Section 230 "provides immunity from liability, not suit." *Chumley*, 840 F.3d at 1179–80.

Orders denying Section 230 defenses are thus reviewable on appeal after final judgment and "do[] not qualify under the collateral order doctrine." *Id.* at 1180–81.

The same should be true in the Ninth Circuit. When a rule of law operates as an "implied limitation as to the reach of the applicable law," such that its application "circumscribe[s] the reach of the cause of action," it is a merits defense to liability. *Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 711 F.3d 1136, 1139 (9th Cir. 2013). A district court's denial of a defense to liability is, of course, not immediately appealable. *Miranda B. v. Kitzhaber*, 328 F.3d 1181, 1190 (9th Cir. 2003). Conversely, "immunity doctrines"—such as absolute, Eleventh Amendment, tribal, and foreign sovereign immunity, as well as the Double Jeopardy Clause—"entitle the defendant to avoid facing suit and bearing the burdens of litigation." *Nunag-Tanedo*, 711 F.3d at 1140. A denial of such an immunity may be reviewable under the collateral order doctrine, *Miranda B.*, 328 F.3d at 1190, if the continuation of proceedings would also imperil a substantial public interest, *see infra* Section I(A)(1)(b).

Because any legal rule that may preclude or narrow the contours of liability can in some sense be interpreted as providing a kind of protection against trial, the Supreme Court has admonished "courts of appeals to view claims of a 'right not to be tried' with skepticism." *Dig. Equip. Corp.*, 511 U.S. at 873. True immunity-from-suit cases are limited to those featuring an "explicit statutory or constitutional guarantee that trial will not occur." *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 801 (1989).

Section 230 contains no such explicit guarantee that a *trial* will not occur; on the contrary, its plain language provides only a defense from liability as to certain *claims. See Chumley*, 840 F.3d at 1182 ("The CDA does not contain such language."); *see also Chi. Lawyers' Comm. for Civil Rts. Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 669 (7th Cir. 2008) (Section 230 "does not mention 'immunity' or any synonym."). Specifically, subsection (c)(2) provides that "[n]o provider or user of an interactive computer service shall be *held liable* on account of" certain actions, thus explicitly conferring a defense to liability. 47 U.S.C. § 230(c)(2) (emphasis added). True, subsection (e)(3) states that "[n]o cause of action may be brought and no liability may be

imposed under any State or local law that is inconsistent with this section." *Id.* § 230(e)(3). However, courts have held that this subsection is a preemption clause that clarifies that Section 230's defense to liability applies even in cases brought pursuant to state or municipal (as opposed to federal) law. *See Chumley*, 840 F.3d at 1182 (rejecting argument that subsection (e)(3) confers immunity from suit); *see also Lemmon*, 995 F.3d at 1090 (subsection (e)(3) "explicitly preempt[s] any [inconsistent] state or local law."); *Est. of Bride ex rel. Bride v. YOLO Techs., Inc.*, 112 F.4th 1168, 1175 (9th Cir. 2024) (same). Subsection (e)(3)'s "[n]o cause of action may be brought" language does not transform Section 230's defense from liability into immunity from suit.

Because Section 230, on its face, limits the reach of applicable law and circumscribes litigants' ability to hold online platforms liable for particular, specified types of conduct, it is a defense from liability not subject to the collateral order doctrine. *Cf. Nunag-Tanedo*, 711 F.3d at 1139–40 (holding that a First Amendment defense circumscribed liability and thus did "not confer a right not to stand trial"). This conclusion accords with the fact that Section 230 concerns private

entities, rather than government actors, who are the typical beneficiaries of immunity from suit. *See Chumley*, 840 F.3d at 1182.

The Court should reject Meta's invitation to depart from this straightforward analysis. Meta first points to Section 230's policy objectives. *See* Op. Br. at 27–28 (citing 47 U.S.C. § 230(b)(1)–(4)). But far from requiring a reading of the statute that provides immunity from suit, as Meta contends, these objectives simply explain Congress's impetus for circumscribing online platforms' liability. The rationales—including "promot[ing] the continued development of the Internet"; encouraging technologies to "maximize user control over what information is received by individuals, families, and schools," and "empower[ing] parents to restrict their children's access to objectionable or inappropriate online material"—have nothing to say about whether online platforms should be permitted fast-track appeals out of the ordinary course of litigation in order to avoid the normal burdens faced by all litigants. Neither does caselaw describing the breadth of the protections provided by Section 230 or applying Section 230 to Meta's platforms. These cases examine the scope of activity protected from liability pursuant to Section 230, not the question of

whether those protections afford an immunity from suit altogether. *See* Op. Br. at 31–32 (citing, among others, *Force v. Facebook, Inc.*, 934 F.3d 53, 65 (2d Cir. 2019); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122–24 (9th Cir. 2003); *Zeran v. Am. Online, Inc.*, 129 F.3d 327 (4th Cir. 1997)).

Meta next incorrectly states that this "Court has repeatedly held that Section 230 confers on online service providers like Meta a broad federal immunity from suit." Op. Br. at 30. Not so. Whether the collateral order doctrine encompasses an immediate appeal of a Section 230 defense is an issue of first impression in this Court, which has never had occasion to analyze this question.

In arguing that Section 230 confers broad immunity from suit, Meta attempts to sow confusion by relying on dicta appearing in appeals brought after final judgment. *See* Op. Br. at 26–30, 32–33 (citing *Bride*, 112 F.4th 1168; *Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1174 (9th Cir. 2009); *Barnes v. Yahoo!, Inc.,* 570 F.3d 1096, 1100–01 (9th Cir. 2009); *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC,* 521 F.3d 1157, 1174–75 (9th Cir. 2008); *Carafano*, 339 F.3d at 1123–25; *Jones v. Dirty World Entm't*

35

*Recordings LLC*, 755 F.3d 398, 407, 417 (6th Cir. 2014); *Klayman v. Zuckerberg*, 753 F.3d 1354, 1355, 1360 (D.C. Cir. 2014); *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009)).[6] In those cases, this Court and others referred in passing to Section 230 as both an immunity and a defense to liability, without considering or analyzing the issue of appealability, which was of no relevance to the matters before them. *See, e.g.*, *Barnes*, 570 F.3d at 1100 (Section 230 is a "statutory bar on liability"); *Roommates.com*, 521 F.3d at 1162 (Section 230 "immunizes . . . against liability."); *cf. Nunag-Tanedo*, 711 F.3d at 1140 ("Although we have repeatedly characterized the protection afforded by *Noerr-Pennington* as a form of 'immunity,' the use of the term 'immunity' in this context signals immunity from liability, not from trial.") (citations omitted). But

---

[6]     Meta also cites district court opinions granting motions to dismiss, which of course did not—and could not—address the propriety of an appeal under the collateral order doctrine. *See* Op. Br. at 30 (citing *Republican Nat'l Comm. v. Google, Inc.*, No. 2:22-CV-01904-DJC-JBP, 2023 WL 5487311 (E.D. Cal. Aug. 24, 2023); *Zuffa, LLC v. Justin.tv, Inc.*, 838 F. Supp. 2d 1102, 1107 (D. Nev. 2012)).

Further, Meta's reliance on *Jones* is particularly inapt, as the Sixth Circuit rejected the defendant's earlier attempt to bring a premature appeal of the denial of its motion to dismiss under the collateral order doctrine. *Compare Jones*, 755 F.3d at 407, *with Jones*, 2012 WL 13418361.

36

"unstated assumptions on non-litigated issues are not precedential holdings binding future decisions." *Guerrero v. RJM Acquisitions LLC*, 499 F.3d 926, 938 (9th Cir. 2007) (citations omitted); *see also Chumley*, 840 F.3d at 1181 & n.2 (application of collateral order doctrine to Section 230 is "issue of first impression" even though court had previously described statute "as providing immunity from suit" because "issue was not before [the court]").

