Nos. 24-7032, 24-7037, 24-7265, 24-7300, 24-7304, 24-7312

# In the United States Court of Appeals for the Ninth Circuit

PERSONAL INJURY PLAINTIFFS; ET AL.,

*Plaintiffs-Appellees-Cross-Appellants,*

—v.—

META PLATFORMS, INC.; ET AL.,

*Defendants-Appellants-Cross-Appellees,*

—and—

PERSONAL INJURY PLAINTIFFS; ET AL.,

*Plaintiffs-Appellees-Cross-Appellants,*

—v.—

TIKTOK LLC; ET AL.,

*Defendants-Appellants-Cross-Appellees.*

and Consolidated Cases

On Appeal from the United States District Court
for the Northern District of California, Oakland Division
Case No. 4:22-MD-03047 (Hon. Yvonne Gonzalez Rogers) (MDL No. 3047)

## PRINCIPAL AND RESPONSE BRIEF OF PLAINTIFFS-APPELLEES

MATTHEW W.H. WESSLER
MICHAEL SKOCPOL
GUPTA WESSLER LLP
2001 K Street NW
Suite 850 North
Washington, DC 20006
(202) 888-1741

JENNIFER BENNETT
GUPTA WESSLER LLP
505 Montgomery Street, Suite 625
San Francisco, CA 94111
(415) 573-0336
*jennifer@guptawessler.com*

*(Additional counsel listed on inside cover)*

June 23, 2025

*Counsel for Personal Injury and School District
Plaintiffs-Appellees-Cross-Appellants*

LEXI J. HAZAM
LIEFF CABRASER HEIMANN &
BERNSTEIN LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
(415) 956-1000

JASON L. LICHTMAN
GABRIEL A. PANEK
LIEFF CABRASER HEIMANN &
BERNSTEIN LLP
250 Hudson Street, 8th Floor
New York, NY 10013
(212) 355-9500

ANDRE MURA
GIBBS MURA LLP
111 Broadway, Suite 2100
Oakland, CA 94607
(510) 350-9717

PREVIN WARREN
ABIGAIL BURMAN
MOTLEY RICE LLC
401 9th Street NW, Suite 630
Washington, DC 20004
(202) 232-5504

MATHEW P. JASINSKI
MOTLEY RICE LLC
20 Church Street, 17th Floor
Hartford, CT 06103
(860) 218-2725

# TABLE OF CONTENTS

Table of authorities ....................................................................................... ii

Introduction .................................................................................................. 1

Jurisdictional statement ............................................................................... 4

Issues presented ........................................................................................... 4

Statement of the case ................................................................................... 5

    I.    Statutory background ................................................................... 5

    II.   Factual background ...................................................................... 8

         A.   Meta designed its platforms to hook kids ..................... 8

         B.   This litigation ................................................................... 12

Summary of argument ................................................................................ 16

Standard of review ..................................................................................... 20

Argument ..................................................................................................... 20

    I.    This Court should dismiss the appeal for lack of jurisdiction .............. 20

    II.   Meta cannot use a motion to dismiss to strike factual allegations ......... 32

    III.  Meta has not demonstrated that Section 230 limits the plaintiffs' failure-to-warn theory .......................................................... 34

    IV.  If this Court does not dismiss Meta's appeal for lack of jurisdiction, it should take jurisdiction over the conditional cross-appeal and reverse ......................................................... 64

Conclusion .................................................................................................. 65

# TABLE OF AUTHORITIES

## Cases

*Air & Liquid Systems Corp. v. DeVries*,
    586 U.S. 446 (2019) ..................................................................43

*Anderson v. TikTok, Inc.*,
    116 F.4th 180 (3d Cir. 2024) ................................................59

*Atkinson v. Meta Platforms, Inc.*,
    2021 WL 5447022 (9th Cir. Nov. 22, 2021) ...................... 31

*Atlantic Richfield Co. v. Christian*,
    590 U.S. 1 (2020) ..................................................................26

*Barnes v. Yahoo!, Inc.*,
    570 F.3d 1096 (9th Cir. 2009) ....................... 24, 38, 46, 47

*BBL, Inc. v. City of Angola*,
    809 F.3d 317 (7th Cir. 2015) ....................................... 32, 33

*Bilek v. Federal Insurance Co.*,
    8 F.4th 581 (7th Cir. 2021) ..................................................54

*Boquist v. Courtney*,
    32 F.4th 764 (9th Cir. 2022) ..............................................20

*Bride v. Yolo Technologies*,
    112 F.4th 1168 (9th Cir. 2024) .....................................*passim*

*Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.*,
    498 U.S. 533 (1991) ..............................................................34

*Calise v. Meta Platforms, Inc.*,
    103 F.4th 732 (9th Cir. 2024)......................................*passim*

*Carafano v. Metrosplash.com*,
    339 F.3d 1119 (9th Cir. 2003) ...................................... 27, 30

*Cobbledick v. United States*,
    309 U.S. 323 (1940)...............................................................21

*Cohen v. Beneficial Industries Loan Corp.*,
    337 U.S. 541 (1949) ........................................................................ 31

*Cunningham v. Hamilton County*,
    527 U.S. 198 (1999) ....................................................................... 30

*Digital Equiptment Corp. v. Desktop Direct, Inc.*,
    511 U.S. 863 (1992) ................................................................*passim*

*Doe v. Backpage.com, LLC*,
    768 F. Supp. 3d 1057 (N.D. Cal. 2025) .......................................58

*Doe v. Grindr*,
    128 F.4th 1148 (9th Cir. 2025) ...............................................52, 53

*Doe v. Internet Brands, Inc.*,
    824 F.3d 846 (9th Cir. 2016) ..................................................*passim*

*Dyroff v. Ultimate Software Group*,
    934 F.3d 1093 (9th Cir. 2019) ............................................ 50, 51, 58

*Dyroff v. Ultimate Software Group*,
    2017 WL 5665670 (N.D. Cal. Nov. 26, 2017) ..............................50, 51

*Estate of Saunders v. Commissioner*,
    745 F.3d 953 (9th Cir. 2014) ......................................................26

*Fair Housing Council of San Fernando Valley v. Roommates.com LLC*,
    521 F.3d 1157 (9th Cir. 2008) .................................................*passim*

*Fields v. Twitter, Inc.*,
    217 F. Supp. 3d 1116 (N.D. Cal 2016) .........................................64

*General Steel Domestic Sales, L.L.C. v. Chumley*,
    840 F.3d 1178 (10th Cir. 2016) ..................................21, 24, 25, 27

*George v. McDonough*,
    596 U.S. 740 (2022) .................................................................... 37

*Gulfstream Aerospace Corp. v. Mayacamas Corp.*,
    485 U.S. 271 (1988) ................................................................. 31, 32

*Hampton v. California,*
    83 F.4th 754 (9th Cir. 2023) ................................................................26

*Hartmann v. California Department of Corrections & Rehabilitation,*
    707 F.3d 1114 (9th Cir. 2013) ...................................................... 32, 33

*Henderson v. Source for Public Data, L.P.,*
    53 F.4th 110 (4th Cir. 2022) ........................................................ 36, 37

*Herrick v. Grindr LLC,*
    765 F. App'x 586 (2d Cir. 2019) ....................................................48

*Hightower v. JPMorgan Chase Bank, N.A.,*
    2012 WL 12878311 (C.D. Cal. Sept. 12, 2012) ...............................33

*HomeAway.com, Inc. v. City of Santa Monica,*
    918 F.3d 676 (9th Cir. 2019) ...............................................*passim*

*Hyde v. City of Willcox,*
    23 F.4th 863 (9th Cir. 2022) ........................................................ 4, 65

*In re Facebook, Inc.,*
    625 S.W.3d 80 (Tex. 2021) ............................................................48

*Johnson v. Jones,*
    515 U.S. 304 (1995) ......................................................................... 31

*Jones v. Dirty World Entertainment Recordings LLC,*
    2012 WL 13418361 (6th Cir. May 9, 2012) ...................................21

*Jones v. Google LLC,*
    73 F.4th 636 (9th Cir. 2023) .........................................................26

*Kimzey v. Yelp!, Inc.,*
    836 F.3d 1263 (9th Cir. 2016) .......................................................62

*L.W. v. Snap Inc.,*
    675 F. Supp. 3d 1087 (S.D. Cal. 2023) .........................................58

*Lemmon v. Snap, Inc.,*
    995 F.3d 1085 (9th Cir. 2021) ...............................................*passim*

*Malwarebytes, Inc. v. Enigma Software Group USA, LLC,*
    141 S. Ct. 13 (2020) ............................................................. 6

*Marshall's Locksmith Service Inc. v. Google, LLC,*
    925 F.3d 1263 (D.C. Cir. 2019) ...................................... 60

*Martin v. Halliburton,*
    618 F.3d 476, (5th Cir. 2010) ........................................ 25

*McElmurry v. U.S. Bank National Association,*
    495 F.3d 1136 (9th Cir. 2007)........................................ 23

*Melendres v. Maricopa County,*
    815 F.3d 645 (9th Cir. 2016) ........................................ 20

*Midland Asphalt Corp. v. United States,*
    489 U.S. 794 (1989).............................................22, 24

*Miranda B. v. Kitzhaber,*
    328 F.3d 1181 (9th Cir. 2003) ...................................... 23

*Nunag-Tanedo v. East Baton Rouge Parish School Board,*
    711 F.3d 1136 (9th Cir. 2013) ...................................... 29

*Pinckney v. Meta Platforms Inc.,*
    127 F.4th 516 (4th Cir. 2025)...................................58, 60

*Pullman Construction Industries, Inc. v. United States,*
    23 F.3d 1166 (7th Cir. 1994) ........................................ 23

*Rowe v. Educational Credit Management Corp.,*
    559 F.3d 1028 (9th Cir. 2009)........................................ 20

*SolarCity Corp. v. Salt River Project Agriculture Improvement & Power District,*
    859 F.3d 720 (9th Cir. 2017) ........................................ 25

*Spice Jazz LLC v. Youngevity International, Inc.,*
    2020 WL 6565268 (S.D. Cal. Nov. 9, 2020).................................... 33

*Stokeling v. United States,*
    586 U.S. 73 (2019)........................................................ 37

*Stratton Oakmont, Inc. v. Prodigy Services Co.*,
   1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995)....................................................7

*Swint v. Chambers County Commission*,
   514 U.S. 35 (1995)........................................................................23

*Tellabs, Inc. v. Makor Issues & Rights, Limited*,
   551 U.S. 308 (2007)......................................................................33

*Thompson v. Paul*,
   657 F. Supp. 2d 1113 (D. Ariz. 2009)....................................................33

*United States v. Academy Mortgage Corp.*,
   968 F.3d 996 (9th Cir. 2020) ........................................................22, 28

*United States v. Hickey*,
   367 F.3d 888 (9th Cir. 2004)............................................................24

*United States v. Hollywood Motor Car Co.*,
   458 U.S. 263 (1982) ....................................................................27

*V.V. v. Meta Platforms*,
   2024 WL 678248 (Conn. Super. Ct. Feb. 16, 2024)........................................52

*Van Cauwenberghe v. Biard*,
   486 U.S. 517 (1988).................................................................29, 30

*Warmenhoven v. NetApp, Inc.*,
   13 F.4th 717 (9th Cir. 2021) ..........................................................49

*Will v. Hallock*,
   546 U.S. 345 (2006)..............................................................*passim*

*Wozniak v. YouTube, LLC*,
   100 Cal. App. 5th 893 (2024) ..........................................................48

*Z-Seven Fund, Inc. v. Motorcar Parts & Accessories*,
   231 F.3d 1215 (9th Cir. 2000) .........................................................29

**Statutes**

28 U.S.C. § 1291.....................................................................1, 22

28 U.S.C. § 1292 ................................................................................ 13

28 U.S.C. § 1331 ................................................................................. 4

28 U.S.C. § 1332 ................................................................................. 4

28 U.S.C. § 1367 ................................................................................. 4

47 U.S.C. § 230 ........................................................................... *passim*

## Rules

Federal Rule of Civil Procedure 12 ................................................ 32, 33

Federal Rule of Civil Procedure 56 ...................................................... 33

## Other authorities

141 Cong. Rec. H8469 (daily ed. Aug. 4, 1995) .................................... 5, 7

Farhad Manjoo,
    *Jurassic Web*, Slate (Feb. 24, 2009)................................................. 5

S. Rep. No. 104-230 (1996) ................................................................... 7

## INTRODUCTION

Meta asks this Court to accept several extraordinary propositions. First, to even consider Meta's appeal, the Court would have to conclude that internet companies have a right to interlocutory appeal that's unavailable to virtually any other litigant. For as long as there have been appellate courts, Congress has required litigants to raise all appellate issues together in a single appeal, taken after final judgment in the case. By statute, the jurisdiction of the circuit courts is limited to appeals of "final decisions," decisions that end the litigation entirely. 28 U.S.C. § 1291. Here, Meta appeals the district court's decision *not* to dismiss allegations. That decision obviously does not end the litigation.