The only courts to have actually analyzed whether the collateral order doctrine encompasses appeals of Section 230 defenses have answered in the negative, and Meta has provided no reason for this Court to reach a different outcome here.

### b. Continuation of proceedings in the district court would not imperil any substantial public interest.

Even if Section 230 could be read to provide an immunity from suit—which it does not—that does not end the inquiry. *See Will*, 546 U.S. at 353 ("[I]t is not mere avoidance of a trial, but avoidance of a trial that would imperil a substantial public interest, that counts when asking whether an order is 'effectively' unreviewable."). Meta has not shown that allowing the claims to proceed to trial would imperil a

substantial public interest. Where the "hardship imposed by postponing review is 'the need to prepare for trials,'" this is not enough to outweigh the "societal interests advanced by the ordinary operation of final judgment principles." *Childs v. San Diego Family Hous. LLC*, 22 F.4th 1092, 1097 (9th Cir. 2022) (cleaned up); *see also Will*, 546 U.S. at 352 (noting that circumstances that would imperil a substantial public interest involve "some particular value of a high order" and pointing to the "denial of absolute Presidential immunity").

Evaluating the exact question at issue here, the Sixth Circuit held that no substantial public interest would be imperiled by the continuation of proceedings after a district court denied a Section 230 defense. *Jones*, 2012 WL 13418361, at *1–2. This result makes good sense: a commercial entity's interest in avoiding litigation—even if expensive and protracted—pales in comparison to the interests that the Supreme Court has said are worthy of such treatment. *See Will*, 546 U.S. at 352–53. Those interests, including the constitutional separation of powers, preserving government efficiency in enforcing the law, and respecting state and foreign governments' dignitary interests, *see id.*, ensure that important governmental and societal norms

38

endure, a far cry from private corporations ensuring that they can raise arguments they lost in the district court at the first available moment.

To be sure, Section 230 embodies certain policy goals, as do all statutes. But as discussed above, *supra* Section I(A)(1)(a), the policy considerations that drove Congress to enact Section 230, including supporting the growth of the internet and protecting children and families, are entirely consistent with Section 230 providing a defense to liability. Pointing to the general purposes of a statute, as Meta does, *see* Op. Br. at 27–28, is insufficient to demonstrate a substantial public interest in reviewing the denial of Meta's Section 230 defense *now*, rather than waiting for a final judgment. Moreover, Meta's warning that requiring it to fully participate in litigation would somehow "chill" third-party speech is both unsupported and belied by the fact that even a denial of a motion to dismiss on the basis of the First Amendment is not immediately appealable under collateral order doctrine. *Nunag-Tanedo*, 711 F.3d at 1141.[7]

---

[7]    Indeed, Meta has not asked the district court for a stay of proceedings or any similar form of relief, in direct contradiction to its

These ordinary policy objectives—akin to those present in myriad federal and local statutes—and vague concerns of chilled speech are a far cry from the specific and weighty "value[s] of a high order" that courts have deemed sufficiently substantial to forgo the final judgment rule and allow immediate appeals. *Will*, 546 U.S. at 352. As the only court to have addressed this issue has found, *Jones*, 2012 WL 13418361, at *1–2, the desire to be shielded from the burdens of litigation does not constitute a substantial public interest worthy of permitting piecemeal appellate jurisdiction over each and every case in which Section 230 is at issue.

### 2. Meta's Section 230 defense is not separate from the merits.

The collateral order doctrine is reserved for issues that are "separate from the merits," meaning that they do not bear on "whether the plaintiff's claim will succeed." *Batzel v. Smith*, 333 F.3d 1018, 1025 (9th Cir. 2003). Such issues include, for example, sovereign immunity, *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993), and a party's entitlement to security for attorney's fees,

---

position in this appeal that its participation in such proceedings is overly burdensome or inappropriate.

*Cohen*, 337 U.S. at 545–47. These issues do not require a court of appeals to evaluate an "ingredient of the cause of action" before the district court has rendered a final judgment. *See Cohen*, 337 U.S. at 546–47.

This Court has repeatedly rejected attempts to invoke the collateral order doctrine where the issue on appeal overlaps with the merits. In *Nunag-Tanedo*, the Court held that a denial of a motion to strike claims under the *Noerr-Pennington* doctrine was not immediately appealable because the question of whether defendant's actions qualified as petitioning activity under that doctrine was "part and parcel of the merits of the plaintiffs' action." 711 F.3d at 1138–39 (holding no jurisdiction because the *Noerr-Pennington* inquiry "merges into the merits of the liability determination"). In *Miranda B.*, the Court held that it lacked jurisdiction under the collateral order doctrine over the denial of the argument that the ADA and the Rehabilitation Act foreclosed a remedy under § 1983 because that decision amounted to a denial of a defense to the merits of the case. 328 F.3d at 1190.

Meta likewise seeks review of an issue that is intertwined with the merits of this case. Meta contends that the State AGs' claims seek to hold Meta liable for activities it supposedly conducted as a publisher of third-party content on Meta's social media platforms. But that defense is enmeshed with the merits of the State AGs' underlying claims that Meta is liable for *that very same conduct*. Because the former cannot be considered without engaging with the latter, the Section 230 inquiry "merges into the merits of the liability determination," and the collateral order doctrine does not apply. *See Nunag-Tanedo*, 711 F.3d at 1139.

*   *   *

Because a denial from a motion to dismiss is a non-final order and the collateral order doctrine does not apply to this appeal, there is no appellate jurisdiction.

### B.    If this appeal is not dismissed, the Court has pendent jurisdiction to consider the State AGs' cross-appeal.

Meta's appeal should be dismissed, but if this Court decides to hear it, it necessarily should also hear the State AGs' conditional cross-appeal. A court may exercise pendent appellate jurisdiction over an

"otherwise non-appealable ruling" when that ruling is either "inextricably intertwined with or necessary to ensure meaningful review of the order properly before [the court]." *Arc of California v. Douglas*, 757 F.3d 975, 992–93 (9th Cir. 2014) (quotation omitted). District court rulings are inextricably intertwined "when the legal theories on which the issues advance [are] . . . so intertwined that" courts "must decide the pendent issue in order to review the claims properly raised on interlocutory appeal." *Id.* (alterations in original). Pendent jurisdiction over the otherwise non-appealable district court ruling is necessary to ensure meaningful review when that ruling "ha[s] much more than a tangential relationship to the decision properly before [the court]." *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 669 (9th Cir. 2004). The State AGs' conditional cross-appeal qualifies under both tests.

Meta's own framing of its appeal makes plain the connection between the two rulings at issue. Meta seeks to appeal the district court's orders "to the extent that they denied [Meta's] motion to dismiss claims for failure to warn of alleged risks relating to certain platform features . . . when [other] claims targeting the same

43

underlying platform features are barred by Section 230." 6-ER-1420. Accordingly, in its opening brief, Meta argues that the district court erred by "permitting plaintiffs to circumvent" Section 230 after "correctly determin[ing] that the features at issue constitute protected publishing activity." Op. Br. at 17. Throughout the brief, Meta relies on the idea that the State AGs' deception claims seek to hold it liable for harms derived from such protected platform features, *see, e.g.*, *id.* at 20, 25–26, 33–37, 40–41, 49, devoting an entire section to defending the district court's ruling as to those features, *id.* at 21–25. Meta's appeal thus turns on the question raised by the State AGs' cross-appeal: whether the district court erred in dismissing the State AGs' unfairness claims based on these same features.