Meta argues that it can appeal anyway under the collateral order doctrine. That doctrine allows the immediate appeal of a "narrow class of decisions" that cannot be effectively reviewed after final judgment, but are "too important" to escape review entirely and so "independent" of the merits that there's no reason to defer appeal. *Will v. Hallock*, 546 U.S. 345, 345-47 (2006). Very few decisions qualify: orders denying a criminal defendant's right to be free from double jeopardy, for example, or a state's sovereign immunity—orders, in other words, that deny a right to avoid suit entirely, which if not immediately appealable would "imperil a substantial public interest." *Id.*

According to Meta, orders denying a motion to dismiss under Section 230 of the Communications Decency Act fit that bill. But every circuit to have considered that proposition has rejected it. Section 230 preempts state-law claims that would hold internet companies vicariously liable for content posted by their users. The statute says nothing at all about immunity from suit. Companies assert preemption all the time. And orders denying that assertion are reviewable after final judgment. Nothing in Section 230 suggests that the rule should be any different for internet companies like Meta. This Court therefore lacks jurisdiction.

Second, even if this Court had jurisdiction, it could not reach the merits of Meta's appeal without accepting another novel proposition: that, on a motion to dismiss, district courts must do more than determine whether the complaint plausibly states a claim; they must determine which factual allegations may be asserted in support of that claim. While Meta challenges the denial of motions to dismiss, it does not dispute that the plaintiffs' claims may proceed. Nor does it dispute that the plaintiffs may assert a failure-to-warn theory in support of those claims. Instead, Meta's sole argument is that the district court should have dismissed some of the factual allegations that could support that theory. But Meta does not cite a single case where this Court or any other circuit has intervened in ongoing trial-court litigation to mandate the dismissal of factual allegations in support of claims that will proceed regardless.

That's because the only question on a motion to dismiss is whether the "complaint state[s] a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). If a complaint's factual allegations are sufficient to state a plausible claim, the motion to dismiss must be denied. Meta does not challenge the district court's conclusion that the causes of action on appeal here state a claim. That's all that's needed to affirm.

Finally, to reverse here, this Court would also have to adopt an interpretation of Section 230 it has repeatedly rejected: that Section 230 shields internet companies from liability not only for the content their users post, but also for a company's own unlawful conduct. Meta designed its platforms to hook children. It spent years researching every minute aspect of platform design—from endless scrolling to the timing of notifications to the placement of user controls—with the goal of creating an app that kids can't stop using. And it succeeded. Meta has known for years that its platforms lead to addiction, or what it euphemistically calls "problematic use." But the company chose not to warn its users. After all, if the public knew that Meta's apps lead to compulsive use in kids, parents would limit their use, Congress might impose new regulations, and Meta would lose advertising dollars.

Companies that design defective products have a duty to warn their customers. Section 230 does not absolve Meta of that obligation just because its product is a social-media platform.

## JURISDICTIONAL STATEMENT

The district court had (and continues to have) subject matter jurisdiction over this ongoing multidistrict litigation under 28 U.S.C. §§ 1331, 1332(a), and 1367(a). But this Court lacks appellate jurisdiction because the orders from which Meta appealed are not final orders. *See infra* Part I.

On November 27, 2024, thirteen days after Meta's timely notice of appeal, the individual and school district plaintiffs filed a timely notice of conditional cross-appeal.[1] 3-SER-482; *see* Fed. R. App. P. 4(a)(3). The issues on cross-appeal are inextricably intertwined with Meta's appeal. *See infra* Part IV. If this Court concludes that it has jurisdiction over Meta's appeal, it therefore also has pendent jurisdiction over the cross-appeal. *Hyde v. City of Willcox*, 23 F.4th 863, 875 (9th Cir. 2022).

## ISSUES PRESENTED

**1.** Are interlocutory orders denying a motion to dismiss on the basis of Section 230 immediately appealable even though they are neither conclusive, completely separate from the merits, nor effectively unreviewable after final judgment?

**2.** Is it sufficient on a motion to dismiss for the district court to determine whether the complaint states a claim or must it also decide precisely which facts may be asserted in support of that claim?

---

[1] In the caption and in the litigation below, these plaintiffs are called the Personal Injury Plaintiffs and the School District/Local Government Plaintiffs.

**3.** Does Section 230 require a district court to dismiss factual allegations in support of a failure-to-warn theory merely because it limited a different legal theory that imposes a different duty?

**4.** Does Section 230 shield internet companies from the duty to warn about known defects in their products, even where a defect stems from features the company itself created and not the content its users post?

**5.** Does Section 230 require a district court to evaluate a platform's features individually, even when the claim is that they act in combination; and, if so, does Section 230 bar claims based on product features that a company itself created?

## STATEMENT OF THE CASE

### I.   **Statutory background**

Congress passed Section 230 in the mid-nineties, when to most people, the internet was "an absolutely brand-new technology." 141 Cong. Rec. H8469 (daily ed. Aug. 4, 1995). It was also a rudimentary one: The internet of 1996 had no Google or Facebook or Instagram; it took forever for webpages to load; information was shared on message boards; and news organizations had only barely begun putting articles online. *See, e.g.*, Farhad Manjoo, *Jurassic Web*, Slate (Feb. 24, 2009), https://perma.cc/XF68-ZVBP; *Fair Hous. Council of San Fernando Valley v. Roommates.com LLC*, 521 F.3d 1157, 1163 & n.10 (9th Cir. 2008) (en banc). Courts were

5

just beginning to grapple with how the rules that had long governed print publications should apply to companies distributing content online.[2]

"Traditionally, laws governing illegal content distinguished between publishers [and] speakers," on the one hand, "and distributors" on the other. *Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 14 (2020) (statement of Thomas, J.); *see Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 739 (9th Cir. 2024). Publishers and speakers—those who publish content and those who create it— "exercise[ ] editorial control" over that content, so they can be held strictly liable if it is unlawful. *Malwarebytes*, 141 S. Ct. at 14; *see Calise*, 103 F.4th at 739. If the New York Times publishes a defamatory op-ed, for example, both the author and the Times may be held liable.

But distributors, such as bookstores and newsstands, do not create or edit the publications they sell. They "act[] as a mere conduit," often distributing "far more content than they could be expected to review." *Malwarebytes*, 141 S. Ct. at 14. Distributors, therefore, are only liable for illegal content when they "knew or had reason to know that the content was unlawful." *Calise*, 103 F.4th at 739.

In applying these rules to the early internet, "one court blurred this distinction." *Malwarebytes*, 141 S. Ct. at 14; *see Stratton Oakmont, Inc. v. Prodigy Servs. Co.*,

---

[2] Unless otherwise specified, internal quotation marks, citations, emphases, and alterations are omitted throughout the brief.

1995 WL 323710, at *1-3 (N.Y. Sup. Ct. May 24, 1995). In *Stratton Oakmont*, a New York state court held that a company that hosted online bulletin boards—forums that saw 60,000 messages daily—could be held liable for defamatory content posted by an anonymous user. 1995 WL 323710, at *1-3. In the court's view, an internet company that allowed users to post anything they wish, without ever removing unlawful content, was a mere distributor of that content. *See id.* But if a company took down any offensive content at all, it became a publisher of all its users' posts, subject to the same liability for defamatory content as the user who posted it. *See id.*

Section 230 was enacted in response to this decision. *See Calise*, 103 F.4th at 739. "Congress was concerned" that "*Stratton Oakmont*'s rule created a perverse incentive" for internet companies "not to moderate any offensive content," lest they be held liable for every message posted on their site. *Id.*; *see* 141 Cong. Rec. H8470-71. So Congress added a section to a then-pending telecommunications bill to overrule the decision. 141 Cong. Rec. H8470-71; S. Rep. No. 104-230, at 194 (1996) (Conf. Rep.).

That amendment became what is now known as Section 230. *See Calise*, 103 F.4th at 739. Its goal—shielding internet companies from liability for policing their users' content—is evident throughout its text, starting with its title: "Protection for private blocking and screening of offensive material." 47 U.S.C. § 230. The heading of its operative provision, Section 230(c), is "Protection for 'Good Samaritan' blocking and screening of offensive material." *Id.* § 230(c).

That provision implements Congress's goal to reverse *Stratton Oakmont*. Section 230(c)(1) states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." (This is the language that Meta relies on here.) And Section 230(c)(2) provides that "[n]o provider or user of an interactive computer service shall be held liable on account of any action voluntarily taken in good faith to restrict access to … objectionable" material. In plain English, these provisions: (1) prohibit internet companies from being treated as the publisher of—and therefore held strictly liable for—their users' content just because they host that content; and (2) shield internet companies from liability for removing content in good faith.

As its text makes clear, Section 230 does not absolve companies from all legal obligation just because they operate online. *See Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1094 (9th Cir. 2021). Rather, Section 230 simply prevents the *Stratton-Oakmont* problem: It ensures that internet companies are not held vicariously liable for content posted by their users. *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 850 (9th Cir. 2016).

## II. Factual background

### A. Meta designed its platforms to hook kids.

Meta is known for its social media apps, Facebook and Instagram. The company earns billions of dollars a year selling advertising on those apps. 3-ER-432. Selling advertising is essentially selling attention: The longer users stay engaged on

8

Meta's platforms, the more advertisements they see. 3-ER-432, 4-ER-725. And the more companies can depend on Meta to deliver users to their ads, the more they will pay Meta for the privilege. 3-ER-432-34, 4-ER-725-27. Meta's business, therefore, depends on user engagement. *Id.*[3]

So Meta designed Facebook and Instagram to compel engagement, to keep users scrolling as long and as often as possible. 3-ER-437-38, 3-ER-456-62, 4-ER-730-31, 4-ER-738-42. "Large teams of expert data scientists" and researchers have worked for years to fine-tune "every aspect" of Meta's apps to capture users' attention and prevent them from leaving. 4-ER-731. The plaintiffs do not allege that Meta pursues users' attention by curating the content posted on its platforms. They allege that Meta's apps are designed to manipulate user behavior to keep them on the platform, regardless of what content its users post. 3-ER-351-53, 3-ER-456, 4-ER-730-31, 4-ER-738-743. Much like a slot machine, Meta's apps provide intermittent rewards, conditioning users to continue scrolling in pursuit of the next reward. 3-ER-356-57, 3-ER-466, 4-ER-673, 4-ER-739. The company compels users to re-open its apps repeatedly throughout the day and night by sending them

---

[3] Meta pioneered this business model, which has since been adopted by other social media companies. 4-ER-801, 4-ER-829, 4-ER-833, 4-ER-857. The MDL from which this appeal arises includes cases against multiple social media companies. But only Meta and TikTok appealed. And only Meta filed a brief. Although TikTok joined Meta's brief, it did not identify any relevant differences between its products and Meta's. For that reason, this brief focuses on Meta, but the arguments are equally applicable to both companies.

strategically timed notifications that are impossible to fully understand without logging on. 3-ER-357, 3-ER-459-61, 4-ER-741-42. And it engineers algorithms that dictate each user's experience to maximize their time spent on its platforms. 3-ER-351-54, 3-ER-452-54, 4-ER-723-27, 4-ER-733-35.

To more effectively ensnare its users, Meta harvests a vast amount of data from them. 3-ER-430-34, 3-ER-453-54, 4-ER-735-36. It compiles an exhaustive dossier on each user: everything from their location to their contacts to what features they use and how long they hover over a post. *See id.* Meta even collects users' activity on other websites. 3-ER-454. It then relies on these dossiers to tailor its efforts to keep users on the platform—and to sell advertisers the ability to precisely target those users they're most interested in reaching. 4-ER-726.

Meta has long known that its platforms—crafted to maximize attention—lead to compulsive use. *See, e.g.*, 3-ER-457-58, 3-ER-486-88, 4-ER-779-81 (cataloging Meta's "years-long concealment" of "detailed research regarding addiction to its products," including its "identification of multiple Meta product features that act as triggers for so-called problematic usage," and findings that such use "causes profound harms, including loss of productivity, sleep disruption, relationship impacts, and safety risks"). That's the whole point: keep users glued to Meta's apps, so companies will pay to advertise on them.