The issue the State AGs seek to raise on cross-appeal is thus both inextricably intertwined with and necessary to ensure meaningful review of the question raised by Meta's appeal. Because Meta's arguments on appeal depend on the Court affirming the district court's unfairness ruling, Meta's appeal is "intrinsic[ly] link[ed]" to the issue the State AGs seek to raise. *See Poulos*, 379 F.3d at 670. Therefore, the Court must decide the State AGs' unfairness claims "in order to

review" Meta's deception issue, making the issues inextricably intertwined. *See Arc of California*, 757 F.3d at 993. Further, the State AGs' unfairness issue is logically antecedent to the issue Meta raises on appeal. If Section 230 does not bar the unfairness claims against certain of Meta's platform features, Meta's argument on appeal necessarily fails. The ruling the State AGs seek to conditionally cross-appeal therefore stands in "much more than a tangential relationship" with the decision Meta seeks to challenge, and the Court should exercise pendent jurisdiction to hear it. *See Poulos*, 379 F.3d at 669.

## II. The district court erred in partially dismissing the State AGs' unfairness claims under Section 230.

Relying on its prior order addressing the Private Plaintiffs' tort claims, the district court held that Section 230 barred the State AGs' unfairness claims with respect to the following features: (1) Meta's algorithms, (2) infinite scroll and autoplay, (3) ephemeral content, (4) notifications for third-party content, and (5) Likes. Contrary to the district court's ruling, however, the State AGs' unfairness claims do not seek to hold Meta liable as a publisher or speaker of information provided by a third party—indeed, they do not seek to hold anyone

45

liable for any information or content at all. The district court therefore erred in dismissing those claims pursuant to Section 230.

### A. Meta's Section 230 defense fails because the State AGs' unfairness claims do not seek to hold Meta liable as a publisher or speaker of third-party information.

Section 230—"Protection for 'Good Samaritan' blocking and screening of offensive material"—protects an internet platform from liability only for those claims that seek to hold it liable as a publisher of third-party content—not for its own conduct. Section 230 provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). It further provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.* § 230(e)(3).

Construing these provisions, this Court has developed a three-part test: Section 230 "only protects from liability (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of

information provided by another information content provider."

*Barnes*, 570 F.3d at 1100–01.

The Parties do not dispute that Meta is a provider of an interactive computer service. But Meta has failed to satisfy the second and third prongs of the *Barnes* test because the State AGs' unfairness claims do not seek to hold Meta liable as a publisher or speaker of information provided by another information content provider.

### 1. Meta fails to establish that the State AGs' unfairness claims seek to hold it liable as a publisher or speaker.

Because the State AGs' unfairness claims do not seek to hold Meta accountable as a publisher, its Section 230 defense cannot meet the second prong of the *Barnes* test. The second prong asks whether the underlying theory of liability "stems 'from the defendant's status or conduct as a publisher or speaker.'" *Lemmon*, 995 F.3d at 1091 (quoting *Barnes*, 570 F.3d at 1107). Where a claim seeks to impose liability on an internet service provider for publishing third-party speech, Section 230 precludes liability.

Here, the State AGs focus solely on Meta's design of its platforms.

The State AGs summarized their unfairness claims against Meta as

follows:

> 847. Meta engaged in unfair and unconscionable
> acts and practices, including the following unfair
> and/or unconscionable acts and practices, in
> connection with young users' use of and/or
> addiction to Meta's Social Media Platforms:
>
> a.      Meta targeted its Social Media Platforms to
> young users while knowingly designing its Social
> Media Platforms to include features that Meta
> knew to be psychologically and physically
> harmful . . . ;
>
> b.      Meta utilized Social Media Platform
> features . . . include[ing] infinite scroll, ephemeral
> content features, autoplay, quantification and
> display of "Likes," and disruptive alerts, all of
> which were unfairly and/or unconscionably
> utilized by Meta to extract additional time and
> attention from young users;
>
> c.      Meta designed, developed, and deployed
> disruptive audiovisual and vibration notifications
> and alerts and ephemeral content features in a
> way that unfairly and/or unconscionably
> exploited young users' psychological
> vulnerabilities . . . ;
>
> d.      Meta algorithmically served content to
> young users, according to "variable reinforcement
> schedules," thereby manipulating dopamine
> releases in young users, unfairly or

48

unconsciably inducing them to engage
repeatedly with its products . . . ; and

e.     Meta collected the personal information of
under-13 users of Instagram and Facebook
without first obtaining verifiable parental
consent, which violated COPPA and the COPPA
Rule.

2-SER-392–393 ¶847. These claims do not implicate Meta's status as

speaker or publisher of *any* particular content or information, much

less any provided by a third-party, nor is there any reference to such

content in the hundreds of subsequent allegations asserting each

state's specific unfairness claims. 2-SER-395–445 ¶¶460–1167.

As this Court addressed at length in *Lemmon*, a claim that an

internet platform designed a harmful or dangerous product "differs

markedly from" a claim targeting the company's role as a "publisher[]

as defined in the CDA." 995 F.3d at 1092 (holding that parents' claim

that a social media provider's design of its platform caused their

children's death did not implicate the social media provider's role as a

publisher). There, the Court reasoned that manufacturers must

"refrain from designing a product that poses an unreasonable risk of

injury or harm to consumers." *Id.* But it noted that "entities acting

solely as publishers" have no similar obligation. *Id.* Because a claim

asserting that a company designed a harmful product does not hold the defendant liable as a publisher or speaker, there is no Section 230 protection. *Id.* at 1093.

This same reasoning applies to the State AGs' unfairness claims, which allege that Meta designed and employed a sophisticated, psychologically-manipulative suite of features for the purpose of addicting young users to its platforms, while knowing the harm these features would cause them. As in *Lemmon*, those claims do not "seek[] to treat [Meta] as a publisher or speaker." 995 F.3d at 1091 (quotation omitted). Because the State AGs' "claim[s] do[] not seek to hold [Meta] responsible as a publisher or speaker, but merely 'seek to hold [Meta] liable for its own conduct, principally for *the creation* of [unsafe features],' § 230(c)(1) immunity is unavailable." *Id.* at 1093 (emphasis in original).

> ### 2. Meta fails to establish that the State AGs' unfairness claims seek to hold Meta liable for third-party content.

Meta's Section 230 argument also fails the third *Barnes* prong, which asks whether the claim is based on information provided by another information content provider.

As a preliminary matter, the district court erred by failing to separately analyze and apply the third prong of the *Barnes* test. Although the second and third prongs can appear to overlap, *Barnes* is a conjunctive test, so all three prongs must be met for Section 230 to protect Meta from liability. The district court noted the overlap of the two prongs and concluded that "[n]o further articulation is required." 5-ER-939. This, in and of itself, is reversible error. Had there been an analysis of the third *Barnes* prong, Meta's Section 230 defense would have failed.

Applying the third *Barnes* prong, *Lemmon* rejected the defendant's Section 230 defense, holding that "§ 230(c)(1) cuts off liability only when a plaintiff's claim faults the defendant for information provided by third parties." 995 F.3d at 1093. This Court explained that the plaintiffs' "claim [did] not turn on information provided by another information content provider" in that it "[did] not depend on what messages, if any, a Snapchat user employing the Speed Filter actually sen[t]" or, more specifically, on "the content of [the late teenager's] particular snap." *Id.* at 1093–94 (internal quotation marks omitted). This Court noted that social media

companies "continue to face the prospect of liability, even for their 'neutral tools,' so long as plaintiffs' claims do not blame them for the content that third parties generate with those tools." *Id.* at 1094.

Like the plaintiffs in *Lemmon*, the State AGs do not seek to hold Meta accountable as an intermediary for third-party information. The State AGs focus on Meta's own choices to craft and develop features that induce compulsive use and addiction. The harms from these features do not flow from the nature of the content, but rather the features themselves—features that work exactly as Meta intended after meticulous study of the developing brain.