Children are uniquely vulnerable to Meta's efforts to keep users enthralled. Because child and adolescent brains are not fully developed, they lack the emotional maturity, impulse control, and psychological resiliency of adults. 3-ER-326, 3-ER-344-49, 4-ER-658, 4-ER-668-72, 4-ER-739. They are therefore far more susceptible to the addictive features of Meta's platform—and far more likely to be harmed. *Id.*

Meta knows this, too. For years, the company has recognized that its platforms are addictive to kids. *See, e.g.*, 3-ER-456, 3-ER-486-88, 4-ER-704, 4-ER-745, 4-ER-779. As one employee put it, "like addicts," teens are "unable to stop themselves" from scrolling on Instagram. 4-ER-704-05. Meta's app design "just keeps people coming back even when it stops being good for them." *Id.* And that online addiction has real-world consequences: Compulsive social-media use leads to sleep disruption, loss of productivity, anxiety, depression, and other mental health issues. 3-ER-496-97. There is strong evidence linking Instagram to "the dramatic rise in rates of teenage anxiety, depression, and self-harm." 4-ER-771.

Rather than fix the problem—or warn children and their parents—Meta capitalized on it. "[S]ince 2018, almost all of Instagram's $390 million global marketing budget has gone towards showing ads to teenagers." 4-ER-727. Meta targets children because, in its own words, children are its "pipeline" for growth— no matter the human cost. 4-ER-657.

### B. This litigation

As the harm from Meta's social-media platforms became apparent, it began to face claims from children and their families, school districts, and states across the country—all of which suffered the costs of Meta's years-long effort to hook kids. These claims were coordinated into an MDL, from which this appeal arises.

Given the many claims, the district court resolved motions to dismiss in stages. In total, the court has issued four orders governing the application of Section 230 to the plaintiffs' claims. Meta appeals from only two.

### 1. The individual plaintiffs' product-liability claims

The district court first considered the individual plaintiffs' product liability claims, which include design-defect and failure-to-warn claims. 5-ER-941-47. The failure-to-warn claims "allege that [Meta] distributed defective and unreasonably dangerous products without adequately warning users of risks including risk of abuse, addiction, and compulsive use." 5-ER-947. The Court denied Meta's request to dismiss these claims under Section 230. *Id.* For one thing, Meta did "not brief the application of Section 230" to the failure-to-warn claims. *Id.* And, "[i]n any event, … these claims plausibly allege that [Meta is] liable for conduct other than publishing of third-party content": Despite knowing that its platforms cause compulsive use in children, it failed to warn of that risk. *Id.*

While the court approached the failure-to-warn claims holistically, it took a different approach to the design-defect claims. Those claims allege that Meta's apps are "defectively designed" because they pose "a risk of abuse, addiction, and compulsive use by youth." 4-ER-890-91, 4-ER-898. Although the plaintiffs allege that Meta's design features work together to cause compulsive use, *see, e.g.*, 4-ER-738, the court separately analyzed each feature, 5-ER-941. Ultimately, the court held that the design-defect claims could proceed, but it concluded that Section 230 barred allegations related to certain features from serving as the basis for those claims. *See* 5-ER-942.

Meta did not appeal this order. Instead, it asked the district court for permission to appeal under 28 U.S.C. § 1292(b), which authorizes courts to certify otherwise-unappealable interlocutory orders for immediate appeal. 4-ER-643-45. The court declined, explaining that an appeal at that stage would leave this Court with only a "partial record," "invite later piecemeal appeals, and disrupt coordination among parallel proceedings." *Id.*

### 2. The states' and individual plaintiffs' consumer-protection claims and the school districts' negligence and public-nuisance claims

About a year later, the district court issued two more orders addressing the application of Section 230, first, to the states' and individual plaintiffs' consumer-protection claims and, second, to the school districts' negligence and

public-nuisance claims. 1-ER-2, 1-ER-49. The court held that these claims, too, could proceed. *Id.*

The plaintiffs allege several theories in support of these claims, including, for example, that Meta affirmatively misrepresented the safety of its products, that it concealed the risks of its apps, and that it designed, developed, and deployed features "to foster compulsive use." 1-ER-13, 1-ER-78. Meta did not challenge the affirmative misrepresentation theory at all. 1-ER-78. As to the concealment theory—that Meta knew of the "risks of addiction" posed by its platforms but did not warn users about them—the court concluded that Meta had not demonstrated that Section 230 requires limiting this theory "at this early juncture." 1-ER-46, 1-ER-83, 1-ER-145. But it left the door open for Meta to raise the issue again "[i]n a motion for summary judgment, where the facts are in front of the [c]ourt." 1-ER-84.

And as to any theory related to the "design, development, and deployment" of platform features (i.e. a product-defect theory), the court treated this theory in the same way it treated the individual plaintiffs' design-defect claims: The court allowed it to proceed, but granted Meta's request "to dismiss as barred by Section 230 allegations" related to the same features that the court had previously held could not be alleged in support of the freestanding design-defect claims. 1-ER-14-15, 1-ER-72-78.

Without seeking permission, Meta appealed these two orders. 6-ER-1415, 6-ER-1420. The company challenges the orders only "to the extent that they denied

[Meta's] motions to dismiss claims for failure to warn of alleged risks relating to certain platform features … when claims targeting the same underlying platform features are barred by Section 230." *Id.* In other words, Meta's sole claim on appeal is that where the district court dismissed allegations in support of a product-defect theory, it was also required to dismiss those allegations in support of a failure-to-warn theory. *See id.*

The plaintiffs moved to dismiss Meta's appeal for lack of appellate jurisdiction because the orders from which Meta appealed are not final decisions. ECF 43, No. 24-7037. The plaintiffs also filed a conditional cross-appeal, challenging the district court's decision to dismiss any factual allegations at this stage. 9-ER-2060. Meta moved to dismiss the cross-appeal for lack of jurisdiction. The motions panel deferred the jurisdictional issues to the merits panel. ECF 82, No. 24-7037.

### 3. The individual plaintiffs' general negligence claim

While this appeal has been pending in this Court, the district court resolved the last outstanding motion to dismiss. In that order, the court held that the individual plaintiffs' general negligence claim could proceed "to the same extent as set forth in prior orders, including with respect to Section 230." Dkt. 1730 at 28, 4:22-md-3047. Meta did not appeal that order.

## SUMMARY OF ARGUMENT

Meta's appeal fails several times over.

**I.** To start, this Court lacks jurisdiction. Appellate courts only have jurisdiction over final decisions—that is, decisions that end the litigation. Meta appeals the district court's denial of its request to dismiss a handful of factual allegations that, if proven, might support claims that will proceed either way. There's no dispute that decision did not end the litigation.

Meta relies on the collateral-order doctrine, but it cannot satisfy any of its requirements. First, the court's Section 230 orders were not conclusive. In fact, the court made clear that it would reconsider the issue at summary judgment, after further factual development. Second, orders denying a motion to dismiss based on Section 230 are not completely separate from the merits. To the contrary, to determine whether Section 230 applies, courts are required to examine the merits of a plaintiff's claims. That's the only way a court can determine whether the plaintiff impermissibly seeks to hold an internet company liable for its users' content or permissibly seeks to hold it liable for its own conduct.

Finally, it does not imperil the public interest for internet companies to wait until after final judgment to appeal like everyone else. Meta claims that Section 230 provides internet companies immunity from suit, a right to avoid litigation altogether that cannot be vindicated after final judgment. But Section 230 is an ordinary

preemption provision; nowhere does it grant internet companies a right to avoid being sued. And even if it did, there is no grave threat to the public interest that justifies allowing internet companies like Meta to circumvent the final-judgment rule and burden the court system with a succession of piecemeal appeals like this one.

**II.** Even if this Court had jurisdiction, it could not award the relief Meta seeks. Meta does not dispute that the plaintiffs' claims may proceed. It argues that the district court should have dismissed certain factual allegations in support of those claims. But a motion to dismiss under Rule 12(b)(6) tests only whether the complaint "state[s] a claim upon which relief can be granted." If it does, the motion should be denied. There is no authority for the proposition that a district court may—let alone must—dismiss particular factual allegations from a well-pled claim.

**III.** In any event, Meta has not come close to satisfying its burden to demonstrate that Section 230 bars the allegations it seeks to dismiss.

**A.** Section 230 prohibits holding internet companies vicariously liable for the content posted by their users. It does not prohibit holding companies liable for their own conduct. To determine whether a claim is permissible, therefore, this Court requires an examination of the legal duty underlying that claim. And in conducting that examination, the Court asks two questions: First, does the duty arise from the defendant's status as a publisher—that is, does it spring from the dissemination of

unlawful content? And, second, would it require the defendant to monitor the content its users post?

**B.** Here, the answer to both questions is no. First, Meta's duty to warn does not spring from its status as a publisher; it springs from its role as a product manufacturer. Manufacturers have a duty to warn of known defects. And Meta knows that its platforms induce compulsive use in children; it designed them that way. Second, complying with its duty to warn would not require Meta to monitor the content its users post. The problem with Meta's platforms is not the content; it's Meta's design choices. Section 230 does not bar claims that would require Meta to warn of the risks caused by its own choices.

**C.** Meta argues that the district court was nevertheless required to limit the plaintiffs' failure-to-warn theory solely because it limited the allegations that could be invoked in support of a product-defect theory. That contention is squarely foreclosed by this Court's precedent. As this Court has repeatedly held, Section 230 applies differently to different claims. To determine whether it bars a particular claim requires an examination of the duty that underlies that claim.

**D.** Meta does not seriously attempt to conduct this analysis. Instead, it argues that Section 230 bars any claim based on an internet company's publishing tools and features. But that argument, too, is foreclosed by this Court's precedent. This Court has explicitly rejected the contention that Section 230 offers internet companies

18

"absolute immunity from all claims" related to their publishing tools and features. *Lemmon*, 995 F.3d at 1094. Section 230 does not shield companies from liability for their own platform-design choices; it bars claims that "blame" internet companies "for the content" their users create. *Id*. The plaintiffs' failure-to-warn theory does not blame Meta for any of the content posted by its users; it blames Meta for creating apps designed to hook children and failing to alert its users to that risk.

**E.** Presumably that's why Meta does not challenge the failure-to-warn theory itself, instead challenging only those allegations that the district court held could not be used to support a product-defect theory. Not only does this Court's precedent foreclose that challenge, it also rests on a false premise: that the district court *correctly* concluded that the plaintiffs could not rely on those allegations in support of a design-defect theory. But the district court misunderstood the allegations. None seek to blame Meta for the content posted by its users. And so none can be barred by Section 230.

**IV.** The plaintiffs conditionally cross-appeal the district court's decision to dismiss those allegations, to the extent it is inextricably intertwined with Meta's appeal. That would be the case only if the Court concludes that it has jurisdiction over Meta's appeal; that a district court is required at the motion-to-dismiss stage to dismiss allegations, not just claims; and that Section 230 necessarily requires a court to limit a plaintiff's failure-to-warn theory if it limits other theories based on other

legal duties. Only then would the Court need to consider whether the district court was correct to dismiss allegations related to certain features in support of a product-defect theory. If the Court reaches that question on Meta's appeal, it will also have pendent jurisdiction over the cross-appeal raising the same question.

## STANDARD OF REVIEW

The party seeking to invoke this Court's jurisdiction "has the burden of establishing that jurisdiction exists." *Melendres v. Maricopa Cnty.*, 815 F.3d 645, 649 (9th Cir. 2016). If the Court has jurisdiction, it reviews a decision denying a motion to dismiss de novo, taking the allegations of the complaint as true and construing them "in the light most favorable to the plaintiff." *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1030 (9th Cir. 2009). Because Section 230 "is an affirmative defense," Meta bears the burden of establishing it. *Calise*, 103 F.4th at 738 n.1. At the motion-to-dismiss stage, that means the defense must "clearly appear[] on the face of the pleading." *Boquist v. Courtney*, 32 F.4th 764, 774 (9th Cir. 2022).

## ARGUMENT

## I.    This Court should dismiss the appeal for lack of jurisdiction.

Meta's appeal fails at the outset: The orders from which it appeals are not final decisions, so this Court lacks jurisdiction. Although Meta invokes the collateral-order doctrine, it cannot satisfy the doctrine's stringent requirements. Indeed, every circuit to have considered the issue has held that orders denying a Section 230 defense are

not immediately appealable. *Gen. Steel Domestic Sales, L.L.C. v. Chumley*, 840 F.3d 1178, 1179-80 (10th Cir. 2016); *Jones v. Dirty World Ent. Recordings LLC*, 2012 WL 13418361 (6th Cir. May 9, 2012).