This Circuit's body of caselaw confirms that a Section 230 defense requires that the plaintiff's claims rest on the existence of some harmful content provided by a third party. For example, "[a] clear illustration of a cause of action that treats a website proprietor as a publisher is a defamation action founded on the hosting of defamatory third-party content." *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851 (9th Cir. 2016) (citing *Carafano*, 339 F.3d 1119). The Court has also found Section 230 provides a defense to claims that a website was responsible for communications between the decedent and a third-

party drug dealer that supplied him fentanyl, *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093 (9th Cir. 2019); from claims that a website was liable for misleading reviews and ratings provided by third parties, *Kimzey v. Yelp! Inc.*, 836 F.3d 1263 (9th Cir. 2016); and from negligence claims based on offensive fake profiles posted by a third-party user, *Barnes*, 570 F.3d at 1101. In each of these cases, the plaintiff's claims rested on some sort of harmful content or information provided by a third party.

Where, as here, however, the claims do not rest on allegations regarding harmful third-party content, this Circuit's cases establish that there is no Section 230 defense. *See, e.g.*, *Lemmon*, 995 F.3d at 1093 (social media company did not have a Section 230 defense where parents' negligent design claim relied solely on Snap's design and architecture); *Internet Brands*, 824 F.3d at 851 (networking site for models was not immune where plaintiff sought to hold the site liable for "failing to warn her about information it obtained from an outside source about how third parties targeted and lured victims through [the website]"); *Roommates.com*, 521 F.3d at 1165, 1173 (roommate-matching website was not immune from claims asserting Fair Housing

53

Act violations based on questions the site posed to its users, but did have a defense to claims based on discriminatory information users provided in an "Additional Comments" section).[8]

The State AGs' unfairness claims similarly do not allege the existence of any harmful content. Rather the claims allege that Meta's

---

[8] Many recent state court decisions confirm that Section 230 bars liability only where the claims rely on harmful third-party content. In *District of Columbia v. Meta Platforms Inc., et al.*, the court rejected the same arguments made by Meta here and concluded that "Section 230 is thus properly understood as protection for social media companies and other providers from 'intermediary' liability—liability based on their role as mere intermediaries between harmful content and persons harmed by it." No. 2023-CAB-6550 (D.C. Super. Ct., Sept. 9, 2024) (Order Denying Mot. To Dismiss at 16). Other state courts have held similarly. *See State of Vermont v. Meta Platforms, Inc.,* No. 23-CV-4453 (Vt. Super. Ct., July 28, 2024) (Order Denying Mot. To Dismiss at 15–16); *Nevada v. Tiktok, Inc.,* No. A-24-886127-B (Nev. Dist. Ct., Sept. 24, 2024) (Order Denying Mot. To Dismiss at 99); *Utah Div. of Consumer Prot. v. Tiktok, Inc.,* No. 230907634 (Utah Dist. Ct., Nov. 12, 2024) (Order Denying Mot. To Dismiss at 13); *Commonwealth of Massachusetts v. Meta Platforms Inc., et al.,* No. 23-2397-BLS1 (Mass. Super. Ct., Oct. 17, 2024) (Order Denying Mot. To Dismiss); *Utah Div. of Consumer Prot. v. TikTok, Inc.,* No. 240904292 (Utah Dist. Ct., Feb. 20, 2025) (Order Denying Mot. To Dismiss at 9–10); *Dist. of Columbia v. TikTok, Inc.,* No. 2024-CAB-006377 (Super. Ct. D.C., Feb 25, 2025); *State of Washington v. TikTok, Inc., et. al.*, No. 24-2-23100-5 SEA (Super. Ct. Wash., Mar. 28, 2025); *South Carolina v. TikTok, Inc.*, No. 2024-CP-40-06018 (Ct. of Com. Pleas S.C., May 6, 2025); *State of Illinois v. TikTok Inc., et. al*, No. 2024CH09302 (Cook Cty. Cir., June 21, 2025) (Order Denying Mot. To Dismiss at 15).

addictive design features are inherently harmful, regardless of the specific content delivered.

### B. The district court erred in concluding that Section 230 provided Meta a defense to the State AGs' unfairness claims with respect to certain of its design features.

The district court incorrectly concluded that Section 230 applied because addressing the State AGs' claims would require Meta to publish less third-party content. *See, e.g.*, 5-ER-943. To the contrary, as evidenced by the State AGs' complaint, Meta could remedy the harms caused by the features at issue without making changes to content posted by third parties.

As a threshold matter, this Court has repeatedly emphasized the limits of Section 230—a claim does not treat a defendant as a publisher merely because publication is relevant to the claim or a but-for cause of the plaintiff's harm. *Internet Brands, Inc.*, 824 F.3d at 853. "Congress has not provided an all purpose get-out-of-jail-free card for businesses that publish user content on the internet." *Id.*; *see also Barnes*, 570 F.3d at 1100 (Section 230 does not create "a general immunity from liability deriving from third-party content"); *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019) ("It is not

enough that third-party content is involved; *Internet Brands* rejected use of a 'but-for' test that would provide immunity under the CDA solely because a cause of action would not otherwise have accrued but for the third-party content."). Instead, courts ask whether the alleged harm could be remedied "without changes to the content posted by the website's users and without conducting a detailed investigation." *Internet Brands, Inc.*, 824 F.3d at 851. If the answer is "yes," Section 230 does not apply.

Despite acknowledging this law generally, the district court erred by incorrectly finding that specific features implicated Meta's status as a publisher or would require it to alter third-party content.

### 1. Claims targeting Meta's addictive algorithms do not stem from Meta's status as a publisher.

Creating algorithms with the purpose of inducing compulsive use is a product design choice, not a publishing act. Meta crafted algorithms that could learn from users how to addict them to its platforms, regardless of the content shown. The district court misunderstood the State AGs' claims as seeking to hold Meta accountable for the use of algorithms to curate content, when the State

AGs actually seek to hold Meta accountable for inducing young people's compulsive use and addiction, distinct from any publishing activity. The district court held that "[w]hether done by an algorithm or an editor," determining "whether, when, and to whom to publish third-party content" is a "traditional editorial function[] that [is] essential to publishing." 5-ER-945–946. In determining that use of recommendation algorithms constituted a traditional editorial function, the district court relied on the Second Circuit's decision in *Force*, 934 F.3d 53. However, *Force* is distinguishable. There, the plaintiffs sued Facebook for connecting users to terrorist content. *Id.* at 59 ("[P]laintiffs claim[] Facebook enables Hamas 'to disseminate its messages directly to its intended audiences.'"). Here, the State AGs' unfairness claims in no way depend on what content Meta's algorithms recommend to young users. 2-SER-261 ¶65 ("These algorithms do not promote any specific message by Meta."). Rather, the very fact that Meta uses addictive algorithms is harmful. 2-SER-278 ¶161 ("By algorithmically serving content to young users according to variable reward schedules, Meta manipulates dopamine releases in its young

users, inducing them to engage repeatedly with its Platforms—much like a gambler at a slot machine.").

Meta seeks to obscure the harm its algorithms cause. It argues that its recommendation algorithms "facilitate when, how, and to whom third-party content will be provided," which it describes as "quintessential publishing activities." Op. Br. at 23. But this characterization misrepresents the function of Meta's algorithms. Unlike the publisher of a newspaper, Meta does not simply decide which content should go where on its platforms. Instead, its algorithms learn each user's vulnerabilities and exploit them to increase engagement—the purpose is not to promote any particular message or viewpoint, but to trap users on the platform.