Initially, Meta agreed. When the district court first rejected Meta's contention that Section 230 bars the plaintiffs' failure-to-warn claims, the company did not appeal under the collateral-order doctrine. Instead, it sought permission to appeal under § 1292(b), under which courts may authorize the appeal of decisions that are not otherwise immediately appealable. It was only when that permission was denied that Meta changed course and argued that subsequent orders reaching the same conclusion were appealable under the collateral-order doctrine.

Meta was right the first time. Orders denying a Section 230 defense do not satisfy the collateral-order doctrine's requirements. This Court should therefore dismiss this appeal.

**1.** Since the Judiciary Act of 1789, Congress has "forbidd[en] piecemeal" appeals "of what for practical purposes is a single controversy." *Cobbledick v. United States*, 309 U.S. 323, 324-25 (1940). A party is "entitled to a single appeal" after final judgment, where "claims of district court error at any stage of the litigation may be ventilated." *Digit. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1992). Were it otherwise, parties would spend years litigating appeals from interlocutory rulings before a district court has even rendered a judgment—and appellate courts would

have to reconsider the same lawsuit over and over. *See United States v. Acad. Mortg. Corp.*, 968 F.3d 996, 1002 (9th Cir. 2020).

The final-judgment rule is jurisdictional: "[C]ourts of appeals" only "have jurisdiction of appeals from … final decisions." 28 U.S.C. § 1291. Ordinarily, a final decision is "deemed not to have occurred" unless it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 798 (1989). But the Supreme Court has recognized "a narrow class of decisions that do not terminate the litigation, but are sufficiently important and collateral to the merits that they should nonetheless be treated as final." *Will*, 546 U.S. at 347.

To fall within this "narrow class" of so-called "collateral orders," a decision must meet three requirements: It must (1) be "effectively unreviewable on appeal from a final judgment"; (2) "resolve an important issue completely separate from the merits"; and (3) "conclusively determine the disputed question." *Id.* at 345. The Supreme Court has repeatedly emphasized that these requirements "are stringent" and must be "kept so." *Id.* at 349-50. Otherwise, what is meant to be a "narrow exception" will swallow the rule and undermine the important interests served by prohibiting piecemeal appeals. *Digit. Equip.*, 511 U.S. at 873.

**2.** Meta has not demonstrated that Section 230 orders satisfy a single collateral-order requirement, let alone all three.

***Section 230 orders are not effectively unreviewable on appeal.*** An order is "effectively unreviewable on appeal" if "the legal and practical value of the right at stake will be destroyed if not vindicated before trial." *McElmurry v. U.S. Bank Nat. Ass'n*, 495 F.3d 1136, 1140 (9th Cir. 2007). An order rejecting a defense to liability is the quintessential example of a decision that can be effectively reviewed after judgment. *See Miranda B. v. Kitzhaber*, 328 F.3d 1181, 1190 (9th Cir. 2003) ("Denial of a defense to suit is not immediately appealable."). If the district court gets it wrong, the court of appeals can simply reverse; the defendant's right to avoid liability remains intact. *See Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 43 (1995).

Meta does not argue otherwise. Instead, the company contends that Section 230 is not just a defense. Section 230, Meta claims, grants internet companies immunity from suit—a right to avoid litigation that would be irrevocably lost absent immediate appeal. Opp'n Mot. Dismiss 8, Dkt. 64.1, No. 24-7037. But, at most, Section 230 grants internet companies immunity from *liability*—the "right to *prevail* at trial," not a right to avoid trial entirely, *Pullman Constr. Indus., Inc. v. United States*, 23 F.3d 1166, 1169 (7th Cir. 1994). And even if Section 230 did provide immunity from suit, it is not the right to avoid suit that renders an order "effectively unreviewable on appeal"; it's the right to avoid a lawsuit "that would imperil a substantial public interest." *Will*, 546 U.S. at 353.

**a.** The Supreme Court has repeatedly emphasized that courts considering attempted collateral-order appeals are "require[d]" to "view claims" of immunity from suit "with skepticism, if not a jaundiced eye." *Digit. Equip.*, 511 U.S. at 873. After all, almost any right that could be "enforced by pretrial dismissal" could be characterized as a right not to face suit. *Will*, 546 U.S. at 351.

Ordinarily, therefore, "an explicit statutory or constitutional guarantee" is required to conclude that a private party has been granted immunity from suit for purposes of the collateral-order doctrine. *Midland Asphalt*, 489 U.S. at 801; *Chumley*, 840 F.3d at 1181; *United States v. Hickey*, 367 F.3d 888, 895 (9th Cir. 2004). Section 230 "does not mention immunity" from suit "or any synonym." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100 (9th Cir. 2009). It states that: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). As this Court has repeatedly explained, this is a "statutory bar on *liability*" for claims that treat internet companies as publishers of third-party content. *Barnes*, 570 F.3d at 1100 (emphasis added). The Court has cautioned that "we must closely hew to [its] text … in construing its extent." *Id.* Nothing in the text of this provision even suggests, let alone expressly grants, a right to avoid litigation entirely.

Meta argues (at 27-28) that the statute's policy statement provides the missing link. But that statement is no different than the policy statements in statutes across

the federal code: It expresses broad policy goals in hortatory terms. *See, e.g.*, 47 U.S.C. § 230(b)(1) ("It is the policy of the United States to promote the continued development of the Internet."). It does not say that those goals are to be achieved by granting internet companies immunity from suit, rather than simply a defense.

Meta tries to bolster its argument by invoking Section 230(e)(3), but that is "merely a preemption provision"; it too gives no indication that the statute grants internet companies immunity from suit. *Chumley*, 840 F.3d at 1182. Section (e)(3) is one of several provisions that explain Section 230's "[e]ffect on other laws." 47 U.S.C. § 230(e). The section, entitled "State law," provides: "Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3). As this Court has explained, this provision "preempts inconsistent state laws." *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 681 (9th Cir. 2019). And preemption is a defense to liability under state law, not an immunity from suit. *See Chumley*, 840 F.3d at 1182; *SolarCity Corp. v. Salt River Project Agric. Improvement & Power Dist.*, 859 F.3d 720, 726-27 (9th Cir. 2017) ("[D]efendants cannot immediately appeal an order rejecting their reliance on statutory preemption."); *Martin v. Halliburton*, 618 F.3d 476, 486 & n.16 (5th Cir. 2010) (collecting cases).

Indeed, interpreting Section 230's preemption provision as providing immunity from suit would lead to the absurd result that internet companies enjoy absolute immunity from suits brought under *state* law but only a defense to suits brought under *federal* law. If Congress actually wanted to provide internet companies a right to avoid litigation entirely, it easily could have said so. *Cf., e.g.*, *Hampton v. California*, 83 F.4th 754, 762 (9th Cir. 2023) (applying the collateral-order doctrine to a statute that explicitly states that "a covered person shall be immune from suit"). There's no reason to believe that Congress hid an extraordinary immunity in an ordinary preemption provision. *See Jones v. Google LLC*, 73 F.4th 636, 643 (9th Cir. 2023) ("Congress does not hide elephants in mouseholes.").[4]

Unable to rely on the text of Section 230, Meta retreats (at 30-33) to a handful of stray comments from courts characterizing the statute as providing immunity from

---

[4] In a footnote, Meta asserts that Section (e)(3) must be read to provide immunity from suit because otherwise, it would be redundant to say that "[n]o cause of action may be brought" and "no liability may be imposed" under inconsistent state law. Opening Br. 29 n.7; Opp'n Mot. Dismiss 12 n.6. "Arguments raised only in footnotes … are generally deemed waived." *Est. of Saunders v. Comm'r*, 745 F.3d 953, 962 & n.8 (9th Cir. 2014). Regardless, there is no superfluousness problem here: Liability may be imposed absent a cause of action—by, for example, a state administrative agency. And a cause of action may be brought without the imposition of liability—such as injunctive relief where a company intends to violate the law, but has not done so yet. Moreover, "sometimes the better overall reading of [a] statute contains some redundancy." *Atl. Richfield Co. v. Christian*, 590 U.S. 1, 14 n.5 (2020). It is "much more likely that Congress employed a belt and suspenders approach" to Section (e)(3) than that it chose to grant immunity from suit to internet companies by preempting inconsistent state-law claims. *Id.*

suit. But not a single case Meta cites involved the collateral-order doctrine. The Tenth Circuit rejected the same gambit. *Chumley*, 840 F.3d at 1182. And the Supreme Court has repeatedly rejected the contention that such loose characterizations control whether a right truly constitutes a right not to be tried for purposes of the collateral-order doctrine. *See, e.g. Digit. Equip.*, 511 U.S. at 873; *United States v. Hollywood Motor Car Co.*, 458 U.S. 263, 268 (1982). After all, any right to end litigation—from a defense under Section 230 to claim preclusion to the lack of personal jurisdiction—can "loosely be described as … a right not to stand trial." *Digit. Equip.*, 511 U.S. at 873.

Despite its occasional loose language, this Court has repeatedly recognized that Section 230 provides a defense to *liability*—including in the cases Meta itself cites. *See, e.g.*, *Roommates.com*, 521 F.3d at 1162 (Section 230 "immunizes … against liability"); *Carafano v. Metrosplash.com*, 339 F.3d 1119, 1122 (9th Cir. 2003) (Section 230 "granted … immunity from liability"); *see also, e.g.*, *Calise*, 103 F.4th at 740 (Section 230 "does not mention immunity" and "only protects from liability" internet companies whom the plaintiff seeks to treat as a publisher).

The Tenth Circuit has squarely rejected the contention that Section 230 provides immunity from suit for purposes of the collateral-order doctrine. *Chumley*, 840 F.3d at 1182. This Court should do the same.

**b.** Even if Section 230 could be construed as providing immunity from suit, it still would not satisfy the effective-unreviewability requirement. "[I]t is not mere

avoidance of a trial, but avoidance of a trial that would imperil a substantial public interest, that counts when asking whether an order is effectively unreviewable if review is to be left until later." *Will*, 546 U.S. at 352-53.

The orders that satisfy this high burden are few and far between and involve the weightiest of public interests. Double Jeopardy orders, for example, meet this burden because there is a strong public interest in avoiding unconstitutionally subjecting a person to the "enormous prosecutorial power of the Government." *Id.* Orders denying state sovereign immunity under the Eleventh Amendment also clear the bar, because the dignity of the states as co-equal sovereigns is at stake. *Id.*

Less weighty interests do not count. Thus, the Supreme Court held that even the Federal Tort Claims Act, which explicitly imposes "a complete bar to any action" against government employees, does not provide a right to avoid suit important enough to allow for collateral-order appeal. *Id.* at 348-49 (quoting 28 U.S.C. § 2676). Avoiding the costs of litigation is not a sufficiently "compelling public" interest to overcome the final-judgment rule. *Id.* at 352-53; *see Acad. Mortg.*, 968 F.3d at 1007.

Meta seeks an exception to this rule for internet companies, arguing (at 31) that there will be a "chilling effect on … third-party speech" if they are forced to bear the costs of litigation like everyone else. But courts have repeatedly rejected the contention that an immediate appeal is "necessary to prevent an unacceptable chill of … First Amendment rights." *Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 711 F.3d

1136, 1140-41 (9th Cir. 2013). Meta offers no reason to believe that Section 230 is any different. *See id.*

   ***Section 230 orders are not completely separate from the merits.*** Section 230 orders also do not satisfy the second collateral-order requirement: They are not "completely separate" from the merits. *Van Cauwenberghe v. Biard*, 486 U.S. 517, 527 (1988). Like all collateral-order requirements, the mandate that orders be completely separate from the merits is strictly construed. *See id.* If reviewing an order would require the court to consider the "substance of the dispute," or undertake an inquiry into the facts or the "legal issues," it cannot be immediately appealed. *See id.*

   Thus, orders denying *forum non conveniens* motions are not "completely separate from the merits" because in some cases, a court might consider factors—such as the availability of witnesses or ease of access to evidence—that would require an understanding of the "substance of the dispute." *Id.* at 527-28. Orders designating a lead plaintiff in a securities class action are not "completely separate" because determining a plaintiff's "adequacy … necessarily involves the consideration of facts and circumstances that relate directly to the merits of the action, such as the typicality of the claims." *Z-Seven Fund, Inc. v. Motorcar Parts & Accessories*, 231 F.3d 1215, 1219 (9th Cir. 2000). Discovery-sanctions orders are also insufficiently separate from the merits because reviewing them may require the "court to inquire into the importance of the

information sought or the adequacy or truthfulness of a response." *Cunningham v. Hamilton County*, 527 U.S. 198, 205 (1999).