Contrary to the district court's ruling, the harm caused by Meta's use of algorithms to addict young users could be remedied without changing any content provided by any third-party user. 5-ER-946. For example, Facebook could return to its original news feed, which simply showed users posts by their friends in chronological order. 2-SER-268 ¶88. Making this change would not require Meta to alter or remove any user-generated content. Nor would it prohibit any user from

finding and viewing any other user's content. The State AGs seek to hold Meta accountable for the ways the algorithms induce compulsive use and addiction, which can be cured without "changes to the content posted by [Meta]'s users." *See Internet Brands, Inc.*, 824 F.3d at 851.

### 2. Claims targeting features that encourage continued use, such as infinite scroll and autoplay, do not stem from Meta's status as a publisher.

Inducing users to continue using the platforms by providing continuous streams of content is not a traditional publishing function. Infinite scroll and autoplay are "teasing" features. As the algorithm conditions users to expect and crave intermittent variable rewards, the infinite scroll and autoplay features tease the next piece of content to trigger the brain so young users cannot disengage from a never-ending stream of content. It does not matter what the content is—it could be violence or it could be puppies playing—what is key is that the stream does not end.

The district court held that addressing the harms caused by infinite scroll "would necessarily require [Meta] to publish less third-party content" and so "would inherently limit what [Meta] [is] able to publish." 5-ER-943. Similarly, the district court held that addressing

the harms caused by the auto-play feature "would necessarily require defendants to publish less third-party content." 1-ER-72.

Not so. If Meta were to eliminate the infinite scroll feature, it would not prohibit any third-party user from posting an unlimited number of photos, videos, and other content to its platforms at any time. Nor would it limit any user's ability to see that content immediately on the creator's profile. The only thing that would change is that users would be able to see a single post without seeing the top portion of the next post in their Feed, 2-SER-268 ¶92, and that users might stop seeing new information when they had viewed all new posts from their peers, 2-SER-310 ¶377.

Similarly, eliminating the autoplay feature would not require Meta to take down any videos. Nor would it prevent a user from seeing any video posted by a third-party on their feed. The only difference would be that the video would not start playing automatically. Because addressing the harm caused by the infinite scroll and autoplay features would not require "changes to the content posted by [Meta]'s users," the State AGs' unfairness claims regarding those features do not

implicate Meta's role as a publisher. *See Internet Brands, Inc.*, 824 F.3d at 851.

### 3. Claims targeting ephemeral design features that induce users to return to a platform do not stem from Meta's status as a publisher.

Providing users the option to make their content ephemeral is not a publishing act, but rather a design functionality. "Meta designed ephemeral content features in its Social Media Platforms, such as Stories or Live, to induce a sense of FOMO in young users." 2-SER-312 ¶389. Meta's decision to do so is a design choice—providing a functionality to users—not a publishing decision. The State AGs' claims target the addictive impact of this design choice, independent of any content that users might post using these features.

The district court again failed to see the distinction that the State AGs have drawn throughout their complaint—holding Meta accountable for the addictive impact of content-neutral design features rather than the harm of the content or its publication. The district court held that claims based on Meta's ephemeral content features were barred by Section 230 because "[e]ditorial decisions such as determining . . . how long to publish content are 'traditional editorial

61

functions' immune under Section 230, where exercised with regard to third-party content." 5-ER-945; Op. Br. at 24. The AGs do not dispute that the *New York Times* deciding how long to leave an article on its website before removing the article is an editorial decision and thus a traditional publishing function. But that is not what Meta is doing here. Meta is not choosing what content is displayed or for how long— the users make that choice. Instead, Meta is providing a feature designed to compel users to remain engaged with the platform.

Meta could address the harms caused by ephemeral design features without making "changes to the content posted by [its platforms'] users." *Internet Brands, Inc.*, 824 F.3d at 851. For example, were Meta to eliminate the Stories feature—which automatically removes content after 24 hours—users of Meta's platforms could still post the same pictures or video that they otherwise would have posted using the Stories feature. The only difference would be that Meta would not be the provider of the functionality for content to automatically disappear after 24 hours. If the user wanted to keep the content up for only a short time period, that would be their choice. The

user could simply delete the content from their profile whenever they no longer wanted it to be visible.

### 4. Claims targeting the use of notifications to lure users back to the platforms do not stem from Meta's status as a publisher.

Disrupting users with visual and haptic alerts is a tactic designed to pull users back to Meta's platforms and has no effect on how content is published. The State AGs do not allege that Meta's notifications alert users to harmful content. Rather, they claim that "[b]y sending notifications to young users, Meta causes young users' smartphones to produce audiovisual and haptic alerts that distract from and interfere with young users' education and sleep." 2-SER-301 ¶315. The State AGs also allege that Meta makes it difficult for users to disable notifications. 2-SER-301 ¶317, 2-SER-302 ¶323, 2-SER-303 ¶325–26. In other words, the State AGs are challenging the design of the notifications feature, not Meta's decision to notify users about any specific content. The district court thus erred by holding that Section 230 bars the State AGs' unfairness claims regarding notifications. 5-ER-945; 1-ER-73.

Because the State AGs' claims do not challenge Meta's decision to notify users about any specific content, Meta could address the harms alleged in the complaint without making "changes to the content posted by [its platforms'] users." *Internet Brands, Inc.*, 824 F.3d at 851. For example, Meta could change its default settings for notifications or make the settings easier to navigate so users could exercise more control over their notifications. 2-SER-301 ¶317, 2-SER-302 ¶323, 2-SER-303 ¶325–26. Or Meta could adjust the frequency with which it pushes notifications, so that those notifications do not interfere with young users' education and sleep. 2-SER-301 ¶315. None of these changes would require Meta to alter or remove any third-party content.

### 5. Claim targeting the Likes feature do not stem from Meta's status as a publisher.

Providing features that allow users to react to content is distinct from the act of publishing. The State AGs do not argue that Meta is responsible for content posted by third-party users simply because Meta created the Like feature. 2-SER-289 ¶227. For example, were a user to Like a distasteful post, the State AGs would not argue that Meta had endorsed that post by creating the Like feature. Instead, the

64

State AGs allege that the "display of Like counts on each piece of content on Instagram and Facebook" "exacerbate[s] social comparison" and harms young users' mental health. 2-SER-289 ¶226.

The district court erred by failing to consider these allegations in its analysis of the Like feature. The district court held that because "[t]he aggregation of 'Likes' is a content-neutral means of displaying a form of third-party content on Meta's platforms," "[t]he States' allegations regarding 'Likes' do not survive Section 230." 1-ER-74. In reaching that decision, the court relied on *Kimzey*, 836 F.3d at 1270. However, *Kimzey* involved an attempt to "plead around the CDA to advance the same basic argument that the statute plainly bars: that Yelp published user-generated speech that was harmful to" the plaintiff. *Id*. at 1266. The State AGs attempt no such end run around Section 230 here.

Because the aggregation of Likes is not a "means of displaying a form of third-party content," 1-ER-74, Meta could address the harms caused by the Likes feature without making "changes to the content posted by [its platforms'] users." *Internet Brands, Inc.*, 824 F.3d at 851. For example, Meta could cease to tabulate and display a total of Like

65

counts (the design change tested in Project Daisy). 2-SER-292 ¶252. Or Meta could change its default settings to make it easier for users to proactively hide those counts for their own well-being. *Id.* Neither of those changes would require Meta to alter or remove any third-party content. Users could still use the Like feature to endorse any content they desired. The only difference would be that young users would not be constantly reminded that other users' content may have been more popular than their own.

*    *    *

In sum, the State AGs' claims do not rely on the publication of third-party content. Instead, it is Meta's conduct in developing its platforms to target and addict young users that violates state consumer protection laws.