Section 230 orders are far more enmeshed with the merits than orders about whether a lawsuit has been brought in an inconvenient forum or a party committed sanctionable discovery misconduct. The defense applies only where the plaintiff seeks to impose a duty that would "necessarily require an internet company to monitor third-party content," *HomeAway.com*, 918 F.3d at 682, and even then, only where the company did not "contribute[] materially to the alleged illegality," *Rommates.com*, 521 F.3d at 1168. It would be virtually impossible to determine either without examining the "substance of the dispute." *Van Cauwenberghe*, 486 U.S. at 528.

Meta contends that Section 230 "is routinely decided … without considering the merits." Opp'n Mot. Dismiss 17. But in every case Meta cites, the Court considered the substance of the claims. In *Carafano*, for example, the Court examined the conduct that the plaintiff alleged gave rise to her tort claims—the same conduct that the Court would have to examine to decide the merits of the case. 339 F.3d at 1124. The same is true of the other cases Meta cites. *See, e.g.*, *Roommates.com*, 521 F.3d at 1170 (denying Section 230 defense to housing discrimination claim because the defendant was "sufficiently involved with the design and operation of the search and email systems—which are engineered to limit access to housing on the basis of the protected characteristics elicited by the registration process," again the same facts

that underlay the claim on the merits); *Atkinson v. Meta Platforms, Inc.*, 2021 WL 5447022, at *2 (9th Cir. Nov. 22, 2021) (unpublished decision affirming dismissal of implied-warranty claims on Section 230 grounds because the "allegations all center on Meta Platforms' removal of [the plaintiff's] posts").

Meta cannot seriously argue otherwise. Instead, its separateness argument rests on its claim that Section 230 provides immunity from suit. Opp'n Mot. Dismiss 17. Not only is that claim incorrect, it's irrelevant. The Supreme Court has held that like any other order, orders denying immunity from suit cannot be collaterally appealed if they are enmeshed with the merits. *See Johnson v. Jones*, 515 U.S. 304, 315, 317-18 (1995).

***Section 230 orders are not conclusive.*** Meta also cannot satisfy the final collateral-order requirement: that the order conclusively resolve the issue. As long as an issue "remains open, unfinished or inconclusive, there may be no … appeal." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). That's precisely the case here. A denial of a motion to dismiss based on Section 230 is "inherently tentative." *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 278 (1988). It means only that the defendant has not, at that stage, met its burden to prove that it is entitled to the defense. It "does not … close the matter for all time." *Id.* Here, for example, the court denied Meta's Section 230 defense "for now" and indicated that on a motion for summary judgment following factual development, it may reconsider.

1-ER-83-84. That, too, is sufficient to deny collateral-order review. *See Digit. Equip.*, 511 U.S. at 868 n.2; *Gulfstream*, 485 U.S. at 278.

## II. Meta cannot use a motion to dismiss to strike factual allegations.

Even if Meta could immediately appeal, the company seeks relief it cannot get. The company chose to appeal only two of the district court's orders, and those orders address only a few of the plaintiffs' claims: the individual plaintiffs' consumer-protection, fraudulent concealment, and negligent concealment claims, and the school districts' negligence claim.[5] 6-ER-1420. But on appeal, Meta does not argue that any of these claims should have been dismissed. Nor does it argue that these claims may not proceed on a failure-to-warn theory. Instead, the company seeks the dismissal of allegations about certain design features. *See* Opening Br. 49; 6-ER-1420. Thus, to win on appeal, Meta must demonstrate that the district court was required to dismiss those allegations, even though it concluded that the plaintiffs' claims were well-pled.

But, by its terms, Rule 12(b)(6) tests the sufficiency of "*claim[s]*"—not parts of claims or specific factual allegations, claims. Fed. R. Civ. P. 12(b)(6) (emphasis added); *see Hartmann v. California Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1122, 1125 (9th Cir. 2013); *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015). The Rule authorizes

---

[5] The states' consumer-protection claims are also on appeal, but the states are filing a separate brief. ByteDance limited its appeal in the same way as Meta. 3-SER-479·

dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss," therefore, a complaint need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hartmann*, 707 F.3d at 1121. Once that requirement is satisfied, the motion must be denied. *Id.* at 1122; *BBL*, 809 F.3d at 325. Nothing in Rule 12(b)(6) requires, or even allows, a court to go further and dismiss "parts of claims" or factual allegations underlying claims. *BBL*, 809 F.3d at 325; *see also Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 310 (2007) ("The inquiry is whether *all* of the facts alleged, taken collectively," are sufficient, "not whether any individual allegation, scrutinized in isolation," is enough.).[6]

The Federal Rules do provide a mechanism for a defendant to seek judgment on parts of claims: summary judgment. Whereas litigants may only move to *dismiss* a "claim," they may seek *summary judgment* on a "claim" or any "part of [a] claim." Fed. R. Civ. P. 56(a). That makes sense: Once a district court has determined that a

---

[6] *Accord, e.g.*, *Spice Jazz LLC v. Youngevity Int'l, Inc.*, 2020 WL 6565268, at *5 (S.D. Cal. Nov. 9, 2020) (denying motion to dismiss "parts of the factual allegations" where "[t]he Court has already found that the [complaint] contains factual allegations that are enough to state a plausible claim for relief"); *Hightower v. JPMorgan Chase Bank, N.A.*, 2012 WL 1287831, at *3 (C.D. Cal. Sept. 12, 2012) (a motion to dismiss "is improper" where a defendant "has moved only to dismiss certain allegations supporting Plaintiffs' claims for relief, but has not moved to dismiss any of Plaintiffs' claims themselves"); *Thompson v. Paul*, 657 F. Supp. 2d 1113, 1129 (D. Ariz. 2009) ("[A] Rule 12(b)(6) motion may [not] be used to strike certain allegations in support of a claim, where the underlying claim itself is not challenged.").

complaint states a claim, there's no reason for it to further examine the factual allegations; those allegations will soon be supplanted by the actual facts, which may turn out to be different than the plaintiff alleged. Summary judgment allows a district court to tailor the plaintiff's claims based on the actual facts. Given that the Rules explicitly contemplate summary judgment on parts of claims, if Rule 12(b)(6) required the dismissal of parts of claims, "it would surely have said so." *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 545 (1991).

## III. Meta has not demonstrated that Section 230 limits the plaintiffs' failure-to-warn theory.

Even if this Court could require district courts to dismiss factual allegations, Meta has not offered any convincing argument for why it should do so here. Section 230 is an affirmative defense that Meta bears the burden to establish. *See Calise*, 103 F.4th at 738 n.1. Meta has not done so.

Section 230 bars claims that seek to hold internet companies vicariously liable for the content posted by their users. It does not prohibit holding internet companies liable for their own conduct. Meta designed its platforms to induce compulsive use and targeted them at children; it knew that its design choices were, in fact, causing children to become addicted; and it concealed that risk. Nothing in Section 230 shields Meta from being held accountable for this conduct.

Meta does not argue otherwise. Instead, it contends that because the district court held that a product-defect theory of liability could not rest on allegations about

34

certain features, a failure-to-warn theory can't either. But this Court has repeatedly held that Section 230 applies differently to different claims. That's because different claims impose different legal duties. To determine whether Section 230 applies to a claim, a court must analyze the duty underlying *that* claim.

Although Meta seeks to dismiss allegations about certain design features, it does not specifically analyze how any of those features affect its duty to warn. The company instead argues (at 36) that Section 230 bars *any* claim that rests on a duty to warn of harm caused by an internet company's "publishing tools." That argument, too, is foreclosed by this Court's precedent, which explicitly holds that Section 230 does *not* bar claims based on an internet company's publishing tools. It only bars claims based on the content users create with those tools. None of the plaintiffs' claims seek to blame Meta for the content its users create.

### A. Section 230 shields internet companies from liability for unlawful content posted by their users, not for their own conduct.

**1.** Section 230 protects internet companies from being held derivatively liable for content posted by their users. *Internet Brands*, 824 F.3d at 850. Again, the statute states: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). This language does not absolve companies of all legal obligations simply because they operate online. *See Roommates.com*, 521 F.3d at 1164. It

provides a defense only to claims that impose liability on internet companies "as the publisher" of information "provided by" someone else. *See id.*

In determining the scope of this defense, then, the "key word" is "publisher." *Calise*, 103 F.4th at 738. The statute itself does not define that term; it didn't need to. By the time Section 230 was enacted, the concept of publisher liability had "a well-defined meaning at common law." *Id.*; *see Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110, 121 & n.11 (4th Cir. 2022). "[A] publisher was someone who intentionally or negligently disseminated information to third parties." *Henderson*, 53 F.4th at 121 (citing Restatement (Second) of Torts § 577). To impose liability on a company *as* a publisher meant to impose liability *for* "[p]ublication." *Calise*, 103 F.4th at 738. And "[p]ublication," in turn, meant "any act by which unlawful matter is intentionally or negligently communicated to a third person." *Id.* (citing Restatement (Second) of Torts §§ 577, 630).

Thus, publisher liability was liability for disseminating "unlawful content." *Id.*; *accord Henderson*, 53 F.4th at 122 ("[T]o hold someone liable as a publisher at common law was to hold them responsible for the content's improper character."). Defamation is the paradigmatic example: Holding the New York Times liable for an article that falsely claims its subject is a murderer imposes liability on the Times "as a publisher." *Lemmon*, 995 F.3d at 1091. But defamation was not the only claim that could be brought against a publisher. Publishers' liability extended to any tort that

36

was based on "the improper nature of their disseminated content." *Henderson*, 53 F.4th at 122 n.15 (citing as examples false-light and invasion-of-privacy claims).

When Congress "transplanted" the concept of publisher liability from the common law into Section 230, it brought this "old soil with it," *Stokeling v. United States*, 586 U.S. 73, 80 (2019). *See George v. McDonough*, 596 U.S. 740, 753 (2022) ("[W]hen Congress employs a term of art, that usage itself suffices to adopt the cluster of ideas that were attached to each borrowed word."). Thus, by shielding internet companies from claims that "treat" them "as the publisher" of third-party content, Section 230 prohibits holding them liable for the "improper nature of the content" that their users post. *Henderson*, 53 F.4th at 122; *see Internet Brands*, 824 F.3d at 850 (Section 230 "protects websites from liability for material posted on the website by someone else"); *Lemmon,* 995 F.3d at 1093 ("[Section] 230(c)(1) cuts off liability only when a plaintiff's claim faults the defendant for information provided by third parties."); *Bride v. Yolo Techs.*, 112 F.4th 1168, 1175 (9th Cir. 2024) ("[Section] 230 protects apps and websites which receive content posted by third-party users … from liability for any of the content posted on their services.").

**2.** To determine whether Section 230 applies to a claim, this Court's case law "require[s]" an examination of the "legal duty" underlying that claim. *Calise*, 103 F.4th at 741. In conducting that examination, the Court considers two questions, both

of which ultimately seek to determine the same thing: whether the claim holds the defendant vicariously liable for content posted by its users.

First, the Court asks, "what is the right from which the duty springs?" *Id.* at 742. "If it springs from something separate from the defendant's status as a publisher, such as from an agreement or from obligations the defendant has in a different capacity," then the claim does not stem from a publisher's duty not to disseminate unlawful content. *Id.* And Section 230 "does not apply." *Id.*

Second, "what is this duty requiring the defendant to do?" *Id.* Does it "necessarily require an internet company to monitor"—or edit or remove—the content posted by its users? *Id.* at 741-42. If the duty does not require the defendant to monitor third-party content, then, again, it does not impose liability for that content. And, again, Section 230 does not apply. *See id.*

**a.** This Court's precedent illustrates each prong of the analysis. Start with step 1, the source of the duty. And take, for example, this Court's decision in *Barnes*. 570 F.3d at 1102. There, the plaintiff sued Yahoo for disseminating indecent profiles of her that her ex-boyfriend had posted without her consent. *Id.* at 1098-99. The plaintiff alleged that by failing to remove the profiles, the company violated two legal duties. First, because Yahoo had initially undertaken to remove the profiles, she alleged, it was liable for the harm caused when the company instead continued to disseminate them. *Id.* at 1099, 1102-03. That claim, this Court held, was barred by

38

Section 230 because the duty it would impose sprung from Yahoo's role as "the publisher of the content it failed to remove"—that is, from its publication of "hurtful material." *Id.* at 1103, 1107.