## III.  Section 230 does not preclude the State AGs' deception claims.

However this Court rules on the applicability of Section 230 to the State AGs' unfairness claims, Section 230 should have no impact on the State AGs' deception claims. As a threshold matter, if the Court reverses the district court's ruling on the unfairness claims, Meta's

argument is moot. And even if the Court does not reverse on the unfairness claims, the deception claims still survive dismissal.

Contrary to Meta's suggestion, the State AGs do not bring failure-to-warn claims, but rather seek to hold Meta accountable for misleading the public in violation of state consumer-protection laws. To the extent that some deceptive statements reference specific features, the State AGs' claims focus on Meta's own deception—the claims have nothing to do with publishing activity or third-party content. Thus, Section 230 does not apply.

## A. Section 230 has no bearing on the State AGs' deception claims.

Meta mischaracterizes the State AGs' deception claims, conflating them with the Private Plaintiffs' failure-to-warn claims. Op. Br. at 10. However, these two legal theories are different. Failure-to-warn claims sound in products liability, seeking to hold a company accountable when it knew of risks from its product and did not mitigate those risks with appropriate warnings to consumers. *See Bride*, 112 F.4th at 1179–80. Deception claims, on the other hand, are much broader, holding a company accountable for any statement or omission that has a tendency or capacity to mislead the public. *See,*

*e.g.*, *Williams v. Gerber Prods. Inc.*, 552 F.3d 934, 938 (9th Cir. 2008). In other words, deception claims stem from the nature of a company's statements, not the nature of its product.

This Court has recognized that in the context of Section 230, the difference between failure-to-warn and deception theories is material. Deception claims based on a company's own affirmative misconduct that misled the public are generally not precluded by Section 230. For example, in *Bride*, three minor children and the estate of the fourth, who had died by suicide, brought a class action against a software company that had developed a feature allowing anonymous questions to be submitted on social media, giving rise to significant online harassment and bullying. 112 F.4th at 1173. This Court divided the plaintiffs' claims into two categories: misrepresentation and products liability. *Id.* at 1178.

This Court held that the products-liability claims were precluded by Section 230 because they "attempt[ed] to hold YOLO responsible as the speaker or publisher of harassing and bullying speech." *Id.* at 1182. The products-liability claims—defective design, negligence, and failure to warn—rested on the theory that the anonymous nature of the app

68

made it inherently dangerous, creating an unreasonable risk of user abuse that YOLO failed to mitigate or warn about. *Id.* at 1179. This Court held that the harm for which these claims sought recovery stemmed from third-party content, and that the duty to warn arose from that third-party content as well: "[T]he failure to warn claim faults YOLO for not mitigating, in some way, the harmful effects of the harassing and bullying content. This is essentially faulting YOLO for not moderating content in some way, whether through deletion, change, or suppression." *Id.* at 1180. Accordingly, this Court concluded that Section 230 precluded the products-liability claims. *Id.* at 1182.

Section 230 did not, however, preclude misrepresentation claims based on YOLO's own statements about its products and services. By representing to users "that it would unmask and ban abusive users," YOLO made a promise that users relied on, and YOLO did not fulfill. *Id.* at 1178. The harm that the misrepresentation claims sought to recover for was the deception itself, and the violation stemmed from YOLO's own deceptive acts, not third-party content. *Id.* at 1179. Although one possible remedy for this misrepresentation would be engaging in content moderation, the deception claims sought "to hold

YOLO accountable for a promise or representation, and not for the failure to take certain moderation actions." *Id.* at 1178. Accordingly, Section 230 did not preclude these claims. *Id.* at 1179.

The State AGs' deception claims similarly fall outside the scope of Section 230. These claims are described in paragraph 846 of the complaint, which outlines six categories of Meta's own affirmative misconduct that deceived the public through misleading statements.

First, the State AGs allege that Meta "misrepresented, directly or indirectly . . . that its Social Media Platforms are not psychologically or physically harmful for young users and are not designed to induce young users' compulsive and extended use, when they are in fact so designed." 2-SER-391 ¶846(a).

Second, the State AGs allege that Meta "misrepresented, directly or indirectly . . . that its Social Media Platforms are less addictive and/or less likely to result in psychological and physical harm for young users than its Social Media Platforms are in reality." 2-SER-391 ¶846(b). To substantiate these two categories of deception, the State AGs provide examples of statements where Meta made affirmative misrepresentations that its platforms were not designed to induce

compulsive use—such as Meta's representation to the BBC that "at no stage does wanting something to be addictive factor into" the design of the platforms, 2-SER-310 ¶374—when internal documents show that Meta studied the teenage brain's dopamine responses to design the platforms to induce compulsive use, 2-SER-313–315 ¶402–410. The State AGs also provided examples where Meta downplayed the harm of its platforms—such as when CEO of Instagram, Adam Mosseri, told reporters that research suggested Instagram's effect on teen well-being was "quite small," 2-SER-317 ¶425—when in fact, Meta was aware of the significant mental and physical harms that its platforms cause teens, 2-SER-317 ¶422–423.

Third, the State AGs allege that "Meta misrepresented, directly or indirectly . . . that the incidences or prevalence of negative or harmful user experiences on Meta's Social Media Platforms was lower than it actually was." 2-SER-391 ¶846(c). The State AGs describe how Meta publicly released and touted reports representing that the prevalence of harmful experiences on its platforms was relatively low. 2-SER-326 ¶490. However, Meta withheld internal data using different

methodologies that showed much higher numbers of negative experiences. 2-SER-326 ¶491–93.

Fourth, the State AGs allege that Meta "misrepresented, directly or indirectly . . . that it prioritized young users' health and safety over maximizing profits, when in fact Meta subordinated young user health and safety to its goal of maximizing profits by prolonging young users' time spent on the platform." 2-SER-391 ¶846(d). The State AGs provide numerous examples where Meta executives claim that the company prioritizes well-being over profit—such as Mark Zuckerberg's post that it is "just not true" that Meta "prioritizes profit over safety and well-being" and Adam Mosseri's statement that Meta "will make decisions that hurt the business if they're good for people's well-being and health." 2-SER-288 ¶223, 2-SER-294 ¶265. However, these same executives declined to implement measures that would have improved youth well-being because of the impact on engagement and profit. 2-SER-295–299 ¶274–98.

Fifth, the State AGs allege that Meta "misrepresented, directly or indirectly . . . that Meta prevents under-13 users from using [its platforms] when in fact Meta was aware that it does not prevent

under-13 users from using Instagram and Facebook." 2-SER-391 ¶846(e). The State AGs cite to Instagram's Help Center, which states unequivocally that "[w]e will delete the account if we can't verify the account is managed by someone over 13 years old." 2-SER-319 ¶438. Yet, the State AGs provide examples where Meta was notified of an under-13 user and did not take the account down. 2-SER-360 ¶668.

Finally, the State AGs allege that Meta "misrepresented, directly or indirectly . . . that Meta's collection of user data was not for the purpose of causing those users to become addicted to the Social Media Platforms, when in reality that was one of the purposes for which Meta collected user data." 2-SER-392 ¶846(f). The State AGs identify representations disclaiming that data is used to fuel addiction, such as a statement made by Facebook's Vice President of Global Affairs that "[t]he goal . . . is to make sure you see what you find most meaningful—not to keep you glued to your smartphone for hours on end." 2-SER-279 ¶168. However, the State AGs allege that Meta uses data from users for "preference amplification" so that users are fed content tailored to them to keep them on the platform.

These claims seek to hold Meta accountable for its own misrepresentations and deceptive misconduct, not its failure to warn. Underlying the State AGs' deception claims is the legal requirement, set out in state consumer-protection law, that Meta cannot mislead the public. These state laws bar Meta itself from engaging in deceptive conduct. Because the State AGs' deception claims seek to hold Meta accountable for its own conduct, the deception claims are distinct from failure-to-warn claims and fall outside the scope of a Section 230 defense. *See Bride*, 112 F.4th at 1178–79.