But, the Court concluded, the same was not true of the plaintiff's second claim: a promissory estoppel claim, which alleged that Yahoo had explicitly promised the plaintiff that it would remove the profiles and then failed to honor its promise. *Id.* at 1107. That claim could go forward because the duty it imposed did not derive from Yahoo's role as the publisher of harmful content; it derived from a promise Yahoo chose to make. *Id.* Yahoo was being held liable for its *own* conduct (making and breaking a promise), not for disseminating the unlawful speech of others. And Section 230 does not shield companies from liability for their own conduct. *See, e.g.*, *Lemmon*, 995 F.3d at 1092; *HomeAway.com*, 918 F.3d at 682-83; *Roommates.com*, 521 F.3d at 1165.

**b.** This Court addressed the second step of the analysis—whether a legal duty "necessarily require[s] an internet company to monitor" its users' content—in *HomeAway.com*, 918 F.3d at 682. There, online platforms that host listings for vacation rentals (like AirBnB) challenged a city ordinance prohibiting the platforms from "processing" requests to book unlicensed properties. *Id.* at 680. The Court held that Section 230 did not prohibit the ordinance's enforcement.

The companies argued that they would have to "monitor[] … incoming requests to complete a booking transaction" and compare them to the city's registry

of licensed vacation rentals. *Id.* But that kind of "internal monitoring," the Court held, does not implicate Section 230. *Id.* "To provide broad immunity every time a website uses data initially obtained from third parties, would eviscerate" the statute. *Id.* Section 230 shields companies from liability for publishing third-party content, not for using it. *See id.*

The companies also complained that although the ordinance might not technically require that they remove user-posted listings for unlicensed rentals, they would have to do so anyway: A vacation-rental platform "cannot leave in place a website chock-full of un-bookable listings." *Id.* at 683. The Court rejected this argument too. *Id.* It is not enough that monitoring—or removing—content may be the "most practical compliance option" or "the best option from a business standpoint." *Id.* Section 230 only applies if a company is "require[d]" to monitor third-party content. *Id.* at 682-83. In other words, content "moderation must be more than one option in [a company's] menu of possible responses" to a legal duty; "it must be the only option." *Bride*, 112 F.4th at 1177 n.3.

**c.** This Court's decision in *Lemmon v. Snap* demonstrates how these principles apply to a case similar to this one. 995 F.3d 1085. There, the parents of two children who died in a high-speed car accident sued Snap, the maker of the social media app Snapchat, which enables users to upload and share photos and videos. The parents claimed that the app was defectively designed, focusing on two features in

40

particular: (1) an "incentive system" that Snap created to "keep its users engaged" by unpredictably "reward[ing] them with trophies, streaks, and social recognitions" for using the app; and (2) a "Speed Filter" that allowed users to overlay their real-time speed on top of a photograph. *Id.* at 1088-89. In combination, the parents alleged, these features encouraged teen Snapchat users to drive dangerously fast, in an effort to seek a "reward" within the app. *Id.* Teenagers viewed this as "a game ... with the goal being to reach 100 MPH, take a photo or video with the Speed Filter, and then share the 100-MPH-Snap on Snapchat." *Id.* The parents argued that Snap was liable for the defects in its product that encouraged teenagers to play that deadly game, just as any offline company would be. *See id.*

After carefully analyzing the "specific duty" underlying this product-defect claim, this Court held that Section 230 did not apply. *Id.* at 1092, 1094. The Court began by determining whether the duty stemmed from Snap's status as a publisher. The parents did not seek to hold Snap liable for publishing illegal content. *Id.* at 1092. They sought to hold it liable for "designing a product ... with a defect." *Id.* A negligent-design claim, the Court explained, "rests on the premise that manufacturers have a duty to exercise due care in supplying products that do not present an unreasonable risk of injury or harm to the public." *Id.* That duty "differs markedly from the duties of publishers"—publishing, editing, monitoring, and removing third-party content. *Id.* "It is thus apparent," the Court concluded, that

41

the claim does not stem from Snap's "conduct as a publisher." *Id.* It "springs from [Snap's] distinct capacity as a product designer." *Id.*

The Court then considered whether the duty necessarily required monitoring its users' content. The Court observed that Snap "could have satisfied its alleged obligation—to take reasonable measures to design a [safe] product … —without altering the content that Snapchat's users generate." *Id.* To provide a safer product, all Snap needed to do was change the features the company itself had designed. *See id.* It could have removed its speed filter, for example, or changed its incentive system. *See id.* It need not have changed its users' content. Section 230 therefore did not apply. *See id.*

**3.** This Court has repeatedly rejected "attempts to expand" Section 230 "beyond these straightforward principles." *Id.* at 1094. Over and over again, the Court has refused companies' attempts to cloak themselves in Section 230 simply because a claim would not have occurred but for a company's "[p]ublishing activity." *See, e.g.*, *Internet Brands*, 824 F.3d at 853. After all, "publishing content is a but-for cause of just about everything" a social media company does. *Lemmon*, 995 F.3d at 1093. Section 230 "does not declare a general immunity from liability deriving from third-party content." *Internet Brands*, 824 F.3d at 852. Nor does it immunize internet companies from all claims related to the "tools" they use to

publish. *Lemmon*, 995 F.3d at 1093-94. Section 230 "cuts off liability" only where the claim seeks to hold an internet company liable for content its users posted. *See id.*

**B.    The duty underlying the plaintiffs' failure-to-warn theory imposes liability on Meta for its own conduct, not its users' content.**

Although the exact elements of the claims on appeal differ, the failure-to-warn theory for each claim rests on the same duty: "The manufacturer of a product … [has] a duty to warn" when it "knows or has reason to know that its product is or is likely to be dangerous." *Air & Liquid Sys. Corp. v. DeVries*, 586 U.S. 446, 452–53 (2019) (citing Restatement (Second) of Torts § 388). The plaintiffs allege that Meta violated that duty by failing to inform them of the "known risks of addiction" to its products. 1-ER-46, 1-ER-49. Their claims based on that violation do not treat Meta as a publisher; they treat Meta as a product manufacturer.[7]

First, the duty to warn does not spring from Meta's status as a publisher. It springs from its choice to market products that it knows are dangerous. *See Air & Liquid Sys.*, 586 U.S. at 452-53. For years, Meta has known that its platforms induce "compulsive use," especially among children. *See, e.g., supra* pages 10-11. It designed them to do so. *See id.* 9-11. And study after study—both internal and external— demonstrated that Meta's efforts worked: Teens cannot stop scrolling, "even though

---

[7] The only failure-to-warn theory the district court considered, and the only one Meta addresses, is the failure to warn about the risk of compulsive use. 1-ER-15, 1-ER-83; Opening Br. 7.

they want to." 3-ER-487; *see supra* pages 10-11. That compulsive use "causes profound harms, including loss of productivity, sleep disruption," and mental health problems. 4-ER-771, 4-ER-779. Meta knows this too, yet it continues to market its products to teens anyway. 4-ER-739, 4-ER-743-47, 4-ER-779.

It is that knowledge, not anything that Meta's users post, that gives rise to its obligation to warn. Manufacturers must warn of known dangers in their products, regardless of whether they make cars or cigarettes or social media apps. This duty "differs markedly" from the "duties of publishers" to review, monitor, and publish content. *Lemmon*, 995 F.3d at 1092. The claim is not that cat videos are irresistible, so Meta must screen for and warn users about kitten content; it's that the design of Meta's platforms itself poses a risk of compulsive use, regardless of what content its users post. Meta must warn about the harm caused by that risk.

Second, complying with the duty to warn would not require Meta to monitor—or edit or remove—third-party content. It would require Meta to provide warnings that its products may foster compulsive use that is harmful to children. "[A]n alleged tort based on a duty that would require such a self-produced warning falls outside of section 230(c)(1)." *Internet Brands,* 824 F.3d at 851.[8]

---

[8] Citing an out-of-circuit district court case, Meta argues (at 38-39) that *Internet Brands* is "best read" to hold that Section 230 applies where claims "depend on a close

### C. This Court's duty-based approach to Section 230 forecloses Meta's attempt to limit the failure-to-warn theory without examining the duty that underlies it.

As explained above, Meta chose not to challenge the plaintiffs' ability to proceed on a failure-to-warn theory. Its sole claim on appeal is that the failure-to-warn theory must be limited in the same way that the district court limited the plaintiffs' product-defect theory: by dismissing allegations related to certain features. But Meta never explains how those features transform a duty that is not barred by Section 230 into one that is. It doesn't even try. Instead, the company argues that *because* the district court held that a product-defect theory based on these allegations was barred, a failure-to-warn theory based on these features must *necessarily* be barred too. That argument is squarely foreclosed by this Court's precedent.

This Court has repeatedly held that Section 230 "requires courts to examine each claim" to determine whether the duty underlying that claim treats the defendant as the publisher of third-party content. *Calise*, 103 F.4th at 740-42; *Bride*, 112 F.4th at 1168. After undertaking this analysis, this Court has often concluded that some claims in a case are barred by Section 230, while others—though based on the

---

connection between the proposed warning and user-generated content." It's not clear what that means or how it could be workably applied. But, in any event, it is not what *Internet Brands*—or any other Ninth Circuit case—says. The test is whether a claim seeks to hold an internet company liable for the improper content of its users, not some amorphous "close connection." *See supra* Part III.A.

same facts—may proceed. *See, e.g.*, *Calise*, 103 F.4th at 743-44; *Barnes*, 570 F.3d at 1103, 1106-07; *Bride*, 112 F.4th at 1179-80.

In *Calise*, for example, the Court held that Section 230 barred claims alleging that Meta violated a duty to prevent fraudulent advertising on its website. *Calise*, 103 F.4th at 743-44. Those claims treated Meta as a publisher because they sought to hold the company liable for the unlawful nature of the content its users posted. *Id.* at 743-44. But the plaintiffs also brought contract claims, alleging that Meta had violated a "promise to moderate third-party advertisements." *Id.* Those claims, the Court held, could go forward because they did not rest on a duty to avoid disseminating fraudulent content; they rested on Meta's duty—publisher or not—to comply with its contractual obligations. *Id.*

*Calise* is not an outlier. This Court has repeatedly emphasized that determining whether Section 230 applies "is not simply a matter of examining the record to see if a claim, including its underlying facts, stems from third-party content." *Bride*, 112 F.4th at 1178. Nor is there any "bright-line rule" that mandates that all tort claims rise and fall together. *See id.* Instead, a court "must engage in a careful inquiry into the fundamental duty" that "each cause of action" would impose. *Id.* at 1176, 1178. Section 230 does not bar one claim simply because it bars another claim arising from the same facts. *See, e.g.*, *Barnes*, 570 F.3d at 1106. It bars a claim if the duty imposed by that

claim would treat an internet company as the publisher of—i.e. hold the company vicariously liable for—third-party content. *Id.* at 1102; *see supra* Part III.A.

None of the cases that Meta cites holds otherwise. Meta leads with *Barnes*, but *Barnes* only proves the point. As explained above, *Barnes* held that although Section 230 barred a claim for negligently failing to remove unlawful content, it allowed a claim for breaching a promise to remove that content. *Barnes*, 570 F.3d at 1103, 1106-07. The difference? The duty underlying the claims. *See id.*

Meta's other cases, too, employ the claim-by-claim duty-focused analysis it asks this Court to eschew. Take *Bride*, for example. In that case, the plaintiffs sued an internet company after being subjected to "extreme harassment and bullying" on the company's app. *Bride*, 112 F.4th at 1172. As in *Barnes*, the Court separately analyzed the duty underlying each claim. Where the claim sought to impose a duty to "moderat[e]" its users' content, the Court held that Section 230 applied. *Id.* at 1180. But where it stemmed from some other duty—such as a company's duty not to misrepresent its own services—it could proceed. *Id.* at 1178-79. The failure-to-warn claims in that case were barred not because other claims in the case were also barred,

but because they sought to impose a duty to "mitigat[e] … the harmful effects of the harassing and bullying content." *Id.* at 1180.[9]

Ultimately, Meta cannot identify a single case in which this Court—or any other—has held that a failure-to-warn claim necessarily fails simply because Section 230 bars some other claim. That's because, again, the rule is clear: To determine whether Section 230 applies to a claim, a court must analyze the duty underlying that claim. *See Calise*, 103 F.4th at 740. Meta's attempt to avoid that inquiry here is foreclosed by this well-established rule.[10]

### D. Meta's contention that failure-to-warn claims can never be based on harm caused by a company's publishing tools is both waived and foreclosed by this Court's precedent.