Meta cannot recast the State AGs' deception claims under a failure-to-warn theory when that is not what they pleaded. No State AG brings a cause of action for failure to warn—all of the state-law causes of action are for unfair and deceptive business acts and practices in violation of state consumer-protection laws. Meta recognized this in its motion to dismiss: in a 22-page appendix to that motion, Meta identified 75 misrepresentations pled in the complaint to which Meta raised no Section 230 objections.[9] 1-SER-197–218. The

---

[9]     It is unclear now on appeal which statements Meta seeks to construe as relevant to a failure-to-warn claim. Because Meta did not

district court recognized that "as long as the States have alleged one actionable misrepresentation, the deceptive acts and practices claims survive." 1-ER-84. As Meta has identified 75 affirmative misrepresentations to which it raises no Section 230 defense, it cannot argue that Section 230 precludes the State AGs' deception claims as a whole.

**B.    To the extent that some misrepresentations reference features that form the basis of unfairness claims, Section 230 does not preclude deception claims as to those misrepresentations.**

The vast majority of the misleading statements that support the State AGs' deception claims do not reference the harmful features that are the subject of the State AGs' unfairness claims. Indeed, in its motion to dismiss, Meta cited only one statement in the State AGs' complaint that referenced a specific feature, namely Meta's algorithm. 1-SER-150. Regardless, even where the State AGs' deception claims reference features addressed by their unfairness claims, the deception

---

seek to dismiss these 75 predicates for the State AGs' deception claims on Section 230 grounds in its motion to dismiss, it cannot raise this for the first time on appeal. *See In re Mortg. Elec. Registration Sys., Inc.*, 754 F.3d 772, 780 (9th Cir. 2014) ("Generally, arguments not raised in the district court will not be considered for the first time on appeal.").

claims neither seek to hold Meta accountable as a publisher nor involve information provided by a third party. *See Barnes*, 570 F.3d at 1101.

### 1. Claims involving feature-specific misrepresentations do not treat Meta as a publisher.

Insofar as the State AGs seek to hold Meta accountable for feature-specific misrepresentations, these claims do not treat Meta as a publisher. Like in *Internet Brands*, any claim involving feature-specific misrepresentations arises from Meta's knowledge of safety risks, not from publishing conduct. 824 F.3d at 851. As noted above, Meta identified in its motion to dismiss only one misrepresentation from the State AGs' complaint that it contended was precluded by Section 230: a post on the Instagram website explaining how the recommendation algorithm works that "provides no accompanying examples or warnings disclosing that the Recommendation Algorithms also tend to suggest content that is dangerous or harmful for young users." 2-SER-282 ¶187. Here, the underlying misconduct that the State AGs seek to hold Meta accountable for is its deceptive representations of Instagram's algorithms as benign, when Meta had actual knowledge about the dangers of the algorithms. As discussed above, the State AGs

have detailed how Meta's recommendation algorithms were designed to use a "variable reinforcement schedule" to trigger releases of dopamine and how Meta uses data harvested from users to deliver content on this variable reinforcement schedule. 2-SER-276–280 ¶151–178. In seeking to hold Meta accountable for its misrepresentations, the State AGs point to Meta's responsibility not for how it publishes content but for making misleading statements to the public about the safety of the algorithm.

Contrary to Meta's arguments, this case is nothing like *Doe v. Grindr*, where a plaintiff sought to hold an internet service provider accountable for failure to warn about third-party content, but "d[id] not allege that [the internet service provider] had independent knowledge" of possible harm. 128 F.4th 1148, 1154 (9th Cir. 2025). In contrast, the State AGs allege Meta knew of severe risks stemming from harmful features yet misled the public as to these risks.

> **2. Claims involving feature-specific misrepresentations do not seek to hold Meta accountable for third-party content.**

Section 230 also does not provide Meta with protection from the State AGs' deception claims as to feature-specific misrepresentations

because those claims target Meta's own deceptive acts, not the third-party content that Meta publishes on its platforms. *Lemmon*, 995 F.3d at 1093. As an illustration, the State AGs' allegation that Meta "provides no accompanying examples or warnings disclosing that the Recommendation Algorithms also tend to suggest content that is dangerous or harmful for young users," 2-SER-282 ¶187, does not fault Meta for any dangerous or harmful third-party content that it has published. Rather, the State AGs seek to hold Meta accountable for misleading the public concerning the design and risks of its platforms. The State AGs' deception claims thus seek to hold Meta liable only for its "own acts." *Roommates.com*, 521 F.3d at 1165. Section 230 does not apply in these circumstances. *See Fed. Trade Comm'n v. LeadClick Media, LLC*, 838 F.3d 158, 176–77 (2d Cir. 2016) (Section 230 did not apply to deception claims because "LeadClick is being held accountable for its *own* deceptive acts or practices"); *see also Roommates.com*, 521 F.3d at 1165 ("Roommate's own acts . . . are entirely its doing and thus section 230 of the CDA does not apply to them"); *Bride*, 112 F.4th at 1179.

In sum, to the extent Meta argues that Section 230 should apply to any aspect of the deception claims, this argument fails because the State AGs seek to hold Meta accountable only for its own statements and omissions, not those of third parties. As discussed above, Meta misconstrues the nature of the State AGs' deception claims, which are distinct from failure-to-warn claims. Further, the State AGs' deception claims require only that Meta address its own statements and no longer mislead the public and so do not require Meta to "exercise some kind of publication or editorial function." *Bride*, 112 F.4th at 1176.

## CONCLUSION

The State AGs respectfully request that the Court dismiss this appeal for lack of jurisdiction. If the Court determines that it has jurisdiction over Meta's appeal, the State AGs request that the Court exercise pendent jurisdiction over the State AGs' appeal, reverse the district court's dismissal of the State AGs' unfairness claims, and affirm the district court's denial of dismissal of their deception claims.

Dated: June 23, 2025

Respectfully Submitted,

**ROB BONTA**
Attorney General
State of California

*/s/ Bernard A. Eskandari*
Bernard A. Eskandari* CA SBN
244395
Supervising Deputy Attorney
General
Megan M. O'Neill
Marissa Roy
Deputy Attorneys General
California Department of Justice
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
Telephone: (213) 269-6348
Email: Bernard.Eskandari@doj.ca.gov

*Counsel of Record

*Attorneys for the People of the State of California*

**PHILIP J. WEISER**
Attorney General
State of Colorado

*/s/ Shannon Stevenson*
Shannon Stevenson* CO Bar No.
35542
Solicitor General
Krista Batchelder
Deputy Solicitor General
Danny Rheiner
Michael McMaster
Assistant Solicitors General
Jenna Baker
Assistant Attorney General Fellow
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: Shannon.Stevenson@coag.gov

*Attorneys for the State of Colorado ex rel. Philip J. Weiser, Attorney General*

**WILLIAM TONG**
Attorney General
State of Connecticut

/s/ *Krislyn Launer*
Krislyn M. Launer (CT Juris No. 440789)
Assistant Attorney General
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, Connecticut 06106
Telephone: (860) 808-5306
Fax: (860) 808-5593
Krislyn.Launer@ct.gov

*Attorney for Plaintiff State of Connecticut*


**KWAME RAOUL**
Attorney General
State of Illinois

/s/ *Alex Hemmer*
ALEX HEMMER
Deputy Solicitor General
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
Telephone: (773) 590-7932
Alex.Hemmer@ilag.gov