**1.** Falling back, Meta contends (at 36-49) that Section 230 would require the "dismissal" of the failure-to-warn theory "to the extent" it relies on allegations about certain features, even if the district court had not dismissed those allegations with respect to other theories. But not once does Meta explain how any of these features

---

[9] Meta's out-of-circuit cases, too, analyzed failure-to-warn claims separately. *See Wozniak v. YouTube, LLC*, 100 Cal. App. 5th 893, 914 (2024); *Herrick v. Grindr LLC*, 765 F. App'x 586, 591 (2d Cir. 2019); *In re Facebook, Inc.*, 625 S.W.3d 80, 94 (Tex. 2021). None of these cases holds that failure-to-warn claims are necessarily barred simply because Section 230 bars some other claim. *See id.* In each case, unlike here, the court barred a failure-to-warn claim that rested on a duty to mitigate harmful third-party content published on its site. *See id.*

[10] Meta (at 26–33) seeks refuge in its claim that Section 230 provides immunity from suit. But, as explained above, that claim is wrong. *See supra* Part I. It's also irrelevant. This Court's precedent dictates a duty-based analysis. Characterizing its defense as an immunity from suit does not make this precedent any less controlling.

transform an otherwise permissible failure-to-warn theory into one that is barred by Section 230. Instead, its sole argument is that failure-to-warn claims can *never* be based on *any* of an internet company's publishing tools or features. That's not an argument for dismissing certain features; it's a categorical challenge to the plaintiffs' failure-to-warn theory.

But Meta "affirmatively waived" any such categorical challenge. *See Warmenhoven v. NetApp, Inc.*, 13 F.4th 717, 725 (9th Cir. 2021). It specifically constructed this appeal to challenge *only* the district court's decision not to dismiss allegations about certain features. Yet it has not made any argument about why those specific allegations render the failure-to-warn theory impermissible. That is yet another basis to affirm.

**2.** Meta's argument, though, is not only waived; it's also squarely foreclosed by this Court's precedent. Meta repeatedly asserts that Section 230 shields internet companies from any duty to protect users from harm caused by their "content-neutral" features (or "publishing tools"). But this Court rejected virtually the same argument in *Lemmon*, 995 F.3d at 1094. "[O]ur case law," the Court emphasized, "has never suggested that internet companies enjoy absolute immunity from all claims related to their content-neutral tools." *Id.* Internet companies "continue to face the prospect of liability, even for their 'neutral tools,' so long as

plaintiffs' claims do not blame them for the content that third parties generate with those tools." *Id.*

None of Meta's cases (at 36-46) holds otherwise. To the contrary, Meta's cases demonstrate that this rule applies no differently in the context of failure-to-warn claims: Failure-to-warn claims that fault an internet company for the features it designed are permissible. Failure-to-warn claims that fault the company for the content its users post are not.

Start with *Dyroff v. Ultimate Software Group*, in which the plaintiff alleged that a social networking website was liable for her son's drug overdose because he bought the drugs from a dealer who posted on that site. 934 F.3d 1093, 1095 (9th Cir. 2019). The plaintiff claimed that the defendant had a duty to warn its users that the dealer was selling fentanyl-laced heroin. *Dyroff v. Ultimate Software Grp., Inc.*, 2017 WL 5665670, at *11 (N.D. Cal. Nov. 26, 2017). Contrary to Meta's assertion, the Court did not hold that Section 230 barred that claim. It dismissed the claim on the merits, holding that the site did not owe the plaintiff a duty of care. *Dyroff*, 934 F.3d at 1100-01. In the Court's view, "[n]o website could function if a duty of care was created" any time "a website facilitates communication, in a content-neutral fashion." *Id.* And the site's "content-neutral functions" themselves "did not create a risk of harm." *Id.*

None of this is relevant here because the merits of the failure-to-warn theory are not on appeal. And, in any event, the plaintiffs' claim is that Meta's

content-neutral features *do* create a risk of harm: Meta designed these features to addict kids to its platform. Nothing in *Dyroff* forecloses a claim that a company must warn its users of features that the company designed and knows cause harm.

Nor does *Dyroff*'s Section 230 analysis—which, again, it did not apply to the failure-to-warn claim—help Meta. Unlike the plaintiffs here, the plaintiff in *Dyroff* concededly sought to hold the company liable for publishing illegal content.[11] She argued that nevertheless Section 230 did not apply because, in her view, the site's publishing tools transformed the content initially published by its users into the website's own. *Id.* at 1097-99. The Court rejected that argument, explaining that illegal content posted by a website's users cannot be attributed to the website itself just because the site provided content-neutral publishing tools. *Id.*

That is not what's happening here. The plaintiffs do not argue that Meta's features somehow transform its users' content into Meta's own. The plaintiffs seek to hold Meta liable for the harm caused by the features themselves. This Court has already explained that *Dyroff* does not bar such a claim. *See Lemmon*, 995 F.3d at 1094.

Unable to rely on *Dyroff*, Meta next turns to *Bride*. As explained above, the Court dismissed the failure-to-warn claims in *Bride* because they sought to hold the

---

[11] *Compare Dyroff*, 2017 WL 5665670, at *8 ("The court holds that Ms. Dyroff's claims at their core seek liability for publishing third-party content."), *with Dyroff*, 934 F.3d at 1096 (listing plaintiff's contentions on appeal, none of which dispute this holding).

defendant liable for publishing, without "mitigating, in some way," its users' harassing messages. 112 F.4th at 1180. But *Bride* explicitly distinguished those claims—barred by Section 230—from claims that rest on a platform's defective features and do "not depend on what messages, if any," its users send (not barred). *Id.* That same distinction explains this Court's decision in *Doe v. Grindr*, which held that Section 230 prohibited claims that relied on a duty "to prevent the harmful sharing of messages between users that could lead to illegal activity." 128 F.4th 1148, 1153 (9th Cir. 2025), *cert. pet. filed*, No. 24-475 (U.S. May 21, 2025). The failure-to-warn claims there failed because the risk that the company failed to warn about was the risk of "sexual exploitation" attributable to messages between children and adults. *Id.* at 1154.[12]

In every single one of Meta's cases, the Court held that Section 230 barred claims because, at their core, they sought to hold an internet company vicariously liable for harmful content posted by its users. Not a single case holds that Section 230 bars claims based on harm caused by the company's own design features.

---

[12] Meta also cites *V.V. v. Meta Platforms*, 2024 WL 678248 (Conn. Super. Ct. Feb. 16, 2024), an unpublished state trial court decision that Meta characterizes (at 45) as holding that Section 230 barred claims "similar to those against Meta in this action." But that is not what the court held. The plaintiffs there alleged that two sex offenders used Snapchat to message with and then sexually assault the minor plaintiff. *See id.* at *2, *4. And the "plaintiffs clearly allege[d] that" Snapchat "failed to regulate content provided by third parties"—e.g. the two sex offenders. *Id.* at *11. Because the plaintiffs' counsel made "no attempt … to differentiate between" claims based on this failure to moderate content, and other claims, the court dismissed them all. *Id.* at *11 n.14. It therefore did not consider whether other claims might be subject to a different analysis.

Meta seizes on this Court's comments that publishing third-party content does not give internet companies a duty to warn of every "general possibility of harm" that exists from using an app "anywhere on the internet." Opening Br. 45-46 (quoting *Bride*, 112 F.4th at 1180-82, and *Grindr*, 128 F.4th at 1154). In context, these comments, too, are about claims based on objectionable third-party content: In *Bride*, the Court refused to impose a duty on internet companies to warn that users could abuse anonymity to post harassing comments. 112 F.4th at 1180. And in *Grindr*, the Court refused to impose a duty to warn that the app's features could be exploited to share messages leading to illegal activity. 128 F.4th at 1152-53.[13] The plaintiffs here do not allege that there is a general possibility that Meta's features could be used to post harmful content. Their claim is that Meta's features *themselves* cause harm.

Finally, Meta argues (at 46-49) that an internet company's "decision about whether to warn about third-party content … is itself publishing activity within the scope of Section 230." This argument, too, is irrelevant. Once again, the theory here is not that Meta failed to warn about third-party content; it's that Meta failed to warn that it designed its platform to promote compulsive use, regardless of what content

---

[13] Indeed, that's the only way to interpret these comments. Otherwise, the Court was either opining on whether there was a duty of care, an issue not on appeal; or it was ignoring its own "careful exegesis" of Section 230's language, which, by this Court's own account, only protects internet companies from claims that seek to hold them liable for the "content posted by third-party users," *Bride*, 112 F.4th at 1175-76.

its users post or see. None of this Court's cases—and nothing in the text of Section 230—bars that theory.

### E. The district court's "dismissal" of allegations related to certain features with respect to the product-defect theory was mistaken.

Ultimately, even when offering supposedly independent reasons for dismissal, Meta resorts to arguing that allegations related to certain features should be dismissed here just because the district court dismissed them with respect to a product-defect theory of liability. *See, e.g.*, Opening Br. 41. Even if, as explained above, that argument were not foreclosed by this Court's precedent, it would still fail because it rests on a false premise: that the district court was correct to dismiss the allegations in evaluating the product-defect theory. But the district court was mistaken—for three independent reasons.

*First*, in dismissing factual allegations, not claims, the court exceeded the scope of what Rule 12(b)(6) authorizes. *See supra* Part II. Rule 12 requires that the district court "start and end" its analysis with whether the plaintiffs plausibly stated a claim. *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 587 (7th Cir. 2021). There is no dispute the plaintiffs did so.

*Second*, the court mistakenly treated the plaintiffs' claims as challenging each individual design feature in isolation. 1-ER-13-15, 1-ER-72-78 (incorporating the "feature-by-feature" analysis that the court applied in its first Section 230 order,

which governed the individual plaintiffs' product-liability claims, 5-ER-941-46). But the gravamen of the plaintiffs' claims is that Meta's "studied efforts to induce young people to compulsively use their products" have led to a host of features that "work *in combination*." 3-ER-360, 4-ER-655, 4-ER-736 (emphasis added); *see also, e.g.*, 4-ER-738 (explaining that a "series of design features that are carefully calibrated to exploit users' neurobiology … work in tandem with algorithmic ranking to promote addictive engagement").

As the district court recognized (*see* 1-ER-14-15, 5-ER-941-43)—and Meta does not challenge on appeal—the complaints here identify a broad range of steps that Meta could take to remedy the harm its platforms cause that would not "necessarily require" the company to edit, monitor, or remove third-party content, *HomeAway.com*, 918 F.3d at 682. So even if Section 230 would bar a claim based on a particular feature, standing alone, that provides no basis for concluding that it bars a claim that the feature works in concert with others to cause harm. *See id.*

*Finally*, even considered in isolation, none of the features is barred by Section 230. In holding otherwise, the district court failed to conduct the inquiry Section 230 demands: Does a claim seek to impose derivative liability on an internet company

for content posted by its users? For each of the features that Meta relies on here, the answer is no.[14]

***Incessant & Strategically Timed Notifications.*** Meta wants to prevent users from spending too much time away from its platforms. So it makes its apps virtually impossible to ignore. Meta's notifications are strategically timed to draw users who have turned to other things back into the app. 4-ER-741-42. And they pop up at all hours of the day and night, interfering with kids' sleep and their schoolwork. *Id.* In the words of the company's internal "growth hackers," the point of this "aggressive" notification system is "to create a habit." 4-ER-778.

A duty not to harass children day and night does not stem from Meta's status as a publisher. If a company rings your doorbell at all hours, trying to get you to use its product, it doesn't matter if the company is selling Avon or the New York Times. The problem is the doorbell-ringing. So too here. The problem with Meta's notifications has nothing to do with the content that Meta publishes; it's the notifications themselves. And Meta can solve the problem without monitoring that content: It just needs to stop incessantly pinging children's phones.

---

[14] Meta has forfeited any reliance on features it does not discuss here, so this discussion is limited only to those features Meta relies on. In addition, the geolocation, account recommendation, and private messaging features are not relevant to the theory that Meta failed to warn of the risk of compulsive use, so this brief does not discuss them.