*Attorney for Plaintiff the People of the State of Illinois*


**KATHLEEN JENNINGS**
Attorney General
State of Delaware

/s/ *Ryan Costa*
Marion M. Quirk (DE Bar 4136)
Director of Consumer Protection
Ryan T. Costa (DE Bar 5325)
Deputy Director of Consumer Protection
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
Telephone: (302) 683-8811
Marion.Quirk@delaware.gov
Ryan.Costa@delaware.gov

*Attorneys for State of Delaware, ex rel. Kathleen Jennings, Attorney General for the State of Delaware*


**THEODORE E. ROKITA**
Attorney General
State of Indiana

/s/ *Corinne Gilchrist*
Corinne Gilchrist
Section Chief, Consumer Litigation
IN Atty No. 27115-53
Office of the Indiana Attorney General
Indiana Government Center South
302 West Washington St., 5th Floor
Indianapolis, IN 46203
Telephone: (317) 233-6143

Corinne.Gilchrist@atg.in.gov

*Attorney for Plaintiff State of Indiana*

**KRIS W. KOBACH**
Attorney General
State of Kansas

*/s/ Sarah M. Dietz*
Sarah Dietz, Assistant
Attorney General
(KS Bar No. 27457), *pro hac vice*
Kaley Schrader, Assistant
Attorney General
(KS Bar No. 27700), *pro hac vice*
Office of the Kansas Attorney
General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Telephone: (785) 296-3751
Sarah.Dietz@ag.ks.gov

*Attorney for the State of Kansas*

**LIZ MURRILL**
Attorney General
State of Louisiana

*/s/ Asyl Nachabe*
Asyl Nachabe (LA Bar No. 38846)
*Pro hac vice*
Assistant Attorney General
Louisiana Department of Justice
Public Protection Division
Consumer Protection Section
1885 N. Third St.

**RUSSELL COLEMAN**
Attorney General
Commonwealth of Kentucky

*/s/ John H. Heyburn*
John H. Heyburn
Principal Deputy
Solicitor General
Office of Kentucky
Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Telephone: (502) 696-5300
Jack.Heyburn@ky.gov

*Attorney for Plaintiff the Commonwealth of Kentucky*

**KEITH ELLISON**
Attorney General
State of Minnesota

/s/ Evan Romanoff
Evan Romanoff (MN Bar No. 0398223)
Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
St. Paul, MN 55101

Baton Rouge, LA 70802
Telephone: (225) 326-6400
NachabeA@ag.louisiana.gov

*Attorney for State of Louisiana*

**MICHAEL T. HILGERS**
Attorney General
State of Nebraska

*/s/ Anna Anderson*
Anna Anderson (NE #28080)
Assistant Attorney General
Consumer Protection Bureau
Office of the Nebraska
Attorney General
2115 State Capitol Building
Lincoln, NE 68509
Telephone: (402) 471-2682
Anna.Anderson@nebraska.gov

*Attorney for Plaintiff State of Nebraska*

**LETITIA JAMES**
Attorney General
State of New York

/s/ Kevin Wallace

Telephone: (651) 728-4126
Evan.Romanoff@ag.state.mn.us

*Attorney for State of Minnesota, by its Attorney General, Keith Ellison*

**MATTHEW J. PLATKIN**
Attorney General
State of New Jersey

*/s/ Kashif T. Chand*
Kashif T. Chand (NJ Bar No. 016752008)
Assistant Attorney General, Affirmative Civil Enforcement Practice Group
New Jersey Office of the Attorney General, Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Telephone: (973) 648-2052
Kashif.Chand@law.njoag.gov

*Attorney for Plaintiffs Matthew J. Platkin, Attorney General for the State of New Jersey, and Elizabeth Harris, Acting Director of the New Jersey Division of Consumer Affairs*

**JEFF JACKSON**
Attorney General
State of North Carolina

/s/ Charles White

83

Kevin Wallace (NY Bar No. 3988482)
Senior Enforcement Counsel
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8262
Kevin.Wallace@ag.ny.gov

*Attorney for the State of New York*

Charles G. White
Assistant Attorney General
N.C. State Bar No. 57735
cwhite@ncdoj.gov
Kunal J. Choksi
Senior Deputy Attorney General
N.C. State Bar No. 55666
kchoksi@ncdoj.gov
Joshua Abram
Special Deputy Attorney General
N.C. State Bar No. 57205
jabram@ncdoj.gov
N.C. Department of Justice
PO Box 629
Raleigh, NC 27602
Telephone: (919) 716-6889
CWhite@ncdoj.gov

*Attorneys for the State of North Carolina*

**DAVID W. SUNDAY, JR.**
Attorney General
Commonwealth of Pennsylvania

*/s/ Jonathan R. Burns*
Jonathan R. Burns
Deputy Attorney General
(PA Bar No. 315206), *pro hac vice*
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Telephone: (717) 645-7269
JBurns@attorneygeneral.gov

**ALAN WILSON**
Attorney General
State of South Carolina

/s/ Jared Q. Libet
Jared Q. Libet (SC Bar No. 74975)
Assistant Deputy Attorney General
OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA
P.O. Box 11549
Columbia, South Carolina 29211
Telephone: (803) 734-5251

*Attorneys for Plaintiff the Commonwealth of Pennsylvania*

JLibet@scag.gov

*Attorneys for Plaintiff the State of South Carolina, ex rel. Alan M. Wilson, in His Official Capacity as Attorney General of the State of South Carolina*

**COMMONWEALTH OF VIRGINIA**

Ex rel. Jason S. Miyares, Attorney General

/s/ Kevin M. Gallagher

Kevin M. Gallagher (VSB No. 87548)
Principal Deputy Solicitor General
Joelle E. Gotwals (VSB No. 76779)
Assistant Attorney General
Office of the Attorney General of Virginia
202 N. 9th Street
Richmond, Virginia 23219
Telephone: (804) 786-7773
Facsimile: (804) 786-0122
KGallagher@oag.state.va.us
JGotwals@oag.state.va.us

*Attorneys for Commonwealth of Virginia ex rel. Jason S. Miyares, Attorney General*

**JOSHUA L. KAUL**
Attorney General
State of Wisconsin

/s/ Colin R. Stroud

Colin R. Stroud
Assistant Attorney General
WI State Bar #1119457
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
Telephone: (608) 261-9224
Stroudcr@doj.state.wi.us

*Attorney for the State of Wisconsin*

## STATEMENT OF RELATED CASES

The following related cases are pending before this Court, and "arise out of the same or consolidated cases in the district court." Ninth Cir. R. 28-2.6.

*Personal Injury Plaintiffs, et al., v. Meta Platforms, Inc., et al.*, No. 24-7037

*State of Colorado, et al., v. Meta Platforms, Inc., et al.*, No. 24-7265

*Multistate Attorney General Plaintiffs, et al., v. Meta Platforms, Inc., et al.*, No. 24-7300

*Personal Injury Plaintiffs, et al., v. Meta Platforms, Inc., et al.*, No. 24-7304

*Personal Injury Plaintiffs, et al., v. TikTok LLC, et al.*, No. 24-7312

*People of the State of California, et al., v. United States District Court for the Northern District of California, Oakland, et al.*, No. 25-584

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Fed. R. App. P. 28.1(e)(2)(B) and Ninth Circuit rule 28.1-1 [no more than 15300 words].

☒     This document contains 15131 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6):

☒     This document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook type.

This document has been submitted in compliance with the court's ECF requirements.

/s/ *Shannon Stevenson*
Shannon Stevenson

## CERTIFICATE OF SERVICE

I certify that I served the foregoing motion upon all parties herein by e-filing with the CM/ECF system maintained by the Court, this 23rd day of June, 2025.

/s/ *Shannon Stevenson*
Shannon Stevenson