That's why the district court's distinction between notifications about third-party content, which it held are barred, and notifications about Meta's own content, which it held are not, does not make sense. 5-ER-941, 5-ER-945. In neither case do the plaintiffs seek to hold Meta liable for the *content* about which Meta notifies its users; they seek to hold Meta liable for the notification system itself.[15]

***Engagement-based algorithmic feeds.*** Meta collects copious, fine-grained data on its users by "continuously monitoring and measuring patterns in [each] user's behavior" on its platforms—down to "how long they hover over" each post. 4-ER-726. The company then inputs this data into algorithms designed to organize each user's "feed"—the posts that the user sees—to maximize the user's engagement. 4-ER-732-33. These engagement algorithms are content-agnostic: Meta does not review posts to determine what content they contain. 3-ER-351-54, 3-ER-438. Rather, its algorithms rely on its vast stores of user-behavior data to rank posts by how likely they are to keep users on the app. *Id.*; 4-ER-732-33. The algorithms "prioritize[] … product use at all costs." 4-ER-734. And the cost for children and teens is often addiction. *Id.*

Meta argues (at 23) that Section 230 requires dismissing allegations about its algorithms because the algorithms "facilitate when, how, and to whom third-party

---

[15] That distinguishes this case from *Dyroff*, on which the district court relied. There, the alleged problem with the notifications was that they notified users of posts about illegal drugs.

content will be provided." But, as explained above, Section 230 does not immunize internet companies for the harm that their own conduct causes—even if that harm is caused by tools through which they publish content. *Lemmon*, 995 F.3d at 1094. Section 230 bars only those claims that seek to fault the company for unlawful content created by its users. *Id.* In every one of the cases that Meta cites, the plaintiffs sought to hold an internet company liable for distributing harmful content.[16]

Here, however, the plaintiffs do not allege that Meta's algorithms violate some duty not to disseminate illegal content. The duty here is to not distribute a defective product, known to addict children. That duty derives not from Meta's status as a publisher, but from its status as a product manufacturer. *See id.* at 1092. And complying with that duty would not require Meta to monitor (or edit or remove) any content posted by its users. Meta could adopt an algorithm that does not optimize for engagement at all costs. Or it could stop collecting or relying on the behavioral data needed to operate an engagement-based algorithm. At a minimum, it could warn about the known dangers inherent to the system it has designed. None of these

---

[16] *See Dyroff*, 934 F.3d at 1095 (claim was based on the recommendation of posts about illegal drugs); *Pinckney v. Meta Platforms Inc.*, 127 F.4th 516, 525-26 (4th Cir. 2025) ("M.P. takes issue with the fact that Facebook allows racist, harmful content."); *Doe v. Backpage.com, LLC*, 768 F. Supp. 3d 1057, 1063 (N.D. Cal. 2025) (algorithm "facilitates [the] promotion of third-party user-generated sex trafficking content"); *L.W. v. Snap Inc.*, 675 F. Supp. 3d 1087, 1098 (S.D. Cal. 2023) (claims alleged "that Defendants violated various state laws by failing to adequately monitor and regulate end-users' harmful messages").

changes would require any change to the content that its users post. Section 230 therefore does not apply. *See HomeAway.com*, 918 F.3d at 683; *Bride*, 112 F.4th at 1177 n.3 (for Section 230 to bar a claim, "moderation must be … the only option"); *see also Anderson v. TikTok, Inc.*, 116 F.4th 180, 184 (3d Cir. 2024) (holding that a claim based on TikTok's recommendation algorithm was not barred by Section 230).

**Infinite scroll & autoplay.** Meta designs its products so that users can scroll forever without noticing that they are doing so, with videos automatically playing without a user even pressing a button. There are no page breaks, no interruptions, no indication of whether a user has been scrolling for five minutes or five hours. 4-ER-655, 4-ER-712. The point is to keep users in a "flow state"—to give them no opportunity to consider whether they actually want to continue scrolling. *Id.* "Because the infinite scroll does not give your brain time to catch up with your impulses you just keep scrolling." 4-ER-842 (describing similar feature on TikTok).

Like the other features Meta designed to ensnare its users, the problem with these features is that they cause compulsive use, not that they disseminate unlawful content. The district court believed that remediating these features "would inherently limit what [Meta is] able to publish." 5-ER-943. But Meta has a whole "menu" of readily available options to improve these features without policing content. *See Bride*, 112 F.4th at 1177 n.3. Meta could add page breaks, display a marker of users' progress through the app, add a "play" button for videos, or incorporate

short pauses during which a user can consider disengaging. None of these options limits or even affects the content Meta can publish.

Meta doesn't endorse the district court's reasoning. Instead, it deems these features "routine publishing consideration[s] of how to arrange third-party material." Opening Br. 24. But, again, Meta relies on cases in which the claim was based on the *content* published. *See Marshall's Locksmith Serv. Inc. v. Google, LLC*, 925 F.3d 1263, 1269 (D.C. Cir. 2019) (scam locksmiths in search engine results); *Pinckney*, 127 F.4th at 525-26 ("racist, harmful content").

Section 230 does not bar claims simply because they involve "publishing considerations"; it bars claims that hold an internet company vicariously liable for the content posted by its users. A newspaper's choice of print is a "routine publishing consideration." But if the L.A. Times decided to print its stories with poisonous ink, holding it liable for that choice would not be holding it liable for the content it published. It would be holding it liable as the manufacturer of a defective product—even if the product happens to be a newspaper. The same is true here. Meta's choice to design its product to trick users into scrolling for far longer than they otherwise would does not hold Meta liable for the content its users post; it holds Meta liable for its own design choices. Section 230 does not shield those choices.

***Vanishing Posts.*** "Act now!" "Going Fast!" Any overbearing product-pusher has these tactics in their repertoire, and Meta is no exception. Meta

feeds compulsive use by mandating that some posts disappear from the platform after 24 hours, well aware that no teenager wants to feel out of the know. *See* 4-ER-742. Holding Meta liable for using this online version of an age-old hard-sell tactic does not hold it liable for the content its users create. It holds it liable for its own choice to design every aspect of its platforms to be as addictive to teenagers as possible.

The district court believed that deciding "how long to publish content" is a "traditional editorial function." 5-ER-945. But if the New York Times intermittently threw articles onto its readers' doorsteps at odd intervals, printing some in disappearing ink to entice readers into constantly checking for the latest article, nobody would say it was performing a "traditional editorial function." Section 230 "cuts off liability only when a plaintiff's claim faults the defendant for information provided by third parties," not when it faults a company for attempting to hook its users. *Lemmon*, 995 F.3d at 1093.

**Intermittent rewards.** Meta's "platforms are designed to purposefully withhold and release rewards" for engaging with the app "on a schedule its algorithms have determined is optimal to heighten a specific user's craving and keep them using the product." 4-ER-673, 4-ER-739. In the words of Meta's first president, each reward gives users "a little dopamine hit," which encourages them to keep engaging, to keep seeking the next little hit. 4-ER-730. In *Lemmon*, this Court held that Section 230 did not bar claims based, in part, on an app's intermittent reward

system—there, "trophies, streaks, and social recognitions" awarded for posting on the app. 995 F.3d at 1088. So too here. Section 230 is about ensuring that internet companies can provide an online forum without having to monitor every user's post. Nothing in the statute requires that companies be permitted to design their platforms to manipulate children's dopamine systems to keep them addicted to social media.

Meta argues (at 25) that one particular reward—"likes"—constitutes "third-party content," for which the company cannot be held liable. In support of this argument, Meta cites *Kimzey v. Yelp!, Inc.*, which held that Section 230 barred claims against Yelp for publishing allegedly libelous negative reviews of the plaintiff's business. 836 F.3d 1263, 1270 (9th Cir. 2016). But, unlike in *Kimzey*, the plaintiffs here do not allege that Meta should be held liable for the message a user communicates when they "like" another user's post. The allegation is that Meta is liable for designing a system of intermittent, unpredictable rewards that make it impossible for kids to turn away—that is, for using "likes" (among other things) to keep kids hooked on its app. That is an allegation about Meta's "own conduct," not its users' content. *Lemmon*, 995 F.3d at 1093.

**Screentime Limits.** Meta could impose default limits on the length and frequency of sessions or block kids from using its apps during school hours or late at night. 1-ER-14, 3-ER-354. But it does not. *See id.* It wants to keep kids on its apps as long as possible, whenever possible. Much like the other features discussed above,

implementing these features would not require Meta to monitor the content its users post; it would simply put default outer bounds on the time kids can spend on its platforms.

In addressing these features, the district court drew an untenable distinction between "opt-in" limits that only apply when a user enables them, and "opt-out" limits that apply by default but can be turned off. 5-ER-941, 5-ER-943. In its view, Section 230 poses no obstacle to requiring Meta to institute opt-in limits, but opt-out limits "would inherently limit what [Meta is] able to publish." *Id.* That view is mistaken. Regardless of whether it is opt-in or opt-out, a limit on the amount of time a child can spend scrolling while in school or when they're supposed to be asleep does not change what Meta can publish. Nothing about screentime limits would require Meta to monitor its users' content or remove or edit it.

To the extent the court believed that Section 230 applies simply because limits on children's compulsive use could lead to fewer posts on Meta's platforms, that reasoning is foreclosed by this Court's decision in *HomeAway.com*: What matters is not whether a claim might ultimately have an impact on how much is posted online; what matters is whether a claim would "necessarily require an internet company to monitor third-party content." 918 F.3d at 682-83. Imposing default screentime limits would not do so.

63

Meta doesn't defend the district court's reasoning. Instead, it contends (at 24) that decisions about how much time kids can spend on a platform are fundamental to publishing. The company does not explain this argument. And the only case it cites involved the claim that "Twitter should have imposed a blanket ban on pro-ISIS content by prohibiting ISIS affiliates from opening accounts at all." *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1124 (N.D. Cal 2016). Content bans plainly implicate Section 230. Screentime limits for kids do not.

*       *       *

But, again, this Court need not get nearly this far. Not only does this Court lack jurisdiction, but Meta seeks relief it cannot get, and the sole arguments it makes on the merits are foreclosed by binding precedent. This Court should dismiss Meta's appeal or affirm.

## IV. If this Court does not dismiss Meta's appeal for lack of jurisdiction, it should take jurisdiction over the conditional cross-appeal and reverse.

For the reasons explained above, the district court erred in dismissing allegations related to the features above with respect to a product-defect theory of liability. The plaintiffs have cross-appealed that dismissal. But this Court's jurisdiction over that cross-appeal is dependent on its jurisdiction over Meta's appeal.

When entertaining an interlocutory appeal, this Court may "exercise pendent appellate jurisdiction over an otherwise nonappealable ruling if the ruling is

inextricably intertwined with [the] claim properly before the Court." *Hyde*, 23 F.4th at 875. Issues are "inextricably intertwined" if the Court "must decide the pendent issue in order to review the claims properly raised on interlocutory appeal," or if "resolution of the issue properly raised on interlocutory appeal necessarily resolves the pendent issue." *Id.*

Both are true here. The question Meta raises on appeal is whether the district court should have granted its "motions to dismiss claims for failure to warn of alleged risks relating to certain platform features … when claims targeting the same underlying platform features are barred." 6-ER-1420. That directly raises an antecedent legal question: whether "claims targeting the same underlying platform features are," in fact, "barred" by Section 230. *Id.* The plaintiffs' cross-appeal challenges the district court's conclusion that they are. To the extent this Court evaluates any of those features to rule on Meta's appeal, this cross-appeal is inextricably intertwined with Meta's appeal. As explained above, the district court erred in dismissing allegations related to the features listed above. If this Court exercises jurisdiction over Meta's appeal, it should also take jurisdiction over the cross-appeal and reverse.

## CONCLUSION

This Court should dismiss this appeal for lack of jurisdiction. If it does not, it should affirm the district court's decision not to limit the plaintiffs' failure-to-warn

theory at this stage. And it should reverse the district court's dismissal of allegations regarding the following features as to the product-defect theory: notifications, engagement-based algorithmic feeds, infinite scroll and autoplay, vanishing posts, intermittent rewards, and screentime limits.

Respectfully submitted,

*/s/ Jennifer Bennett*
JENNIFER BENNETT
GUPTA WESSLER LLP
505 Montgomery Street, Suite 625
San Francisco, CA 94111
(415) 573-0336

MATTHEW W.H. WESSLER
MICHAEL SKOCPOL
GUPTA WESSLER LLP
2001 K Street NW
Suite 850 North
Washington, DC 20006
(202) 888-1741

LEXI J. HAZAM
LIEFF CABRASER HEIMANN &
BERNSTEIN LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
(415) 956-1000

JASON L. LICHTMAN
GABRIEL A. PANEK
LIEFF CABRASER HEIMANN &
BERNSTEIN LLP
250 Hudson Street, 8th Floor
New York, NY 10013
(212) 355-9500

PREVIN WARREN
ABIGAIL BURMAN
MOTLEY RICE LLC
401 9th Street NW, Suite 630
Washington, DC 20004
(202) 232-5504

MATHEW P. JASINSKI
MOTLEY RICE LLC
20 Church Street, 17th Floor
Hartford, CT 06103
(860) 218-2725

ANDRE MURA
GIBBS MURA LLP
1111 Broadway, Suite 2100
Oakland, CA 94607
(510) 350-9717

June 23, 2025

*Counsel for Personal Injury and School District Plaintiffs-Appellees-Cross Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Circuit Rule 28.1-1(c) because this brief contains 16,352 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

June 23, 2025

*/s/ Jennifer Bennett*
Jennifer Bennett