**Nos. 24-7032, 24-7037, 24-7265, 24-7300, 24-7304, 24-7312**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————————

**PEOPLE OF THE STATE OF CALIFORNIA ET AL.,**
*Plaintiffs-Appellees/Cross-Appellants*,

**v.**

**META PLATFORMS, INC. ET AL.,**
*Defendant-Appellants/Cross-Appellees.*

———————————————

On Appeal from the United States District Court
For the Northern District of California
Case No. 4:23-cv-05448 (MDL No. 3047)
The Honorable Yvonne Gonzalez Rogers

---

**BRIEF OF VERMONT, NEW HAMPSHIRE AND NINE OTHER STATES AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES/CROSS-APPELLANTS AND IN SUPPORT OF AFFIRMANCE IN PART AND REVERSAL IN PART**

---

Ryan D. Andrews
randrews@edelson.com
Roger Perlstadt
rperlstadt@edelson.com
EDELSON PC
350 North LaSalle Street,
14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................. i

TABLE OF AUTHORITIES........................................................... ii

IDENTITY AND INTEREST OF AMICI ................................. 1

ARGUMENT ................................................................................ 2

  I.    STATE COURTS HAVE NEAR-UNIVERSALLY HELD THAT SOCIAL MEDIA ADDICTION CLAIMS ARE NOT BARRED BY THE CDA. ........................................................ 3

  II.   STATE APPELLATE COURTS ROUTINELY DECLINE TO TAKE INTERLOCUTORY REVIEW OF DENIALS OF MOTIONS TO DISMISS BASED ON THE CDA. .................... 10

  CONCLUSION ........................................................................ 14

# TABLE OF AUTHORITIES

## Cases

*Arkansas v. Meta Platforms, Inc.*,
  No. 57CV-23-47 (Ark. Cir. Ct. June 13, 2024) ............................ 3, 6

*Arkansas v. TikTok Inc.*,
  No. 12CV-23-65 (Ark. Cir. Ct. May 15, 2024) ............................. 3, 8

*ASARCO Inc. v. Kadish*,
  490 U.S. 605 (1989) ............................................................. 1

*Calise v. Meta Platforms, Inc.*,
  103 F.4th 732 (9th Cir. 2024) ............................................. 9

*District of Columbia v. Meta Platforms, Inc.*,
  No. 2023-CAB-006550, 2023 WL 11921682
  (D.C. Super. Ct. Sept. 9, 2024) ................................................ 3, 8, 9

*District of Columbia v. Meta Platforms, Inc.*,
  No. 2023-CAB-006550 (D.C. Super. Ct. Nov. 25, 2024) .......... 12, 14

*District of Columbia v. TikTok Inc.*,
  No. 2024-CAB-006377 (D.C. Super. Ct. Feb. 28, 2025).................. 3

*Doe v. Internet Brands, Inc.*,
  824 F.3d 846 (9th Cir. 2016) ........................................... 10

*Lemmon v. Snap, Inc.*,
  995 F.3d 1085 (9th Cir. 2021) ........................................... 9

*Illinois v. TikTok Inc.*,
  No. 2024CH09302 (Ill. Cir. Ct. June 12, 2025)............................. 3

*Massachusetts v. Meta Platforms, Inc.*,
  No. 23-2397-BLS1 (Mass. Super. Ct. Oct. 17, 2024) ........... 3, 6, 7, 9

*Massachusetts v. Meta Platforms, Inc.*,
    No. 23-2397-BLS1 (Mass. Super. Ct. Jan. 9, 2025) ...................... 12

*Miller-Wohl Co. v. Comm'r of Lab. & Indus. State of Mont.*,
    694 F.2d 203 (9th Cir. 1982) ........................................................... 2

*Minasyan v. Gonzales*,
    401 F.3d 1069 (9th Cir. 2005) ........................................................ 1

*Nevada v. TikTok Inc.*,
    No. A-24-886127-B (Nev. Dist. Ct. Sept. 24, 2024).......................... 3

*New Hampshire v. Meta Platforms, Inc.*,
    No. 217-2023-CV-00594 (N.H. Super. Ct. Dec. 10, 2024).... 3, 7, 8, 9

*New Hampshire v. Meta Platforms Inc.*,
    No. 2025-0022 (N.H. Feb. 18, 2025) .............................................. 11

*New Mexico v. Meta Platforms, Inc.*,
    No. D-101-CV-2023-02838 (N.M. Dist. Ct. June 21, 2024) ............. 4

*New Mexico v. Snap Inc.*,
    No. D-101-CV-2024-02131 (N.M. Dist. Ct. May 12, 2025) .............. 4

*New York v. TikTok Inc.*,
    No. 452749/24 (N.Y. May 28, 2025)............................................. 4, 7

*Oklahoma v. Meta Platforms, Inc.*,
    No. CJ-2023-180 (Okla. Dist. Ct. Nov. 20, 2024) ........................ 4, 5

*Oregon v. TikTok Inc.*,
    No. 24CV-48473 (Or. Cir. Ct. June 13, 2025) ................................. 5

*South Carolina v. TikTok Inc.*,
    No. 2024-CP-40-06018 (S.C. Cir. Ct. May 6, 2025) ......................... 4

*Spinner Corp. v. Princeville Dev. Corp.*,
    849 F.2d 388 (9th Cir. 1988) ........................................................... 1

*Tennessee v. Meta Platforms, Inc.*,
  No. 23-1364-IV (Tenn. Ch. Ct. Oct. 17, 2024) .............................. 4, 7

*Utah Div. of Consumer Prot. v. Meta Platforms, Inc.*,
  No. 230908060, 2024 WL 3741422
  (Utah Dist. Ct. July 18, 2024)........................................................ 4, 5

*Utah Div. of Consumer Prot. v. Meta Platforms, Inc.*,
  No. 20240875-SC (Utah Oct. 18, 2024) ........................................ 11

*Utah Div. of Consumer Prot. v. TikTok Inc.*,
  No. 230907634 (Utah Dist. Ct. Nov. 12, 2024) ............................... 4

*Utah Div. of Consumer Prot. v. TikTok Inc.*,
  No. 20241276-SC (Utah Feb. 10, 2025)........................................ 12

*Vermont v. Meta Platforms, Inc.*,
  No. 23-CV-4453, 2024 WL 3741424
  (Vt. Super. Ct. July 29, 2024) ...................................................*passim*

*Vermont v. Meta Platforms, Inc.*,
  No. 24-AP-295 (Vt. Dec. 23, 2024) .......................................... 11, 13

*Washington v. TikTok Inc.*,
  No. 24-2-23100-5 SEA (Wa. Super. Ct. Mar. 28, 2025) .................. 4

## Statutes

47 U.S.C. § 230 ........................................................................................ 1

## Rules

Fed. R. App. P. 29 ..................................................................................... 1

## IDENTITY AND INTEREST OF AMICI

Vermont, New Hampshire, and the nine additional undersigned states (the "Amici States") submit this brief in support of Plaintiffs-Appellees/Cross-Appellants State of California et al. (the "State AGs"). The brief is submitted as of right pursuant to Fed. R. App. P. 29(a)(2). Each of the Amici States currently has cases pending against social media companies in their respective state courts that make social media addiction claims similar to the claims brought by the State AGs in the MDL here. An important issue in both the state court cases and the MDL is whether social media addiction claims are barred by the Communications Decency Act, 47 U.S.C. § 230 (the "CDA").

Although state courts are not bound by this Court's interpretation of the CDA, *see ASARCO Inc. v. Kadish*, 490 U.S. 605, 617 (1989), nor is this Court bound by state court CDA rulings, *see Spinner Corp. v. Princeville Dev. Corp.*, 849 F.2d 388, 390 n.2 (9th Cir. 1988), this Court may find state court decisions persuasive, and vice versa. Additionally, "uniformity is an important concern in federal statutory interpretation." *Minasyan v. Gonzales*, 401 F.3d 1069, 1076 (9th Cir. 2005). Accordingly, the Amici States submit this brief to inform the Court of state court

1

decisions in social media addiction cases, virtually all of which hold that the CDA does not bar such claims. *See Miller-Wohl Co. v. Comm'r of Lab. & Indus. State of Mont.*, 694 F.2d 203, 204 (9th Cir. 1982) (noting that one "classic role of amicus curiae [is] assisting in a case of general public interest, supplementing the efforts of counsel, and drawing the court's attention to law that escaped consideration").

## ARGUMENT

Two aspects of state court social media addiction litigation are particularly relevant here. First, at least eighteen state court decisions across fourteen states have held that social media addiction claims—including claims that defendants incorporated addictive design features into their platforms and that defendants deceived the public about the safety of their platforms—are not barred by the CDA. Second, multiple state appellate courts have declined to accept interlocutory review of decisions denying motions to dismiss social media addiction claims on CDA grounds, even where social media companies argue that the CDA immunizes them not just from ultimate liability but from even facing suit.

## I. STATE COURTS HAVE NEAR-UNIVERSALLY HELD THAT SOCIAL MEDIA ADDICTION CLAIMS ARE NOT BARRED BY THE CDA.

Multiple state courts have ruled on motions to dismiss social media addiction claims brought by states against Meta and its peers, TikTok and Snap. Eighteen out of nineteen of those decisions have held that such claims—brought under various state consumer protection statutes and common law—are not barred by the CDA. *Arkansas v. Meta Platforms, Inc.*, No. 57CV-23-47, Slip Op. at 4–5 (Ark. Cir. Ct. June 13, 2024); *Arkansas v. TikTok Inc.*, No. 12CV-23-65, Slip Op. at 13–14 (Ark. Cir. Ct. May 15, 2024); *District of Columbia v. Meta Platforms, Inc.*, No. 2023-CAB-006550, 2023 WL 11921682, at *5–12 (D.C. Super. Ct. Sept. 9, 2024) ("*District v. Meta I*"); *District of Columbia v. TikTok Inc.*, No. 2024-CAB-006377, Slip Op., att. Tr. of Hr'g at 62–72 (D.C. Super. Ct. Feb. 28, 2025); *Illinois v. TikTok Inc.*, No. 2024CH09302, Slip Op. at 15–23 (Ill. Cir. Ct. June 12, 2025); *Massachusetts v. Meta Platforms, Inc.*, No. 23-2397-BLS1, Slip Op. at 6–18 (Mass. Super. Ct. Oct. 17, 2024); *Nevada v. TikTok Inc.*, No. A-24-886127-B, Tr. of Hr'g re: Mot. to Dismiss at 98:18–99:20 (Nev. Dist. Ct. Sept. 24, 2024); *New Hampshire v. Meta Platforms, Inc.*, No. 217-2023-

CV-00594, Slip Op. at 21–26 (N.H. Super. Ct. Dec. 10, 2024) ("*New Hampshire v. Meta I*"); *New Mexico v. Meta Platforms, Inc.*, No. D-101-CV-2023-02838, Slip Op. at 2 (N.M. Dist. Ct. June 21, 2024); *New Mexico v. Snap Inc.*, No. D-101-CV-2024-02131, Slip Op. at 3–4 (N.M. Dist. Ct. May 12, 2025); *New York v. TikTok Inc.*, No. 452749/24, Tr. of Hr'g at 63:16–68:19 (N.Y. May 28, 2025); *Oklahoma v. Meta Platforms, Inc.*, No. CJ-2023-180, Slip Op. at 5–6 (Okla. Dist. Ct. Nov. 20, 2024); *South Carolina v. TikTok Inc.*, No. 2024-CP-40-06018, Slip Op. at 10–12 (S.C. Cir. Ct. May 6, 2025); *Tennessee v. Meta Platforms, Inc.*, No. 23-1364-IV, Slip Op. at 16–23 (Tenn. Ch. Ct. Oct. 17, 2024); *Utah Div. of Consumer Prot. v. Meta Platforms, Inc.*, No. 230908060, 2024 WL 3741422, at *4–5 (Utah Dist. Ct. July 18, 2024) ("*Utah v. Meta I*"); *Utah Div. of Consumer Prot. v. TikTok Inc.*, No. 230907634, Slip Op. at 12–14 (Utah Dist. Ct. Nov. 12, 2024) ("*Utah v. TikTok I*"); *Vermont v. Meta Platforms, Inc.*, No. 23-CV-4453, 2024 WL 3741424, at *4–6 (Vt. Super. Ct. July 29, 2024) ("*Vermont v. Meta I*"); *Washington v. TikTok Inc.*, No.

4

24-2-23100-5 SEA, Tr. of Hr'g at 56:4–58:16 (Wa. Super. Ct. Mar. 28, 2025).[1]

The basis of the state court decisions finding that the CDA does not bar the states' social media addiction claims (many of which cite and apply this Court's precedents) is that the states' claims are not treating social media companies as the publisher or speaker of third-party content. Rather, the states are seeking to hold social media companies liable for their own conduct of incorporating addictive design features into their platforms and misrepresenting the safety of those platforms. As an Oklahoma court aptly summarized:

> Oklahoma is not attempting to hold Meta responsible for any third-party content in this suit…. Instead, it is seeking to hold Meta accountable for unlawfully designing its Platforms in a manner Meta knew to be harmful—for example, to induce compulsive use among adolescents in particular—and then presenting its Platforms as safe for adolescent use.

*Oklahoma v. Meta*, Slip Op. at 6 (footnote omitted); *see also Utah v. Meta I*, 2024 WL 3741422, at *4 ("Although Meta does disseminate

---

[1]     The lone exception to state courts' otherwise uniform rulings that social media addiction claims are not barred by the CDA is *Oregon v. TikTok Inc.*, No. 24CV-48473 (Or. Cir. Ct. June 13, 2025). Even that case, however, held that some of the state's deception claims were not barred by the CDA. *Id.*, slip op. at 27–28, 30. Copies of all the state court opinions are included in the attached addendum as Exhibits 1–19.

third-party content, the Division's claims rest on the Defendants' own acts: their use of features and practices to target children into spending excessive amounts of time on their platforms and their misrepresentations about the safety of those platforms.").

These decisions recognize that states' claims that social media companies incorporated addictive design features into their platforms seek to hold them liable for their own conduct—not for third-party content—because the harm alleged is the addiction itself, not some other harm arising from any particular content. *See, e.g.*, *Vermont v. Meta I*, 2024 WL 3741424, at *5 ("The State alleges that the intentional *addictiveness* itself harms Young Users' mental health, separate and apart from the *content* of what they see."); *Arkansas v. Meta*, Slip Op. at 5 ("The State is not seeking to treat Meta as a publisher or speaker of information, rather it is alleging that the design features of Meta's platforms themselves are hazardous to adolescents because the features are designed to addict and exploit the frailties of developing brains."); *Massachusetts v. Meta*, Slip Op. at 13 ("The Commonwealth alleges physical and mental harm to young users from Instagram's design features *themselves*, which purportedly cause addictive use, and not

from the viewing of any specific third-party content[.]"). As the Vermont court explained, "[w]hether [young users] are watching porn or puppies, the claim is that they are harmed by the time spent, not by what they are seeing." *Vermont v. Meta I*, 2024 WL 3741424, at *5; *see also Massachusetts v. Meta*, Slip Op. at 13 ("[T]he alleged harm occurs regardless of the content that users see."); *New Hampshire v. Meta I*, Slip Op. at 25–26 ("[T]he State alleges that Meta's product design features, in and of themselves, are harmful to New Hampshire children regardless of the substance of the third-party content displayed."); *New York v. TikTok*, Tr. at 65:17 ("[T]he allegations are unrelated to third-party content on TikTok, but focus exclusively on the design feature of the application that leads to compulsive and excessive use.").[2]

The state court decisions likewise recognize that the states' deception claims are not seeking to treat social media companies as the publisher or speaker of third-party content. As an Arkansas court put

---

[2]      The harms arising out of teen and other young users' excessive and compulsive use of social media include "lack of sleep and related health outcomes, diminished in-person socialization skills, difficulty maintaining attention, increased hyperactivity, self-control challenges, increased depression and anxiety, and interruption of various brain development processes." *Tennessee v. Meta*, Slip Op. at 19.

it, those claims are agnostic as to whether social media platforms contain harmful third-party content; they "demand[] only that [social media companies] be honest with consumers about what content the [platforms] contain[]." *Arkansas v. TikTok*, Slip Op. at 13; *see also Vermont v. Meta I*, 2024 WL 3741424, at *6 (claim that "Meta has failed to disclose to consumers its own internal research and findings about Instagram's harms to youth, including compulsive and excessive platform use" not barred by the CDA) (quotations omitted). As the District of Columbia court explained, such claims are not barred by the CDA because "Meta would not have to change the content it publishes or engage in any content moderation to avoid liability for future omissions claims." *District v. Meta I*, 2023 WL 11921682, at *11. "Rather, Meta can simply stop making affirmative misrepresentations about the nature of the third-party content it publishes, or it can disclose the material facts within its possession to ensure that its representations are not misleading or deceptive[.]" *Id.*; *see also New Hampshire v. Meta I*, Slip Op. at 26 ("These [deception] counts are not based on Meta's role as a publisher of third-party content. Rather, the

8

duty alleged to be breached arises out of Meta's knowledge that its products harm New Hampshire children.").

As these cases illustrate, the district court's determination that the bulk of the State AGs' addictive design features and deception claims are barred by the CDA is an outlier. Even those state courts addressing the issue after the district court's ruling have declined to follow it. *See, e.g., District v. Meta I*, 2023 WL 11921682, at *9 ("This court respectfully declines to follow the decision of the judge in the multi-district litigation, as that decision is inconsistent with this court's reading of the case law and the purpose of the Section 230 immunity provisions."); *Vermont v. Meta I*, 2024 WL 3741424, at *5 (expressly declining to follow MDL district court opinion); *Massachusetts v. Meta*, Slip Op. at 13–14 ("I do not find [the MDL district court decision] persuasive as it pertains to [Instagram's addictive design] features[.]"). Indeed, one of the state court decisions declining to follow the MDL district court's opinion found it inconsistent with this Court's precedents. *New Hampshire v. Meta I*, Slip Op. at 25 (stating that it was following this Court's decisions in *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 736 (9th Cir. 2024); *Lemmon v. Snap, Inc.*, 995 F.3d 1085,

1092–93 (9th Cir. 2021); and *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 853 (9th Cir. 2016), rather than the MDL district court's decision).

As eighteen state courts across fourteen states have done, this Court, too, should hold that the State AGs' social media addiction claims are not barred by the CDA.

## II. STATE APPELLATE COURTS ROUTINELY DECLINE TO TAKE INTERLOCUTORY REVIEW OF DENIALS OF MOTIONS TO DISMISS BASED ON THE CDA.

In addition to state trial courts refusing to dismiss social media addiction claims as barred by the CDA, state appellate courts routinely decline to take interlocutory review of those decisions. When seeking immediate review in the state courts, Meta and TikTok have made the same "immunity from suit" argument that Meta makes here. *See, e.g.*, Meta Platforms, Inc. and Instagram, LLC's Mot. for Permission to Appeal Pursuant to V.R.A.P. 5(b)(7)(A) at 16, *Vermont v. Meta Platforms, Inc.*, No. 24-AP-295 (Vt. Oct. 28, 2024) ("*Vermont v. Meta II*") ("An immediate appeal of the superior court's Section 230 ruling is necessary to protect Meta's statutory immunity from suit."); Rule 7 Notice of Discretionary Appeal at 11, *New Hampshire v. Meta Platforms Inc.*, No. 2025-0022 (N.H. Jan. 10, 2025) ("*New Hampshire v. Meta II*")

("[T]he ruling is immediately appealable under Rule 7 because Section 230 provides Meta with immunity from suit."); Petition for Permission to Appeal from Interlocutory Order at 2, *Utah Div. of Consumer Prot. v. Meta Platforms, Inc.*, No. 20240875-SC (Utah Aug. 15, 2024) ("*Utah v. Meta II*") ("[The lower court's] ruling warrants an immediate appeal because Meta seeks to vindicate…its federal statutory immunity from suit under Section 230."); Petition for Permission to Appeal from Interlocutory Order at 2–3, *Utah Div. of Consumer Protection v. TikTok Inc.*, No. 20241276-SC (Utah Dec. 3, 2024) ("*Utah v. TikTok II*") ("[T]he entire point of § 230 immunity…will be largely lost if [TikTok] must endure lengthy litigation before its statutory immunity as 'publisher' is enforced.").[3]

That argument has been rejected by the supreme courts of Vermont, New Hampshire, and Utah (twice), which have denied Meta and TikTok's requests for interlocutory review of their CDA losses. *See, e.g.*, Entry Order, *Vermont v. Meta II* (Vt. Dec. 23, 2024); Order, *New Hampshire v. Meta II* (N.H. Feb. 18, 2025); Order, *Utah v. Meta II*

---

[3]    Copies of these motions are attached in the addendum as Exhibits 20–23.

(Utah Oct. 18, 2024); Order, *Utah v. TikTok II* (Utah Feb. 10, 2025).[4] At least two state trial courts have also refused to certify their orders denying Meta's motion to dismiss on CDA grounds for interlocutory review. Mem. and Order on Mot. for Report, *Massachusetts v. Meta Platforms, Inc.*, No. 23-2397-BLS1 (Mass. Super. Ct. Jan. 9, 2025); *District of Columbia v. Meta Platforms, Inc.*, No. 2023-CAB-006550, Slip Op. at 3 (D.C. Super. Ct. Nov. 25, 2024) ("*District v. Meta II*").[5] That said, while no state supreme court has accepted Meta's position that the CDA provides immunity to suit, the Massachusetts Supreme Court has taken up the question of whether that state's analogue to the collateral order doctrine—the doctrine of present execution—applies to denials of CDA motions to dismiss. *Massachusetts v. Meta Platforms, Inc.*, No. SJC-13747.

Notably, the Vermont Supreme Court refused to accept an interlocutory appeal of Meta's CDA loss even though it decided to accept interlocutory review of Meta's personal jurisdiction loss in the same

---

[4]   Copies of these opinions are attached in the addendum as Exhibits 24–27.

[5]   Copies of these opinions are attached in the addendum as Exhibits 28–29.

case. Entry Order, *Vermont v. Meta II* (Vt. Dec. 23, 2024). In other words, while the Vermont Supreme Court deemed proceeding against a defendant over whom the state potentially lacked personal jurisdiction a concern warranting immediate review, it did not view proceeding against a defendant who might potentially be protected by the CDA as requiring the same expeditiousness.

Finally, there are strong policy reasons to follow the lead of the Vermont, Utah, and New Hampshire Supreme Courts and to not allow unnecessary early appeals in enforcement cases like these. The Attorneys General here are seeking to protect the children of their various States from serious harms allegedly fostered by Meta's social media applications. Any interlocutory appeal on CDA grounds risks injecting potentially years of delay into the resolution of these important cases. As a District of Columbia court observed when refusing to certify its order denying Meta's motion to dismiss on CDA grounds for an interlocutory appeal:

> [W]hile the court cannot predict how the [District of Columbia] Court of Appeals would resolve an interlocutory appeal, the court notes that a growing number of state court judges who have addressed virtually the same … Section 230 arguments advanced by Meta in this case have issued rulings consistent with this court's order.… This emerging case law

13

may make it more likely that an interlocutory appeal would be rejected on the merits, notwithstanding the contrary ruling from the judge overseeing the multi-district litigation in federal court. In reality, therefore, an interlocutory appeal— which would freeze this litigation for months, if not years, while the Court of Appeals considered the issues raised— might very well be more likely to delay than to speed up the resolution of this case.

*District v. Meta II*, Slip Op. at 3–4.

## CONCLUSION

To the extent it addresses these issues, this Court should hold, consistent with the state court decisions and orders discussed above, that (1) social media addiction claims are not barred by the CDA, and (2) the CDA provides only immunity from ultimate liability, not from suit entirely.

Dated: June 30, 2025   Respectfully submitted,

**VERMONT, NEW HAMPSHIRE AND NINE OTHER STATES AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES/CROSS-APPELLANTS**

By: s/ Roger Perlstadt
*One of Their Attorneys*

Ryan D. Andrews
randrews@edelson.com

Roger Perlstadt
rperlstadt@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Jonathan T. Rose
Solicitor General
jonathan.rose@vermont.gov
Merideth C. Chaudoir
Assistant Attorney General
merideth.chaudoir@vermont.gov
109 State Street
Montpelier, Vermont 05609
Tel: 802.828.3176

Brandon H. Garod
Senior Assistant Attorney General
brandon.h.garod@doj.nh.gov
Kevin P.J. Scura
Senior Assistant Attorney General
kevin.p.j.scura@doj.nh.gov
New Hampshire Department of
Justice, Office of the Attorney General
1 Granite Place South
Concord, New Hampshire 03301
Tel: 603.271.3650

Jimmy Rock
jrock@edelson.com
EDELSON PC
1255 Union Street NE, Suite 850
Washington, D.C. 20002
Tel: 2.02.270.4777

*Counsel for Amici Curiae*

15

## ADDITIONAL STATE ATTORNEYS GENERAL IN SUPPORT

State of Arkansas
Noah P. Watson
Deputy Solicitor General

District of Columbia
Brian L. Schwalb
Attorney General for the District
of Columbia

State of Massachusetts
Andrea Joy Campbell
Attorney General
Commonwealth of
Massachusetts

State of Mississippi
Lynn Fitch
Attorney General of Mississippi

State of Nevada
Aaron D. Ford
Attorney General of Nevada

State of New Mexico
Aletheia V.P. Allen
Solicitor General
New Mexico Department of
Justice

State of Oklahoma
Gentner F. Drummond
Attorney General
State of Oklahoma

State of Tennessee
J. Matthew Rice
Solicitor General

State of Utah
Stanford E. Purser
Utah Solicitor General

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**

I am the attorney or self-represented party.

**This brief contains _____ words,** including _____ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☐ complies with the word limit of Cir. R. 32-1.

☐ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

☐ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    ☐ it is a joint brief submitted by separately represented parties.
    ☐ a party or parties are filing a single brief in response to multiple briefs.
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated        .

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**                                       **Date**
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                               *Rev. 12/01/22*

## TABLE OF ADDENDA

| Addenda No. | Addenda Title |
|---|---|
| 1 | Ruling on Defendants' Motion to Dismiss First Amended Complaint, *Arkansas v. Meta Platforms, Inc.*, No. 57CV-23-47 (Ark. Cir. Ct. June 13, 2024) |
| 2 | Order Denying Defendants' Motion to Dismiss, *Arkansas v. TikTok Inc.*, No. 12CV-23-65 (Ark. Cir. Ct. May 15, 2024) |
| 3 | Memorandum Opinion and Order Denying Defendants' Motion to Dismiss, *District of Columbia v. Meta Platforms, Inc.*, No. 2023-CAB-006550, 2023 WL 11921682 (D.C. Super. Ct. Sept. 9, 2024) |
| 4 | Order, *District of Columbia v. TikTok Inc.*, No. 2024-CAB-006377 (D.C. Super. Ct. Feb. 28, 2025) |
| 5 | Memorandum Opinion and Order, *Illinois v. TikTok Inc.*, No. 2024CH09302 (Ill. Cir. Ct. June 12, 2025) |
| 6 | Memorandum Order and Motion to Dismiss *Massachusetts v. Meta Platforms, Inc.*, No. 23-2397-BLS1 (Mass. Super. Ct. Oct. 17, 2024) |
| 7 | Transcript of Hearing re: Motion to Dismiss, *Nevada v. TikTok Inc.*, No. A-24-886127-B (Nev. Dist. Ct. Sept. 24, 2024) |
| 8 | Order, *New Hampshire v. Meta Platforms, Inc.*, No. 217-2023-CV-00594 (N.H. Super. Ct. Dec. 10, 2024) |
| 9 | Order Denying the Meta Defendants' Motion to Dismiss, *New Mexico v. Meta Platforms, Inc.*, No. D-101-CV-2023-02838 (N.M. Dist. Ct. June 21, 2024) |
| 10 | Order Denying Defendant's Motion to Dismiss, *New Mexico v. Snap Inc.*, No. D-101-CV-2024-02131 (N.M. Dist. Ct. May 12, 2025) |
| 11 | Transcript of Hearing, *New York v. TikTok Inc.*, No. 452749/24 (N.Y. May 28, 2025) |
| 12 | Order on Defendants' Motion to Dismiss, *Oklahoma v. Meta Platforms, Inc.*, No. CJ-2023-180 (Okla. Dist. Ct. Nov. 20, 2024) |

| 13 | Opinion and Order, *South Carolina v. TikTok Inc.*, No. 2024-CP-40-06018 (S.C. Cir. Ct. May 6, 2025) |
|----|------|
| 14 | Order on Motion to Dismiss Amended Complaint, *Tennessee v. Meta Platforms, Inc.*, No. 23-1364-IV (Tenn. Ch. Ct. Oct. 17, 2024) |
| 15 | Order Denying Defendants' Motion to Dismiss, *Utah Div. of Consumer Prot. v. Meta Platforms, Inc.*, No. 230908060, 2024 WL 3741422 (Utah Dist. Ct. July 18, 2024) |
| 16 | Order Denying Defendant's Motion to Dismiss, *Utah Div. of Consumer Prot. v. TikTok Inc.*, No. 230907634 (Utah Dist. Ct. Nov. 12, 2024) |
| 17 | Ruling on Motion to Dismiss, *Vermont v. Meta Platforms, Inc.*, No. 23-CV-4453, 2024 WL 3741424 (Vt. Super. Ct. July 29, 2024) |
| 18 | Transcript of Motion Hearing, *Washington v. TikTok Inc.*, No. 24-2-23100-5 SEA (Wa. Super. Ct. Mar. 28, 2025) |
| 19 | Opinion and Order on Defendants' Motion to Dismiss, *Oregon v. TikTok Inc.*, No. 24CV-48473 (Or. Cir. Ct. June 13, 2025) |
| 20 | Meta Platforms, Inc. and Instagram, LLC's Mot. for Permission to Appeal Pursuant to V.R.A.P. 5(b)(7)(A), *Vermont v. Meta Platforms, Inc.*, No. 24-AP-295 (Vt. Oct. 28, 2024) |
| 21 | Rule 7 Notice of Discretionary Appeal, *New Hampshire v. Meta Platforms Inc.*, No. 2025-0022 (N.H. Jan. 10, 2025) |
| 22 | Petition for Permission to Appeal from Interlocutory Order, *Utah Div. of Consumer Protection v. Meta Platforms, Inc.*, No. 20240875-SC (Utah Aug. 15, 2024) |
| 23 | Petition for Permission to Appeal from Interlocutory Order, *Utah Div. of Consumer Protection v. TikTok Inc.*, No. 20241276-SC (Utah Dec. 3, 2024) |
| 24 | Entry Order, *Vermont v. Meta Platforms, Inc.*, No. 24-AP-295 (Vt. Dec. 23, 2024) |
| 25 | Order, *New Hampshire v. Meta Platforms Inc.*, No. 2025-0022 (N.H. Feb. 18, 2025) |

| | |
|---|---|
| 26 | Order, *Utah Div. of Consumer Protection v. Meta Platforms, Inc.*, No. 20240875-SC (Utah Oct. 18, 2024) |
| 27 | Order, *Utah Div. of Consumer Protection v. TikTok Inc.*, No. 20241276-SC (Utah Feb. 10, 2025) |
| 28 | Memorandum Opinion and Order on Motion for Report, *Massachusetts v. Meta Platforms, Inc.*, No. 23-2397-BLS1 (Mass. Super. Ct. Jan. 9, 2025) |
| 29 | Order Denying Defendants' Motion for Interlocutory Appeal, *District of Columbia v. Meta Platforms, Inc.*, No. 2023-CAB-006550 (D.C. Super. Ct. Nov. 25, 2024) |

# EXHIBIT 1

ELECTRONICALLY FILED
Polk County Circuit Court
Michelle Schnell, Circuit Clerk
2024-Jun-13  15:29:58
57CV-23-47
C18WD01 : 13 Pages

IN THE CIRCUIT COURT OF POLK COUNTY, ARKANSAS
CIVIL DIVISION

STATE OF ARKANSAS, ex rel.
TIM GRIFFIN, ATTORNEY GENERAL                                                PLAINTIFF

VS.                                        NO. 57CV-23-47

META PLATFORMS, INC.; FACEBOOK HOLDINGS, LLC;
FACEBOOK OPERATIONS, LLC; META PAYMENTS, INC.;
FACEBOOK TECHNOLOGIES, LLC; INSTAGRAM, LLC;
and SICULUS, INC.                                                          DEFENDANTS

## RULING ON DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

The state filed its first amended complaint on October 30, 2023. Defendants filed a motion to dismiss the first amended complaint or "FAC" on November 29, 2023. The court held a hearing on the motion to dismiss on April 17, 2024. The parties then each submitted proposed findings for the court to consider before making its determination. The parties submitted six issues for the court to consider (1) whether Arkansas has specific personal jurisdiction over the defendants, (2) whether the state's claims are barred under Section 203 of the Communications Decency Act, (3) whether the state's claims are barred by the first amendment, (4) whether the state has plead facts sufficient to set out claims for relief under theories of public nuisance, (5) the Arkansas Deceptive Trade Practices Act, and (6) the doctrine of unjust enrichment.

### I. Arkansas has specific personal jurisdiction over Meta

The court need not address the landmark cases on the issue of personal jurisdiction, nor should it make an unnecessary attempt to discuss the distinctions between general and specific jurisdiction. The parties agree that if the court has jurisdiction at all that the plaintiff must establish that the court has specific personal jurisdiction over the defendants. The parties also agree on which test that this court must apply. In their respective briefs and arguments the parties have argued that the court must determine whether or not (1) the defendants purposefully availed

1

themselves of the privilege of acting in the forum state or causing a consequence in the forum state; (2) whether or not the cause of action arises from or relates to the defendants' contacts with the forum state; and (3) whether or not the acts of the defendants or the consequences caused by the defendants have a substantial enough connection with the forum state to make the exercise of personal jurisdiction over the defendant reasonable. *Lawson v. Simmons Sporting Goods, Inc.* 2019 Ark. 84.

Defendant argues that Meta has not purposefully availed itself of the privilege of acting in Arkansas. The argument Meta makes is a nuanced one. It argues that it did not target its activities at the State of Arkansas. If the court understands Meta's arguments correctly, Meta seems to suggest that its business model is as passive as a community bulletin board located in another state. Anyone from anywhere can post any message on the face of such a board. In making its argument, Meta understands that it must draw a distinction between its own activities and the activities of third party advertisers who use its services to offer products to Arkansas consumers. Meta obviously couches its argument in such a way as to make it appear to be factually similar to the sporting goods store in *Lawson* whose only contact with Arkansas was to solicit business from Arkansans using the medium of an Arkansas-based publication.

The plaintiffs argue that Meta's activities and tools involve much more interaction with and manipulation of Arkansans than a passive newspaper circular. Plaintiff argues that Meta "specifically and purposefully directed activity toward Arkansas's youth." They allege that Meta purposefully targets Arkansans by "collecting data"--including location data--on all young Meta users who utilize Meta's service within the borders of this state. They allege that Meta makes advertising revenue by selling the data they collect to companies who are eager to use targeted information to tailor their ads to consumers. It is the court's belief that the interactive nature of Meta's platform standing alone might not give rise to personal jurisdiction; however, its collection of

data and use of that data to create sharpened opportunities to enable advertisers to hawk goods to specific users within the state of Arkansas satisfies the "purposeful availment" requirement.

Likewise, Meta argues that the plaintiff's claims "do not arise from or relate to Meta's alleged contacts with Arkansas." It argues that there is no connection between Arkansas and the specific claims at issue as required by *Lawson*. However, the allegations in this case are nothing like the allegations made in *Lawson*. In *Lawson*, Justice Wood, writing for the court, was careful to home in on the facts—after all in a lawsuit the facts do indeed matter. Lawson involved a claim of negligence against a Louisiana merchant for a slip and fall that occurred in a store located in the State of Louisiana.[1] Dismissal was warranted because the advertising in Arkansas had no connection with the negligence claim.

The allegations in this case demonstrate that it is a horse of a different color when compared with *Lawson*. The plaintiff has argued that Meta's features and targeted activities toward young Arkansans have significantly injured them by causing various harms and psychological injuries as well as addiction to the platform. While it remains to be seen if these allegations can be satisfactorily proven, the allegations contained in the first amended complaint are sufficient to qualify as suit-related conduct.

Finally, the court must decide whether the exercise of jurisdiction over Meta would be reasonable. The court concludes that it would. Meta has made a substantial amount of gross sales and income receipts in Arkansas. These receipts come in part from its targeted ad sales in the state, a portion of which are complained of in this action, Meta has employees who work in, reside in, and have income taxes withheld in and paid to the state because of the employees' connection

---

[1] If Lawson were a deceptive trade practice case, I speculate that it is unlikely that the result would have been the same.

to the state. Based upon the advertising revenue and the way it is allegedly obtained, Meta could reasonably anticipate being summoned to court in Arkansas in an action over these particular allegations.

Based upon the foregoing, the defendant's motion to dismiss for want of personal jurisdiction is denied.

### II. Section 230 of the Communications Decency Act does not bar the state's claims

Defendants argue that the State's claims are barred under 47 U.S.C. § 230. Section 230's "Good Samaritan" provision states that, "no provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." To determine whether or not Section 230's Good Samaritan provision applies a court must decide(i) if the party is a provider or user of an interactive computer service; (ii) if the state is seeking to treat the defendants, under a state law cause of action, as publisher or speaker of information; (iii) and that the information is provided by another information content provider.

There is not—probably only because it could not be seriously argued—a dispute on the first element. Meta is a provider of an interactive computer service. This being the case, the parties have trained their arguments on the second element of § 230.

According to the defendants, the state is seeking to treat Meta as a publisher or speaker of information posted to its platforms by third-party users. As evidence to back their contention, they direct the court's attention to the portions of the first amended complaint where dissemination of information provided by third party users is discussed. (See, p.6 of proposed order of dismissal) Relying on several cases,[2] the defendants also believe that § 230 immunity applies to this case

---

[2] The court understood the defendants to rely primarily on *Dyroff v. Ultimate Software Group, Inc.,* 934 F.3d. 1093 (2019), and *Force v. Facebook, Inc.,* 934 F.3d 53 (2019). Both of those cases were dismissed because

4

because they argue that at its essence the state's complaint is about how information is curated and published before it is delivered to users.

The state contends that it is not complaining about the content itself rather it claims to concern itself with the design features of the platforms.[3] The state alleges that Meta's platforms are designed in such a way as to exploit areas of vulnerability to adolescent users of Meta's services. The allegations in the complaint are not aimed at the content itself rather the allegations are aimed at alleged harm caused by the design features themselves. The State alleges that it is merely attempting to hold Meta liable for its own conduct.

It is the court's opinion that § 230's immunity does not apply in this case. The State is not seeking to treat Meta as a publisher or speaker of information, rather it is alleging that the design features of Meta's platforms themselves are hazardous to adolescents because the features are designed to addict and exploit the frailties of developing brains. If that is ultimately proven to be true, the nature of the content shared on the platforms is irrelevant. This case is properly understood as a dispute over whether the design features of Meta's platforms harm adolescents.

### III. The first amendment does not bar the state's complaint

The first amendment arguments advanced by the parties are similar in nature to the arguments advanced in support of their respective arguments regarding § 230. Defendants argue that the state's claims run afoul of the first amendment to the constitution because they claim that the state is attempting to impose a restraint on their editorial judgment and their method of

---

the claims for liability were based upon actions that speakers took using the format that the interactive computer service as a megaphone, i.e. selling heroin and causing the death of a user of the interactive computer, and Hamas' coordinating of terrorist acts using an interactive computer service when the attacks themselves caused American citizens to die.

[3] The state principally relies on *Lemon v. Snap, Inc*. 995 F.3d 1085 (2021) and several trial court decisions deciding issues like those before this court. In Lemon, an interactive computer service was not dismissed from a lawsuit because it created a Speed Filter for users to utilize while operating or riding in a motor vehicle.

disseminating speech. The state claims that it is not aiming its fire at speech, content moderation, or organization of content rather it claims that the allegations in the complaint are aimed at alleged harms caused by the design features of Meta's platforms.

The court believes that this case is about conduct rather than speech. Here, the language from a decision of the Eleventh Circuit is instructive "[p] ut simply, with minor exceptions, the government cannot tell a private person or entity what to say or how to say it." *NetChoice v. Att'y Gen*., 34 F. 4th 1196, 1203 (11th Cir. 2022). The complaint does not seek to restrain speech, interfere with editorial function, or compel a publisher to publish content against its will; therefore, the first amendment does not require dismissal.

### IV. Meta's platform cannot constitute a public nuisance

The defendants allege that the State's public nuisance claim against them must fail because the acts complained of in this case are conducted through the medium of an internet website or application. They ask the court to hold that public nuisance claims are limited to cases involving land or property use. To support their argument, they cite a decision from the Eastern District of Arkansas that quickly and efficiently dispatched a claim for public nuisance against pharmaceutical companies because the companies "[were] not landowners." *Independence County v. Pfizer, Inc*. 534 F. Supp. 2d. 882, 890 (E.D. Ark. 2008) *Independence County* adopted the definition of "nuisance" from *Milligan v. Gen. Oil Co*. 293 Ark. 401 (1987) to reach its decision. The definition recited in Milligan is "[n]uisance is defined as conduct by one landowner which unreasonably interferes with the use and enjoyment of the lands of another and includes conduct on property which disturbs the peaceful, quiet, and undisturbed use and enjoyment of nearby property." (Id. at 404) A few common examples are enterprises that emit unreasonable noise or noxious odors, bookmaking operations, bootlegging operations, and theatres. Thus, it is the

defendants' contention that an act may not be abated as a nuisance unless the act itself is carried out on land.

The state claims that the court's authority to enjoin a nuisance is not tethered to real property provided that the nuisance is a public nuisance. It asks the court to focus its attention on Meta's activities that it alleges threaten public health, safety, and morals.

The real property tethered definition of "nuisance" advanced by the defendants appears to show up without citation to precedent for the first time in *Ark. Rel. Guidance Fdn v. Needler*, 252 Ark. 194, 196 (1972). The rule announced and applied in *Needler* is recited again in *Milligan* as settled law and is cited in other cases thereafter. (See also, *Aviation Cadet Museum, Inc. v. Hammer*, 373 Ark. 202, 207 (2008).) Thus, it would appear that the Arkansas Supreme Court has declared that nuisance is a land based caused of action as urged by the defendants.

To get around the "land-based rule" of *Needler*, the state asks the court to distinguish between public and private nuisance.[4]  The problem child for the state is, again, *Needler*.  The distinction Needler drew between a public and private nuisance "is simply the extent of the injury." *Ark. Rel. Guidance Fdn. v. Needler*, 252 Ark. 194, 196  (1972). Thus, it would appear to the court that the land-based rule applies in both public and private nuisance cases.  The nuisance claim is, therefore, dismissed.

---

[4] *Webber v. Gray*, 307 S.W. 2d 80 (1957) is a factually interesting case that did not bind nuisance law to land. *Webber* focused upon the court's power to abate harassing acts when there exists no adequate remedy at law. It should be noted that *Webber* was decided before harassment was criminalized. Since *Webber* was decided prior to *Needler*, the court believes that the language contained in *Needler* relegated nuisance to a land based cause of action.

**V. Deceptive trade practices**

The state alleges that Meta's activities violate three portions of the Arkansas Deceptive Trade Practices Act. First, the state claims that Meta utilized deceptive and unconscionable trade practices that included "knowingly making false representations as to the characteristics – specifically the safety and addictiveness – of Meta's services and platforms in violation of Ark. Code Ann. § 4-88-107(a)(1)." Meta counters that subsection (a)(1) is not applicable because it only applies to "goods or services." Clearly Meta's interpretation of (a)(1) is correct because Meta's platform neither meets the definition of a "good" nor does it meet the definition of a "service" as set out in the ADTPA.

**Is the platform offered by Meta a "good" for the purpose of ADTPA?**

The ADPTA defines "goods" as "tangible property, coupons or certificates whether bought or leased." (Ark. Code Ann. § 4-88-102(4)) The words "bought or leased" present a barrier that the state must attempt to circumnavigate.  So, to avoid the plain language that Meta offers as a defense, the state resorts to a novel argument—that Meta's platform is "bought or leased" by consumers who pay no money, but instead render consideration in the form of data which Meta exploits to turn its profits. The state's argument fails because Meta's platforms are not anything approaching "tangible property, coupons, or certificates."  Therefore, the court rejects the state's contention that Meta's platforms are a "good" for the purposes of ADTPA.[5]

**Is the platform offered by Meta "services" as contemplated in ADTPA?**

The ADTPA defines "services" as "work, labor, or other things purchased that do not have physical characteristics." Though Meta's platforms are a "service" in the common usage of the

---

[5] The state cites no authority to support its contention that Meta provides a "good or goods."

word, this court finds that they are not "services" under the ADTPA because they are not

"purchased." The Arkansas Supreme Court has adopted the following definition of the word

"purchase:" [a] purchase is a transmission of property from one person to another by voluntary act

and agreement on valuable consideration." <u>Erxlebren v. Horton Printing Co</u>. 283 Ark. 272, 275

(1984). Justice Hubbell, writing for the Erxlebren majority, derived this definition by consulting

Black's law dictionary. Id.  There has been considerable debate in the public square regarding

whether personal data generated on the internet is personal property,[6] but there is no consensus on

the issue. This court finds that users purchase nothing directly from Meta, therefore, the court must

decline to extend the ADTPA to this portion of the state's argument.

**Do the pleadings set out sufficient allegations that Meta's activities violate § 4-88-107(8)?**

For its second ADTPA claim, the state argues that Meta's actions violate § 4-88-107(8) which

states that it is unlawful and prohibited to knowingly take "advantage of a consumer who is

reasonably unable to protect his or her interest because of physical infirmity, ignorance, illiteracy,

inability to understand the language of the agreement, or a similar factor." Here, the state alleges

that "the Defendants knowingly took advantage of vulnerable adolescent users who were

reasonably unable to protect their own interests because of their young age, ignorance of the facts

which Defendants had in their possession and control, and inability to understand the addictive

and harmful consequences of using Meta's platforms." (FAC ¶ 251) Because the ADTPA is broadly

construed, the state's allegations survive the motion to dismiss.

---

[6] The United States Senate considered the "Own Your Own Data" Act during the 116th Congress, but the bill did not become law.

**Do the pleadings set out sufficient allegations that Meta's conduct violates § 4-88-107(a)(10)?**

Finally, the state asks the court to deny Meta's motion to dismiss because the totality of Meta's "conduct described [in the complaint] also constitutes unconscionable[7] and deceptive acts or practices which Defendants undertook in furtherance of their business, commerce, or trade and attempts to profit at the cost of the decimated mental health of teen users in violation of Ark. Code Ann. § 4-88-107(a)(10). The false representations, fraud, concealments, omissions and suppressions of damaging information were deceptive and constituted a repeated course of unconscionable conduct contrary to public policy and the public's interest which continues to this day." (FAC ¶ 256-257) Ark. Code Ann. § 4-88-107(a)(10) is often referred to as ADTPA's "catch-all provision." (see, *State v. R&A Investment Co.,* 336 Ark. 289, 295 (1999)) Generally, "[a]n act is unconscionable if it affronts the sense of justice, decency, and reasonableness." Howard W. Brill, Arkansas Law of Damages §17:18 (6th Ed. 2014) Because the "catch-all" provision" has been broadly construed to encompass acts not specifically named in the act or even envisioned by the General Assembly, the claims set out in the state's complaint, which must be accepted as true in the current analysis, are sufficient to survive a motion to dismiss.

### VI. Unjust enrichment

Arkansas law on unjust enrichment is based upon the notion that "one person should not be free to unjustly enrich himself at the expense of another."  Howard W. Brill, Arkansas Law of Damages §31:2 (6th Ed. 2014)  In this action, the legal theory advanced by the state is that Meta's platforms are dangerous because they are designed to be addictive--especially so to younger users. The argument continues that Meta, through deception and omission and suppression of

---

[7] The Arkansas Supreme Court has stated that 'unconscionability' is not precisely defined in the law." *LegalZoom.com, Inc. v. McIllwain*, 2013 Ark. 370, 6. In the context of contract law, it seems that the cases focus upon the inequality of bargaining positions between parties to a contract as a part of an unconscionability analysis.

facts, fraudulently concealed those alleged addictive features from the unsuspecting public. Once Meta got its unwary victims addicted to its platforms, its coffers were swelled with advertising revenue because the addictive nature of the platforms caused these vulnerable Arkansans to stay on the platforms longer. Thus, the state claims that the user's addiction to Meta drove its advertising revenue even higher.

In the court's judgment, a claim for unjust enrichment is not available under the specific facts alleged in the complaint. It is the court's opinion that the State cannot assert an unjust enrichment claim because it does not allege that Defendants were enriched by Arkansas or its citizens. The basis of the state's complaint is that Meta profits from its malevolent practices, but the alleged malevolent practices do not generate monies or property from the state or its citizens.

Taking the allegations of the complaint as true, Meta's practices stimulate users to engage with Meta longer thereby increasing the value of advertising, but it cannot seriously be argued that Meta is not entitled to receive the advertising revenue from the ***advertisers***. The Arkansas Court of Appeals has held that "[o]ne is not unjustly enriched by receipt of that to which he is legally entitled." *Smith v. Whitener*, 42 Ark. App. 225, 228 (1993) When one is found to have been unjustly enriched at the expense of another, he or she must restore the item or sum of money (or said another way--pay restitution) wrongly received back to the person or entity from whom it was wrongly received. Considering the allegations set out in the state's complaint against these standards, the state does not allege that Meta is not entitled to payment for the advertising revenues that it has received from the advertisers, rather it complains about the way the revenues were earned. Under the state's theory, Meta received neither money nor property from the users of its platforms that could be restored to the State or to Arkansas residents on whose behalf it sues, and there is no basis for a claim of unjust enrichment.

11

IT IS SO ORDERED this the _____ day of June 2024.

ELECTRONIC SIGNATURE



**Case Title:**       STATE OF ARKANSAS VS. META PLATFORMS, INC ETAL

**Case Number:**    57CV-23-47

**Type:**         ORDER OTHER

So Ordered

_____
James A. Riner, 18th West Judicial Circuit Judge

Electronically signed by JARINER2 on 2024-06-13    page 13 of 13

# EXHIBIT 2

ELECTRONICALLY FILED
CLEBURNE COUNTY CIRCUIT COURT
HEATHER SMITH, CIRCUIT CLERK
2024-May-15  12:13:00
12CV-23-65
C16D01 : 15 Pages

## IN THE CIRCUIT COURT OF CLEBURNE COUNTY, ARKANSAS
## CIVIL DIVISION

**STATE OF ARKANSAS, ex rel.**
**TIM GRIFFIN, ATTORNEY**                                         **PLAINTIFF**
**GENERAL**

**v.**                                    **Case No. 12CV-23-65**

**TIKTOK INC.; TIKTOK PTE.**
**LTD.; BYTEDANCE INC.; and**                                    **DEFENDANTS**
**BYTEDANCE LTD.**

---

## ORDER DENYING DEFENDANTS'
## MOTION TO DISMISS

Before the Court is the Defendants' Motion to Dismiss the State's First Amended Complaint. The matter has been fully briefed, and this Court held a hearing on the Motion on February 7, 2024. For the reasons set forth below, Defendants' Motion to Dismiss the First Amended Complaint is **DENIED**.

### I. PROCEDURAL HISTORY

The State filed its original Complaint on March 28, 2023. On June 13, 2023, Defendants moved to dismiss the State's original Complaint. The State responded to the Defendants' Motion to Dismiss on August 9, 2023. On August 18, 2023, the Defendants filed a Motion for Protective Order, Stay of Discovery, and Extension of Time pending disposition of their Motion to Dismiss.

On October 4, 2023, the State filed its First Amended Complaint. On November 8, 2023, the Defendants moved to dismiss the First Amended Complaint. The State responded to the Defendants Motion to Dismiss the First Amended Complaint on December 1, 2023. The Court held a hearing on the Motion to Dismiss the First Amended Complaint on February 7, 2024. At

the hearing, the Court requested that each party prepare a proposed order concerning Defendants' Motion to Dismiss the First Amended Complaint. The Court also stayed discovery until it ruled on Defendants' pending Motion to Dismiss the First Amended Complaint.

## II. LEGAL STANDARD

When presented with a motion to dismiss, a court must treat the facts alleged in the complaint as true and view them in the light most favorable to the non-moving party. *Perry v. Baptist Health*, 358 Ark. 238, at 244–248, 189 S.W.3d 54, 57–60 (2004). All reasonable inferences must be resolved in favor of the complaint, and the pleadings are to be liberally construed. *Id*. In determining whether to dismiss, it is improper for the court to look beyond the complaint. *Battle v. Harris*, 298 Ark. 241, at 243, 766 S.W.2d 431, 432 (1989); *Smith v. Eisen*, 97 Ark. App. 130, 138–39, 245 S.W.3d 160, 168 (2006). Thus, the court may dismiss only where the complaint fails to include "(1) a statement in ordinary and concise language of facts showing that the court has jurisdiction of the claim and is the proper venue and that the pleader is entitled to relief, and (2) a demand for the relief to which the pleader considers himself entitled." Ark. R. Civ. P. 8(a). Arkansas's appellate courts have further noted that the standard imposed upon the pleading party is "lenient." *Clayton v. Batesville Casket Co., Inc.*, 2015 Ark. App. 361, at 6, 465 S.W.3d 441, 445.

## III. ANALYSIS

Defendants have moved to dismiss on several grounds. First, Defendants argue that this Court does not have personal jurisdiction over each of the Defendants. Second, Defendants argue that the State has not pleaded the essential elements of a violation of the Arkansas Deceptive Trade Practices Act ("ADTPA"), Ark. Code Ann. § 4-88-101 *et seq.* Third, Defendants argue that Section 230 of the Communications Decency Act bars the State's claims. Finally, Defendants argue that

the State's unjust enrichment claim fails a matter of law. The Court will address each of these arguments in turn.

    *1.*     *This Court has specific personal jurisdiction over the Defendants.*

Defendants argue that they have not purposefully availed themselves of doing business in Arkansas. Arkansas courts have personal jurisdiction to the maximum extent allowed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Lawson v. Simmons Sporting Goods, Inc.*, 2019 Ark. 84, at 6, 569 S.W.3d 865, 869–70 (citing Ark. Code Ann. § 16-4-101(A–B)). In order to establish specific personal jurisdiction: (1) the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state; (2) the cause of action must arise from or relate to the defendant's contacts with the forum state; and (3) the acts of the defendant or consequences caused by the defendant must have substantial enough connection with the forum state to make the exercise of personal jurisdiction over the defendant reasonable. *Id.* at 9–10, 569 S.W.3d at 871 (citing *Ficarelli v. Champion Petfoods USA, Inc.*, No. 3:18-cv-00361, 2018 WL 6832075, at \*3 (M.D. Tenn. Dec. 28, 2018)). The Court finds that the State's First Amended Complaint pleads sufficient facts to establish specific personal jurisdiction over the Defendants.

First, Defendants have purposefully availed itself of the privilege of doing business in Arkansas because Defendants "serve[] a market for a product" in Arkansas, namely, the market for social media applications. *See Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1022 (2021). The TikTok app has been downloaded at least hundreds of thousands of times in Arkansas. First Am. Compl. ¶ 21. Defendants are serving content to and collecting data from all of those devices and accounts located in Arkansas. First Am. Compl. ¶ 21. The State has also alleged that Defendants know and rely on the location of its Arkansas users to target them with

content and advertisements, creating an Arkansas-specific experience inside the TikTok app. First Am. Compl. ¶¶ 22–24. In this way, Defendants have designed its app to encourage Arkansas users to return to the app frequently and for long durations, which increases Defendants' ability to earn advertising revenue. First Am. Compl. ¶¶ 22–23, 48, 51. All this activity is in service of continuing bilateral contractual relationships that Defendants have entered into with at least hundreds of thousands of Arkansas users—relationships that the State alleges many Arkansans would not have agreed to absent the deceptive statements that are the subject of this lawsuit. *See, e.g.*, First Am. Compl. ¶ 13, 31, 62, 66, 69, 218; *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76 (1985) (finding purposeful availment where a defendant "has created 'continuing obligations' between [it]self and residents of the forum," including when "transacted solely by … wire communications").

In addition, Defendants have availed themselves of the financial rewards of operating within the State of Arkansas. First Am. Compl. ¶ 25. For the period of May 1 through August 31, 2023, Defendant TikTok, Inc. reported to the Arkansas Department of Finance and Administration taxable sales in Arkansas of $1,808,956 and state and local remittances of vendor use taxes totaling $70,313. First Am. Compl. ¶ 26. Defendant TikTok, Inc. also has employees located in Arkansas. First Am. Compl. ¶ 27. In 2021, TikTok, Inc. employed two people in Arkansas with combined wages of $567,874.71. First Am. Compl. ¶ 27 In 2022, TikTok, Inc. employed five people in Arkansas with combined wages of $547,395.32. First Am. Compl. ¶ 27. Defendants are also doing business *with the State of Arkansas*. First Am. Compl. ¶ 32. Over the past five years, Defendants have sold $284,967.06 in advertising to the Arkansas Department of Health that was, in part, estimated to reach 500,000 English-speaking TikTok users ages 13–24 located in the State of

Arkansas in one instance and 300,000 TikTok users ages 16–24 located in the State of Arkansas in another. First Am. Compl. ¶ 32.

Defendants have also targeted Arkansas as a market for TikTok. First Am. Compl. ¶ 34. They have awarded grant money to Arkansas educators as part of their effort to persuade Arkansas parents that TikTok is safe and appropriate for young people. First Am. Compl. ¶ 34. TikTok has internally identified Arkansas as a "Key Market[]," for "pushing our safety narratives among parenting audiences" and "[d]riv[ing] perception among elite audiences of TikTok as a place where parents feel comfortable for their teens, and want to join." First Am. Compl. ¶ 34. An internal TikTok document specifically lists Arkansas as one of the places where TikTok seeks to "[b]uild trust and establish TikTok as a safe and welcoming place for parents, families, and teens to create, share, and watch videos." First Am. Compl. ¶ 34.

Defendants dispute that these contacts constitute "purposeful availment" because in its view, Defendants' allegedly unlawful actions and allegedly deceptive statements and omissions did not occur in Arkansas and did not specifically target Arkansas. Def.'s Br. in Supp. of Mot. to Dismiss at 12–14. Defendants misunderstand the relevant legal test, however, and cannot hide behind the scale of its business operations to evade personal jurisdiction in Arkansas.

"[W]hat matters" for specific personal jurisdiction "is [TikTok's] structuring of its own activities so as to target the [Arkansas] market." *NBA Props., Inc. v. HANWJH*, 46 F. 4th 614, 624 (7th Cir. 2022). The fact that Arkansans have downloaded the TikTok app is not the "result of random, fortuitous, or attenuated contacts." *Id.* (quoting *Burger King Corp.*, 471 U.S. at 475). It is the direct result of Defendants' business and how it has "structured" its operations to "invite" downloads in Arkansas, as detailed above. *NBA Props.*, 46 F. 4th at 625; *see also Doffing v. Meta*, 2022 WL 3357698, at *4 (D. Or. July 20, 2022). Defendants expected, if not encouraged, the

Arkansas contacts that give rise to this case: representations to Arkansas consumers about the safety of the TikTok app and the accessibility of users' digital data. These representations induced Arkansans to enter into continuous bilateral contracts with Defendants that provided the company with the valuable consideration it seeks—user data in exchange for the use of its app. This data allows Defendants to target Arkansans with location-based advertisements, which are central to their business model. Moreover, Defendants' collection of data and targeted advertisements depends on minors' consistent use of the app. Thus, TikTok's alleged addictiveness is also central to its contacts with Arkansans.

Second, the State's claims "relate to" Defendants' contacts with Arkansas. *Ford Motor Co.*, 141 S. Ct. at 1025–26. Arkansans download the TikTok app in the Apple App Store, Google Play Store, or Microsoft Store. *E.g.*, First Am. Compl. ¶ 3–8, 13–17, 52–69. When they do, they are presented with Defendants' allegedly false age-rating representations. *Id.* Every Arkansas user therefore receives this information when they consider whether to download the TikTok app, and that means that these allegedly false and deceptive representations and omissions relate to Defendants' contacts with Arkansas—the thousands of Arkansas user downloads of the TikTok app.

Third, as a global company doing business throughout the United States, it is entirely reasonable for TikTok to expect that it could be haled into court in Arkansas, especially considering TikTok profits handsomely off Arkansas minors. TikTok does not dispute this aspect of the specific personal jurisdiction analysis. Further, Arkansas has a strong interest in providing a forum for the adjudication of claims under the Arkansas Deceptive Trade Practices Act, a broad remedial statute. The Court finds that the State has pleaded sufficient facts to establish specific personal jurisdiction over Defendants.

2.     *The State has pleaded claims under the Arkansas Deceptive Trade Practices Act.*

Defendants claim that the State's ADTPA claims fail for several reasons. First, Defendants claim that their questionnaire responses for the TikTok platform, its age ratings, its public statements, and its statements about Restricted Mode are statements of subjective opinion that cannot lead to liability under the ADTPA. Def.'s Br. in Supp. of Mot. to Dismiss at 22. Defendants also claim the State has not alleged that the questionnaire responses and statements about Restricted Mode are false or misleading in any material respect. *Id.* Defendants further argue that the State's claim based on the platform's addictiveness fails because the State has not alleged a consumer-oriented act that is misleading in a material respect, nor an actionable omission. *Id.* Finally, Defendants claim that all of the State's ADTPA claims must be dismissed because the TikTok app is not a good or service or that Defendants' acts were "consumer-oriented." *Id.* For ease of reference, the Court references the below table that outlines the State's claims.

| Count # | Claim Description | Statutory or Legal Basis |
|---------|-------------------|--------------------------|
| Count I | Misrepresentation as to Alcohol, Tobacco, and Drug References | Ark. Code Ann. § 4-88-107(a)(1), (10), (12) |
| Count II | Misrepresentation as to Sexual Content and Nudity | Ark. Code Ann. § 4-88-107(a)(1), (10), (12) |
| Count III | Misrepresentation as to Mature and Suggestive Themes | Ark. Code Ann. § 4-88-107(a)(1), (10), (12) |
| Count IV | Misrepresentation as to Profanity and Crude Humor | Ark. Code Ann. § 4-88-107(a)(1), (10), (12) |
| Count V | Misrepresentation as to 12+ Age Rating in the Apple Store | Ark. Code Ann. § 4-88-107(a)(1), (10), (12) |

| Count # | Claim Description | Statutory or Legal Basis |
|---|---|---|
| Count VI | Misrepresentation as to the T for Teen Rating in the Google Play and Microsoft Stores | Ark. Code Ann. § 4-88-107(a)(1), (10), (12) |
| Count VII | Cumulative Deceptive Representations | Ark. Code Ann. § 4-88-107(a)(1), (10), (12) |
| Count VIII | Misrepresentation as to Restricted Mode | Ark. Code Ann. § 4-88-107(a)(1), (10) |
| Count IX | Deception and Omission of Material Facts Related to Content and Age Ratings | Ark. Code Ann. § 4-88-108(a)(1–2) |
| Count X | Deception and Omission of Material Facts from TikTok's Community Guidelines | Ark. Code Ann. § 4-88-108(a)(1–2). |
| Count XI | Addictiveness—Unconscionability, Misrepresentations, and Omissions | Ark. Code Ann. § 4-88-107(a)(1), (10), (12) |
| Count XII | Unjust Enrichment | Common Law |

### A.    The TikTok App is a service under the ADTPA.

The ADTPA applies to "services," among other things, and defines "services" as "work, labor, or other things purchased that do not have physical characteristics." Ark. Code Ann. § 4-88-102(7). Notably, the ADTPA does not define "purchase." *See id.* The State has adequately alleged that the TikTok app is a service. Although Defendants do not charge a monetary fee for the use of the TikTok app, users provide valuable consideration to TikTok—their data. First Am. Compl. ¶ 31. Consumers agree, by bilateral contract, to provide their valuable personal data to Defendants in return for their use of the TikTok app. *E.g.*, First Am. Compl. ¶¶ 21–24, 51, 181–89. This

contractual exchange is central to TikTok's business model. *E.g.*, First Am. Compl. ¶¶ 11, 31, 51, 181. The State has adequately pleaded that the TikTok app is a "service" under the ADTPA.

### B. Defendants' alleged misrepresentations in Counts I through X are actionable under the ADTPA.

The Court concludes that the State has pleaded sufficient facts to show Defendants' misrepresentations were specific, concrete, and actionable under the ADTPA. Defendants ask this Court to hold that the words "infrequent, frequent, mild, intense, and safe" are inherently subjective and thus constitute non-actionable statements of opinion. Even assuming *arguendo* that some exception for statements of opinion exists in the ADTPA, Defendants' argument is belied by the specific facts alleged in the First Amended Complaint. For example, the State's First Amended Complaint alleges that material such as videos related to "pegging" are rampant on TikTok. *E.g.*, First Am. Compl. ¶ 95. It strains credulity to suggest that minors should view content related to pegging—a point Defendants themselves cannot seriously dispute given the content of their Community Guidelines. Words like "infrequent, frequent, mild, intense, and safe" are not inherently subjective and relative, but instead turn on context and relevant facts. For example, it is a fact, not an opinion, that bleach is not safe for use on hands. *See, e.g.*, *Thompson v. Proctor and Gamble Co.*, No. 18-CV-60107, 2018 WL 5113052, at *2 (S.D. Fla. Oct. 19, 2018). Similarly, the State challenges specific, concrete, and factual representations that Defendants have made about the safety of its product; these representations are central to its business model. Said simply, it is not possible to paint words such as "infrequent, frequent, mild, intense, and safe" in one broad stroke as Defendants request.

The same is true for the age ratings. The State has alleged that the age ratings are important to get minors on its platform and secure Defendants' profits. *E.g.*, First Am. Compl. ¶ 11. Defendants tell people that the TikTok app is safe for minors—specifically, those 12+—through

its age ratings. First Am. Compl. ¶ 12. Yet even Apple itself has told Defendants that TikTok contains frequent or intense mature content. First Am. Compl. ¶ 15. Undoubtedly, any consumer who views the age ratings, which are based on Defendants' own assertions about their product, is entitled to rely on them when they decide what is appropriate for themselves or their children. In fact, the State alleges that Defendants tout their app store age ratings in public statements. First Am. Compl. ¶ 65. In other words, the State alleges that Defendants *want* consumers to treat these age ratings as conveying concrete, factual information on which they can rely.

Defendants also claim that the State must prove just how "frequent" inappropriate content is in order to successfully challenge the alleged misrepresentations. Def.'s Br. in Supp. of Mot. to Dismiss, at 31–32. First, the State has repeatedly alleged that several categories of mature content on TikTok is not "infrequent," as TikTok claims. *See, e.g.*, First Am. Compl. ¶¶ 12, 16–17, 18– 19, 20–21. On a motion to dismiss, that allegation is sufficient to establish that Defendants have made a deceptive or false statement. Defendants' objection goes to the *degree* of falsity or deception, which is not necessary for the State to establish at this early stage. This is a motion to dismiss and not a motion for summary judgment. The State is not required to plead this level of detail at this stage of the litigation. Second, because the State challenges Defendants' claim that certain mature content on the TikTok app is "infrequent/mild," the State can show that the inappropriate content is *either* frequent *or* intense to allege deception or falsity. In other words, the State can establish that the inappropriate content is intense regardless of its frequency. The State has pleaded sufficient facts alleging that the TikTok app contains intense content in several mature categories. *E.g.*, First Am. Compl. ¶¶ 80, 94–98. Third, the State has alleged that TikTok places users in filter bubbles that cause some users to be bombarded by a large volume of mature content. First Am. Compl. ¶ 145–148. The overall proportion of mature content on TikTok as a

whole is irrelevant to users who fall into such filter bubbles and see frequent, intense mature content as a result.

Finally, the State has pleaded sufficient facts to show that Defendants' promotion of Restricted Mode deceives Arkansas consumers. *E.g.*, First Am. Compl. ¶¶ 170–177. While Defendants ask this Court to weigh the facts at this stage, it is inappropriate to do so. *See* Def.'s Br. in Supp. of Mot. to Dismiss, at 35–37. Defendants may disagree with the State's assertions in its First Amended Complaint, but they are sufficient to proceed to discovery.

The bottom line is that the State has pleaded sufficient facts to show that Defendants' representations are actionable under the ADTPA and has plausibly stated a claim that Defendants violated the ADTPA. For these reasons, the Court denies Defendants' Motion to Dismiss as to Counts I through X.

    **C.**    **Count XI, the State's addictiveness claim, is actionable under the ADTPA.**

Defendants claim that the State's addictiveness claim must be dismissed because "claims of omission" cannot be brought under Ark. Code Ann. § 4-88-107(a). Def.'s Br. in Supp. of Mot. to Dismiss, at 38. Defendants, however, mischaracterize the State's claim. The State clearly pleaded its addictiveness claim under the umbrella of unconscionability, misrepresentation, and omissions. First Am. Compl. ¶ 369. The State pleaded its addictiveness claim under Ark. Code Ann. § 4-88-107(a), not Ark. Code Ann. § 4-88-108. *Id.* Therefore, the Court rejects Defendants' attempt to apply the materiality requirement found in Ark. Code Ann. § 4-88-108 to the State's addictiveness claim. Def.'s Br. in Supp. of Mot. to Dismiss, at 38. Nevertheless, despite Defendants' claims, Ark. Code Ann. § 4-88-107 *et. seq.* covers omissions. *See* Ark. Code Ann. § 4-88-107(a) ("Deceptive and unconscionable trade practices made unlawful and prohibited by this chapter include, *but are not limited to*, the following. . .").

An act is unconscionable if it affronts the sense of justice, decency, and reasonableness. *Gulfco of Louisiana, Inc. v. Brantley*, 2013 Ark. 367, at 9, 430 S.W.3d 7, 13 (citing *Baptist Health v. Murphy*, 2010 Ark. 358, at 27, 373 S.W.3d 269, 287). The State has pleaded sufficient facts that show Defendants created and marketed a purposefully addictive app that was designed to harm children for its own profit. This is an unconscionable business or trade practice under the ADTPA. *E.g.*, First Am. Compl. ¶¶ 189–90, 363–372.

Moreover, the State has sufficiently pleaded that Defendants misled people about the safety of its app for minors. Despite Defendants' assertions of safety, the State alleges that Defendants know minors are especially susceptible to addiction and the mental health harms associated with addiction to the app. First Am. Compl. ¶¶ 367–69. In addition, despite knowing about the app's addictiveness, Defendants continued tailoring their app to optimize the time users spent using it, including by adopting "many coercive design tactics that detract from user agency such as infinite scroll, constant notifications, and the 'slot machine' effect," and it did so while knowing that minors would be "particularly sensitive" to these features and would have "minimal ability to self-regulate effectively" when confronted with them. First Am. Compl. ¶¶ 181–86. Defendants' assertion that "addiction" cannot be defined rings especially hollow given that Defendants' own documents describe this problem with the TikTok app. First Am. Compl. ¶¶ 188–90.

Finally, the State has pleaded sufficient facts showing Defendants should have disclosed TikTok's addictiveness to minors—a fact that Defendants have internally studied, analyzed, and acknowledged. *E.g.*, First Am. Compl. ¶ 189. These facts, if proven, would affront a sense of justice, decency, and reasonableness. The State has thus plausibly alleged an unconscionable business or trade practice under the ADTPA. *E.g.*, First Am. Compl. ¶¶ 189–90, 363–372. The Court denies Defendants' Motion to Dismiss as to Count XI.

3.     *The State has alleged sufficient facts that show Defendants engaged in facilitation that states a claim under Ark. Code Ann. § 4-88-107(a)(12).*

Defendants argue that the State has not alleged sufficient facts that show Defendants engaged in facilitation to state a claim under Ark. Code Ann. § 4-88-107(a)(12). This Court has found that the State has pleaded sufficient facts that show Defendants violated the ADTPA. Therefore, the Court finds that the State has pleaded sufficient facts that show facilitation under the ADTPA.

4.     *Section 230 of the Communications Decency Act does not bar the State's claims.*

Defendants argue that they are immune from suit under Section 230 of the Communications Decency Act, 47 U.S.C. § 230, but Section 230 does not bar the State's claims. Section 230 protects providers of Internet services from liability for content created by "*another* information content provider." 47 U.S.C. § 230(c)(1). Under Section 230, an internet service provider like TikTok is not "legally responsible for information that third parties created" and is "liable only for speech that is properly attributable to" it. *Johnson v. Arden*, 614 F.3d 785, 791 (8th Cir. 2010) (citing *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 1997)); *see also Demetriades v. Yelp, Inc.*, 175 Cal. Rptr. 3d 131, 145 (Cal. Ct. App. 2014). Here, Defendants made their age-rating and content representations themselves. The First Amended Complaint is agnostic on whether TikTok should contain frequent and intense content about drugs, alcohol, tobacco, sex, nudity, and profanity. The First Amended Complaint demands only that TikTok be honest with consumers about what content the app contains. That does not come within the purview of Section 230.

Likewise, the State's claims relating to the TikTok app's addictiveness are not barred by Section 230. Defendants represent to consumers that the TikTok app is safe for minors. Yet,

Defendants know from their own studies that the app's addictive nature harms minors. Here again, the State is not attempting to hold Defendants liable for the content on the platform. The State's allegations establish that Section 230 of the Communications Decency Act does not bar the State's claims.

      5.     *The State has pleaded sufficient facts to support Count XII, its unjust enrichment claim.*

Defendants claim that the State's unjust enrichment claim should be dismissed because a contract exists between the users of the TikTok app and the Defendants. Def.'s Br. in Supp. of Mot. to Dismiss, at 48. The State has alleged that the alleged contracts, the Terms of Service, were wrongfully induced due to Defendants' misrepresentations about the safety of the TikTok app for minors. Pl.'s Resp. to Def.'s Mot. to Dismiss, at 38. Defendants retort that, even if true, that would make the contracts *voidable*, not void, and an unjust enrichment claim cannot lie where a contract is merely voidable. That question of substantive contract interpretation would require the Court to weigh facts and, ultimately, make a factual determination as to the nature of the contracts between Defendants and Arkansas users. That determination is not appropriate for a motion to dismiss. At this point, given the totality of the allegations in the State's First Amended Complaint, this Court finds that the State has pleaded sufficient facts to support a claim for unjust enrichment. This Court denies Defendants' Motion to Dismiss as to Count XII.

## IV. CONCLUSION

At this stage, this Court declines to weigh the evidence. This Court must take the State's allegations as true and view them in a light most favorable to the State. The State has pleaded sufficient facts to establish specific personal jurisdiction. Defendants target Arkansas minors and profit substantially off their data. There is nothing unfair or unexpected about Defendants being subject to this Court's jurisdiction. Moreover, the State has pleaded sufficient facts to show that

Defendants violated the ADTPA and to state a claim for unjust enrichment. Finally, Section 230 does not bar the State's claims. Defendants' Motion to Dismiss is denied in its entirety.

**IT IS SO ORDERED.**

THE HONORABLE HOLLY L. MEYER
16th Circuit Judge, Division 1

May 15, 2024

Prepared by:
Matthew M. Ford, Ark. Bar No. 2013180
Assistant Attorney General
Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, Arkansas 72201-2610
Telephone: (501) 320-3069
Fax: (501) 682-8118
Matthew.Ford@ArkansasAG.gov

*Counsel for Plaintiff*

# EXHIBIT 3

2023 WL 11921682 (D.C.Super.) (Trial Order)
Superior Court of the District of Columbia.

DISTRICT OF COLUMBIA, Plaintiff,

v.

META PLATFORMS, INC., et al., Defendants.

No. 2023-CAB-6550.
2023.

**Memorandum Opinion and Order Denying Defendants' Motion to Dismiss**

Neal E. Kravitz, Judge.

## I. INTRODUCTION

**\*1**  The District of Columbia filed this action on October 24, 2023 against Meta Platforms, Inc. and Instagram, LLC (collectively "Meta") alleging past and ongoing violations of the District of Columbia Consumer Protection Procedures Act, D.C. Code §§ 28-3901 to 28-3913 ("CPPA"). The District alleges that Meta intentionally manipulates children into compulsive and excessive use of Facebook and Instagram, Meta's flagship social media platforms, through the use of design features specifically intended to exploit children's heightened vulnerabilities to addictive technologies. The District claims that Meta actively seeks to ensnare children in the overuse of its platforms for the purpose of maximizing its profits from advertising revenue, and that it does so despite its knowledge, based on extensive internal and external studies, that compulsive and excessive use of social media is directly linked to profoundly negative outcomes for youth, including depression, anxiety, insomnia, diminished academic performance, and even suicide.

The complaint alleges two counts of CPPA violations. In the first, the District alleges that Meta engages in unfair trade practices, in violation of D.C. Code § 28-3904, by designing its social media platforms to include features it knows are psychologically and physically harmful to children. In the second, the District alleges that Meta engages in deceptive trade practices, in violation of D.C. Code §§ 28-3904(e), (f), and (f-1), by making false misrepresentations and material omissions that have a tendency to mislead in its statements regarding the safety of Facebook and Instagram. The District seeks a permanent injunction prohibiting Meta from engaging in unfair and deceptive trade practices that harm District consumers, including children, and from making false and otherwise misleading statements about the safety of its social media platforms. The District also seeks restitution or damages, civil penalties, and reasonable attorney's fees and costs.

### Count I: Unfair Trade Practices

As indicated, the District alleges in Count I that Meta commits unfair trade practices in violation of the CPPA by seeking to maximize its advertising revenue at the expense of the health and well-being of its youngest subscribers through the use of addictive and manipulative design features intended to hook children into spending as much time as possible on its social media platforms-platforms that are readily available to children and other users through applications ("apps") on their smartphones, tablets, and other devices. The complaint identifies the following as the most addictive and manipulative design features employed by Meta:

> • "Personalization algorithms" allow Meta to provide each child user with personalized content tailored to the particular child's previous use of the platform. The District alleges that Meta provides the personalized content using a sequencing method referred to by psychologists as a "variable reinforcement schedule" or "variable reward schedule." Compl. ¶ 59. The schedule refers to a periodic pattern that delivers specific

types of content known to be of interest to the particular user and is targeted to trigger a release of dopamine at unpredictable intervals. Compl. ¶ 60. The District alleges that Meta predicts what content will generate a dopamine response in a particular user and then tailors the user's feed so that content likely to elicit a dopamine response is provided on a variable schedule. Compl. ¶ 62. The District analogizes Meta's approach to that of a slot machine-alternately providing and withholding rewards to induce addictive behavior. Compl. ¶ 61. The District alleges that personalization algorithms result in longer usage for children and that they push young users to more extreme content. Compl. ¶¶ 64, 66. The longer periods of usage, and the resulting greater amounts of data collected, the District alleges, increase Meta's advertising revenue at the expense of children's health.

**\*2**   • "Alerts" are notifications Meta provides to its users on their smartphones. Compl. ¶ 68. The District alleges that the alerts, including vibrations and visual and sound notifications, enable Meta to interrupt its users at any time of the day or night for the purpose of luring them back to its platforms. Compl. ¶¶ 69-70. According to the District, alerts are disruptive for users of all ages but are especially harmful to children, who, because of their greater vulnerability to distraction and psychological manipulation, suffer inattentiveness, hyperactivity, and reduced productivity and well-being as a result of the alerts. Compl. ¶ 72. The District alleges that Meta sends alerts to children during the school day, interrupting their ability to concentrate on their schoolwork, and at night, preventing them from sleeping enough to be able to function at their best. Compl. ¶¶ 74, 107. The District cites a recent study showing that teenagers received a median of 237 notifications on their smart phones each day, 23% of which arrived during school hours, and 5% of which arrived during sleeping hours on school nights. Compl. ¶¶ 74, 107. The alerts employed by Meta, the District alleges, have an impact on the brains of children similar to that of stimulating drugs. Compl. ¶ 72.

• "Infinite scroll" involves the partial display of additional content at the bottom of a user's screen. Compl. ¶ 76. The feature prevents the user from viewing a single post without also seeing the top portion of the next post in the user's feed. *Id.* The teasing of future content continues indefinitely, inducing the user to continue scrolling without pause and, the District alleges, making it difficult for children to disengage from the platform because the feed lacks a natural end point. Compl. ¶¶ 76, 78. Similar to the infinite scroll feature, the District alleges, Meta also employs an "autoplay" feature intended to keep children glued to Facebook and Instagram by automatically moving to the next "story" once one story is complete. Compl. ¶ 80.

• "Ephemeral content" is material Meta makes available on its platforms only temporarily. Compl. ¶ 83. Examples include "stories," which are available for viewing for a short time, and "Instagram live" videos, which are streamed in real time and not thereafter available. Compl. ¶¶ 84-86. Meta notifies users of the availability of ephemeral content through push notifications and tells them the content will soon disappear forever. Compl. ¶ 83. The District alleges that the feature is intended to induce a fear of missing out ("FOMO") in children and to create a sense of urgency that encourages children to check their social media accounts on a frequent basis to avoid missing posts of interest. Compl. ¶¶ 83, 89.

• "Reels" uses Meta's algorithms to present short-form videos that are individually tailored to users' known interests. Compl. ¶ 90. Individual videos in a reel last fifteen to ninety seconds and are presented as an infinite stream; like the infinite scroll, they play automatically and perpetually as the user swipes up. Compl. ¶ 91. The District alleges that the addition of reels in 2020 and 2021 increased the addictive design of Facebook and Instagram and was created for the express purpose of attracting and increasing youth engagement. Compl. ¶¶ 90, 92. According to the District, the manner in which Reels are presented ensures that a child using Facebook or Instgram will not navigate away from the platform due to boredom. Compl. ¶ 91.

The District alleges that these design features foster compulsive and excessive use of Meta's platforms. The complaint cites internal data from Meta in 2019 showing that 55% of Meta's users in the United States suffered from problematic use, defined by Meta as "serious, negative impacts on sleep, relationships, work, or lives, combined with lack of control over [Facebook] use," while 3.1% of its users suffered from "severe" problematic use. Compl. ¶ 97. The District alleges that these harms are particularly acute in children, Compl. ¶ 98, and that the increased use of Meta's platforms is connected with significant psychological harms, including higher rates of major depressive episodes, anxiety, sleep disturbances, and suicide, Compl. ¶96, and with distinct changes in brain development that can adversely affect emotional regulation and impulse control, Compl. ¶ 103. According to the District, the frequency of suicidal thoughts in children has increased dramatically in recent years in parallel with the increase in children's use of social media. Compl. ¶¶ 111, 114.

**\*3**  The District also alleges that Meta is well aware of extensive psychological and survey data showing that its social media products harm children. For example, the District cites a 2021 study conducted in-house by Meta indicating that 6% of teen girls in the United States and 13% of those in the United Kingdom traced their desire to commit suicide or otherwise harm themselves to their use of Instagram. Compl. ¶ 128. Other internal Meta documents cited by the District describe the unique vulnerability of teenagers to features designed to cause addiction. As examples, the District quotes Meta researchers who have stated in internal reports that "[t]een brains are much more sensitive to dopamine," Compl. ¶ 119, that teenagers therefore "have a much harder time stopping [excessive use of Meta's platforms] even though they want to," *id.,* and that teenagers talk about their use of Meta's products like "addicts" and "wish they could spend less time caring about it, but they can't help themselves," Compl. ¶ 124.

Finally, the District alleges that Meta steadfastly refuses to take any action to mitigate its platforms' known harms to children. Specifically, the District alleges that Meta's leaders have repeatedly rejected steps recommended by the company's own internal researchers aimed at limiting the extent of the harm, such as by removing the most addictive design features described above, and that Meta's leaders have done so because they prioritize the company's profit over the safety and well-being of the children who use the company's platforms. Compl. ¶ 134.

### Count II: Deceptive Trade Practices

The District alleges in Count II that Meta commits deceptive trade practices in violation of the CPPA by affirmatively misrepresenting to its consumers that its social media platforms are safe for children and by omitting from its statements and otherwise concealing from the public the known adverse effects on children of its addictive design features. The misrepresentations and omissions alleged in the complaint fall into the following categories:

• Meta falsely claims that its social media platforms are safe and age-appropriate for young people and that the platforms are not designed to take advantage of children's addictive tendencies, despite Meta's possession of information establishing precisely the opposite. Specifically, the District alleges that Meta officials and publications have falsely stated, among other things, that Meta does not set goals for increasing the amount of time users spend on its platforms, Compl. ¶¶ 43, 44, 88, 143, 148; that it does not quantify a lifetime monetary value for a child's use of its products, Compl. ¶ 46; and that it did not study dopamine feedback loops for the purpose of keeping users trapped on its platforms, Compl. ¶¶ 5, 119, 141.

• Meta knowingly misrepresents the appropriateness of its social media platforms for children and conceals the known risk that its platforms will expose children to harmful content. The District alleges, for example, that Meta claims it "age-gates" (limits children's access to) content understood to be inappropriate for young people, Compl. ¶ 149, even though Meta's own internal documents reveal, to the contrary, that Meta amplifies on its platforms psychologically and emotionally gripping content relating to eating disorders, violence, negative self-perception and body image, bullying, and other subjects harmful to children. Compl. ¶ 153. For example, the complaint cites internal Meta research showing that

when a user follows anorexia-related content, the personalization algorithms provide the user additional anorexia-related content. Compl. ¶ 155. The complaint also alleges that Meta publicly characterizes Instagram as a source of support for teenagers struggling with thoughts of suicide and self-harm, Compl. ¶ 158, even though Meta's officials are fully aware, and have acknowledged internally, that the more time a user spends on Instagram, the more likely the user is to be exposed to admissions of suicide and self-harm. Compl. ¶ 154. The complaint states further that Meta claims its platforms are a source of support for teens struggling with mental health issues, Compl. ¶ 158, even though it knows that 13.5% of teen girls who use Instagram say the platform makes thoughts of suicide and self-harm worse, 17% say the platform makes eating issues worse, and one in three say Meta makes their body image issues worse, Compl. ¶ 156.

**\*4** • Meta knowingly omits from its statements and conceals the existence and prevalence of adult predators who contact children via its social media platforms. In particular, the District alleges that Meta has failed to tell children or their parents that predatory adults pretending to be teens interact with minors on the platforms and prepare minors for "sextortion or CEI [child exploitive imagery] trading." Compl. ¶¶ 161, 166. The District alleges further that Meta fails to warn children and their parents of the risks of adult predators notwithstanding a 2020 internal Meta report expressly finding that Instagram has "minimal child safety protections" and that the "interoperability" design feature of Meta's platforms increases the ability of predators to discover minors across apps. Compl. ¶ 162.

• Meta knowingly misleads consumers, including parents, about design features that promote body dysmorphia (a mental health condition that causes obsessive thoughts about perceived flaws in one's appearance) and eating disorders in children. As one example, the District alleges that Meta has told parents it has taken steps to combat body dissatisfaction and eating disorders, Compl. ¶ 168, when in fact Meta knows its platforms' visual selfie camera filters, which simulate facial plastic surgery, actively encourage body dysmorphia in young girls. Compl. ¶ 170. As another example, the District alleges that Meta's own employees recommended that a temporary ban on the visual selfie camera filters (put in place based on internal data showing the filters' negative psychological effects on teenage girls) be made permanent, Compl. ¶ 171, but that Meta's founder vetoed a permanent ban, falsely stating that he had seen "no data" suggesting the filters are harmful, Compl. ¶ 175. The complaint quotes a senior Meta staffer who noted her disagreement with this decision in a message to Meta's founder: "I don't think it's the right call given the risks ... I just hope that years from now we will look back and feel good about the decision we made here." Compl. ¶ 176.

• Meta knowingly misleads consumers about the harms children face from features on its social media platforms that encourage social comparisons. As one example, the District alleges that Meta's "likes" feature, which allows users to tap a heart or a thumbs-up icon, causes unhealthy social comparisons among teenagers, Compl. ¶ 181, 182, and that showing users "like counts" exacerbates the problem, Compl. ¶ 183. Yet despite Meta's knowledge of the mental health effects of "likes" and "like counts," the District alleges, Meta's senior leadership has chosen to maintain this harmful feature while deceptively representing to the public that Meta favors the well-being of its users whenever it is faced with a choice between features that promote addictive user engagement and those that promote user well-being. Compl. ¶ 185. The District alleges further that Meta chose not to implement a proposal known as Project Daisy to remove "like counts" from Instagram posts, and that it falsely claimed its decision was based on user preferences rather than on concerns about a likely adverse impact on its revenue. Compl. ¶¶ 187, 193, 196.

• Meta knowingly misleads consumers concerning the safety of its social media platforms for children by making statements that omit, obscure, and misrepresent contrary internal research findings. The complaint describes several unpublished internal studies the District alleges Meta has hidden from the

public, including a 2019 study finding that Instagram is addictive and creates low-level mental anxiety that can become more serious over time, Compl. ¶ 204; a 2019 study finding that one in two Instagram users experienced at least one mental-health-related issue in the preceding thirty days, Compl. ¶ 205; a 2020 internal literature review finding that Instagram worsened body dissatisfaction to a greater extent than the end of a relationship or the loss of a job, Compl. ¶ 206; a 2021 internal report finding that 68% of teenage girls experience negative social comparison on Instagram, Compl. ¶ 208; internal 2021 research showing that the personalization algorithm increases exposure to "negative appearance comparison-provoking" content, Compl. ¶ 209; and internal survey data showing that 6.7% of surveyed Instagram users in 2021 had seen self-harm content within the preceding seven days, Compl. ¶ 220, while 16.9% of users between thirteen and fifteen years old had seen content relating to self-harm on Instagram in the same period, *id.* The District alleges that Meta makes misleading statements contrary to the findings of these unpublished internal reports, such as a third quarter 2021 CSER Report in which Meta claimed that on Instagram "less than 0.05% of views were of content that violated our standards against suicide & self-injury," Compl. ¶¶ 218-219, thereby creating the misleading impression that Instagram users only very rarely experience content relating to suicide and self-injury, Compl. ¶ 221.

## Meta's Motion to Dismiss

**\*5** The case is now before the court on Meta's motion to dismiss the complaint for failure to state a claim on which relief can be granted. *See* Super. Ct. Civ. R. 12(b)(6). Meta makes three main arguments: first, that Section 230 of the Communications Decency Act, 47 U.S.C. § 230, bars all of the unfair trade practice claims in Count I and the omissions-based deceptive trade practice claims in Count II because the challenged claims seek to treat Meta as the publisher of third-party content; second, that the First Amendment precludes the unfair trade practice claims in Count I because the District is seeking to hold Meta liable for organizing, disseminating, and otherwise exercising editorial judgment over protected third-party speech; and third, that the complaint fails to state actionable claims under the CPPA because the statute does not apply to services provided free of charge, because the District has not alleged a substantial injury to the users of Meta's platforms, and because the misrepresentations alleged in the complaint are non-actionable puffery and/or constitutionally protected speech. Finally, Meta argues that there is no basis under the CPPA for the District to seek disgorgement as a remedy.

The District has filed an opposition to Meta's motion, and Meta has filed a reply. The parties presented oral arguments on June 6, 2024, and both parties have filed supplemental briefs and notices of additional authority.

The court has carefully considered the arguments of the parties and the many precedents the parties have brought to the court's attention. For the following reasons, the court concludes that Meta's motion to dismiss must be denied.

## II. GOVERNING LEGAL STANDARD

A complaint is subject to dismissal under Rule 12(b)(6) of the Superior Court Rules of Civil Procedure for failure to state a claim on which relief can be granted if it does not satisfy the requirement, set forth in Rule 8(a)(2), that it contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *See Potomac Dev. Corp. v. District of Columbia,* 28 A.3d 531, 543-44 (D.C. 2011). The notice pleading rules do "not require detailed factual allegations," *id.* at 544 (internal quotation marks omitted) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)), and all factual allegations in a complaint challenged under Rule 12(b)(6) must be presumed true and liberally construed in the plaintiff's favor, *Grayson v. AT&T Corp.,* 15 A.3d 219, 228-29 (D.C. 2011) (en banc). Nevertheless, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," and the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Potomac Dev. Corp.,* 28 A.3d at 544 (internal quotation marks omitted) (quoting *Iqbal,* 556 U.S. at 678). Although a plaintiff can survive a Rule 12(b)(6) motion even if

"recovery is very remote and unlikely," *Grayson*, 15 A.3d at 229 (quoting *Solers, Inc. v. Doe*, 977 A.2d 941, 947 (D.C. 2009)), the "factual allegations must be enough to raise a right to relief above the speculative level," *One West Bank, FSB v. Marshall*, 18 A.3d 715, 721 (D.C. 2011) (internal quotation marks and brackets omitted). Conclusory allegations "are not entitled to the assumption of truth," and "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Potomac Dev. Corp.*, 28 A.3d at 544 (quoting *Iqbal*, 556 U.S. at 664).

### III. SECTION 230

Congress enacted the Communications Decency Act of 1996 ("CDA") to modernize protections against obscenity and harassment in the digital age. S. Rep. No. 104-23, at 59 (1995); *see* Congressional Research Service, "Section 230: An Overview," January 4, 2024, at 1-2. The CDA contained provisions that increased the penalties for obscene, indecent, harassing, and other wrongful uses of telecommunications facilities by persons who knowingly and intentionally create and send prohibited messages or otherwise use telecommunications devices to harm others. S. Rep. No. 104-23, at 59. The statute also contained an immunity provision that was specifically intended to "exclude from liability telecommunications and information service providers and systems operators who are not themselves knowing participants in the making of or otherwise responsible for the content of the prohibited communications." *Id.*

 **\*6** The CDA's immunity provision is codified at 47 U.S.C. § 230, giving rise to the term "Section 230 immunity." Section 230 states, in subsection (c)(1), that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." Section 230 states further, in subsection (e)(3), that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. §§ 230(c)(1), (e)(3). Together, subsections (c)(1) and (e)(3) provide immunity for telecommunications and information service providers and systems operators from claims that seek to treat them as publishers of information provided by other content providers. *See, e.g., Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 n.3 (11th Cir. 2006).

The question before this court is whether Section 230 immunizes Meta as a matter of law from any of the District's claims. Meta argues that Section 230 bars the District's unfair trade practice claims alleged in Count I because those claims are based on design features by which Meta makes publishing decisions regarding the organization, display, and dissemination of third-party content. Meta argues that Section 230 bars the omissions-based deceptive trade practice claims alleged in Count II because those claims are premised on the publication of third-party content. The District argues in opposition that Section 230 immunity is inapplicable because neither category of claims seeks to treat Meta as the publisher or speaker of any particular third-party content.

The parties agree that the Ninth Circuit's decision in *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009), sets forth the proper analytical framework for determining whether the immunity provisions of Section 230 apply in any given set of circumstances. *Barnes* created a three-part test, holding that Section 230 immunizes from liability "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." 570 F.3d at 1100-01. The parties agree further that Meta satisfies the first prong of the *Barnes* test, as Meta is unquestionably an interactive computer service provider. The parties dispute whether Meta satisfies the second and third prongs.

Meta contends that the District is seeking to treat it as a publisher-thereby satisfying the second prong of the *Barnes* test-because its use of the challenged design features constitutes publishing activity and because it would have to change the manner, extent, and timing of its publication of third-party content if it were held liable in this case. Meta contends that the District seeks to treat it as a publisher of third-party content-thereby satisfying the third prong of the *Barnes* test-because it could not be held liable on the District's claims were it not for its publication of third-party content. Specifically, Meta argues that the addiction of children alleged in the complaint would not occur but for the third-party content published on its platforms. Meta thus contends that Section 230 bars all of the unfair trade practice claims alleged in Count I and the omissions-based deceptive trade practice claims alleged in Count II, the latter of which Meta argues are inextricably linked to its failure to edit or remove third-party

content. Both sets of claims, Meta contends, seek to treat it as a publisher of third-party content and therefore fall within the reach of Section 230 immunity. [1]

 **\*7**  The District argues, to the contrary, that the second and third prongs of the *Barnes* test are not satisfied because its complaint seeks neither to treat Meta as a publisher nor to hold Meta liable for any particular third-party content. In particular, the District argues that Meta's use of the challenged design features is not traditional publishing activity; that the remedies sought in the complaint would require Meta to change only the way it publishes content, not the content itself; that its claims cannot be brought against the content creators; and most important, that its claims alleged in Count I arise not from any particular third-party content but from the harmful effects of the addictive design features employed by Meta. As for the omissions-based claims alleged in Count II, the District argues that Section 230 poses no bar to Meta's liability because the claims do not seek to treat Meta as a publisher of third-party content and because Meta could avoid liability in the future without changing the third-party content it publishes-that is, Meta could simply stop making statements that have a tendency to mislead due to their omission of inconsistent or contrary information.

The case presents a potentially close question on the second prong of the *Barnes* test. The parties make interesting arguments on whether Meta's creation and use of the challenged design features constitutes publishing activity, and the case law, all of it non-binding, yields no definitive answer. *Compare, e.g., In re Soc. Media Adolescent Addiction/Personal Inj. Prods. Liab. Litig.,* 702 F. Supp. 3d 809, 831, 833-34 (N.D. Cal. Nov. 14, 2023), *with Zeran v. Am. Online, Inc.,* 129 F.3d 327, 333 (4th Cir. 1997), and *Lemmon v. Snap, Inc.,* 995 F.3d 1085, 1091-93 (9th Cir. 2021); *see also Utah Div. of Consumer Prot. v. Meta, No. 230908060,* slip op. at 11-12 (Utah 3d Dist. Ct. July 25, 2024). In the end, the court need not decide whether Meta has satisfied the second prong of the *Barnes* test, because the court concludes that Meta has not satisfied the third prong, at least not as a matter of law at the pleading stage.

Again, the third prong of the *Barnes* test requires a social media company claiming immunity under Section 230 to establish that the plaintiff, through its state law claims, seeks to treat the company as the publisher of "information provided by another information content provider"-*i.e.,* of third-party content. Neither the Supreme Court nor the District of Columbia Court of Appeals has had occasion to decide the merits of a dispute over the third prong of the *Barnes* test or otherwise to interpret the reach of Section 230 immunity. This court thus looks to persuasive case law from otherjurisdictions. That case law leads to the conclusion that a social media company satisfies the third prong of the *Barnes* test and thereby qualifies for immunity under Section 230 only for harms arising from particular third-party content displayed on the company's platforms.

The Ninth Circuit's decision in *Lemmon* is particularly instructive. The court held in *Lemmon* that Section 230 did not bar the plaintiffs' claim against an interactive computer service provider in part because the claim did not seek to hold the provider liable for third-party content. 995 F.3d at 1093. Two sets of parents sued Snap, the provider of the social media site Snapchat, over the deaths of their teenage sons, who died in a car crash minutes after uploading a snap on the platform with a filter showing the car's speed (more than 100 miles per hour). *Id.* at 1087-88. The plaintiffs alleged that Snap negligently designed its speed filter in a way that incentivized users to drive at dangerous speeds. *Id.* at 1097. Snap claimed immunity under Section 230. *Id.* The court rejected the Section 230 defense, holding that "[b]y its plain terms, and as the last part of the *Barnes* test recognizes, § 230(c)(1) cuts off liability only when a plaintiffs claim faults the defendant for information provided by third parties." *Id.* at 1093. The court explained that the plaintiffs' "claim [did] not turn on information provided by another information content provider" in that it "[did] not depend on what messages, if any, a Snapchat user employing the Speed Filter actually sen[t]" or, more specifically, on "the content of [the late teenager's] particular snap." *Id.* at 1093-94 (internal quotation marks omitted). The court noted that "[t]hose who use the internet ... continue to face the prospect of liability, even for their 'neutral tools,' so long as plaintiffs' claims do not blame them for the content that third parties generate with those tools." *Id.* at 1094. The court emphasized that it was not the third-party content that caused the plaintiffs' injuries: "[t]he danger is not the Snap [message using the Speed Filter] itself. Obviously, no one is harmed by the post. Rather, the danger is the speeding." *Id.* at 1093 (quoting the plaintiffs' amended complaint). [2]

**\*8** Most courts that have considered the scope of the immunity provided by Section 230 have used language consistent with that used in *Lemmon.* Indeed, the 11th Circuit observed in *Almeida* that "[t]he majority of federal circuits have interpreted the CDA to establish broad 'federal immunity to any cause of action that would make service providers liable *for information* originating with a third-party user of the service.'" 456 F.3d at 1321 (emphasis added) (quoting *Zeran,* 129 F.3d at 330); *see Johnson v. Arden,* 614 F.3d 785, 791 (8th Cir. 2010) (same); *Herrick v. Grindr LLC,* 765 Fed. App'x 586, 590 (2d Cir. 2019) (focusing on whether the claims in the case are "based on information provided by another content provider" and seek to "treat [the provider] as the publisher or speaker of the offensive content"); *see also Doe v. Backpage.com, LLC,* 817 F.3d 12, 19 (1st Cir. 2016); *Henderson v. Source For Pub. Data, L.P.,* 53 F.4th 110, 123 (4th Cir. 2022); *Doe v. MySpace Inc.,* 528 F.3d 413, 419-20 (5th Cir. 2008); *Doe v. Internet Brands, Inc.,* 824 F.3d 846, 852 (9th Cir. 2016); *Ben Ezra, Weinstein, & Co. v. Am. Online, Inc.,* 206 F.3d 980, 986 (10th Cir. 2000); *Marshall's Locksmith Serv. Inc. v. Google, LLC,* 925 F.3d 1263, 1268 (D.C. Cir. 2019); *cf. Competitive Enter. Inst. v. Mann,* 150 A.3d 1213, 1251 (D.C. 2016) (noting, in dictum, that the D.C. Circuit has stated that Section 230 immunity applies if, among other things, the "statement *on which liability is based is* 'provided by another content provider'" (emphasis added) (quoting *Klayman v. Zuckerberg,* 753 F.3d 1354, 1357 (D.C. Cir. 2014)).

The immunity created by Section 230 is thus properly understood as protection for social media companies and other providers from "intermediary" liability-liability based on their role as mere intermediaries between harmful content and persons harmed by it. *See Herrick,* 765 Fed. Appx. at 590 (holding that the defendant provider was entitled to Section 230 immunity as an intermediary because a third-party's content was "precisely the basis of [the plaintiff's] claims that [the provider's platform] is defective and dangerous"); *Internet Brands, Inc.,* 824 F.3d at 852 (holding that the defendant provider could not be held liable as an intermediary for third-party content because the defendant did not transmit any harmful messages). As the Fourth Circuit has explained, "Congress made a policy choice ... not to deter harmful online speech through the separate route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages." *Zeran,* 129 F.3d at 330-31.

Citing a long list of cases, Meta nonetheless asserts that courts have overwhelmingly found social media companies and other internet content providers categorically immune under Section 230 for their use of algorithms, notifications, and other design features like those at issue in this case. Meta reads far too much into these other cases. Other than a recent ruling by the judge presiding over related multi-district litigation-to be addressed below-all of the decisions on which Meta relies were issued in cases in which plaintiffs sought to hold providers liable for specific (and harmful) third-party content. Other than the multi-district litigation, none of the cases cited by Meta held that Section 230 bars liability where, as here, the third-party content is irrelevant to the claim. [3]

**\*9** The cases relied on by Meta are thus fully consistent with this court's conclusion that Section 230 protects against liability only "for information originating with a third-party user." *Johnson,* 614 F.3d at 791; *see Dyroff v. Ultimate Software Grp., Inc.,* 934 F.3d 1093, 1096 (9th Cir. 2019) (same). As the court stated in *Lemmon,* 995 F.3d at 1094, "while providing content-neutral tools does not render an internet company a 'creator or developer' of the downstream content that its users produce with those tools, our case law has never suggested that internet companies enjoy absolute immunity from all claims related to their content-neutral tools."

The case law also refutes Meta's argument that the third prong of the *Barnes* test is satisfied as long as the District's claims would not exist but for Meta's publication of third-party content. Meta asserts, in this regard, that the District's claims based on addictive design features seek to hold it liable for third-party content, giving rise to Section 230 immunity, because there would be nothing for children to become addicted to if not for the third-party content Meta publishes. But-for causation, however, is not sufficient to implicate Section 230 immunity. As the court explained in *Internet Brands, Inc.:*

> [H]osting [the plaintiffs] user profile on [its] website ... could be described as a "but-for" cause of [the plaintiff's] injuries. Without it, Flanders and Callum would not have identified her and been able to lure her to their trap. But that does not mean the failure to warn claim seeks to hold Internet Brands liable as the "publisher or speaker" of user content.

> Publishing activity is a but-for cause of just about everything [the defendant] is involved in. It is an internet publishing business. Without publishing user content, it would not exist. As noted above, however, we held in *Barnes* that the CDA does not provide a general immunity against all claims derived from third-party content.

824 F.3d at 853; *see also Henderson,* 53 F.4th at 123 (stating that the finding that the defendant's publication of information and "the content of the information published" were but-for causes of the plaintiff's claims was not alone sufficient to trigger Section 230 immunity, "as we do not apply a but-for test.").

As indicated above, the related multi-district litigation is the one case cited by Meta in which a court has found Section 230 immunity applicable even though the claims in the case are not based on any particular third-party content. In *In re Soc. Media Adolescent Addiction,* the court considered whether Section 230 barred claims, similar to those alleged here, based on the addictive effects of design features employed by Meta and other social media providers. 702 F. Supp. 3d 809. The court granted the defendants' motion to dismiss most of the claims, holding that the claims were barred by Section 230 because they stemmed from the defendants' publishing activities. *Id.* at 831, 833-34. The court did not squarely address the contrasting view, advanced by the District and adopted by this court, that Section 230 provides immunity only for claims based on the publication of particular third-party content. *See id.* This court respectfully declines to follow the decision of the judge in the multi-district litigation, as that decision is inconsistent with this court's reading of the case law and the purpose of the Section 230 immunity provisions.

Indeed, other courts that have recently considered assertions of Section 230 immunity in cases involving the same types of claims have ruled consistently with this court's interpretation of the reach of the statute. In *Netchoice, LLC v. Reyes,* No. 2:23-cv-0091 1-RJS-CMR, LEXIS 129686, at *2-5 (D. Utah July 22, 2024), a trade association representing internet companies including Meta sued the State of Utah over a statute that banned social media companies from using autoplay, infinite scroll, and push notifications and empowered the state to bring civil actions to enforce the ban. The court rejected Netchoice's argument that actions brought under the Utah statute were invalid under Section 230, holding that the Utah statute lacked "a critical component"-specifically, "an effort to hold a website liable for content produced by third-party users"-present in cases in which Section 230 immunity was found to apply. *Id.* at *14. Because the Utah statute did not make social media companies liable for third-party content, the court held, the statute did not run afoul of Section 230. *Id.* at *14. *See also State v. Meta Platforms, Inc.,* No. 23-CV-4453, LEXIS 146, *15-16 (Vt. Super. Ct. July 28, 2024) (holding that Section 230 does not bar the plaintiff's claims against Meta based on its allegedly defective features because "[w]hether [users] are watching porn or puppies, the claim is that they are harmed by the time spent, not by what they are seeing"-*i.e.,* the plaintiff is "not seeking to hold Meta liable for any content provided by another entity"); Pl.'s Not. of Supp. Auth. Ex. A, *State of Tenn. v. Meta et al.,* slip op. at 19 (Tenn. Chancery Ct. 20th Dist. March 13, 2024) (holding that Section 230 does not bar the plaintiff's claims against Meta because "the features themselves allegedly operate to addict and harm Young Users, regardless of the particular third-party content viewed by the Young Users"); *In re Coordinated Proceeding Special Title Rule 3.550 Soc. Media Cases,* 2023 Cal. Super. LEXIS 76992, *99 (Super. Ct. Cal. Oct. 13, 2023) (holding that Section 230 does not bar the plaintiffs' claims against Meta and other social media companies "based on the allegedly addictive qualities of the interactive features of [their] social media sites" because the companies "are allegedly liable for their own actions, not for the content of third-party postings").

**\*10** The court therefore concludes that Section 230 provides Meta and other social media companies immunity from liability under state law only for harms arising from particular third-party content published on their platforms.

This interpretation of the statute leads to the further conclusion that Section 230 does not immunize Meta from liability for the unfair trade practice claims alleged in Count I. The District alleges that it is the addictive design features employed by Meta-and not any particular third-party content-that cause the harm to children complained of in the complaint. Compl. ¶ 242. As in *Lemmon,* therefore, the District does not seek to "blame [the provider] for the content that third parties generate" on its platforms, only for the "tools" the provider uses to present whatever content third parties provide. 995 F.3d at 1094. Given that Section 230

immunity is limited to liability for harms arising from particular third-party content, the statute provides no protection to Meta here, at least not at the pleading stage, at which the court is required to accept as true the well-pled facts alleged in the complaint.

The court reaches the same conclusion regarding the omissions-based deceptive trade practice claims alleged in Count II. Through those claims, the District seeks to hold Meta liable for concealing information in its possession about harmful third-party content on its platforms that would have contradicted Meta's public statements about its platforms' safety, and for omitting information in its possession about the prevalence of sexual predators on its platforms and the dangers to children of certain design features, including its plastic surgery filter. Again applying the *Barnes* three-part analytical framework, the court concludes that Section 230 provides no refuge to Meta because none of the omissions-based deceptive trade practice claims seeks to treat Meta as a publisher of any particular third-party content.

The court notes that both parties refer to these allegations as "failure to warn" claims and discuss cases from other jurisdictions that address the availability of Section 230 immunity from tort claims based on a defendant's common law duty to warn certain types of plaintiffs of certain types of harms. Such "failure to warn" claims may give rise to Section 230 immunity if they are the functional equivalent of claims that would be barred by the statute-*i.e.,* if they seek to hold internet service providers liable for failing to provide warnings about offensive or otherwise tortious third-party content on their platforms. Arguably, such claims might be understood as efforts to treat the providers as publishers of the harmful third-party content, potentially giving rise to Section 230 immunity.

But that is not what the District seeks to accomplish through its omissions-based deceptive trade practice claims. A deceptive omission claim under the CPPA "does not require a plaintiff to plead and to prove a duty to disclose information." *Saucier v. Countrywide Home Loans,* 64 A.3d 428, 444 (D.C. 2013). Rather, under the CPPA a plaintiff need prove only that the defendant omitted material information and that the omission had a tendency to mislead consumers. *Id.* ("Under [D.C. Code] § 28-3904(f), [the plaintiff] must show that the omitted information is material and has a tendency to mislead."). The CPPA thereby effectively imposes a duty on all merchants to disclose information if the information is material and if a failure to disclose the information has a tendency to mislead. Case law cited by the parties regarding common law failure to warn claims is thus inapplicable to the statutory claims at issue in this case.

**\*11** A closer look at the claims themselves establishes that the claims are not based on Meta's publication of particular third-party content. The District alleges that Meta's omissions about the prevalence of harmful third-party content on its platforms are actionable under the CPPA because the omitted information contradicted Meta's affirmative representations about the safety of its platforms and rendered those representations misleading. *See, e.g.,* Compl. ¶ 149 (alleging that Meta claims it 'age-gates' inappropriate content for children while failing to disclose that it serves children age-inappropriate content). The deceptiveness of these omissions is tied to Meta's own allegedly false, incomplete, and otherwise misleading representations, not to Meta's publication of any particular third-party content. The third prong of the *Barnes* test therefore is not satisfied. Indeed, contrary to an assertion in its brief, Meta would not have to change the content it publishes or engage in any content moderation to avoid liability for future omissions claims. Rather, Meta can simply stop making affirmative misrepresentations about the nature of the third-party content it publishes, or it can disclose the material facts within its possession to ensure that its representations are not misleading or deceptive within the meaning of the CPPA. *See Est. of Bride,* No. 23-55134, 2024 U.S. App. LEXIS 21229, at \*18 (9th Cir. Aug. 22, 2024) (holding that Section 230 did not bar the plaintiffs' misrepresentation claims-based on an allegation that the defendant failed to ban users who bullied or harassed others after stating it would do so-even though "online content [was] involved in these facts, and content moderation [was] one possible solution").

The District's claim that Meta has unlawfully omitted information it obtained from internal and external reports about the prevalence of sexual predators on its platforms similarly falls outside the scope of Section 230 immunity. The claim seeks to impose liability on Meta based on its failure to disclose information about the dangers posed by predatory users of its platforms and the ability of those predatory users to connect with children on the platforms. *See* Compl. ¶ 165 (alleging that Meta is aware that a "top privacy problem (based on prevalence and severity) on Instagram is receiving messages from unwanted people"); Compl. ¶ 160 ("Because it fails to disclose these known risks to children and their parents, Meta allows them a false sense of

security."). The focus of this claim is on Meta's failure to disclose its knowledge of the sexual predators who are able to contact minors over its platforms, not on the content of any messages those sexual predators send. The claim therefore does not seek to hold Meta liable for any particular third-party content.

Meta, moreover, could avoid liability for such claims in the future without engaging in content moderation. It could disclose the information it has about the prevalence of sexual predators operating on its platforms, and it could take steps to block adult strangers from contacting minors over its apps. Indeed, the District alleges that Meta planned to work on "block[ing] unconnected adults on [Facebook] and [Instagram] from initiating messages with minors on [Facebook]" but that "it does not appear Meta ever implemented the 'block.'" Compl. ¶ 163.

Finally, the District alleges that Meta omitted information about known harms of its design features, including its plastic surgery filter. [4] Compl. ¶ 170-78. The District's claim is fairly understood as alleging that Meta's omissions are unlawful given its statements suggesting that its platforms do not foster eating disorders, *see* Compl. ¶ 167-69, or as alleging that Meta had a duty to disclose the harms of its features and failed to do so, *see* Compl. ¶ 178. Either way, the claim is not barred by Section 230. If the claim seeks to hold Meta liable for omissions that make its statements about eating disorders misleading, then, as with the omissions regarding the prevalence of harmful third-party content on Meta's platforms, the claim seeks to hold Meta liable for its own false, incomplete, and otherwise misleading representations, not for its publication of any particular third-party content. If the claim seeks to hold Meta liable for breaching a duty to disclose the harms of its platforms' features, including the plastic surgery filter, then the claim is based on Meta's own conduct, not on any third-party content published on its platforms.

**\*12** For all of these reasons, the court concludes that Section 230 does not bar any of the District's claims as a matter of law at the pleading stage.

## IV. <u>FIRST AMENDMENT</u>

Meta contends that the unfair trade practice claims alleged in Count I of the complaint are barred by the First Amendment because the District seeks to hold the company liable for organizing, disseminating, and otherwise exercising editorial judgment over protected third-party speech. Meta contends further that the deceptive trade practice claims alleged in Count II also run afoul of the First Amendment to the extent the District seeks to hold the company liable for its officials' statements of opinion and privileged testimony to Congress.

The court will address Meta's First Amendment challenge to the unfair trade practice claims in this section. It will address Meta's First Amendment challenge to the deceptive trade practice claims in the course of its discussion of the CPPA in Section V.

As an initial matter, the court is not persuaded that the District's unfair trade practice claims implicate the First Amendment. The District seeks to hold Meta liable for the company's use of addictive design features aimed at maximizing the amount of time children spend on its social media platforms. The District does not seek to hold Meta liable for any of the content hosted on those platforms or for any message expressed or intended through the use of the design features at issue. Asked at oral argument to identify such a message, Meta's counsel pointed out (correctly) that Meta's content moderation activities express a message. Meta's content moderation activities are not at issue in this case, however, and Meta's counsel was unable to articulate any message expressed or intended through Meta's implementation and use of the challenged design features.

In a variety of contexts, the Supreme Court has afforded First Amendment protection to the "editorial function itself." *Denver Area Educ. Telcoms. Consortium v. FCC,* 518 U.S. 727, 737 (1996). The Court's decisions prohibit the government from requiring newspapers to afford a right of reply to political candidates, *Miami HeraldPub. Co., Div. of Knight Newspapers, Inc. v. Tornillo,* 418 U.S. 241, 258 (1974); from forcing a company to offer a forum for alternate viewpoints in its newsletter; *Pac. Gas & Elec. Co. v. Pub. Utils. Comm 'n,* 475 U.S. 1, 4, 20-21 (1986); and from compelling parade organizers to include a group that advocates a message with which the organizers disagree, *Hurley v. Irish-American Gay,* 515 U.S. 557, 559, 581 (1995).

These cases are not controlling here, however, because all of them involved state action that interfered with messaging or other expressive conduct-a critical element that is not present in the case before this court.

Nor are the many other cases cited by Meta helpful to its cause, as every one of them in which the court found challenged conduct to be protected by the First Amendment involved an identifiable message. *See, e.g., 303 Creative LLC v. Elenis,* 600 U.S. 570, 593, 596-97 (2023) (marriage website design expresses views on marriage and same-sex marriage); *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.,* 6 F.4th 1247, 1254 (11th Cir. 2021) (donating money to specific charities expresses a view); *Telescope Media Grp. v. Lucero,* 936 F.3d 740, 752-53 (8th Cir. 2019) (wedding videography expresses views on marriage and same-sex marriage); *O'Handley v. Padilla,* 579 F. Supp. 3d 1163, 1187-88 (N.D. Cal. 2022), *aff'd sub nom., O'Handley v. Weber,* 62 F.4th 1145 (9th Cir. 2023) (Twitter's actions in removing, suspending, or adding disclaimers about posts were inherently expressive because "[t]hese decisions operated 'together with numerous decisions regarding other tweets and users to more broadly shape and develop the nature, tone, and substance of the ongoing dialogue that Twitter seeks to foster and present on its platform.'") (quoting Twitter's reply brief).

**\*13** And although the Supreme Court's recent decision in *Moody v. NetChoice, LLC,* 144 S. Ct. 2383 (2024), is informative, it is similarly unhelpful to Meta. In *Moody,* the Court remanded decisions of the Fifth and Eleventh Circuits for reconsideration of facial challenges to state laws that would restrict the ability of social media companies to engage in content moderation. *Id.* at 2399. In an effort to ensure proper First Amendment analyses on remand, the Court noted that "[d]eciding on the third-party speech that will be included in or excluded from a compilation--and then organizing and presenting the included items-is expressive activity of its own." *Id.* at 2402. Relying on *Hurley,* moreover, the Court stated that "a narrow, succinctly articulable message is not a condition of constitutional protection." *Id.* at 2402.

*Moody,* however, involved First Amendment concerns that are not present in the case before this court. In particular, *Moody* involved state regulations of online platforms' decisions to remove or deprioritize posts based on the posts' content or viewpoint. *Id.* at 2395-96. Deprioritizing content relates to "the organizing and presenting" of content, *id.* at 2402, as do the design features at issue here. But the reason deprioritizing specific content or content providers can be expressive is not that it affects the way content is displayed; it can be expressive because it indicates the provider's relative approval or disapproval of certain messages. The Court stated:

> [A social media feed] is the product of a wealth of choices about whether-and, if so, how-to convey posts having a certain content or viewpoint. Those choices rest on a set of beliefs about which messages are appropriate and which are not (or which are more appropriate and which less so). And in the aggregate they give the feed a particular expressive quality.

*Id.* at 2405; *see also id.* at 2408 ("Texas does not like the way those platforms are selecting and moderating content, and wants them to create a different expressive product, *communicating different values and priorities.* But under the First Amendment, that is a preference Texas may not impose.") (emphasis added).

The Supreme Court, moreover, expressly limited the reach of its holding in *Moody* to algorithms and other features that broadly prioritize or deprioritize content based on the *provider's* preferences, and it emphasized that it was not deciding whether the First Amendment applies to algorithms that display content based on the *user's* preferences. "We therefore do not deal here with feeds whose algorithms respond solely to how users act online-giving them the content they appear to want, without any regard to independent content standards." *Id.* at 2404 n.5 (citing *post,* at 2 (Barrett, J., concurring)).

Meta nonetheless asks this court to focus on the Supreme Court's statements in *Moody* that content moderation activity is "expressive activity of its own" and that "a narrow, succinctly articulable message is not a condition of constitutional protection." These statements are of course significant, given the court that made them, but they do not aid Meta's case. As discussed, the District's unfair trade practice claims challenge Meta's use of addictive design features without regard to the content Meta provides, and Meta has failed to articulate even a broad or vague message it seeks to convey through the implementation of

its design features. So although regulations of community norms and standards sometimes implicate expressive choices, the design features at issue here do not.

Moreover, even if the District's prosecution of its unfair trade practice claims implicated the First Amendment, the court could not find, at least not at the pleading stage, that the District's pursuit of the claims violates the First Amendment as a matter of law. Intermediate scrutiny must be applied when a statute implicates expression but is content-neutral. *See Turner Broad. Sys. v. FCC,* 512 U.S. 622, 642 (1994) (Turner I); *see also 303 Creative LLC,* 600 U.S. at 626, 630 (citing *United States v. O'Brien,* 391 U.S. 367, 376-377 (1968)). To satisfy that constitutional standard, the "law must further a substantial governmental interest that is unrelated to the suppression of expression," *Moody,* 144 S. Ct. at 2407 (internal quotation marks omitted), and that "'would be achieved less effectively absent the regulation,'" *303 Creative LLC,* 600 U.S. at 626 (quoting *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,* 547 U.S. 47, 67 (2006)).

**\*14** The District easily satisfies this standard at the pleading stage. The CPPA is a content-neutral statute focused on the protection of consumers. The District's stated interest in prosecuting its claims is the protection of children from the significant adverse effects of the addictive design features on Meta's social media platforms. The District's interest has nothing to do with the subject matter or viewpoint of the content displayed on Meta's platforms; indeed, the complaint alleges that the harms arise without regard to the content served to any individual user. Compl. ¶ 242. Meta, moreover, has not suggested any reason to believe that the "manifest purpose" of the District's claims is "to regulate speech because of the message it conveys." *Turner I,* 512 U.S. at 645.

The court therefore has little difficulty concluding that the allegations in Count I of the complaint would be sufficient at the pleading stage to survive intermediate scrutiny even if the court were to find that the District's prosecution of its unfair trade practice claims somehow burdens Meta's expressive activity. The District has a substantial interest in protecting the city's children from the dire mental health effects of Meta's addictive design features, *see Moody,* 144 S. Ct. at 2403 (recognizing that an emerging danger of social media is its effects on adolescents' mental health), and its interest is unrelated to the suppression of expression. The District alleges, moreover, that Meta has steadfastly refused to modify its use of the addictive design features in response to the many internal and external studies that have exposed the dangers of those features to children. It therefore appears that the District's interest in protecting the city's children would be achieved less effectively without this litigation.

For all of these reasons, Meta's request for the dismissal of the unfair trade practices claims on First Amendment grounds must be rejected.

## V. <u>CONSUMER PROTECTION PROCEDURES ACT</u>

The CPPA protects consumers against false, deceptive, and unfair business practices. *Earth Island Institute v. The Coca-Cola Co.,* No. 22-CV-0895, 2024 D.C. App. LEXIS 330, at *17 (D.C. August 29, 2024). It is "a broad consumer protection statute, meant to 'assure that a just mechanism exists to remedy all improper trade practices.'" *Id.* (quoting D.C. Code § 28-3901(b)(1)). It "establishes an enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased, leased, or received in the District of Columbia," and it is to be "construed and applied liberally to promote its purpose." D.C. Code § 28-3901(c).

Meta nonetheless contends that the complaint fails to state plausible claims for relief under the CPPA. Specifically, Meta argues that (1) the CPPA does not apply to its conduct because users have free access to its social media platforms and its provision of services thus does not constitute a "sale, lease or transfer" of consumer goods or services; (2) the District has not alleged the type of economic or monetary harm necessary to establish the "substantial injury" required for unfair trade practice claims; (3) the District's deceptive trade practice claims are based on non-actionable "puffery" and on other speech protected by the First Amendment; and (4) disgorgement is not a remedy available to the District under the statute.

The court will address each of these arguments in turn.

### Applicability of CPPA to Meta's Free Services

Despite the statute's intended breadth, the reach of the CPPA is not unlimited. By its express terms, and as relevant here, the CPPA applies to trade practices only to the extent they relate to the "sale, lease or transfer" of consumer goods or services. *See* D.C. Code § 28-3901(a)(6) (defining "trade practice" as "any act which does or would create, alter, repair, furnish, make available, provide information about, or, directly or indirectly, solicit or offer for or effectuate, a sale, lease or transfer, of consumer goods or services").

**\*15** Meta argues that its services are not sold, leased, or transferred within the meaning of § 28-3901(a)(6) because they are provided free of charge to the users of its social media platforms. In particular, Meta contends that the free access it provides to its users clearly is not a "sale" or a "lease" of its platforms and services and that it also cannot plausibly be considered a "transfer" because no ownership interest in its platforms or services is transferred to its users. Meta argues, in this regard, that under the *ejusdem generis* principle of statutory construction the terms "sale," "lease," and "transfer" should be interpreted consistently to require payment and the conveyance of an ownership or other property interest. *See Bolz v. Dist. of Columbia,* 149 A.3d 1130, 1139 (D.C. 2016) ("The canon of *ejusdem generis* counsels that the meaning of a catchall term [in a statute] is informed by the list of words preceding it.").

The court is not persuaded by Meta's reliance on the canon of *ejusdem generis.* "Transfer" is not a "catchall term" found at the end of a list of more specific terms in § 28-3901(a)(6). It is one of three specific terms listed in the statute. The canon of *ejusdem generis* therefore provides no guidance here.

As to the merits of Meta's argument, the court agrees that the use of Meta's social media platforms does not involve a "sale" or a "lease." But the terms "sale" and "lease" must refer to different types of transactions than the term "transfer," else "transfer" would be superfluous and would add nothing to the scope of the statute's reach. *See D.C. Bd. of Elections v. District of Columbia,* 866 A.2d 788, 795 (D.C. 2005) ("A basic principle [of statutory construction] is that each provision of the statute should be construed so as to give effect to all of the statute's provisions, not rendering any provision superfluous.") (quoting *United States Parole Comm'n v. Noble,* 693 A.2d 1084, 1107-08 (D.C. 1997)). Indeed, it would be illogical to require the conveyance of an ownership or other property interest where the provision of services, as opposed to goods, is at issue. The providers of services ordinarily do not, and cannot, transfer property interests in their services to their customers. The Court of Appeals appears to agree, at least implicitly, having repeatedly applied the CPPA in cases involving the provision of services through which no transfer of property interests appears to have occurred. *See, e.g., Frankeny v. Dist. Hosp. Partners, LP,* 225 A.3d 999, 1002, 1008 (D.C. 2020) (medical services); *Dist. Cablevision Ltd. P'shp v. Bassin,* 828 A.2d 714, 717, 733 (D.C. 2003) (cable television services).

The CPPA, moreover, defines the term "consumer" as "a person who, other than for purposes of resale, does or would purchase, lease (as lessee), or receive consumer goods or services." D.C. Code § 28-3901(a)(2)(A). The inclusion of the term "receive" in addition to the terms "purchase" and "lease" in the definition of "consumer" strongly suggests the legislature's intention that the statute cover circumstances in which a person receives goods or services free of charge or in return for something of value other than a direct monetary payment. Here, of course, the District alleges that Meta receives something of very significant value in return for the use of its platforms: the right to monetize its users' time and data.

The court thus concludes that the complaint plausibly alleges a "transfer" of consumer goods and services within the meaning of D.C. Code § 28-3901(a)(6) even though Meta does not charge a fee for the use of its social media platforms. At least at the pleading stage, therefore, Meta's argument that the CPPA is inapplicable to the conduct alleged in the complaint must be rejected.

**Substantial Injury**

Meta contends next that the unfair trade practice claims alleged in Count I fail as a matter of law because the District has not alleged economic or monetary harm, a necessary component of the "substantial injury" required to prove claims of unfair trade practices. The court concludes otherwise.

**\*16** The CPPA does not expressly require a showing of "substantial injury." It provides that in construing the term "unfair or deceptive trade practice" due consideration must be given to the interpretations by the Federal Trade Commission ("FTC") and the federal courts of the term "unfair or deceptive act or practice" in the Federal Trade Commission Act ("FTC Act"). D.C. Code § 28- 3901(d). The FTC Act in turn provides that the FTC may not "declare unlawful an act or practice on the grounds that such act or practice is unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n). The FTC has determined that "'ordinarily' 'emotional impact and other more subjective types of harm' would not make a practice unfair," *Am. Fin. Servs. Ass'n v. FTC,* 767 F.2d 957, 972 (D.C. Cir. 1985) (quoting Letter from FTC to Senators Ford and Danforth, 39 (Dec. 17, 1980)), and federal case law suggests that monetary harm is usually required for a showing of substantial injury, *see, e.g., FTC v. DirectMktg. Concepts, Inc.,* 569 F. Supp. 2d 285, 299 (D. Mass. 2008) ("In most cases 'substantial injury' involves monetary harm.").

Monetary harm, however, is not always a necessary component of "substantial injury." The FTC determined in *In re Int'l Harvester Co.,* 104 F.T.C. 949, 1064 (F.T.C. Dec. 21, 1984), that farm equipment caused substantial injury where a design flaw led to severe burns "resulting in mobility limitations, lasting psychological harm, and severe disfigurement." The FTC held that health risks caused by the equipment, rather than any monetary injury, supported a finding of substantial injury, explaining that "unwarranted health and safety risks may also support a finding of unfairness." *Id.* at 1061. The FTC expressly noted that "i[n] an extreme case ... where tangible injury could be clearly demonstrated, [even] emotional effects might possibly be considered as the basis for a finding of unfairness." *Id.* at 1073 n.36. Federal courts have reached the same conclusion, holding that non-monetary, and even non-tangible, harms can be sufficient for a finding of substantial injury. *See, e.g., FTC v. Roca Labs, Inc.,* 345 F. Supp. 3d 1375, 1395 (M.D. Fla. 2018) ("[N]either the legislative history nor the current law requires proof of tangible harm to the exclusion of intangible harm."); *see also FTC v. Wyndham Worldwide Corp.,* 799 F.3d 236, 246 (3d Cir. 2015) ("[T]he FTC Act expressly contemplates the possibility that conduct can be unfair before actual injury occurs.").

Taken as true at the pleading stage, as they must be, the allegations in the complaint are sufficient to place this case in the category of unusual cases in which "substantial injury" can be established without proof of economic harm. The District alleges that Meta's addictive design features significantly increase rates among children of major depressive episodes, anxiety, sleep disturbances, and other mental health disorders, including suicide. Compl. ¶ 96. The District alleges further that Meta knows of the devastating effects its design features have on the mental health of children and nonetheless persists in its efforts to maximize the amount of time children spend on its platforms for the purpose of harvesting as much data and selling as many targeted ads as possible. Comp. ¶¶ 1, 96, 106, 179, 241. The court concludes that the District has presented a plausible claim of "substantial injury" based on allegations of non-economic harm.

The FTC and at least one federal court have determined, moreover, that an injury can be "substantial" within the meaning of the FTC Act "if it does a small harm to a large number of people, or if it raises a significant risk of concrete harm." *Roca Labs,* 345 F. Supp. 3d at 1397 (quoting "FTC's Policy Statement on Unfairness," Sen. Comm. on Commerce, Science and Transportation (Dec. 17, 1980), p. 5). The District alleges that Meta's practices pose dangers to the "55,580 daily active teenage users and 94,656 monthly active teenage users" of Meta's platforms in the District. Compl. ¶ 30. Therefore, even if the alleged injuries were too small to constitute "substantial injury" when considered on an individual basis, the District has alleged a plausible claim that the injuries are large enough to do so when viewed collectively.

**\*17** The District's failure to allege economic or financial harm thus does not require the dismissal of its unfair trade practice claims at the pleading stage.

**Commercial Puffery and Protected Speech**

Meta argues that the District's deceptive trade practice claims in Count **II** fail as a matter of law to the extent they are based on affirmative misrepresentations because the false statements alleged in the complaint are either non-actionable statements of commercial puffery, protected by the First Amendment right to petition the government, or pled without the level of specificity required for claims alleging fraud. The court disagrees.

### 1. Puffery

"Puffery is a legal doctrine that posits some statements are of a type that no reasonable consumer would rely upon them, because there is a certain amount of bluster or 'sales talk' that is to be expected when pushing one's wares." *Earth Island Institute,* No. 22-CV-0895, 2024 D.C. App. LEXIS at *24. Puffery "includes 'the exaggerations reasonably to be expected of a seller as to the degree of quality of his product, the truth or falsity of which cannot be precisely determined.'" *Id.* at 25-26 (quoting *Pearson v. Chung,* 961 A.2d 1067, 1076 (D.C. 2008)).

The doctrine's reach, however, is more limited than Meta suggests. While commercial puffery may be non-actionable under the CPPA on the theory that a "general assertion, incapable of measurement, is unlikely to lead reasonable consumers astray," *Meta Platforms, Inc. v. District of Columbia,* 301 A.3d 740, 759 (D.C. 2023), the puffery doctrine is not automatically applicable any time the truth or falsity of a statement cannot be precisely determined. "That is too rigid a view." *Earth Island Institute,* 2024 D.C. App. LEXIS at *28. Rather, "businesses cannot insulate themselves from suit simply by avoiding concrete claims." *Id.* "Vague and ambiguous statements, incapable of being strictly true or false, may yet be actionable as misrepresentations," since "a statement literally true is actionable [under the CPPA] if made to create a false impression." *Id.* at *28-29 (citing *Remeikis v. Boss & Phelps, Inc.,* 419 A.2d 986, 990 (D.C. 1980)). The text of the CPPA makes clear, after all, that the statute "prohibits not just false statements, but those that have any 'tendency to mislead,' including by 'fail[ing] to state a material fact,' or 'us[ing] innuendo and ambiguity as to a material fact.'" *Id.* at *29 (quoting D.C. Code §§ 28-3904(a)-(h)).

The puffery rule, moreover, "'has not been a favored one,' and except in rare cases, the question of whether a statement is an 'actionable misrepresentation' or mere puffery must be 'left to the jury.'" *Id.* at *24 (quoting Prosser & Keeton on Torts § 109 at 757 (5th ed. 1984)). Unless the statement at issue is "so patently hyperbolic that it is implausible for a reasonable consumer to be misled," the statement must "be subject to a 'fact-intensive inquiry' on how a reasonable buyer would be affected" by it, making dismissal of a CPPA claim at the pleading stage improper. *Id.* at *25 (quoting *MacNaughton v. Young Living Essential Oils, LC,* 67 F.4th 89, 98 (2d Cir. 2023)).

Some of Meta's statements cited in the complaint may be too vague and unverifiable to form the bases of deceptive trade practice claims. Others, including what appear to be internal "talking points," may not have been published to third parties and thus may turn out to be non-actionable even if demonstrably false. But many of the statements attributed to Meta and its top officials in the complaint are not so patently hyperbolic that it would be implausible for a reasonable consumer to be misled by them. Others are sufficiently detailed, quantifiable, and capable of verification that, if proven false, they could support a deceptive trade practice claim. And contrary to Meta's argument, the category of actionable statements under the CPPA includes false and misleading statements of goals or aspirations, as "[a]n aspirational statement can be reasonably 'interpreted to be a representation about the defendant's present intent ... to act as stated.'" *Id.* at *31-32 (quoting 3 Dobbs *et. al,* The Law of Torts § 678 at 690 (2d ed. 2011)).

**\*18** The following are just a few examples of the statements alleged in the complaint that are legally sufficient to state plausible deceptive trade practice claims:

> * Meta founder Mark Zuckerberg's public statement in 2019 that Meta does not allow "teams [to] set goals around increasing time spent on [Meta's] services." Compl. ¶ 143. The complaint alleges that Meta does in fact set such goals. Compl. ¶¶ 43, 44, 88, 148.

* Mr. Zuckerberg's public statement in 2018 denying that Meta had studied dopamine feedback loops as a means of keeping users trapped on their platforms. Compl. ¶ 141. The complaint alleges that Meta did in fact perform such studies and that Meta utilizes dopamine feedback loops to keep users trapped. Compl. ¶¶ 5, 119.

* Testimony before Congress of Antigone Davis, Meta's Global Head of Safety, in 2021 suggesting that Meta does not identify the lifetime monetary value of children who use its products by stating that is "just not the way we think about it." Compl. ¶ 46. The complaint alleges that an internal Meta email from 2018 identifies the "lifetime value" of a thirteen-year-old teen using Meta's products as roughly $270.00. Compl. ¶ 45.

* Meta's statement in its 2023 Responsible Business Report that "[w]e want people to connect with others in a safe, positive and supportive environment and leave our apps feeling good about the time they spend on them." Compl. ¶ 140. The complaint alleges that Meta employees have acknowledged that Instagram's ranking algorithm takes youth "into negative spirals & feedback loops that are hard to exit from." Compl. ¶ 66. The complaint alleges further that Meta's features exploit teenagers who are uniquely vulnerable to addictive technologies. Compl. ¶ 2, 119.

* Meta's statements touting its platforms' "time-management tools" as ways for users to control their use of its products. Compl. ¶ 133. The complaint alleges that Meta knows its time-management tools are ineffective. *Id.*

* Ms. Davis's 2021 testimony before Congress that "we do not direct people towards content that promotes eating disorders." Compl. ¶ 169. The complaint alleges that Meta's personalization algorithm serves anorexia-related content to users who have previously viewed such content. Compl. ¶ 155.

The District's deceptive trade practice claims therefore must be allowed to proceed to the fact-intensive inquiries contemplated by the case law on the way a reasonable buyer would be affected by Meta's allegedly false and misleading statements.

### 2. First Amendment/Noerr-Pennington Doctrine

The *Noerr-Pennington* doctrine provides First Amendment protection for statements made in furtherance of "attempt[s] to persuade the legislature or the executive to take particular action with respect to a law." *E.R. Presidents Conference v. NoerrMotor Freight, Inc.,* 365 U.S. 127, 136 (1961); *see also UnitedMine Workers of Am. v. Pennington,* 381 U.S. 657, 670 (1965). Statements to the public in support of publicity campaigns advocating for government actions can be similarly protected. *See Allied Tube & Conduit Corp. v. Indian Head,* 486 U.S. 492, 499-500 (1988).

The First Amendment, however, "does not 'cover activity that was not genuinely intended to influence government action,'" *United States v. Philip Morris USA, Inc.,* 566 F.3d 1095, 1123 (D.C. Cir. 2009) (quoting *Allied Tube,* 486 U.S. at 508 n.10), and it does not protect "deliberately false or misleading statements," *Philip Morris USA Inc.,* 566 F.3d at 1123-24; *see also Whelan v. Abell,* 48 F.3d 1247, 1255 (D.C. Cir. 1995) ("However broad the First Amendment right to petition may be, it cannot be stretched to cover petitions based on known falsehoods."). In *Philip Morris USA Inc.,* for example, the D.C. Circuit held that false statements regarding the dangers of cigarettes were not protected by the First Amendment, even though the statements were made in furtherance of a public campaign. 566 F.3d at 1124.

**\*19** As set forth in detail above, the District has plausibly alleged in the complaint that at least some of Meta's statements to Congress and the public were deliberately false or misleading. This is sufficient at the pleading stage to avoid dismissal based on First Amendment protections.

### 3. Heightened Pleading Standard for Fraud Claims

Rule 9(b) of the Superior Court Rules of Civil Procedure provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Meta cites a single decision of the United States District Court for the District of Columbia for the proposition that CPPA claims premised on misrepresentations and omissions are subject to the heightened pleading standard of Rule 9(b) because they "sound in fraud." *See Witherspoon v. Philip Morris Inc.,* 964 F. Supp. 455, 464 (D.D.C. 1997). Meta argues that the District's deceptive trade practice claims are not pled with sufficient particularity.

Meta's argument is foreclosed by more recent case law from the District of Columbia Court of Appeals. The Court of Appeals expressly stated in *Frankeny v. Dist. Hosp. Partners, LP,* 225 A.3d 999 (D.C. 2020), that the CPPA "overcomes the 'pleadings problem associated with common law fraud claims' by abridging the elements needed to prove a CPPA violation." *Id.* at 1004 (quoting *Fort Lincoln Civic Ass'n v. Fort Lincoln New Town Corp.,* 944 A.2d 1055, 1073 n.20 (D.C. 2008)); *see also Saucier,* 64 A.3d at 442. Based on this binding appellate case law, Superior Court judges have repeatedly declined to apply Rule 9(b)'s heightened pleading standard to CPPA claims premised on alleged misrepresentations. *See District of Columbia v. Hofgard,* No. 2015-CA-3354-B, 2015 D.C. Super. LEXIS 15, \*13 (D.C. Super. Ct. Aug. 8, 2015) ("[A]s multiple Superior Court judges have held, Rule 9(b) does not apply to a complaint alleging violations of the CPPA.") (collecting cases). Indeed, at least one more recent federal court decision has reached the same conclusion-that "imposing the particularized pleading requirements of Rule 9(b) on such claims would undermine the [CPPA's] purpose." *McMullen v. Synchrony Bank,* 164 F. Supp. 3d 77, 91 (D.D.C. 2016).

The court therefore declines to apply Rule 9(b)'s heightened pleading standard to the District's deceptive trade practice claims.

### Disgorgement

In its prayer for relief, the District asks the court to order Meta "to pay restitution or damages in accordance with D.C. Code § 28-3909." Compl. at page 58. Meta acknowledges that § 28-3909(a) authorizes the District, through the Office of the Attorney General, to seek "the restitution of money or property," but it argues that restitution is unavailable here because none of the consumers alleged to have been harmed by its products has paid or otherwise lost any money or property using them. Meta contends that what the District really is requesting is disgorgement, a remedy Meta argues the District is not authorized to seek under the CPPA.

Meta's argument regarding the availability of restitution or disgorgement as a remedy is best understood as a motion to strike pursuant to Rule 12(f) of the Superior Court Rules of Civil Procedure. Rule 12(f) provides, in relevant part, that the court "may strike from a pleading ... any redundant, immaterial, or scandalous matter."

**\*20** The court is not persuaded that the District's request for restitution should be stricken. "[R]estitution today is a general term for diverse kinds of recoveries aimed at preventing unjust enrichment of the defendant and measured by the defendant's gains." *Divver v. D.C. Dep't of Ins., Sec. & Banking,* 306 A.3d 595, 608 (D.C. 2023) (quoting Dan B. Dobbs, *Law of Remedies, Damages, Equity, Restitution* § 1.1 (2d ed. 2001)). "[R]estitution's central purpose," therefore, "is not simply to make a victim whole, but also to disgorge the wrongdoer of ill-gotten funds." *Id.* Thus, even if Meta is correct that what the District really seeks here is disgorgement, the court cannot say that the District's request so clearly falls outside the Attorney General's authority under the CPPA that the request should be stricken as redundant, immaterial, or scandalous.

## VI. CONCLUSION

For the foregoing reasons, it is this 9th day of September 2024

**ORDERED** that Meta's motion to dismiss is **denied.** It is further

**ORDERED** that Meta has until September 23, 2024 to file an answer to the complaint. *See* Super. Ct. Civ. R. 12(a)(4)(A). It is further

**ORDERED** that the case remains set for an initial scheduling conference on October 4, 2024 at 9:30 a.m. As the court and parties have discussed previously, the parties are encouraged to try to reach agreement on a proposed scheduling order to be jointly submitted to the court.

<<signature>>

Neal E. Kravitz, Associate Judge

(Signed in Chambers)

Copies to:

Adam R. Teitelbaum, Esq.

Jimmy R. Rock, Esq.

Kevin J. Vermillion, Esq.

John J. DeBoy, Esq.

Timothy C. Hester, Esq.

Christian J. Pistilli, Esq.

---

**Footnotes**

1    Meta does not argue that Section 230 bars the deceptive trade practice claims in Count II based on alleged affirmative misrepresentations. Those claims, Meta argues, must be dismissed under the First Amendment and for failure to state a claim under the CPPA. The court will address those arguments below, in Sections IV and V, respectively.

2    The court also held that the second prong of the *Barnes* test was not satisfied, because the plaintiffs' claim treated Snap as a product designer rather than a publisher. *Lemmon,* 995 F.3d at 1092. The court made clear, however, that "even if Snap [were] acting as a publisher in releasing Snapchat and its various features to the public," the plaintiffs' claim still would not be barred by Section 230 because it "is not predicated on information provided by another information content provider." *Id.* at 1094 (internal quotation marks omitted).

3      *See Backpage.com,* 817 F.3d at 16-17 (sex trafficking ads); *Herrick,* 765 Fed. App'x at 588 (profile impersonating someone); *Nemet Chevrolet, Ltd. v. Consumeraffairs.Com, Inc.,* 591 F.3d 250, 252 (4th Cir. 2009) (negative customer reviews of plaintiff's business); *Zeran,* 129 F.3d at 328 (defamatory messages); *Dyroff v. Ultimate Software Grp.,* Inc., 934 F.3d 1093, 1095 (9th Cir. 2019) (posts coordinating a drug deal); *Kimzey v. Yelp! Inc.,* 836 F.3d 1263, 1265 (9th Cir. 2016) (negative reviews of plaintiff's business); *Barnes,* 570 F.3d at 1098 (revenge porn); *Perfect 10, Inc. v. CCBill, LLC,* 488 F.3d 1102, 1108 (9th Cir. 2007) (copyrighted images); *Almeida,* 456 F.3d at 1318 (misappropriated photograph); *Marshall's Locksmith,* 925 F.3d at 1265 (scam posts); *Klayman,* 753 F.3d at 1355 (Facebook page that incited violence); *Doe v. Grindr Inc.,* No. 2:23-CV-2093-ODW, 2023 U.S. Dist. LEXIS 230505, at *8-10 (C.D. Cal. Dec. 28, 2023) (profile content, including user age); *M.P. v. Meta Platforms, Inc.,* 692 F. Supp. 3d 534, 537 (D.S.C. 2023) (white supremacist content), *remanded on other grounds, MP. v. Meta Platforms Inc.,* No. 23-1880, 2023 U.S. App. LEXIS 24059, at * 1-2 (4th Cir. Sep. 7, 2023); *McCarthy v. Amazon.com, Inc.,* 679 F. Supp. 3d 1058, 1064-65 (W.D. Wash. 2023) (post selling sodium nitrite); *L.W. v. Snap, Inc.,* 675 F. Supp. 3d 1087, 1093 (S.D. Cal. June 5, 2023) (child sex abuse material); *Bride v. Snap, Inc.,* No. 2:21-CV-6680-FWS-MRW, 2023 U.S. Dist. LEXIS 5481, *2 (C.D. Cal. Jan. 10, 2023) (harassing messages), *aff'd in part, rev'd in part sub nom., Est. of Bride v. YOLO Techs., Inc.,* No. 23-55134, 2024 U.S. App. LEXIS 21229, at *1 (9th Cir. Aug. 22, 2024); *Anderson v. TikTok, Inc.,* 637 F. Supp. 3d 276, 278 (E.D. Pa. 2022) (self-asphyxiation videos), *rev'd in part, Anderson v. TikTok, Inc.,* No. 22-3061, 2024 U.S. App. LEXIS 21771, at *5 (3d Cir. Aug. 27, 2024) (holding that Section 230 did not bar the plaintiff's claims); *Doe v. Snap, Inc.,* 2022 U.S. Dist. LEXIS 119560, * 1-2 (S.D. Tex. July 7, 2022) (sexually explicit messages and photos), *aff'd, Doe v. Snap, Inc.,* No. 22-20543, 2023 U.S. App. LEXIS 16095, at *3 (5th Cir. June 26, 2023); *FTC v. Match Grp.,* Inc., No. 3:19-CV-2281-K, 2022 U.S. Dist. LEXIS 52960, at *4, 23-26 (N.D. Tex. Mar. 24, 2022) (third-party communications perpetuating scams); *Rodriguez v. OfferUp, Inc.,* No. 8:19-CV-1290-T-30SPF, 2019 U.S. Dist. LEXIS 247480, at *5-6 (M.D. Fla. Aug. 29, 2019) (misleading advertisement that led to violent robbery and shooting); *Force v. Facebook, Inc.,* 934 F.3d 53, 59 (2d Cir. 2019) (posts allegedly inciting terrorist attacks); *Fields v. Twitter, Inc.,* 217 F. Supp. 3d 1116, 1120 (N.D. Cal. 2016) (radicalizing propaganda allegedly linked to terrorist attacks), *aff'd on other grounds,* 881 F.3d 739, 750 (9th Cir. 2018) (declining to decide whether Section 230 barred the plaintiffs' claims); *Blumenthal v. Drudge,* 992 F. Supp. 44, 47 (D.D.C. 1998) (defamatory statement); *In re Facebook,* 625 S.W.3d 80, 84-85 (Tex. 2021) (grooming messages allegedly aimed at luring victims into sex trafficking), *cert. denied sub. nom., Doe v. Facebook, Inc.,* 142 S. Ct. 1087, 1087 (2022); *Cross v. Facebook, Inc.,* 222 Cal. Rptr. 3d 250, 255 (Cal. Ct. App. 2017) (posts that allegedly incited violence).

The only other case relied on by Meta, *Prager Univ. v. Google LLC,* 301 Cal. Rptr. 3d 836 (Cal. Ct. App. 2022), is inapposite. Prager University sued Google for deplatforming its YouTube posts because of its conservative views, and Google claimed immunity under Section 230. *Id.* at 843-44. The case thus involved a provider's claim of immunity for its actions *restricting* access to (rather than publishing) third-party content. Indeed, although the judge in the case found Google immune under § 230(c)(1), *id.* at 847, the immunity question was properly governed by § 230(c)(2).

4      Meta's motion to dismiss specifically cites the District's claim about its plastic surgery filter, *see* Compl. ¶ 178, but Meta's broad language and the way it quotes the complaint suggests it may be referring to all alleged omissions relating to harmful design features. *See* MTD at 15 (citing Compl. ¶ 178 as saying "'Meta ha[d] ... an obligation to disclose the[] risks and harms' of "harmful features"'). To the extent Meta seeks the dismissal of claims based on omissions relating to other design features, the court's analysis would lead to the same conclusion the court reaches with regard to the claim based on omissions relating to the plastic surgery filter.

---

# EXHIBIT 4

**IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION**

| | |
|---|---|
| **DISTRICT OF COLUMBIA**, <br><br> *Plaintiff,* <br><br> **v.** <br><br> **TIKTOK INC.**, <br><br> *Defendant.* | **Case No.: 2024-CAB-006377** <br><br> **Judge Ebony M. Scott** <br><br> **Next Event: Remote Mediation <br> February 10, 2026 at 9:00 a.m.** |

## <u>ORDER</u>

This matter was before the Court on February 24, 2025, for a Motion Hearing, and on February 28, 2025, for a Scheduling Conference.

At the **February 24, 2025, Motion Hearing**, for the reasons stated on the record, the Court took several actions.[1]  First, the Court denied Defendant TikTok Inc.'s Motion to Dismiss or in the Alternative, Opposed Motion to Stay, filed on November 22, 2024.  Second, the Court denied as moot: (1) Defendant TikTok Inc.'s Opposed Motion to Seal Confidential Portions of Defendant TikTok Inc.'s (i) Motion to Dismiss or, in the Alternative, Opposed Motion to Stay, and (ii) Opposed Motion for Protective Order, filed on November 22, 2024; (2) Defendant TikTok Inc.'s Opposed Motion for Protective Order, filed on November 22, 2024; and (3) Defendant TikTok Inc.'s Opposed Motion for Leave to File Under Seal Confidential Portions of its Reply Brief in Support of its Motion to Dismiss or in the Alternative, Opposed Motion to Stay, filed on January 9, 2025.  Third, the Court granted-in-part and denied-in-part Defendant TikTok Inc.'s Partially

---

[1] The Court attaches to this Omnibus Order a transcript of the February 24, 2025 Motion Hearing in which the Court issued its ruling on the Motion to Dismiss.

Unopposed Motion to Seal Complaint, filed on October 30, 2024. Fourth, the Court held in abeyance Plaintiff District of Columbia's Opposed Motion for Entry of Protective Order, filed on December 17, 2024, and ordered that the Parties meet and confer on the outstanding issues ahead of the February 28, 2025 Initial Scheduling Conference.

At the **February 28, 2025, Initial Scheduling Conference**, for the reasons stated on the record, the Court: (1) granted-in-part and denied-in-part Plaintiff District of Columbia's Opposed Motion for Entry of Protective Order, filed on December 17, 2024; (2) granted Defendant TikTok Inc.'s Consent Motion to Extend Defendant's Time to Answer Complaint, filed on February 27, 2025; and (3) granted-in-part and denied-in-part Plaintiff District of Columbia's Opposed Motion for Entry of Proposed Scheduling Order, filed on February 27, 2025.

With respect to Plaintiff District of Columbia's Opposed Motion for Entry of Protective Order, the Court denied the District's Motion with respect to the provision regarding expert witnesses and ordered that the Protective Order shall mirror the Protective Order entered in *District of Columbia v. Meta Platforms, Inc.*, No. 2023-CAB-6550 (D.C. Sup. Ct. Jan. 29, 2024), as it pertains to expert witnesses. Accordingly, the Court ordered that the District submit an updated Proposed Protective Order incorporating language consistent with paragraph 35 and its sub-parts of the Protective Order in *Meta*.

Accordingly, it is this **28th day of February, 2025**, hereby:

**ORDERED** that Defendant TikTok Inc.'s Motion to Dismiss or in the Alternative, Opposed Motion to Stay is **DENIED**; it is further

**ORDERED** that Defendant TikTok Inc.'s Opposed Motion to Seal Confidential Portions of Defendant TikTok Inc.'s (1) Motion to Dismiss or, in the Alternative, Opposed Motion to Stay, and (2) Opposed Motion for Protective Order is **DENIED AS MOOT**; it is further

**ORDERED** that Defendant TikTok Inc.'s Opposed Motion for Protective Order is **DENIED AS MOOT**; it is further

**ORDERED** that Defendant TikTok Inc.'s Opposed Motion for Leave to File Under Seal Confidential Portions of its Reply Brief in Support of its Motion to Dismiss or in the Alternative, Opposed Motion to Stay is **DENIED AS MOOT**; it is further

**ORDERED** that Defendant TikTok Inc.'s Partially Unopposed Motion to Seal Complaint is **GRANTED-IN-PART** and **DENIED-IN-PART**.  The Court **GRANTS** the Motion as to the following paragraphs, or portions thereof, that are the subject of Defendant's request for filing under seal: ¶¶ 44, 57, 60, 69, 91, 134, 136, 192.  The Court finds that the redactions in those paragraphs which Defendant has sought to maintain as redacted **SHALL REMAIN SEALED** and redacted from the public version of Plaintiff's Complaint; it is further

**ORDERED** that Plaintiff **SHALL FILE** a version of the Complaint consistent with this Order on the public docket on or before **March 3, 2025**; it is further

**ORDERED** that Plaintiff District of Columbia's Opposed Motion for Entry of Protective Order is **GRANTED-IN-PART** and **DENIED-IN-PART**; it is further

**ORDERED** that Plaintiff District of Columbia **SHALL SUBMIT** an updated Proposed Protective Order incorporating language consistent with paragraph 35 and its sub-parts of the Protective Order in *Meta* on or before **March 3, 2025**; it is further

**ORDERED** that Defendant TikTok Inc.'s Consent Motion to Extend Defendant's Time to Answer Complaint is **GRANTED**; it is further

**ORDERED** that Defendant TikTok Inc. **SHALL FILE** an Answer to Plaintiff District of Columbia's Complaint on or before **March 26, 2025**; it is further

**ORDERED** that Plaintiff District of Columbia's Opposed Motion for Entry of Proposed

Scheduling Order is **GRANTED-IN-PART** and **DENIED-IN-PART**; and it is further

**ORDERED** that the following deadlines are in effect until further order of this Court:

| Event | Deadline |
|---|---|
| Exchange Fact Witnesses | 08/27/2025 |
| Proponent's Rule 26(a)(2)(B) Report | 09/10/2025 |
| Opponent's Rule 26(a)(2)(B) Report | 10/16/2025 |
| Discovery Requests | 10/27/2025 |
| Close of Discovery | 11/25/2025 |
| Filing Motions | 12/26/2025 |
| Dispositive Motions Decided | 01/26/2026 |
| Mediation | 02/10/2026 at 9:00 a.m. |
| Pretrial | To be set upon completion of ADR |

This Order may not be modified except by leave of Court upon a showing of good cause. Stipulations by counsel will not be effective to change any deadlines in the Order without Court approval. Failure to comply with this Order and the deadlines set forth herein may result in dismissal, default judgment, refusal to let witnesses testify, refusal to admit exhibits, the assessment of costs and expenses, including attorney's fees, or other sanctions.

**SO ORDERED**.

**Associate Judge Ebony M. Scott**
*(Signed in Chambers)*

**Copies via Odyssey to:**

Adam Teitelbaum, Esq.
adam.teitelbaum@dc.gov
*Counsel for Plaintiff*

Kevin Vermillion, Esq.
kevin.vermillion@dc.gov
*Counsel for Plaintiff*

Brittany Nyovanie, Esq.
Brittany.nyovanie@dc.gov
*Counsel for Plaintiff*

Jorge Bonilla-Lopez, Esq.
jorge.bonillalopez@dc.gov
*Counsel for Plaintiff*

Jimmy R. Rock, Esq.
jrock@edelson.com
*Counsel for Plaintiff*

Theo Benjamin, Esq.
tbenjamin@edelson.com
*Counsel for Plaintiff*

Emily Penkowski Perez, Esq.
epenkowski@edelson.com
*Counsel for Plaintiff*

John Feeney-Coyle, Esq.
jfeeneycoyle@edelson.com
*Counsel for Plaintiff*

Martha F. Hutton, Esq.
mhutton@omm.com
*Counsel for Defendant*

Stephen D. Brody, Esq.
sbrody@omm.com
*Counsel for Defendant*

Jonathan D. Hacker, Esq.
jhacker@omm.com
*Counsel for Defendant*

Anne T. Marchitello, Esq.
amarchitello@omm.com
*Counsel for Defendant*

Daniel M. Petrocelli
dpetrocelli@omm.com
*Counsel for Defendant*

Lauren F. Kaplan
lkaplan@omm.com
*Counsel for Defendant*

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION


- - - - - - - - - - - - - - x
DISTRICT OF COLUMBIA,          :  Docket Number:  2024 CAB 006377
                               :
         vs.                   :
                               :
TIK TOK, INC.,                 :
                               :
         Defendant.            :  Monday, February 24, 2025
- - - - - - - - - - - - - - x  Washington, D.C.



The above-entitled action came on for a Motion

hearing before the HONORABLE EBONY M. SCOTT, Judge, in

Courtroom Number 219.


APPEARANCES:

On Behalf of the Plaintiff:

JIMMY R. ROCK, Esquire
BRITTANY N. NYOVANIE, Esquire
KEVIN VERMILLION, Esquire
Washington, D.C.


On Behalf of the Defendant:

JOHNATHAN D. HACKER, Esquire
MARTHA F. HUTTON, Esquire
ANN MARCHITELLO, Esquire
Washington, D.C.


25-00870



1  remains the same, which is just one of judicial modesty.

2  It's just urging courts to stay their hand when another

3  agency is doing the job a statute tells the agency to do.

4         There's no reason to jump ahead in this case and

5  proceed unless and until we get an answer from DISB.

6  Thank you.

7         THE COURT:  Okay.  Thank you.  We'll just take a

8  short recess.  When I return, I will give my ruling on the

9  record.  Okay, thanks.

10         (Recess from 11:26 a.m. until 12:07 p.m.)

11         THE DEPUTY CLERK:  Calling the matter of

12  District of Columbia versus TikTok, Inc., 2024 CAB 6377.

13         All parties are present.

14                      **FINDINGS OF THE COURT**

15         THE COURT:  Okay.  The Court has had an

16  opportunity to consider the oral argument of counsel, as

17  well as the briefing in this matter, and took an

18  opportunity during the short recess to review some of the

19  cases that relied upon at today's oral argument and the

20  Court is ready to rule.

21         So of course, at the outset, the Court is guided

22  by the 12(b)(6) standard.  And dismissal under this

23  standard is warranted where the complaint fails to allege

24  the elements of a legally viable claim.  And in deciding a

25  Rule 12(b)(6) motion, the Court must accept all of the

1    allegations in the complaint as true here, must accept the

2    allegations as alleged by the District in its complaint as

3    true, and construe all inferences in favor of the

4    District.

5        So to survive a motion to dismiss, a claim must

6    have facial plausibility.  That simply means factual

7    content that allows the Court to draw inferences, or to

8    draw the reasonable inference that the defendant, here

9    TikTok, is liable for the alleged misconduct.  And so

10   guided by that broad framework, the first question the

11   Court must consider is whether Section 230 of the

12   Communications Decency Act, what we've been referring to

13   as the CDA, bars Counts I through III of the complaint.

14       So the CDA, the Act, which was enacted in 1996,

15   contains provisions that increases the penalties for

16   conduct, for indecent conduct, harassing conduct, obscene

17   conduct, and other wrongful uses of telecommunications by

18   persons who knowingly or intentionally created said

19   prohibited messages, or otherwise used communications in a

20   harmful way.  To harm others, in fact.

21       And the statute, which has been the subject of a

22   lot of our conversations, includes an immunity clause and

23   an immunity provision which is intended to exclude from

24   liability, telecommunications and information service

25   providers and system operators who are not themselves

1  knowing participants in the making of, or otherwise

2  responsible for the content of the prohibited

3  communications.

4           And the immunity provisions are codified in

5  Section 230, what has been called or referred to as

6  Section 230 immunity.  In that section, in subsection

7  (C)(1) says that, "No provider or user of an interactive

8  computer service shall be treated" -- excuse me -- "as the

9  publisher or speaker of any information provided by

10  another information" contact -- or "content provider."

11          Further along in the statute in subsection

12  (E)(3), the statute says that, "No cause of action may be

13  brought and no liability may be imposed under any state or

14  local law that is inconsistent with this section."  And so

15  when one combines these two provisions, they provide

16  immunity for telecommunications and information service

17  providers and systems operators that seek to treat them as

18  publishers of information provided by other content

19  providers.

20          It seems, at least from this record, that both

21  parties agree that the decision in the *Barnes* case, *Barnes*

22  *v. Yahoo*, which comes from our Ninth Circuit in 2009, sets

23  forth the proper analytical framework for determining

24  whether this Section 230 immunity applies at any given set

25  of circumstances.  And so *Barnes* creates a test, a three-



1    part test, holding that Section 230 immunizes from

2    liability: one, a provider or user of an interactive

3    computer service; two, whom a plaintiff seeks to treat

4    under a state law -- state cause of action as a publisher

5    or speaker; or three, of information provided by another

6    information content provider.

7         Now, with respects to all count, there does not

8    seem to be dispute in this record, that the first *Barnes*

9    element is satisfied here, namely that TikTok is a

10   provider of interactive computer services.  As to the

11   second opinion, there's been some discussion in the

12   briefings by the parties and at oral argument related to

13   Judge Kravitz's decision in *Meta*, the 2023 case.  I think

14   it's 2023 CAP 6550, I believe.  And the Court agrees with

15   Judge Kravitz on this issue, and that is that whether or

16   not the defendant is attempting to -- or whether the

17   plaintiff -- excuse me -- is attempting to treat TikTok as

18   a publisher is really a close question and it need not be

19   resolved now at the pleading stage, as the Court finds

20   that the third prong of the test, namely whether the

21   District is or has sought to treat TikTok as the publisher

22   of third-party content is sufficiently established on the

23   record.

24        And so looking at each of the counts, starting

25   with Count I, of course we know Count I alleges these



1    addictive design features such as the recommendation

2    engine, the infinite scroll, the push notifications, the

3    filters, the coins.  And which do not, according to the

4    District, involve traditional publishing activity like

5    reviewing, editing, and deciding whether to publish or

6    withdraw from publication third-party content.

7          Their recommendation engine, which has been

8    referred to the algorithm, the District alleges that the

9    platform uses this algorithm to provide content

10   recommended for each user.  This algorithm then curates a

11   personalized video stream and facilitates excessive

12   platform use.  This is going to take me quite a few

13   minutes to get through this and so just be ready, okay?

14         It'll probably take me about three hours.  I am

15   joking.  It won't take me that long.  So the District is

16   not seeking to ascribe liability on TikTok because of the

17   content that is produced by the algorithm.  This is the

18   District's argument.  The District is contending instead

19   that TikTok is liable for this anticipation of dopamine.

20         These dopamine hits, again, akin to the slot

21   machine that the Court mentioned during our earlier

22   colloquy with TikTok's attorney.  And that this

23   anticipation of dopamine, which the algorithm is designed

24   to provide as a reward, is the issue.  And so the

25   addiction is not to the content, but to this expectation



1    and anticipation which is specifically engineered by the

2    algorithm as an ultimate goal of the engine.

3           And that's in paragraph 70 of the District's

4    complaint.  And the ultimate goal is, in disrupting what

5    has been termed this habit loop, this cue routine and

6    reward.  And so that is the loop that causes disruption

7    and harm.  And so the engine, according to the District,

8    is designed to give young users immediate gratification

9    and boosts rewards, encouraging this excessive routine use

10   of the app.

11          Next, there's the infinite scroll.  And this is

12   described as a function that allows new videos to

13   automatically and constantly load each time a user watches

14   a third-party generated video.  That comes from paragraph

15   77 of the complaint.  And this design element is -- it

16   facilitates extended use by users of the platform and the

17   same content, displayed another way, would not have this

18   effect.

19          So the District is not seeking liability against

20   TikTok and accepting the allegations as true, as the Court

21   must at this juncture, for publishing third-party content.

22   So what is the Court saying?  It is not about the content;

23   it's about the ease of the access to the content, which

24   was -- undergirded the colloquy the Court had at the onset

25   with TikTok's attorney.

1          The push notification.  So here, the District

2    challenges the use of these push notifications to alert

3    new users, or to alert to new messages -- excuse me -- to

4    provide updates and to suggest new videos, which according

5    to the District, entices users to reopen the app.  This is

6    at paragraph 82.

7          Advertising the content on the app or trying to

8    entice users, as the District alleges, to open this app

9    back up.  The Court finds, based upon the allegations,

10   it's not third-party content.  It is not about the

11   content, but indeed, it's about TikTok's own actions here.

12   Same is true for the filters.  The District alleges that

13   the filters and the effects, with which the platform users

14   can edit their content, are unsafe for users because one

15   can't -- a user can alter their appearance.  That's in

16   paragraph 86.

17         The decision to apply filters to users' content

18   without consent, or even to supply them at all, is

19   TikTok's decision.  It's not a decision of the user.  And

20   so again, it's not about the content, it's about what

21   TikTok affirmatively provides to users, and that it is

22   done automatically.

23         TikTok LIVE.  Well, according to the District,

24   this feature permits users to use these virtual coins to

25   purchase virtual gifts, which they can then use to express



1    appreciation to other users for their content.  And these

2    gifts allegedly function like social recognition of reward

3    signal, similar to likes on other social media

4    application.  And so the District's claims, the Court

5    finds, are not seeking liability for the content, which is

6    on TikTok LIVE; but for TikTok's decision, its own

7    decision, to combine this live feature with this digital

8    coin to create monetary incentives in live streaming,

9    which introduces a variable reward that the Court

10   mentioned, which is effective in changing or driving

11   predicted behavior or even changes in behavior.  That's in

12   paragraph 97.

13          And so Count I is not challenging TikTok's

14   content moderation policies, which counsel argued today

15   are achieved through the algorithm, but how TikTok

16   promotes and displays the content that it has already

17   approved for the app to keep children addicted.  And so

18   going back to this line, whether users are watching porn

19   or puppies -- not this judge's words -- the claim is not

20   that they are harmed by the time spent, not by what they

21   are -- they are harmed by the time spent and not what they

22   are seeing.  That comes from the *D.C. v. Meta* case.

23          So as to Count II, the complaint states in

24   paragraph 211, "That TikTok has had an understanding of

25   the increased risk of fraud and other criminal activity,"



1    and that it created -- "and it was created by" adding --

2    "combining this live streaming feature with a virtual

3    monetary system in TikTok LIVE."

4            Paragraph 212 discusses TikTok's failures to

5    take measures to mitigate the risk of fraud, sexual

6    exploitation, and financial harm that LIVE creates.  It

7    has maintained the design -- according to the District, it

8    has maintained these design features that create these

9    risks.  And they have -- TikTok has failed to implement

10   compliance programs common for the industry and required

11   under federal law.

12           And so Count II seeks to hold TikTok liable for

13   its own conduct, which has been characterized as the

14   District as brokering this illegal -- or brokering

15   unlawful transactions through its live streaming features.

16   And so the District seeks liability, as the Court

17   understands and accepts as true, for TikTok's decision,

18   its own decision, to combine this live streaming function

19   with the monetary function because TikTok knows that the

20   combination facilitates unlawful or illegal activities.

21           And so the District is not suing TikTok for

22   accountability for the fraud, sexual exploitation of

23   minors which has been alleged by the District and alleged

24   to be occurring online.  But it's suing TikTok for

25   facilitating these transactions, acting as the conduit, if

1  you will, by providing the platform which makes them

2  possible.

3         Certainly, the CDA does not protect brokering

4  illegal transactions online as alleged in the complaint.

5  In fact, the courts have refused to extend the CDA

6  immunity to online platforms that sound -- and this has

7  been discussed; it was mentioned in the briefing.  The

8  particular cases, I believe it were -- it was virtual

9  casino chips for legal gambling or these short-term rental

10 transactions for unregistered properties in violation of

11 ordinances.

12        And this comes from the *In re: Apple* case, the

13 *In re: Facebook's* simulated casino style games case, and

14 many cases cited by the parties in their briefings.  And

15 so the Court agrees with the plaintiff here, that Counts I

16 and II do not arise from third-party content, and in fact,

17 are rather content neutral.

18        As the addictive features, not the content that

19 is being pushed, is responsible for the harms alleged, and

20 the courts have held that where the claim does not depend

21 on publishing or speaking, Section 23(C), which creates

22 this immunity that TikTok seeks, becomes irrelevant and

23 the Court agrees.

24        As to Count III, the concern, as I understand

25 it, is related to allegations about statements made that



1    were explicitly or implicitly misleading about the safety

2    of the platform.  And so for example, in the complaint,

3    paragraph 221, the District alleges that TikTok claims it

4    is deeply committed to being a safe and positive

5    experience for people under the age of 18 when, according

6    to the District, and the Court accepts it as true, that

7    District -- that TikTok knows it is profiting from the

8    sexual exploitation of minors.  The Court disagrees with

9    TikTok that these statements are puffery.  This was not

10   the subject of our argument today.  It was such a part,

11   just a little, at the last motion hearing.  But it was

12   certainly briefed in the papers.

13         And so the Court disagrees with TikTok that

14   these statements are puffery, are not actionable because

15   their truth or falsity, as TikTok alleges, cannot be

16   precisely determined.  Count III seeks to hold TikTok

17   liable for its own statements and not for anyone else's.

18   And so that means, according to the District and the Court

19   agrees, that TikTok could satisfy its duty under the CPPA

20   by avoiding the misrepresentations or the misleading

21   omissions without reviewing, editing, or withdrawing any

22   third-party content on its application.

23         The Court took a look at the -- the *Demetri v.*

24   *Yelp* case.  It's a 2014 case.  In there, a plaintiff

25   alleged that Yelp, an online publisher of business



1    reviews, falsely advertised that reviews passed through a

2    filter, ultimately providing consumers with the most

3    trusted reviews.

4           The Court found that the CDA did not apply

5    because the plaintiff target Yelp's own statements

6    regarding the accuracy of its filter, not the third-party

7    reviews themselves.  That is what's happening here.  And

8    so the District is not seeking to hold TikTok accountable

9    as a publisher of harmful conduct -- or content, excuse

10   me.  The District is seeking liability for the alleged

11   affirmative statements and omissions, which tend to

12   mislead users and their parents into thinking that the

13   platform is safe for children, when TikTok knows that it

14   in fact is not.

15          AS the plaintiff notes in the briefing, not

16   argued orally, the protections of the CDA cannot become

17   part of a per se test.  That is, that where an entity

18   publishes other people's views, they are automatically

19   insulated from all suits.  And where the claim does not

20   depend on publishing or speaking, Section 2030(C) of the

21   CDA is irrelevant.  And therefore, the CDA does not

22   provide immunity to TikTok in this matter, and dismissal

23   is not warranted under this theory.

24          The second question then becomes whether or not

25   Counts I through III should be dismissed on First



1   Amendment grounds.  Now, of course the First Amendment

2   protects a platform from when it compiles the third-party

3   speech it wants in the way that it wants, and thus

4   offering this expressive conduct or this expressive

5   product, I think is what *Moody* says, which most reflects

6   its own views and priorities.  Of course, it's the *Moody*

7   *v. Net Choice* case from 2024.

8           In a variety of context, the Supreme Court has

9   afforded First Amendment protection to the editorial

10  function itself.  And TikTok listed a host of cases that

11  stand for this proposition.  The Court's decision -- the

12  Court's decisions prohibiting the Government from

13  requiring newspapers to afford a right to reply -- I think

14  that's the *Miami Herald* case.  There's other cases where

15  entities were prevented from forcing a company to offer a

16  forum for alternative viewpoints and a newsletter, or from

17  compelling parade organizers to include a group that

18  advocates a different message.  I believe that comes

19  from -- the latter comes from the *Hurley* case, and so

20  that's clear in this record.  It's certainly clear in this

21  jurisdiction.

22          So looking at Count I, II, and III in

23  particular, relying on *Moody* as done in the briefings and

24  as done today, TikTok argues that the challenge design

25  features each involved the platform's method of displaying



1   content.  And these features are -- help TikTok exercise

2   its traditional publishing and editing discretion to

3   select and shape other parties' expression into its own

4   curated speech products.  Now, while *Moody v. Net*

5   *Choice* -- while the Court agrees that it is in fact quite

6   informative, it doesn't warrant dismissal here of Counts

7   I, II, or III.

8           As the Court mentioned, during its colloquy with

9   Counsel, *Moody* specifically considered state action which

10  sought to regulate the content which online platforms

11  removed or deprioritize.  These regulations were squarely

12  on the basis in *Moody* of the content published, and

13  implicated the online platform's First Amendment rights

14  because the platform has the right to select, based upon

15  its own preferences, the content which it publishes.

16          And so what's important here is that in *Moody*,

17  the Supreme Court stated, and without resorting to

18  recollection, "We therefore do not deal here with the

19  feeds whose algorithms respond solely to help users act

20  online, giving them the content they appear to want

21  without any regard to independent content standards."  And

22  that's at 2401; that's in note 5, I believe.  And so the

23  Court -- as the Court mentioned, during its colloquy,

24  clearly stopped short of determining whether an algorithm

25  based on the user's preferences warrants similar First

escribers
www.escribers.net | 800-257-0885

1    Amendment preferences.  Now here, the District claims are

2    content-neutral.

3         The recommendation engine -- while the Supreme

4    Court has only found an algorithm to be -- and this is

5    what we're talking about when we're speaking of the

6    recommendation engine, the algorithm.  So the Supreme

7    Court has only found an algorithm to be worthy of First

8    Amendment protection where it's creating some kind of a

9    message on its operator's behalf.

10        And although TikTok's message, as counsel stated

11   during argument, need not be clear or cognizable, even

12   articulate, it must in fact be its own message.  Here, it

13   is that of the users, based upon the allegations in the

14   complaint.  In terms of infinite scroll, TikTok is not on

15   this record at this juncture, expressing any message by

16   allowing its users to continue to scroll from one video to

17   the next without having to search or select a video.

18        The push notifications.  Well, the District's

19   allegations are not simply about the use of the

20   notifications all together, as the Court understands them,

21   but about the use of the notifications and the way that is

22   going to be harmful to children, i.e. sending

23   notifications during the school day, at all hours of the

24   night, and inhibiting their sleep and focus in school.

25        Such allegations are not about the content of



1  the advertisement or even a type of advertisement being

2  pushed by these notifications, but the manner in which

3  these notifications or these advertisements are

4  transmitted.  And so TikTok on this record, at this

5  juncture, simply cannot be said to be expressing a message

6  by sending these notifications to children during these

7  hours.  And the fact that the app could transmit these

8  same notifications at other hours is indicative of the

9  fact that speech here is simply not at issue.

10            Filters.  Well, TikTok, on this record at this

11  juncture has not shown that it's expressing any message by

12  providing filters for its users to use.  The coins, well,

13  as the Court understands it, based upon the District's

14  pleading, it provides the opportunity for users to engage

15  in financial transactions.  This is not speech.  Even if

16  it were, the Court would apply the intermediate scrutiny

17  standard.  And of course, that standard must be applied

18  when a statute implicates expression, but it's content

19  neutral.  And that comes from a whole host of Supreme

20  Court cases.  The *Turnner Broad Systems* (phonetic) case,

21  the *Creative LLC* case, *United States v. O'Brien, Runsfield*

22  *v. Form*, et cetera.

23            And so here, the Court finds that the CPA is

24  content-neutral.  It's a content-neutral statute focused

25  on the protection of consumers.  Here, the focus is that



1    of children consumers. And the District's interests in

2    prosecuting the claims, its claims is to protect these

3    children, these users, from the significant harms of these

4    addictive features, and the District's interests has

5    nothing to do with the content based upon this record.

6            Count II. Well, although liking, briefly --

7    this wasn't argued but this was certainly discussed --

8    which could be likened to paying based upon approval or

9    appreciation, has been understood to be an expressive

10   activity. That comes from the *Bland* case, *Bland v.*

11   *Roberts*. It was deep and expressive activity of the

12   person liking the post, not the entity which provided the

13   platform. It was the conduit on which the individual

14   liked the post.

15           Count III. Contrary to TikTok's argument, the

16   District, based upon the pleadings which the Court must

17   accept as true, is not seeking an order requiring TikTok

18   to regulate the content on its app in a manner more

19   consistent with the stated policies. Any such allegations

20   of the complaint are simply indicators of the fact that

21   TikTok knew that the content at issue did not comport the

22   policies it itself publicly expressed.

23           And so rather, as the Court understands it and

24   as supported by the allegations of the complaint, the

25   District contends that the public statements made in



1  omissions were meant to mislead users in violating -- in

2  violation rather, of the CPPA.

3      Now, *Meta Platforms v. D.C.* and this was cited

4  by the District.  And this is 301, Atlantic 740.  It's a

5  2023 case.  This was cited by the District, I believe, in

6  opposition regarding the compelled speech question.  It's

7  in the record in some place.  But the District says that

8  it's investigating only whether -- in that case, whether

9  Meta's representations regarding efforts to prevent and

10 remove vaccine information from the Facebook platform,

11 violates the consumer protection statute, the CPPA.  And

12 there was no suggestion -- this is from the *Meta* case,

13 that the District is investigating whether Meta's

14 moderation policies or efforts to police them were

15 unlawful or insufficient in themselves, except to the

16 extent that they belie Meta's representations.  The Court

17 finds this to be persuasive and akin to and similar to the

18 issues that the Court is faced with in this case.

19      Now, there was some mention about whether or not

20 it is considered compelled speech to give warnings.  This

21 was briefed in the pleadings.  While this case is

22 different, from this Court's perspective, from the cases

23 that TikTok cites, one of one of them is the *Olivia v.*

24 *National Board* case, I believe, and that is because the

25 District is not seeking warnings to prevent copycat



1   behaviors, not seeking tort liability for copycat behavior

2   on a failure to warn theory, or even, as the Court

3   understands the allegations, to hold TikTok accountable

4   for the content which it publishes or pushes.  But the

5   District is alleging that the user, the parents are simply

6   unaware of the potential risk of the platform and further

7   misled by TikTok's assertions that everything on the

8   platform is child safe.

9          In addition to these affirmative statements made

10  by TikTok, according to the District, the admissions are

11  misleading.  These include failing to inform children and

12  parents about the risk that children will encounter

13  extensive harmful material on the app, the risk that

14  children will encounter or be coerced into sexually

15  exploitative activities on TikTok, the risk that children

16  will be taken advantage of financially by live gifting,

17  TikTok's use of coercive features and design tactics that

18  limit user agency, particularly that of children.  This is

19  all found in paragraph 222 of the complaint.

20         So the affirmative statements make the omissions

21  misleading here is what the District is alleging.  The

22  plaintiff, the District cites to *Earth Island*, among many

23  other cases, to support this proposition, and that case

24  says that the First Amendment does not prohibit the state

25  from ensuring that the stream of commercial information

1    flow cleanly as well as freely.  And the speech that *Earth*
2    *Island* targets is Coca-Cola's commercial speech about its
3    goods and services.  It was alleged in that case that
4    Coca-Cola cultivated a sustainability narrative in an
5    effort to sell its particular products, and because *Earth*
6    *Island* plausibly alleges that commercial speech would
7    mislead reasonable consumers, the court found that Coca-
8    Cola's First Amendment claim was a nonstarter.

9         The Court finds the same is true here.  And
10   contrary to the issue cited by TikTok on these issues, one
11   of them was the Wisconsin case, the *Democratic Party of*
12   *the United States v. Wisconsin*.  It's a 1981 case.  The
13   District is not expressing approval or disapproval over a
14   particular expression that it deems unwise or irrational,
15   which is the subject of that *Wisconsin* case.

16        Additionally, TikTok cites to the *Thomas v.*
17   *Review Board of Indiana*.  This is in the Employment
18   Service Division.  I believe this was a 1981 case, as
19   well, from our Supreme Court.  And TikTok cites to this
20   for the proposition that, like religious expression,
21   expressive activity need not be acceptable, logical,
22   consistent, or comprehensive to others in order to merit
23   First Amendment protections.  But this case dealt
24   exclusively with religious expression, stating that the
25   state cannot deny the free exercise of rights based on

escribers
www.escribers.net | 800-257-0885

1    which beliefs it deems sensible.

2          From the case law that TikTok cites, it is clear

3    that a speaker need not have a clear message in order to

4    warrant First Amendment protection, but that they must

5    have a message based upon their own interest and their

6    viewpoint nonetheless.  The record does not demonstrate at

7    this juncture that TikTok, in fact, has a viewpoint or a

8    message here.  Even in TikTok's example of a book

9    publisher making decisions based upon readership, such

10   function is still rooted, it's undergirded, supported by a

11   decision to publish or not to publish, indicating some

12   sort of opinion as to the relevance of the book in the

13   current climate.

14         TikTok's features, specifically the algorithm,

15   publishes everything and sorts it depending on the

16   preference of the reader and creates this curated load or

17   this package for the particular reader.  Such actions do

18   not express any kind of view of the content on behalf of

19   TikTok.

20         Therefore, the Court finds that the First

21   Amendment affords no protection from liability for TikTok

22   at this stage.

23         So this brings us to the claims under the CPPA

24   and whether or not the District has stated a claim under

25   the CPPA.  The CPPA establishes an enforceable right to


www.escribers.net | 800-257-0885

1   what has been deemed truthful information from merchants

2   about consumer goods or services that would be purchased,

3   leased, or received in the District.  And this

4   jurisdiction and many others have found or opined that the

5   CPPA is to be construed liberally and applied liberally to

6   promote its purpose.  And so even despite the intended

7   breadth of the end reach of the CPPA, it certainly is not

8   limited.  And by its own express terms, and as relevant

9   here, the CPPA applies to trade practices only to the

10  extent that they relate to the sale, the transfer, or the

11  lease of consumer goods and services.

12          In the *DC v. Meta* case, the 2024 case, the Court

13  found that users were exchange -- Judge Kravitz found that

14  users were exchanging their time and their data for use of

15  the platform, and that such exchange was a transfer under

16  the CPPA.  At this pleading stage, the Court agrees.

17  Judge Kravitz, in his opinion, opined that the CPPA

18  defined the -- well, it's not his opinion.  He looked at

19  the definition of the CPPA and pointed out that consumer

20  is defined as a person who, other than for purposes of

21  resale, does or would purchase, lease, or receive consumer

22  goods or services, and that this inclusion of the term

23  receive in addition to purchase, according to Judge

24  Kravitz, and lease, and the definition of consumer,

25  strongly suggests the intent of our legislator to cover



1    circumstances in which a person receives goods or services

2    free of charge in return for something of value other than

3    a direct monetary payment.

4           The Court agrees at this juncture, but finds

5    that whether or not the app is indeed free has not been

6    conclusively established, but it does not have to be at

7    the pleading stage, as the Court must accept the

8    allegations in the complaint as true.

9           Well, what about the unfair practices under the

10    CPPA?  The CPPA does not expressly require a showing of

11    substantial injury and understanding or construing the

12    term unfair or deceptive trade practice.  And due

13    consideration must be given to interpretations by our

14    Federal Trade Commission and the federal courts of the

15    term unfair act or deceptive practice in the FTC.  And so

16    the FTC, in turn, provides that it, the FTC, may not

17    declare unlawful any act or practice on the grounds that

18    such act or practice is unfair, unless the act or practice

19    causes or is likely to cause substantial injury to

20    consumers, which is not reasonably avoidable, which is

21    important here, by consumers themselves and not outweighed

22    by countervailing benefits to consumers or competition.

23           The FTC has determined that ordinarily emotional

24    impact and other more subjective types of harms as how

25    it's been characterized would not make a practice unfair.

1    And that can be seen in the *FTC* case coming from our

2    circuit in 1985. *Financial Services Association v. FTC*.

3    Monetary harm, however, is not always a necessary

4    component of substantial injury. The FTC determined in In

5    re *International Harvester Company*, it's a 1984 case, that

6    farm equipment caused substantial injury where the

7    design -- in that case, a design flaw led to severe burns

8    and resulting in mobility limitations. I believe there

9    was lasting psychological harm and severe disfigurement.

10            Well, the FTC in that case held the health risk

11   caused by the equipment, rather than any monetary injury,

12   supported a finding of substantial injury, explaining that

13   unwarranted health and safety risks may also support a

14   finding of unfairness. In order for there to be an unfair

15   practice, the case law is very clear that the practice

16   must cause or is likely to cause injury, substantial

17   injury to consumers, which is not reasonably avoidable and

18   not outweighed by other benefits.

19            And so coming to the issue of free and informed

20   choice, a topic that was discussed today during oral

21   argument, as the Court mentioned, the Court is not

22   entirely conclusive on whether or not the monetization of

23   TikTok LIVE means that the app is not free. The complaint

24   certainly alleges that TikTok is not free and thus

25   involved consumer sales under the CPPA. And that's



1    because, according to the District, TikTok earns money.

2    And I don't think this is disputed by TikTok, that it

3    earns monetary commissions from in-app purchases and from

4    the transmission of money between live users through their

5    virtual coins and gifts.

6          The District alleges that young consumers did

7    not have a free and informed choice to use TikTok, as they

8    were misled into thinking that the platform was safe and

9    that once users joined the app, TikTok's addictive

10   features, which we've discussed at length, exploit their

11   neurological vulnerabilities to keep them engaged, to keep

12   them in this loop, and consumers cannot reasonably avoid

13   these unfair practices, just as TikTok intended.

14         Also, the fact that these issues have been

15   reported on other -- and have been reported on and that

16   other social media sites which are similar allegedly have

17   similar deficiencies is simply insufficient here to

18   overcome the 12(b)(6) standard.

19         Well, what about the deceptive practices?  As it

20   relates to misrepresentations, again, under the CPPA, the

21   District's complaint alleges that there are

22   misrepresentations of provably false statements, like

23   TikTok is safe from children.  Well, this is a distinction

24   here when discussing or considering puffery, which has

25   been unfavored in this jurisdiction and others.  While

1    some of TikTok's language, as TikTok argued in its

2    briefing, could indicate an aspiration for safety,

3    Plaintiff alleges that even this aspiration was false,

4    because TikTok knew that these harmful effects were

5    occurring and chose to do nothing at least sufficient.

6    The Court finds this allegation sufficient to survive this

7    12(b)(6) motion.

8            And so there's other sufficient allegations here

9    that create a plausible claim which must be present in the

10   record.  I'll name a few.  So contrary to TikTok community

11   guidelines, which claim that TikTok is deeply committed to

12   being a safe and positive experience for minors, TikTok

13   internally admitted that its features are causing severe

14   psychological harm.  This is in the complaint, paragraphs

15   88 and 116.  This is, again, the District's allegation

16   that contrary to TikTok's claims from its CEO, TikTok has

17   clear community guidelines and that executives do not make

18   any ad hoc decisions to deal with bad actors.  TikTok

19   acknowledged leaks in their moderation tools due to

20   existing policy gaps and under-moderation, which exposes

21   users' children to harm and discomfort.  This is found in

22   paragraphs 118 and 211.  Or excuse me, 121 of the

23   complaint.

24            Zero tolerance policy.  There was discussion

25   about that in the briefings.  TikTok publicly promotes



1   that the company knows moderation quality is low across

2   several, or excuse me, contrary to the zero tolerance

3   policy TikTok publicly promotes.  TikTok knows moderation

4   quality is low across several policy categories, including

5   sexual abuse, minors, sexual solicitation, so on and so

6   forth.  And this is found at the complaint, paragraphs 123

7   to 124, 129, and 136.

8           And so the Court finds that the claims at this

9   juncture, and accepting all of the allegations in the

10  complaint are true, do provide or do have facial

11  plausibility such that 12(b)(6) shall not defeat the

12  plaintiff's claims at this time.

13          Let me mention quickly the 9(b) standard.  There

14  was an argument that the 9(b) standard is applicable for

15  frauds.  And of course 9(b) anticipates a higher pleading

16  standard.  One has to plead with particularity when making

17  allegations of fraud.  The District, or excuse me, TikTok,

18  contends that that standard is applicable here.  Well, the

19  Court agrees with Judge Kravitz in his opinion, looking at

20  the *Frank Kinney v. District Hospital Partners* (phonetic)

21  case.  It's a binding Court of Appeals case from our

22  jurisdiction, a 2020 case, that this case indicates that

23  the CPPA was created to avoid these pleading requirements

24  and traditional fraud causes of action to make it easier

25  for litigants who believe they have been harmed by

1   particular practices to sue under the CPPA, including the

2   intent to deceive, and that the Rule 9(b)'s purpose is to

3   put the defendant on proper notice of the allegedly

4   fraudulent statements.

5       Let me talk quickly about the *Grindr* case.  We

6   had some discussion about *Grindr*.  The Court took another

7   look at it during the short recess.  TikTok, as I

8   understand it, uses *Grindr* in relation to two main points.

9   One is that the Court held that targeting speech between

10  users on the app violates the immunity provision of the

11  CDA, Section 230.  And two, that statements must be

12  targeted to specific issues of safety to shed CDA 230

13  liability on the misrepresentation theory.

14      Well, regarding the first issue, as the Court

15  understands it, *Grindr* considered a more removed harmful

16  activity, namely speech between users that could lead to

17  illegal activity.  In *Grindr* there was speech between

18  users, which led, unfortunately, to a rape in the real

19  world outside of the application.  Here, in alleging a

20  harm and illegal financial transactions themselves, such

21  as paying for sexual acts of minors or in perpetuating a

22  fraud, there is a clear difference.  The Court agrees with

23  the argument made by the District's attorney.

24      So while TikTok alleges that sending financial

25  gifts is akin to likes, that may be the case if the



1    transactions themselves were not illegal as alleged by the

2    District.  Moreover, relating to the misrepresentation

3    theory in *Grindr,* the affirmative statements focused on in

4    *Grindr*, the Court asked counsel whether or not there were

5    affirmative statements in *Grindr*.  Counsel said, oh, yes,

6    there are.  Well, the affirmative statements in *Grindr*

7    that were focused on was that the app was designed to

8    create a safe and secure environment for its users.  It's

9    not a -- it's not a specific promise, as TikTok noted, but

10   a description of its moderation policies.

11           Here, the statements alleged by the District are

12   much more specific promises.  The Court went over some of

13   the statements enumerated by the District in its complaint

14   earlier, but as it relates to why the Court believes the

15   statements here are much more specific, the Court took a

16   look at some of those statements.

17           So for example, the District argues that TikTok

18   worked to address -- TikTok has stated that it worked to

19   address issues with its recommendation engine, including

20   filter bubbles, as early as 2020.  TikTok's policies are

21   strict and apply to everyone and everything.  TikTok

22   prohibits content about bullying, drugs, mature themes,

23   disordered eating and weight loss, suicide and self-harm,

24   and content that exploits children.  TikTok identifies and

25   proactively removes content that violates these policies.

1      These statements are much more specific than

2  those that the Court contemplated in *Grindr*.  And even a

3  statement that TikTok LIVE or any part of TikTok is safe

4  is more specific than the aspirational claim and *Grindr*

5  describing, as the Court understands, what *Grindr* strives

6  to do or what the policy is designed to do.  The sorts of

7  statements the District is considering are specific

8  representations as to what TikTok is actually doing today.

9      And so based on the foregoing, the CPPA claims

10  survive.

11      Now lastly, moving to Counts IV and V, which are

12  the claims under the MTA, the Court agrees with the

13  District that the MTA creates and what the District has

14  described as an overlapping enforcement regimen whereby

15  DISB may institute an administrative cease and desist

16  proceeding pursuant to D.C. Code 26-1022(a), and that

17  under the MTA, the civil enforcement provisions, the

18  Office of the Attorney General has the power to bring

19  proceedings to recover all amounts due to the District

20  under the civil penalty provision.

21      Nothing in the statute, and counsel was candid

22  when the Court inquired on this issue, nothing in the

23  statute requires the civil enforcement to stay the

24  proceeding, or requires this Court to stay the proceedings

25  while DISB makes a determination.



1      And there was talk about the *Harmon* case and how

2   perhaps this was a bit different.  The Court disagrees.

3   In *Harmon*, the USAO indicted a defendant under a section

4   of the MTA.  I think it was 26-102(c) of the MTA for

5   engaging in unlicensed money transmission acts by trading

6   virtual currency in the District, even though at the time

7   of the indictment DISB had never determined that the

8   defendant needed a license, and so the defendant and

9   *Harmon* sought reconsideration based upon DISB's view of

10   the MTA's application of the situation.  But the Court

11   concluded that the letter was only an informal opinion

12   about the status of a single company and did not purport

13   to express broader principles about the application of the

14   MTA contained flawed and abbreviated research and

15   reasoning, and at the end of the day, it refused to

16   dismiss the indictment, relying upon its own construction

17   of the MTA licensing requirements.

18      There is no dispute in this record that TikTok

19   does not have a license under the MTA.  This undergirds

20   both counts.  For this reason alone, the claims have

21   facial plausibility here.  Even so the defendants have not

22   presided or have not presented, excuse me, viable

23   arguments as to the merits, only that the Court should

24   hold off until the administrative process concludes.  But

25   the Court is simply not convinced that it should,



1  especially considering that DISB's inquiry, at whatever

2  stage it finds itself, does not preclude this Court's

3  judicial review.

4         There was some conversation today by counsel for

5  TikTok about primary jurisdiction, and the primary

6  jurisdiction doctrine applies whenever enforcement of a

7  claim requires the resolution of the issues under which,

8  under a particular regulatory scheme, have been placed

9  within the special competence of an administrative body.

10  This comes from the *Lawlor* (phonetic) case and its

11  progeny.  And the doctrine is really grounded in the

12  teaching that cases that raise an issue of fact, not

13  within the conventional wisdom of the finder of fact or

14  judges, should be left to the discretion of administrative

15  agencies, and that the administrative agency should not be

16  passed over, akin to the arguments made by counsel during

17  oral argument.

18         Well, number one, the Court can make a

19  determination as to whether or not the MTA has been

20  violated.  It's not without the conventional experience or

21  wisdom of the Court, because either one has a license or

22  they don't.  And here, there is no license in the record,

23  or there's no indication that TikTok has a license, and

24  TikTok has not produced any evidence that DISB engaged in

25  any formal administrative action against it that could



1  even ripen, rather, attach an informal inquiry from DISB.

2  The Court does acknowledge that the November

3  6th, 2024 letter does indicate that TikTok may be or that

4  the Department has concerns related to TikTok engaging in

5  certain money transaction activities and intends to

6  conduct a comprehensive review of the various activities

7  and asks for a meeting and additional documentation.

8  The record has not established that there has

9  been any further movement, whether there has been an

10  informal or even a formal undertaking beyond what we see

11  here in this record.

12  And so given the record at this stage, there's

13  simply no basis to stay consideration of these counts and

14  certainly not to dismiss them, given the lack of argument

15  as to the merits.

16  The Court will say that if DISB, in fact,

17  undertakes an administrative proceeding, TikTok can raise

18  this issue again.  I'm going to deny the request.  Of

19  course, it's not without prejudice.

20  And so based upon the rulings of the Court, the

21  Court finds that all claims have facial plausibility and

22  TikTok's motion will be denied.

23  And so moving to the second motion, and that is

24  the 1122 opposed motion for protective order, one of the

25  reasons for the request was that TikTok did not want to be

<u>CERTIFICATE OF TRANSCRIBER</u>

I, DeAnne Ridge, transcriber, do hereby certify that I have transcribed the proceedings had and the testimony adduced in the case of DISTRICT OF COLUMBIA v. TIKTOK, INC., Docket Number: 2024 CAB 006377, in said Court, on the 24th day of February, 2025.

I further certify that the foregoing 184 pages constitute the official transcript of said proceedings as transcribed from audio recording to the best of my ability.

In witness whereof, I have hereto subscribed my name, this 26th day of February, 2025.

_____

TRANSCRIBER



# EXHIBIT 5

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

COUNTY DEPARTMENT, CHANCERY DIVISION

THE PEOPLE OF THE STATE OF ILLINOIS,

                Plaintiff,

    v.

TIKTOK INC., TIKTOK U.S. DATA
SECURITY INC., TIKTOK LLC, TIKTOK PTE.
LTD., TIKTOK LTD., BYTEDANCE INC., and
BYTEDANCE LTD.,

                Defendants.

Case No. 2024CH09302

Judge Michael T. Mullen

**MEMORANDUM OPINION AND ORDER**

This is an action brought by the Illinois Attorney General under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*, ("ICFA") (Count I) and the Uniform Deceptive Trade Practices Act, 815 ILCS 510/1, *et seq.*, ("UDTPA") (Count 2) against the owners and operators of the popular social media application TikTok. More specifically, this action is brought against defendants TikTok Inc., TikTok U.S. Data Security Inc., TikTok LLC, TikTok Pte. Ltd., TikTok Ltd., ByteDance Inc., and ByteDance Ltd. (the "Defendants"). This matter comes before the Court on the Defendants' combined section 2-619.1 motion to dismiss (the "Motion") the Complaint filed by Plaintiff the People of the State of Illinois (the "State"). The Court has reviewed the briefs and supplemental authorities submitted by the parties and heard the parties' oral arguments. For the reasons discussed below, the Defendants' motion is denied.

**I.    Background**

In 2017, ByteDance released TikTok as a video-hosting application. Complaint ("Compl.") ¶ 51. Today, TikTok is among the most widely used social media applications in the world. *See id.* ¶¶ 64-66. The "TikTok Platform" is an online entertainment platform that allows users to create,

share, and comment on videos. *Id.* ¶¶ 50-54. The central feature of TikTok is its "For You" feed. *Id.* ¶ 96. Each individual user has a different "For You" feed that serves the user with an endless stream of videos provided by TikTok's "Recommendation System." *Id.* The Recommendation System is comprised of a complex set of algorithms that work together to predict how to maximize user engagement. *Id.* ¶ 100. The Recommendation System's predictions are based on behavioral patterns and data trends gleaned from users' interactions with the videos. *Id.* ¶¶ 104-05. The Recommendation System does not detect a video's content or identify why a user might decide to watch (or skip) a video. *Id.* ¶¶ 98-99. Therefore, the Recommendation System does not, because it cannot, determine what users subjectively want to see. *Id.* ¶ 96. As the Recommendation System does not know or understand the contents of the videos it serves, the State's allegations describe this system as "content-agnostic." *Id.* ¶ 101.

The State alleges that TikTok is designed to create compulsive and excessive use by young users, *i.e.*, children (individuals under the age of 13) and teenagers (individuals aged 13 to 17). *Id.* ¶¶ 1-3. The State further alleges that the Defendants have *targeted* children and teenagers with coercive-by-design features to keep young users on the TikTok Platform as long as possible in order to sell advertisements and catalog their data. *Id.* ¶¶ 1, 3, 67-79, 82, 122, 144, 154. The State alleges that the Defendants are aware that the TikTok Platform is particularly compelling but harmful to young users as it is designed to override their autonomy and increase time spent on the TikTok Platform. *See id.* ¶¶ 1, 80-95. The State additionally alleges that TikTok Platform features also drive compulsive and excessive use by young users, which the Defendants know is detrimental to young users' mental health. *Id.* ¶¶ 5, 118-56, 195, 199, 208, 213-14, 361. These features include filters that interact with videos, push notifications, and the "For You" feed's endless stream of

videos. *Id.* The State alleges that the Defendants' development and deployment of these technologies amount to unfair business practices under the ICFA. *Id.* ¶ 362.

The State further alleges that the Defendants have misled the public about its Platform. The State alleges that the Defendants have made false statements about TikTok's features, as well as the company's overall goals as to how the TikTok Platform is used. *Id.* ¶¶ 230-358. TikTok's officials – including their CEO – allegedly made deceptive public statements in Congressional testimony, as well as at TED Talks (filmed at TED conferences and released online), in full-page newspaper advertisements, and in official statements on their company website. *Id.* The State alleges that these false and misleading statements violate both the ICFA and the UDTPA, 815 ILCS 510/2, which is incorporated into the ICFA. *Id.* ¶¶ 361, 369; 815 ILCS 505/2.

More specifically, the State alleges that the TikTok platform is "unfair" because certain features cause user-generated content on the TikTok Platform to become "addict[ive]," leading younger users to engage with excessive content. Compl. ¶¶ 362-65. The State alleges a number of features are unfair:

- **Recommendation system.** The State challenges the TikTok Platform's use of algorithms to review and select videos for each user, presenting each with a personalized stream of videos. *Id.* ¶¶ 96-117;

- **Effects.** The State challenges "[e]ffects" that allow user-creators to edit how their videos appear. *Id.* ¶¶ 119-20;

- **Autoplay and "infinite scroll."** The State challenges the use of features that allegedly "automatically begin[] to play" videos in a user's feed when the user opens the application, *id.* ¶¶ 121-23, and that "load and serve new videos for the user to view as the user scrolls through their feed," *id.* ¶¶ 124-27;

3

- **TikTok Stories and LIVE.** The State challenges TikTok Stories, which allows users to post videos that remain visible on the TikTok Platform for 24 hours, *id.* ¶¶ 127-28, and TikTok LIVE, a feature that allows users to livestream videos, *id.* ¶¶ 127-31;

- **Push notifications.** The State challenges "push notifications," which "alert a user" to activity within the TikTok Platform. *Id.* ¶¶ 132-44; and

- **Likes, comments, and other interactions.** The State challenges features that allow users to interact with each other, by "lik[ing]" or commenting on videos. *Id.* ¶¶ 145-56.

The State further alleges that the Defendants have inadequately and inaccurately described the alleged risks and harms of using the TikTok Platform. *Id.* ¶¶ 361, 369. The State's deception claims allege misrepresentations concerning the following topics:

- **Safety of TikTok Platform design features.** The State alleges that the Defendants misrepresented and concealed that TikTok Platform features promote "compulsive, prolonged, and unhealthy use by young users." *Id.* ¶¶ 157-227, 361(A)-(C), (F), 362(A), 369(A)-(B), (D)-(E);

- **Efficacy of TikTok Platform "safety tools."** The State alleges that the Defendants misrepresented the efficacy of various TikTok Platform safety "features" and "processes for protecting young users." *Id.* ¶¶ 228-356, 361(D), (G), 369(C), (F). Specifically, the State challenges representations about the efficacy of TikTok Platform "screentime management tools," *id.* ¶¶ 231-65, and content management features, *id.* ¶¶ 266-88, and the Defendants' alleged inconsistent application and enforcement of TikTok Platform content-moderation policies, such as its "Community Guidelines," *id.* ¶¶ 289-356; and

- **TikTok Platform's safety priorities.** The State alleges that the Defendants misrepresented that it "prioritized young users' health and safety." *Id.* ¶¶ 357-58, 361(E).

4

In response to the State's Complaint, the Defendants moved to dismiss the State's Complaint in a combined motion pursuant to Code of Civil Procedure section 2-619.1, 735 ILCS 5/2-619.1, raising arguments under 735 ILCS 5/2-619 ("Section 2-619") and 735 ILCS 5/2-615 ("Section 2-615").[1] In essence, the Defendants argue that dismissal is warranted under Section 2-619, as the State's claims are precluded by both Section 230 of the Communications Decency Act, 47 U.S.C. § 230, and the First Amendment to the United States Constitution, U.S. Const. amend. I. The Defendants further argue that dismissal is required under Section 2-615 as the State has failed to plead properly the required elements of an ICFA claim. The motion has been fully briefed. Following the close of briefing, the Court allowed both parties to cite to supplemental authorities and then heard oral arguments from the parties' very able counsel.

## II.     Analysis

### A. Standard of Review

The Defendants' motion has been brought pursuant to Section 2-619.1 of the Code of Civil Procedure, which permits Section 2-615 and Section 2-619 motions to be brought in a single motion. *See* 735 ILCS 5/2-619.1 (2024). Although the Section 2-615 and 2-619 motions may be combined, they may not be commingled. A motion to dismiss filed under Section 2-615 of the Code challenges the legal sufficiency of the complaint based upon defects apparent on its face. 735 ILCS 5/2-615 (2024); *Khan v. Deutsche Bank AG*, 2012 IL 112219, ¶ 47. The critical inquiry is whether the allegations in the complaint are sufficient to state a cause of action for which relief may be granted. *Wakulich v. Mraz*, 203 Ill. 2d 223, 228 (2003). In making this determination, all well-pled facts in the complaint and all reasonable inferences that may be drawn from those facts,

---

[1] Although the Defendants do not specifically identify under which subpart of Section 2-619 this motion has been brought, the Court assumes that the Defendants' motion is brought under Section 2-619(a)(9), which provides that an asserted claim is barred by "other affirmative matter avoiding the legal effect of or defeating the claim." 735 ILCS 5/2-619(a)(9).

are taken as true and are to be construed in a light most favorable to the plaintiff. *Khan*, 2012 IL 112219, ¶ 47; *Young v. Bryco Arms*, 213 Ill. 2d 433, 441 (2004). A 2-615 motion does not admit conclusions of law or conclusory factual allegations unsupported by specific facts alleged in the complaint. *Zander v. Carlson*, 2020 IL 125691, ¶ 25. A cause of action should not be dismissed unless it is clearly apparent that no set of facts can be proved that would entitle a plaintiff to recover. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006). However, a court may not rely on extrinsic material when ruling on a Section 2-615 motion. *Bryson v. News Am. Publ'ns, Inc.*, 174 Ill. 2d 77, 91 (1996).

In contrast, a motion to dismiss under Section 2-619 admits the legal sufficiency of all well-pled facts but allows for the dismissal of claims barred by affirmative matter that defeats those claims or avoid their legal effect. *Janda v. U.S. Cellular Corp.*, 2011 IL App (1st) 103552, ¶ 83 (citing *DeLuna v. Burciaga*, 223 Ill. 2d 49, 59 (2006)). "Affirmative matter" encompasses any defense other than a denial of the essential allegations of the plaintiff's claim. *Khan*, 2012 IL 112219, ¶ 18. For this reason, a Section 2-619 motion admits as true all well-pled facts and all reasonable inferences drawn from those facts. *Morr-Fitz, Inc. v. Blagojevich*, 231 Ill. 2d 474, 488 (2008). Additionally, a cause of action should not be dismissed under Section 2-619 unless it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to relief. *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 277-78 (2003).

### B. The Defendants' 2-615 Motion

The Consumer Fraud Act is a regulatory and remedial statute designed to protect consumers against unfair and deceptive business practices. *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 416-17 (2002). "It is to be liberally construed to effectuate its purpose." *Id.* at 417. Section 7 of the ICFA authorizes the Attorney General to sue any person utilizing methods, acts, or

practices declared to be unlawful under it and to seek a multitude of remedies including injunctive relief, restitution, and civil penalties. 815 ILCS 505/7. To state a claim under the ICFA, "the Attorney General need allege only that: (1) a defendant is engaged in a trade or commerce; and (2) the defendant is engaged in unfair deceptive acts or practices in the conduct of that trade or commerce." *People ex rel. Hartigan v. All Am. Aluminum & Constr. Co.*, 171 Ill. App. 3d 27, 34 (1st Dist. 1988). The State, through the Attorney General, has sufficiently pled that the Defendants have engaged in both deceptive and unfair conduct.

### i. The Complaint sufficiently pleads deceptive acts.

#### A. The Consumer Fraud Act.

The State has sufficiently alleged that the Defendants violated the ICFA through deceptive statements regarding TikTok Platform features and the company's intent to keep users on the TikTok Platform for as long as possible. *See* Compl. ¶¶ 157-358. To state a claim for deceptive conduct under the ICFA, the State must allege that: (1) the Defendants committed a deceptive act or practice; (2) the Defendants intended for consumers to rely on that deceptive act or practice; and (3) the deception occurred in the course of trade or commerce. *People ex rel. Madigan v. United Constr. of Am.*, 2012 IL App (1st) 120308, ¶ 16.

The Defendants maintain that the State has failed to plead the first element, *i.e.*, that the Defendants committed a deceptive act or practice. An act or practice is deceptive under the Consumer Fraud Act if it has the tendency or capacity to deceive. *Harwood v. Piser Mem'l Chapels*, 102 Ill. App. 3d 514, 518 (1st Dist. 1981). In its Complaint, the State has identified numerous statements made by the Defendants' representatives that, if proven, would meet this standard. These allegations include:

7

- A full-page advertisement in the *Washington Examiner*, along with similar advertisements in newspapers like the *Washington Post*, stating that "Teen accounts automatically have a daily screen time limit of 60 minutes," though, the State alleges, this "limit" is easily circumvented by entering a passcode and, thus, is not really a limit at all. It is reasonable to infer that the purpose of this advertisement was to convince parents that their teens would be unable to spend more than one hour per day on TikTok, inducing them to allow their teens to use it. The words "automatically" and "limit" have well-understood, concrete meanings, and the phrase "[o]nly on TikTok" represents that this is a feature differentiating TikTok from other social media applications that have no purported limits. When paired with the State's allegations that this "limit" could be easily disabled for the remainder of any given day, the Complaint sufficiently alleges that this advertisement was deceptive. Compl. ¶¶ 241-44, 256-63.

- Congressional testimony by Michael Beckerman, TikTok's Vice President and Head of Public Policy, and statements by Shou Chew, TikTok's CEO, at a TED Talk touting "Take a Break" videos and "Family Pairing," which were purportedly created to be time-management tools. The State alleges, however, that TikTok acknowledged that these referenced tools are merely "useful talking points" and are "not altogether effective" at actually managing compulsive use or time spent on the TikTok Platform. *Id.* ¶¶ 162-67, 259-64.

- Congressional testimony by CEO Chew describing TikTok's approach to its product as a "safety-by-design mentality, even if those features limit [TikTok's] monetization opportunities," while the State alleges TikTok's internal records established that its business model was actually designed to optimize time spent on the TikTok Platform.

Indeed, the company's internal metrics for success regarding several "safety features" measured drops in time minors spent on the TikTok Platform and sought to *minimize* any drop in time spent by minors to no more than 5%. *Id.* ¶¶ 249-55.

- Official media statements representing that TikTok had not found any evidence of a dangerous "Blackout Challenge" on the application, although, the State alleges that months before these statements were made, TikTok's internal records described the "Blackout Challenge" as a "high risk trend." *Id.* ¶¶ 296-304.

Taking these well-pled allegations as being true, as is required when determining whether to grant or deny a 2-615 motion, the State has clearly set forth explicit statements regarding TikTok Platform's design and safety features that extend well beyond "mere puffery." These statements are not "subjective characterizations" as the Defendants argue when quoting *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 173-74 (2005). "Puffing in the usual sense signifies meaningless superlatives that no reasonable person would take seriously, and so it is not actionable as fraud." *Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill. 2d 45, 73 (2007).

In the State's Complaint, it is clearly and factually alleged that the statements:

i.      were public representations about specific features of the TikTok Platform;

ii.      described how the company designed its product and intended consumers to engage and react to its product; and

iii.      demonstrated whether the company was aware of dangerous content on the TikTok Platform.

The Complaint alleges that each of these statements were false and contradicted by TikTok's own documents. At this stage of the proceedings, it is reasonable to infer that the Defendants intended for consumers to rely on identified statements considering their public nature

9

and that some were contained within paid advertisements that clearly emphasized the alleged safety of the TikTok Platform. Further, the State's Complaint alleges that during testimony at a Congressional hearing (which had been convened to determine TikTok Platform safety) CEO Chew emphasized that TikTok's cited features ensured the safe and appropriate use of its product. A reasonable inference is that CEO Chew's testimony demonstrates both the importance of this information and that the Defendants intended for consumers to rely on the accuracy and truthfulness of the information conveyed.

Although the Defendants argue that the State is attempting to have this Court find that an otherwise lawful good or service itself constitutes an unfair act or practice, the well-pled allegations support the State's identified cause of action and is not novel as the Defendants argue. The State's Complaint sufficiently alleges claims for deceptive conduct in violation of the Consumer Fraud Act.

### B. The Uniform Deceptive Trade Practices Act.

In its Complaint, the State alleges that the Defendants violated Sections 2(a)(5), (7), and (12) of the UDTPA. Section 2(a)(5) makes it unlawful to represent that a good or service has characteristics, uses, or qualities that the good does not have. 815 ILCS 510/2(a)(5). The State alleges that TikTok represented that the TikTok Platform had certain features designed to limit the time young users spend on it when these features are actually ineffective. For example, the State alleges in its Complaint that Beckerman testified before Congress that TikTok has "a responsibility, along with parents, to make sure that [TikTok is] being used in a responsible way" and that Chew stated at a TED talk that the Defendants' "goal is not to optimize and maximize time spent." Compl. ¶¶ 159-60. The State alleges that these cited statements misrepresented the nature of the TikTok Platform, as the Defendants designed it to do just the opposite – "target users' time and attention"

10

and "exploit psychological vulnerabilities to keep young users compulsively using the TikTok Platform." *Id.* ¶ 161.

Section 2(a)(7) makes it unlawful to represent that goods or services are of a particular standard or quality when they are really of another. 815 ILCS 510/2(a)(7). Chew's cited testimony before Congress that TikTok "launch(ed)…products with a safety-by-design mentality, even if those features limit our monetization opportunities," is contradicted by TikTok's cited internal metrics for success that reasonably establish that the opposite is true. Compl. ¶¶ 249-55. For example, the State alleges that TikTok's guidelines are to stay within "guardrails" for new safety features to only allow a maximum of a 5 % drop in stay time for young users. *Id.* ¶¶ 252-53.

Section 2(a)(12) makes it unlawful to engage in conduct that creates a likelihood of confusion or misunderstanding. 815 ILCS 510/2(a)(12). The State's Complaint contains allegations as to how the Defendants have misled consumers regarding the 60-minute "limit" for teen accounts that are easily circumvented and which, in fact, do not create any real limit at all. The State's Complaint sufficiently alleges claims for conduct in violation of the UDTPA, which is a violation of Section 2 of the ICFA.

### ii. *The Complaint sufficiently pleads unfair business practices.*

Illinois courts consider three factors to determine if conduct constitutes an unfair business practice in violation of the ICFA. "These factors are: (1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers." *Robinson*, 201 Ill. 2d at 417-18 (citing *Federal Trade Comm'n v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972)) (the "*Sperry* factors"). "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the

degree it meets one of the criteria or because to a lesser extent it meets all three." *Id.* at 418 (quoting *Cheshire Mortgage Serv's, Inc. v. Montes*, 612 A.2d 1130, 1143 (Conn. 1992)).

The State identifies several technologies developed and deployed by the Defendants to teens that it claims constitute unfair business practices. These technologies, all of which were pushed to and used by teens, include: (1) an algorithm that recommends an endless stream of new and diversified videos on users' "For You" feeds meant to create a "slot machine" type of effect of producing dopamine reactions in young users' brains; (2) "effects" that are overlayed on top of videos to alter users' appearances; (3) autoplay of videos; (4) live and ephemeral videos; (5) push notifications; and (6) interactive features such as "likes" and comments. Compl. ¶¶ 96-156. The State claims that these features drive young users to compulsive and excessive use of the TikTok Platform and that TikTok is aware that they are detrimental to teens' mental health. *Id.*

Construing the Complaint in the light most favorable to the State, the Court finds that these allegations satisfy all three *Sperry* factors at least to some extent. *First*, a practice satisfies the "immoral, unethical, oppressive, or unscrupulous" *Sperry* factor if it is so oppressive that it leaves consumers with little alternative but to submit to it. *Robinson*, 201 Ill. 2d at 418. The State argues that this *Sperry* factor is satisfied through its allegations that the TikTok Platform is designed to keep young users on it by taking advantage of their dopamine reward systems and creating social consequences for those who do not use the TikTok Platform excessively. Compl. ¶¶ 80–156. While the Defendants argue that consumers always have a choice as to whether to use a service that is on the market, it is reasonable to infer, given the facts as alleged in the Complaint, that this choice is illusory for teens because of social pressure and the immaturity of their developing brains. The State alleges that the Defendants specifically target children, who have unique psychological vulnerabilities, with algorithmic models and features meant to keep them on the TikTok Platform

12

as long as possible. *Id.* ¶¶ 3, 67–156. Further, the State alleges that studies have shown that 63 % of Americans aged 13-17 reported using TikTok, with most teens reporting using it daily. *Id.* ¶¶ 66, 210.

The cases cited by the Defendants to rebut this factor, *Phillips v. Double Down Interactive LLC*, 173 F. Supp. 3d 731 (N.D. Ill . 2016), and *Ristic v. Machine Zone, Inc.*, No. 15 CV 8996, 2016 U.S. Dist. LEXIS 127056 (N.D. Ill. Sept. 19, 2016), are distinguishable. Both cases dealt with the general addiction of adults, not claims based on the deliberate targeting of minors' brain chemistry and their uniquely sensitive "fear of missing out" of what their peers are doing. Indeed, the one court to apply Illinois law to a claim similar to this one found both *Phillips* and *Ristic* inapplicable. *See California v. Meta Platforms, Inc. (In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.)* (the "*Social Media MDL*"), 753 F. Supp. 3d 849, 895-97 (N.D. Cal. Oct. 15, 2024).

*Second*, a practice may satisfy the "substantial injury" *Sperry* factor by doing a small harm to a large number of people or raising a significant risk of concrete harm. *Id.* at 895-96. The State satisfies this criterion through numerous allegations showing that the Defendants have knowledge that the coercive nature of the TikTok Platform is harmful to young users but refuse to change the TikTok Platform to prevent such harm. Compl. at ¶¶ 169–229. The Defendants again argue that *Phillips* and *Ristic* show that this criterion is not satisfied because the courts in those cases found that the adult plaintiffs could have reasonably avoided the costs of buying more virtual coins from those gambling sites. Def. Motion at 15; *Phillips,* 173 F. Supp. 3d at 743; *Ristic,* 2016 U.S. Dist. LEXIS 127056 at *12. But the State's Complaint alleges that the Defendants target the psychological vulnerabilities of young users by designing the TikTok Platform's features to override their ability to engage with it in a non-compulsive manner. Compl. at ¶¶ 134, 138, 161,

13

223(d), 362(C), 363. The State also alleges that significant percentages of users are on TikTok "several times a day" or "almost constantly." *See id.* ¶¶ 66, 210. Consequently, the known harms of the TikTok Platform cannot reasonably be avoided by young users, at least based on the well-pled facts contained in the Complaint. Unsurprisingly, similar arguments that TikTok has made in other jurisdictions have been rejected. *See, e.g., Social Media MDL*, 753 F. Supp. 3d at 898-99; *Commonwealth v. Meta Platforms, Inc.*, No. 23-2397-BLS1, 2024 Mass. Super. LEXIS 161 (Sup. Ct. Mass. Oct. 17, 2024); *Dist. of Columbia v. Meta Platforms, Inc.*, No. 2023-CAB-6650, 2024 D.C. Super. LEXIS 27 at *50–51 (Sup. Ct. D.C. Sept. 9, 2024).

*Finally*, to satisfy the "public policy" *Sperry* factor, a practice needs to at least fall within the penumbra of a common-law or statutory concept of unfairness. *See Doctors Direct Ins., Inc. v. Bochenek*, 2015 IL App (1st) 142919, ¶ 34. The State argues that creating an application meant to addict minors falls within the penumbra of various Illinois laws to shield minors from products and services that tend to be used addictively, such as drugs, alcohol, and gambling: 1) the Juvenile Court Act of 1987, art. IV, 705 ILCS 405/4-1; 2) the Juvenile Drug Court Treatment Act, 705 ILCS 410; and 3) the Illinois Gambling Act, 230 ILCS 10, *et seq*. The Court agrees that the State's claim falls within this penumbra sufficiently to satisfy the public policy *Sperry* factor.

The well-pled allegations contained within the State's complaint satisfy each *Sperry* factor. Therefore, the Complaint states a sufficient claim for unfair conduct in violation of the ICFA. The motion to dismiss pursuant to Section 2-615 must be denied.

### C. The Defendants' 2-619 Motion

The Defendants' threshold argument contained in its 2-619 motion, is that even if the State's allegations set forth viable claims under ICFA or UDTPA, those claims are barred by Section 230 of the Communications Decency Act and the First Amendment. The Defendants

14

recognize that the State has made allegations relative to TikTok Platform's "own conduct," but argue that the cited conduct is actually conduct that constitutes the acts of deciding which third-party videos to display to each user and how to display them. The Defendants maintain that as such, the acts are expressive publishing activity protected by both Section 230 and the First Amendment.

i. *Section 230 of the Communications Decency Act does not bar the State's claims.*

Section 230 generally protects online platforms from being held liable as the "publisher or speaker" of third-party content. 47 U.S.C. § 230(c)(1). Section 230 makes clear that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider[,]" and it preempts any state law inconsistent with that provision. 47 U.S.C. §§ 230(c), (e)(3). These provisions immunize online platforms from both suit and liability for any alleged harms arising out of "reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009); *Winter v. Facebook, Inc.*, 2021 U.S. Dist. LEXIS 224836, at *8 (E.D. Mo. Nov. 22, 2021) (collecting cases).

Section 230's protections are broad and extend to "causes of action of all kinds[,]" *Marshall's Locksmith Serv. Inc. v. Google, LLC*, 925 F.3d 1263, 1267 (D.C. Cir. 2019), ranging from claims arising from a provider's "exercise of its editorial and self-regulatory functions," *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997), to claims arising from providing users with "a forum with[in] which to communicate" and "failure to delete content," *Force v. Facebook, Inc.*, 934 F.3d 53, 65 (2d Cir. 2019). To avoid chilling the expressive activity that online platforms facilitate, courts "agree" that "close cases . . . must be resolved in favor of" protecting online platforms. *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,

15

521 F.3d 1157, 1174 (9th Cir. 2008) (en banc). As the Defendants correctly argue, courts should apply Section 230 at the pleading stage, as the statute protects online platforms "from ultimate liability," and also "from having to fight costly and protracted legal battles." *Id.* at 1175; *see, e.g., Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 738 (9th Cir. 2024).

Section 230 was passed in the wake of a New York Court's decision in *Stratton Oakmont v. Prodigy Servs. Co.*, No. 31063/94, 1995 N.Y. Misc. LEXIS 229 (Nassau Cnty. Sup. Ct. May 24, 1995), which held that an internet forum website was liable for defamation by a third-party user as the website moderated out some, but not all, potentially defamatory statements of that user. *Zeran*, 129 F. 3d at 331. "The amendment was intended to overrule *Stratton* and provide immunity for 'interactive computer service[s]' that make 'good faith' efforts to block and screen offensive content." *FTC v. LeadClick Media, LLC*, 838 F. 3d 158, 173 (2d Cir. 2016).

While Section 230 has been broadly applied across various causes of action sounding in state tort law, its text and subsequent application clearly show that it is meant to immunize liability based on the substance of third-party content. It is not a "get-out-of-jail-free card" for websites that permit user-submitted content. *Doe v. Internet Brands, Inc.*, 824 F. 3d 846, 853 (9th Cir. 2016). Nor was it "meant to create a lawless no-man's-land on the Internet." *Roommates.com, LLC*, 521 F. 3d at 1164.

Within the not so distant past, many state courts have been presented with motions similar to the Defendants' present motion that seeks the involuntary dismissal of the State's Complaint based on Section 230 immunity. In several cases in which State Attorneys General have brought claims under the relevant state consumer fraud acts against TikTok and Meta, courts have declined to dismiss the Complaints based on arguments that Section 230 provided those entities with immunity. *See, e.g., State of Vermont v. Meta Platforms, Inc.*, No. 23-CV-4453, 2024 Vt. Super.

16

LEXIS 146 at \*15–16 (Vt. Super. Ct. July 28, 2024); *Iowa v. TikTok Inc.*, No. EQCE089810, at 20–21 (Iowa Dist. Ct. Aug. 26, 2024); *Dist. of Columbia v. Meta Platforms, Inc.*, No. 2023-CAB-6650, 2024 D.C. Super. LEXIS 27 (Sup. Ct. D.C. Sept. 9, 2024); *Nevada v. TikTok Inc.*, No. A-24-886127-B, at 99 (Nev. Dist. Ct. Sept. 24, 2024); *Utah Div. of Consumer Prot. v. TikTok Inc.*, No. 230907634, at 13 (Utah Dist. Ct. Nov. 12, 2024); *Commonwealth*, 2024 Mass. Super. LEXIS 161; *Utah Div. of Consumer Prot. v. TikTok Inc.*, No. 240904292 at 9-10 (Utah Dist. Ct. Feb. 20, 2025); *Dist. of Columbia v. TikTok, Inc.*, No. 2024-CAB-006377 (Super. Ct. D.C. Feb. 24, 2025); *State of Washington v. TikTok, Inc., et al*, No. 24-2-23100-5 SEA (Super. Ct. Wash Mar. 28, 2025); *South Carolina v. TikTok, Inc.*, No. 2024-CP-40-06018 (Ct. of Com. Pleas S.C. May 6, 2025).[2]

The Defendants maintain that each court has made the same fundamental mistake. According to the Defendants, each court interpreted the underlying claims as attacks on the Defendants' own conduct. The Defendants assert that the focus should be on the substance of the third-party videos on the Defendants' platform.

The parties agree that the Ninth Circuit's three-prong test in *Barnes v. Yahoo!, Inc.* provides the proper framework to analyze a Section 230 defense. Under this test, Section 230 applies if: (1) the defendant is a provider or user of an interactive computer service; (2) whom a plaintiff seeks to treat as a publisher or speaker under a state law cause of action; and (3) of information provided by another information content provider. *Barnes*, 570 F. 3d at 1100-01. There is no dispute that the Defendants are providers of an interactive computer service; therefore, the first prong of the identified test is satisfied.

"The second and third prongs of *Barnes* require [courts] to consider each cause of action alleged 'to determine whether a plaintiff's "*theory of liability* would treat a defendant as a

---

[2] The Court fully recognizes that, although each cited decision was well reasoned, none of the cited decisions are binding on this Court.

publisher or speaker of third-party content.'"" *Doe v. Grindr, Inc.*, 128 F.4th 1148, 1151 (9th Cir. 2025) (quoting *Calise v. Meta Platforms, Inc.*, 103 F. 4th 732, 740 (9th Cir. 2024)) (quoting *Barnes*, 570 F. 3d at 1101)) (emphasis in original). The Defendants argue that their actual conduct was a decision they made to determine what third-party content should be published to each user. Therefore, the Defendants maintain that any claims raised by the State (in this or any other cited case) is necessarily based on the substance of the third-party content.

The scope of Section 230 is broad, barring any "lawsuit[] seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions." *Zeran*, 129 F.3d at 330. These "protected" functions encompass any "activity that can be boiled down to deciding whether to exclude material that third parties seek to post online." *Roommates.com, LLC*, 521 F.3d at 1170-71. The functions include "reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content," *Barnes*, 570 F.3d at 1102, as well as "editorial decisions and functions ancillary to the decision to make content available." *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d 809, 827 (N.D. Cal. 2023) ("In re Soc. Media I").

The "ordinary meaning" of "publisher" includes an online platform's use of "tools such as algorithms that are designed to match [third-party] information with a consumer's interests." *Force*, 934 F.3d at 66. The reason for this broad definition is that a key function of an online platform is to decide what content to select, how to organize it, and how to present it to users. Decisions that are "part and parcel of [a website's] overall design and operation"—and that "reflect choices about what content can appear on the website and in what form"—"fall within the purview of traditional publisher functions." *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1124 (N.D. Cal. 2016) (citation omitted).

In each decision the Defendants have cited to support dismissal based on Section 230, the plaintiff's theory of liability was based on the substance of third-party user content and the allegations that the defendant was liable because of that content. *See, e.g., Nasca v. ByteDance Ltd.*, Index No. 607250/2023, slip op. (N.Y. Sup. Ct. Apr. 15, 2025) (the claim was based on plaintiff's son committing suicide after viewing user-submitted content promoting suicide and self-harm); *Grindr, Inc.*, 128 F. 4th at 1152 (the claim was based on direct messages on a dating application that led to adults having inappropriate encounters with the minor plaintiff); *M.P. v. Meta Platforms, Inc.*, 127 F. 4th 516, 521 (4th Cir. 2025) (the claim was based on Dylan Roof being radicalized by white supremacist propaganda he viewed on Facebook); *Force*, 934 F. 3d at 65 (the claim was based on Facebook "giving Hamas a forum with which to communicate and for actively bringing Hamas' message to interested parties").

The State's theory of liability as set forth in its Complaint does not treat the Defendants as the publisher or speaker of third-party content. The State alleges that it is *not* seeking to hold the Defendants liable for content created by "another information content provider," but instead for the Defendants' own alleged unfair and deceptive statements and acts. This is true both regarding the alleged addictive-by-design features of the TikTok Platform, as well as the alleged misleading or deceptive claims made by TikTok regarding the safety of the TikTok Platform for children and teenagers.

The alleged unfair conduct consists of technologies developed and deployed by the Defendants. These technologies are analogous to the defendant-developed speed filter at issue in *Lemmon v. Snap*, 995 F. 3d 1085, 1094 (9th Cir. 2021), and the defendant-developed questionnaire at issue in *Roommates.com, LLC*, 521 F. 3d at 1164, neither of which were protected by Section 230. For example, the State alleges that the Recommendation System is designed to create a "slot

machine" type effect in users' brains such that the arrival of a new video creates a dopamine reaction, leading to compulsive use in anticipation of more dopamine. Compl. ¶¶ 138-39. "And so the addiction is not to the content, but to this expectation and anticipation which is specifically engineered by the algorithm as an ultimate goal of the engine." *See Tr. of Mar. 28, 2025 Ruling, Wash. v. TikTok, Inc.*, No. 24-2-23100-5 SEA at 57. The State's theory of liability is therefore based on the Defendants' own conduct, not the substance of any third-party user content.

The Defendants maintain that the State's claim *is* in fact based on third-party user content, at least regarding the Recommendation System. According to the Defendants, when the Recommendation System serves a video in a user's "For You" feed, it is "publishing" that video to that user based on the substance of the video and the users' preferences. The Defendants argue that the Complaint explicitly alleges this. At oral argument, Defense counsel pointed to Paragraphs 112 and 113 of the State's Complaint as examples of allegations that are based on the Recommendation System being aware of the substance of the content of the video. These paragraphs allege that the system creates a unique score for each video that creates a weighed prediction as to whether a user will engage with the video. Compl. ¶¶ 112-13. Defense counsel argued that this could not be done without understanding the content of the videos.

The Defendants appear to be seeking an inference that these paragraphs allege that the Recommendation System is aware of the substance of videos. The Complaint's allegations make no such assertion, and such an inference would also contradict prior Complaint allegations. In fact, the Complaint *does* allege that scoring is done without understanding the content of the videos. Neither paragraphs 112 nor 113 allege that the system is aware of the substance of a given video. To determine the nature of the State's cause of action, the Court must consider the whole of the Complaint and not focus on isolated paragraphs. *See Borcia v. Hatyina*, 2015 IL App (2d) 140559,

¶ 37. The State's allegations about the Recommendation System describe it as "content-agnostic" – that it does not know to concentrate on content based on a shared substantive trait between videos. Compl. ¶¶ 101-03. Instead, the Complaint alleges that the Recommendation System relies on patterns of user engagement as opposed to the substance of the videos. *Id.* ¶¶ 104-16.

The second prong of the *Barnes* test is also unmet as the State's theory of liability does not treat the Defendants as a "publisher or speaker," but as a product maker. "Although the statute does not define 'publisher,'" courts have interpreted the term to refer to an individual or entity who "*mak[es] the decision* whether to print or retract a given piece of content," as this decision-making function represents "the very essence of publishing." *Klayman v. Zuckerberg*, 753 F. 3d 1354, 1359 (D.C. Cir. 2014) (emphasis added). It protects decisions about "whether to exclude material that third parties seek to post online." *Roommates.com, LLC*, 521 F.3d at 1170–71. These authorities demonstrate that there must be a nexus between a defendant's decision to publish or remove content and the specific substance of that content for Section 230 to apply. Based upon the well-pled allegations, no such nexus exists.

None of the Complaint's allegations pertain to any aspect of the TikTok Platform that could reasonably be related to any decision making as to content exclusion. Therefore, the Defendants cannot be considered a "publisher" under Section 230 because the State's unfairness claim concerns the TikTok Platform's content-agnostic technology that does not involve any decision-making regarding the substance of videos. Section 230 does not bar the State's unfairness claim.

Section 230 also does not immunize the Defendants' alleged deceptive statements. The State's deception claim does not concern the Defendants' role as a publisher of third-party content. Put another way, the State's allegations are based on the Defendants' *own* deceptive statements, not those of a third party. In contrast, the Defendants argue that the State's deception claim is based

on the Defendants' failure to remove harmful third-party content. A fair reading of the Complaint makes clear that the deception claim does not seek to hold the Defendants liable for failing to remove third-party content as aggressively as their own policies would require. Rather, the Defendants' failure to remove third-party content is only relevant to the extent that the Defendants have issued statements potentially misleading the public into concluding that the Defendants remove certain types of content despite their failure to do so. Compl. ¶¶ 289–305. A similar argument was rejected in *Demetriades v. Yelp, Inc.*, in which a plaintiff alleged that the Yelp website falsely advertised that its user-submitted reviews passed through a filter to provide consumers with the most trusted reviews. *Demetriades*, 228 Cal. App. 4th 294, 300–01 (2014). The court found that Section 230 did not apply as the plaintiff's claim targeted Yelp's "own statements regarding…its filter," not the third-party reviews themselves. *Id.* at 313. Likewise, the deception claim here targets the Defendants' own statements, not any third-party statements.

The Court has reviewed the well written and reasoned decisions cited by the Defendants in *M.P. v. Meta Platforms Inc.*, 127 F.4th at 524-27, *Grindr, Inc.*, 128 F.4th at 1152-55, and *Angelilli v. Activision Blizzard, Inc.*, 2025 U.S. Dist. LEXIS 7724 (N.D. Ill. Apr. 23, 2025). In this case, the State focuses on the Defendants' statements. Again, it is the Defendants' own statements that are being used to support the deception claim relative to specific features and/or company goals. The Defendants' cited statements are allegedly false and are contradicted by TikTok's internal records. Based upon a thorough review of the State's Complaint and viewing the State's Complaint in the light most favorable to the Plaintiff, it is reasonable to conclude based on specific factual allegations that the State does not seek to treat the Defendants as publishers of third-party content. Rather, the State seeks to hold the Defendants responsible for their own design features that determine what videos to display, how to display them and how users can interact with the videos.

22

The Court has concluded that as both the State's unfairness and deception claims do not seek to treat the Defendants as a publisher of the third-party content published on the TikTok platform, the protections afforded by Section 230 do not apply.

### ii. The First Amendment does not bar the State's claims.

The Defendants further argue that the First Amendment bars the State's claims. More specifically, the Defendants argue that the First Amendment prohibits the State's challenge to the manner in which the TikTok Platform selects and organizes third-party content. In support of their position, the Defendants cite the recent decision in *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), in which the Court struck down a challenge seeking to impose liability for protective expressive activity. The Defendants also argue that the State's deception claims would compel the Defendants to warn about potential harms from viewing third-party content on the TikTok Platform in violation of the First Amendment.

The First Amendment protects a platform's "exercise of editorial control and judgment" in selecting content for publication and the speech on the platform itself. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974). *Moody* stemmed from a facial challenge to Florida and Texas statutes that regulated content moderation. The Supreme Court confirmed that expressive editorial judgments made by traditional publishing entities apply equally to online platforms, like the TikTok Platform, and are protected by the First Amendment. As the Court observed, a platform's choices about "which third-party content" an online platform's viewer feed "will display"—"or how the display will be ordered and organized"—are what "give the feed a particular expressive quality." *Moody*, 603 U.S. at 738-40. The *Moody* Court made very clear that the First Amendment prohibits a state's attempt to regulate or "alter[]" how an online platform chooses "the views [it] will, and will not, convey." *Id.* at 737. The Court, however, specifically excluded "feeds

whose algorithms respond solely to how users act online—giving them the content they appear to want, without any regard to independent content standards." *Id.* at 736, n.5. *Moody*'s holding explicitly excluded the type of claim that is framed within the State's Complaint. *See Vermont v. Meta*, 2024 Vt. Super. LEXIS 146 at *18 (distinguishing *Moody*).

As to the unfairness claim, the Defendants assert that the State is challenging the Defendants' editorial control and judgment over what content to show to users. Generally, a state actor's interference with a newspaper's editorial control and judgment, *i.e.*, the choice of material that appears in a newspaper or the treatment of public issues and public officials, violates the First Amendment's guarantees to a free press. *Tornillo*, 418 U.S. at 258. The State's claims, however, are not based on the substance of any content appearing on the TikTok Platform.

The State specifically alleges that the Defendants' content-agnostic technology does not know or engage with the substance of the content it serves. Compl. ¶¶ 101-03. Rather, the claim is based on TikTok's alleged role in manipulating young users' brain chemistry to induce compulsive and excessive use of the TikTok Platform. *See Vermont*, 2024 Vt. Super. LEXIS 146 at *17 (noting that Meta's First Amendment argument "fails to distinguish between Meta's role as an editor of content and its alleged role as a manipulator of Young Users' ability to stop using the product."). The State's deception claims are based on the Defendants' own alleged false and misleading commercial speech, not how the Defendants moderate content. "[T]he Supreme Court has repeatedly emphasized that the first amendment is not a bar to State regulation prohibiting false, misleading or deceptive commercial speech." *Scott v. Assoc. for Childbirth at Home, Inter.*, 88 Ill. 2d 279, 287 (1981) (citing *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 774 (1976)). A fair reading of the allegations contained within the State's

Complaint and viewing the well-pled allegations in the light most favorable to the State, the State is challenging non-expressive conduct, not a manifestation of the Defendants' expression.

The Defendants further argue that the First Amendment bars the deception claim as the ultimate injunctive relief would necessarily be compelled speech. Yet, the State has not presently requested this Court for the extraordinary remedy of injunctive relief. Consequently, this argument is clearly premature. As importantly, the State's Complaint does not request the relief as characterized by Defendant. The specific injunctive relief requested in the State's Complaint is an injunction "to prevent future violations of the Consumer Fraud Act." Compl. at 81, ¶ B. The Court will not order any injunctive relief unless the State properly establishes the need for such a remedy.

The Court concludes that the State does not seek to impose liability impermissibly for protective expressive activity. The Court further concludes that the State's unfairness and deception claims do not violate the Defendants' First Amendment protections as they do not seek to "regulate" or "alter[]" "editorial choices" that the TikTok Platform makes in providing a third-party content viewing experience. The Defendants' Section 2-619 motion is therefore denied.

**III. Conclusion**

The State has sufficiently alleged claims for both deceptive and unfair conduct under the ICFA and deceptive conduct under the UDTPA. These claims are not barred either by Section 230 of the Communications Decency Act or the First Amendment. The Defendants' Section 2-619.1 motion to dismiss is therefore denied.

WHEREFORE, it is hereby ordered that:

1.      The Defendants' Combined Motion to Dismiss the State's Complaint pursuant to 735 ILCS 5/2-619.1 is denied in its entirety.

25

2.     The Defendants shall file their Answer to the Complaint within 21 days of the date of this

order and no later than July 3, 2025.

3.     The previously set status date of July 8, 2025 at 1:30 p.m. stands, and the parties may

appear via Zoom pursuant to the below instructions:

ZOOM INSTRUCTIONS
Zoom Meeting ID:     966 9558 1801
Zoom Meeting Password:     160424
Zoom Call-in Number:      312-626-6799

DATE:                                          SO ORDERED:

6-12-2025

_____

Judge Michael T. Mullen

Judge Michael T. Mullen

JUN 12 2025

Circuit Court-2084

26

# EXHIBIT 6



**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, ss.**

**SUPERIOR COURT**
**Civil No. 23-2397-BLS1**

**COMMONWEALTH**
**Plaintiff**

**vs.**

**META PLATFORMS, INC., & another[1]**
**Defendants**

## MEMORANDUM AND ORDER
## ON MOTION TO DISMISS

The Commonwealth contends that Meta Platforms, Inc. and Instagram, LLC (together,

"Meta") violated G.L. c. 93A, § 2, and created a public nuisance, by designing and using

addictive design features on Instagram to exploit children's psychological vulnerabilities, and

falsely represented to the public that its features were not addictive and that Meta prioritized

youth health and safety. Meta has now moves to dismiss for failure to state a claim. For the

reasons set out below, that motion is denied.

## BACKGROUND

### A.    The Commonwealth's Factual Allegations[2]

Meta owns, develops, designs, markets, and operates Instagram, a social media platform

that enables users to post and share images and videos, and allows them to interact with other

users. Instagram is accessible through web browsers or through a smart phone application

("app"). Most Instagram users access the platform through the app. More than 33 million young

---

[1]       Instagram, LLC.

[2]       This is a brief summary of the Complaint's factual allegations, which span 88
pages.

people in the United States use Instagram, including over 300,000 daily active users in Massachusetts between ages 13 and 17. Almost all of Meta's revenue comes from advertising targeted based on data collected from its users.

### 1.    Use of Addictive Platform Tools

To generate advertising revenue, Meta knowingly designs and employs the following four features or tools (the "Platform Tools") to interfere with or override young user's ability to regulate their time on Instagram, resulting in mental and physical harms from addictive use:

Incessant Notifications. When the Instagram app is installed on a smart phone, Instagram enables approximately 40 types of audio and visual push notifications by default. These notifications alert users to a variety of events and activities on Instagram. Many of these notifications appear on a user's phone screen even when the user is not on the app or using the phone.

Meta has purposefully designed these notifications, including the way they are "pushed" and displayed, to take advantage of well-understood neurological and psychological phenomena and to increase young users' time spent on Instagram. Among other things, Meta uses sounds and vibrations to trigger dopamine releases and prey on users' "fear of missing out" ("FOMO").

Meta's research has shown that because teens crave acceptance, notifications are highly effective in bringing them back to the app to receive positive validation. Meta's research also shows that the high volume of notifications causes young users to feel overloaded, overwhelmed, and compelled to revisit the app repeatedly during the day and night, causes inattention and hyperactivity, and reduces productivity and well-being.

Intermittent Variable Rewards. To prolong young users' time on Instagram or induce them to return to the platform, Meta uses intermittent variable rewards ("IVRs") associated with

2

"likes" of a user's post. IVRs provide positive stimuli that induces a psychologically pleasing dopamine release at random, unpredictable intervals. The unpredictability of the rewarding stimuli creates a feedback loop in which the user keeps checking for more rewarding stimuli. Knowing that teen brains are particularly susceptible to the feel-good effects of dopamine, Meta has designed its notification delivery system to randomly supply young users with positive, dopamine-inducing notifications (i.e., that someone "liked" a user's post), interspersed with dopamine gaps, to build anticipation and craving. This strengthens the desire to return to the platform with each dopamine release. Meta also sometimes withholds notifications of "likes" on a user's post to deliver larger bursts of dopamine. Similarly, to create suspense, Meta employs a short delay after a user swipes to refresh their feed before new information is displayed.

Infinite Scroll and Autoplay. Meta uses features such as "infinite scroll" and "autoplay" to encourage young users to use Instagram for extended amounts of time. The infinite scroll feature loads new posts and advertisements for the user to view as the user scrolls down their page feed, removing the need to hit a next page button to view more posts. Because there is no natural end point for the user, the infinite scroll format makes it difficult for young users to leave the platform. The autoplay function in Instagram's "Stories" and "Reels" automatically starts playing the next "Story" or "Reel" as the prior one ends without the user needing to take any further action. Both features exploit young users' minds, which seek novelty. Meta is aware that these features harm young users by encouraging passive consumption.

Ephemeral Features. To capitalize on teens' sensitivity to FOMO, Meta has added ephemeral aspects to its "Stories" and "Live" features. Stories are only available to view for 24 hours before disappearing from a user's feed. A user can only interact with the Live feature

3

when the user broadcasts their livestream video to followers or the public. Meta knows these features cause problematic, habitual use and contribute to mental health harms to young users.

### 2. Ineffective Age Assurance Measures

Meta has publicly stated that children under 13 years of age should not use Instagram and that it is focused on keeping these users off the platform. Nonetheless, Meta uses an ineffective age verification process. Although Meta is aware that individuals under 13 lack the skill to safely use social media, it has recklessly and/or deliberately disregarded the existence of hundreds of thousands of such users on its platforms because removing them would impact Instagram's growth. Had young users and their families known about Meta's conduct, they would have taken their own measures to police inappropriate underage use.

### 3. Deceptive Public Statements About Platform Safety

On multiple occasions, Meta has represented that its platform features are safe, not addictive, and prioritize the safety and well-being of its young users over profits. Such statements were made during, among other events, media interviews in 2018 and 2019, a 2018 technology event, Congressional testimony in 2020 and 2021, an October 2021 Facebook post responding to Congressional testimony from a whistleblower, and an October 2021 public statement in response to a 60-Minutes segment on the harms caused by Meta's products.

Meta's statements are belied by its internal data showing that Instagram addicts and harms children. Meta has repeatedly deprioritized youth well-being to increase revenue. Contrary to its public assertions from 2018 to 2022, Meta repeatedly failed to invest meaningfully in well-being initiatives to address known harms to young users. Meta's top executives repeatedly rejected design changes that Meta's internal research indicated would improve well-being. For example, because it would impact revenue, Meta refused to hide "Like"

4

counts, which induces corrosive social comparisons, even after a pilot program indicated hiding "Like" counts would improve well-being. Meta also refused to remove cosmetic surgery filters used primarily by teen girls, which experts agreed were harmful. Had consumers known the truth about Meta's failure to prioritize youth well-being, they would have altered their own conduct.

## B.    The Present Lawsuit

The Commonwealth filed this case in November 2023. It asserts three counts under G.L. c. 93A, § 2: that Meta engaged in unfair and deceptive acts and practices by deploying the Platform Tools with features to induce young users' addictive use of Instagram (Count One); by misrepresenting that Instagram was safe, not addictive, and prioritized young users' well-being over profits (Count Two); and by publicly claiming that it excludes users under age 13 from Instagram and inhibits such users, and failing to employ meaningful age enforcement efforts for profit-motivated reasons (Count Three). The Commonwealth also asserts a public nuisance claim, alleging that by purposefully employing features and tools to addict youth and induce their problematic use of Instagram, Meta has knowingly created, substantially contributed to, and/or substantially participated in maintaining a youth mental health crisis, the costs of which have been borne by the Commonwealth's schools and public health system (Count Four).

## DISCUSSION

Meta moves to dismiss on several grounds. It argues that the Commonwealth's claims are barred by Section 230 of the Communications Decency Act ("the CDA"), 47 U.S.C. § 230 ("Section 230"), and/or the First Amendment. It also argues the factual allegations are

5

insufficient to support the claims. I review these arguments under the Mass. R. Civ. P. 12(b)(6) standard.[3]

## I.   The Communications Decency Act

Meta contends that the Commonwealth's claims – whether grounded on Instagram's design features or Meta's public representations – are barred by Section 230. As explained below, I disagree.

### A.   Overview of Section 230 Immunity

Congress enacted Section 230 "when the internet was young and few of us understood how it would transform American society." Lemmon v. Snap, Inc., 995 F.3d 1085, 1090 (9th Cir. 2021). Among other things, it sought "to promote the continued development of the Internet and other interactive computer services and other interactive media," 47 U.S.C. § 230(b)(1), and "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." 47 U.S.C. § 230(b)(2). See Massachusetts Port Auth. v. Turo Inc. ("Turo"), 487 Mass. 235, 239-240 (2021).[4]

---

[3]      Under Rule 12(b)(6), a court must accept as true the complaint's factual allegations and draw "all reasonable inferences" from those allegations in plaintiff's favor. Dunn v. Genzyme Corp., 486 Mass. 713, 717 (2021). The factual allegations must set forth the basis for plaintiff's entitlement to relief with "more than labels and conclusions," Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); "'rais[ing] a right to relief above the speculative level[,] . . . plausibly suggesting (not merely consistent with)' an entitlement to relief." Iannacchino, 451 Mass. at 636, quoting Bell Atl. Corp., 550 U.S. at 555.

[4]      "Child safety and well-being" are also "explicit goals of the CDA." In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig., 2023 WL 7524912 at * 7 (N.D. Cal. Nov. 14, 2023). See 47 U.S.C. § 230(b)(3) ("encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services"), § 230(b)4) ("remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material").

6

To achieve these aims, Section 230 provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). See Turo, 487 Mass. at 240. Section 230 "shields website operators from being 'treated as the publisher or speaker' of material posted by users of the site, . . . which means that 'lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions – such as deciding whether to publish, withdraw, postpone or alter content – are barred.'"[5] Jane Doe No. 1 v. Backpage.com, LLC ("Backpage"), 817 F.3d 12, 18 (1st Cir. 2016) (internal quotations and citations omitted), cert. denied, 580 U.S. 1083 (2017).

"[C]ourts have construed § 230 'to establish broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service." Turo, 487 Mass. at 240, quoting Perfect 10, Inc. v. CCBill LLC, 488 F.3d 1102, 1118 (9th Cir.), cert. denied, 552 U.S. 1062 (2007). See Backpage, 817 F.3d at 18 ("near-universal agreement that section 230 should not be construed grudgingly") (and cases cited). Immunity "does not depend on the form of the asserted cause of action; rather, it depends on whether the cause of action necessarily requires that the defendant be treated as the publisher or speaker of content provided by another." Id. at 19. See Federal Trade Comm'n v. Accusearch Inc., 570 F.3d 187, 1195 (10th Cir. 2009) ("The prototypical service qualifying for this [Section 230] immunity is an online messaging board . . . on which Internet subscribers post comments and respond to comments posted by others.").

---

[5]     Section 230 alters "the common-law rule that allocates liability to publishers or distributors of tortious material written or prepared by others." Jones v. Dirty World Ent. Recordings LLC, 755 F.3d 398, 407 (6th Cir. 2014).

"Section 230(c)(1) is implicated not only by claims that explicitly point to third party content but also by claims which, though artfully pleaded to avoid direct reference, implicitly require recourse to that content to establish liability or implicate a defendant's role, broadly defined, in publishing or excluding third party [c]ommunications." Cohen v. Facebook, Inc., 252 F. Supp. 3d 140, 156 (E.D.N.Y. 2017), aff'd in part and dismissed in part sub nom, Force v. Facebook, Inc., 934 F.3d 53 (2d Cir. 2019), cert. denied, 140 S. Ct. 2761 (2020). Accord Lemmon, 995 F.3d at 1094 (immunity applies to "claims [that], at bottom, depend[ ] on a third party's content, without which no liability could have existed").[6]

"[E]ven with the broad protections provided by the CDA," the immunity available under Section 230(c)(1) is not absolute;[7] "'an interactive computer service provider remains liable for its own speech' and for its own unlawful conduct." Turo, 487 Mass. at 240, quoting Universal Communication Sys., Inc. v. Lycos, Inc. ("Lycos"), 478 F.3d 413, 419 (1st Cir. 2007). See Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC ("Roommates"), 521 F.3d 1157, 1164 (9th Cir. 2008) (CDA "not meant to create a lawless no-man's-land on the Internet"); Doe v. Internet Brands, Inc., 824 F.3d 846, 853 (9th Cir. 2016) ("Congress has not provided an all purpose get-out-of-jail-free card for businesses that publish user content on the internet,

---

[6]     See Dyroff v. Ultimate Software Grp., Inc., 934 F.3d 1093, 1098 (9th Cir. 2019) (rejecting attempt to "plead around Section 230 immunity"), cert. denied, 140 S. Ct. 2761 (2020); Kimzey v. Yelp! Inc., 836 F.3d 1263, 1266 (9th Cir. 2016) (rejecting attempt "to plead around the CDA to advance the same basic argument that the statute plainly bars"); Backpage, 817 F.3d at 22 ("third-party content . . . appears as an essential component of each . . . of the appellants' . . . claims."); Doe v. MySpace, Inc., 528 F.3d 413, 420 (5th Cir. 2008) (rejecting plaintiff's attempt to plead around Section 230; plaintiff's "allegations are merely another way of claiming that MySpace was liable for publishing the communications and they speak to MySpace's role as a publisher of online third-party-generated content").

[7]     See 47 U.S.C. § 230(e)(3) ("Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section.").

8

though any claims might have a marginal chilling effect on internet publishing businesses. . . . '[W]e must be careful not to exceed the scope of the immunity provided by Congress.'"), quoting Roommates, 521 F.3d at 1164 n. 15.

Section 230(c)(1) immunity "applies when 'the defendant (1) is a provider or user of an interactive computer service; (2) the claim is based on information provided by another information content provider; and (3) the claim would treat the defendant as the publisher or speaker of that information.'" Turo, 487 Mass. at 240, quoting Backpage, 817 F.3d at 19.[8] "Practically speaking, the second and third factor tend to overlap in significant ways. The question of whether a plaintiff seeks to treat an interactive computer service as a publisher or speaker of third-party information . . . interacts in obvious ways with the question of whether the information provided is the information of a third-party." In re Apple Inc. App Store Simulated Casino-Style Games Litig., 625 F. Supp. 3d 971, 978 (N.D. Cal. 2022). See Turo, 487 Mass. at 241-242, quoting Backpage, 817 F.3d at 19 ("The 'ultimate question' in determining whether an interactive computer service provider . . . is entitled to § 230 immunity is whether 'the cause of action necessarily requires that the defendant be treated as the publisher or speaker of content provided by another.'"). "Where a defendant establishes these requirements based on the face of a complaint, a motion to dismiss may be granted." Cohen, 252 F. Supp. 3d at 156. See Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 254-255 (4th Cir. 2009) (because Section 230 provides "immunity from suit rather than a mere defense to liability," courts

---

[8]    The Ninth Circuit and other courts have articulated this test slightly differently and in a different order. Under their version of the test, the statute provides immunity to "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." Barnes v. Yahoo!, Inc., 570 F.3d 1096, 1100-1101 (9th Cir. 2009) (footnote omitted). To avoid ambiguity, when referring to the prongs of the test, I refer to them in the order they are described in Turo, even when describing cases from the Ninth Circuit.

9

"resolve the question of § 230 immunity at the earliest possible stage") (internal quotations, emphasis omitted); Backpage, 817 F.3d at 15 (affirming dismissal under Section 230).

## B. Deceptive Statements

Section 230 does not apply to claims based on a defendant's own speech. Thus, claims based on a publisher's representations about its publishing conduct are not immunized under Section 230. See, e.g., Hiam v. HomeAway.com, Inc., 267 F. Supp. 3d 338, 346-347 (D. Mass. 2017) (Young, J.), aff'd, 887 F.3d 542 (1st Cir. 2018); Moving & Storage, Inc. v. Panayotov, 2014 WL 949830 at * 2 (D. Mass. Mar. 12, 2014) (O'Toole, J.).

The Commonwealth alleges that Meta misrepresented the safety of its platform, its efforts to protect the well-being of young users, and its age-verification efforts. To the extent the Commonwealth's claims are based on these purportedly false statements, they are not subject to Section 230 immunity. Sec, e.g., State v. Meta Platforms, Inc., 2024 WL 3253106 at * 11 (Tenn. Ch. Ct. Mar. 13, 2024) (Section 230 does not bar deception claim against Meta).

## C. Platform Tools and Age Verification

The Commonwealth's claims are also based on the negative impacts of Instagram's Platform Tools – i.e., incessant notifications, IVR, ephemeral posts, infinite scroll, and auto play – and its ineffective age verification efforts. Whether these claims are subject to immunity requires a careful application of Section 230's three-part test. It is undisputed that Meta meets the first prong of the test. The parties, however, hotly contest whether Meta has satisfied the test's second and third prongs. As explained below, I read the Complaint as principally seeking to hold Meta liable for its own business conduct. In other words, the claims are based, not on

10

Instagram's third-party content, but its features regardless of content. Consequently, I conclude that Meta is not entitled to dismissal under Section 230.[9]

### 1. Prong 2

The second prong of the test to determine if Section 230 immunity applies looks at whether the claim is based on information provided by another information content provider. An "information content provider" is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). See Lycos, 478 F.3d at 419 ("broad definition" covers "even those who are responsible for the development of content only 'in part'"). "[I]nternet companies remain on the hook when they create or develop their own internet content" and "to the extent they are responsible . . . in part, for the creation or the development of the offending content on the internet." Lemmon, 995 F.3d at 1093 (internal quotations omitted).

"[A] website helps to develop unlawful content . . . if it contributes materially to the alleged illegality of the conduct." Roommates, 521 F.3d at 1168. "A material contribution to the alleged illegality of the content does not mean merely taking action that is necessary to the display of allegedly illegal content. Rather, it means being responsible for what makes the displayed content allegedly unlawful." Jones, 755 F.3d at 410. See Force v. Facebook, Inc., 934 F.3d 53, 68-69 (2d Cir. 2019) (defendant considered to have developed third-party content if "defendant directly and materially contributed to what made the content itself unlawful" and "may, in some circumstances, be a developer of its users' content if it encourages or advises users to provide the specific actionable content that forms the basis for the claim") (internal

---

[9] In its briefing, Meta did not separately analyze Prongs 2 and 3, but conflated the analysis after noting that the two prongs tend to overlap. This overlap does not mean that the distinction between the prongs should necessarily be ignored. I analyze each prong separately.

quotations omitted); Social Media Cases, 2023 WL 6847378 at * 32 (Super. Ct. Cal. Oct. 13, 2023) ("Where a provider manipulates third party content in a manner that injures a user, Section 230 does not provide immunity."). "Given the complexity with which online platforms function, it is not always clear . . . if the platform's involvement or intervention in the posting or presentation of [another's] content crosses the line into . . . 'development.'" In re Social Media Adolsecent Addiction/Personal Injury Products Liability Litigation ("In re Soc. Media"), 702 F. Supp. 3d 809, 827-828 (N.D. Cal. 2023). See Elliott v. Donegan, 469 F. Supp. 3d 40, 56-57 (E.D.N.Y. 2020) ("It is relatively easy to define what constitutes the creation of information. . . . Determining what constitutes the development of information is a stickier task.").

Generally, "providing content-neutral tools does not render an internet company a 'creator or developer' of the downstream content that its users produce with those tools." Lemmon, 995 F.3d at 1094. See Daniel v. Armslist, LLC, 386 Wis.2d 449, 472 (2019) ("A neutral tool in the CDA context is a feature provided by an interactive computer service provider that can be utilized for proper or improper purposes. . . . A defendant who provides a neutral tool that is subsequently used by a third party to create unlawful content will generally not be considered to have contributed to the content's unlawfulness.") (internal quotations and citation omitted).[10] However, internet companies do not enjoy "absolute immunity from all claims related to their content-neutral tools;" liability may arise from such tools provided "plaintiffs' claims do not blame them for the content that third parties generate with those tools." Lemmon, 995 F.3d at 1094. See Social Media Cases, 2023 WL 6847378 at ** 30, 33 ("Section 230 does not bar a

---

[10]     "Examples of . . . neutral tools include a blank text box for users to describe what they are looking for in a roommate . . . , a rating system that allows consumers to award businesses between one and five stars and write reviews, ... and a social media website that allows groups to create profile pages and invite members." Daniel, 386 Wis.2d at 473 (internal citations omitted).

12

claim based on features of a social media site that have an adverse effect on users apart from the content of material published on the site" and "does not shield [d]efendants from liability for the way in which their platforms actually operate").

The Commonwealth alleges physical and mental harm to young users from Instagram's design features *themselves*, which purportedly cause addictive use, and not from the viewing of any specific third-party content or from design choices that contributed to the development or creation of that content. In other words, the alleged harm occurs regardless of the content that users see. As such, Prong 2 is not satisfied because the Commonwealth is seeking to hold Meta liable for its own injurious conduct (creating and employing tools to addict young users and engaging in ineffective age verification), not that of any other party.[11]

In support of its position, Meta cites several decisions from around the country. However, in each, Prong 2 was conceded, undisputed, or satisfied because the action alleged harm caused by third party content.[12] Meta also relies on a recent decision by a federal district court in

---

[11]    See, e.g., Lemmon, 995 F.3d at 1093-1094 (Prong 2 not satisfied where Snapchat designed reward system and Speed Filter; plaintiffs' negligent design claim based on allegation these features worked together to encourage users to drive at dangerous speeds; claim "rest[ed] on nothing more than Snap's 'own acts'"); Moving & Storage, Inc., 2014 WL 949830 at * 2 (Prong 2 not satisfied where "plaintiffs' claims do not arise from the content of [third-party customer] reviews . . . but instead, the defendants' alleged ill-intentioned deletion of . . . reviews . . . , coupled with various representations;" "[t]be manner in which the information is presented, or withheld, is the conduct at issue, as well as the allegedly misleading ratings which result from such alleged manipulations").

[12]    See, e.g., Backpage, 817 F.3d at 19 (Prong 2 conceded); Lycos, 478 F.3d at 420 (Prong 2 satisfied where plaintiff's allegations merely established defendant's conduct made it easier for *others* to develop and disseminate misinformation); Dyroff, 934 F.3d at 1096, 1099 (Prong 2 satisfied where website's notification and recommendation functions did not materially contribute to content that harmed plaintiff's son); Barnes, 570 F.3d at 1101 (website allegedly failed to remove explicit profiles of plaintiff posted by ex-boyfriend, no dispute "'information content' . . . at issue . . . provided by another 'information content provider'"); Force, 934 F.3d at 68-71 (Facebook's algorithms did not develop terrorist organization's content by directing such content to users most interested in the organization and terrorist activities). See also Social

13

California, which concluded that claims against Instagram and other platforms were barred insofar as they were based on notifications, infinite scroll, autoplay, and ephemeral postings. See In re Soc. Media, 2023 WL 7524912 at ** 13-16. However, that decision does not explicitly conduct a Prong 2 analysis,[13] and I do not find it otherwise persuasive as it pertains to those features, particularly considering the cogent analysis provided by a California Superior Court decision that reaches the opposite conclusion. See Social Media Cases, 2023 WL 6847378 at ** 30-35.

### 2. Prong 3

Prong 3 "asks whether a cause of action seeks to treat a defendant as a 'publisher or speaker' of third-party content." Lemmon, 995 F.3d at 1091. Stated differently, it "focus[es] on whether the duty the plaintiff alleges stems from the defendant's status or conduct as a publisher or speaker." Id. (internal quotations omitted). See Dyroff, 934 F.3d at 1098 ("what matters is whether the claims 'inherently require[ ] the court to treat the defendant as the "publisher or speaker" of content provided by another,'" quoting Barnes, 570 F.3d at 1102); Henderson v. Soiurce for Public Data, L.P., 53 F.4th 110, 120-121 (4th Cir. 2022) ("A claim treats the defendant 'as the publisher or speaker of any information' when it (1) makes the defendant liable for publishing certain information to third parties, and (2) seeks to impose liability based on that information's improper content."). "In this particular context, publication generally involve[s] reviewing, editing, and deciding whether to publish or to withdraw from publication third-party

---

Media Cases, 2023 WL 6847378 at * 34 (distinguishing Dyroff and explaining that "in Dyroff, liability was premised on the website's publication and recommendation of third-party content and injury flowing from that content, not from the provider's own actions").

[13]     See In re Soc. Media, 2023 WL 7524912 at * 8 ("[P]laintiffs allege that defendants fail to meet the [third] prong. The Court thus directs the bulk of its analysis there.")

14

content." Lemmon, 995 F.3d at 1091 (internal quotations omitted). See Lycos, 478 F.3d at 422 ("If the cause of action is one that would treat the service provider as the publisher of a particular posting, immunity applies not only for the service provider's decisions with respect to that posting, but also for its inherent decisions about how to treat postings generally."); Turo, 487 Mass. at 242 ("[f]eatures . . . [that] reflect choices about what content can appear on the website and in what form are editorial choices that fall within the purview of traditional publisher functions. . . but more concentrated involvement in the transaction may fall outside that purview") (internal quotations and citations omitted).[14]

"Section 230 does not create immunity simply because publication of third-party content is relevant to or a but-for cause of the plaintiff's harm. The issue is whether the defendant's alleged duty to the plaintiff could 'have been satisfied without changes to the content posted by the website's users and without conducting a detailed investigation.'" In re Soc. Media, 2023 WL 7524912 at * 9, quoting Doe v. Internet Brands, Inc., 824 F.3d 846, 851 (9th Cir. 2016). See HomeAway.com, Inc. v. City of Santa Monica, 918 F.3d 676, 682 (9th Cir. 2019) (rejecting "test that would provide immunity under the CDA solely because a cause of action would not otherwise have accrued but for the third-party content"; courts must "look instead to what the duty at issue actually requires: specifically, whether the duty would necessarily require an internet company to monitor third-party content"); Social Media Cases, 2023 WL 6847378 at * 12 ("Even if third-party content is a 'but-for' cause of the harm suffered by a plaintiff, the action is not barred by Section 230 if the cause of action does not seek to hold the provider liable as a publisher."); Henderson, 53 F.4th at 122-123 ("for [immunity] to apply, we require that liability

---

[14]    "A clear illustration of a cause of action that treats a website proprietor as a publisher is a defamation action founded on the hosting of defamatory third-party content." Internet Brands, Inc., 824 F.3d at 851.

attach to the defendant on account of some improper content within their publication;" "we do not apply a but-for test") (internal quotation marks omitted, emphasis removed).

Meta fails to satisfy Prong 3 for essentially the same reasons it cannot satisfy Prong 2. The Complaint does not seek to hold Meta liable for its conduct as a publisher or speaker, i.e., for its publication decisions. Rather, the Commonwealth seeks to hold Meta liable in "its distinct capacity as a product designer." Lemmon, 995 F.3d at 1092. The Commonwealth alleges that Instagram's features in and of themselves, regardless of their associated content, cause its young users to become addicted to the platform or to participate on the platform at an inappropriate age. If the Commonwealth were successful, Meta would not have to alter or monitor Instagram's third-party content; the gravamen of the allegations have nothing to do with the type of content editing, monitoring, or removal that could trigger immunity under Section 230.[15]

In support of its position, Meta points to statements in Backpage, Lycos, Force, and other cases which perhaps could be broadly read to suggest that any efforts engaged in by a social media company related to the content of its platforms or the platform's design and operation constitute an exercise of protected publishing functions. See, e.g., Backpage, 817 F.3d at 21

---

[15] See Lemmon, 995 F.3d at 1092-1093 (Prong 3 not satisfied where claim derived from alleged dangerous Snapchat filter that showed the user's speed, not content created using the feature; "though publishing content is 'a but-for cause of just about everything' Snap is involved in, that does not mean that the [plaintiffs'] claim, specifically, seeks to hold Snap responsible in its capacity as a 'publisher or speaker'"); Social Media Cases, 2023 WL 6847378 at * 31 (claims against Meta and other platform owners based on interactive operational features, including IVR algorithms, continuous scrolling, auto play, not subject to Section 230 because they "do not seek to require that Defendants publish or de-publish third-party content that is posted on those platforms. The features themselves allegedly operate to addict and harm minor users of the platforms regardless of the particular third-party content viewed by the minor user"); State v. Meta Platforms, Inc., 2024 WL 3253106 at * 10 (no immunity where complaint alleged that Instagram's features operated to addict and harm young users, regardless of the third-party content). Cf. MySpace, 528 F.3d at 420, 422 (immunity applied to claims regarding age-verification where plaintiff attempted to hold defendant liable for harm caused by objectionable content posted by third-party user).

(Prong 3 satisfied where plaintiffs' claims, which "address[ed] . . . decisions about how to treat postings," challenged "features that are part and parcel of the overall design and operation of the [defendant's] website (such as the lack of phone number verification, the rules about whether a person may post after attempting to enter a forbidden term, and the procedure for uploading photographs)" that "reflect[ed] choices about what content can appear on the website and in what form"). As noted above, however, these decisions concerned cases that at their core focused on the defendants' display of third-party content and the analysis therein must be read in that light. In Force, for example, victims of terrorist attacks alleged that Facebook provided material support to terrorist organization through its display of terrorist content. See 934 F.3d at 57, 65, 68. Similarly, in Backpage, sex trafficking victims brought claims against the operator of online classified advertisements for the harm they suffered from its postings. See 817 F.3d at 16, 19–20. Because in those cases the plaintiffs' claims were closely tied to third-party content, their assertions regarding the platform's features were properly viewed as seeking "to treat [the] defendant as a 'publisher or speaker' of third-party content." Lemmon, 995 F.3d at 1091.

The same is not true here. As discussed with regard to Prong 2, the Commonwealth is seeking to hold Meta liable for its own conduct, not that of a third-party. As pled, third-party content is not an essential component of the Commonwealth's claims. See Lemmon, 995 F.3d at 1093, 1094 (Section 230 "cuts off liability only when a plaintiff's claim faults the defendant for information provided by third parties" and as such immunity only applies to "claims [that], at bottom, depend[ ] on a third party's content, without which no liability could . . . exist[ ]"); Social Media Cases, 2023 WL 6847378 at * 32 ("Where a provider manipulates third party content in a manner that injures a user, Section 230 does not provide immunity."); Airbnb, Inc. v. Boston, 386 F. Supp. 3d 113, 120 n.5, 121 n.7 (D. Mass. 2019) (Sorokin, J.) (rejecting assertion

17

that First Circuit interpreted Section 230 to "expansively protect[ ] all decisions a company makes that in any way implicate the overall design and operation of its online platform"; both Backpage and Lycos "focused on the basis for the plaintiffs' assertions of liability, asking whether 'third-party content is . . . an essential component of' the plaintiffs' claims") (internal quotations omitted).

I recognize the distinction the Commonwealth makes is somewhat subtle given that features like ephemeral content, notifications, and autoplay are tied to the display of the platform's third-party content. However, the distinction is consistent with the purposes and language of the CDA. See Social Media Cases, 2023 WL 6847378 at * 32 ("So long as providers are not punished for publishing third-party content, it is consistent with the purposes of Section 230 to recognize a common law duty that providers refrain from actions that injure minor users by inducing frequency and length of use of a social media platform to the point where a minor is addicted and can no longer control the information they receive from that platform."). Discovery may reveal that the line the Commonwealth seeks to draw cannot be maintained in fact, but the Complaint's allegations are sufficient to avoid a finding of Section 230 immunity at this stage.

## II.     First Amendment

Meta argues the Commonwealth's claims are barred by the First Amendment because they seek to hold Meta liable for its content policies and other editorial functions associated with curating third-party content.[16] Viewing the Complaint in the light most favorable to the Commonwealth, I find this argument is unavailing.

---

[16]     Meta also argues that the claims violate Article 16 of the Massachusetts Declaration of Rights. The parties agree that Article 16 is "generally coextensive with the federal constitution when it comes to the freedom of expression," Flaherty v. Knapik, 999 F. Supp. 2d 323, 332 (D. Mass. 2014) (Ponsor, J.), and therefore focus their arguments on authority analyzing the First Amendment. See Defendants' Memorandum in Support of Defendants'

Insofar as the Commonwealth's claims are based on the Platform Tools that allegedly induce addiction in young users and Meta's allegedly ineffective age verification efforts, I read such claims to be principally based on conduct and product design, not on expressive content. See Id. at * 37 ("Because the allegations . . . can be read to state that Defendants' liability grows from the way their platforms functioned, the Demurrer cannot be sustained pursuant to the protections of the First Amendment. . . . [T]he allegations can be read to state that Plaintiffs' harms were caused by their addiction to Defendants' platforms themselves, not simply to exposure to any particular content visible on those platforms.").[17] As such, Meta has failed to establish that the claims are entirely based on protected speech or expression and that therefore dismissal is appropriate.

To the extent the Commonwealth's claims are based on Meta's alleged false statements to the public about its efforts to ensure the well-being of its young users and age verification efforts, such misrepresentations are not protected by the First Amendment. See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 771 (1976) ("Untruthful speech, commercial or otherwise, has never been protected for its own sake."); Fanning v. Federal Trade Comm'n, 821 F.3d 164, 174 (1st Cir. 2016) ("The First Amendment . . . . does not protect misleading commercial speech."), cert. denied, 580 U.S. 1049 (2017); Meta Platforms, Inc. v. District of Columbia, 301 A.3d 740, 758 (D.C. 2023) ("the only speech that is

---

Motion to Dismiss (Docket # 23) at 10 n.4; Commonwealth's Opposition to Defendants' Motion to Dismiss (Docket # 24) at 23 n.23. I do the same.

[17]     Even if these features carry some expressive element, the claim may very well be permitted under the intermediate scrutiny test set forth in Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York, 447 U.S. 557, 566 (1980), because the Complaint plausibly alleges that such elements are commercial in nature and that the Commonwealth has a substantial interest in protecting young users from their harmful impacts. This determination, however, is better left to a later stage of the litigation.

being targeted by the District's investigation are Meta's public statements regarding the company's content moderation practices;" "even if content moderation is itself protected speech, fraudulent misrepresentations regarding a company's moderation practices is not").[18]

## III.    Sufficiency of Allegations

### A.    G.L. c. 93A

The Consumer Protection Act prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." G.L. c. 93A, § 2(a). Generally, to state a claim under G.L. c. 93A, "a plaintiff must allege facts sufficient to establish four elements: first, that the defendant has committed an unfair or deceptive act or practice; second, that the unfair or deceptive act or practice occurred in the conduct of any trade or commerce; third, that the plaintiff suffered an injury; and fourth, that the defendant's unfair or deceptive conduct was a cause of the injury." Rafferty v. Merck & Co., 479 Mass. 141, 161 (2018) (internal quotations omitted). When the Commonwealth brings an enforcement action under the statute, however, it is not required to establish that any individual was harmed by the allegedly unfair or deceptive act or practice insofar as it seeks injunctive relief and civil penalties. See G.L. c. 93A, § 4;[19] Commonwealth v.

---

[18]    Meta also suggests the deception claims concern alleged misrepresentations made to influence the legislative process and are therefore protected by the First Amendment under the Noerr-Pennington doctrine. See United Mine Workers of Am. v. Pennington, 381 U.S. 657 (1965); Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961); Evans v. Lorillard Tobacco Co., 465 Mass. 411, 456-457 (2013) (explaining doctrine). However, "[t]he protection [provided by the doctrine] does not cover activity that was not genuinely intended to influence government action . . . [and] does not protect deliberately false or misleading statements." United States v. Philip Morris USA Inc., 566 F.3d 1095, 1123 (D.C. Cir. 2009) (citation omitted). I note that it appears from the Complaint that several statements relied upon by the Commonwealth were made in the press. The extent to which the doctrine applies is best resolved at a later stage of the litigation.

[19]    And compare G.L. c. 93A, §§ 9, 11.

20

Fall River Motor Sales, Inc., 409 Mass. 302, 312 (1991); Commonwealth v. Chatham Development Co., Inc., 49 Mass. App. Ct. 525, 528-529 (2000).

"[W]hether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact. . . . But whether conduct found to be unfair or deceptive rises to the level of a chapter 93A violation is a question of law[.]" H1 Lincoln, Inc. v. South Washington St., LLC, 489 Mass. 1, 13-14 (2022) (internal quotations and citation omitted).

Meta argues the Commonwealth fails to plausibly allege that its conduct was unfair and/or deceptive or that such conduct occurred in trade or commerce. These arguments are unpersuasive.[20]

### 1. Unfair Conduct (Counts One and Three)

"To determine whether conduct rises to the level of an unfair act or practice, courts look to the following factors: '(1) whether the conduct is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers or other businesses.'" Columbia Plaza Assocs. v. Northeastern Univ., 493 Mass. 570, 587 (2024), quoting H1 Lincoln, 489 Mass. at 14. Meta argues that as to Counts One and Three, the Complaint fails to plausibly suggest that its conduct rises to the level of an unfair act or practice.

---

[20]     Among other things, the Commonwealth prays for relief requiring defendants to "pay full and complete restitution to every person who has suffered any ascertainable loss by reason of Defendant's unlawful conduct." Complaint at 100. Meta argues that the request for restitution must be dismissed because the harms allegedly experienced by Instagram users relate to mental and physical health, Instagram is a free service, and the Commonwealth pleads no financial injury. The extent to which restitution or some other relief is appropriate is a factual issue that cannot be addressed at this stage. See Commonwealth v. DeCotis, 366 Mass. 234, 245 (1974) ("G.L. c. 93A granted full authority to the courts to use their traditional equity power to fashion decrees to remedy the wrong complained of and to make the decree effective").

Meta first argues that the Commonwealth fails to allege conduct that falls within an established concept of unfairness. I disagree. Count One alleges that Meta designs and employs various Instagram features that it knows encourage addictive use by teenagers. Count Three alleges that Meta fails to meaningfully exclude children under 13, although it is aware of how harmful Instagram is for children. Such allegations are sufficient to avoid dismissal.

Meta also argues that Counts One and Three fail adequately to allege substantial injury. First, it asserts that the Complaint only alleges an attenuated causal chain between the alleged unfair conduct (the design features) and the alleged harm (mental and physical health issues). But the Complaint does adequately allege such a causal connection. To the extent Meta contends that the injuries to users alleged by the Commonwealth all stem from the content of third-party postings, this argument is unpersuasive for the reasons discussed above. See, supra, at 10-18.

Second, Meta argues that the Commonwealth fails to allege monetary harm or non-subjective harm. This argument fails because the type of mental and physical harm alleged by the Commonwealth is the proper subject of an unfair acts or practices claim. See In the Matter of Int'l Harvester Co., 104 F.T.C. 949, 1061 (1984) (with regard to substantial harm requirement, "[w]hile in most cases the harm involved is monetary, . . . 'unwarranted health and safety risks may also support a finding of unfairness,'" quoting Letter from Federal Trade Commission to Senators Ford and Danforth (Dec. 17, 1980)). See also Commonwealth v. Keches Law Group, 2021 WL 2226449 at * 4 (Mass. Super. May 17, 2021) (Salinger, J.) (Attorney General "may enforce c. 93A without having to allege, prove, or quantify any economic injury").

Lastly, pointing to the three-part test used to analyze unfairness under the Federal Trade Commission Act, Meta argues that the Complaint fails to allege that the purported harms to young users are not outweighed by Instagram's countervailing benefit or that those harms are not

22

reasonably avoidable by Instagram's users. See Federal Trade Comm'n v. Direct Mktg. Concepts, Inc., 569 F. Supp. 2d 285, 299 (D. Mass. 2008) (O'Toole, J.), aff'd, 624 F.3d 1 (1st Cir. 2010) ("To justify a finding of unfairness[,] the injury . . . must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that consumers themselves could not reasonably have avoided," quoting American Fin. Serv. Ass'n v. Federal Trade Comm'n, 767 F.2d 957, 971 (D.C. Cir. 1985)). In support of the latter contention, Meta points to the Complaint's allegations regarding Meta's "Take a Break," "Daily Limit," and age-verification tools.

Meta's arguments miss the mark. The Commonwealth is not required to meet these two factors to prove unfairness and, in any event, the Complaint adequately alleges facts that satisfy them. The Commonwealth alleges that because Instagram's features are designed to overcome users' choice and autonomy to regulate their time on the platform, the elective tools referenced by Meta are an unreasonable option. See Complaint ¶¶ 82-83, 124, 134-136, 255-265, 383. The Complaint also alleges that Meta's internal research and an expert advisor confirmed that the risks of the platform outweigh its benefits. Complaint ¶¶ 181, 349, 384. These allegations are sufficient to plausibly suggest that the harm alleged could be reasonably avoided and that such harm was not outweighed by Instagram's countervailing benefits.

### 2. Deceptiveness (Counts Two and Three)

An act or practice is deceptive "if it could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted," that is, "if it possesses a tendency to deceive." Aspinall v. Philip Morris Companies, Inc., 442 Mass. 381, 394 (2004) (internal quotations omitted). Liability for deceptive acts or practices "does not require proof that a plaintiff relied on the representation, . . . that the defendant intended to deceive the plaintiff, . . .

23

or even knowledge on the part of the defendant that the representation was false." Id. (internal citations omitted). "In determining whether an act or practice is deceptive, regard must be had, not to fine spun distinctions and arguments that may be made in excuse, but to the effect which it might reasonably be expected to have upon the general public." Leardi v. Brown, 394 Mass. 151, 156 (1985) (internal quotations omitted). See Aspinall, 442 Mass. at 394. A statement "need not be totally false in order to be deemed deceptive in the context of G.L. c. 93A." Id. A statement that is half-true or even "true as a literal matter" may be actionable if it "create[s] an over-all misleading impression through failure to disclose material information." Id. at 394-395.

     Meta alleges Counts Two and Three fail to allege that it engaged in deceptive practices for three reasons. None have merit. First, Meta contends alleged statements about prioritizing safety and well-being are non-actionable, non-specific statements of opinion. But the Complaint alleges that Meta's statements about Instagram's safety and its concern for the well-being of its young users were inconsistent with its actions, which included deprioritizing youth well-being and ignoring its own internal evidence about the harm the platform caused. Given this context, the Complaint plausibly suggests that the statements are at the very least misleading half-truths. Even if the relevant statements are considered opinions, the allegations plausibly suggest that the statements created an over-all misleading impression through failure to disclose material information. See Aspinall, 442 Mass. at 394-395; McEneaney v. Chestnut Hill Realty Corp., 38 Mass. App. Ct. 573, 575 (1995) ("opinion may constitute a statement of fact if it may reasonably be understood by the recipient as implying that there are facts to justify the opinion or at least that there are no facts that are incompatible with it. . . . This is particularly true where the maker is understood to have special knowledge of facts unknown to the recipient.") (internal citations omitted). The extent to which these statements are actionable are best addressed at a later stage.

Second, Meta argues the Commonwealth fails to allege that many of its purported statements are false. It specifically points to the allegations supporting Count Three. See Complaint ¶¶ 324, 327, 335-336, 402. However, even if these statements are literally true, the Complaint plausibly suggests that the statements created an over-all misleading impression through the failure to disclose material information.

Lastly, Meta contends the Complaint fails plausibly to allege that users would have acted differently if they were aware of the purported deception. Whether consumers would have acted differently is "ill-suited for resolution on a motion to dismiss." Commonwealth v. Exxon Mobil Corp., 2021 WL 3493456 at * 12 (Mass. Super. June 22, 2021) (Green, J.). In any event, the Commonwealth alleges that had users and families been aware of the harmful nature of Instagram's design features they may have decided not to use the platform or restricted its use. Complaint ¶¶ 55, 298, 299, 344. [21]

### 3. Trade or Commerce

As noted above, a plaintiff must allege that the unfair or deceptive act or practice occurred "in the conduct of any trade or commerce," which the statute defines to include:

> the advertising, the offering for sale, rent or lease, the sale, rent, lease or distribution of any services and any property, tangible or intangible, real, personal or mixed, any security ... and any contract of sale of a commodity for future delivery, and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this commonwealth.

G.L. c. 93A, § 1(b) (emphasis added). "The use of the words 'distribution of any services' in conjunction with words such as 'sale' and 'lease' indicates an intent that the services be

---

[21]    Meta also argues that the Commonwealth's allegations fail to show a causal connection between the deceptive act and the alleged injury. I disagree.

distributed in exchange for some consideration <u>or that there must be other strong indications that the services are distributed in a business context.</u>" Planned Parenthood Fed'n of Am., Inc. v. <u>Problem Pregnancy of Worcester, Inc.,</u> 398 Mass. 480, 493 (1986) (emphasis added). See <u>Sullivan</u> v. <u>Five Acres Realty Tr.,</u> 487 Mass. 64, 69 (2021) (c. 93A "intended to apply to individuals acting in a business context"). To determine whether a defendant acted in a business context, the court examines "the nature of the transaction, the character of the parties, the activities engaged in by the parties, whether the transaction was motivated by business or personal reasons, whether similar transactions have been undertaken in the past, and whether the participant played an active role in the transaction." <u>Sullivan,</u> 487 Mass. at 69. Whether a defendant was acting in the business context "is determined by the facts of each case" and as such, "[t]his determination is typically for the trier of fact and is preferably decided on a fuller record rather than on a motion to dismiss." <u>Baker</u> v. <u>Wilmer Cutler Pickering Hale & Dorr LLP,</u> 91 Mass. App. Ct. 835, 849-850 (2017) (internal quotations omitted).

Meta argues that using Instagram does not involve trade or commerce because Instagram is a free service. While the Commonwealth concedes Instagram is free to users, the Complaint alleges that Meta offers and distributes its social media services to millions of Massachusetts users, including over 300,000 teens, in exchange for the collection of personal data, which it then uses to sell targeted advertising opportunities to third parties, Complaint ¶¶ 39, 50, 51, 54; and that Meta derives revenue from selling this advertising. <u>Id.</u> at ¶¶ 36, 52, 143. These allegations plausibly suggest that, although free to users, the provision of Instagram accounts serves a commercial end and that therefore, Meta undertook its purportedly unfair and deceptive actions while engaged in trade or commerce. Cf. <u>Planned Parenthood Fed'n of Am., Inc.,</u> 398 Mass. at 493-494 (defendant was not engaged in trade or commerce where it did not charge for its

26

services and "[t]here [was] little question that [its] employees ... [were] motivated in their work to advocate the pro-life position," rather than profit).

**B.    Public Nuisance**

Citing the Restatement (Third) of Torts and cases from outside Massachusetts, Meta argues that the Commonwealth's public nuisance claim should be dismissed because it seeks an unwarranted expansion of the public nuisance doctrine beyond its traditional bounds to include a product and its impact. It also contends that the claim fails because Meta's alleged conduct does not involve a public right. I disagree.

A public nuisance is one that "interferes with the exercise of a public right by directly encroaching on public property or by causing a common injury." Sullivan v. Chief Justice for Admin. & Mgmt. of Trial Court, 448 Mass. 15, 34 (2006), quoting Connerty v. Metropolitan Dist. Comm'n, 398 Mass. 140, 148 (1986). "In determining whether there has been an unreasonable interference with a public right, a court may consider, inter alia, '[w]hether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience[.]'" Id., quoting Restatement (Second) of Torts § 821B. "Massachusetts courts have allowed public nuisance claims concerning dangerous products." Commonwealth v. Purdue Pharma, L.P., 2019 WL 5495866 at * 5 (Mass. Super. Sept. 17, 2019) (Sanders, J) (and cases cited). Here, the Commonwealth alleges that Meta has contributed to a youth mental health crisis by promoting the addictive use of its platform. This is sufficient to support a public nuisance claim.

Meta also argues that the public nuisance claim fails because the Complaint does not plausibly suggest that Meta proximately caused the alleged harms. See Alholm v. Town of Wareham, 371 Mass. 621, 626 (1976) ("plaintiffs ha[ve] the burden of proving that the alleged

27

nuisance . . . was the proximate cause of their injuries"). Meta asserts that those harms are associated with third parties who provide the alleged content and who act independently from Meta. Again, I disagree. As noted above, the Complaint is primarily based on Meta's own conduct, not third-party content. Moreover, because Meta was purportedly aware of the harms occurring to young users from overuse of Instagram, the alleged mental and physical harms suffered by Massachusetts youth and the associated burdens to the Massachusetts school and health care systems were foreseeable.

## ORDER

Defendants' Motion to Dismiss (Docket # 22) is **DENIED**.

Dated: October 17, 2024

Peter B. Krupp
Justice of the Superior Court

28

# EXHIBIT 7

Electronically Filed
9/27/2024 11:13 AM
Steven D. Grierson
CLERK OF THE COURT

TRAN

DISTRICT COURT
CLARK COUNTY, NEVADA
* * * * *

| | | |
|---|---|---|
| STATE OF NEVADA, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. A-24-886127-B |
| | ) | DEPT NO. XXXI |
| vs. | ) | |
| | ) | |
| TIKTOK, INC., | ) | |
| | ) | **TRANSCRIPT OF** |
| | ) | **PROCEEDINGS** |
| Defendant. | ) | |
| | ) | |
| AND RELATED PARTIES | ) | |

BEFORE THE HONORABLE JOANNA S. KISHNER, DISTRICT COURT JUDGE

TUESDAY, SEPTEMBER 24, 2024

**TRANSCRIPT OF HEARING RE:**

**MOTION TO DISMISS**

*SEE PAGE 2 FOR APPEARANCES*

RECORDED BY: LARA CORCORAN, COURT RECORDER
TRANSCRIBED BY: JD REPORTING, INC.

A-24-886127-B | State v. TikTok | Motion| 09-24-2024

1                      **A P P E A R A N C E S**

2   FOR THE STATE OF NEVADA:          MARK J. KRUEGER, ESQ.
                                      Chief Deputy Attorney General
3                                     RAQUEL FULGHUM, ESQ.
                                      Senior Deputy Attorney General
4                                     J. RANDALL JONES, ESQ.
                                      MICHAEL J. GAYAN, ESQ.
5                                     PHILIP D. CARLSON, ESQ.
                                      *Pro Hac Vice*
6                                     DAVID F. SLADE, ESQ.
                                      *Pro Hac Vice*
7

8

9   FOR THE DEFENDANTS:              J. COLBY WILLIAMS, ESQ.
                                      SHAUN A. MATHUR, ESQ.
10                                    Pro Hac Vice
                                      BLAINE H. EVANSON, ESQ.
11                                    Pro Hac Vice

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **LAS VEGAS, CLARK COUNTY, NEVADA, SEPTEMBER 24, 2024, 9:32 A.M.**

2    **\* \* \* \* \***

3    THE COURT: Okay. Pages 9 and 10 is our 9:30 matter.

4    Our 9:30 matter is Case 886127, State of Nevada versus TikTok.

5    Counsels, feel free to come forward, and then I'd

6    like you to make your appearances when you have a moment,

7    please.

8    Okay. Appearances, please.

9    MR. JONES: Good morning, Your Honor. Randall Jones

10   on behalf of State of Nevada.

11   MR. GAYAN: Good morning, Your Honor. Michael Gayan

12   on behalf of the State of Nevada as well.

13   And I'll just announce the folks appearing just

14   observing only on Zoom on behalf of the State of Nevada. It

15   looks like we have Brian Moore, Michaela Hohwieler, Matt Bush,

16   Brian McMath, Sidney Jing, Laura Rios, Samantha Feeley, Anthony

17   Walsh, Michael Gurwitz (phonetic), Naomie Saint-Sume, and

18   Katrina Stark.

19   And I believe I got everybody.

20   MR. SLADE: Good morning, Your Honor. David Slade

21   for the State of Nevada.

22   MR. KRUEGER: Good morning, Your Honor. Mark Krueger

23   on behalf of the State of Nevada.

24   THE COURT RECORDER: I'm sorry. I can't hear

25   anybody. I'm sorry.

JD Reporting, Inc.

3

A-24-886127-B | State v. TikTok | Motion| 09-24-2024

1          THE COURT:  Yeah, because you all are -- there's a

2    lot of rustling with papers and kind of quiet voices.  Feel

3    free.  A nice voice that we can hear you, please.

4          MR. SLADE:  I'll project, Your Honor.  Good morning.

5    David Slade for the State of Nirvana -- Nevada.

6          MR. GAYAN:  Nirvana.

7          THE COURT:  Oh, mispronouncing our State's name one

8    month before Nevada Day.  Oh.

9          UNIDENTIFIED SPEAKER:  We're still working on him,

10   Your Honor.

11         MR. GAYAN:  There's no jury.  There's no jury.

12         THE COURT:  We do not have a jury, yeah.  The juries

13   do not like that.

14         Sorry, Counsel.  The Court takes no opinion on it.

15   Go ahead, Counsel.

16         MR. KRUEGER:  Mark Krueger on behalf of the State of

17   Nevada.

18         MS. FULGHUM:  Raquel Fulghum on behalf of the State.

19         MR. CARLSON:  Phil Carlson on behalf of the State of

20   Nevada.

21         THE COURT:  Counsel for defense.  Where are you --

22         MR. WILLIAMS:  Good morning, Your Honor.  Colby

23   Williams, Campbell & Williams, on behalf of the defendants.

24   And let me just take the lead here and introduce Blaine Evanson

25   and Shaun Mathur, both from Gibson Dunn, both who have been

1    admitted *pro hac vice*, Your Honor.

2          THE COURT:  Anybody remotely that you need to --

3          MR. WILLIAMS:  Not appearing that I need to

4    address -- or excuse me, introduce.

5          THE COURT:  Thank you.  Welcome, everyone.

6          So first let's just get through with the procedural

7    aspect.  The Court had signed the *pro hacs*.  I've been in trial

8    and fifty other things.  I assume you got your MEOs in; is that

9    correct?

10          MR. WILLIAMS:  We did, and we've done the notices of

11    compliance as well, Your Honor.

12          THE COURT:  Perfect.  Thank you so much.

13          Okay.  And on your side you've got yours taken care

14    of?

15          MR. JONES:  It is my understanding that they have all

16    been signed and filed with the court.

17          THE COURT:  Okay.  We didn't see that there was

18    anything outstanding from anyone.

19          So, okay.  So let's get to substance.  So feel free

20    to sit down, stand up.

21          Are we having one person on each side taking the

22    weathering or on --

23          MR. WILLIAMS:  Your Honor --

24          THE COURT:  How are we doing it?

25          MR. WILLIAMS:  Sorry to interrupt.  I was going to

1  make a couple of comments and suggestions, of course, subject

2  to the Court's discretion, and I think Mr. Jones has a couple

3  comments as well.

4       What we had --

5       THE COURT:  You all resolved everything?

6       MR. WILLIAMS:  Well, I think there may be -- I think

7  there might be a difference of opinion, Your Honor.

8       THE COURT:  All right.  Go ahead, please.

9       MR. WILLIAMS:  What we had thought would be efficient

10 was to group the issues into basically three segments.  The

11 first would be to address personal jurisdiction.  We would

12 argue, the State would argue, we would do a reply and close

13 that issue off only because there are so many issues that by

14 the time you hear about personal jurisdiction again if we go

15 straight through, it may be over an hour.  But give or take,

16 that's -- that would be segment one.

17      Segment two would be the CDA, Section 230 argument,

18 grouped with the First Amendment argument because they're very

19 closely related.

20      And then group three would be the State law arguments

21 under the 12(b)(5) motion as to why the claims fail in our

22 opinion.

23      In conjunction with that, Your Honor, we had planned

24 to argue that between Mr. Evanson and myself with Mr. Evanson

25 handling the first three issues, and then I would handle the

1  State law issues, which would be the third segment if the Court

2  proceeded in that way.  Even if we went straight through, we

3  still propose to divide the arguments that way with respect to

4  those issues.

5          THE COURT:  Any objection from your end?

6          MR. JONES:  Yes, Your Honor.

7          THE COURT:  Okay.  So just FYI for those of you who

8  might be newer to the Court, right, is the Court's fine if

9  multiple parties argue if all parties are fine with it.  If

10 there is an objection, I have to hear it because of the way

11 these were -- pleadings were done as a solid pleading, right,

12 not separate motions.

13         But let me hear, Counsel for plaintiff, because are

14 you wanting multiple riders on those horses too?

15         MR. JONES:  You've actually made my point.  I'm going

16 to be the only person arguing on behalf of the State.  This was

17 filed as one motion.

18         I did discuss with Mr. Williams, who I've known for

19 many years, and I explained to him this is certainly nothing

20 personal, it's just I feel that would be inappropriate under

21 the circumstances to allow them essentially -- and I understand

22 their position probably is they're not tag teaming me, but from

23 my perspective, that's in essence what it would amount to, and

24 I think that since they filed it as one motion, then it's one

25 motion, and one party gets to argue -- or one person gets to

1    argue on behalf of that party.  So that's my first concern.

2         I understand you have wide discretion to do what you

3    think is appropriate, but that I think would be inappropriate

4    and based on the custom and practice as I understand it in the

5    Eighth Judicial District Court.

6         The second issue relates to the order of the

7    arguments or the method of arguing.  So having one argument

8    first and then another.  That makes a lot of sense in one

9    respect, that it gives the Court an opportunity to focus on one

10   particular issue, have the full argument made and then make a

11   ruling or defer as the Court sees fit.

12        The concern I have is this, and this is what I

13   expressed to Mr. Williams when he brought this up to me.

14   Because of the fact that these are some pithy briefs here, they

15   have -- well, I guess the Court will determine how pithy they

16   are, but they are certainly thick.  There's a lot of stuff

17   here.  And my concern is even the Court is -- even though the

18   Court has given us a significant period of time to argue these

19   things, the Court has its limits in time.

20        And so what I'm concerned with is there may be, allow

21   me if you will, a limited amount of time to argue the last

22   arguments that are going to be made.  So I don't want to put

23   myself in a position where I don't get to argue my points fully

24   because of the length of time that it's taken on the first

25   issue or the second issue by the time we get to what they have

1    referred to as the third issue.

2            So that's my concern, and I obviously will defer to

3    the Court, however you want to do it, but I have at least --

4    and we won't know if that concern is a legitimate concern until

5    the arguments are over in which case I may have been

6    prejudiced.  And so I'm just trying to avoid any potential

7    prejudice to the State by having that process be the manner in

8    which we proceed today.

9            THE COURT:  Okay.  Let me tell you what I'm thinking.

10            MR. WILLIAMS:  Okay.

11            THE COURT:  The arguments need to proceed all

12    together.  It's a motion to dismiss.  That's the proper way

13    because one, too many different issues and with regards to

14    people want to do it and then people say that they may not have

15    enough time.  We were very clear.  You've got your hour, right,

16    each side.  You can appreciate you've probably heard I'm in the

17    midst of a trial, and I've got jurors driving in from all over

18    the county, and we've got to be fair to them and fair to you.

19            We offered you to change you to a different date.  We

20    understood you all didn't want to.  So right, everyone got the

21    message, yes?

22            MR. WILLIAMS:  We did, Your Honor.  We spoke with

23    your staff.

24            THE COURT:  I'm just saying, you know, we offered to

25    switch you to a different date where we had some more time.

1  Trials are trials.  You all know that.  They need to take

2  priority, particularly when it's supposed to be jury

3  deliberation and closing argument day.

4         So I think the smoother way to do that, the more fair

5  and accurate way is that these were filed as one motion -- is

6  to address them all.  I am more than cognizant that there's

7  multiple issues, but you all can -- you've all appeared before

8  this -- well, most everyone has appeared before this Court

9  before.  That's not unusual.  I get it a lot.  So that's not an

10  issue.

11         The two attorneys arguing, I am inclined to allow two

12  attorneys to argue.  And the same thing with regards to on

13  plaintiff side.  If there's somebody who wants to bring in

14  something that you are able to --

15         The reason why the Court's inclined to do that is I

16  do have to take into account the issue of people wanting their

17  attorney of choice and that as you all both have presented,

18  right, a plethora of things from other jurisdictions, right,

19  (indiscernible) how other Courts that have ruled throughout the

20  country on similar motions, that realistically don't want to

21  have an issue of not having a counsel of choice being able to

22  argue it and have that cloud the actual substantive rulings,

23  okay.

24         Don't hold that to me on other smaller issues when

25  we're in the midst of trial right in front of a jury.  Wholly

1    different situation.

2         But I think that is the appropriate thing because,

3    based on the pleadings as presented to this Court, you all have

4    referenced things outside, and people may have already prepared

5    that way for this issue.  So I think that's the fair way to go

6    there and not multiply the issue.

7         So that means you're going to get it, but that

8    doesn't mean you get another minute.  So if one person is going

9    to be loquacious, then you're going to have less time; right?

10        MR. WILLIAMS:  We understand, Your Honor, and we

11   appreciate the Court's ruling.

12        THE COURT:  Okay.  Are we ready to go into substance

13   now?  Does any --

14        MR. JONES:  Your Honor, yes.

15        THE COURT:  Sorry.  Go ahead, Mr. Jones.  Go ahead.

16        MR. JONES:  The State is ready to proceed.

17        THE COURT:  Okay.  So was there any issue about --

18   because you all had a lot of stipulations on this.  When we did

19   the math on defendants' reply, was there any issue about it

20   being timely or not timely?  Because there's two ways we

21   calculated it, but it looked like you all had an agreement that

22   it was the date; right?  That's not an issue, is it?

23        MR. WILLIAMS:  I'm not aware of that being an issue,

24   Your Honor.

25        MR. JONES:  Nor am I, Your Honor.

1    THE COURT:  Okay.  I had that as a question mark.

2    Okay.  So let's start with your walking through.

3 9:43, whoever is going first, go ahead, please.

4    MR. EVANSON:  Thank you, Your Honor.  And may it

5 please the Court.  First of all, let me thank you for granting

6 my *pro hac vice* admission.  It's an honor to be in your

7 courtroom.  And there's obviously lots to cover today, and we

8 are well aware of the Court's other constraints, and so I'll

9 try to be brief.

10    I'm going to start with personal jurisdiction.  And

11 then as Mr. Williams mentioned, I'll cover the Section 230

12 arguments and the First Amendment.

13    The State's complaint really has two parts to it.

14 The vast majority of the complaint describes the features of

15 the platform that they are challenging and the statements that

16 they challenge as false or misleading.  This section of the

17 complaint is not -- it has nothing to do with Nevada.  It's not

18 directed at Nevada.

19    The features, there's no allegation that the features

20 were created in, created for or directed to Nevada.  That

21 portion of the complaint could be pleaded the exact same way by

22 any plaintiff anywhere in the country.

23    Then there was a smaller section of the complaint,

24 paragraphs 82 to 86 where the State alleges a few contacts with

25 Nevada.  They talk about contracts with Nevada residents.  They

1   talk about a PTA president from Nevada joining a national Zoom

2   call.  They talk about TikTok participating in the Consumer

3   Electronics Show.  The evidence --

4         THE COURT:  Aren't you forgetting some video

5   billboards that they --

6         MR. EVANSON:  Some billboards, exactly.  That's in

7   that section of the complaint.

8         THE COURT:  Okay.

9         MR. EVANSON:  The evidence that they submitted, on

10   many of those allegations, is very flimsy.  As to the what they

11   call the Nevada PTA program, what that was is it's clear from

12   pages 239 to 240 of the appendix, that was a national Zoom call

13   with 91 participants where there was one person from Nevada on

14   that call.

15         And where they say that TikTok maintains a presence

16   at the CES conference, they submitted web search results from a

17   Google search where they searched for TikTok in CES.  Now, I

18   can't even read the results, but they certainly don't show that

19   TikTok had some overwhelming presence at the Consumer

20   Electronics Show.

21         But those sort of problems with their evidence aside,

22   the main problem, the more important problem is that this

23   jurisdictional section of the complaint is the only place where

24   these facts are alleged.  They are not mentioned once elsewhere

25   in the complaint, and they have nothing to do with the actual

1    claims that the State is pursuing here.

2              Same thing in their opposition.  They have this nice

3    little jurisdiction section of their opposition where they talk

4    about all these contacts alleged to -- TikTok to have with the

5    State, but then they do nothing with them elsewhere in their

6    complaint.

7              And the reason for that is that these claims that the

8    State is asserting have nothing to do with the contacts that

9    they are trying to use as a jurisdictional hook.  And that

10   highlights the two-part problem with their jurisdictional

11   argument.  The one, that what they are actually challenging,

12   the actual substance of their claims is not conduct directed at

13   Nevada, conduct that occurred in Nevada that is, you know,

14   engineered for Nevada, and it cannot give rise to personal

15   jurisdiction.

16             And the unrelated Nevada contacts that they allege in

17   the jurisdiction of their complaint can't provide a

18   jurisdictional hook because the State's claims do not arise out

19   of those contacts, and the State does not cite any appellate

20   authority at all supporting personal jurisdiction over an

21   Internet platform that operates -- sorry, supporting specific

22   personal jurisdiction over an Internet platform that operates

23   the same way in every state in the country.

24             And if the State is right and that simply operating a

25   nationwide platform means that you are subject to personal

jurisdiction in all 50 states, then the State has totally
gotten rid of the due process defense of specific personal
jurisdiction. They have completely collapsed general and
specific personal jurisdiction, and that is exactly what the
Supreme Court and *Bristol-Myers Squibb* said that you cannot do.

In that case, the Supreme Court said you cannot
simply allege enough contacts that at some point there are
enough contacts with the State when aggregated give rise to
specific jurisdiction.

You are either at home in the state or you are not,
and there's no claim whatsoever that TikTok is at home in
Nevada for purposes of general personal jurisdiction or the
claim has to arise out of or relate to the contacts. And so
this disconnect in the State's complaint between the facts that
they allege for jurisdiction and the claims they assert is
fatal to the personal jurisdiction in this case.

And the State's attempt to subject TikTok to personal
jurisdiction is particularly pernicious when viewed in the
broader context of what's going on here. TikTok is subject to
general personal jurisdiction in California, and there are
dozens of cases that have been filed there, and TikTok is
defending them.

But on the features that the State challenges in this
case, the plaintiffs have lost. The Federal District Court in
the MDL in Northern California ruled that those features are

1   either -- or the claims related to those features are barred by

2   either Section 230 of the Communications Decency Act or the

3   First Amendment.

4            But if the State is right, then TikTok has to

5   continue defending those same claims in all 50 states where

6   it's going to get conflicting rulings and duplicate efforts.

7   And that's already happening, and that is simply completely

8   anathema to the due process concerns that animate the personal

9   jurisdiction doctrine.

10           And there are a host of federal appellate decisions

11  that have grappled with this question of personal jurisdiction

12  for interactive online platforms that are available throughout

13  the country, and we point the Court to the *AMA* decision out of

14  the Ninth Circuit, the XMission decision out of the 10th

15  Circuit, and the *Johnson versus HuffingtonPost* case out of the

16  Fifth Circuit.

17           These are nationally available platforms.  They

18  provide an interactive experience in one way or another.  They

19  target individuals throughout the country.  But because the

20  platforms operate the same way in all 50 states and do not

21  target any individual state, they can only be sued in their --

22  in the jurisdiction where they are at home where they're

23  subject to general personal jurisdiction unless a claim

24  actually arises out of a contact that the platform has with a

25  particular forum.

1          And the *XMission* case describes this in detail.  It

2     says there has to be a particular focus by the defendant on the

3     forum state for specific personal jurisdiction to be

4     appropriate.  The conduct must be expressly aimed at the forum

5     state, and the platform's availability in the forum is

6     insufficient.

7          And these courts have all explained, as I'm arguing

8     this morning, that if it were otherwise, then the due process

9     defense of specific personal jurisdiction would no longer exist

10     for Internet platforms.  They would essentially be subject to

11     general personal jurisdiction in all 50 states, and the Supreme

12     Court has expressly rejected that.

13          Now, the State's lead case, the one that they lead

14     with in the jurisdiction section, is a case from the Supreme

15     Court called *South Dakota versus Wayfair*.  That case is not a

16     personal jurisdiction case.  It does not even use the term

17     personal jurisdiction in the opinion.  It is a Commerce Clause

18     case about the scope of a State's power to tax.  It has nothing

19     to do with personal jurisdiction.

20          The State also relies on the *Ford* case from the

21     Supreme Court, but *Ford* had in-state brick and mortar car

22     dealerships, and the in-state advertising was used to direct

23     people to the car dealerships.

24          And the Court said in Footnote 4 of that opinion that

25     it was not ruling and that the situation would be different if

1    we were talking about an Internet platform and e-commerce.  So

2    that case does not apply here.

3           There are a series of cases dealing with this

4    question of interactive online platforms, and the State simply

5    ignores those cases.  Again, the *AMA* case, *XMission* case, and

6    *TheHuffingtonPost* case.  They cite the Arkansas Superior Court

7    trial court decision.  That case has been taken up by the

8    Arkansas Supreme Court on a writ.  And so that case is, you

9    know, no longer something that should be relied on.  It's going

10   to be reviewed by the highest court.  But the federal appellate

11   authority on this question is uniform and requires the Court to

12   deny personal jurisdiction in this case.

13          I'm happy to take any questions that the Court has on

14   personal jurisdiction.  But if not, I'll move on to

15   Section 230.

16          THE COURT:  I do have a quick question.  So what are

17   you contending would be the remedy for the State of Nevada if

18   it had any concerns about your client?  Are you saying they'd

19   have to go to California and address those concerns?  Because

20   you know what I mean?

21          MR. EVANSON:  Yeah.

22          THE COURT:  You're not the first -- you've probably

23   done your research, and at least you know you're not my only

24   case kind of in this area that's before this Court.

25          MR. EVANSON:  Yeah.

1    THE COURT: But so I asked the same question last

2   time. I'm just saying. So if you all check the transcripts,

3   you would have seen I asked the same question last time because

4   that is an issue.

5        I mean, where would the State of Nevada be able to

6   get some kind of remedy if they are asserting that they're

7   aggrieved here in the State of Nevada?

8        MR. EVANSON: Yes, Your Honor. They would file suit

9   in California, like many people have. Plenty of out of

10   people -- out of state people --

11        THE COURT: States -- are you telling me the State of

12   Nevada would have to file in California to say -- to protect

13   rights of its Nevada citizens? That's -- I mean, are you

14   saying that any other state has done so?

15        MR. EVANSON: Yes, Your Honor. That is exactly

16   right. Because the test here, and the law is absolutely clear

17   on this. I point the Court to the *Walden* case in front of the

18   Supreme Court. The law is absolutely clear that the personal

19   jurisdiction analysis is not focused on the harm to the

20   plaintiff. It is focused on the defendants' contacts with the

21   forum.

22        THE COURT: Right.

23        MR. EVANSON: And so it does not matter that we're

24   dealing with the State of Nevada here. It does not matter that

25   the State of Nevada is purporting to assert the interests of

1    Nevada.

2             What matters is whether TikTok has availed itself of

3    the forum.  And so it's -- I understand the sort of the concern

4    for the Court, but it is not legally relevant that it is the

5    State of Nevada asserting the interest here because this is a

6    due process rule under the federal due process (indiscernible).

7             THE COURT:  The Court wasn't asking the question in

8    flipping the law.

9             MR. EVANSON:  Sorry, Your Honor.

10            THE COURT:  The Court was, it was more like kind of

11   the reality.  Are you saying that any states have asserted

12   their rights in California?

13            MR. EVANSON:  Yes, Your Honor.  And I don't have the

14   list of which states with me, but I will give that to you in

15   rebuttal.  But, yes.  And plenty of out-of-state plaintiffs as

16   well.  Those are being litigated in the MDL in Northern

17   California.

18            THE COURT:  Okay.  Thank you.  That was my only

19   question.

20            Go ahead, please.  Next topic.  Are you doing 230, or

21   what are you doing?

22            MR. EVANSON:  I'm doing 230, yes.

23            THE COURT:  Okay.

24            MR. EVANSON:  So Section 230 shields online platforms

25   from liability for publishing third-party speech.  And the

1   statute says that no provider or user of an interactive

2   computer or service shall be treated as the publisher.  That's

3   the operative language:  Shall be treated as the publisher or

4   speaker of any information provided by another information

5   content provider.

6           And Courts have consistently interpreted Section 230

7   broadly.  They have said that closed cases must be resolved in

8   favor of immunity.  And the reason is these Courts are trying

9   to -- they're acknowledging that Congress passed Section 230 to

10  promote the free exchange of information and ideas over the

11  Internet and to encourage -- encourage voluntary monitoring for

12  offensive or obscene material.

13          So our courts in a litany of cases discussed in our

14  papers have interpreted Section 230 to immunize not just the

15  simple publishing of the third party's text on the platform but

16  for the features and conduct attendant to that publication.

17  And they look to just the commonsense definition of what

18  constitutes publishing, that it's editorial decisions and

19  functions ancillary to the decision to publish the content.

20          So they have held that reviewing, editing and

21  deciding whether to publish third-party content that that's

22  publishing activity.  The deciding whether to withdraw,

23  postpone or alter content, recommending user-generated content

24  and sending notifications about that content, these are all

25  functions that are attendant part of the publication of

1    third-party content, and they are covered by Section 230.

2              And in the MDL that I mentioned, a case -- a decision

3    last year against TikTok challenging the very features that the

4    State is challenging in this case, the Court ruled that these

5    same features are included within Section 230 because they are

6    attendant to the publishing process.

7              Now, the State argues that its claims are not barred

8    by Section 230 because it has pleaded its complaint to target

9    TikTok's features rather than the third-party content that the

10   platform publishes.

11             But Section 230 does not say that a platform is

12   immune only for third-party content.  It says that you can't

13   treat the platform as a publisher of third-party content.

14   That's what the plain text of the statute says, and that's the

15   way Courts have interpreted.

16             So the State is simply dead wrong as a matter of law

17   in its argument that features are for some reason exempted from

18   the scope of Section 230.  And we have a whole list, 10

19   bullets, on page 12 of our reply brief detailing all the ways

20   in which Courts have found that features of platforms that

21   publish third-party content are included within the scope of

22   Section 230 and therefore cannot be the substance of a claim.

23             The State harps on the *Lemmon* case.  But the reason

24   Section 230 did not apply there was that it was the platform's

25   content and not the third party's content.  And the Court said

1  expressly in Footnote 4 of the decision that if the feature on

2  Snap would have been used as part of a publication of

3  third-party content, that it would have been -- it would have

4  been brought within the scope of Section 230.

5          So the question is not whether the State has artfully

6  pleaded its complaint to attack a feature rather than a

7  particular piece of third-party content.  The question is

8  whether the claim in substance treats the online publisher

9  as -- or sorry, treats the online platform as a publisher of

10  third-party content.  And there's no question that the same

11  claims here do that, that the State is attempting to affect the

12  way that TikTok publishes content.

13          And if you look at each of the design features that

14  the State challenges, they are all central to the way that

15  TikTok publishes content.

16          And so starting with the recommendation algorithm,

17  the way -- this is from the way that the State pleads its

18  complaint, the way that it has described the platform in the

19  allegation.

20          The State's claim is that the algorithm works too

21  well, that it delivers content to users, that the users find

22  especially attractive or -- and as a result, they consume too

23  much content.  That's the substance of the State's claim as to

24  the recommendation algorithm.  But that claim treats TikTok as

25  the publisher of third-party content.  Publication almost

1  always includes making choices about what to include and what
2  to exclude, and that's what the algorithm does here.  That's
3  what they are challenging.

4          Algorithms make recommendations based on the user's
5  activity, and they decide what to publish, and the algorithm is
6  therefore central to that publication process.

7          Many Courts have considered this same claim,
8  challenges to algorithms, and the Courts have held that a
9  challenge to the recommendation algorithm treats the platform
10  as a publisher and is therefore barred by Section 230.

11          And I'd point the Court to the *Dyroff* case from the
12  Ninth Circuit, page 1098 of the opinion and to the MDL, which
13  again considered this exact same claim, exact same feature
14  against TikTok, and the Court held that whether -- this is
15  straight out of the opinion, page 833 to 834 -- whether done by
16  an algorithm or editor, the decisions whether, when and to whom
17  to publish third-party content are traditional editorial
18  functions that are essential to publisher.

19          And the Court dismissed that claim on pleadings under
20  Section 230.

21          The second feature they challenge is endless scroll,
22  what they call endless scroll and AutoPlay, that as you, you
23  know, swipe up on the platform that the For You page
24  continuously gives you videos and that those videos start
25  automatically.  Now, to clarify, that does not mean that you

1   just open the app, and it just feeds you videos forever.  You

2   have to swipe up, and it responds to that input.

3           But the State -- and the State's claim is essentially

4   that this feature results in the TikTok platform publishing too

5   much content to users, but that claim treats TikTok as the

6   publisher of third-party content.

7           The question of how much content to deliver is

8   fundamentally a publishing decision.  A newspaper's decision of

9   how many pages to include in a particular section is a

10  publishing decision, and the Courts, again, the Courts that

11  have considered this claim have held that the claim challenging

12  what the State calls infinite scroll is a challenge to or

13  treats the TikTok platform as a publisher of third-party

14  content.

15          And I would point the Court to the *Force versus*

16  *Facebook* case.  And again, the MDL, which dealt with this exact

17  same claim against TikTok.

18          Now, I'm happy to keep running through all the

19  features that they challenge, but the story is basically the

20  same, that in each one of these instances they are complaining

21  about a feature on the platform, not in the abstract, but it's

22  a feature that publishes third-party content.  And in doing so,

23  they are treating TikTok, the TikTok platform as a publisher of

24  third-party content, and that is exactly what Section 230

25  prohibits.

1      Now, the State says at one point in its brief that
2  it's not trying to stop TikTok from publishing third-party
3  content, but that's again the substance of the claims.  That's
4  just not true.  Because by challenging the recommendation
5  algorithm, the State is trying to change the content that
6  TikTok publishes on the platform to make it whatever, less
7  attractive, less enticing, less likely to keep people looking
8  at it.  By challenging the AutoPlay and the infinite scroll
9  features, the State is trying to force TikTok to publish less
10 content.

11      So they are trying to through this lawsuit force
12 TikTok to change the way it publishes content on the platform,
13 and that treats TikTok like a publisher.  That is exactly what
14 Section 230 was designed to prohibit.  These are direct attacks
15 on TikTok's publishing activity, and they fall within
16 Section 230.

17      I'm happy to answer any Section 230 questions the
18 Court has.

19      THE COURT:  I do.  I do.  It's a *Dyroff* related
20 question, okay; right?  They adopted the *Barnes versus Yahoo!*
21 test, right, the three-prong test.

22      But here, I was trying to -- that was different;
23 right?  A child -- unfortunate child ends up dying, right,
24 because of drug overdose, and they say, you know, that there
25 was -- a mother trying to do a connection between the

JD Reporting, Inc.

26

1   application of the provider to the experience project,

2   et cetera.

3             But here, I'm trying to see what's your applicability

4   to this case; right?  Because I have to look at a motion to

5   dismiss standard, and it's plaintiffs are the master of their

6   complaint, right, and I have to treat their allegations as

7   true.

8             So how are you saying that the *Dyroff* design features

9   and functions case really is applying to this case and then by

10  extension that the Court should because Nevada Courts sometimes

11  look right to the federal law to brace the Ninth Circuit;

12  right?  Because I don't see that connection; right?  There was

13  a very tenuous concept, right, of that a provider somehow could

14  be responsible for a son hooking up with a drug dealer, buying

15  drugs and then unfortunately passing away before that.

16            Here, the allegations are such, but you're saying

17  that their allegations really were heading to something else.

18  Can I look at that on a motion to dismiss standard are you

19  contending?

20            MR. EVANSON:  Yes, Your Honor.

21            THE COURT:  Okay.  How?

22            MR. EVANSON:  And let me try and address your

23  question.  So it is true that *Dyroff* involved a different, you

24  know, type of platform, and --

25            THE COURT:  Not only a different type of platform;

1   right?  It was an indirect aspect of trying to attribute a drug

2   overdose.  Here, by their allegations, which I have to take as

3   true; right?

4          MR. EVANSON:  Yes.

5          THE COURT:  They're not saying that TikTok has caused

6   something which they're seeking a remedy for; right?  They're

7   seeking a remedy for, in their words, aspects of TikTok.

8          MR. EVANSON:  Right.

9          THE COURT:  So can you kind of explain how you're

10  saying the 230 analysis -- they're kind of articulating taking

11  *Barnes versus Yahoo!* really is applying to this case in the 12,

12  in the motion to dismiss standard under our state law.

13         MR. EVANSON:  Yes.  So I think the answer to Your

14  Honor's question is that if you read *Dyroff* --

15         THE COURT:  When I read *Dyroff*, but go ahead.

16         MR. EVANSON:  Yeah.  When you read *Dyroff*, it's clear

17  that the Ninth Circuit is looking at the features of the

18  platform that were challenged because just like the State here,

19  the plaintiff in that case said the problem with the platform

20  is it recommended this content, and it sent a notification to

21  connect these two users that caused the harm.

22         So in *Dyroff*, as in this case, what the plaintiff was

23  challenging was the features of the platform that they said

24  caused the harm.

25         Now, it's a different type of harm, and that's true

1   because the facts are different, but it's still a challenge to

2   the features of the platform, which is what the State says

3   Section 230 doesn't cover.

4           And I think the best way for the Court to interpret

5   *Dyroff* is to read the way that the MDL interpreted it.  The MDL

6   decision is obviously bound by *Dyroff* as the Ninth Circuit

7   binding precedent, even more bound than this Court is.  You're

8   not bound at all.

9           THE COURT:  I'm a little State Court Judge.

10          MR. EVANSON:  I know, yes.

11          But the MDL decision in painstaking detail talked

12  about *Dyroff*, *Barnes*, all the other authority and said, you

13  know, when you're challenging features, if those features

14  require you to treat the platform as a publisher of third-party

15  content, and that's what the statute says, then it falls within

16  Section 230.

17          THE COURT:  Which is highlighting where my question

18  was; right?  It's that "if."  Right?

19          MR. EVANSON:  Yes.

20          THE COURT:  If you're treating, right, and you're

21  treating it as a platform for content, how are you linking that

22  to a motion to dismiss in this case if the Court should make

23  that -- they're calling it a presumption.  You're calling it

24  it's the law, but, okay.

25          MR. EVANSON:  I would invite the Court to look at the

1    way they have pleaded their claims because we are not saying

2    that, you know, they've pleaded their claims one way, and we're

3    asking the Court to look outside the complaint.  They have

4    pleaded their claims in a way that is clear that the features

5    that they target are part of the process for publishing

6    third-party content.

7          So if you look at -- it's just on the -- on the

8    recommendation algorithm.  For example, look at paragraphs 35,

9    36, 103 and 110 to 112.  Those paragraphs -- those paragraphs

10    of the complaint describe how the -- they allege the

11    recommendation algorithm works.  And they don't describe that

12    algorithm as operating in a vacuum.  They describe that

13    algorithm as deciding what third-party content to publish.

14          So the Court's on a motion to dismiss.  I understand

15    the deferential standard, the pleading standard, but they have

16    pleaded their claims in a way that makes clear they are

17    targeting the platform's publication's third-party content

18    because the features they are challenging they describe in the

19    complaint, publish third-party content.

20          On the infinite scroll and AutoPlay allegations,

21    that's paragraphs 108 to 109 and 113, same thing.  They

22    describe the way that infinite scroll works, not in, you know,

23    a vacuum, but the way that it publishes third-party content.

24          So I don't think the Court needs to venture beyond

25    the complaint as well.  You just need to take their allegations

1  as pleaded and see that they are describing the features of the
2  platform in a way that makes clear they publish third-party
3  content.
4          Now, they characterize their claims as no, we're not
5  talking about the content, but they allege publication of
6  third-party content.  And so that's squarely within
7  Section 230.
8          THE COURT:  Appreciate it.  Thank you.  That was all
9  the questions.
10         Go ahead, please.
11         MR. EVANSON:  Okay.  Moving on to the First
12  Amendment, and I will be brief here.  The sort of elephant in
13  the room in the First Amendment is *Moody versus Netchoice*.
14  Just a couple months ago the Supreme Court decided that case
15  and held very clearly that when a platform curates and compiles
16  user generated content into its own expressive offering, that
17  is expressive activity subject to First Amendment scrutiny.
18         And the Supreme Court in *Moody* rejected many of the
19  arguments that the State made in its opposition now.  The State
20  did not have the benefit of *Moody* when it wrote its opposition,
21  but the -- those arguments were rejected by and large by the
22  *Moody* Court which said that using an algorithm to curate and
23  compile third-party content into a platform's own expressive
24  offering is still the platform's expressive activity, and that
25  is what the State is challenging here, TikTok's expressive

1    activity.

2          As the complaint alleges, as the complaint describes,

3    the algorithm analyzes content posted on the platform.  It

4    culls from the third-party content.  It applies its content

5    moderation protocols, and it curates a feed of content that the

6    algorithm deems beautiful and attractive and expressive.  And

7    that feed is TikTok's expressive activity.

8          On the push notifications, TikTok pulls out

9    third-party content.  The algorithm makes choices about which

10   third-party content to promote and determines when to convey

11   the speech.  Again, this is all alleged in the complaint, and

12   the result is TikTok's expressive offering and will be held

13   squarely -- there was a holding in the case that that is

14   subject to First Amendment scrutiny.

15         The other binding case from the U.S. Supreme Court is

16   *Brown*, and we discussed *Brown* at length in our motion, and it

17   got one sentence in the State's opposition.  *Brown* was about a

18   2011 California ban on video games.  And, of course, video

19   games were the hysteria before social media, and California

20   banned a certain subset of video games, and the Supreme Court

21   invalidated that statute under the First Amendment.  The Court

22   said that basic principles of freedom of speech do not vary

23   when a new and different medium of communication appears, but

24   the First Amendment does not include a free-floating power to

25   restrict the ideas to which minors may be exposed.

1    And the Court in *Brown* made clear that there are

2 certain areas where the State has an interest in regulating.

3 They can prevent obscenity. They can prevent incitement. It

4 can prohibit fighting words, but it doesn't have this

5 free-floating ability to ban all speech to minors and to keep

6 dangerous ideas from them.

7    And so we again we cited and discussed all of this in

8 our papers, and the State had no opposition to it.

9    We think that no matter the level of scrutiny that

10 the State's enforcement action doesn't survive it. We think

11 strict scrutiny applies because the complaint makes clear that

12 the State is targeting content.

13    With respect to each of the features the State

14 challenges, it is attempting to alter TikTok speech. It wants

15 it to publish different speech on the For You Page, speech that

16 has a different recommendation algorithm that, you know, it

17 wants it to publish different notifications or to prevent

18 certain notifications. That is targeting the content of the

19 expressive activity on the TikTok platform, and it gets strict

20 scrutiny. And the State has not even claimed that it can

21 satisfy strict scrutiny.

22    But even if intermediate scrutiny applies, the

23 State's claims fail because what they are doing is trying to

24 ban speech across the board. They have not targeted particular

25 content on the platform that they say might warrant some sort

1  of restriction.  It's not -- you know, they're not limiting it

2  to obscenity or fighting words or incitement.  They're banning

3  all speech within the realm of what they're challenging, and

4  that's going to include political speech.  That's going to

5  include butterflies in meadows.  It's going to include harmless

6  and beautiful artistic expression.  It's going to wrap in all

7  that because they are not distinguishing between the content

8  that is harmful, they allege, and the content that they have no

9  interest whatsoever in prohibiting.

10       And so this across-the-board approach is not narrowly

11  tailored to whatever interest the State has in restricting

12  speech.  And so it would fail even intermediate scrutiny.

13       And I am happy to answer any First Amendment

14  questions the Court has.

15       THE COURT:  I do not have any First Amendment

16  questions.

17       MR. EVANSON:  Okay.  Thank you, Your Honor.

18       THE COURT:  Appreciate it.  Thank you so very much.

19       Okay.  Counsel, feel free to proceed.

20       MR. WILLIAMS:  Thank you, Your Honor.  Colby

21  Williams, for the record, on behalf of the defendants.  And I

22  will likewise try to move through this quickly, but, of course,

23  Your Honor, to the extent you have questions on any of these

24  issues, feel free to stop me.

25       THE COURT:  No worries.

1       MR. WILLIAMS:  As the Court has pointed out we're

2  here on a 12(b)(5) motion, at least this portion that I'll be

3  arguing is a 12(b)(5) motion and the arguments as to why we

4  contend the State law claims fail.

5       And the Court does have to consider well-pled factual

6  allegations as being true, but we would submit on behalf of the

7  defendants, Your Honor, that despite the application of that

8  standard, which we're prepared to address, TikTok not does not

9  concede any of the State's allegations have merit.

10       But taking any well-pled factual allegations as true,

11  we submit all of the claims still fail for additional reasons.

12       Let's start with Counts 1 and 2.  These claims are

13  both brought under the Nevada deceptive trade practices act,

14  and they both fail for a common reason, and that common reason,

15  Your Honor, is that the statutory scheme requires a sale or

16  lease of goods or services.  In order for the statute to apply,

17  there has to be a sale or lease.

18       Here, Your Honor, it is undisputed that the TikTok

19  platform is downloaded for free.  There is no exchange of

20  money.  And if there's no exchange of money, there's no sale.

21  There is no lease.  Your Honor, would not be the first Court to

22  reach that conclusion.

23       We have cited to you the cases from Indiana.  We

24  refer to them in the briefing as Indiana I and Indiana II where

25  two different Judges in Indiana -- one at the preliminary

A-24-886127-B | State v. TikTok | Motion| 09-24-2024

1   injunction stage, one at the motion to dismiss stage -- looked
2   at this exact issue under Indiana's version of its Deceptive
3   Trade Practices Act, and it found that downloading the app for
4   free was not a, quote, Consumer Transaction, end quote, under
5   that State's scheme.

6          Consumer transaction in turn was likewise based on
7   the existence of a sale. There was no sale there. There is no
8   sale here. We've cited additional cases, Your Honor, including
9   the *Claridge versus RockYou* case, where there it was
10  downloading a free app, and the Northern District of California
11  said there was no purchase of goods or services under
12  California's version of its Deceptive Trade Practices Act. So
13  for that reason, Your Honor, both Count 1 and Count 2 fail, but
14  they fail for additional independent reasons as well.

15         Talking about Count 1 first. This is a claim that is
16  premised on alleged misrepresentations and alleged omissions
17  regarding the platform's safety.

18         If we're talking about misrepresentations and
19  omissions, we are talking about claims that sound in fraud.

20         Even though this is being brought as a statutory
21  claim under the act, it is premised on factual -- alleged
22  factual misrepresentations and alleged omissions. And, Your
23  Honor, if that's the case, then Rule 9(b) applies, and these
24  claims have to be pled with particularity.

25         Now, if you look at this complaint, despite its heft,

JD Reporting, Inc.

36

1    there is no allegation in here or there are no allegations with

2    respect to the who, what, when, where and how that is required

3    to be pled when you are pleading fraud claims.

4            The same is true with the alleged omissions.  There

5    is no allegation about what the omitted or material facts were,

6    Your Honor, and so what does the State say in response to this?

7    We don't have to plead under Rule 9(b) because we are suing

8    under the act.  And what they say is that the act is remedial

9    and that it is to be construed liberally, and it cites to you

10   several Nevada cases from the Supreme Court and the appellate

11   court, *Betsinger*, *Poole* and, to a lesser extent, *R.J. Reynolds*.

12           And what those cases say, Your Honor, is that there

13   are some distinctions between pursuing a claim under the act

14   versus pursuing a common law fraud claim.  For example, you

15   don't have to establish a claim under the act by the higher

16   burden of clear and convincing evidence.  You don't have to

17   establish knowingly by proving deceit was part of the wrongful

18   actor's mindset.

19           But, Your Honor, what those cases do not address are

20   the pleading standards at the outset of a case, when a

21   defendant is entitled to notice of what it is being sued for.

22   And every federal court case that has looked at that issue,

23   Your Honor, in Nevada I'm speaking of, has found that the

24   Rule 9(b) pleading standards still apply.  And those cases,

25   most recently the *Austin* case specifically acknowledge the

1    Nevada Supreme Court's interpretation of the act under

2    *Betsinger* and *Poole*, acknowledge that it's remedial,

3    acknowledge that it gets construed liberally, but it said you

4    still have to plead under 9(b) at the outset.

5            And, Your Honor, again, I don't have time, nor does

6    the Court to go through all this, but let me read one example

7    of the problem with the complaint that the defendants are faced

8    with.

9            Paragraph 224, Your Honor, falls under the heading of

10   Through Public Misrepresentation and Material Omission,

11   Defendants Lead the Public to Trust That TikTok Is Safe for

12   Young Users.

13           Now let's look at one of the allegations under here.

14   224 says, Moreover, defendants know that any statement

15   regarding the substance of content on TikTok and its

16   appropriateness for young users is also false.

17           THE COURT:  Can I pause you for a quick second?

18           MR. WILLIAMS:  Of course.

19           THE COURT:  I was just making sure you -- you said

20   224; right?

21           MR. WILLIAMS:  I did say 224.

22           THE COURT:  You may not recall, remember, there's a

23   redacted version of the complaint.

24           MR. WILLIAMS:  There is.  And that's the one I'm

25   holding.

A-24-886127-B | State v. TikTok | Motion| 09-24-2024

1        THE COURT:  Okay.  And so -- because the one --

2        MR. WILLIAMS:  And this is the amended complaint I'm

3    reading from, Your Honor.  We probably filed a different

4    version.

5        THE COURT:  Right.  Okay.  That's why I was quickly

6    checking to make sure you weren't saying something on the

7    redacted portion.  Go ahead, please.

8        MR. WILLIAMS:  Correct.  And when I say we, I should

9    say that the State filed an updated complaint, Your Honor.  So

10   I'm on 224.

11        THE COURT:  Okay.

12        MR. WILLIAMS:  And not to bog us down, there are some

13   typos with respect to paragraph numbers, but I think they show

14   up later, and so I don't think that's impacted by what we're

15   talking about here.

16        So to repeat, paragraph 224 says, Defendants know

17   that any statement regarding the substance of content on TikTok

18   and its appropriateness for young users is also false.

19        Now, could there be any broader of a statement than

20   we're having to address any statement that's ever been made

21   about the content that appears, Your Honor?  I would submit

22   that highlights why the pleading standard of 9(b) has to apply

23   here, but there are other problems with Count 1.

24        The statements that they rely on to challenge

25   TikTok's position on safety are replete with nonactionable

A-24-886127-B | State v. TikTok | Motion| 09-24-2024

1  statements that constitute opinion, Your Honor.  You'll see it
2  throughout the complaint, and I can take off some paragraphs
3  for you:  222, 240, 241, 243, 246.  You don't have to look at
4  them now, but we can go over them.

5      What these statements are, are they are statements
6  that are talking about TikTok's prioritization of safety or its
7  approach to the well-being of its users, the goals that it has
8  for the platform, statements about that the platform supports
9  or that it is committed to.  These are aspirational statements,
10  Your Honor.  They are not actionable opinion.  They are
11  forward-looking, and they reflect corporate optimism.

12      And when we're talking about those kinds of
13  statements, those classically have been rejected as a basis for
14  a fraud claim, and we've cited to you a number of cases for
15  that, but I'll just focus on the *Ford Motor* case from the Sixth
16  Circuit, which there it was a securities case where the types
17  of statements were things like, Quality comes first, Quality is
18  a top priority.  We want to make customers' lives safer.  And
19  the Court found that those types of statements are
20  nonactionable opinion.  They are not misrepresentations of
21  fact.

22      Similarly, in the In re Lyft Securities litigation
23  case; there the Court looked at it and said, Lyft didn't
24  guarantee safety.  What it said was that it believed in safety,
25  that it thought it was important and that it was committed to

JD Reporting, Inc.

1    safety.  Those were not actionable misrepresentations.  And if

2    you look at the paragraphs that I cited to you, Your Honor,

3    that's the exact type of language that they are complaining

4    about, what our goals are, what our commitments are, what our

5    priorities are.  Those are not statements of fact upon which a

6    fraud claim can rest.

7            Moving on to Count 2, Your Honor.  This claim

8    likewise fails due to the lack of a sale.  I will not repeat

9    that.

10           But what this claim is seeking relief for, Your

11   Honor, are alleged unconscionable acts.  And here, what the

12   State must show is that the defendants took advantage of

13   Nevadans', quote, lack of knowledge, ability, experience, or

14   capacity to a grossly unfair degree.

15           Now, the Nevada courts have not interpreted this

16   language, but we did provide the Court with other Court

17   opinions that have interpreted this exact language,

18   specifically from Texas.  And what the Texas Courts have said

19   is this language means that the resulting unfairness that we're

20   talking about must be glaringly noticeable, flagrant, complete

21   and unmitigated, Your Honor, complete and unmitigated.  And

22   what the Courts also say is that this is an objective standard.

23           Now, the so-called design elements that are being

24   complained about in the complaint, Your Honor, are standard

25   features that have been available for years.  They're part of

1    the platform's infrastructure through which content is

2    filtered.

3              The platform has a set of community guidelines that

4    explain how the platform works.

5              And I would submit, Your Honor, that the State

6    actually pleads itself right out of this claim when you read

7    the complaint.  You obviously have to take well-pled factual

8    allegations as true, but let's look at what they say.

9              One thing that the complaint is detailed on is it has

10   an abundance of information about what the public knew about

11   how these platforms work.  It repeatedly relies on the Netflix

12   documentary, The Social Dilemma.  It cites numerous surgeon

13   general advisories, and it cites abundant other sources, all

14   explaining how these platforms work.  So there was no lack of

15   public knowledge.

16             To use the words of the statute, there was no lack of

17   knowledge based on the State's own allegations, Your Honor.

18   The objective facts indicate that users have ample information

19   at their fingertips disclosing how social media platforms work,

20   including the TikTok platform, Your Honor, and that's not all.

21   With respect to the issue of mitigation, the State again admits

22   in its complaint that the TikTok platform takes steps to

23   mitigate against harm.

24             Again, we have the community guidelines saying what

25   can and cannot be on the platform.  There are moderation

1   efforts to take down material that -- or content that does not

2   belong on the platform.  There are screen time tools to limit

3   the amount of time someone may be on the platform.  The State

4   admits all of these items exist and that TikTok enforces them.

5         What the State's complaint appears to be is that we

6   don't do it good enough.  And if that's the argument, that we

7   don't do a good enough job of content moderation, then that

8   runs smack into the Section 230 arguments that you just heard

9   about, and I certainly won't waste time repeating those, Your

10   Honor.

11         So I'm going to move on to Counts 3 through 6.  If

12   you have any questions about 1 and 2, I'll stop for a moment.

13         THE COURT:  I do not.  Thank you.

14         MR. WILLIAMS:  And I'll try to hustle up through

15   here.

16         Your Honor, Counts 3 through 6 are common-law and

17   equitable claims.  They are for products liability, negligence

18   and unjust enrichment.  They likewise all suffer from a common

19   defect, and that is the State lacks standing to bring these

20   claims.

21         If you look at the complaint, the basis for alleged

22   standing to bring these claims in the complaint is the doctrine

23   of *parens patriae*, but that does not apply here, Your Honor.

24   That doctrine is reserved for situations where we're talking

25   about public hazards or other wrongs that affect nearly the

1    entire population or the entire population.

2            What that doctrine does not support is the ability of

3    a State to pursue money damages claims on behalf of individual

4    citizens who are perfectly capable of bringing those same

5    claims themselves.  And the State has acknowledged Nevadans

6    have brought claims against social media platforms and that

7    they may do so in the future.  That's in the complaint.  So

8    there's no dispute that Nevadans could bring these claims if

9    they wanted to.

10           So if *parens patriae* is out, then what's the basis of

11   standing, because it's the State's burden to show that it can

12   bring these claims, Your Honor.  And it hasn't done so.

13           This question is informed by the fact that the powers

14   and duties of the AG have to be spelled out by a legislative

15   enactment.  In other words, they've got to point to you a

16   statute that allows them to bring these common law and

17   equitable claims.  So they tried to do that in the opposition.

18           Respectfully, we say that they are -- we believe they

19   are unsuccessful in doing so.  NRS 228.170 is the first statute

20   that they cite which allows a claim to be brought or defended

21   to protect and secure the interests of the State.

22           Now, Your Honor, again, the State isn't pursuing its

23   own alleged interest here.  It's pursuing interest on behalf of

24   Nevada citizens.  And when this situation has come up

25   previously under the prior version of this statute in *State*

1    *versus Moore*, the Nevada Supreme Court said the State can't use

2    it in the way that it's trying to do so here.

3              What the Court said in that case is that the term

4    interest has to be given its plain and ordinary meaning.  That

5    case involved the State's effort to set aside a divorce it

6    believed had been obtained improperly.  And what the Supreme

7    Court said was, while the State may have a interest in

8    marriage, that interest is not harmed when a private couple

9    divorces, and so you can't use the statute to bring this claim.

10             Here, the allegation is not that the State is

11   allegedly addicted to TikTok; it's that Nevada consumers

12   allegedly were, you know, addicted to TikTok.  That, Your

13   Honor, is not a basis to pursue these claims under this

14   statute.

15             Under 228.390, the next one that they cite, this is

16   part of a series of statutes that creates a bureau of consumer

17   protection and a consumer advocate.  It has to be read in the

18   statutes that surround it.  When you look at the prior statute,

19   228.380, it sets forth a series of statutory chapters that the

20   AG can seek to enforce, not common law claims, not equitable

21   claims, statutory claims.  So that doesn't help it with these

22   claims either.

23             And last, Your Honor, they cite 598.0963.  That comes

24   from the trade practices act statute that we just talked about.

25   We aren't disputing that the State has standing to bring the

1    statutory claims, but it can't use a statute from the Trade

2    Practices Act to support its ability to bring these common law

3    and equitable claims here.

4           Moreover, if you actually read the statute, if it had

5    any application here, it is addressing the types of relief the

6    State can seek, not the type of claims it can pursue.

7           So, Your Honor, I would close with the fact that the

8    State hasn't cited one case that sites these statutes as a

9    basis for it to bring equitable and common law claims seeking

10   money damages on behalf of Nevada citizens.  So I'll move on to

11   the independent reasons why these claims fail.

12          Counts 3 and 4 are products defect claims.  Count 3,

13   design defect.  Count 4, failure to warn.  They both fail

14   because the TikTok platform is not a product.  This is a

15   threshold issue in any products liability case.  It is a

16   question of law for the Court under *Schueler*.

17          *Schueler* also says that the courts, Nevada courts

18   have to look to the Restatement (Second) of Torts to determine

19   whether something constitutes a product.  And the focus of the

20   Restatement (Second) of Torts is on tangible items, Your Honor,

21   physical items.  In comment D, it references automobiles,

22   tires, airplanes, power tools, things that are tangible.

23          Here what we're talking about, Your Honor, is alleged

24   harm that arises from user content.  User content is not

25   tangible, Your Honor.  They are -- it consists of intangible

JD Reporting, Inc.

1    ideas, intangible information, not a tangible product.  And

2    even if the State stands up and says, no, we're focused on the

3    platform or the design elements of the platform, all the

4    platform does, Your Honor, is bring those intangible ideas and

5    intangible information to the public.  The platform is no more

6    of a tangible product than the ideas and the information it's

7    delivering.

8            So given the clarity of Nevada law on this point, you

9    would think that we would have seen something in the opposition

10   addressing the restatement and addressing *Schueler*, but it's

11   not in there.

12           The State doesn't even raise those cases or the

13   restatement, Your Honor.  What it instead does is it relies

14   exclusively on the *Lemmon versus Snap* case that you heard about

15   earlier from the Ninth Circuit in 2021.  But, Judge, that case

16   decided one thing and one thing only, that a negligent design

17   defect claim wasn't barred by Section 230.  That's it.  There

18   is no analysis of whether the Snap filter in that case

19   constituted a product, none.  And I will tell you why.

20           If you read the whole case and get to the last page,

21   it's very informative.  The District Court from which that case

22   arose didn't even decide what state law applied.  There was a

23   distinction between potentially Wisconsin or California law

24   applying.  The Court hadn't even determined which one applied

25   or if a conflict existed.  So if there was no determination

1   what state law applied, then you certainly didn't get to any

2   subsequent issues that would have been informed by whatever

3   state law did apply.  The case does not help the State at all.

4          Now, we did cite to a *Snap* case that does help inform

5   this issue.  That's the *Ziencik versus Snap* case, Your Honor,

6   from the Central District of California in 2023, which did look

7   at a social media platform and did analyze whether it's a

8   product for purposes of a products liability claim and found

9   that it's not because it's intangible, Your Honor.

10         And we've cited you additional cases at pages 33 and

11  34 of the motion standing for the proposition that, for

12  example, Airbnb, not a product; online video games, not a

13  product; the Uber app, not a product; the Meta Platform, not a

14  product, Your Honor, for the same reasons the TikTok platform

15  is not a product, and the products claims have to be dismissed

16  for that reason.

17         Count 5 -- and I'm close to wrapping up, Your

18  Honor -- is negligence.  It fails for two reasons.  No duty, no

19  proximate cause.  Starting with duty, of course, the existence

20  of duty in a negligence claim is a question of law.  Under

21  Nevada law, there is no duty to protect third parties from the

22  dangerous conduct of others absent a special relationship.

23  There is nothing pled in the complaint to establish a special

24  relationship between the TikTok platform and its users.  It's

25  not in there.

A-24-886127-B | State v. TikTok | Motion| 09-24-2024

1          We have cited to you the *Beckman versus Match.com*
2   case.  It's a Ninth Circuit case, 2018 that affirmed the
3   decision from Judge Mahan, and what the Ninth Circuit found
4   there is that Nevada Courts have never recognized a special
5   relationship akin to that between users and the platform.

6          That's not the only case, Your Honor.  The *Ziencik*
7   *versus Snap* case I was just talking about likewise found no
8   legal duty was owed to protect the plaintiff from the conduct
9   of third parties, and no duty owed to protect third parties
10  that were on its platform.

11         Now, Your Honor, what did the State say in response
12  to this?  Surprisingly, it went back to this *Lemmon versus Snap*
13  case.  And for the same reason *Lemmon versus Snap* doesn't help
14  on the products claims, it certainly doesn't help on the
15  negligence claims because again, they haven't even -- the
16  District Court had not even decided what state law applied.

17         With respect to proximate cause, Your Honor, the
18  State's biggest gripe on this is that proximate cause is a fact
19  question that can't be decided as a matter of law.  Of course,
20  that's not correct.  It is usually a fact question, but there
21  are plenty of cases that we have cited to you, including two
22  from the Nevada Supreme Court that affirmed decisions that were
23  based on the lack of proximate cause decided as a matter of
24  law.

25         A harmful act, Your Honor, must be the -- or excuse

A-24-886127-B | State v. TikTok | Motion| 09-24-2024

1  me.  The harm must be the natural and probable consequence of a
2  wrongful act, and it has to be foreseeable in order to meet the
3  definition of probable -- or excuse me, proximate cause.  Your
4  Honor, that chain can be broken if there's an intervening act.

5        THE COURT:  Do you want to reserve some time for
6  rebuttal?  Because right now you're about 10 minutes for your
7  side.

8        MR. WILLIAMS:  I do, Your Honor.  So with that, I
9  will stop there and just say about unjust enrichment.  It
10  doesn't apply because of the fact that there is no dispute a
11  written agreement exists here.  Given the existence of the
12  written agreement, you can't bring an equitable claim based on
13  unjust enrichment.

14        THE COURT:  The Court has one question which doesn't
15  go to your timing.  The question is with regards to the
16  standing argument.

17        MR. WILLIAMS:  Yes.

18        THE COURT:  There's a difference of opinion between
19  the briefing, right, on who has the burden to show standing.
20  They cite in their opposition that you've cited no case law
21  that says that basically it's their burden to show standing and
22  that there isn't standing, and you state that they haven't
23  shown that there is standing by any case law.

24        So who are you saying on a motion -- on the present
25  motion before this Court has the obligation to establish

JD Reporting, Inc.

A-24-886127-B | State v. TikTok | Motion| 09-24-2024

1  standing?

2          MR. WILLIAMS:  Your Honor, it's -- I thought we had

3  cited cases standing for the proposition that it is the State's

4  burden to establish standing on a motion to dismiss or any

5  other time.  I believe that burden is incumbent on any

6  plaintiff in any case.

7          THE COURT:  Appreciate it.  Thank you.  That was my

8  only question.  Thank you.

9          Okay.

10         MR. JONES:  Do you want to take a break, Your Honor?

11  I'm happy to --

12         THE COURT:  I just was thinking about that.  My

13  wonderful team because remember, you were not our first or even

14  our fifth case in the morning.

15         So I think it makes the most sense that we take a

16  15-minute break and we come back at 10 minutes to 11:00, right,

17  which I've incorporated like this extra time so that we can get

18  done.

19         MR. JONES:  Very good.

20         THE COURT:  And that way my team gets their morning

21  break.  So see you back at 10 minutes of 11:00.

22         We are going to have to ask you to leave the

23  courtroom because otherwise my marshal doesn't get his break

24  because he'd have to oversee the courtroom.  Appreciate it.

25  Thank you so much.

A-24-886127-B | State v. TikTok | Motion| 09-24-2024

1   (Proceedings recessed at 10:38 a.m., until 10:49 a.m.)

2           THE COURT:  We are now on the record.  The red lights

3   are on.  So that means -- red means go.

4           So feel free, Counsel for plaintiff, to commence.

5           MR. JONES:  Again, good morning, Your Honor.  Randall

6   Jones on behalf of the State of Nevada.

7           I'm going to, I guess, start by referencing a point

8   you made during the defendants' argument and how you commented

9   about, you know, the plaintiff gets to describe their

10  complaint.  And it is a common tactic -- I've certainly seen it

11  many times over the course of my career -- where the defendant

12  in a motion to dismiss tries to co-opt what it is that the

13  plaintiff is alleging, and that is probably as significant an

14  effort as I have ever seen in this particular case.

15          Everything I think you heard in all the arguments to

16  some extent was trying to tie our claim back to content.  And

17  that just is not the case.  And they acknowledge that we

18  expressly disclaim any intent or desire to try to influence or

19  limit or in any other way impact the content of their platform.

20          But they then go on to say, but we're doing it

21  anyway.  And that's just patently not true.

22          So with that said, I'm going to start.  I guess I'd

23  like to start with the standard.  I know you know it, but I

24  think it's important to reiterate that the motion to dismiss

25  standard -- I never pronounce this case right -- Tri-

1          THE COURT:  *Tricarichi*.

2          MR. JONES:  Yes.  Which I think is your case?

3          THE COURT:  I had one version of it, yes.

4          MR. JONES:  Where in the State of Nevada the Court

5    held that you only need to show -- make a *prima facie* showing

6    of personal jurisdiction.

7          Okay.  So we also looked at the standard of 12(b)(5)

8    under *Buzz Stew versus City of North Las Vegas*:  Quote,

9    Dismissal is only if it appears beyond doubt that plaintiff

10   could prove no set of facts which if true would entitle

11   plaintiff to relief.

12         Of course, we also know that Nevada recognizes that

13   its long arm statute reaches the constitutional limits of due

14   process.  So we've got that.  That is sort of the backdrop of

15   which we're making the arguments here today in front of you.

16         And in that regard, there's talk about sort of

17   minimum contacts that defendant could reasonably anticipate --

18   such minimum contacts that defendant could reasonably

19   anticipate being haled into Nevada thereby complying with

20   traditional motions of fair play and substantial justice.  And

21   that's the matter of *Beatrice*, which is another Nevada case

22   that we've cited for that proposition.  None of that is really,

23   I think, unusual, in just about any jurisdiction in the country

24   or under the United States Supreme Court precedent as to what

25   you need to do would be able to demonstrate personal

1   jurisdiction.

2           So with that as our backdrop and that very broad

3   standard by which you should evaluate the claims here, I want

4   to talk about the contacts.  What did they do?  So, you know,

5   you would think by listening to counsel for TikTok that TikTok

6   is some kind of a benign, actually probably great public

7   service to the world.

8           When if you look at its business model, Judge, what

9   is its business model?  This is in essence -- and this goes to

10  the heart of what we're alleging, not what they're claiming

11  we're alleging.  This is essentially a monster they have

12  created.  And I know that sounds a little overdramatic, but

13  think about it, that it has tentacles that reach out.  The

14  business model, it is intended to reach out through these

15  tentacles everywhere, and that's part of what their argument

16  here is, is if we're everywhere, we're nowhere.  If we're

17  everywhere, we're nowhere.  So you can't get us.

18          And you asked the questions, well, does that mean

19  that the Attorney General of the State of Nevada has to go to

20  California to pursue a claim for the citizens who have been

21  harmed in the State of Nevada?  We think not, and we think the

22  case law and the statutory structure in the State of Nevada

23  says we don't need to do that, and it would be an absurd

24  proposition to think that, that every Attorney General in any

25  state in the country would have to go to the state of

1    incorporation of a company like TikTok where they intentionally

2    reach out to that state with the intent -- and by the way, this

3    is -- we've cited exhibits.  We have declarations.  We have

4    the -- and I can give you those, and there are plenty of them

5    where we talk about is Exhibit 3, Exhibit 6 in our motion where

6    we take TikTok's own information where they acknowledge their

7    business model is essentially intended to reach out to these

8    consumers, wherever they be.  So they're reaching out

9    intentionally.

10           Now, they happen to be not just Nevada, but every

11   other state too.  So does that mean, oh, because they target

12   every state and every consumer in every state that somehow or

13   other those people are not harmed in those states when they

14   intentionally target those people?

15           The business model, Judge, is to get eyes on their

16   site, to keep the screen time going as long as possible by

17   those consumers in the states that they have targeted and have

18   them click as often as they can on things, and they actually

19   evaluate that, and we refer to that on page 2 of our brief if

20   you look at that.  Nearly a million -- 1,500,000 Nevadans have

21   created TikTok accounts, which create bilateral contracts.  So

22   these are contracts.

23           As you know, I'm sure you, as any other consumer

24   that's ever gone to a site, you've got to click that you agree

25   to terms and conditions of that site.  That's creating a

1  contract.  Now, where is the contract being entered into?  In

2  the State of Nevada, the resident, including the minor children

3  that we are representing here.  So they're clicking.  They're

4  creating this contract.  So for some reason, that to them is

5  not a big deal.

6         By the way, you didn't hear any conversation about

7  the bilateral contracts that are being created here every time

8  they reach into our State through the Internet, and people

9  saying, okay, I -- the only way I can get on their site is if I

10  agree to their terms and conditions.

11         Then they also, as you heard, the Court and

12  parent-teacher associations, oh, it was just a Zoom call.  So

13  apparently that doesn't matter that one Nevada PTA

14  representative was on that Zoom call when they're basically

15  talking to people about their platform.  So there was direct

16  engagement with a PTA person, a parent teacher association

17  person from the State of Nevada with TikTok to talk, engages in

18  significant outdoor advertising, as we talked about, including

19  billboards that depict young people.  TikTok maintains a

20  presence at the Consumer Electronics Show.

21         Well, apparently, That's not important to them, but

22  it's again on the standard the Court is evaluating this case,

23  we think it's cumulative.  All of these various things.  TikTok

24  prepared a music (indiscernible) to host a TikTok lounge at the

25  Las Vegas or the Latin Grammys in Las Vegas.  They invited a

A-24-886127-B | State v. TikTok | Motion| 09-24-2024

1    singer-songwriter influencer with over 54 million followers to

2    attend the MusicAres Person of the Year Gala in Las Vegas.  And

3    this is what I found really interesting.

4         In one example, TikTok gave a grant to the Howard

5    Wasden Elementary School located in Las Vegas.

6         THE COURT:  Okay.  Counsel is mentioning that because

7    I went there probably.

8         MR. JONES:  Well, I --

9         MR. WILLIAMS:  So did my wife, Your Honor.

10        THE COURT:  So did probably you?

11        MR. JONES:  I did.

12        THE COURT:  Under West Charleston.

13        MR. JONES:  Although it was called West Charleston --

14        THE COURT:  Sorry.  Go ahead.  Let me let you finish.

15   My apologies.  There's my disclaimer.

16        Does anyone need me to put myself off the case

17   because I happened to have gone to Howard Wasden when it was

18   called West Charleston?  I won't say what decade.

19        Okay.  Go ahead, Counsel.  Please continue.

20        MR. JONES:  And sending correspondence to the State

21   and copying the Attorney General Ford on a letter discussing

22   the Attorney General's safety concerns.

23        So, but -- and again, on page 2, we referenced how

24   much money that they've made -- and they track this

25   information, Your Honor.  In the State of Nevada in 2018:

JD Reporting, Inc.

1    141,000 downloads of their app generating, according to them,

2    $59,000 in revenue.  And then all the way to 2023, 113,000

3    downloads generating over $4 million in revenue.  So they're

4    making money on Nevada consumers.

5           Their business model is -- its whole purpose is to

6    get people addicted to their site -- they don't like it when

7    you say that, but that's their own documentation shows that

8    that's what it does.  And they're doing it intentionally.  It's

9    not like this was just serendipitous that Nevada consumers saw

10   their site and got on it.  So I think that's important to

11   understand with respect to how they do business.

12          With respect to -- with respect to the *Ford* case, the

13   *Ford Motor* case, we were talking about -- in footnote 4, where

14   they reference footnote 4, I want to read what it actually

15   says:  And we do not here consider Internet transactions which

16   may raise doctrinal questions of their own.  In other words,

17   they never addressed the issue, that at least was suggested.

18   They did in that case.

19          In *Peccole versus Eighth Judicial District Court*, the

20   Court found it is not necessary to have a physical -- to have

21   physically entered the State.  A phone call can be physical

22   presence.  Well, here we have hundreds of thousands of direct

23   contacts with their platform by Nevada consumers in Nevada.

24          And by the way, to suggest -- it's almost as if

25   they're suggesting somehow or other they're doing this

1   gratuitously, as some kind of a charity.  They're making money,

2   Your Honor, on this.  And they say, well, we don't charge for

3   this, and I'm kind of jumping ahead a bit, but understand

4   that -- and I'll get to the consideration aspects later with

5   respect to the sale of a product and whether you have a product

6   liability case without a sale.  But if you look at our statute,

7   it talks about consideration, any other consideration.  Well,

8   Your Honor, in this day and age, I think it goes without any

9   question.

10         I don't know if the Court would take judicial notice

11   of it, but data, data is what they're acquiring from the

12   consumers in Nevada.  They're acquiring their personal data.

13   They're acquiring what they like, where they live, how long

14   they're on the site, all of which goes to their business model.

15   The consideration in this case is the data that they acquire

16   when they accept the terms and conditions of that app and sign

17   on to TikTok.  So there is -- that consideration is --

18         And by the way, just again, skipping ahead, the

19   Indiana case they cite, that's a different consumer

20   protection -- or excuse me, deceptive practices definition.

21   It's not the same as Nevada.  So and by the way, that's the

22   only other case we're aware of where that has occurred because

23   they have a different definition of what a sale may constitute.

24         But in this case we have a much broader definition,

25   and it includes any consideration.

1    So with respect to the bilateral contract as well, I

2  should mention that you're downloading the app.  There are

3  presumably cookies that are installed on your system when you

4  download that app.  They track your use.  This is all admitted.

5  They don't deny it.  They track your use, and then they entice

6  the users to use more, and the more they use, the more

7  profitable that user is to them with their advertising.

8    And again, with respect to the *Ford Motor* case and

9  the distinction they try to make, that advertising, as the

10  Supreme Court held, where you live is where you see them when

11  talking about their advertising, about their billboards, and

12  they made a distinction, well*,* Ford has dealerships in those

13  cities.  Well, Your Honor, those dealerships are not owned by

14  Ford.  Those dealerships are owned by local business people who

15  buy Ford products from Ford, the Ford company from out of

16  state.  So I think that's a distinction without a difference in

17  this case.

18    And then I wanted to cite the -- it's on page 9 of

19  our opposition, but I think it encapsulates this point very

20  well.  It's the Arkansas court, and I know it's not

21  precedential in this case.  I'm just offering it for a good

22  description of I think what's going on here.

23    TikTok advertising to Nevada consumers -- in this

24  case Arkansas consumers -- creates a form specific experience.

25  In other words, their advertising to these people creates a

1  forum specific experience.  So there is that direct connection.

2          And by the way, did you have any questions about

3  that, Your Honor, before I go on?

4          THE COURT:  Realistically, they address both general

5  and specific jurisdiction in their motion, and I saw your

6  motion -- your opposition focused more on specific

7  jurisdiction.

8          MR. JONES:  Yes.

9          THE COURT:  Are you contending that they've kind of

10  acquiesced to general jurisdiction or not?

11          MR. JONES:  I don't know if they've acquiesced to

12  general jurisdiction.  I don't want to put words in their

13  mouth.  We certainly think that we have jurisdiction over them

14  whether it be specific or general.  I don't know if that

15  answers your question.  Probably not.

16          THE COURT:  No worries.  Go ahead, please.

17          MR. JONES:  Okay.

18          I want to talk about -- so they talked -- well, first

19  of all, do you have any other questions about the

20  jurisdictional issue?

21          THE COURT:  I do not.  Thank you so much.

22          MR. JONES:  Okay.  So with respect to Section --

23  well, let me talk about fraud first and Rule 9, 6 [sic].  We

24  don't believe -- and by the way, I don't think they've cited

25  any Nevada case law that says that we have to plead to a rule

1    that -- excuse me, 9, 6, 9(b) standard in a Deceptive Trade

2    Practices Act. We did state that -- excuse me, that Rule 8 is

3    not subject to Rule 9 specificity. And, as I already said, in

4    terms of the harms that we believe constitute the fraud, I

5    believe there's -- gosh, how many -- there are -- I'm looking

6    at my notes here, Your Honor.

7            THE COURT: Of course.

8            MR. JONES: Oh, also, I would mention with respect to

9    consideration -- it's paragraph 131 -- TikTok also sells coins

10    to their users, which can turn -- send to their favorite TikTok

11    video creators known as gifts. So that's additional

12    consideration. And certainly under a motion to dismiss

13    standard, we believe that's sufficient to pass muster on a

14    motion to dismiss.

15            But the other point I wanted to make with respect to

16    the alleged misleading conduct, and Mr. Williams referenced it,

17    but I would consider it cherry picked certain allegations and

18    misconstrued what we're alleging there.

19            But if you look at paragraphs 220 through 282, that's

20    12 pages where we talk about the various misleading conduct

21    that TikTok has entered into in this case. TikTok's claims, we

22    believe they lied about the safety and efficacy of their

23    platform and their marketing, including the billboards, which

24    you already talked about.

25            So, you know, for a motion to dismiss standard, we've

1    got 12 pages of allegations where we have stated what we

2    believe to be their deceptive trade practices under the

3    statute.

4           If I can -- and with respect to that issue, TikTok

5    has embedded within their platform design features --

6           And by the way, I want to make this point.  Design

7    features are not algorithms.  They are not content.  It's a

8    design feature.  It's a feature that it's basically code, if

9    you will, that TikTok has created that creates features that

10    apply to the consumer's use of their platform.  So for them to

11    try to mix up these words like algorithm and embed them in a

12    design feature is just simply false.  And so I don't want the

13    Court to be misled by their argument of trying to describe or

14    explain what our case is about.  That is not what it's about.

15           We reference I think in two paragraphs early on in

16    the complaint, and I think it's paragraph 32 or around there

17    where we talk about algorithms, but that's just talking about

18    the business that they're in.  It's not talking about the

19    claims that we're making, and there is a distinction.  For

20    example, some of the design features that are used to maximize

21    young engagement.  I'll just go on from there.

22           Young engagement means essentially synonymous with

23    addiction.  Try to get these young kids to be addicted to their

24    platform and use it as long as possible, to stay on their

25    platform as long as possible.

1          Low friction and variable rewards is one feature we

2     talked about.  Social manipulations, ephemeral conduct, push

3     notifications, harmful filters and ineffective and misleading

4     parental controls and so-called well-being initiatives.  So

5     these are the design features that we also believe make this a

6     defective product as well.  So and by the way, they sought to

7     hide the knowledge, its knowledge of these harmful qualities

8     from Nevada consumers.

9          So at this point I'm going to talk about the Section

10    230, and I'm going to start talking about initially with the

11    good Samaritan, so-called good Samaritan section.  And again,

12    we did cite *Lemmon*, the Ninth Circuit case.  The platform where

13    they basically say, the Ninth Circuit says that these -- in

14    that case, it's a different product, but they said it is a

15    product.  And I would use sort of an intellectual property

16    analogy to this.

17         So, Your Honor, think about this.  So Meta -- excuse

18    me, TikTok has its platform.  Well, what is that platform?

19    That platform is at a minimum, it's intellectual property that

20    they want to protect very closely.  They don't want anybody

21    else to use their product, or what are they going to do?

22    They're going to sue them.  They're not going to allow somebody

23    else to take their product and use it without taking action.

24    They treat that platform as their product.

25         And so that's why I believe the *Lemmon* Courts looked

1   at this and said, hey, look, this is, when you're not talking

2   about content, separate and apart from, you know, what is being

3   published by third parties, this is something of their own

4   design and creation.  These features are something that TikTok

5   created and utilizes to engage with, and we submit, addict

6   Nevada consumers to their platform.  So this really has nothing

7   to do with the information that is being provided to the

8   consumer.  It's on their platform.  It's their features that

9   the consumer engages with.

10          And on page 13 of our brief, we cite a couple of

11   pages of the complaint, paragraphs 173, 174 and 175, where we

12   expressly state, and I'm quoting in 173, the State does not

13   challenge or seek to curtail the publishing of any specific

14   type of third-party content by challenging the above-described

15   addicting and harmful design elements.  And you'll note we go

16   on to talk about the design elements, and I just mentioned

17   them.  And the substance of any content incorporated into or

18   used by the design elements is immaterial to our claims.

19          So again, Your Honor, the defense cannot redefine

20   what we're alleging in order to prevail on a motion to dismiss.

21   That would be totally improper.

22          So just because they're calling it something doesn't

23   mean that's what our allegation is.  And this Court needs to

24   look at the complaint we drafted and the allegations we've made

25   and consider the plain meaning of those allegations, not their

1    take on those allegations or their attempts to spin our

2    allegations.

3           And paragraph 175 goes on to say, Regardless of the

4    substance of any content on TikTok, either first or third

5    party, the purpose of the design elements is to extract

6    additional time and attention from young users whose developing

7    brains were not equipped to resist these manipulative tactics.

8           So those are our allegations, not their spin on our

9    allegations, and that's what this Court needs to consider and

10   construe in determining whether or not we survive a motion to

11   dismiss.

12          And by the way, I would just point out that

13   Section 230 has nothing to do with design.  It is all about,

14   you know, essentially content and speech, and that's not what

15   we're talking about here.

16          As was referenced in the social media cases that we

17   talk about on page 15, and here I'm quoting, a reference by the

18   Court to Section 230, quote, The features themselves allegedly

19   operate to addict and harm minor users of the platform

20   regardless of the particular third-party content viewed by the

21   minor user, end quote.  And that's at page 15, starting at

22   lines 14.

23          And as I talked about in *Lemmon*, the Ninth Circuit

24   Court essentially held that in rejecting Snap's Section 230

25   defense that the plaintiffs in that case sought to hold Snap

1  liable for negligently designing a product, Snapchat, with a

2  defective interplay between Snapchat's reward system and the

3  speed filter and that, quote, Snap could have satisfied its

4  alleged obligation to take reasonable measures to design a

5  product more useful than it was foreseeably dangerous without

6  altering the content that Snap users generated.

7          So I think that's a very appropriate summary.

8  Essentially what the Ninth Circuit held in that case is, look,

9  you can change your features in a way that is not unreasonably

10 dangerous without affecting the content.  So that's why we

11 think their position is just simply trying to misconstrue our

12 allegations and what we're alleging in our complaint, which we

13 specifically disavow by the way.

14         The *Lemmon* Court went on to say, quote, The duty to

15 design a reasonably safe product is fully independent of Snap's

16 roll in monitoring or publishing third-party content.  That

17 goes to the heart of our position and directly contradicts

18 TikTok's position that we are trying somehow to moderate or

19 influence or impact the content.

20         And by the way, that reference in *Lemmon* to design a

21 reasonably safe product, again, speaks to the negligence

22 elements of our claim as well in terms of the --

23         THE COURT:  Can I pause you for a quick second?

24 Right?

25         MR. JONES:  Sure.  Of course.

1    THE COURT:  Because, counsel, right, for TikTok

2  stated that in *Lemmon* the only issue that the appellate court

3  actually addressed, right, was the 230 claim, right, because

4  they use the language that, you know, *Snap* has also urged us to

5  affirm the District Court's decision on the alternative ground

6  that the parents have failed to plead adequately their amended

7  complaint, the causation element of their negligent design

8  claim, that we may affirm on any ground supported by law we

9  declined to exercise that discretion here for three reasons,

10  and then they give the reasons.

11    So are you contending that the *Lemmon versus Snap*

12  case, the Ninth Circuit did address the negligent design or

13  that it was purely a 230 claim?

14    MR. JONES:  Well, I think it was a 230 claim, but I

15  think it's instructive with respect to negligent design.  And

16  the reason I think it's important is because really what they

17  did, at least as far as I can tell in the reading of it, they

18  made a commonsense -- did a commonsense analysis of what a duty

19  would be if that issue was before them.  So whether it's --

20    And by the way, since it's Ninth Circuit, the Court

21  is not compelled to follow it anyway, but it is a Ninth Circuit

22  case, and so since we're in the Ninth Circuit, certainly as

23  this Court I know has in the past, and especially when there's

24  a lack of other authority that the Court can look at, will

25  sometimes consider the Ninth Circuit precedent as important and

1    instructive.

2            And so I think that's really the point I was trying

3    to make, Your Honor, not specifically that they held that.

4            THE COURT:  No worries.  Go ahead, please.  Thank you

5    so much.

6            MR. JONES:  I'm sorry?

7            THE COURT:  Oh, thank you so much.

8            MR. JONES:  Oh, okay.  Sure.

9            With respect to the 230(e)(3) Communications Decency

10   Act, and by the way, this is my failure, but in getting

11   prepared for the argument, I came across *Erwin versus State*,

12   and so it's not in our briefs, but I think I have an obligation

13   to the Court to mention controlling Nevada law if I think it

14   exists.  And so *Erwin versus State*, I believe is relevant, and

15   it's at 111 Nevada 1535.  It's a 1995 case, and it essentially

16   says that commercial speech which concerns unlawful activity or

17   is misleading is not protected by the First Amendment, and the

18   State may freely regulate it.

19           So we believe this is all commercial speech and

20   therefore assuming that this has anything to do with content,

21   by the way, because our position is again, and I'll say it

22   again and again and again -- because they said again and again

23   it's all about the content -- it's not.  And they cannot define

24   our allegations to suit their motion to dismiss.  The Court

25   needs to look at what we said and what we've alleged.

1      But to the extent that the Court even wants to

2  consider that argument, that somehow it would be content, *Erwin*

3  says if its commercial content it's not restricted.

4      And assuming there somehow is, the Court believes

5  there somehow is a connection to content here, the First

6  Amendment also does not apply.  Or if it does apply, the

7  State's claims satisfy intermediate scrutiny.

8      The claims here deal with content neutral

9  restrictions that impose no incidental burden on speech, and

10  that's the *Turner Broadcasting* case that we've cited.  It's a

11  Supreme Court case.

12      So in other words, because we are contending these

13  are design features that have nothing to do with the content

14  that the site is or the platform is forwarding to the consumer,

15  and to the extent there is any effect, it's incidental to the

16  First Amendment because it's really all about the design

17  features, not whatever content is being pushed through by those

18  design features.

19      And if I can, I want to move now to the issue of

20  product liability, strict product liability.  And we're

21  referencing there NRS 598, and I'm sorry, I'm talking about the

22  Nevada Deceptive Trade Practices Act.  And this is where I talk

23  about the sale.  If you look at the statute itself, in this

24  case I'm referring to 598.094, quoting here, The sale includes

25  any sale, offer for sale or attempt to sell any property for

1    any consideration, and in our complaint, we talk about -- and

2    this is at paragraph 55 of the complaint:  Quote, We use your

3    information -- this is quoting from TikTok -- to fulfill and

4    enforce our terms of service.  We may also use your information

5    to, among other things, show you suggestions, promote the

6    platform and customize your ad experience, end quote.

7            So the consideration is again, as I've mentioned, if

8    you don't even consider the coins that they offer to their

9    Nevada residents, the consideration is the data that they're

10   collecting from the consumers by utilizing the site.

11           I would also reference the Reynolds versus Tobacco

12   versus -- or excuse me, *Reynolds Tobacco versus Eighth Judicial*

13   *District Court* where the Court held that a consumer need not

14   actually purchase or use a defendant's product to state a claim

15   under the NDTPA.  The plain language of the NDPTA [sic]

16   contemplates situations in which liability may be found even

17   when, like here, an individual did not actually purchase or use

18   the product.

19           So, again, to the extent that that is an issue, our

20   Supreme Court has addressed it, and, again goes on to say --

21   that Court goes on to say, quote, Even if a plaintiff did not

22   use the manufacturer's product, so long as a plaintiff can

23   still show a direct harm arising from the manufacturer's

24   deceptive trade practices, end quote.  So we again believe that

25   they have established -- we have established that there is

1    consideration here under both the statute and the facts.

2           And with respect to the undisclosed facts that we are

3    alleging, it's in paragraphs 91 through 92.  This is from

4    TikTok's own reporting, internal documents, that the platform

5    can become habitual or excessive, can lead to deficient

6    self-regulation, including negative life consequences that

7    cause negative mental health effects, including loss of

8    analytical skills and memory formation and contextual thinking,

9    conversational depth, empathy, and increased anxiety, leading

10   to interfering with lack of sleep, work and school

11   responsibilities, connecting with loved ones.

12          So these are things that -- and here's the point,

13   Judge, in deceptive trade practices.  These are things that

14   TikTok knew about its own design features.  So they knew this,

15   and they didn't tell.  So there's a misrepresentation by

16   omission.  They didn't tell the consumer.  And then they go

17   on -- and then they double down, and then they actually have

18   initiatives called its well-being initiative.  So they're

19   telling people that these things are going to make your life

20   better without telling them the actual harms that they know

21   from their internal research is going to happen to their

22   customers.

23          Do you have any questions about that, Your Honor?

24          THE COURT:  I do not.  Thank you.

25          MR. JONES:  And with respect to Mr. Williams talked

1    about the *Poole* case.  I think that -- we think that the *Poole*

2    case is relevant to this litigation, and I'm citing here where

3    I say from *Poole*, quote, Because the Nevada deceptive trade

4    practice act is remedial statutory scheme in interpreting

5    (indiscernible) end quote knowingly to require more than a

6    general intent would render the NDTPA and common law fraud

7    claims redundant to serve the NDTPA's remedial purpose and

8    discourage claims by forcing parties to clear a significantly

9    higher bar.

10          The point again there being that we don't believe

11   that the greater specificity under Rule 9(b) is required for

12   the NDPTA [sic] under the *Poole* case.

13          With respect to unconscionable practices claim,

14   NRS 598.0923(1)(e), as you saw, I mean, the definition is an

15   unconscionable practice is an instance where a business takes

16   advantage of a lack of knowledge, ability, expertise or

17   capacity of the consumer to a grossly unfair degree.

18          Again, if you take our allegations in a most

19   favorable light and assume that they are true, we're talking

20   about the parties we're representing, and the State is

21   representing these minors, children 17 years old or younger.

22          And when you look at what they've done, TikTok has

23   purposely targeted, including minors, and we've got the

24   evidence from TikTok that we cited to you early on in the

25   discussion of their own statistics that there is approximately

1   400,000 minors that they have on their platform in the State of

2   Nevada.  Over 400,000 minors.

3        So the question is, does this Court think there's

4   sufficient basis on the pleading stage to go forward and -- on

5   whether or not we can ultimately make a claim.  Again, this is

6   based upon their own admissions and their own reporting that

7   there has been an unconscionable practice where a business, in

8   this case TikTok, takes advantage of the lack of knowledge,

9   ability and experience or capacity of the consumer to a grossly

10   unfair degree.

11        Well, so it's one thing to do what they've done to

12   adults.  It's a whole nother matter to do it to children.

13        And so we certainly think at the pleading stage we

14   have provided more than sufficient evidence, especially because

15   we've been able to acquire some of TikTok's own internal

16   reports that demonstrate the very point we're trying to make,

17   which it seems to me falls directly within the confines of the

18   statute itself for -- to make out a claim for unconscionable

19   practice claims.

20        With respect to the Attorney General's standing, one

21   thing I would just mention is the complaint, and this is in

22   paragraph -- excuse me, page 36 of our brief.

23        THE COURT:  Sorry, Counsel.  What paragraph?  Did you

24   say 36?

25        MR. JONES:  Paragraph -- page -- I'm sorry.  Page 36

1   of our brief at lines 9 and 10 you'll see there's a reference

2   to the consumer advocate as, has the sole discretion to

3   represent the public interest in any class of consumers in any

4   proceeding.  If you'll take a moment to catch up.

5           THE COURT:  Right.  That's the 598 analysis; right?

6   Isn't the citation to 598?

7           MR. JONES:  Yes.  The reason I bring that up is

8   because you'll note in the complaint that the complaint has

9   also been brought by the consumer advocate for the State of

10  Nevada.

11          Oh, I'm sorry.  As Mr. Gayan just pointed out, it's

12  at page 36 starting at line 9.  We had actually referenced

13  Section 228.391A.  That's where I was quoting.  I misquoted.

14          THE COURT:  Okay.

15          MR. JONES:  That's where it talks about the consumer

16  advocate.

17          THE COURT:  Uh-huh.

18          MR. JONES:  So the other point I would make is there

19  is no case law that counsel has been able to cite which

20  indicates that the Attorney General does not have standing in a

21  case like this to represent the minor children of the State of

22  Nevada who have been harmed by deceptive trade practices, by --

23  well, in particular, by deceptive trade practices or negligent

24  actions, strict product liability.

25          So as far as we can tell, there's nothing that

A-24-886127-B | State v. TikTok | Motion| 09-24-2024

1    suggests that the Attorney General does not have the authority

2    to do that that they have cited to.  And we believe that if you

3    look at 598.0963, Sub 3, quote, The Attorney General may bring

4    an action in this name of the State of Nevada against that

5    person to obtain a temporary restraining order, a preliminary

6    or permanent injunction, or other appropriate relief,

7    including, without limitation the recovery of a civil penalty,

8    disgorgement, restitution or recovery of damages.  So again, we

9    think that 598.0963 does provide, on its face, the Attorney

10   General that authority.

11           Do you have any questions about that, Your Honor?

12           THE COURT:  My question on standing is going to be

13   for the negligence claim and the unjust enrichment claim.  I'm

14   just --

15           MR. JONES:  Okay.

16           THE COURT:  If you're asking me about standing, yes,

17   I have a question, but those are the claims I have a question

18   on.

19           MR. JONES:  Well, I guess my point -- I -- my

20   response would be that there is nothing to suggest that a

21   parens parenti -- or *patriae*, excuse me, *parens patriae* claim

22   that the Attorney General does not have the ability to

23   represents minors in the State of Nevada where a party has

24   committed a negligent act against those minors.

25           Let me address -- there was one other thing I wanted

A-24-886127-B | State v. TikTok | Motion | 09-24-2024

1  to reference, Your Honor.

2          Well, since we're kind of at that point, I can talk

3  about the duty of care.  Actually, Mr. Slade made a point here,

4  and actually it's a case that you know a little bit about is

5  the opioids case.  In that case there were negligence claims

6  brought by the State of Nevada through the Attorneys General's

7  office against the manufacturer and distributors of opioids.

8  So there is case precedent here, at least in this courtroom for

9  (indiscernible) kind of claims to proceed.

10          THE COURT:  I was thinking of that when I was asking

11  the question; however, I went back historically to see if that

12  was ever raised as an issue because remember I took over that

13  case from Judge Gonzalez when she retired.

14          MR. JONES:  Right.

15          THE COURT:  So I have most knowledge, but not --

16  well, I didn't see that it was.

17          MR. JONES:  Well, Your Honor --

18          THE COURT:  I'm not going to back -- I mean, please,

19  I've got hundreds and hundreds of cases in my docket.  There's

20  been thousands of hearings I've had since I've addressed

21  certain opioid issues, but that's why I was asking the question

22  because I was like, oh, well, that was going to be my question

23  on the standing issue on the 598 because we already dealt with

24  that, but the design defects in the opioids and things like

25  that, that one was addressed.  So I was going to ask you all a

1  question, and that's what I was focusing on.

2          And anyways, I didn't see that that was brought to

3  the Court as being something disputed.  But once again, like I

4  said, I've had thousands of hearings since those.  So I'm not

5  saying (indiscernible).  I didn't see it, but go ahead.  Feel

6  free to continue.  You've got a few more minutes, and I'm going

7  to have to circle back to defense counsel.

8          MR. JONES:  Sure.  The other thing I would refer to

9  the Court to is NRS-- and it's in our brief on page 36.

10  228.170, Sub (1), where the statute provides, quote, To protect

11  and secure the interest of the State it is necessary that a

12  suit be commenced or defended in any federal or state court.

13  The Attorney General shall commence the action or take the

14  defense -- or make the defense.  Excuse me.

15          So there is some statutory support for the argument

16  that there was no limitation in that statute as to what type of

17  claim the Attorney General may bring.

18          We also cite *Ryan versus Eighth Judicial District*

19  *Court* holding that, quote, the legislature made clear its

20  intention that the authority of NRS 228.170 embraces only civil

21  matters, end quote.

22          Well, this is obviously a civil matter.  So I think

23  by sort of, if you will, exclusion, then criminal matters would

24  be excluded, but they're essentially saying the civil matters

25  would be allowed.  So I hope that answers your question, Your

1    Honor.

2              And I don't want to belabor this too much.  We've

3    already talked about *Lemmon*.  And when we talk about duty of

4    care, in terms of the negligence context, I think it is

5    instructive to see what the *Lemmon* Court said about duty of

6    care.

7              But I would also think that if you just apply just

8    general negligence doctrine to a claim like this, I would

9    assert that a company like TikTok who puts a social media

10   platform out there to consumers has a common law duty not to

11   put out a product because I don't know -- they can call it

12   whatever they want.  But at the end of the day, that is their

13   product.  That is what they sell.  They're selling the consumer

14   an experience on their platform, which where they gather the

15   consumer's data, and then they use that data to make money.

16   So -- through advertisers.

17             So I would suggest that it only makes sense that if

18   you're going to do that, if you're going to take that upon

19   yourself and put a product out there to the consuming public,

20   and especially when you're talking about minors, you have a

21   duty to reasonable care.  And if you breach that duty, if you

22   put out a product that is unreasonably safe -- or excuse me,

23   not unreasonably safe, unreasonably dangerous, it can create a

24   liability for you.  So I think, again, at the pleading stage of

25   this case, we have sufficiently pled a negligence claim.

A-24-886127-B | State v. TikTok | Motion| 09-24-2024

1    And, again, just from a semantic standpoint, the fact

2  that TikTok doesn't want to describe what they're selling as a

3  product doesn't make it not a product.  It does not ignore --

4  or excuse me, it doesn't create a situation where they're not

5  selling something to the public.  They're certainly -- there's

6  an exchange going on here.  We'll give you our access to our

7  platform in exchange for you giving us your data.

8    With respect to proximate cause, that's an issue of

9  fact, Your Honor.  I don't know how much you want me to go into

10  that.  That has no place in a motion to dismiss situation

11  argument.

12    So at this stage of the proceedings, we believe we

13  can certainly show that there is a natural and probable

14  consequence of the negligence or wrongful acts that were not

15  just -- that should have been foreseen by TikTok, that they

16  actually were foreseen because of the research they've done.

17  So we certainly think we can demonstrate proximate cause if we

18  need to, but we don't believe we are required to do that at

19  this stage of the proceedings.

20    With respect to unjust enrichment, I would just

21  simply reference the Court to Rule 8(d)(3) where we're entitled

22  to do alternative pleadings at this stage of the case.  Also,

23  they argue that, you know, they have a bilateral contract.  We

24  talked about the bilateral contracts between the consumer.  In

25  this case, the minor and TikTok, and they said, well, you can't

1    have these contracts you talk about, these bilateral contracts

2    and have an unjust enrichment claim.

3            Well, we think that Rule 8(d)(3) does allow us to do

4    that, but I would also make this point.  There is no

5    allegation, nor is there any evidence that the Attorney General

6    has a contract with the -- with TikTok.  This is a *parens*

7    *patriae* claim.  So we don't think that applies either.

8            And then the only other point I would make is we do

9    have countermotions.  To the extent the Court thinks it's

10   necessary on the personal jurisdiction, I -- I think the

11   evidence --

12           THE COURT:  Are you talking about your countermotion

13   to engage in discovery, jurisdictional discovery?

14           MR. JONES:  Yes.

15           THE COURT:  Okay.

16           MR. JONES:  And a motion to amend if necessary, a

17   motion for leave to amend if necessary.

18           Your Honor, you know, in this case, I believe that

19   there is somewhat unusual circumstances in that we have been

20   able to get a substantial amount of information from TikTok in

21   preparation of filing the complaint demonstrating through their

22   own records, their own research, their own investigation of

23   their customers, information that shows, you know, all the

24   things we believe they've done that are actionable.

25           And so -- and also the contacts with the State of

1   Nevada.  The intentional directed action towards consumers in

2   this State that they have tracked, they have analyzed, and they

3   use to make money on.  And so from a personal jurisdiction

4   standpoint, we certainly think we have demonstrated more than

5   sufficient evidence of specific jurisdiction in this case for

6   the specific claims that have been alleged in this case.

7           So there's no need for any further discovery at this

8   stage of the proceedings, but we did make that countermotion

9   out of an abundance of caution.  We think this -- in fact, I

10  think Mr. Williams talked about the heft of our complaint.  We

11  tried to be very thorough.  As you know, it is a pretty

12  comprehensive complaint.

13          THE COURT:  89 pages.

14          MR. JONES:  And it has with very specific factual

15  allegations referencing very specific information derived from

16  TikTok.  So we think that they are more than on notice of what

17  our claims are about.  And to the extent that they get up here

18  and say it's all about content, well, that doesn't mean they

19  don't know what the claims are about.  They just want to

20  misconstrue them or mislabel them so they can get out of this

21  case.

22          But there's been no suggestion that they're not fully

23  on notice of what the allegations are and how they misled the

24  minor consumers that we represent.  So I don't think there's

25  any need for any further clarification of the allegations in

A-24-886127-B | State v. TikTok | Motion| 09-24-2024

1   the complaint.

2          But again, out of an abundance of caution, we have

3   made that countermotion.

4          THE COURT:  Appreciate it.  Thank you so very much.

5          Okay.  Counsel, there's -- are you dividing up your

6   8, slash, 9 minutes, or are you taking it all?

7          MR. EVANSON:  I will endeavor to leave a minute or so

8   for Mr. Williams.

9          THE COURT:  Generous.  Go ahead.

10          MR. EVANSON:  Yes.  Well, I want to begin with the

11   Court's question on personal jurisdiction about what other

12   states have done, and I misspoke when the other states -- when

13   I said that other State Attorney Generals have sued TikTok.

14   They've sued Meta.

15          THE COURT:  So you have to realize I have that case

16   too.

17          MR. EVANSON:  I know.  And Your Honor is familiar

18   with this, but 35 states have sued Meta in California for

19   claims that are essentially the same claims as these, and those

20   35 --

21          THE COURT:  You understand I cannot discuss any other

22   cases that are currently pending in this court, and I make no

23   rulings on any other case --

24          MR. EVANSON:  Certainly.

25          THE COURT:  -- made reference to my opioid case.  Go

JD Reporting, Inc.

A-24-886127-B | State v. TikTok | Motion| 09-24-2024

1    ahead.

2              MR. EVANSON:  Certainly, Your Honor.  And I'm not

3    talking about the cases before this Court.  I'm talking about

4    the cases the attorneys general have brought in California, and

5    that's attorneys general on the East Coast.

6              THE COURT:  Right.  But we're on TikTok.  That's why

7    I asked the TikTok question.

8              MR. EVANSON:  Yes.

9              THE COURT:  I am familiar with Meta.  That's why I

10   was asking my TikTok question.

11             MR. EVANSON:  Okay.  So those are not claims against

12   TikTok.  Those are claims against Meta, but the point is the

13   same, that attorneys general filed enforcement actions in the

14   home states of defendants all the time where there's a personal

15   jurisdiction problem with suing the defendants in the attorney

16   general's state.  That happens all the time.

17             And the state has Arkansas and Texas counsel in this

18   case.  They could have just as easily associated California

19   counsel and brought the case in California where TikTok is at

20   home.

21             Mr. Jones mentioned bilateral contracts.  There's no

22   claim arising out of those contracts.  He mentioned billboards,

23   Latin Grammys, the Consumer Electronics Show.  There are no

24   claims arising from any of those contacts, and the argument

25   that I heard, and it's the same argument that's in their

JD Reporting, Inc.

84

1    papers, is that you have to view this cumulatively, that you

2    look at all of these contacts together, and even though the

3    claims don't arise out of any of those contacts, at some point

4    there's just enough contact with the State that there's

5    specific personal jurisdiction.  And that is exactly what the

6    *Bristol-Myers* case, the United States Supreme Court, 2017, that

7    is exactly what the Supreme Court rejected.

8           I'm just going to read two sentences from that

9    opinion.

10          THE COURT:  Sure.

11          MR. EVANSON:  For specific jurisdiction -- this is

12   page 264 of the opinion:  For specific jurisdiction, a

13   defendant's general connection with the forum are not enough.

14   As we have said, a corporation's continuous activity of some

15   sorts within a state is not enough to support the demand that

16   the corporation be amenable to suits unrelated to that

17   activity.

18          So it is just wrong as a matter of law that you can

19   abrogate all these contacts and consider some point at which

20   there's enough contact with the State for specific personal

21   jurisdiction as it's wrong as a matter of law.

22          I'll also point the Court to the *Johnson versus*

23   *HuffingtonPost* case, page 324, where the Fifth Circuit makes

24   the same point, distinguishes the *Ford* case on this ground.

25          Mr. Jones suggested that there's a claim for general

1  personal jurisdiction here, and I just want to make sure that

2  that is not the case.  They did not argue general personal

3  jurisdiction in their opposition, and there would be no basis

4  for that.  General personal jurisdiction is only available

5  where the defendant is at home, meaning where their principal

6  place of business is, where their headquarters is or where

7  they're incorporated, none of which is true of Nevada.  So

8  there's absolutely no basis for general personal jurisdiction.

9          On Section 230 --

10         THE COURT:  And can I stop you for a minute?

11         MR. EVANSON:  Oh, of course, yes.

12         THE COURT:  So are you saying that because your

13  contention is that there's not general personal jurisdiction

14  that that precludes this Court from continuing with the case?

15  I'm just trying to get the clarity of what your position is.

16         MR. EVANSON:  Our position is that there's certainly

17  no general personal jurisdiction, no basis for this Court to

18  continue with the case on that ground.

19         And on specific personal jurisdiction, we think the

20  same is true and that the Court doesn't have to have the

21  jurisdiction to adjudicate the State's claims against TikTok

22  under either general or specific personal jurisdiction.

23         THE COURT:  Do you mind if I pause you for a quick

24  second.  I'm just going to ask from plaintiffs, because I just

25  want clarity, right, because that's why I asked the question

A-24-886127-B | State v. TikTok | Motion| 09-24-2024

1  because it was a little unclear.

2          MR. EVANSON:  Of course.

3          THE COURT:  Counsels for plaintiff, are you

4  contending general jurisdiction as well?  And if so, what page

5  in your opposition would that be?

6          MR. JONES:  We are not.  And when you asked the

7  question, I basically was sort of deflecting, but no, we think

8  this is a specific jurisdiction case based on the arguments and

9  the evidence we presented.

10          THE COURT:  Thank you.  I just -- (indiscernible)

11  clear what was actually before the Court.  Wanted to make

12  sure --

13          MR. EVANSON:  Super helpful.  Thank you, Your Honor.

14          THE COURT:  -- same page for -- okay.  Go ahead,

15  please.

16          MR. EVANSON:  So on Section 230, Mr. Jones said that

17  we are mischaracterizing the complaint, and I definitely don't

18  want to do that.  I referenced these paragraphs in my topside

19  argument, but I just want to read them, a couple sentences from

20  them just to make clear what we are pointing to as their

21  allegations that describe publishing of third-party content.

22  So this is in paragraphs 103 generally to 112.  This is the

23  section of the complaint where they describe the design

24  features that they are challenging in this case.

25          Paragraph 103, TikTok employees the endless scroll,

1   supplying young users with unpredictable variable awards by

2   strategically and intermittently surfacing content that

3   defendants predict users will want to see.  But defendants are

4   not just making a lucky guess about the type of content that

5   children and others would wish to engage.

6          Paragraph 108, this is talking about the AutoPlay

7   feature.  Another form of navigation and manipulation called

8   AutoPlay is similar to endless scrolling.  Like TikTok -- other

9   social media platforms like TikTok that provide video content

10  for users, simply put, once one video is over, another one

11  begins without any prompting -- further prompting from the

12  user.

13         Paragraph 109, 110, 111, 112, same thing.

14         112.  The algorithm tends to serve more and more

15  similar videos as shown in this internal presentation.

16         So it is just not true that the complaint does not

17  describe the publication of third-party content.  It's littered

18  all over the complaint.  There are over 120 times in the

19  complaint where the complaint uses the term content.  120 --

20  over 120 references to content in the complaint, and there are

21  dozens if not hundreds more references to videos, posts,

22  notifications, which, of course, are also other words for

23  content.  So it's just not true that this complaint doesn't

24  describe the publication of third-party content.

25         *Lemmon versus Snap*, I addressed this in the topside

1   argument.  The Ninth Circuit said very clearly that the reason

2   that that case fell outside of 230 was that it was Snap's

3   content and not third-party content.  It did not say that

4   Section 230 does not apply to features.

5           And I would point the Court to the *Bride versus YOLO*

6   case decided last month by the Ninth Circuit.  That's 112 F.

7   4th 1168.  The Ninth Circuit distinguishes *Lemmon* on that very

8   ground.

9           THE COURT:  And that's in what page of your brief?

10          MR. EVANSON:  It was decided last month, so after

11  briefing had closed.

12          THE COURT:  Right.  So how can -- distinct, right,

13  from bringing something that's law here in Nevada; right?  Here

14  you're just asking the Court to address something that you're

15  saying is persuasive, not controlling; correct?

16          MR. EVANSON:  That's correct, Your Honor.  And the

17  most --

18          THE COURT:  Has counsel for plaintiff had an

19  opportunity to address that case so that the Court could

20  consider it?  That's where I really -- the essence of my

21  question is.

22          MR. EVANSON:  I don't know whether they've read it or

23  not.  It hasn't been briefed because it was decided after

24  briefing closed.  I'm merely citing it to the Court as the most

25  recent authority from the Ninth Circuit, which distinguishes

1   their authority as they described it in their argument.  So

2   it's responsive.

3           Okay.  So moving on to the First Amendment.  I was

4   shocked that Mr. Jones in his argument did not even mention

5   *Moody versus Netchoice*.  This is controlling on point authority

6   from the U.S. Supreme Court decided in the last couple months

7   that holds directly that Internet platforms that curate and

8   compile third-party content into their own expressive offering

9   triggers First Amendment scrutiny.  I mean, I'm not going to

10  reargue my *Moody* point, but I'm just shocked that we didn't

11  hear anything about that because that is directly on point

12  recent case law.

13          There have been decisions since *Moody*, including out

14  of the district of Utah, that applied *Moody* to challenges to

15  features much like the ones the State challenges here.  This is

16  just on point authority that the State has not even tried to

17  distinguish.

18          Instead, they cite a 1995 decision, which, you know,

19  again, was not included in the briefing despite being 30 years

20  old that obviously has nothing to do with the application of

21  the First Amendment to online interactive Internet platforms.

22  *Moody versus Netchoice* is the case, and we think that it

23  governs here and requires -- and triggers First Amendment

24  scrutiny requires that the claims be dismissed.

25          I'm happy to take any questions the Court has on --

JD Reporting, Inc.

A-24-886127-B | State v. TikTok | Motion| 09-24-2024

1          THE COURT:  I do not have any.  Thank you so much
2     though.
3          MR. EVANSON:  Okay.  Thank you, Your Honor.
4          MR. WILLIAMS:  Your Honor, I'm not sure how much time
5     I have.  So let me start by asking is there any question that
6     the Court has that it would like me to address right out of the
7     box?
8          THE COURT:  Realistically, I'm going to ask the same
9     question I told you I was, right, the standing question because
10    under the products concept, you would be under the products
11    concept unjust enrichment and negligence.  You heard response
12    of plaintiff's counsel.  I mean --
13         MR. WILLIAMS:  I did.  And so let me start there,
14    Your Honor.
15         I heard citation to the same three statutes that I
16    addressed in my opening presentation, and, Your Honor, quite
17    simply reading those statutes, none of them authorize the State
18    to bring these types of common law or equitable claims if you
19    read them.
20         The 598 is the easiest one because it deals strictly
21    with deceptive trade practices under that part of the statutory
22    scheme.
23         The other two, creating consumer advocate, but, Your
24    Honor, it's got to be read in conjunction with the statutes
25    that surround it which specify the statutes upon which they can

A-24-886127-B | State v. TikTok | Motion| 09-24-2024

1   seek relief.

2          And the other one dealt with something in the public

3   interest of the State, which I think is very similar to the

4   *parens patriae*, and the law is clear that you can't bring those

5   types of claims based on harm to individual -- alleged harm

6   that is to individual Nevada citizens.  But what those claims

7   or those concepts are directed at is harm to the entire

8   population.

9          And so for those reasons I don't think that they've

10  provided you with any statutory authority to say why they can

11  bring this subset of the claims.  And it is their burden, Your

12  Honor, I would submit.

13         Moving on very quickly unless I --

14         THE COURT:  No, no, that's it.  I -- I want to make

15  sure you get your two minutes.  Go ahead.

16         MR. WILLIAMS:  Great.  So with respect to the

17  products liability claims, Your Honor, I heard no reference to

18  the Restatement (Second).  The *Schueler* case tells us that's

19  what Nevada Courts have to look at to determine whether

20  something constitutes a product.

21         Most respectfully, looking at *Lemmon versus Snap* is

22  not what this Court should be doing for a couple of reasons

23  because it is not the Restatement (Second), and it never

24  addressed the issue of products for the reasons that I stated

25  earlier.

1    With respect to the Deceptive Trade Practices Act

2 claim and specifically the issue of the sale, Your Honor, they

3 say that any consideration counts.  But let's look at the

4 definition of sale.  Sale means any sale, offer for sale or

5 attempt to sell any property for consideration.

6    Now, I'll admit it's somewhat of a confusing

7 definition because the term being defined is used repeatedly

8 throughout the definition itself, but, Your Honor, number one,

9 I don't know what the property is here.  That's never been

10 identified.  And we cited to you the Webster's definition of

11 sale, which is a transfer of ownership for a price.  That

12 simply has not occurred here, Your Honor.  And if user data

13 could constitute consideration to satisfy the definition of

14 sale, then literally any time any of us go to the Internet and

15 click the button to either accept cookies or confirm my

16 choices, then that website operator is engaged in the sale

17 under the Deceptive Trade Practices Act whether it's intending

18 to sell anything or not.  And respectfully, I submit that's

19 just too far of a broad reading for that statute would, you

20 know, be, respectfully, an absurd interpretation of that

21 statutory provision.

22    Your Honor, very quickly on the other points, again,

23 on negligence, Your Honor, the *Snap* versus *Lemmon* cases will be

24 heard to support the concept that a duty exists here.  For the

25 reasons I've said before, it doesn't.  But if they tried to

A-24-886127-B | State v. TikTok | Motion| 09-24-2024

1    bring the focus to the platform itself in owing a common-law or

2    a general duty is what I heard, but the design elements

3    themselves, Your Honor, in and of themselves are meaningless in

4    a vacuum.

5            There's no allegation in the complaint that the

6    design elements or the platform itself is addictive.  If the

7    design element and the platform sent people to a blank space,

8    there wouldn't be any claim of alleged harm.  The alleged harm

9    is the referring users to other third-party content.  And so I

10   don't think they get there with this alleged general duty or

11   common law duty.

12           And finally, with unjust enrichment, Your Honor, they

13   talk about it being an alternative claim.  But usually it's an

14   alternative claim to a breach of contract claim.  Usually

15   someone comes in and says it's a breach of contract.  And if

16   the contract for some reason isn't valid, then they'd seek

17   relief on unjust enrichment.

18           There is no contract claim here.  What the State's

19   trying to do is step into the shoes of the users who are a

20   party to a contract and seek to recover a benefit under that

21   contract.  That's why they can't do it under unjust enrichment.

22           THE COURT:  Okay.  Appreciate it very much.  Thank

23   you so much.

24           So.

25           MR. JONES:  Your Honor, I get, only as it relates to

A-24-886127-B | State v. TikTok | Motion| 09-24-2024

1    the -- my countermotion?

2              THE COURT:  Haven't we --

3              MR. JONES:  If I need to.  If your Court is going to

4    rule, I don't -- if it's going to rule in my favor, I

5    definitely don't need to say anything.

6              THE COURT:  Okay.  Well, you get a minute on the

7    countermotion.  Two minutes, the same two minutes, fairness

8    aspect, go ahead.

9              MR. JONES:  Well, and I'd just say from the

10   standpoint even from here, under NRCP 17(a)(2), the real party

11   in interest, a statute is -- a statute so provides an action

12   for another's use or benefit must be brought in the name of the

13   State.  So there's no authority here that allows the Attorney

14   General to do it.

15             And even Mr.-- and the reason I bring that up in

16   terms of a amended complaint is we don't think that, again,

17   they've raised any issues.  They talk about content, content.

18   They're trying to interpret our complaint and what we've

19   alleged.  And sort of the last things that Mr. Williams said,

20   for all factual arguments about what they believe -- actually

21   all counsel for TikTok in their counterarguments they're

22   making -- they're arguing what our complaint says or doesn't

23   say.

24             So I don't think we should have a need to amend, but

25   if the Court feels it's appropriate, we certainly can do that,

1  but what their arguments have been essentially are arguing the

2  facts and their interpretation of the facts, and that would not

3  give rise for us to need to amend, I don't believe.  Thank you.

4            THE COURT:  Appreciate it.  Okay.

5            So here's the Court's ruling.  I'm going to walk

6  through how you pretty much did your argument.

7            First, the Court is not needing to rule on the

8  general jurisdiction issue because it's been stated that that

9  issue is not being presented by counsels for plaintiff.  So the

10  Court's going specifically to specific jurisdiction.

11            You all agree on the standard of specific

12  jurisdiction.  A Court may exercise specific jurisdiction over

13  a nonresident defendant only if, 1, It purposely availed itself

14  of the privilege of acting in the forum state or purposely

15  directed, bracket, its conduct to the forum state; 2, The

16  claims arise out -- arise out of or relate to the defendants

17  contact with the forum; and 3, Exercise of jurisdiction would

18  not, quote, offend the traditional notions of fair play and

19  substantial justice.

20            Whether I go to defendants' brief where they cite

21  In re Paul Burgauer 5 -- the Nevada Advanced, 138 Nevada

22  Advance Op. 79, 521 P.3d 1160, or I go to *Tricarichi* cited in

23  plaintiff's, the same standards there because *Tricarichi* was

24  pretty much the same.  It phrases it a little bit different.

25            *Tricarichi* says, quote, Specific jurisdiction is

1  proper only when the cause of action arises from the defendant

2  contacts with the forum, end quote, citing to Fulbright

3  (phonetic) (indiscernible).

4          In evaluating specific personal jurisdiction, this

5  Court has considered two factors.  One, whether defendant

6  purposely availed himself of the privilege of acting in the

7  forum state or personally directed its conduct to the forum

8  state; and 2, whether the cause of action arose from the

9  defendants' purposeful conduct or activities within connection

10 of the forum state, such as reasonable to exercise personal

11 jurisdiction.  It cites to Dogra (phonetic) et cetera.

12         Realistically, it's the same test.  So here the Court

13 does find that specific jurisdiction does exist over

14 defendants.

15         For ease, I am going to adopt the specific analysis

16 that has been set forth in the opposition.  You have, well,

17 contacts with the forum.  You have all the issues with regards

18 to related in the 89-page complaint.  As stated, those are

19 based on the contacts with this forum.  It's the conduct and

20 the context to the actual claim, the actual users here in the

21 State and the design aspects, whether you go to the data

22 collection, whether you go to the coins, whether you go to the

23 user agreements, whether you go to the advertising, whether you

24 go to all the other contacts that are listed in the opposition,

25 the Court finds that prong is met.

1    The Court also finds that the second prong arise out

2  of relate to the contacts with the forum.  Yes, because that's

3  where the claims are based on.  See the 89-page complaint and

4  see the analysis in the opposition.

5    Three, the exercise of jurisdiction would not offend

6  traditional motions of fair play and substantial justice.

7  Well, here the Court doesn't find that it would do that because

8  in TikTok knowingly, when it does all the things that it is

9  asserted to do in the case, and remember, on a motion to

10 dismiss stage, that's all the Court has right now, is that it

11 would be appropriate to find that it, quote, would be brought

12 into the jurisdiction.

13    So the Court without going through all of the other

14 cases that are cited in the pleadings you all have cited,

15 really the standards, and so the Court's adopting those cases

16 with regards to the standard and finds -- find it does apply

17 here.

18    Next, we go to the 230.  So since jurisdiction.

19    Now, we'll go to the 230 motion to dismiss based on

20 230.  The Court is going to deny that because really, here,

21 *Lemmon* is instructive, okay.  *Lemmon* is instructive because

22 basically while it's not mandatory, it is persuasive.  And I'm

23 going to give a quote from *Lemmon*.  Each of Snap's novel

24 attempts to expand CDA immunity beyond the straight core

25 principles is to no avail.  To start, while providing content

1   neutral tools, does not render an Internet company, quote, a

2   creator or developer, end quote, of the downstream content that

3   is user content -- excuse me, that its users produce with those

4   tools.

5        Our case law has never suggested that Internet

6   companies enjoy absolute immunity from all claims related to

7   their content neutral tools.  And it says *see Dyroff*, Kimzi

8   (phonetic) Roommates (phonetic), et cetera citations I'm

9   omitting.

10       To the contrary, the CDA was not meant to create a

11  lawless, no man's land on the Internet, citing Roommates.

12  Those who use the Internet thus continue to face prospect of

13  liability if their, quote, neutral tools, end quote, as long as

14  plaintiff's claims do not blame them for the content that the

15  third parties generate with those tools.

16       When I look at that case and look at the other cases

17  cited on the totality of the different pleadings, the Court

18  really finds that this does not fall within the protections of

19  230.  So therefore on a motion to dismiss standard, I need to

20  deny the motion to dismiss on that basis.

21       Then we get to the First Amendment.  With regards to

22  the First Amendment, the Court really does see this as

23  commercial speech.  So it would have an intermediary --

24  intermediate scrutiny analysis (indiscernible) analysis,

25  obviously I'm taking into account *Moody* because it is what it

A-24-886127-B | State v. TikTok | Motion| 09-24-2024

1   is.

2           When I look at the nature, and I'm looking at a

3   motion to dismiss, I do not see that the complaint as pled, and

4   plaintiffs are the master of their complaint, is a preclusion

5   under a First Amendment analysis.  Once again, this is a motion

6   to dismiss standard.  So I have to look at what they said, not

7   one party's interpretation of what they did.

8           So those would -- so then we get to the substance of

9   actually the causes of action.  Let's go to the causes of

10  action, the causes of action set forth in the complaint.  So we

11  go to the causes of action, and your first cause --

12          Do I need to slow down a little bit?  Sorry.  I'm

13  trying to be cognizant of everyone's time here.  I will speak a

14  little slower so anybody transcribing will have a better

15  opportunity.

16          Okay.  So let's go to the actual causes of action.

17  So if you go to the causes of action -- give me a quick second

18  because I'm scrolling through the complaint.  I'll get to the

19  page where the causes of action start.

20          The challenge with such a long (indiscernible) takes

21  a moment to scroll.  I know you all gave me a jump drive.  It's

22  just -- it's just as -- it still takes me to scroll through.

23  So it takes a while.  No worries.

24          Causes of action.  Count 1, deceptive trade

25  practices, 598.0903 through 598.091.  In that one, there was

A-24-886127-B | State v. TikTok | Motion| 09-24-2024

1   not an issue of the standing aspect because the plain language
2   of 598 allows the Attorney General.
3           So the Court now needs to go to the actual merit
4   based analysis with the 598 claim.
5           Here, when you look at -- have to look at whether or
6   not the -- design features, whether or not there is, quote, a
7   product or is it the nature of, quote, the consideration.
8   Here, the Court is -- when I look at how it's pled
9   (indiscernible) capacity to do so, the Court -- one second.
10          The Court does not see that the State's claims are
11  treating defendants as publishers of a third-party conduct.
12  The Court really has to take the complaint as drafted and that
13  it's focusing on design elements.  And so therefore that would
14  pass muster under a motion to dismiss.
15          So the first cause of action would be denied under
16  the motion to dismiss standards.  And, yes, the Court is also
17  taking into account *Poole*, which is cited in the complaint as
18  well as the other case law cited really by both parties in
19  their motion.
20          I have to look at whether or not under deceptive
21  trade practices with regards to the aspect.  So then the Court
22  really has to look at whether or not was this a sale under the
23  statute.  Was it sale or consideration.
24          Realistically, I think the case law interpreting that
25  case, and I would have to go to some more recent cases, not, of

1course, addressing any cases that are still currently pending

2before this Court, is that that has been more broadly read,

3that it doesn't actually have to be a monetized sale.

4And here, because of the allegations of the complaint

5do address the concept, I mean, enough that this Court would

6have to view that there is, quote, consideration. I'm not just

7taking the user agreements, also taking the coins, which is a

8moneterzation -- a monetization is what I meant to say, a

9monetization aspect, and I take, once again, in a motion to

10dismiss stage, I think it meets those standards, whether it's

11the data or whether it's the design features, whether or not it

12is the coins. I think it meets that.

13And the Court's analysis is going to be similar --

14well, it's pretty much similar under Count 2. So I need to

15deny the motion to dismiss with regard to that, and that was

16not a standing issue under the claimed aspect of the motion to

17dismiss.

18Now, let's get to Count 3, product liability, design

19defect. Here the Court is going to grant the motion to dismiss

20but give leave to amend. Realistically, and I appreciate the

21reference to the other case, which I can't say too much about

22because it is still technically currently pending before this

23Court because there's bankruptcy and other matters. So all

24matters have not been fully resolved in that case.

25But there is a distinction because while I appreciate

1    that is a heads up, remember in opioid there actually was a

2    product; right?  There was the pills and medication too.  The

3    State of Nevada was asserting, and I don't -- this is nothing

4    for any merits based analysis.  I'm just kind of giving a

5    simple distinction here because, well, you all brought it up.

6              (Indiscernible) the State of Nevada will state it

7    actually incurred expenses for all the underinsured and

8    uninsured individuals.  So you had something that was distinct,

9    and so it was a bit different.  So I did analyze that to see if

10   there was something that was similar.  Try and be consistent in

11   my rulings, okay.

12             But that being said, the design defect concept, I see

13   the concept, but whether or not I've got issues here on the

14   standing question, and I think that can be fleshed out with an

15   opportunity for leave to amend to see if it's something more

16   than what is just currently stated.

17             And second, about whether or not it is actually a

18   product, okay.  So that's why the Court finds it's appropriate

19   to grant the motion to dismiss but give leave to amend.

20             So I'm giving leave to amend, i.e., I am granting --

21   you can treat it two ways.  A, the Court's inherent powers for

22   leave to amend, but I've also got a countermotion for leave to

23   amend.  So I'm granting the countermotion portion as

24   appropriate with the Count 3 on product liability.  And also

25   the Court would have exercised its inherent power anyway

JD Reporting, Inc.

1    because it would be appropriate.

2         Okay.  So next, go to Count 4, Product Liability,

3    Failure to Warn.  Same analysis, although I appreciate a

4    failure to warn is a little bit different, but once again, we

5    have to have a clarity on what's actually the product.  You

6    have to have a clarity on the standing aspect, and so therefore

7    the Count 4 also is going to be dismissed with leave to amend,

8    i.e., granting the countermotion for leave to amend as well as

9    inherent power to grant leave to amend.

10        Count 5, Negligence.  Similarly here, the standing

11   issue.  With regards to here, whether or not, since the

12   negligence is who the duty is to, I don't see that it is

13   clearly articulated how the -- who the duty would be to the

14   State of Nevada, and I think that is possible for leave to

15   amend with the Nevada Supreme Court's preference, right, trying

16   cases on the merits and giving people an opportunity to have

17   leave to amend.  So I think there's issue of the duty.

18        And so I -- and the duty ties into the standing

19   analysis because a duty to whom; right?  So that goes to the

20   standing analysis.  So it's the standing analysis, and then the

21   duty would tie into that.

22        So the Court's going to grant the motion to dismiss

23   but give leave to amend with the fifth cause of action for

24   negligence.

25        And similarly, then we get to Count 6, Unjust

A-24-886127-B | State v. TikTok | Motion| 09-24-2024

1  Enrichment, that's an equitable claim.

2          I haven't seen -- really the Court would find it's

3  appropriate to grant the motion to dismiss because how the

4  State of Nevada would have the right to bring an equitable

5  claim on behalf of whom?

6          I think there's a standing issue there that, you

7  know, given opportunity for leave to amend, right, but then

8  because of its equitable nature, how the State of Nevada could

9  step in the shoes for an equitable relief it's -- I'm not

10  really going in the alternative to a contract issue because you

11  could plead things in the alternative, but here really it's the

12  issue of what is the State of Nevada articulating is unjust

13  that it has the right to assert on behalf of whom under what

14  aspect.

15          I appreciate it gives me a general statement in

16  paragraph 355, but I think that needs to be clarified under

17  Nevada law, and how that would apply to this particular claim.

18          So the Court's ruling is motion to dismiss granted in

19  part, denied in part with leave to amend in the parts that it

20  was granted.

21          With regards to the leave to amend, I think as

22  sophisticated litigators, knowing the extent and breadth and

23  knowing that you might be trying to get a transcript,

24  et cetera, I'm going to leave it to you all to give the Court a

25  letter or a stipulation, either a joint letter or a stipulation

1    within the next 10 days on what you want to put in for the

2    leave to amend date, okay.  Because I appreciate you might be

3    asking me for more than the 14 days under EDCR 7.21 to get the

4    Court -- the order in rather than going those back and forths.

5            I assume as sophisticated litigators you all can pick

6    some dates that are going to meet your needs, provide it to the

7    Court in a proposed stipulation and also put in that proposed

8    stipulation the leave to amend date.

9            Is that a correct assumption, or do I need to start

10   getting my calendar out now?

11           MR. WILLIAMS:  I think it's a correct assumption on

12   behalf of defendants, Your Honor.

13           MR. JONES:  Yes.  I think that would work fine.

14           THE COURT:  Okay.  So I'm going to tell you within

15   the 14 days get me the stip that tells me when you want to have

16   the order done, right, a reasonable date for the order and a

17   reasonable date for when the leave to amend would be triggered.

18           Okay.  So the Court believes it has addressed each

19   and every argument and feels it has addressed its analysis.

20           To the extent I've only gone over some of the

21   highlighted ones, I am adopting the arguments and the case law

22   in the pleadings.

23           Does anyone request that this Court go through your

24   hundreds of pages of pleadings and your appendices and detail

25   each and every element?  Because I wouldn't want someone to

1    think for purposes of any other future process that you might

2    be doing that the Court is omitting something; I'm not.  I am

3    realistically trying to give you some of the general guidelines

4    that I'm adopting.  The case law says what the case law says

5    whether I repeat it or not.

6              MR. WILLIAMS:  Understood, Your Honor.  On behalf of

7    defendants, no, we're not asking you to go through everything.

8              THE COURT:  Counsels for plaintiffs, are you?  If you

9    are, let me know now.

10             MR. JONES:  Your Honor, no.  If -- with the Court's

11   approval, we would draft the first draft and provide it to

12   counsel for review of the order.

13             THE COURT:  I'm going to -- whoever wants to do it is

14   going to be fine with the Court.

15             MR. WILLIAMS:  I think it's going to be a

16   collaborative process, if they want to take the first shot,

17   Your Honor.

18             THE COURT:  Okay.

19             MR. WILLIAMS:  Knock themselves out.

20             THE COURT:  Okay.  So we'll do that.  And then you

21   all can reach your agreements with regards thereto.

22             Is there anything from today's purposes that I need

23   to say anything else or address anything else?

24             MR. JONES:  Not from plaintiff's side, Your Honor.

25             MR. WILLIAMS:  No, Your Honor.

1          THE COURT:  Okay.  Then thank you so very much for

2     the excellent briefing, for the excellent oral argument and

3     your time today.

4               (Proceedings concluded at 12:15 p.m.)

5                          -oOo-

6     ATTEST:  I do hereby certify that I have truly and correctly

7     transcribed the audio/video proceedings in the above-entitled

8     case to the best of my ability.

9

10

11                         Dana L. Williams
                          Transcriber

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MR. CARLSON: [1] 4/19

MR. EVANSON: [40] 12/4 13/6 13/9 18/21 18/25 19/8 19/15 19/23 20/9 20/13 20/22 20/24 27/20 27/22 28/4 28/8 28/13 28/16 29/10 29/19 29/25 31/11 34/17 83/7 83/10 83/17 83/24 84/2 84/8 84/11 85/11 86/11 86/16 87/2 87/13 87/16 89/10 89/16 89/22 91/3

MR. GAYAN: [3] 3/11 4/6 4/11

MR. JONES: [45] 3/9 5/15 7/6 7/15 11/14 11/16 11/25 51/10 51/19 52/5 53/2 53/4 57/8 57/11 57/13 57/20 61/8 61/11 61/17 61/22 62/8 67/25 68/14 69/6 69/8 72/25 74/25 75/7 75/15 75/18 76/15 76/19 77/14 77/17 78/8 81/14 81/16 82/14 87/6 94/25 95/3 95/9 106/13 107/10 107/24

MR. KRUEGER: [2] 3/22 4/16

MR. SLADE: [2] 3/20 4/4

MR. WILLIAMS: [32] 4/22 5/3 5/10 5/23 5/25 6/6 6/9 9/10 9/22 11/10 11/23 34/20 35/1 38/18 38/21 38/24 39/2 39/8 39/12 43/14 50/8 50/17 51/2 57/9 91/4 91/13 92/16 106/11 107/6 107/15 107/19 107/25

MS. FULGHUM: [1] 4/18

THE COURT RECORDER: [1] 3/24
THE COURT: [117]
UNIDENTIFIED SPEAKER: [1] 4/9

**$**

$4 [1] 58/3
$4 million [1] 58/3
$59,000 [1] 58/2

**-**

-oOo [1] 108/5

**1**

1,500,000 [1] 55/20
10 [7] 3/3 22/18 50/6 51/16 51/21 75/1 106/1
103 [3] 30/9 87/22 87/25
108 [2] 30/21 88/6
109 [2] 30/21 88/13
1098 [1] 24/12
10:38 a.m [1] 52/1

10th [1] 16/14
110 [2] 30/9 88/13
111 [2] 69/15 88/13
112 [5] 30/9 87/22 88/13 88/14 89/6
113 [1] 30/21
113,000 [1] 58/2
1160 [1] 96/22
1168 [1] 89/7
11:00 [2] 51/16 51/21
12 [8] 6/21 22/19 28/11 35/2 35/3 53/7 62/20 63/1
120 [3] 88/18 88/19 88/20
12:15 p.m [1] 108/4
13 [1] 65/10
131 [1] 62/9
138 [1] 96/21
14 [3] 66/22 106/3 106/15
141,000 [1] 58/1
15 [2] 66/17 66/21
15-minute [1] 51/16
1535 [1] 69/15
17 [2] 73/21 95/10
173 [2] 65/11 65/12
174 [1] 65/11
175 [2] 65/11 66/3
1995 [2] 69/15 90/18

**2**

2011 [1] 32/18
2017 [1] 85/6
2018 [2] 49/2 57/25
2021 [1] 47/15
2023 [2] 48/6 58/2
2024 [2] 1/12 3/1
220 [1] 62/19
222 [1] 40/3
224 [6] 38/9 38/14 38/20 38/21 39/10 39/16
228.170 [3] 44/19 78/10 78/20
228.380 [1] 45/19
228.390 [1] 45/15
228.391A [1] 75/13
230 [46] 6/17 12/11 16/2 18/15 20/20 20/22 20/24 21/6 21/9 21/14 22/1 22/5 22/8 22/11 22/18 22/22 22/24 23/4 24/10 24/20 25/24 26/14 26/16 26/17 28/10 29/3 29/16 31/7 43/8 47/17 64/10 66/13 66/16 66/24 68/3 68/13 68/14 69/9 86/9 87/16 89/2 89/4 98/18 98/19 98/20 99/19
239 [1] 13/12
24 [2] 1/12 3/1
240 [2] 13/12 40/3
241 [1] 40/3
243 [1] 40/3
246 [1] 40/3
264 [1] 85/12

**3**

3 through [1] 43/16
30 [1] 90/19
32 [1] 63/16
324 [1] 85/23
33 [1] 48/10
34 [1] 48/11
35 [3] 30/8 83/18 83/20
355 [1] 105/16
36 [6] 30/9 74/22 74/24 74/25 75/12 78/9

**4**

4 are [1] 46/12
400,000 [2] 74/1 74/2
4th [1] 89/7

**5**

50 [4] 15/1 16/5 16/20 17/11
521 [1] 96/22
54 million [1] 57/1
55 [1] 71/2
598 [7] 70/21 75/5 75/6 77/23 91/20 101/2 101/4
598.0903 [1] 100/25
598.091 [1] 100/25
598.0923 [1] 73/14
598.094 [1] 70/24
598.0963 [3] 45/23 76/3 76/9

**6**

6 are [1] 43/16

**7**

7.21 [1] 106/3
79 [1] 96/22

**8**

82 [1] 12/24
833 [1] 24/15
834 [1] 24/15
86 [1] 12/24
886127 [1] 3/4
89 [1] 82/13
89-page [2] 97/18 98/3

**9**

9 and [1] 3/3
91 [2] 13/13 72/3
92 [1] 72/3
9:30 matter [2] 3/3 3/4
9:32 [1] 3/1
9:43 [1] 12/3

**A**

a.m [3] 3/1 52/1 52/1
ability [8] 33/5 41/13 44/2 46/2 73/16 74/9 76/22 108/8
able [7] 10/14 10/21 19/5 53/25 74/15 75/19 81/20
about [112]
above [2] 65/14 108/7

65/14
above-entitled [1] 108/7
abrogate [1] 85/19
absent [1] 48/22
absolute [1] 99/6
absolutely [3] 19/16 19/18 86/8
abstract [1] 25/21
absurd [2] 54/23 93/20
abundance [3] 42/10 82/9 83/2
abundant [1] 42/13
accept [2] 59/16 93/15
access [1] 80/6
according [1] 58/1
account [3] 10/16 99/25 101/17
accounts [1] 55/21
accurate [1] 10/5
acknowledge [5] 37/25 38/2 38/3 52/17 55/6
acknowledged [1] 44/5
acknowledging [1] 21/9
acquiesced [2] 61/10 61/11
acquire [2] 59/15 74/15
acquiring [3] 59/11 59/12 59/13
across [3] 33/24 34/10 69/11
act [22] 16/2 35/13 36/3 36/12 36/21 37/8 37/8 37/13 37/15 38/1 45/24 46/2 49/25 50/2 50/4 62/2 69/10 70/22 73/4 76/24 93/1 93/6
acting [2] 96/14 97/6
action [18] 33/10 64/23 76/4 78/13 82/1 95/11 97/1 97/8 100/9 100/10 100/10 100/11 100/16 100/17 100/19 100/24 101/15 104/23
actionable [3] 40/10 41/1 81/24
actions [2] 75/24 84/13
activities [1] 97/9
activity [11] 21/22 24/5 26/15 31/17 31/24 32/1 32/7 33/19 69/16 85/14 85/17
actor's [1] 37/18
acts [2] 41/11 80/14
actual [8] 10/22 13/25 14/12 72/20 97/20 97/20 100/16 101/3
actually [24] 7/15 14/11 16/24 42/6 46/4 54/6 55/18 58/14 68/3 71/14 71/17 72/17 75/12 77/3 77/4 80/16 87/11 95/20 100/9 102/3 103/1 103/7 103/17 104/5
ad [1] 71/6

addict [2] 65/5 66/19
addicted [4] 45/11 45/12 58/6 63/23
addicting [1] 65/15
addiction [1] 63/23
addictive [1] 94/6
additional [5] 35/11 36/8 36/14 48/10 62/11 66/6
address [16] 5/4 6/11 10/6 18/19 27/22 35/8 37/19 39/20 61/4 68/12 76/25 89/14 89/19 91/6 102/5 107/23
addressed [10] 58/17 68/3 71/20 77/20 77/25 88/25 91/16 92/24 106/18 106/19
addressing [4] 46/5 47/10 47/10 102/1
adequately [1] 68/6
adjudicate [1] 86/21
admission [1] 12/6
admissions [1] 74/6
admit [1] 93/6
admits [2] 42/21 43/4
admitted [2] 5/1 60/4
adopt [1] 97/15
adopted [1] 26/20
adopting [3] 98/15 106/21 107/4
adults [1] 74/12
Advance [1] 96/22
Advanced [1] 96/21
advantage [3] 41/12 73/16 74/8
advertisers [1] 79/16
advertising [8] 17/22 56/18 60/7 60/9 60/11 60/23 60/25 97/23
advisories [1] 42/13
advocate [5] 45/17 75/2 75/9 75/16 91/23
affect [2] 23/11 43/25
affecting [1] 67/10
affirm [2] 68/5 68/8
affirmed [2] 49/2 49/22
after [2] 89/10 89/23
AG [2] 44/14 45/20
again [45] 6/14 18/5 24/13 25/10 25/16 26/3 32/11 33/7 38/5 42/21 42/24 44/22 49/15 52/5 56/22 57/23 59/18 60/8 64/11 65/19 67/21 69/21 69/22 69/22 69/22 69/22 69/22 71/7 71/19 71/20 71/24 73/10 73/18 74/5 76/8 78/3 79/24 80/1 83/2 90/19 93/22 95/16 100/5 102/9 104/4
against [11] 22/3 24/14 25/17 42/23 44/6 76/4 76/24 77/7 84/11 84/12 86/21
age [1] 59/8
aggregated [1] 15/8
aggrieved [1] 19/7

**A**

ago [1] 31/14
agree [1] 55/24 56/10 96/11
agreement [3] 11/21 50/11 50/12
agreements [3] 97/23 102/7 107/21
ahead [21] 4/15 6/8 11/15 11/15 12/3 20/20 28/15 31/10 39/7 57/14 57/19 59/3 59/18 61/16 69/4 78/5 83/9 84/1 87/14 92/15 95/8
aimed [1] 17/4
Airbnb [1] 48/12
airplanes [1] 46/22
akin [1] 49/5
algorithm [19] 23/16 23/20 23/24 24/2 24/5 24/9 24/16 26/5 30/8 30/11 30/12 30/13 31/22 32/3 32/6 32/9 33/16 63/11 88/14
algorithms [4] 24/4 24/8 63/7 63/17
all [81] 4/1 1/15 6/5 6/8 7/9 9/11 9/17 9/20 10/1 10/6 10/7 10/7 10/17 11/3 11/18 11/21 12/5 14/4 14/20 15/1 16/5 16/20 17/7 17/11 19/2 21/24 22/19 23/14 25/18 29/8 29/12 31/8 34/6 35/11 38/6 42/13 42/20 43/4 43/18 47/3 48/3 52/15 56/23 58/2 59/14 60/4 61/19 66/13 69/19 69/23 70/16 77/25 81/23 82/18 83/6 84/14 84/16 85/2 85/19 88/18 95/20 95/21 96/11 97/17 97/24 98/8 98/10 98/13 98/14 99/6 100/21 102/23 103/5 103/7 105/24 106/5 107/21
allegation [8] 12/19 23/19 37/1 37/5 45/10 65/23 81/5 94/5
allegations [30] 13/10 27/6 27/16 27/17 28/2 30/20 30/25 35/6 35/9 35/10 37/1 38/13 42/8 42/17 62/17 63/1 65/24 65/25 66/1 66/2 66/8 66/9 67/12 69/24 73/18 82/15 82/23 82/25 87/21 102/4
allege [6] 14/16 15/7 15/15 30/10 31/5 34/8
alleged [21] 13/24 14/4 32/11 36/16 36/16 36/21 36/22 37/4 41/11 43/21 44/23 46/23 62/16 67/4 69/25 82/6 92/5 94/8 94/8 94/10

allegedly [1] 45/11 45/12 66/18
alleges [2] 12/24 32/2
alleging [7] 52/13 54/10 54/11 62/18 65/20 67/12 72/3
allow [5] 7/21 8/20 10/11 64/22 81/3
allowed [1] 78/25
allows [4] 44/16 44/20 95/13 101/2
almost [3] 23/25 58/24
already [6] 11/4 16/7 62/3 62/24 77/23 79/3
also [30] 17/20 38/16 39/18 41/22 46/17 53/7 53/12 56/11 62/8 62/9 64/5 68/4 70/6 71/4 71/11 75/9 78/18 79/7 80/22 81/4 81/25 85/22 88/22 98/1 101/16 102/7 103/22 103/24 104/7 106/7
alter [2] 21/23 33/14
altering [1] 67/6
alternative [6] 68/5 80/22 94/13 94/14 105/10 105/11
although [2] 57/13 104/3
always [1] 24/1
am [9] 10/6 10/11 11/25 34/13 84/9 97/15 103/20 106/21 107/2
AMA [2] 16/13 18/5
amenable [1] 85/16
amend [22] 81/16 81/17 95/24 96/3 102/20 103/15 103/19 103/20 103/22 103/23 104/7 104/8 104/9 104/15 104/17 104/23 105/7 105/19 105/21 106/2 106/8 106/17
amended [3] 39/2 68/6 95/16
Amendment [21] 6/18 12/12 16/3 31/12 31/13 31/17 32/14 32/21 32/24 34/13 34/15 69/17 70/6 70/16 90/3 90/9 90/21 90/23 99/21 99/22 100/5
among [1] 71/5
amount [4] 7/23 8/21 43/3 81/20
ample [1] 42/18
analogy [1] 64/16
analysis [18] 19/19 28/10 47/18 68/18 75/5 97/15 98/4 99/24 99/24 100/5 101/4 102/13 103/4 104/3 104/19 104/20 104/20 106/19
analytical [1] 72/8
analyze [2] 48/7 103/9
analyzed [1] 82/2
analyzes [1] 32/3

ancillary [1] 21/19
animate [1] 16/8
announce [1] 3/13
another [7] 8/8 11/8 16/18 21/4 53/21 88/7 88/10
another's [1] 95/12
answer [3] 26/17 28/13 34/13
answers [2] 61/15 78/25
Anthony [1] 3/16
anticipate [2] 53/17 53/19
anxiety [1] 72/9
any [79] 7/5 9/6 11/13 11/17 11/19 12/22 14/19 16/21 18/13 18/18 19/14 20/11 21/4 26/17 34/13 34/15 34/23 35/9 35/10 38/14 39/17 39/19 39/20 43/12 46/5 46/15 48/1 50/23 51/4 51/5 51/6 52/18 52/19 53/23 54/24 55/23 56/6 59/7 59/8 59/25 61/2 61/19 61/25 65/13 65/17 66/4 68/8 70/15 70/25 70/25 71/1 72/23 75/3 75/3 76/11 78/12 81/5 82/7 82/25 82/25 83/21 83/23 84/24 85/3 88/11 90/25 91/1 91/5 92/10 93/3 93/4 93/5 93/14 93/14 94/8 95/17 102/1 103/4 107/1
anybody [4] 3/25 5/2 64/20 100/14
anyone [3] 5/18 57/16 106/23
anything [8] 5/18 69/20 90/11 93/18 95/5 107/22 107/23 107/23
anyway [3] 52/21 68/21 103/25
anyways [1] 78/2
anywhere [1] 12/22
apart [1] 65/2
apologies [1] 57/15
app [8] 25/1 36/3 36/10 48/13 58/1 59/16 60/2 60/4
apparently [2] 56/13 56/21
appearances [3] 1/16 3/6 3/8
appeared [2] 10/7 10/8
appearing [2] 31/3 53/3
appears [4] 32/23 39/21 43/5 53/9
appellate [5] 14/19 16/10 18/10 37/10 68/2
appendices [1] 106/24
appendix [1] 13/12
applicability [1] 27/3
application [4] 27/1 35/7 46/5 90/20

at [48] 1 49/16 90/14
applies [2] 32/4 33/11 33/22 36/23 81/7
apply [15] 18/2 22/24 35/16 37/24 39/22 43/23 48/3 50/10 63/10 70/6 70/6 79/7 89/4 98/16 105/17
applying [3] 27/9 28/11 47/24
appreciate [14] 9/16 11/11 31/8 34/18 51/7 51/24 83/4 94/22 96/4 102/20 102/25 104/3 105/15 106/2
approach [2] 34/10 40/7
appropriate [11] 8/3 11/2 17/4 67/7 76/6 95/25 98/11 103/18 103/24 104/1 105/3
appropriateness [2] 38/16 39/18
approval [1] 107/11
approximately [1] 73/25
are [183]
area [1] 18/24
areas [1] 33/2
aren't [2] 13/4 45/25
argue [13] 6/12 6/12 6/24 7/9 7/25 8/1 8/18 8/21 8/23 10/12 10/22 80/23 86/2
argues [1] 22/7
arguing [7] 7/16 8/7 10/11 17/7 35/3 35/22 96/1
argument [25] 6/17 6/18 8/7 8/10 10/3 14/11 22/17 43/6 50/16 52/8 54/15 63/13 69/11 70/2 78/15 80/11 84/24 84/25 87/19 89/1 90/1 90/4 96/6 106/19 108/2
arguments [17] 6/20 7/3 8/7 8/22 9/5 9/11 12/12 31/19 31/21 35/3 43/8 52/15 53/15 87/8 95/20 96/1 106/21
arise [6] 14/18 15/13 85/3 96/16 96/16 98/1
arises [3] 16/24 46/24 97/1
arising [3] 71/23 84/22 84/24
Arkansas [5] 18/6 18/8 60/20 60/24 84/17
arm [1] 53/13
arose [1] 47/22 97/8
around [1] 63/16
artfully [1] 23/5
articulated [1] 104/13
articulating [2] 28/10 105/12
artistic [1] 34/6
as [132]
aside [2] 13/21 45/5

ask [4] 51/22 77/25 86/24 91/8
asked [6] 19/1 19/3 54/18 84/7 86/25 87/6
asking [10] 20/7 30/3 76/16 77/10 77/21 84/10 89/14 91/5 106/3 107/7
aspect [9] 5/7 28/1 95/8 101/1 101/21 102/9 102/16 104/6 105/14
aspects [3] 28/7 59/4 97/21
aspirational [1] 40/9
assert [4] 15/15 19/25 79/9 105/13
asserted [2] 20/11 98/5
asserting [4] 14/8 19/6 20/5 103/3
associated [1] 84/18
association [1] 56/16
associations [1] 56/12
assume [3] 5/8 73/19 106/5
assuming [2] 69/20 70/4
assumption [2] 106/9 106/11
at [100] 9/3 12/18 13/16 13/19 14/12 14/20 15/7 15/10 15/11 16/22 17/4 18/23 23/13 26/1 26/8 27/4 27/18 28/17 29/8 29/25 30/7 30/8 32/16 35/2 35/25 36/1 36/2 36/25 37/20 37/22 38/4 38/13 40/3 40/23 41/2 42/8 42/19 43/21 45/18 48/3 48/7 48/10 51/16 51/21 52/1 53/7 54/8 55/20 56/20 56/24 58/17 59/6 62/6 62/19 64/9 64/19 65/1 65/24 66/21 66/21 68/17 68/24 69/15 69/25 70/23 71/2 73/22 74/13 75/1 75/12 75/12 76/3 77/2 77/8 79/12 79/24 80/12 80/18 80/22 82/7 84/19 85/2 85/3 85/19 86/5 92/7 92/19 92/21 93/3 99/16 99/16 100/2 100/2 100/6 101/5 101/5 101/8 101/20 101/22 108/4
attack [1] 23/6
attacks [1] 26/14
attempt [3] 15/17 70/25 93/5
attempting [2] 23/11 33/14
attempts [2] 66/1 98/24
attend [1] 57/2
attendant [3] 21/16 21/25 22/6
attention [1] 66/6

## A

ATTEST [1] 108/6
attorney [20] 2/2 2/3 10/17 54/19 54/24 57/21 57/22 74/20 75/20 76/1 76/3 76/9 76/22 78/13 78/17 81/5 83/13 84/15 95/13 101/2
attorneys [6] 10/11 10/12 77/6 84/4 84/5 84/13
attractive [3] 23/22 26/7 32/6
attribute [1] 28/1
audio [1] 108/7
audio/video [1] 108/7
Austin [1] 37/25
authority [13] 14/20 18/11 29/12 68/24 76/1 76/10 78/20 89/25 90/1 90/5 90/16 92/10 95/13
authorize [1] 91/17
automatically [1] 24/25
automobiles [1] 46/21
AutoPlay [5] 24/22 26/8 30/20 88/6 88/8
avail [1] 98/25
availability [1] 17/5
available [4] 16/12 16/17 41/25 86/4
availed [3] 20/2 96/13 97/6
avoid [1] 9/6
awards [1] 88/1
aware [3] 11/23 12/8 59/22
away [1] 27/15

## B

back [8] 49/12 51/16 51/21 52/16 77/11 77/18 78/7 106/4
backdrop [2] 53/14 54/2
ban [3] 32/18 33/5 33/24
bankruptcy [1] 102/23
banned [1] 32/20
banning [1] 34/2
bar [1] 73/9
Barnes [3] 26/20 28/11 29/12
barred [4] 16/1 22/7 24/10 47/17
based [15] 8/4 11/3 24/4 36/6 42/17 49/23 50/12 74/6 87/8 92/5 97/19 98/3 98/19 101/4 103/4
basic [1] 32/22
basically [8] 6/10 25/19 50/21 56/14 63/8 64/13 87/7 98/22
basis [10] 40/13 43/21 44/10 45/13 46/9 74/4 86/3 86/8 86/17 99/20

## B (continued)

Beatrice [1] 106/1
beautiful [2] 32/6 34/6
because [93] 4/1 6/13 6/18 7/10 7/13 8/14 8/24 9/13 11/2 11/18 11/20 14/18 16/19 18/19 19/3 19/16 20/5 22/5 22/8 26/4 26/24 27/4 27/10 27/12 28/18 29/1 30/1 30/18 33/11 33/23 34/7 37/7 39/1 44/11 46/14 48/9 49/15 50/6 50/10 51/13 51/23 51/24 55/11 57/6 57/17 59/22 65/22 68/1 68/3 68/16 69/21 69/22 70/12 70/16 73/3 74/14 75/8 77/12 77/22 77/23 79/11 80/16 86/12 86/24 86/25 87/1 89/23 90/11 91/9 91/20 92/23 93/7 96/8 96/23 98/2 98/7 98/20 98/21 99/25 100/18 101/1 102/4 102/22 102/23 102/25 103/5 104/1 104/19 105/3 105/8 105/10 106/2 106/25
Beckman [1] 49/1
become [1] 72/5
been [33] 4/25 5/7 5/16 9/5 15/21 18/7 23/2 23/3 23/4 39/20 40/13 41/25 45/6 48/2 54/20 74/7 74/15 75/9 75/19 75/22 77/20 80/15 81/19 82/6 82/22 89/23 90/13 93/9 96/1 96/8 97/16 102/2 102/24
before [16] 1/11 4/8 10/7 10/8 10/9 18/24 27/15 32/19 50/25 61/3 68/19 84/3 87/11 93/25 102/2 102/22
begin [1] 83/10
begins [1] 88/11
behalf [20] 3/10 3/12 3/14 3/23 4/16 4/18 4/19 4/23 7/16 8/1 34/21 35/6 44/3 44/23 46/10 52/6 105/5 105/13 106/12 107/6
being [24] 10/21 11/20 11/23 20/16 35/6 20/20 37/21 40/7 41/23 53/19 56/1 56/7 64/4 65/2 65/7 70/17 72/18 73/10 78/3 90/19 93/7 94/13 96/9 103/12
belabor [1] 79/2
believe [22] 3/19 44/18 51/5 61/24 62/4 62/5 62/13 62/22 63/2 64/5 64/25 69/14 69/19 71/24 73/10 76/2 80/12 80/18 81/18 81/24 95/20 96/3
believed [2] 40/24 45/6

## B (continued 2)

believe[in]ly [1] 70/14
106/18
belong [1] 43/2
benefit [3] 31/20 94/20 95/12
benign [1] 54/6
best [3] 29/4 108/8
Betsinger [2] 37/11 38/2
better [2] 72/20 100/14
between [11] 6/24 15/14 26/25 34/7 37/13 47/23 48/24 49/5 50/18 67/2 80/24
beyond [3] 30/24 53/9 98/24
big [1] 56/5
biggest [1] 49/18
bilateral [7] 55/21 56/7 60/1 80/23 80/24 81/1 84/21
billboards [6] 13/5 13/6 56/19 60/11 62/23 84/22
binding [2] 29/7 32/15
bit [6] 59/3 77/4 96/24 100/12 103/9 104/4
BLAINE [2] 2/10 4/24
blame [1] 99/14
blank [1] 94/7
board [2] 33/24 34/10
bog [1] 39/12
both [10] 4/25 4/25 10/17 35/13 35/14 36/13 46/13 61/4 72/1 101/18
bound [3] 29/6 29/7 29/8
box [1] 91/7
brace [1] 27/11
bracket [1] 96/15
brains [1] 66/7
breach [3] 79/21 94/14 94/15
breadth [1] 105/22
break [4] 51/10 51/16 51/21 51/23
Brian [2] 3/15 3/16
brick [1] 17/21
Bride [1] 89/5
brief [11] 12/9 22/19 26/1 31/12 55/19 65/10 74/22 75/1 78/9 89/9 96/20
briefed [1] 89/23
briefing [6] 35/24 50/19 89/11 89/24 90/19 108/2
briefs [2] 8/14 69/12
bring [21] 10/13 43/19 43/22 44/8 44/12 44/16 45/9 45/25 46/2 46/9 47/4 50/12 75/7 76/3 78/17 91/18 92/4 92/11 94/1 95/15 105/4
bringing [2] 44/4 89/13
Bristol [2] 15/5 85/6
Bristol-Myers [2] 15/5 85/6

## B (continued 3)

Broadcasting [1] 70/10
broader [3] 15/19 39/19 59/24
broadly [2] 21/7 102/2
broken [1] 50/4
brought [14] 8/13 23/4 35/13 36/20 44/6 44/20 75/9 77/6 78/2 84/4 84/19 95/12 98/11 103/5
Brown [4] 32/16 32/16 32/17 33/1
bullets [1] 22/19
burden [8] 37/16 44/11 50/19 50/21 51/4 51/5 70/9 92/11
bureau [1] 45/16
Burgauer [1] 96/21
Bush [1] 3/15
business [13] 54/8 54/9 54/14 55/7 55/15 58/5 58/11 59/14 60/14 63/18 73/15 74/7 86/6
but [129]
butterflies [1] 34/5
button [1] 93/15
buy [1] 60/15
buying [1] 27/14
Buzz [1] 53/8

## C

calculated [1] 11/21
calendar [1] 106/10
California [17] 15/20 15/25 18/19 19/9 19/12 20/12 20/17 32/18 32/19 36/10 47/23 48/6 54/20 83/18 84/4 84/18 84/19
California's [1] 36/12
call [9] 13/2 13/11 13/12 13/14 14/22 56/12 56/14 58/21 79/11
called [8] 17/15 41/23 57/13 57/18 64/4 64/11 72/18 88/7
calling [3] 29/23 29/23 65/22
calls [1] 25/12
came [1] 69/11
Campbell [1] 4/23
can [53] 4/3 9/16 10/7 16/21 27/18 28/9 33/3 33/3 33/4 33/20 38/17 40/2 40/4 41/6 42/25 44/11 45/20 46/6 46/6 50/4 51/17 55/4 55/18 56/9 58/21 62/10 63/4 67/9 67/23 68/17 68/24 70/19 71/22 72/5 72/5 74/5 75/25 77/2 79/11 79/23 80/13 80/17 82/20 85/18 86/10 89/12 91/25 92/10 95/25 103/14 103/21 106/5 107/21

## C (continued)

can't [14] 3/24 13/18 14/17 22/12 45/1 45/9 46/1 49/19 50/12 54/17 80/25 92/4 94/21 102/21
cannot [8] 14/14 15/5 15/6 22/22 42/25 65/19 69/23 83/21
capable [1] 44/4
capacity [4] 41/14 73/17 74/9 101/9
car [2] 17/21 17/23
care [5] 5/13 77/3 79/4 79/6 79/21
career [1] 52/11
CARLSON [2] 2/5 4/19
case [149]
cases [28] 15/21 18/3 18/5 21/7 21/13 35/23 36/8 37/10 37/12 37/19 37/24 40/14 47/12 48/10 49/21 51/3 66/16 77/19 83/22 84/3 84/4 93/23 98/14 98/15 99/16 101/25 102/1 104/16
catch [1] 75/4
causation [1] 68/7
cause [13] 48/19 49/17 49/18 49/23 50/3 72/7 80/8 80/17 97/1 97/8 100/11 101/15 104/23
caused [3] 28/5 28/21 28/24
causes [8] 100/9 100/9 100/10 100/10 100/16 100/17 100/19 100/24
caution [2] 82/9 83/2
CDA [3] 6/17 98/24 99/10
central [3] 23/14 24/6 48/6
certain [5] 32/20 33/2 33/18 62/17 77/21
certainly [19] 7/19 8/16 13/18 43/9 48/1 49/14 52/10 61/13 62/12 68/22 74/13 80/5 80/13 80/17 82/4 83/24 84/2 86/16 95/25
certify [1] 108/6
CES [2] 13/16 13/17
cetera [4] 27/2 97/11 99/8 105/24
chain [1] 50/4
challenge [9] 12/16 24/9 24/21 25/12 25/19 29/1 39/24 65/13 100/20
challenged [1] 28/18
challenges [6] 15/23 23/14 24/8 33/14 90/14 90/15
challenging [15] 12/15 14/11 22/3 22/4 24/3 25/11 26/4 26/8 28/23 29/13 30/18 31/25 34/3 65/14 87/24
change [4] 9/19 26/5

# C

**change... [2]** 26/12 67/9
**chapters [1]** 45/19
**characterize [1]** 31/4
**charge [1]** 59/2
**charity [1]** 59/1
**Charleston [3]** 57/12 57/13 57/18
**check [1]** 19/2
**checking [1]** 39/6
**cherry [1]** 62/17
**Chief [1]** 2/2
**child [2]** 26/23 26/23
**children [5]** 56/2 73/21 74/12 75/21 88/5
**choice [2]** 10/17 10/21
**choices [3]** 24/1 32/9 93/16
**circle [1]** 78/7
**Circuit [25]** 16/14 16/15 16/16 24/12 27/11 28/17 29/6 40/16 47/15 49/2 49/3 64/12 64/13 66/23 67/8 68/12 68/20 68/21 68/22 68/25 85/23 89/1 89/6 89/7 89/25
**circumstances [2]** 7/21 81/19
**citation [2]** 75/6 91/15
**citations [1]** 99/8
**cite [15]** 14/19 18/6 44/20 45/15 45/23 48/4 50/20 59/19 60/18 64/12 65/10 75/19 78/18 90/18 96/20
**cited [24]** 33/7 35/23 36/8 40/14 41/2 46/8 48/10 49/1 49/21 50/20 51/3 53/22 55/3 61/24 70/10 73/24 76/2 93/10 96/22 98/14 98/14 99/17 101/17 101/18
**cites [4]** 37/9 42/12 42/13 97/11
**cities [1]** 60/13
**citing [4]** 73/2 89/24 97/2 99/11
**citizens [6]** 19/13 44/4 44/24 46/10 54/20 92/6
**City [1]** 53/8
**civil [4]** 76/7 78/20 78/22 78/24
**claim [64]** 15/11 15/13 16/23 22/22 23/8 23/20 23/23 23/24 24/7 24/13 24/19 25/3 25/5 25/11 25/11 25/17 36/15 36/21 37/13 37/14 37/15 40/14 41/6 41/7 41/10 42/6 44/20 45/9 47/17 48/8 48/20 50/12 52/16 54/20 67/22 68/3 68/8 68/13 68/14 71/14 73/13 74/5 74/18 76/13 76/13 76/21 78/17 79/8 79/25 81/2 81/7 84/22
**94/14** 94/14 94/18 97/20 101/4 105/1 105/5 105/17
**claimed [2]** 33/20 102/16
**claiming [1]** 54/10
**claims [79]** 6/21 14/1 14/7 14/12 14/18 15/15 16/1 16/5 22/7 23/11 26/3 30/1 30/2 30/4 30/16 31/4 33/23 35/4 35/11 35/12 36/19 36/24 37/3 43/17 43/20 43/22 44/3 44/5 44/6 44/8 44/12 44/17 45/13 45/20 45/21 45/21 45/22 46/1 46/3 46/6 46/9 46/11 46/12 48/15 49/14 49/15 54/3 62/21 63/19 65/18 70/7 70/8 73/7 73/8 74/19 76/17 77/5 77/9 82/6 82/17 82/19 83/19 83/19 84/11 84/12 84/24 85/3 86/21 90/24 91/18 92/5 92/6 92/11 92/17 96/16 98/3 99/6 99/14 101/10
**Claridge [1]** 36/9
**clarification [1]** 82/25
**clarified [1]** 105/16
**clarify [1]** 24/25
**clarity [5]** 47/8 86/15 86/25 104/5 104/6
**CLARK [2]** 1/2 3/1
**class [1]** 75/3
**classically [1]** 40/13
**Clause [1]** 17/17
**clear [16]** 9/15 13/11 19/16 19/18 28/16 30/4 30/16 31/2 33/1 33/11 37/16 73/8 78/19 87/11 87/20 92/4
**clearly [3]** 31/15 89/1 104/13
**click [3]** 55/18 55/24 93/15
**clicking [1]** 56/3
**client [1]** 18/18
**close [3]** 6/12 46/7 48/17
**closed [3]** 21/7 89/11 89/24
**closely [1]** 6/19 64/20
**closing [1]** 10/3
**cloud [1]** 10/22
**co [1]** 52/12
**co-opt [1]** 52/12
**Coast [1]** 84/5
**code [1]** 63/8
**cognizant [2]** 10/6 100/13
**coins [5]** 62/9 71/8 97/22 102/7 102/12
**COLBY [3]** 2/9 4/22 34/20
**collaborative [1]** 107/16
**collapsed [1]** 15/3
**collection [1]** 97/22
**come [3]** 3/5 44/24 51/16
**comes [3]** 40/17 45/23 94/15
**commence [2]** 52/4 78/13
**commenced [1]** 78/12
**comment [1]** 46/21
**commented [1]** 52/8
**comments [2]** 6/1 6/3
**commerce [2]** 17/17 18/1
**commercial [4]** 69/16 69/19 70/3 99/23
**commitments [1]** 41/4
**committed [3]** 40/9 40/25 76/24
**common [15]** 35/14 35/14 37/14 43/16 43/18 44/16 45/20 46/2 46/9 52/10 73/6 79/10 91/18 94/1 94/11
**common-law [2]** 43/16 94/1
**commonsense [3]** 21/17 68/18 68/18
**communication [1]** 32/23
**Communications [2]** 16/2 69/9
**community [2]** 42/3 42/24
**companies [1]** 99/6
**company [4]** 55/1 60/15 79/9 99/1
**compelled [2]** 68/21
**compile [1]** 31/23 90/8
**compiles [1]** 31/15
**complained [1]** 41/24
**complaining [2]** 25/20 41/3
**complaint [74]** 12/13 12/14 12/17 12/21 12/23 13/7 13/23 13/25 14/6 14/17 15/14 22/8 23/6 23/18 27/6 30/3 30/10 30/19 30/25 32/2 32/2 32/11 33/11 36/25 38/7 38/23 39/2 39/9 40/2 41/24 42/7 42/9 42/22 43/5 43/21 43/22 44/7 48/23 52/10 63/16 65/11 65/24 67/12 68/7 71/1 71/2 74/21 75/8 75/8 81/21 82/10 82/12 83/1 87/17 87/23 88/16 88/18 88/19 88/19 88/20 88/23 94/3 94/5 95/16 95/18 95/22 97/18 98/3 100/3 100/4 100/10 100/18 101/12 101/17 102/4
**complete [2]** 41/20 41/21
**completely [2]** 15/3 16/7
**compliance [1]** 5/11
**collecting [1]** 72/11
**comprehensive [1]** 82/12
**computer [1]** 21/2
**concede [1]** 35/9
**concept [7]** 27/13 91/10 91/11 93/24 102/5 103/12 103/13
**concepts [1]** 92/7
**concern [7]** 8/1 8/12 8/17 9/2 9/4 9/4 20/3
**concerned [1]** 8/20
**concerns [5]** 16/8 18/18 18/19 57/22 69/16
**concluded [1]** 108/4
**conclusion [1]** 53/3
**conditions [3]** 55/25 56/10 59/16
**conduct [14]** 14/12 14/13 17/4 21/16 48/22 49/8 62/16 62/20 64/2 96/15 97/7 97/9 97/19 101/11
**conference [1]** 13/16
**confines [1]** 74/17
**confirm [1]** 93/15
**conflict [1]** 47/25
**conflicting [1]** 16/6
**confusing [1]** 93/6
**Congress [1]** 21/9
**conjunction [2]** 6/23 91/24
**connect [1]** 28/21
**connecting [1]** 72/11
**connection [6]** 26/25 27/12 61/1 70/5 85/13 97/9
**consequence [2]** 50/1 80/14
**consequences [1]** 72/6
**consider [10]** 35/5 58/15 62/17 65/25 66/9 68/25 70/2 71/8 85/19 89/20
**consideration [18]** 59/4 59/7 59/7 59/15 59/17 59/25 62/9 62/12 71/1 71/7 71/9 72/1 93/3 93/5 93/13 101/7 101/23 102/6
**considered [4]** 24/7 24/13 25/11 97/5
**consistent [1]** 103/10
**consistently [1]** 21/6
**consists [1]** 46/25
**constitute [4]** 40/1 59/23 62/4 93/13
**constituted [1]** 47/19
**constitutes [3]** 21/18 46/19 92/20
**constitutional [1]** 53/13
**constraints [1]** 12/8
**construe [1]** 66/10
**construed [2]** 37/9 38/3
**consume [1]** 23/22
**consumer [24]** 13/2 13/19 36/4 36/6 45/16 45/17 55/12 55/23 56/20 59/19 65/8 65/9 70/14 71/13 72/16 73/17 74/9 75/2 75/9 75/15 79/13 80/24 84/23 91/23
**consumer's [2]** 63/10 79/15
**consumers [16]** 45/11 55/8 55/17 58/4 58/9 58/23 59/12 60/23 60/24 64/8 65/6 71/10 75/3 79/10 82/1 82/24
**consuming [1]** 79/19
**contact [4]** 16/24 85/4 85/20 96/17
**contacts [23]** 12/24 14/4 14/8 14/16 14/19 15/7 15/8 15/13 19/20 53/17 53/18 54/4 58/23 81/25 84/24 85/2 85/3 85/19 97/2 97/17 97/19 97/24 98/2
**contemplates [1]** 71/16
**contend [1]** 35/4
**contending [6]** 18/17 27/19 61/9 68/11 70/12 87/4
**content [106]** 21/5 21/19 21/21 21/23 21/23 21/24 22/1 22/9 22/12 22/13 22/21 22/25 22/25 23/3 23/7 23/10 23/12 23/15 23/21 23/23 23/25 24/17 25/5 25/6 25/7 25/14 25/22 25/24 26/3 26/5 26/10 26/12 28/20 30/17 30/19 30/23 31/3 31/5 31/6 31/16 31/23 32/3 32/4 32/4 32/5 32/9 32/10 33/12 33/18 33/25 34/7 34/8 38/15 39/17 39/21 42/1 43/1 43/7 46/24 46/24 52/16 52/19 63/7 65/2 65/14 65/17 66/4 66/14 66/20 67/6 67/10 67/16 67/19 69/20 69/23 70/2 70/3 70/5 70/8 70/13 70/17 82/18 87/21 88/2 88/4 88/9 88/17 88/19 88/20 88/23 88/24 89/3 89/3 90/8 94/9 95/17 95/17 98/25 99/2 99/3 99/7 99/14
**contention [1]** 86/13
**context [3]** 15/19 79/4 97/20
**contextual [1]** 72/8
**continue [5]** 16/5 57/19 78/6 86/18 99/12
**continuing [1]** 86/14
**continuous [1]** 85/14
**continuously [1]** 24/21

**C**

**contract [13]** 56/1 56/1 56/4 60/1 80/23 81/6 94/14 94/15 94/16 94/18 94/20 94/21 105/10
**contracts [9]** 12/25 55/21 55/22 56/7 80/24 81/1 81/1 84/21 84/22
**contradicts [1]** 67/17
**contrary [1]** 99/10
**controlling [3]** 69/13 89/15 90/5
**controls [1]** 64/4
**conversation [1]** 56/6
**conversational [1]** 72/9
**convey [1]** 32/10
**convincing [1]** 37/16
**cookies [2]** 60/3 93/15
**copying [1]** 57/21
**CORCORAN [1]** 1/24
**core [1]** 98/24
**corporate [1]** 40/11
**corporation [1]** 85/16
**corporation's [1]** 85/14
**correct [7]** 5/9 39/8 49/20 89/15 89/16 106/9 106/11
**correctly [1]** 108/6
**correspondence [1]** 57/20
**could [13]** 12/21 27/13 39/19 44/8 53/10 53/17 53/18 67/3 84/18 89/19 93/13 105/8 105/11
**counsel [21]** 4/14 4/15 4/21 7/13 10/21 34/19 52/4 54/5 57/6 57/19 68/1 74/23 75/19 78/7 83/5 84/17 84/19 89/18 91/12 95/21 107/12
**counsels [3]** 3/8 87/3 96/9 107/8
**Count [16]** 36/13 36/13 36/15 39/23 41/7 46/12 46/13 48/17 100/24 102/14 102/18 103/24 104/2 104/7 104/10 104/25
**Count 1 [4]** 36/13 36/15 39/23 100/24
**Count 3 [2]** 46/12 102/18
**Count 3 on [1]** 103/24
**Count 4 [1]** 46/13
**Count 4 also [1]** 104/7
**Count 5 [2]** 48/17 104/10
**Count 6 [1]** 104/25
**counterarguments [1]** 95/21
**countermotion [8]** 81/12 82/8 83/3 95/1 95/7 103/22 103/23 104/8
**countermotions [1]**

**country [7]** 10/20 12/22 14/23 16/13 16/19 53/23 54/25
**counts [5]** 35/12 43/11 43/16 46/12 93/3
**Counts 1 [1]** 35/12
**Counts 3 and [1]** 46/12
**Counts 3 through [1]** 43/11
**county [3]** 1/2 3/1 9/18
**couple [8]** 6/1 6/2 31/14 45/8 65/10 87/19 90/6 92/22
**course [14]** 6/1 32/18 34/22 38/18 48/19 49/19 52/11 53/12 62/7 67/25 86/11 87/2 88/22 102/1
**court [171]**
**Court's [18]** 6/2 7/8 10/15 11/11 12/8 30/14 38/1 68/5 83/11 96/5 96/10 98/15 102/13 103/21 104/15 104/22 105/18 107/10
**courtroom [4]** 12/7 51/23 51/24 77/8
**courts [20]** 10/19 17/7 21/6 21/8 21/13 22/15 22/20 24/7 24/8 25/10 25/10 27/10 41/15 41/18 41/22 46/17 46/17 49/4 64/25 92/19
**cover [3]** 12/7 12/11 29/3
**covered [1]** 22/1
**create [4]** 55/21 79/23 80/4 99/10
**created [7]** 12/20 12/20 54/12 55/21 56/7 63/9 65/5
**creates [4]** 45/16 60/24 60/25 63/9
**creating [3]** 55/25 56/4 91/23
**creation [1]** 65/4
**creator [1]** 99/2
**creators [1]** 62/11
**criminal [1]** 78/23
**culls [1]** 32/4
**cumulative [1]** 56/23
**cumulatively [1]** 85/1
**curate [2]** 31/22 90/7
**curates [2]** 31/15 32/5
**currently [4]** 83/22 102/1 102/22 103/16
**curtail [1]** 65/13
**custom [1]** 8/4
**customers [2]** 72/22 81/23
**customers' [1]** 40/18
**customize [1]** 71/6

**D**

**Dakota [1]** 17/15
**damages [3]** 44/3 46/10 76/8

**dangerous [5]** 33/6 48/22 67/5 67/10 79/23
**data [11]** 59/11 59/11 59/12 59/15 59/19 79/15 80/7 93/12 97/21 102/11
**date [7]** 9/19 9/25 11/22 106/2 106/8 106/16 106/17
**dates [1]** 106/6
**DAVID [3]** 2/6 3/20 4/5
**day [4]** 4/8 10/3 59/8 79/12
**days [3]** 106/1 106/3 106/15
**dead [1]** 22/16
**deal [2]** 56/5 70/8
**dealer [1]** 27/14
**dealerships [5]** 17/22 17/23 60/12 60/13 60/14
**dealing [2]** 18/3 19/24
**deals [1]** 91/20
**dealt [3]** 25/16 77/23 92/2
**decade [1]** 57/18
**deceit [1]** 37/17
**Decency [2]** 16/2 69/9
**deceptive [17]** 35/13 36/2 36/12 59/20 62/1 63/2 70/22 71/24 72/13 73/3 75/22 75/23 91/21 93/1 93/17 100/24 101/20
**decide [2]** 24/5 47/22
**decided [9]** 31/14 47/16 49/16 49/19 49/23 89/6 89/10 89/23 90/6
**deciding [3]** 21/21 21/22 30/13
**decision [14]** 16/13 16/14 18/7 21/19 22/2 23/1 25/8 25/8 25/10 29/6 29/11 49/3 68/5 90/18
**decisions [5]** 16/10 21/18 24/16 49/22 90/13
**declarations [1]** 55/3
**declined [1]** 68/9
**deems [1]** 32/6
**defect [6]** 43/19 46/12 46/13 47/17 102/19 103/12
**defective [2]** 64/6 67/2
**defects [1]** 77/24
**defendant [10]** 1/9 17/2 37/21 52/11 53/17 53/18 86/5 96/13 97/1 97/5
**defendant's [2]** 71/14 85/13
**defendants [18]** 2/9 4/23 34/21 35/7 38/7 38/11 38/14 39/16 41/12 84/14 84/15 88/3 88/3 96/16 97/14

**defendants' [5]** 11/19 19/20 52/8 96/20 97/9
**defended [2]** 44/20 78/12
**defending [2]** 15/22 16/5
**defense [8]** 4/21 15/2 17/9 65/19 66/25 78/7 78/14 78/14
**defer [2]** 8/11 9/2
**deferential [1]** 30/15
**deficient [1]** 72/5
**define [1]** 69/23
**defined [1]** 93/7
**definitely [2]** 87/17 95/5
**definition [11]** 21/17 50/3 59/20 59/23 59/24 73/14 93/4 93/7 93/8 93/10 93/13
**deflecting [1]** 87/7
**degree [3]** 41/14 73/17 74/10
**deliberation [1]** 10/3
**deliver [1]** 25/7
**delivering [1]** 41/7
**delivers [1]** 23/21
**demand [1]** 85/15
**demonstrate [3]** 53/25 74/16 80/17
**demonstrated [1]** 82/4
**demonstrating [1]** 81/21
**denied [2]** 101/15 105/19
**deny [5]** 18/12 60/5 98/20 99/20 102/15
**depict [1]** 56/19
**DEPT [1]** 1/6
**depth [1]** 72/9
**Deputy [2]** 2/2 2/3
**derived [1]** 82/15
**describe [12]** 30/10 30/11 30/12 30/18 30/22 52/9 63/13 80/2 87/21 87/23 88/17 88/24
**described [3]** 23/18 65/14 90/1
**describes [3]** 12/14 17/1 32/2
**describing [1]** 31/1
**description [1]** 60/22
**design [39]** 23/13 27/8 41/23 46/13 47/3 47/16 63/5 63/6 63/8 63/12 63/20 64/5 65/4 65/15 65/16 65/18 66/5 66/13 67/4 67/15 67/20 68/7 68/12 68/15 70/13 70/16 70/18 72/14 77/24 87/23 94/2 94/6 94/7 97/21 101/6 101/13 102/11 102/18 103/12
**designed [1]** 26/14
**designing [1]** 67/1
**desire [1]** 52/18

**despite [3]** 35/7 36/25 90/19
**detail [3]** 17/1 29/11 106/24
**detailed [1]** 42/9
**detailing [1]** 22/19
**determination [1]** 47/25
**determine [3]** 8/15 46/18 92/19
**determined [1]** 47/24
**determines [1]** 32/10
**determining [1]** 66/10
**developer [1]** 99/2
**developing [1]** 66/6
**did [35]** 5/10 7/19 9/22 11/18 22/24 31/20 38/21 41/16 48/3 48/4 48/6 48/7 49/11 54/4 57/9 57/10 57/11 58/18 61/2 62/2 64/12 68/12 68/17 68/18 71/17 71/21 74/23 82/8 86/2 89/3 90/4 91/13 96/6 100/7 103/9
**didn't [12]** 5/17 9/20 40/23 47/22 48/1 56/6 72/15 72/16 77/16 78/2 78/5 90/10
**difference [6]** 6/7 50/18 60/16
**different [23]** 9/13 9/19 9/25 11/1 17/25 26/22 27/23 27/25 28/25 29/1 32/23 33/15 33/16 33/17 35/25 39/3 59/19 59/23 64/14 96/24 99/17 103/9 104/4
**Dilemma [1]** 42/12
**direct [6]** 17/22 26/14 56/15 58/22 61/1 71/23
**directed [7]** 12/18 12/20 14/12 82/1 92/7 96/15 97/7
**directly [4]** 67/17 74/17 90/7 90/11
**disavow [1]** 67/13
**disclaim [1]** 52/18
**disclaimer [1]** 57/15
**disclosing [1]** 42/19
**disconnect [1]** 15/14
**discourage [1]** 73/8
**discovery [3]** 81/13 81/13 82/7
**discretion [4]** 6/2 8/2 68/9 75/2
**discuss [2]** 7/18 83/21
**discussed [3]** 21/13 32/16 33/7
**discussing [1]** 57/21
**discussion [1]** 73/25
**disgorgement [1]** 76/8
**dismiss [34]** 1/14 9/12 27/5 27/18 28/12 29/22 30/14 36/1 51/4 52/12 52/24 62/12 62/14 62/25 65/20 66/11 69/24 80/10 98/10 98/19 99/19 99/20

**D**

dismiss... **[12]** 100/3 100/6 101/14 101/16 102/10 102/15 102/17 102/19 103/19 104/22 105/3 105/18
Dismissal **[1]** 53/9
dismissed **[4]** 24/19 48/15 90/24 104/7
dispute **[2]** 44/8 50/10
disputed **[1]** 78/3
disputing **[1]** 45/25
distinct **[2]** 89/12 103/8
distinction **[7]** 47/23 60/9 60/12 60/16 63/19 102/25 103/5
distinctions **[1]** 37/13
distinguish **[1]** 90/17
distinguishes **[3]** 85/24 89/7 89/25
distinguishing **[1]** 34/7
distributors **[1]** 77/7
district **[13]** 1/2 1/11 8/5 15/24 36/10 47/21 48/6 49/16 58/19 68/5 71/13 78/18 90/14
divide **[1]** 7/3
dividing **[1]** 83/5
divorce **[1]** 45/5
divorces **[1]** 45/9
do **[76]** 4/12 4/13 6/12 8/2 9/3 9/14 10/4 10/15 10/16 12/17 13/25 14/5 14/8 14/18 15/5 16/20 17/19 18/16 23/11 26/19 26/19 26/25 32/22 34/15 37/19 43/6 43/7 43/13 44/7 44/17 45/2 50/5 50/8 51/10 53/25 54/4 54/23 58/11 58/15 61/19 61/21 64/21 65/7 66/13 69/20 70/13 72/23 72/24 74/11 74/12 76/2 76/11 79/18 80/18 80/22 81/3 81/8 86/23 87/18 90/20 91/1 94/19 94/21 95/14 95/25 98/7 98/9 99/14 100/3 100/12 101/9 102/5 106/9 107/13 107/20 108/6
docket **[1]** 77/19
doctrinal **[1]** 58/16
doctrine **[5]** 16/9 43/22 43/24 44/2 79/8
documentary **[1]** 42/12
documentation **[1]** 58/7
documents **[1]** 72/4
does **[46]** 11/13 14/19 17/16 18/2 19/23 19/24 22/11 24/2 24/25 32/24 35/5 35/8 37/6 38/5 43/1 43/23 44/2 47/4 47/13 48/3 48/4 54/18 55/11 57/16 58/8 65/12 70/6 70/6 74/3 75/20 76/1 76/9 76/22 80/3
97/13 98/8 98/16 99/1 99/18 99/22 101/10 106/23
doesn't **[23]** 11/8 29/3 33/4 33/10 45/21 47/12 49/13 49/14 50/10 50/14 51/23 56/13 65/22 80/2 80/3 80/4 82/18 86/20 88/23 93/25 95/22 98/7 102/3
Dogra **[1]** 91/7
doing **[12]** 5/24 20/20 20/21 20/22 25/22 33/23 44/19 52/20 58/8 58/25 92/22 107/2
don't **[51]** 8/22 8/23 10/20 10/24 13/18 20/13 27/12 30/11 30/24 37/7 37/15 37/16 38/5 39/14 40/3 43/6 43/7 54/23 58/6 59/2 59/10 60/5 61/11 61/12 61/14 61/24 61/24 63/12 64/20 71/8 73/10 79/2 79/11 80/9 80/18 81/7 82/19 82/24 85/3 87/17 89/22 92/9 93/9 94/10 95/4 95/5 95/16 95/24 96/3 103/3 104/12
done **[13]** 5/10 7/11 18/23 19/14 24/15 44/12 51/18 73/22 74/11 80/16 81/24 83/12 106/16
double **[1]** 72/17
doubt **[1]** 53/9
down **[5]** 5/20 39/12 43/17 72/17 100/12
download **[1]** 60/4
downloaded **[1]** 35/19
downloading **[3]** 36/3 36/10 60/2
downloads **[2]** 58/1 58/3
downstream **[1]** 99/2
dozens **[2]** 15/21 88/21
draft **[2]** 107/11 107/11
drafted **[2]** 65/24 101/12
drive **[1]** 100/21
driving **[1]** 9/17
drug **[3]** 26/24 27/14 28/1
drugs **[1]** 27/15
due **[7]** 15/2 16/8 17/8 20/6 20/6 41/8 53/13
Dunn **[1]** 4/25
duplicate **[1]** 16/6
during **[1]** 52/8
duties **[1]** 44/14
duty **[24]** 48/18 48/19 48/20 48/21 49/8 49/9 67/14 68/18 77/3 79/3 79/5 79/10 79/21 79/21 93/24 94/2 94/10 94/11 104/12 104/13 104/17 104/18 104/19 104/21

Dyroff **[12]** 24/11 26/19 27/8 27/23 28/14 28/15 28/16 28/22 29/5 29/6 29/12 99/7

**E**

e-commerce **[1]** 18/1
each **[8]** 5/21 9/16 23/13 25/20 33/13 98/23 106/18 106/25
earlier **[2]** 47/15 92/25
early **[2]** 63/15 73/24
ease **[1]** 97/15
easiest **[1]** 91/20
easily **[1]** 84/18
East **[1]** 84/5
EDCR **[1]** 106/3
editing **[1]** 21/20
editor **[1]** 24/16
editorial **[2]** 21/18 24/17
effect **[1]** 70/15
effects **[1]** 72/7
efficacy **[1]** 62/22
efficient **[1]** 6/9
effort **[2]** 45/5 52/14
efforts **[2]** 16/6 43/1
Eighth **[4]** 8/5 58/19 71/12 78/18
either **[9]** 15/10 16/1 16/2 45/22 66/4 81/7 86/22 91/5 105/25
Electronics **[4]** 13/3 13/20 56/20 84/23
element **[3]** 68/7 94/7 106/25
Elementary **[1]** 57/5
elements **[10]** 41/23 47/3 65/15 65/16 65/18 66/5 67/22 94/2 94/6 101/13
elephant **[1]** 31/12
else **[5]** 27/17 64/21 64/23 107/23 107/23
elsewhere **[1]** 13/24 14/5
embed **[1]** 63/11
embedded **[1]** 63/5
embraces **[1]** 78/20
empathy **[1]** 72/9
employees **[1]** 87/25
enactment **[1]** 44/15
encapsulates **[1]** 60/19
encourage **[2]** 21/11 21/11
end **[11]** 7/5 36/4 66/21 71/6 71/24 73/5 78/21 79/12 97/2 99/2 99/13
endeavor **[1]** 83/7
endless **[4]** 24/21 24/22 87/25 88/8
ends **[1]** 26/23
enforce **[2]** 45/20 71/4
enforcement **[2]** 33/10 84/13
enforces **[1]** 43/4
engage **[3]** 65/5 81/13 88/5

engagement **[2]** 56/16 63/21 63/22
engages **[1]** 56/17 65/9
engineered **[1]** 14/14
enjoy **[1]** 99/6
enough **[10]** 9/15 15/7 15/8 43/6 43/7 85/4 85/13 85/15 85/20 102/5
enrichment **[11]** 43/18 50/9 50/13 76/13 80/20 81/2 91/11 94/12 94/17 94/21 105/1
entered **[3]** 56/1 58/21 62/21
entice **[1]** 60/5
enticing **[1]** 26/7
entire **[3]** 44/1 44/1 92/7
entitle **[1]** 53/10
entitled **[3]** 37/21 80/21 108/7
ephemeral **[1]** 64/2
equipped **[1]** 66/7
equitable **[11]** 43/17 44/17 45/20 46/3 46/9 50/12 91/18 105/1 105/4 105/8 105/9
Erwin **[3]** 69/11 69/14 70/2
especially **[4]** 23/22 68/23 74/14 79/20
ESQ **[9]** 2/2 2/3 2/4 2/4 2/5 2/6 2/9 2/9 2/10
essence **[3]** 7/23 54/9 89/20
essential **[1]** 24/18
essentially **[13]** 7/21 17/10 25/3 54/11 55/7 63/22 66/14 66/24 67/8 69/15 78/24 83/19 96/1
establish **[5]** 37/15 37/17 48/23 50/25 51/4 71/25
established **[2]** 71/25 71/25
et **[4]** 27/2 97/11 99/8 105/24
et cetera **[4]** 27/2 97/11 99/8 105/24
evaluate **[2]** 54/3 55/19
evaluating **[2]** 56/22 97/4
EVANSON **[4]** 2/10 4/24 6/24 6/24
even **[26]** 7/2 8/17 8/17 13/18 17/16 29/7 33/20 33/22 34/12 36/20 47/2 47/12 47/22 47/24 49/15 49/16 51/13 70/1 71/8 71/16 71/21 85/2 90/4 90/16 95/10 95/15
ever **[4]** 39/20 52/14 55/24 77/12
every **[10]** 14/23 37/22 54/24 55/10 55/12 55/12 55/10 56/7 106/19 106/25
everybody **[1]** 3/19

everyone **[3]** 5/5 9/20 10/8
everyone's **[1]** 100/13
everything **[3]** 6/5 52/15 107/7
everywhere **[3]** 54/15 54/16 54/17
evidence **[10]** 13/3 13/9 13/21 37/16 73/24 74/14 81/5 81/11 82/5 87/9
exact **[7]** 12/21 24/13 24/13 25/16 36/2 41/3 41/17
exactly **[7]** 13/6 15/4 19/15 25/24 26/13 85/5 85/7
example **[6]** 30/8 37/16 38/6 48/12 57/4 63/20
excellent **[2]** 108/2 108/2
excessive **[1]** 72/5
exchange **[5]** 21/10 35/19 35/20 80/6 80/7
exclude **[1]** 24/2
excluded **[1]** 78/24
exclusion **[1]** 78/23
exclusively **[1]** 47/14
excuse **[14]** 5/4 49/25 50/3 59/20 62/1 62/2 64/17 71/12 74/22 76/21 78/14 79/22 80/4 99/3
exempted **[1]** 22/17
exercise **[5]** 68/9 96/12 96/17 97/10 98/5
exercised **[1]** 103/25
Exhibit **[2]** 55/5 55/5
Exhibit 3 **[1]** 55/5
Exhibit 6 **[1]** 55/5
exhibits **[1]** 55/3
exist **[3]** 17/9 43/4 97/13
existed **[1]** 47/25
existence **[3]** 36/7 48/19 50/11
exists **[3]** 50/11 69/14 93/24
expand **[1]** 98/24
expenses **[1]** 103/7
experience **[8]** 16/18 27/1 41/13 60/24 61/1 71/6 74/9 79/14
expertise **[1]** 73/6
explain **[3]** 28/9 42/4 63/14
explained **[1]** 7/19 17/7
explaining **[1]** 42/14
exposed **[1]** 32/25
expressed **[1]** 8/13
expression **[1]** 34/6
expressive **[10]** 31/16 31/17 31/23 31/24 31/25 32/6 32/7 32/12 33/19 90/8
expressly **[5]** 17/4 17/12 23/1 52/18 65/12
extension **[1]** 27/10
extent **[10]** 34/23 37/11

**E**

extent... **[8]** 52/16 70/1 70/15 71/19 81/9 82/17 105/22 106/20
extra **[1]** 51/17
extract **[1]** 66/5
eyes **[1]** 55/15

**F**

face **[2]** 76/9 99/12
Facebook **[1]** 25/16
faced **[1]** 38/7
facie **[1]** 53/5
fact **[11]** 8/14 40/21 41/5 44/13 46/7 49/18 49/20 50/10 80/1 80/9 82/9
factors **[1]** 97/5
facts **[10]** 13/24 15/14 29/1 37/5 42/18 53/10 72/1 72/2 96/2 96/2
factual **[7]** 35/5 35/10 36/21 36/22 42/7 82/14 95/20
fail **[10]** 6/21 33/23 34/12 35/4 35/11 35/14 36/13 36/14 46/11 46/13
failed **[1]** 68/6
fails **[2]** 41/8 48/18
failure **[4]** 46/13 69/10 104/3 104/4
fair **[7]** 9/18 9/18 10/4 11/5 53/20 96/18 98/6
fairness **[1]** 95/7
fall **[2]** 26/15 99/18
falls **[3]** 29/15 38/9 74/17
false **[2]** 12/16 38/16 39/18 63/12
familiar **[2]** 83/17 84/9
far **[3]** 68/17 75/25 93/19
fatal **[1]** 15/16
favor **[2]** 21/8 95/4
favorable **[1]** 73/19
favorite **[1]** 62/10
feature **[12]** 23/1 23/6 24/13 24/21 25/4 25/21 25/22 63/8 63/8 63/12 64/1 88/7
features **[44]** 12/14 12/19 12/19 15/23 15/25 16/1 21/16 22/3 22/5 22/9 22/17 22/20 23/13 25/19 26/9 27/8 28/17 28/23 29/2 29/13 29/13 30/4 30/18 31/1 33/13 41/25 63/5 63/7 63/9 63/20 64/5 65/4 65/8 66/18 67/9 70/13 70/17 70/18 72/14 87/24 89/4 90/15 101/6 102/11
federal **[7]** 15/24 16/10 18/10 20/6 27/11 37/22 78/12
feed **[2]** 32/5 32/7
feel **[8]** 3/5 4/2 5/19 7/20 34/19 34/24 52/4 78/5
Feeley **[1]** 3/16
feels **[2]** 95/25 106/19
fell **[1]** 89/2
few **[2]** 12/24 78/6
fifth **[4]** 16/16 51/14 85/23 104/23
fifty **[1]** 5/8
fighting **[2]** 33/4 34/2
file **[2]** 19/8 19/12
filed **[8]** 5/16 7/17 7/24 10/5 15/21 39/3 39/9 84/13
filing **[1]** 81/21
filter **[2]** 47/18 67/3
filtered **[1]** 42/2
filters **[1]** 64/3
finally **[1]** 94/12
find **[6]** 23/21 97/13 98/7 98/11 98/16 105/2
finds **[5]** 97/25 98/1 98/16 99/18 103/18
fine **[4]** 7/8 7/9 106/13 107/14
fingertips **[1]** 42/19
finish **[1]** 57/14
first **[43]** 5/6 6/11 6/18 6/25 8/1 8/8 8/24 12/3 12/5 12/12 16/3 18/22 31/11 31/13 31/17 32/14 32/21 32/24 34/13 34/15 35/21 36/15 40/17 44/19 51/13 61/18 61/23 66/4 69/17 70/5 70/16 90/3 90/9 90/21 90/23 96/7 99/21 99/22 100/5 100/11 101/15 107/11 107/16
fit **[1]** 8/11
flagrant **[1]** 41/20
fleshed **[1]** 103/14
flimsy **[1]** 13/10
flipping **[1]** 20/8
floating **[2]** 32/24 33/5
focus **[5]** 8/9 17/2 40/15 46/19 94/1
focused **[4]** 19/19 19/20 47/2 61/6
focusing **[2]** 78/1 101/13
folks **[1]** 3/13
follow **[1]** 68/21
followers **[1]** 57/1
footnote **[4]** 17/24 23/1 58/13 58/14
Footnote 4 **[1]** 17/24
Footnote 4 of **[1]** 23/1
force **[3]** 25/15 26/9 26/11
forcing **[1]** 73/8
Ford **[13]** 17/20 17/21 40/15 57/21 58/12 58/13 60/8 60/12 60/14 60/15 60/15 60/15 85/24
foreseeably **[1]** 67/5
foreseen **[2]** 80/15 80/16
forever **[1]** 25/1
forgetting **[1]** 13/4
form **[2]** 60/24 88/7
formation **[1]** 72/8
forth **[3]** 45/19 97/16 100/10
forths **[1]** 106/4
forum **[18]** 16/25 17/3 17/4 17/5 19/21 20/3 61/1 85/13 96/14 96/15 96/17 97/2 97/7 97/7 97/10 97/17 97/19 98/2 98/9 98/22 99/2 100/1
forward **[3]** 3/5 40/11 74/4
forward-looking **[1]** 40/11
forwarding **[1]** 70/14
found **[10]** 22/20 36/3 37/23 40/19 48/8 49/3 49/7 57/3 58/20 71/16 106/5
fraud **[8]** 36/19 37/3 37/14 40/14 41/6 61/23 62/4 73/6
free **[11]** 3/5 4/3 5/19 21/10 32/24 33/5 34/19 34/24 35/19 36/4 36/10 52/4 78/6
free-floating **[2]** 32/24 33/5
freedom **[1]** 32/22
freely **[1]** 69/18
friction **[1]** 64/1
front **[3]** 10/25 19/17 53/15
Fulbright **[1]** 97/2
fulfill **[1]** 71/3
FULGHUM **[2]** 2/3 4/18
full **[1]** 8/10
fully **[4]** 8/23 67/15 82/22 102/24
functions **[2]** 21/19 21/25 24/18 27/9
fundamentally **[1]** 25/8
further **[3]** 82/7 82/25 88/11
future **[2]** 44/7 107/1
FYI **[1]** 7/7

**G**

Gala **[1]** 57/2
games **[4]** 32/18 32/19 32/20 48/12
gather **[1]** 79/14
gave **[2]** 57/4 100/21
GAYAN **[3]** 2/4 3/11 75/11
general **[44]** 2/2 2/3 15/3 15/12 15/20 16/23 17/11 42/13 54/19 54/24 57/21 61/4 61/10 61/12 61/14 73/6 75/20 76/1 76/3 76/10 76/22 78/13 78/17 79/8 81/5 84/4 84/5 84/13 85/13 85/25 86/2 86/4 86/8
general's **[4]** 57/22 74/20 77/6 84/16
generally **[1]** 87/22
Generals **[1]** 83/13
generate **[1]** 99/15
generated **[3]** 21/23 31/16 67/6
generating **[2]** 58/1 58/3
Generous **[1]** 83/9
get **[35]** 5/6 5/19 8/23 8/25 10/9 11/7 11/8 16/6 19/6 47/20 48/1 51/17 51/23 54/17 55/15 56/9 58/6 59/4 63/23 81/20 82/17 82/20 86/15 92/15 94/10 94/25 95/6 99/21 100/8 100/18 102/18 104/25 105/23 106/3 106/15
gets **[6]** 7/25 7/25 53/19 38/3 51/20 52/9
getting **[2]** 69/10 106/10
Gibson **[1]** 4/25
gifts **[1]** 62/11
give **[15]** 6/15 14/14 15/8 20/14 55/4 68/10 80/6 96/3 98/23 100/17 102/20 103/19 104/23 109/19 104/23
given **[5]** 8/18 45/4 47/8 50/11 105/7
gives **[3]** 8/9 24/24 105/15
giving **[4]** 80/7 103/4 103/20 104/16
glaringly **[1]** 41/20
go **[55]** 4/15 6/8 6/14 11/5 11/12 11/15 11/15 12/3 18/19 20/20 28/15 31/10 38/6 39/7 40/4 50/15 52/3 52/20 54/19 54/25 57/14 57/19 61/3 61/16 63/21 65/15 69/4 72/16 74/4 78/5 80/9 83/9 83/25 87/14 92/15 93/14 95/8 96/20 96/22 97/21 97/22 97/22 97/23 97/24 98/18 98/19 100/9 100/11 100/16 100/17 101/3 101/25 104/2 106/23 107/7
goals **[2]** 40/7 41/4
goes **[8]** 54/9 59/8 59/14 66/3 67/17 71/20 71/21 104/19
going **[60]** 5/25 7/15 8/22 11/7 11/8 11/9 12/3 12/10 15/19 16/6 18/9 34/4 34/4 34/5 34/6 43/11 51/22 52/7 52/22 55/16 60/22 64/9 64/10 64/21 64/22
64/22 72/19 72/21 76/12 77/18 77/22 77/25 78/6 79/18 79/18 80/6 85/8 86/24 90/9 91/8 95/3 95/4 96/5 96/10 97/15 98/13 98/20 98/23 102/13 102/19 104/7 104/22 105/10 105/24 106/4 106/6 106/14 107/13 107/14 107/15
gone **[3]** 55/24 57/17 106/20
Gonzalez **[1]** 77/13
good **[13]** 3/9 3/11 3/20 3/22 4/4 4/22 43/6 43/7 51/19 52/5 60/21 64/11 64/11
goods **[2]** 35/16 36/11
Google **[1]** 13/17
gosh **[1]** 62/5
got **[19]** 3/19 5/8 5/13 9/15 9/17 9/18 9/20 32/17 44/15 53/14 55/24 58/10 63/1 73/23 77/19 78/6 91/24 103/13 103/22
gotten **[1]** 15/2
governs **[1]** 90/23
Grammys **[2]** 56/25 84/23
grant **[6]** 57/4 102/19 103/19 104/9 104/22 105/3
granted **[2]** 105/18 105/20
granting **[4]** 12/5 103/20 103/23 104/8
grappled **[1]** 16/11
gratuitously **[1]** 59/1
great **[2]** 54/6 92/16
greater **[1]** 73/11
gripe **[1]** 49/18
grossly **[3]** 41/14 73/17 74/9
ground **[5]** 68/5 68/8 85/24 86/18 89/8
group **[2]** 6/10 6/20
grouped **[1]** 6/18
guarantee **[1]** 40/24
guess **[8]** 8/15 52/17 52/22 76/19 88/4
guidelines **[3]** 42/3 42/24 107/3
Gurwitz **[1]** 3/17

**H**

habitual **[1]** 72/5
hac **[6]** 2/5 2/6 2/10 2/11 5/1 52/6
hacs **[1]** 5/7
had **[23]** 5/7 6/4 6/9 6/23 9/25 11/18 11/21 12/1 13/19 17/21 18/18 33/8 45/6 46/4 49/16 51/2 53/3 75/12 77/20 78/4 89/11 89/18 103/8
hadn't **[1]** 47/24
haled **[1]** 53/19

**H**

handle [1] 6/25
handling [1] 6/25
happen [2] 55/10 72/21
happened [1] 57/17
happening [1] 16/7
happens [1] 84/16
happy [6] 18/13 25/18 26/17 34/13 51/11 90/25
harm [14] 19/19 28/21 28/24 28/25 42/23 46/24 50/1 66/19 71/23 92/5 92/5 92/7 94/8 94/8
harmed [4] 45/8 54/21 55/13 75/22
harmful [5] 34/8 49/25 64/3 64/7 65/15
harmless [1] 34/5
harms [2] 62/4 72/20
harps [1] 22/23
has [85] 6/2 8/18 8/19 10/8 12/13 12/17 15/1 15/13 16/4 16/24 17/2 17/12 17/18 18/7 18/13 19/14 20/2 22/8 23/5 23/18 26/18 28/5 33/2 33/16 33/20 34/11 34/14 35/1 35/17 37/22 37/23 39/22 40/7 42/3 42/9 44/5 44/24 45/4 45/17 45/25 50/2 50/14 50/19 50/25 54/13 54/19 59/22 60/12 62/21 63/5 63/9 64/18 65/6 66/13 68/4 68/23 69/20 71/20 73/22 74/7 75/2 75/8 75/19 76/23 79/10 80/10 81/6 82/14 84/17 89/18 90/16 90/20 90/25 91/6 93/12 97/5 97/16 98/10 99/5 101/12 101/22 102/2 105/13 106/18 106/19
hasn't [1] 44/12 46/8 89/23
have [188]
haven't [4] 49/15 50/22 95/2 105/2
having [5] 5/21 8/7 9/7 10/21 39/20
hazards [1] 43/25
he [2] 8/13 84/22
he'd [1] 51/24
heading [2] 27/17 38/9
headquarters [1] 86/6
heads [1] 103/1
health [1] 72/7
hear [7] 3/24 4/3 6/14 7/10 7/13 56/6 90/11
heard [11] 9/16 43/8 47/14 52/15 56/11 84/25 91/11 91/15 92/17 93/24 94/2
HEARING [1] 1/13
hearings [2] 77/20 78/4

heft [2] 36/25 82/10
held [12] 21/20 24/8 24/14 25/11 31/15 32/12 53/5 60/10 66/24 67/8 69/3 71/13
help [5] 45/21 48/3 48/4 49/13 49/14
helpful [1] 87/13
here [84] 4/24 8/14 8/17 14/1 15/19 18/2 19/7 19/16 19/24 20/5 23/11 24/2 26/22 27/3 27/16 28/2 28/18 31/12 31/25 35/2 35/18 36/8 37/1 38/13 39/15 39/23 41/11 43/15 43/23 44/23 45/2 46/10 46/3 46/5 46/23 50/11 53/15 54/3 54/16 56/3 56/7 58/15 58/22 60/22 62/6 66/15 66/17 68/9 70/5 70/8 70/24 71/17 72/1 73/2 77/3 77/8 80/6 82/17 86/1 89/13 89/13 90/15 90/23 93/9 93/12 93/24 94/18 95/10 95/13 97/12 97/20 98/7 98/7 98/20 100/13 101/5 101/8 102/4 102/19 103/5 103/13 104/10 104/11 105/11
here's [2] 72/12 96/5
hereby [1] 108/6
hey [1] 65/1
hide [1] 64/7
higher [2] 37/15 73/9
highest [1] 18/10
highlighted [1] 106/21
highlighting [1] 29/17
highlights [2] 14/10 39/22
him [2] 4/9 7/19
himself [1] 97/6
his [2] 51/23 90/4
historically [1] 77/11
Hohwieler [1] 3/15
hold [1] 10/24 66/25
holding [3] 32/13 38/25 78/19
holds [1] 90/7
home [6] 15/10 15/11 16/22 84/14 84/20 86/5
honor [122]
Honor's [1] 28/14
HONORABLE [1] 1/11
hook [2] 14/9 14/18
hooking [1] 27/14
hope [1] 78/25
horses [1] 7/14
host [2] 16/10 56/24
hour [2] 6/15 9/15
how [30] 5/24 8/15 10/19 25/7 25/9 27/8 27/21 28/9 29/21 30/10 37/2 42/4 42/11 42/14 42/19 52/8 57/23 58/11 59/13 62/5 80/9 82/23 89/12 91/4 94/6 101/8

105/17
Howard [1] 57/4 57/17
however [2] 9/3 77/11
HuffingtonPost [2] 16/15 85/23
huh [1] 73/17
hundreds [5] 58/22 77/19 77/19 88/21 106/24
hustle [1] 43/14
hysteria [1] 32/19

**I**

I'd [4] 3/5 24/11 52/22 95/9
I'll [16] 3/13 4/4 12/8 12/11 18/14 35/2 40/15 43/12 43/14 46/10 59/4 63/21 69/21 85/22 93/6 100/18
I'm [74] 3/24 3/25 7/15 8/20 9/6 9/9 9/16 9/24 11/23 12/10 17/7 18/13 19/2 20/22 25/18 26/17 27/3 29/9 37/23 38/24 39/2 39/10 43/11 48/17 51/11 52/7 52/22 55/23 59/3 60/21 62/5 64/9 64/10 65/12 66/17 69/6 70/21 70/21 70/24 73/2 74/25 75/11 76/13 77/18 78/4 78/6 84/2 84/3 85/8 86/15 86/24 89/24 90/9 90/10 90/25 91/4 91/8 96/5 98/22 99/8 99/25 100/2 100/12 100/18 102/6 103/4 103/20 103/23 105/9 105/24 106/14 107/2 107/4 107/13
I've [14] 5/7 7/18 9/17 51/17 52/10 71/7 77/19 77/20 77/20 78/4 93/25 103/13 103/22 106/20
i.e [2] 103/20 104/8
ideas [6] 21/10 32/25 33/6 47/1 47/4 47/6
identified [1] 93/10
if [101] 6/14 7/1 7/2 7/8 7/9 7/9 8/21 9/4 10/3 11/8 14/24 16/4 17/8 17/25 18/14 18/17 19/2 19/6 23/1 23/13 28/14 29/13 29/18 29/20 29/22 30/7 33/22 35/20 36/18 36/23 36/25 41/1 43/6 43/11 43/21 44/8 44/10 46/4 46/4 47/2 47/20 47/25 47/25 50/4 53/9 53/10 54/8 54/16 54/16 55/19 56/9 58/24 59/6 59/10 61/11 61/14 62/19 63/4 63/8 68/19 69/13 70/3 70/6 70/19 70/23 71/7 71/21 73/18 75/4 76/2 76/16 77/11 78/23 79/7 79/19 79/18 79/21 79/21 80/17

Howard [1] 57/4 57/17
infinite [4] 25/12 26/8 30/20 30/22
influence [2] 52/18 67/19
influencer [1] 57/1
inform [1] 48/4
information [16] 21/4 21/4 21/10 42/10 42/18 47/1 47/5 47/6 55/6 57/25 65/7 71/3 71/4 81/20 81/23 82/15
informative [1] 47/21
informed [2] 44/13 48/2
infrastructure [1] 42/1
inherent [3] 103/21 103/25 104/9
initially [1] 64/10
initiative [1] 72/18
initiatives [2] 64/4 72/18
injunction [2] 36/1 76/6
input [1] 25/2
installed [1] 60/3
instance [1] 73/15
instances [1] 25/20
instead [2] 47/13 90/18
instructive [5] 68/15 69/1 79/5 98/21 98/21
insufficient [1] 17/6
intangible [5] 46/25 47/1 47/4 47/5 48/9
intellectual [2] 64/15 64/19
intended [2] 54/14 55/7
intending [1] 93/17
intent [3] 52/18 55/2 73/6
intention [1] 78/20
intentional [1] 82/1
intentionally [4] 55/1 55/9 55/14 58/8
interactive [5] 16/12 16/18 18/4 21/1 90/21
interest [13] 20/5 33/2 34/9 34/11 44/23 44/23 45/4 45/17 45/8 75/3 78/11 92/3 95/11
interesting [1] 57/3
interests [2] 19/25 44/21
interfering [1] 72/10
intermediary [1] 99/23
intermediate [4] 33/22 34/12 70/7 99/24
intermittently [1] 88/2
internal [2] 72/4 72/21 74/15 88/15
Internet [14] 14/21 14/22 17/10 18/1 21/11 56/8 58/15 90/7 90/21 93/14 99/1 99/5 99/11 99/12
interplay [1] 67/2
interpret [2] 29/4 95/18
interpretation [4] 38/1 93/20 96/2 100/7

**I**

**interpreted [6]** 21/6
21/14 22/15 29/5 41/15
41/17
**interpreting [2]** 73/4
101/24
**interrupt [1]** 5/25
**intervening [1]** 50/4
**into [19]** 6/10 10/16
11/12 31/16 31/23 43/8
53/19 56/1 56/8 62/21
65/17 80/9 90/8 94/19
98/12 99/25 101/17
104/18 104/21
**introduce [2]** 4/24 5/4
**invalidated [1]** 32/21
**investigation [1]** 81/22
**invite [1]** 29/25
**invited [1]** 56/25
**involved [2]** 27/23 45/5
**is [400]**
**isn't [4]** 44/22 50/22
75/6 94/16
**issue [42]** 6/13 8/6
8/10 8/25 8/25 9/1
10/10 10/16 10/21 11/5
11/6 11/17 11/19 11/22
11/23 19/4 36/2 37/22
42/21 46/15 48/5 58/17
61/20 63/4 68/2 68/19
70/19 71/19 77/12
77/23 80/8 92/24 93/2
96/8 96/9 101/1 102/16
104/11 104/17 105/6
105/10 105/12
**issues [14]** 6/10 6/13
6/25 7/1 7/4 9/13 10/7
10/24 34/24 48/2 77/21
95/17 97/17 103/13
**it [266]**
**it's [112]**
**items [3]** 43/4 46/20
46/21
**its [43]** 8/19 19/13 22/7
22/8 22/17 23/6 23/17
26/1 31/16 31/19 31/20
32/4 36/2 36/12 36/25
38/15 39/18 40/6 40/7
42/22 44/22 45/4 46/2
48/24 49/10 53/13 54/8
54/9 58/5 64/7 64/18
67/3 70/3 72/14 72/18
76/9 78/19 96/15 97/7
99/3 103/25 105/8
106/19
**itself [8]** 20/2 42/6
70/23 74/18 93/8 94/1
94/6 96/13

**J**

**JD [1]** 1/25
**Jing [1]** 3/16
**JOANNA [1]** 1/11
**job [1]** 43/7
**Johnson [2]** 16/15
85/22
**joining [1]** 13/1
**joint [1]** 105/25

11/15 52/6 84/21 85/25
87/16 90/4
**JUDGE [8]** 1/11 29/9
47/15 49/3 54/8 55/15
72/13 77/13
**Judge Gonzalez [1]**
77/13
**Judges [1]** 35/25
**judicial [5]** 8/5 58/19
59/10 71/12 78/18
**jump [1]** 100/21
**jumping [1]** 59/3
**juries [1]** 4/12
**jurisdiction [71]** 6/11
6/14 12/10 14/3 14/15
14/17 14/20 14/22 15/1
15/3 15/4 15/9 15/12
15/15 15/16 15/18
15/20 16/9 16/11 16/22
16/23 17/3 17/9 17/11
17/14 17/16 17/17
17/19 18/12 18/14
19/19 53/6 53/23 54/1
61/5 61/7 61/10 61/12
61/13 81/10 82/3 82/5
83/11 84/15 85/5 85/11
85/12 85/21 86/1 86/3
86/4 86/8 86/13 86/17
86/19 86/21 86/22 87/4
87/8 96/8 96/10 96/12
96/12 96/17 96/25 97/4
97/11 97/13 98/5 98/12
98/18
**jurisdictional [6]** 13/23
14/9 14/10 14/18 61/20
81/13
**jurisdictions [1]** 10/18
**jurors [1]** 9/17
**jury [5]** 4/11 4/11 4/12
10/2 10/25
**just [73]** 3/13 3/13 4/24
5/6 7/7 7/20 9/6 9/24
19/2 21/14 21/17 25/1
25/1 26/4 28/18 30/7
30/25 31/14 38/19
40/15 43/8 45/24 49/7
50/9 51/12 52/17 52/21
53/23 55/10 56/12 58/9
59/18 60/21 63/12
63/17 63/21 65/16
65/22 66/12 67/11
74/21 75/11 76/14 79/7
79/7 80/1 80/15 80/20
82/19 84/18 85/4 85/8
85/18 86/1 86/15 86/24
86/24 87/10 87/19
87/20 88/4 88/16 88/23
89/14 90/10 90/16
93/19 95/9 100/22
100/22 102/6 103/4
103/16
**justice [1]** 53/20 96/19
98/6

**K**

**Katrina [1]** 3/18
**keep [4]** 25/18 26/7
33/5 55/16

**Kimzi [1]** 99/7
**kind [13]** 4/2 18/24
19/6 20/10 28/9 28/10
54/6 59/1 59/3 61/9
77/2 77/9 103/4
**kinds [1]** 40/12
**KISHNER [1]** 1/11
**knew [3]** 42/10 72/14
72/14
**Knock [1]** 107/19
**know [52]** 9/4 9/24
10/1 14/13 18/9 18/20
18/23 24/23 26/24
27/24 29/10 29/13 30/2
30/22 33/16 34/1 38/14
39/16 45/12 52/9 52/23
52/23 53/12 54/4 54/12
55/23 59/10 60/20
61/11 61/14 62/25 65/2
66/14 68/4 68/23 72/20
77/4 79/11 80/9 80/23
81/18 81/23 82/11
82/19 83/17 89/22
90/18 93/9 93/20
100/21 105/7 107/9
**knowing [2]** 105/22
105/23
**knowingly [3]** 37/17
73/5 98/8
**knowledge [8]** 41/13
42/15 42/17 64/7 64/7
73/16 74/8 77/15
**known [2]** 7/18 62/11
**KRUEGER [3]** 2/2 3/22
4/16

**L**

**lack [9]** 41/8 41/13
42/14 42/16 49/23
68/24 72/10 73/16 74/8
**lacks [1]** 43/19
**land [1]** 99/11
**language [8]** 21/3 41/3
41/16 41/17 41/19 68/4
71/15 101/1
**LARA [1]** 1/24
**large [1]** 31/21
**LAS [6]** 2/12 53/8
56/25 56/25 57/2 57/5
**Las Vegas [4]** 56/25
56/25 57/2 57/5
**last [10]** 8/21 19/1 19/3
22/3 45/23 47/20 89/6
89/10 90/6 95/19
**later [2]** 39/14 59/4
**Latin [2]** 56/25 84/23
**Laura [1]** 3/16
**law [51]** 6/20 7/1 19/16
19/18 20/8 22/16 27/11
28/12 29/24 35/4 37/14
43/16 44/16 45/20 46/2
46/9 46/16 47/8 47/22
47/23 48/1 48/3 48/20
48/21 49/16 49/19
49/24 50/20 50/23
54/22 61/25 68/8 69/13
73/6 75/19 79/10 85/18
85/21 89/13 90/12

99/5 101/18 101/24
105/17 106/21 107/4
107/4
**lawless [1]** 99/11
**lawsuit [1]** 26/11
**lead [5]** 4/24 17/13
17/13 38/11 72/5
**leading [1]** 72/9
**lease [3]** 35/16 35/17
35/21
**least [6]** 9/3 18/23 35/2
58/17 68/17 77/8
**leave [22]** 51/22 81/17
83/7 102/20 103/15
103/19 103/20 103/22
103/22 104/7 104/8
104/9 104/14 104/17
104/23 105/7 105/19
105/21 105/24 106/2
106/8 106/17
**legal [1]** 49/8
**legally [1]** 20/4
**legislative [1]** 44/14
**legislature [1]** 78/19
**legitimate [1]** 9/4
**Lemmon [20]** 22/23
47/14 49/12 49/13
64/12 64/25 66/23
67/14 67/20 68/2 68/11
79/3 79/5 88/25 89/7
92/21 93/23 98/21
98/21 98/23
**length [2]** 8/24 32/16
**less [5]** 11/9 26/6 26/7
26/7 26/9
**lesser [1]** 37/11
**let [13]** 4/24 7/13 9/9
12/5 27/22 38/6 57/14
57/14 61/23 76/25 91/5
91/13 107/9
**let's [10]** 5/6 5/19 12/2
35/12 38/13 42/8 93/3
100/9 100/16 102/18
**letter [3]** 57/21 105/25
105/25
**level [1]** 33/9
**liability [15]** 20/25
43/17 46/15 48/8 59/6
70/20 70/20 71/16
75/24 79/24 92/17
99/13 102/18 103/24
104/2
**liable [1]** 67/1
**liberally [2]** 37/9 38/3
**lied [1]** 62/22
**life [2]** 72/6 72/19
**light [1]** 73/19
**lights [1]** 52/2
**like [13]** 3/6 3/15 4/13
11/21 19/9 20/10 26/13
28/18 40/17 51/17
52/23 55/1 58/6 58/9
59/13 63/11 71/17
75/21 77/22 77/24 78/3
78/8 79/9 88/8 88/9
90/15 91/6
**likely [1]** 26/7
**likewise [5]** 34/22 36/6

41/8 43/18 49/7
**limit [2]** 43/2 52/19
**limitation [2]** 76/7
78/16
**limited [1]** 8/21
**limiting [1]** 34/1
**limits [2]** 8/19 53/13
**line [1]** 75/12
**lines [2]** 66/22 75/1
**linking [1]** 29/21
**list [2]** 20/14 22/18
**listed [1]** 97/24
**listening [1]** 54/5
**litany [1]** 21/13
**literally [1]** 93/14
**litigated [1]** 20/16
**litigation [2]** 40/22
73/2
**litigators [2]** 105/22
106/5
**littered [1]** 88/17
**little [9]** 14/3 29/9
54/12 77/4 87/1 96/24
100/12 100/14 104/4
**live [2]** 59/13 60/10
**lives [1]** 40/18
**local [1]** 60/14
**located [1]** 57/5
**long [8]** 53/13 55/16
59/13 63/24 63/25
71/22 99/13 100/20
**longer [2]** 17/9 18/9
**look [42]** 21/17 23/13
27/4 27/11 27/18 29/25
30/3 30/7 30/8 36/25
38/13 40/3 41/2 42/8
43/21 45/18 46/18 48/6
54/8 55/20 59/6 62/19
65/1 65/24 67/8 68/24
69/25 70/23 73/22 76/3
85/2 92/19 93/3 99/16
99/16 100/2 100/6
101/5 101/5 101/8
101/20 101/22
**looked [6]** 11/21 36/1
37/22 40/23 53/7 64/25
**looking [6]** 26/7 28/17
40/11 62/5 92/21 100/2
**looks [1]** 3/15
**loquacious [1]** 11/9
**loss [1]** 72/7
**lost [1]** 15/24
**lot [5]** 4/2 8/8 8/16 10/9
11/18
**lots [1]** 12/7
**lounge [1]** 56/24
**loved [1]** 72/11
**Low [1]** 64/1
**lucky [1]** 88/4
**Lyft [2]** 40/22 40/23

**M**

**made [15]** 7/15 8/10
8/22 31/19 33/1 39/20
52/8 57/24 60/12 65/24
68/18 77/3 78/19 83/3
83/25
**Mahan [1]** 49/3
**main [1]** 13/22

**M**

**maintains [2]** 13/15 56/19
**majority [1]** 12/14
**make [31]** 3/6 6/1 8/10 24/4 26/6 29/22 39/6 40/18 53/5 60/9 62/15 63/6 64/5 69/3 72/19 74/5 74/16 74/18 75/18 78/14 79/15 80/3 81/4 81/8 82/3 82/8 83/22 86/1 87/11 87/20 92/14
**makes [8]** 8/8 30/16 31/2 32/9 33/11 51/15 79/17 85/23
**making [8]** 24/1 38/19 53/15 58/4 59/1 63/19 88/4 95/22
**man's [1]** 99/11
**mandatory [1]** 98/22
**manipulation [1]** 88/7
**manipulations [1]** 64/2
**manipulative [1]** 66/7
**manner [1]** 9/7
**manufacturer [1]** 77/7
**manufacturer's [2]** 71/22 71/23
**many [10]** 6/13 7/19 9/13 13/10 19/9 24/7 25/9 31/18 52/11 62/5
**mark [4]** 2/2 3/22 4/16 12/1
**marketing [1]** 62/23
**marriage [1]** 45/8
**marshal [1]** 51/23
**master [2]** 27/5 100/4
**Match.com [1]** 49/1
**material [4]** 21/12 37/5 38/10 43/1
**math [1]** 11/19
**MATHUR [2]** 2/9 4/25
**Matt [1]** 3/15
**matter [14]** 3/3 3/4 19/23 19/24 22/16 33/9 49/19 49/23 53/21 56/13 74/12 78/22 85/18 85/21
**matters [6]** 20/2 78/21 78/23 78/24 102/23 102/24
**maximize [1]** 63/20
**may [21]** 6/6 6/15 8/20 9/5 9/14 11/4 12/4 32/25 38/22 43/3 44/7 45/7 58/16 59/23 68/8 69/18 71/4 71/16 76/3 78/17 96/12
**McMath [1]** 3/16
**MDL [8]** 15/25 20/16 22/2 24/12 25/16 29/5 29/5 29/11
**me [45]** 4/24 5/4 7/13 7/22 8/13 8/21 9/9 10/24 12/5 19/11 20/14 27/22 34/24 38/6 50/1 50/3 57/14 57/16 59/20 61/23 62/1 62/2 64/18 71/12 74/17 74/22
78/14 79/22 80/4 80/9 91/5 91/6 91/13 99/3 100/17 100/21 100/22 105/15 106/3 106/15 106/15 107/9
**meadows [1]** 34/5
**mean [14]** 11/8 18/20 19/5 19/13 24/25 54/18 55/11 65/23 73/14 77/18 82/18 90/9 91/12 102/5
**meaning [3]** 45/4 65/25 86/5
**meaningless [1]** 94/3
**means [7]** 11/7 14/25 41/19 52/3 52/3 63/22 93/4
**meant [2]** 99/10 102/8
**measures [1]** 67/4
**media [7]** 32/19 42/19 44/6 48/7 66/16 79/9 88/9
**medication [1]** 103/2
**medium [1]** 32/23
**meet [2]** 50/2 106/6
**meets [2]** 102/10 102/12
**memory [1]** 72/8
**mental [1]** 72/7
**mention [5]** 60/2 62/8 69/13 74/21 90/4
**mentioned [7]** 12/11 13/24 22/2 65/16 71/7 84/21 84/22
**mentioning [1]** 57/6
**MEOs [1]** 5/8
**merely [1]** 89/24
**merit [2]** 35/9 101/3
**merits [2]** 103/4 104/16
**message [1]** 9/21
**met [1]** 97/25
**Meta [6]** 48/13 64/17 83/14 83/18 84/9 84/12
**method [1]** 8/7
**MICHAEL [3]** 2/4 3/11 3/17
**Michaela [1]** 3/15
**midst [1]** 9/17 10/25
**might [6]** 6/7 7/8 33/25 105/23 106/2 107/1
**million [3]** 55/20 57/1 58/3
**mind [1]** 86/23
**mindset [1]** 37/18
**minimum [3]** 53/17 53/18 64/19
**minor [6]** 56/2 66/19 66/21 75/21 80/25 82/24
**minors [9]** 32/25 33/5 73/21 73/23 74/1 74/2 76/23 76/24 79/20
**minute [5]** 11/8 51/16 83/7 86/10 95/6
**minutes [8]** 50/6 51/16 51/21 78/6 83/6 92/15 95/7 95/7
**mischaracterizing [1]**

**misconstrue [2]** 67/11 82/20
**misconstrued [1]** 62/18
**mislabel [1]** 82/20
**misleading [5]** 12/16 62/16 62/20 64/3 69/17
**misled [2]** 63/13 82/23
**mispronouncing [1]** 4/7
**misquoted [1]** 75/13
**misrepresentation [2]** 38/10 72/15
**misrepresentations [5]** 36/16 36/18 36/22 40/20 41/1
**misspoke [1]** 83/12
**mitigate [1]** 42/23
**mitigation [1]** 42/21
**mix [1]** 63/11
**model [7]** 54/8 54/9 54/14 55/7 55/15 58/5 59/14
**moderate [1]** 67/18
**moderation [3]** 32/5 42/25 43/7
**moment [4]** 3/6 43/12 75/4 100/21
**monetarzation [1]** 102/8
**monetization [2]** 102/8 102/9
**monetized [1]** 102/3
**money [9]** 35/20 35/20 44/3 46/10 57/24 58/4 59/1 79/15 82/3
**monitoring [2]** 21/11 67/16
**monster [1]** 54/11
**month [3]** 4/8 89/6 89/10
**months [2]** 31/14 90/6
**Moody [10]** 31/13 31/18 31/20 31/22 90/5 90/10 90/13 90/14 90/22 99/25
**Moore [2]** 3/15 45/1
**more [24]** 9/25 10/4 10/6 13/22 20/10 29/7 47/5 60/6 60/6 60/6 61/6 67/5 73/5 74/14 78/6 82/4 82/16 88/14 88/14 88/21 101/25 102/2 103/15 106/3
**Moreover [2]** 38/14 46/4
**morning [10]** 3/9 3/11 3/20 3/22 4/4 4/22 17/8 51/14 51/20 52/5
**mortar [1]** 17/21
**most [8]** 10/8 37/25 51/15 73/18 77/15 89/17 89/24 92/21
**mother [1]** 26/25
**motion [51]** 1/14 6/21 7/17 7/24 7/25 9/12 10/5 27/4 27/18 28/12 29/22 30/14 32/16 35/2

50/25 51/4 52/12 52/24 55/5 61/5 61/6 62/12 62/14 62/25 65/20 66/10 69/24 80/10 81/16 81/17 98/9 98/19 99/19 99/20 100/3 100/5 101/14 101/16 101/19 102/9 102/15 102/16 102/19 103/19 104/22 105/3 105/18
**motions [4]** 7/12 10/20 53/20 98/6
**Motor [3]** 40/15 58/13 60/8
**mouth [1]** 61/13
**move [5]** 18/14 34/22 43/11 46/10 70/19
**moving [4]** 31/11 41/7 90/3 92/13
**Mr [1]** 95/15
**Mr. [18]** 6/2 6/24 6/24 7/18 8/13 11/15 12/11 62/16 72/25 75/11 77/3 82/10 83/8 84/21 85/25 87/16 90/4 95/19
**Mr. Evanson [1]** 6/24 6/24
**Mr. Gayan [1]** 75/11
**Mr. Jones [6]** 6/2 11/15 84/21 85/25 87/16 90/4
**Mr. Slade [1]** 77/3
**Mr. Williams [8]** 7/18 8/13 12/11 62/16 72/25 82/10 83/8 95/19
**much [24]** 5/12 23/23 25/5 25/7 34/18 51/25 57/24 59/24 61/21 69/5 69/7 79/2 80/9 83/4 90/15 91/1 91/4 94/22 94/23 96/6 96/24 102/14 102/21 108/1
**multiple [3]** 7/9 7/14 10/7
**multiply [1]** 11/6
**music [1]** 56/24
**MusicAres [1]** 57/2
**must [7]** 17/4 21/7 41/12 41/20 49/25 50/1 95/12
**muster [2]** 62/13 101/14
**my [38]** 5/15 7/15 7/23 8/1 8/17 8/23 9/2 12/6 18/23 20/18 29/17 51/7 51/12 51/20 51/23 52/11 57/9 57/15 57/15 62/6 69/10 76/12 76/19 76/19 77/19 77/22 83/25 84/10 87/18 89/20 90/10 91/16 93/15 95/1 95/4 103/11 106/10 108/8
**Myers [2]** 15/5 85/6
**myself [3]** 6/24 8/23 57/16

**N**

**name [3]** 4/7 76/4

95/12
**Naomie [1]** 3/17
**narrowly [1]** 34/10
**national [2]** 13/1 13/12
**nationally [1]** 16/17
**nationwide [1]** 14/25
**natural [2]** 50/1 80/13
**nature [3]** 100/2 101/7 105/8
**navigation [1]** 88/7
**NDPTA [2]** 71/15 73/12
**NDTPA [2]** 71/15 73/6
**NDTPA's [1]** 73/7
**nearly [1]** 43/25 55/20
**necessary [5]** 58/20 78/11 81/10 81/16 81/17
**need [22]** 5/2 5/3 9/11 10/1 30/25 53/5 53/25 54/23 57/16 71/13 80/18 82/7 82/25 95/3 95/5 95/24 96/3 99/19 100/12 102/14 106/9 107/22
**needing [1]** 96/7
**needs [7]** 30/24 65/23 66/9 69/25 101/3 105/16 106/6
**negative [2]** 72/6 72/7
**negligence [16]** 43/17 48/18 48/20 49/15 67/21 76/13 77/5 79/4 79/8 79/25 80/14 91/11 93/23 104/10 104/12 104/24
**negligent [6]** 47/16 68/7 68/12 68/15 75/23 76/24
**negligently [1]** 67/1
**Netchoice [3]** 31/13 90/5 90/12
**Netflix [1]** 42/11
**neutral [4]** 70/8 99/1 99/7 99/13
**NEVADA [100]** 1/2 1/4 2/2 3/1 3/4 3/10 3/12 3/14 3/21 3/23 4/5 4/8 4/17 4/20 12/17 12/18 12/20 12/25 12/25 13/1 13/11 13/13 14/13 14/13 14/14 14/16 15/12 18/17 19/5 19/7 19/12 19/13 19/24 19/25 20/1 20/5 27/10 35/13 37/10 37/23 38/1 41/15 44/24 45/1 45/11 46/10 46/17 47/8 48/21 49/4 49/22 52/6 53/4 53/12 53/19 53/21 54/19 54/21 54/22 55/10 56/2 56/13 56/17 57/25 58/4 58/9 58/23 58/23 59/12 59/21 60/23 61/25 64/8 65/6 69/13 69/15 70/22 71/9 73/3 74/2 75/10 75/22 76/4 76/23 77/6 82/1 86/7 89/13 92/6 92/19 96/21 96/21 103/3

**N**

NEVADA... **[7]** 103/6 104/14 104/15 105/4 105/8 105/12 105/17
**Nevadans [3]** 44/5 44/8 55/20
**Nevadans' [1]** 41/13
**never [6]** 49/4 52/25 58/17 92/23 93/9 99/5
**new [1]** 32/23
**newer [1]** 7/8
**newspaper's [1]** 25/8
**next [5]** 20/20 45/15 98/18 104/2 106/1
**nice [2]** 4/3 14/2
**Ninth [21]** 16/14 24/12 27/11 28/17 29/6 47/15 49/2 49/3 64/12 64/13 66/23 67/8 68/12 68/20 68/21 68/22 68/25 89/1 89/6 89/7 89/25
**Nirvana [2]** 4/5 4/6
**no [70]** 1/5 1/6 4/11 4/11 4/14 12/19 15/11 17/9 18/9 21/1 23/10 31/4 33/8 33/9 34/8 34/25 35/19 35/20 35/20 35/21 36/7 36/7 36/11 37/1 37/1 37/5 42/14 42/16 44/8 47/2 47/5 47/18 47/25 48/18 48/18 48/21 49/7 49/9 50/10 50/20 53/10 61/16 69/4 70/9 75/19 78/16 80/10 81/4 82/7 82/22 83/22 84/21 84/23 86/3 86/8 86/17 86/17 87/7 92/14 92/14 92/17 94/5 94/18 95/13 98/25 99/11 100/23 107/7 107/10 107/25
**nonactionable [2]** 39/25 40/20
**none [4]** 47/19 53/22 86/7 91/17
**nonresident [1]** 96/13
**nor [3]** 11/25 38/5 81/5
**North [1]** 53/8
**Northern [3]** 15/25 20/16 36/10
**not [214]**
**note [2]** 65/15 75/8
**notes [1]** 62/6
**nother [1]** 74/12
**nothing [14]** 7/19 12/17 13/25 14/5 14/8 17/18 48/23 65/6 66/13 70/13 75/25 76/20 90/20 103/3
**notice [4]** 37/21 59/10 82/16 82/23
**noticeable [1]** 41/20
**notices [1]** 5/10
**notification [1]** 28/20
**notifications [6]** 21/24 32/8 33/17 33/18 64/3 88/22
**notions [1]** 96/18

**now [31]** 11/13 13/17 17/13 22/7 24/25 25/18 26/1 28/25 31/4 31/19 36/25 38/13 39/19 40/4 41/15 41/23 44/22 48/4 49/11 50/6 52/2 55/10 56/1 70/19 93/6 98/10 98/19 101/3 102/18 106/10 107/9
**nowhere [2]** 54/16 54/17
**NRCP [1]** 95/10
**NRS [5]** 44/19 70/21 73/14 78/9 78/20
**NRS 228.170 [2]** 44/19 78/20
**NRS 598 [1]** 70/21
**NRS 598.0923 [1]** 73/14
**number [2]** 40/14 93/8
**numbers [1]** 39/13
**numerous [1]** 42/12

**O**

**objection [2]** 7/5 7/10
**objective [2]** 41/22 42/18
**obligation [3]** 50/25 67/4 69/12
**obscene [1]** 21/12
**obscenity [2]** 33/3 34/2
**observing [1]** 3/14
**obtain [1]** 76/5
**obtained [1]** 45/6
**obviously [7]** 9/2 12/7 29/6 42/7 78/22 90/20 99/25
**occurred [3]** 14/13 59/22 93/12
**off [3]** 6/13 40/2 57/16
**offend [2]** 96/18 98/5
**offensive [1]** 21/12
**offer [3]** 70/25 71/8 93/4
**offered [2]** 9/19 9/24
**offering [5]** 31/16 31/24 32/12 60/21 90/8
**office [1]** 77/7
**often [1]** 55/18
**oh [10]** 4/7 4/8 55/11 56/12 62/8 69/7 69/8 75/11 77/22 86/11
**okay [55]** 3/3 3/8 5/13 5/17 5/19 7/7 9/9 9/10 10/23 11/12 11/17 12/1 12/2 13/8 20/18 20/23 26/20 27/21 29/24 31/11 34/17 34/19 39/1 39/5 39/11 51/9 53/7 56/9 57/6 57/19 61/17 61/22 69/8 75/14 76/15 81/15 83/5 84/11 87/14 90/3 91/3 94/22 95/6 96/4 98/21 100/16 103/11 103/18 104/2 106/2 106/14 106/18 107/18 107/20 108/1
**old [2]** 73/21 90/20

**omission [2]** 38/20 72/16
**omissions [4]** 36/16 36/19 36/22 37/4
**omitted [1]** 37/5
**omitting [2]** 99/9 107/2
**on [206]**
**once [6]** 13/24 78/3 88/10 100/5 102/9 104/4
**one [52]** 4/7 5/21 6/16 7/17 7/24 7/24 7/25 7/25 8/7 8/8 8/9 9/13 10/5 11/8 13/13 14/11 16/18 17/13 25/20 26/1 30/2 32/17 35/25 36/1 38/6 38/13 38/24 39/1 42/9 45/15 46/8 47/16 47/16 47/24 50/14 53/3 56/13 57/4 64/1 74/11 74/20 76/25 77/25 88/10 88/10 91/20 92/2 93/8 97/5 100/7 100/25 101/9
**ones [3]** 72/11 90/15 106/21
**online [7]** 16/12 18/4 20/24 23/8 23/9 48/12 90/21
**only [25]** 3/14 6/13 7/16 13/23 16/21 18/23 18/22 20/12 27/25 47/16 49/6 51/8 53/5 53/9 56/9 59/22 68/2 78/20 79/17 81/8 86/4 94/25 96/13 97/1 106/20
**oOo [1]** 108/5
**Op [1]** 96/22
**open [1]** 25/1
**opening [1]** 91/16
**operate [2]** 16/20 66/19
**operates [2]** 14/21 14/22
**operating [2]** 14/24 30/12
**operative [1]** 21/3
**operator [1]** 93/16
**opinion [13]** 4/14 6/7 6/22 17/17 17/24 24/12 24/15 40/1 40/10 40/20 50/18 85/9 85/12
**opinions [1]** 41/17
**opioid [3]** 77/21 83/25 103/1
**opioids [3]** 77/5 77/7 77/24
**opportunity [6]** 8/9 89/19 100/15 103/15 104/16 105/7
**opposition [16]** 14/2 14/3 31/19 31/20 32/17 33/8 44/17 47/9 50/20 60/19 61/6 86/3 87/5 97/16 97/24 98/4
**opt [1]** 52/12
**optimism [1]** 40/11
**or [134]**

**order [9]** 8/6 35/16 50/2 65/20 76/5 106/4 106/16 106/16 107/12
**ordinary [1]** 45/4
**other [51]** 5/8 10/18 10/19 10/24 12/8 19/14 29/12 32/15 39/23 41/16 42/13 43/25 44/15 51/5 52/19 55/11 55/13 55/23 58/16 58/25 59/7 59/22 60/25 61/19 62/15 68/24 70/12 71/5 75/18 76/6 76/25 78/8 81/8 83/11 83/12 83/13 83/21 83/23 88/8 88/22 91/23 92/2 93/22 94/9 97/24 98/13 99/16 101/18 102/21 102/23 107/1
**others [2]** 48/22 88/5
**otherwise [2]** 17/8 51/23
**our [51]** 3/3 3/4 4/7 6/21 21/13 21/13 22/19 28/12 32/16 33/8 41/4 41/4 41/4 51/13 51/14 52/16 54/2 55/5 55/19 56/8 59/6 60/19 63/14 65/10 65/18 65/23 66/1 66/8 66/8 67/11 67/12 67/17 67/22 69/12 69/21 69/24 71/1 71/4 71/19 73/18 74/22 75/1 78/9 80/6 80/6 82/10 82/17 86/16 95/18 95/22 99/5
**out [41]** 14/18 15/13 16/13 16/14 16/15 16/24 19/19 19/10 20/15 24/15 32/8 35/1 42/6 44/10 44/14 54/13 54/14 55/2 55/7 55/8 60/15 66/12 74/18 75/11 79/10 79/19 79/19 79/22 82/9 82/20 83/2 84/22 85/3 90/13 91/6 96/16 96/16 98/1 103/14 106/10 107/19
**outdoor [1]** 56/18
**outset [2]** 37/20 38/4
**outside [3]** 11/4 30/3 89/2
**outstanding [1]** 5/18
**over [20]** 6/15 9/5 9/17 14/20 14/22 21/10 40/4 52/11 57/1 58/3 61/13 74/2 77/12 88/10 88/18 88/25 90/16 92/12 97/13 106/20
**overdose [2]** 26/24 28/2
**overdramatic [1]** 54/12
**oversee [1]** 51/24
**overwhelming [1]** 13/19
**owed [2]** 49/8 49/9
**owing [1]** 94/1
**own [18]** 31/16 31/23

42/17 44/23 55/6 58/7 58/16 65/3 72/4 72/14 73/25 74/6 74/6 74/15 81/22 81/22 81/22 90/8 **owned [2]** 60/13 60/14
**ownership [1]** 93/11

**P**

**P.3d [1]** 96/22
**p.m [1]** 108/4
**page [26]** 1/16 22/19 24/12 24/15 24/23 33/15 47/20 55/19 57/23 60/18 65/10 66/17 66/21 74/22 74/25 75/12 78/9 85/12 85/23 87/4 87/14 89/9 97/18 98/3 100/19
**page 1098 [1]** 24/12
**page 12 [1]** 22/19
**page 13 [1]** 65/10
**page 15 [2]** 66/17 66/21
**page 2 [2]** 55/19 57/23
**page 264 [1]** 85/12
**page 324 [1]** 85/23
**page 36 [4]** 74/22 74/25 75/12 78/9
**page 833 [1]** 24/15
**page 9 [1]** 60/18
**pages [9]** 3/3 13/12 25/9 48/10 62/20 63/1 65/11 82/13 106/24
**painstaking [1]** 29/11
**papers [4]** 4/2 21/14 33/8 85/1
**paragraph [14]** 38/9 39/13 39/16 62/9 63/16 66/3 71/2 74/22 74/23 74/25 87/25 88/6 88/13 105/16
**Paragraph 103 [1]** 87/25
**Paragraph 108 [1]** 88/6
**Paragraph 109 [1]** 88/13
**paragraph 131 [1]** 62/9
**paragraph 175 [1]** 66/3
**paragraph 224 [2]** 38/9 39/16
**paragraph 32 [1]** 63/16
**paragraph 355 [1]** 105/16
**paragraph 55 [1]** 71/2
**paragraphs [11]** 12/24 30/8 30/9 30/9 30/21 40/2 41/2 62/19 63/15 65/11 72/3 87/18 87/22
**paragraphs 35 [1]** 30/8
**parens [6]** 43/23 44/10 76/21 76/21 81/6 92/4
**parent [2]** 56/12 56/16
**parent-teacher [1]** 56/12
**parental [1]** 64/4
**parenti [1]** 76/21
**parents [1]** 68/6
**part [11]** 14/10 21/25 23/2 30/5 37/17 41/25

**P**

part... **[5]** 45/16 54/15 91/21 105/19 105/19
**participants [1]** 13/13
**participating [1]** 13/13
**particular [10]** 8/10 16/25 17/2 23/7 25/9 33/24 52/14 66/20 75/23 105/17
**particularity [1]** 36/24
**particularly [2]** 10/2 15/18
**parties [11]** 1/10 7/9 7/9 48/21 49/9 49/9 65/3 73/8 73/20 99/15 101/18
**parts [2]** 12/13 105/19
**party [45]** 7/25 8/1 20/25 21/21 22/1 22/9 22/12 22/13 22/21 23/3 23/7 23/10 23/25 24/17 25/6 25/13 25/22 25/24 26/2 29/14 30/6 30/13 30/17 30/19 30/23 31/2 31/6 31/23 32/4 32/9 32/10 65/14 66/5 66/20 67/16 76/23 87/21 88/17 88/24 89/3 90/8 94/9 94/20 95/10 101/11
**party's [3]** 21/15 22/25 100/7
**pass [2]** 62/13 101/14
**passed [1]** 21/9
**passing [1]** 27/15
**past [1]** 68/23
**patently [1]** 52/21
**patriae [6]** 43/23 44/10 76/21 76/21 81/7 92/4
**Paul [1]** 96/21
**pause [2]** 38/17 67/23 86/23
**Peccole [1]** 58/19
**penalty [1]** 76/7
**pending [3]** 83/22 102/1 102/22
**people [20]** 9/14 9/14 10/16 11/4 17/23 19/9 19/10 19/10 26/7 55/13 55/14 56/8 56/15 56/19 58/6 60/14 60/25 72/19 94/7 104/16
**Perfect [1]** 5/12
**perfectly [1]** 44/4
**period [1]** 8/18
**permanent [1]** 76/6
**pernicious [1]** 15/18
**person [9]** 5/21 7/16 7/25 11/8 13/13 56/16 56/17 57/2 76/5
**personal [45]** 6/11 6/14 7/20 12/10 14/14 14/20 14/22 14/25 15/2 15/4 15/12 15/16 15/17 15/20 16/8 16/11 16/23 17/3 17/9 17/11 17/16 17/17 17/19 18/12 18/14 19/18 53/6 53/25

84/14 85/5 85/20 86/1 86/2 86/4 86/8 86/13 86/17 86/19 86/22 97/4 97/10
**personally [1]** 97/7
**perspective [1]** 7/23
**persuasive [2]** 89/15 98/22
**Phil [1]** 4/19
**PHILIP [1]** 2/5
**phone [1]** 58/14
**phonetic [5]** 3/17 97/3 97/11 99/8 99/8
**phrases [1]** 96/24
**physical [3]** 46/21 58/20 58/21
**physically [1]** 58/21
**pick [1]** 106/5
**picked [1]** 62/17
**piece [1]** 23/7
**pills [1]** 103/2
**pithy [2]** 8/14 8/15
**place [3]** 13/23 80/10 86/6
**plain [5]** 22/14 45/4 65/25 71/15 101/1
**plaintiff [19]** 1/5 7/13 10/13 12/22 19/20 28/19 28/22 49/8 51/6 52/4 52/9 52/13 53/9 53/11 71/21 71/22 87/3 89/18 96/9
**plaintiff's [4]** 91/12 96/23 99/14 107/24
**plaintiffs [7]** 15/24 20/15 27/5 66/25 86/24 100/4 107/8
**planned [1]** 6/23
**platform [80]** 12/15 14/21 14/22 14/25 16/24 18/1 21/15 22/10 22/11 22/13 23/9 23/18 24/9 24/23 25/4 25/13 25/21 25/23 26/6 26/12 27/24 27/25 28/18 28/19 28/23 29/2 29/14 29/21 31/2 31/15 32/3 33/19 33/25 35/19 40/8 40/8 42/3 42/4 42/20 42/22 42/25 43/2 43/3 46/14 46/14 47/3 47/3 47/4 47/5 48/7 48/13 48/14 48/24 49/5 49/10 52/19 56/15 58/23 62/23 63/5 63/10 63/24 63/25 64/12 64/18 64/18 64/19 64/24 65/6 65/8 66/19 70/14 71/6 72/4 74/1 79/10 79/14 80/7 94/1 94/6 94/7
**platform's [7]** 17/5 22/24 30/17 31/23 31/24 36/17 42/1
**platforms [14]** 16/12 16/17 16/20 17/10 18/4 20/24 22/20 42/11 42/14 42/19 44/6 88/9 90/7 90/21

98/6
**plead [5]** 37/7 38/4 61/25 68/6 105/11
**pleaded [8]** 12/21 22/8 23/6 30/1 30/2 30/4 30/16 31/1
**pleading [9]** 7/11 30/15 37/3 37/20 37/24 39/22 74/4 74/13 79/24
**pleadings [8]** 7/11 11/3 24/19 80/22 98/14 99/17 106/22 106/24
**pleads [2]** 23/17 42/6
**please [14]** 3/7 3/8 4/3 6/8 12/3 12/5 20/20 31/10 39/7 57/19 61/16 69/4 77/18 87/15
**pled [9]** 35/5 35/10 36/24 37/3 42/7 48/23 79/25 100/3 101/8
**plenty [4]** 19/9 20/15 49/21 55/4
**plethora [1]** 10/18
**point [35]** 7/15 15/7 16/13 19/17 24/11 25/15 26/1 44/15 47/8 52/7 60/19 62/15 63/6 64/9 66/12 69/2 72/12 73/10 74/16 75/18 76/19 77/2 77/3 81/4 81/8 84/12 85/3 85/19 85/22 85/24 89/5 90/5 90/10 90/11 90/16
**pointed [2]** 35/1 75/11
**pointing [1]** 87/20
**points [2]** 8/23 93/22
**political [1]** 34/4
**Poole [7]** 37/11 38/2 73/1 73/1 73/3 73/12 101/17
**population [3]** 44/1 44/1 92/8
**portion [4]** 12/21 35/2 39/7 103/23
**position [9]** 7/22 8/23 39/25 67/11 67/17 67/18 69/21 86/15 86/16
**possible [4]** 55/16 63/24 63/25 104/14
**posted [1]** 32/3
**postpone [1]** 21/23
**posts [1]** 88/21
**potential [1]** 9/6
**potentially [1]** 47/23
**power [5]** 17/18 32/24 46/22 103/25 104/9
**powers [2]** 44/13 103/21
**practice [5]** 8/4 73/4 73/15 74/7 74/19
**practices [19]** 35/13 36/3 36/12 45/24 46/2 59/20 62/2 63/2 70/22 71/24 72/13 73/13 75/22 75/23 91/21 93/1 93/17 100/25 101/21
**precedent [4]** 29/7

**precedential [1]** 60/21
**precludes [1]** 86/14
**preclusion [1]** 100/4
**predict [1]** 88/3
**preference [1]** 104/15
**prejudice [1]** 9/7
**prejudiced [1]** 9/6
**preliminary [2]** 35/25 76/5
**premised [2]** 36/16 36/21
**preparation [1]** 81/21
**prepared [4]** 11/4 35/8 56/24 69/11
**presence [2]** 13/15 13/19 56/20 58/22
**present [1]** 50/24
**presentation [2]** 88/15 91/16
**presented [4]** 10/17 11/3 87/9 96/9
**president [1]** 13/1
**presumably [1]** 60/3
**presumption [1]** 23/22
**pretty [4]** 82/11 96/6 96/24 102/14
**prevail [1]** 65/20
**prevent [3]** 33/3 33/3 33/17
**previously [1]** 44/25
**price [1]** 93/11
**prima [1]** 53/5
**principal [1]** 86/5
**principles [2]** 32/22 98/25
**prior [2]** 44/25 45/18
**priorities [1]** 41/5
**prioritization [1]** 40/6
**priority [2]** 10/2 40/18
**private [1]** 45/8
**privilege [2]** 96/14 97/6
**pro [7]** 2/5 2/6 2/10 2/11 5/1 5/17 12/6
**probable [3]** 50/1 50/3 80/13
**probably [9]** 7/22 9/16 18/22 39/3 52/13 54/6 57/7 57/10 61/15
**problem [6]** 13/22 13/22 14/10 28/19 38/7 84/15
**problems [2]** 13/21 39/23
**procedural [1]** 5/6
**proceed [5]** 9/8 9/11 11/16 34/19 77/9
**proceeded [1]** 7/2
**proceeding [1]** 75/4
**proceedings [7]** 1/8 52/1 80/12 80/19 82/8 108/4 108/7
**process [12]** 9/7 15/2 16/8 17/8 20/6 20/6 22/6 24/6 30/5 53/14 107/1 107/16
**produce [1]** 99/3
**product [43]** 46/14 46/19 47/1 47/6 47/19

48/8 48/12 48/13 48/13 48/14 48/15 59/5 59/5 64/6 64/14 64/15 64/21 64/23 64/24 67/1 67/5 67/15 67/21 70/20 70/20 71/14 71/18 71/22 75/24 79/11 79/13 79/19 79/22 80/3 80/3 92/20 101/7 102/18 103/2 103/18 103/24 104/2 104/5
**products [11]** 43/17 46/12 46/15 48/8 48/15 49/14 60/15 91/10 91/10 92/17 92/24
**profitable [1]** 60/7
**program [1]** 13/11
**prohibit [2]** 26/14 33/4
**prohibiting [1]** 34/9
**prohibits [1]** 25/25
**project [2]** 4/4 27/1
**promote [3]** 21/10 32/10 71/5
**prompting [2]** 88/11 88/11
**prong [3]** 26/21 97/25 98/1
**pronounce [1]** 52/25
**proper [2]** 9/12 97/1
**property [5]** 64/15 64/19 70/25 93/5 93/9
**propose [1]** 7/3
**proposed [2]** 106/7 106/7
**proposition [4]** 48/11 51/3 53/22 54/24
**prospect [1]** 99/12
**protect [7]** 19/12 44/21 48/21 49/8 49/9 64/20 78/10
**protected [1]** 69/17
**protection [2]** 45/17 59/20
**protections [1]** 99/18
**protocols [1]** 32/5
**prove [1]** 53/10
**provide [7]** 14/17 16/18 41/16 76/9 88/9 106/6 107/11
**provided [4]** 21/4 65/7 74/14 92/10
**provider [4]** 21/1 21/5 27/1 27/13
**provides [2]** 78/10 95/11
**providing [1]** 98/25
**proving [1]** 37/17
**provision [1]** 93/21
**proximate [1]** 48/19 49/17 49/18 49/23 50/3 80/8 80/17
**PTA [4]** 13/1 13/11 56/13 56/16
**public [11]** 38/10 38/11 42/10 42/15 43/25 47/5 54/6 75/3 79/19 80/5 92/2
**publication [8]** 21/16 21/25 23/2 23/25 24/6

**P**

**publication... [3]** 31/5 88/17 88/24

**publication's [1]** 30/17

**publish [11]** 21/19 21/21 22/21 24/5 24/17 26/9 30/13 30/19 31/2 33/15 33/17

**published [1]** 65/3

**publisher [13]** 21/2 21/3 22/13 23/8 23/9 23/25 24/10 24/18 25/6 25/13 25/23 26/13 29/14

**publishers [1]** 101/11

**publishes [7]** 22/10 23/12 23/15 25/22 26/6 26/12 30/23

**publishing [14]** 20/25 21/15 21/18 21/22 22/6 25/4 25/8 25/10 26/2 26/15 30/5 65/13 67/16 87/21

**pulls [1]** 32/8

**purchase [3]** 36/11 71/14 71/17

**purely [1]** 68/13

**purporting [1]** 19/25

**purpose [3]** 58/5 66/5 73/7

**purposeful [1]** 97/9

**purposely [4]** 73/23 96/13 96/14 97/6

**purposes [4]** 15/12 48/8 107/1 107/22

**pursue [4]** 44/3 45/13 46/6 54/20

**pursuing [5]** 14/1 37/13 37/14 44/22 44/23

**push [2]** 32/8 64/2

**pushed [1]** 70/17

**put [9]** 8/22 57/16 61/12 79/11 79/19 79/22 88/10 106/1 106/7

**puts [1]** 79/9

**Q**

**qualities [1]** 64/7

**Quality [2]** 40/17 40/17

**question [46]** 12/1 16/11 18/4 18/11 18/16 19/1 19/3 20/7 20/19 23/5 23/7 23/10 25/7 26/20 27/23 28/14 29/17 44/13 46/16 48/20 49/19 49/20 50/14 50/15 51/8 59/9 61/15 74/3 76/12 76/17 76/17 77/11 77/21 77/22 78/1 78/25 83/11 84/7 84/10 86/25 87/7 89/21 91/5 91/9 91/9 103/14

**questions [14]** 18/13 26/17 31/9 34/14 34/16 34/23 43/12 54/18

**quick [5]** 18/16 38/17 67/23 86/23 100/17

**quickly [4]** 34/22 39/5 92/13 93/22

**quiet [1]** 4/2

**quite [1]** 91/16

**quote [30]** 36/4 36/4 41/13 53/8 66/18 66/21 67/3 67/14 71/2 71/6 71/21 71/24 73/3 73/5 76/3 78/10 78/19 78/21 96/18 96/25 97/2 98/11 98/23 99/1 99/2 99/13 99/13 101/6 101/7 102/6

**quoting [5]** 65/12 66/17 70/24 71/3 75/13

**R**

**R.J [1]** 37/11

**raise [2]** 47/12 58/16

**raised [2]** 77/12 95/17

**RANDALL [3]** 2/4 3/9 52/5

**RAQUEL [2]** 2/3 4/18

**rather [3]** 22/9 23/6 106/4

**re [3]** 1/13 40/22 96/21

**reach [7]** 35/22 54/13 54/14 55/2 55/7 56/8 107/21

**reaches [1]** 53/13

**reaching [1]** 55/8

**read [17]** 13/18 28/14 28/15 28/16 29/5 38/6 42/6 45/17 46/4 47/20 58/14 85/8 87/19 89/22 91/19 91/24 102/2

**reading [4]** 39/3 68/17 91/17 93/19

**ready [2]** 11/12 11/16

**real [1]** 95/10

**realistically [7]** 10/20 61/4 91/8 97/12 101/24 102/20 107/3

**reality [1]** 20/11

**realize [1]** 83/15

**really [21]** 12/13 27/9 27/17 28/11 53/22 57/3 65/6 68/16 69/2 70/16 89/20 98/15 98/20 99/18 99/22 101/12 101/18 101/22 105/2 105/10 105/11

**realm [1]** 34/3

**reargue [1]** 90/10

**reason [16]** 10/15 14/7 21/8 22/17 22/23 35/14 35/14 36/13 48/16 49/13 56/4 68/16 75/7 89/1 94/16 95/15

**reasonable [5]** 67/4 79/21 97/10 106/16 106/17

**reasonably [4]** 53/17 53/18 67/15 67/21

**reasons [11]** 35/11

76/11 90/25

**quick [5]** 18/16 38/17 67/23 86/23 100/17

48/18 68/9 68/10 92/9 92/22 92/24 93/25

**rebuttal [2]** 20/15 50/6

**recall [1]** 38/22

**recent [3]** 89/25 90/12 101/25

**recently [1]** 37/25

**recessed [1]** 52/1

**recognized [1]** 49/4

**recognizes [1]** 53/12

**recommendation [7]** 23/16 23/24 24/9 26/4 30/8 30/11 33/16

**recommendations [1]** 24/4

**recommended [1]** 28/20

**recommending [1]** 21/23

**record [2]** 34/21 52/2

**RECORDED [1]** 1/24

**RECORDER [1]** 1/24

**records [1]** 81/22

**recover [1]** 94/20

**recovery [2]** 76/7 76/8

**red [2]** 52/2 52/3

**redacted [2]** 38/23 39/7

**redefine [1]** 65/19

**redundant [1]** 73/7

**refer [3]** 35/24 55/19 78/8

**reference [11]** 58/14 63/15 66/17 67/20 71/11 75/1 77/1 80/21 83/25 92/17 102/21

**referenced [6]** 11/4 57/23 62/16 66/16 75/12 87/18

**references [3]** 46/21 88/20 88/21

**referencing [3]** 52/7 70/21 82/15

**referred [1]** 9/1

**referring [2]** 70/24 94/9

**reflect [1]** 40/11

**regard [2]** 53/16 102/15

**regarding [3]** 36/17 38/15 39/17

**regardless [2]** 66/3 66/20

**regards [10]** 9/13 10/12 50/15 97/17 98/16 99/21 101/21 104/11 105/21 107/21

**regulate [1]** 69/18

**regulating [1]** 33/2

**regulation [1]** 72/6

**reiterate [1]** 52/24

**rejected [5]** 17/12 31/18 31/21 40/13 85/7

**rejecting [1]** 66/24

**relate [3]** 15/13 96/16 98/2

**related [6]** 1/10 6/19 16/1 26/19 97/18 99/6

**relates [2]** 8/6 94/25

48/24 49/5

**relevant [3]** 20/4 69/14 73/2

**relied [1]** 18/9

**relief [7]** 41/10 46/5 53/11 76/6 92/1 94/17 105/9

**relies [3]** 17/20 42/11 47/13

**rely [1]** 39/24

**remedial [4]** 37/8 38/2 73/4 73/7

**remedy [4]** 18/17 19/6 28/6 28/7

**remember [5]** 38/22 51/13 77/12 98/9 103/1

**remotely [1]** 5/2

**render [2]** 73/6 99/1

**repeat [3]** 39/16 41/8 107/5

**repeatedly [2]** 42/11 93/7

**repeating [1]** 43/9

**replete [1]** 39/25

**reply [3]** 6/12 11/19 22/19

**reporting [1]** 1/25 72/4 74/6

**reports [1]** 74/16

**represent [3]** 75/3 75/21 82/24

**representative [1]** 56/14

**representing [3]** 56/3 73/20 73/21

**represents [1]** 76/23

**request [1]** 106/23

**require [2]** 29/14 73/5

**required [3]** 37/2 73/11 80/18

**requires [4]** 18/11 35/15 90/23 90/24

**research [4]** 18/23 72/21 80/16 81/22

**reserve [1]** 50/5

**reserved [1]** 43/24

**resident [1]** 56/2

**residents [2]** 12/25 71/9

**resist [1]** 66/7

**resolved [3]** 6/5 21/7 102/24

**respect [27]** 7/3 8/9 33/13 37/2 39/13 42/21 49/17 58/11 58/12 58/12 59/5 60/1 60/8 61/22 62/8 62/15 63/4 68/15 69/9 72/2 72/25 73/13 74/20 80/8 80/20 92/16 93/1

**respectfully [4]** 44/18 92/21 93/18 93/20

**responds [1]** 25/2

**response [3]** 37/6 49/11 76/20 91/11

**responsibilities [1]** 72/11

**responsible [1]** 27/14

**responsive [1]** 90/2

**rest [1]** 41/6

**restatement [6]** 46/18 46/20 47/10 47/13 92/18 92/23

**restitution [1]** 76/8

**restraining [1]** 76/5

**restrict [1]** 32/25

**restricted [1]** 70/3

**restricting [1]** 34/11

**restriction [1]** 34/1

**restrictions [1]** 70/9

**result [2]** 23/22 32/12

**resulting [1]** 41/19

**results [3]** 13/16 13/18 25/4

**retired [1]** 77/13

**revenue [2]** 58/2 58/3

**review [1]** 107/12

**reviewed [1]** 18/10

**reviewing [1]** 21/20

**reward [1]** 67/2

**rewards [1]** 64/1

**Reynolds [3]** 37/11 71/11 71/12

**rid [1]** 15/2

**riders [1]** 7/6

**right [60]** 6/8 7/8 7/11 9/15 9/20 10/18 10/18 10/25 11/9 11/22 14/24 16/4 19/16 19/22 26/20 26/21 26/23 26/23 27/4 27/6 27/11 27/12 27/12 27/13 28/1 28/3 28/6 28/8 29/18 29/18 29/20 38/20 39/5 42/6 50/6 50/19 51/16 52/25 67/24 68/1 68/3 68/3 75/5 75/5 77/14 84/6 86/25 89/12 89/12 89/13 91/6 91/9 98/10 103/2 104/15 104/19 105/4 105/7 105/13 106/16

**rights [2]** 19/13 20/12

**Rios [1]** 3/16

**rise [3]** 14/14 15/8 96/3

**RockYou [1]** 36/9

**roll [1]** 67/16

**room [1]** 31/13

**Roommates [2]** 99/8 99/11

**rule [14]** 20/6 36/23 37/7 37/24 61/23 61/25 62/2 62/3 73/11 80/21 81/3 95/4 95/4 96/7

**Rule 8 [1]** 81/3

**Rule 9 [4]** 36/23 37/24 61/23 62/3

**ruled [3]** 10/19 15/25 22/4

**ruling [5]** 8/11 11/11 17/25 96/5 105/18

**rulings [4]** 10/22 16/6 83/23 103/11

**running [1]** 25/18

**runs [1]** 43/8

**rustling [1]** 4/2

**Ryan [1]** 78/18

**S**

safe [5] 38/11 67/15 67/21 79/22 79/23
safer [1] 40/18
safety [8] 36/17 39/25 40/6 40/24 40/24 41/1 57/22 62/22
said [36] 15/5 15/6 17/24 21/7 22/25 28/19 28/23 29/12 31/22 32/22 36/11 38/3 38/19 40/23 40/24 41/18 45/1 45/3 45/7 52/22 62/3 64/14 65/1 69/22 69/25 78/4 79/5 80/25 83/13 85/14 87/16 89/1 93/25 95/19 100/6 103/12
Saint [1] 3/17
Saint-Sume [1] 3/17
sale [25] 35/15 35/17 35/20 36/7 36/7 36/8 41/8 59/5 59/6 59/23 70/23 70/24 70/25 70/25 93/2 93/4 93/4 93/4 93/11 93/14 93/16 101/22 101/23 102/3
Samantha [1] 3/16
Samaritan [2] 64/11 64/11
same [35] 10/12 12/21 14/2 14/23 16/5 16/20 19/1 19/3 22/5 23/10 24/7 24/13 24/13 25/17 25/20 30/21 37/4 44/4 48/14 49/13 59/21 83/19 84/13 84/25 85/24 86/20 87/14 88/13 91/8 91/15 95/7 96/23 96/24 97/12 104/3
satisfied [1] 67/3
satisfy [3] 33/21 70/7 93/13
saw [3] 58/9 61/5 73/14
say [39] 9/14 13/15 19/12 22/11 26/24 33/25 37/6 37/8 37/12 38/21 39/8 39/9 41/22 42/8 44/18 49/11 50/9 52/20 57/18 58/7 59/2 64/13 66/3 67/14 69/21 71/20 71/21 73/3 74/24 82/18 89/3 92/10 93/3 95/5 95/9 95/23 102/8 102/21 107/23
saying [18] 9/24 18/18 19/2 19/14 20/11 27/8 27/16 28/5 28/10 30/1 39/6 42/24 50/24 56/9 78/5 78/24 86/12 89/15
says [24] 17/2 21/1 22/12 22/14 26/1 29/2 29/15 38/14 39/16 46/17 47/2 50/21 54/23 58/15 61/25 64/13 69/16 70/3 94/15 95/22

scheme [4] 35/15 36/5 73/4 91/22
school [2] 57/5 72/10
Schueler [4] 46/16 46/17 47/10 92/18
scope [4] 17/18 22/18 22/21 23/4
screen [2] 43/2 55/16
scroll [9] 24/21 24/22 25/12 26/8 30/20 30/22 87/25 100/21 100/22
scrolling [2] 88/8 100/18
scrutiny [12] 31/17 32/14 33/9 33/11 33/20 33/21 33/22 34/12 70/7 90/9 90/24 99/24
search [2] 13/16 13/17
searched [1] 13/17
second [14] 8/6 8/25 24/21 38/17 46/18 46/20 67/23 86/24 92/18 92/23 98/1 100/17 101/9 103/17
section [45] 6/17 12/11 12/16 12/23 13/7 13/23 14/3 16/2 17/14 18/15 20/24 21/6 21/9 21/14 22/1 22/5 22/8 22/11 22/18 22/22 22/24 23/4 24/10 24/20 25/9 25/24 26/14 26/16 26/17 29/3 29/16 31/7 43/8 47/17 61/22 64/9 64/11 66/13 66/18 66/24 75/13 86/9 87/16 87/23 89/4
Section 228.391A [1] 75/13
Section 230 [29] 6/17 16/2 18/15 20/24 21/6 21/14 22/1 22/5 22/8 22/11 22/18 22/22 22/24 23/4 24/10 24/20 25/24 26/14 26/16 26/17 29/3 29/16 31/7 47/17 66/13 66/18 66/24 86/9 89/4
secure [2] 44/21 78/11
securities [2] 40/16 40/22
see [25] 1/16 5/17 27/3 27/12 31/1 40/1 51/21 60/10 75/1 77/11 77/16 78/2 78/5 79/5 88/3 98/3 98/4 99/7 99/22 100/3 101/10 103/9 103/12 103/15 104/12
seek [6] 45/20 46/6 65/13 92/1 94/16 94/20
seeking [4] 28/6 28/7 41/10 46/9
seems [1] 74/17
seen [5] 19/3 47/9 52/10 52/14 105/2
sees [1] 8/11
segment [3] 6/16 6/17 7/1
segments [1] 6/10

self-regulation [1] 72/6
sell [4] 70/25 79/13 93/5 93/18
selling [3] 79/13 80/2 80/5
sells [1] 62/9
semantic [1] 80/1
send [1] 62/10
sending [2] 21/24 57/20
Senior [1] 2/3
sense [3] 8/8 51/15 79/17
sent [2] 28/20 94/7
sentence [1] 32/17
sentences [2] 85/8 87/19
separate [2] 7/12 65/2
SEPTEMBER [2] 1/12 3/1
serendipitous [1] 58/9
series [3] 18/3 45/16 45/19
serve [2] 73/7 88/14
service [3] 21/2 54/7 71/4
services [2] 35/16 36/11
set [5] 42/3 45/5 53/10 97/16 100/10
sets [1] 45/19
several [1] 37/10
shall [3] 21/2 21/3 78/13
SHAUN [2] 2/9 4/25
she [1] 77/13
shields [1] 20/24
shocked [2] 90/4 90/10
shoes [2] 94/19 105/9
shot [1] 107/16
should [9] 18/9 27/10 29/22 39/8 54/3 60/2 80/15 92/22 95/24
show [14] 13/3 13/18 13/20 39/13 41/12 44/11 50/19 50/21 53/5 56/20 71/5 71/23 80/13 84/23
showing [1] 53/5
shown [2] 50/23 88/15
shows [2] 58/7 81/23
sic [3] 61/23 71/15 73/12
side [6] 5/13 5/21 9/16 10/13 50/7 107/24
Sidney [1] 3/16
sign [1] 59/16
signed [2] 5/7 5/16
significant [3] 8/18 52/13 56/18
significantly [1] 73/8
similar [7] 10/20 88/8 88/15 92/3 102/13 102/14 103/10
similarly [3] 40/22 104/10 104/25
simple [2] 21/15 103/5

since [9] 7/24 68/20 68/22 77/2 77/20 78/4 90/13 98/18 104/11
singer [1] 57/1
singer-songwriter [1] 57/1
sit [1] 5/20
site [9] 55/16 55/24 55/25 56/9 58/6 58/10 59/14 70/14 71/10
sites [1] 46/8
situation [5] 11/1 17/25 44/24 80/4 80/10
situations [2] 43/24 71/16
Sixth [1] 40/15
skills [1] 72/8
skipping [1] 59/18
SLADE [4] 2/6 3/20 4/5 77/3
slash [1] 83/6
sleep [1] 72/10
slow [1] 100/12
slower [1] 100/14
smack [1] 43/8
smaller [2] 10/24 12/23
smoother [1] 10/4
Snap [16] 23/2 47/14 47/18 48/4 48/5 49/7 49/12 49/13 66/25 67/3 67/6 68/4 68/11 88/25 92/21 93/23
Snap's [4] 66/24 67/15 89/2 98/23
Snapchat [1] 67/1
Snapchat's [1] 67/2
so [238]
so-called [3] 41/23 64/4 64/11
social [9] 32/19 42/12 42/19 44/6 48/7 64/2 66/16 79/9 88/9
sole [1] 75/2
solid [1] 7/11
some [28] 8/14 9/25 13/4 13/6 13/19 15/7 19/6 22/17 33/25 37/13 39/12 40/2 50/5 52/16 54/6 56/4 59/1 63/20 74/15 78/15 85/3 85/14 85/19 94/16 101/25 106/6 106/20 107/3
somebody [2] 10/13 64/22
somehow [7] 27/13 55/12 58/25 67/18 70/2 70/4 70/5
someone [3] 43/3 94/15 106/25
something [20] 10/14 18/9 27/17 28/6 39/6 46/19 47/9 65/3 65/4 65/22 78/3 80/5 89/13 89/14 92/2 92/20 103/8 103/10 103/15 107/2

sometimes [2] 27/10 68/25
somewhat [2] 81/19 93/6
son [1] 27/14
songwriter [1] 57/1
sophisticated [2] 105/22 106/5
sorry [15] 3/24 3/25 4/14 5/25 11/15 14/21 20/9 23/9 57/14 69/6 70/21 74/23 74/25 75/11 100/12
sort [10] 13/21 20/3 31/12 33/25 53/14 53/16 64/15 78/23 87/7 95/19
sorts [1] 85/15
sought [2] 64/6 66/25
sound [1] 36/19
sounds [1] 54/12
sources [1] 42/13
South [1] 17/15
space [1] 94/7
speak [1] 100/13
speaker [1] 21/4
speaking [1] 37/23
speaks [1] 67/21
special [3] 48/22 48/23 49/4
specific [30] 14/21 15/2 15/4 15/9 17/3 17/9 60/24 61/1 61/5 61/6 61/14 65/13 82/5 82/6 82/14 82/15 85/5 85/11 85/12 85/20 86/19 86/22 87/8 96/10 96/11 96/12 96/25 97/4 97/13 97/15
specifically [6] 37/25 41/18 67/13 69/3 93/2 96/10
specificity [2] 62/3 73/11
specify [1] 91/25
speech [16] 20/25 32/11 32/22 33/5 33/14 33/15 33/15 33/24 34/3 34/4 34/12 66/14 69/16 69/19 70/9 99/23
speed [1] 67/3
spelled [1] 44/14
spin [2] 66/1 66/8
spoke [1] 9/22
squarely [2] 31/6 32/13
Squibb [1] 15/5
staff [1] 9/23
stage [11] 36/1 36/1 74/4 74/13 79/24 80/12 80/19 80/22 82/8 98/10 102/10
stand [1] 5/20
standard [21] 27/5 27/18 28/12 30/15 30/15 35/8 39/22 41/22 41/24 52/23 52/25 53/7 54/3 56/22 62/1 62/13 62/25 96/11 98/16 99/19 100/6

**standards [6]** 37/20 37/24 96/23 98/15 101/16 102/10

**standing [28]** 43/19 43/22 44/11 45/25 48/11 50/16 50/19 50/21 50/22 50/23 51/1 51/3 51/4 74/20 75/20 76/12 76/16 77/23 91/9 101/1 102/16 103/14 104/6 104/10 104/18 104/20 104/20 105/6

**standpoint [3]** 80/1 82/4 95/10

**stands [1]** 47/2

**Stark [1]** 3/18

**start [13]** 12/2 12/10 24/24 35/12 52/7 52/22 52/23 64/10 91/5 91/13 98/25 100/19 106/9

**starting [4]** 23/16 48/19 66/21 75/12

**state [161]**

**State's [25]** 4/7 12/13 14/18 15/14 15/17 17/13 17/18 23/20 23/23 25/3 32/17 33/10 33/23 35/9 36/5 42/17 43/5 44/11 45/5 49/18 51/3 70/7 86/21 94/18 101/10

**stated [6]** 63/1 68/2 92/24 96/8 97/18 103/16

**statement [5]** 38/14 39/17 39/19 39/20 105/15

**statements [11]** 12/15 39/24 40/1 40/5 40/5 40/8 40/9 40/13 40/17 40/19 41/5

**states [15]** 15/1 16/5 16/20 17/11 19/11 20/11 20/14 53/24 55/15 55/17 83/12 83/12 83/18 84/14 85/6

**statistics [1]** 73/25

**statute [27]** 21/1 22/14 29/15 32/21 35/16 42/16 44/16 44/19 44/25 45/9 45/14 45/18 45/24 46/1 46/4 53/13 59/6 63/3 70/23 72/1 74/18 78/10 78/16 93/19 95/11 95/11 101/23

**statutes [7]** 45/16 45/18 46/8 91/15 91/17 91/24 91/25

**statutory [11]** 35/15 36/20 45/19 45/21 46/1 54/22 73/4 78/15 91/21 92/10 93/21

**stay [1]** 63/24

**step [2]** 94/19 105/9

**steps [1]** 42/22

**Stew [1]** 53/8

**standards** 71/23 100/22 102/1 102/22

**stip [1]** 106/15

**stipulation [4]** 105/25 105/25 106/7 106/8

**stipulations [1]** 11/18

**stop [5]** 26/2 34/24 43/12 50/9 86/10

**story [1]** 25/19

**straight [4]** 6/15 7/2 24/15 98/24

**strategically [1]** 88/2

**strict [5]** 33/11 33/19 33/21 70/20 75/24

**strictly [1]** 91/20

**structure [1]** 54/22

**stuff [1]** 8/16

**Sub [2]** 76/3 78/10

**subject [9]** 6/1 14/25 15/17 15/19 16/23 17/10 31/17 32/14 62/3

**submit [7]** 35/6 35/11 39/21 42/5 65/5 92/12 93/18

**submitted [2]** 13/9 13/16

**subsequent [1]** 48/2

**subset [2]** 32/20 92/11

**substance [12]** 5/19 11/12 14/12 22/22 23/8 23/23 26/3 38/15 39/17 65/17 66/4 100/8

**substantial [4]** 53/20 81/20 96/19 98/6

**substantive [1]** 10/22

**such [4]** 27/16 53/18 97/10 100/20

**sue [1]** 64/22

**sued [5]** 16/21 37/21 83/13 83/14 83/18

**suffer [1]** 43/18

**sufficient [4]** 62/13 74/4 74/14 82/5

**sufficiently [1]** 79/25

**suggest [3]** 58/24 76/20 79/17

**suggested [3]** 58/17 85/25 99/5

**suggesting [1]** 58/25

**suggestion [1]** 82/22

**suggestions [2]** 6/1 71/5

**suggests [1]** 76/1

**suing [2]** 37/7 84/15

**suit [3]** 19/8 69/24 78/12

**suits [1]** 85/16

**Sume [1]** 3/17

**summary [1]** 67/7

**Super [1]** 87/13

**Superior [1]** 18/6

**supplying [1]** 88/1

**support [5]** 44/2 46/2 78/15 85/15 93/24

**supported [1]** 68/8

**supporting [2]** 14/20 14/21

**supposed [1]** 10/2

**Supreme [24]** 15/5 15/6 17/11 17/14 17/21 18/8 19/18 31/14 31/18 32/15 32/20 37/10 38/1 45/1 45/6 49/22 53/24 60/10 70/11 71/20 85/6 85/7 90/6 104/15

**sure [11]** 38/19 39/6 55/23 67/25 69/8 78/8 85/10 86/1 87/12 91/4 92/15

**surfacing [1]** 88/2

**surgeon [1]** 42/12

**Surprisingly [1]** 49/12

**surround [2]** 45/18 91/25

**survive [2]** 33/10 66/10

**swipe [2]** 24/23 25/2

**switch [1]** 9/25

**synonymous [1]** 63/22

**system [2]** 60/3 67/2

**T**

**tactic [1]** 52/10

**tactics [1]** 66/7

**tag [1]** 7/22

**tailored [1]** 34/11

**take [25]** 4/24 6/15 10/1 10/16 18/13 28/2 30/25 40/2 42/7 43/1 51/10 51/15 55/6 59/10 64/23 66/1 67/4 73/18 75/4 78/13 79/18 90/25 101/12 102/9 107/16

**taken [3]** 5/13 8/24 18/7

**takes [7]** 4/14 42/22 73/15 74/8 100/20 100/22 100/23

**taking [9]** 5/21 28/10 35/10 64/23 83/6 99/25 101/17 102/7 102/7

**talk [22]** 12/25 13/1 13/2 14/3 53/16 54/4 55/5 56/17 61/18 61/23 62/20 63/17 64/9 65/16 66/17 70/22 71/1 77/2 79/3 81/1 94/13 95/7

**talked [11]** 29/11 45/24 56/18 61/18 62/24 64/2 66/23 72/25 79/3 80/24 82/10

**talking [27]** 18/1 31/5 36/15 36/18 36/19 39/15 40/6 40/12 41/20 43/24 46/23 49/7 56/15 58/13 60/11 63/17 63/18 64/10 65/1 66/15 70/21 73/19 79/20 81/12 84/3 84/3 88/6 89/16 89/20 94/12 92/18 93/9 93/18 94/21 98/2 98/10 103/18 105/1

**talks [2]** 59/7 75/15

**tangible [5]** 46/20 46/22 46/25 47/1 47/6

**target [6]** 16/19 16/21 22/8 30/5 55/11 55/14

**targeted [3]** 33/24 55/17 73/23

**tax [1]** 17/18

**teacher [2]** 56/12 56/16

**team [2]** 51/13 51/20

**teaming [1]** 7/22

**technically [1]** 102/22

**tell [7]** 9/4 47/19 68/17 72/15 72/16 75/25 106/14

**telling [3]** 19/11 72/19 72/20

**tells [2]** 92/18 106/15

**temporary [1]** 76/5

**tends [1]** 88/14

**tentacles [2]** 54/13 54/15

**tenuous [1]** 27/13

**term [4]** 17/16 45/3 88/19 93/7

**terms [8]** 55/25 56/10 59/16 62/4 67/22 71/4 79/4 95/16

**test [4]** 19/16 26/21 26/21 97/12

**Texas [3]** 41/18 41/18 84/17

**text [2]** 21/15 22/14

**than [14]** 10/6 22/9 23/6 29/7 39/19 47/6 67/5 73/5 74/14 82/4 82/16 103/16 106/3 106/4

**thank [25]** 5/5 5/12 12/4 12/5 20/18 31/8 34/17 34/18 34/20 43/13 51/7 51/8 51/25 61/21 69/4 69/7 72/24 83/4 87/10 87/13 91/1 91/3 94/22 96/3 108/1

**that [725]**

**that's [91]** 6/16 7/23 8/1 9/2 9/12 10/9 10/9 11/5 11/22 13/6 16/7 18/24 19/13 21/2 21/21 22/14 22/14 23/23 24/2 24/2 26/3 26/3 28/25 29/15 30/21 31/6 34/4 34/4 36/23 38/24 39/5 39/14 39/20 41/3 42/20 43/6 44/7 47/17 48/5 49/6 49/20 52/21 53/21 54/15 55/24 55/25 56/21 58/7 58/8 58/10 59/19 59/21 60/16 62/11 62/13 62/19 63/17 64/25 65/23 66/9 66/14 66/21 67/7 67/10 69/2 70/10 75/5 75/13 75/15 77/21 78/1 80/8 84/5 84/6 84/9 84/25 86/25 89/6 89/9 89/13 89/16 89/20 92/14 92/18 93/9 93/18 94/21 98/2 98/10 103/18 105/1

**there [109]**

**there's [45]** 4/1 4/11 4/11 8/16 10/6 10/13 11/20 12/7 12/19 15/11 23/10 35/20 35/20 38/22 44/8 50/4 50/18 53/16 57/15 62/5 68/23 72/15 74/3 75/1 75/25 77/19 80/5 82/7 82/22 82/24 83/5 84/14 84/21 85/4 85/4 85/20 85/25 86/8 86/13 86/16 94/5 95/13 102/23 104/17 105/6

**thereby [1]** 53/19

**therefore [7]** 22/22 24/6 24/10 69/20 99/19 101/13 104/6

# T

**thereto [1]** 107/21

**these [57]** 7/11 8/14 8/18 10/5 13/24 14/4 14/7 16/17 17/7 21/8 21/24 22/4 25/20 26/14 28/21 34/23 35/12 36/23 40/5 40/9 42/11 42/14 43/4 43/19 43/22 44/8 44/12 44/16 45/13 45/21 46/2 46/8 46/11 54/14 55/7 55/22 56/23 60/25 63/11 63/23 64/5 64/7 64/13 65/4 66/7 70/12 72/12 72/13 72/19 73/21 81/1 81/1 83/19 85/2 85/19 87/18 91/18

**they [212]**

**they'd [2]** 18/18 94/16

**they're [44]** 6/18 7/22 16/22 19/6 21/9 28/5 28/6 28/6 28/10 29/23 34/1 34/2 34/3 41/25 54/10 55/8 56/3 56/3 56/14 58/3 58/8 58/25 58/25 59/1 59/11 59/12 59/13 59/14 63/18 64/22 64/22 65/22 71/9 72/18 78/24 79/11 80/2 80/4 80/5 82/22 86/7 95/18 95/21 95/22

**they've [14]** 30/2 44/15 57/24 61/9 61/11 61/24 73/22 74/11 80/16 81/24 83/14 89/22 92/9 95/17

**thick [1]** 8/16

**thing [12]** 10/12 11/2 14/2 30/21 42/9 47/16 47/16 74/11 74/21 76/25 78/8 88/13

**things [17]** 5/8 8/19 10/18 11/4 40/17 46/22 55/18 56/23 71/5 72/12 72/13 72/19 77/24 81/24 95/19 98/8 105/11

**think [85]** 6/2 6/6 6/6 7/24 8/3 8/3 10/4 11/2 11/5 28/13 29/4 30/24 33/9 33/10 39/13 39/14 47/9 51/15 52/15 52/24 53/2 53/23 54/5 54/13 54/21 54/21 54/24 56/23 58/10 59/8 60/16 60/19 60/22 61/13 61/24 63/15 63/16 64/17 67/7 67/11 68/14 68/15 68/16 69/2 69/12 69/13 73/1 73/1 74/3 74/13 76/9 78/22 79/4 79/7 79/24 80/17 81/3 81/7 81/10 82/4 82/9 82/10 82/16 82/24 86/19 87/7 90/22 92/3 92/9 94/10 95/16 95/24 101/24 102/10 102/12

105/6 105/16 105/21 106/11 106/13 107/1 107/15

**thinking [4]** 9/9 51/12 72/8 77/10

**thinks [1]** 81/9

**third [49]** 7/1 9/1 20/25 21/15 21/21 22/1 22/9 22/12 22/13 22/21 22/25 23/3 23/7 23/10 23/25 24/17 25/6 25/13 25/22 25/24 26/2 29/14 30/6 30/13 30/17 30/19 30/23 31/2 31/6 31/23 32/4 32/9 32/10 48/21 49/9 49/9 65/3 65/14 66/4 66/20 67/16 87/21 88/17 88/24 89/3 90/8 94/9 99/15 101/11

**third-party [39]** 20/25 21/21 22/1 22/9 22/12 22/13 22/21 23/3 23/7 23/10 23/25 24/17 25/6 25/13 25/22 25/24 26/2 29/14 30/6 30/13 30/17 30/19 30/23 31/2 31/6 31/23 32/4 32/9 32/10 65/14 66/20 67/16 87/21 88/17 88/24 89/3 90/8 94/9 101/11

**this [179]**

**thorough [1]** 82/11

**those [63]** 7/4 7/7 7/14 13/10 13/21 14/19 15/25 16/1 16/5 18/5 18/19 20/16 24/24 29/13 30/9 30/9 31/21 37/12 37/19 37/24 40/12 40/13 40/19 41/1 41/5 43/9 44/4 47/4 47/12 55/4 55/13 55/13 55/14 55/17 60/12 60/13 60/14 65/25 66/1 66/8 70/17 76/17 76/24 78/4 83/19 84/11 84/12 92/4 92/6 92/7 92/9 97/18 98/15 99/3 99/12 99/15 100/8 102/10 106/4

**though [4]** 8/17 36/20 85/2 91/2

**thought [3]** 6/9 40/25 51/2

**thousands [3]** 58/22 77/20 78/4

**three [7]** 6/10 6/20 6/25 26/21 68/9 91/15 98/5

**three-prong [1]** 26/21

**threshold [1]** 46/15

**through [28]** 5/6 6/15 7/2 12/2 25/18 26/11 34/22 38/6 38/10 42/1 43/11 43/14 43/16 54/14 54/8 62/19 70/17 72/3 77/6 79/16 81/21 96/6 98/13 100/18 100/22 100/25 106/23

**throughout [5]** 10/19 16/12 16/19 40/2 93/8

**thus [1]** 99/12

**tie [2]** 52/16 104/21

**ties [1]** 104/18

**TIKTOK [91]** 1/7 3/4 13/2 13/15 13/17 13/19 14/4 15/11 15/17 15/19 15/21 16/4 20/2 22/3 23/12 23/15 23/24 24/14 25/4 25/5 25/13 25/17 25/23 25/23 26/2 26/6 26/9 26/12 26/13 28/5 28/7 32/8 33/14 33/19 35/8 35/18 38/11 38/15 39/17 42/20 42/22 43/4 45/11 45/12 46/14 48/14 48/24 54/5 54/5 55/1 55/21 56/17 56/19 56/23 56/24 57/4 59/17 60/23 62/9 62/10 62/21 63/4 63/9 64/18 65/4 66/4 68/1 71/3 72/14 73/22 73/24 74/8 79/9 80/2 80/15 80/25 81/6 81/20 82/16 83/13 84/6 84/7 84/10 84/12 84/19 86/21 87/25 88/8 88/9 95/21 98/8

**TikTok's [12]** 22/9 26/15 31/25 32/7 32/12 39/25 40/6 55/6 62/21 67/18 72/4 74/15

**time [27]** 6/14 8/18 8/19 8/21 8/24 8/25 9/15 9/25 11/9 19/2 19/3 38/5 43/2 43/3 43/9 50/5 51/5 51/17 55/16 56/7 66/6 84/14 84/16 91/4 93/14 100/13 108/3

**timely [1]** 11/20 11/20

**times [2]** 52/11 88/18

**timing [1]** 50/15

**tires [1]** 46/22

**Tobacco [2]** 71/11 71/12

**today [4]** 9/8 12/7 53/15 108/3

**today's [1]** 107/22

**together [2]** 9/12 85/2

**told [1]** 91/9

**too [11]** 7/14 9/13 23/20 23/22 25/4 55/11 79/2 83/16 93/19 102/21 103/2

**took [2]** 41/12 77/12

**tools [7]** 43/2 46/22 99/1 99/4 99/7 99/13 99/15

**top [1]** 40/18

**topic [1]** 20/20

**topside [2]** 87/18 88/25

**Torts [2]** 46/18 46/20

**totality [1]** 99/17

**totally [2]** 15/1 65/21

**towards [1]** 82/1

**track [3]** 57/24 60/4

**tracked [1]** 82/2

**trade [18]** 35/13 36/3 36/12 45/24 46/1 62/1 63/2 70/22 71/24 72/13 73/3 75/22 75/23 91/21 93/1 93/17 100/24 101/21

**traditional [4]** 24/17 53/20 96/18 98/6

**TRAN [1]** 1/1

**transaction [2]** 36/4 36/6

**transactions [1]** 58/15

**transcribed [2]** 1/25 108/7

**Transcriber [1]** 108/11

**transcribing [1]** 100/14

**transcript [3]** 1/8 1/13 105/23

**transcripts [1]** 19/2

**transfer [1]** 93/11

**treat [5]** 22/13 27/6 29/14 64/24 103/21

**treated [2]** 21/2 21/3

**treating [4]** 25/23 29/20 29/21 101/11

**treats [7]** 23/8 23/9 23/24 24/9 25/5 25/13 25/14

**Tri [1]** 52/25

**trial [4]** 5/7 9/17 10/25 18/7

**trials [2]** 10/1 10/1

**Tricarichi [4]** 53/1 96/22 96/23 96/25

**tried [4]** 44/17 82/11 90/16 93/25

**tries [1]** 52/12

**triggered [1]** 106/17

**triggers [2]** 90/9 90/23

**true [16]** 26/4 27/7 27/23 28/3 28/25 35/6 35/10 37/4 42/8 52/21 53/10 73/19 86/7 86/20 88/16 88/23

**truly [1]** 108/6

**Trust [1]** 38/11

**try [9]** 12/9 27/22 34/22 43/14 52/18 60/9 63/11 63/23 103/10

**trying [26]** 9/6 14/9 21/8 26/2 26/5 26/9 26/11 26/22 26/25 27/3 28/1 33/23 45/2 52/16 63/13 67/11 67/18 69/2 74/16 86/15 94/19 95/18 100/13 104/15 105/23 107/3

**TUESDAY [1]** 1/12

**turn [2]** 36/6 62/10

**Turner [1]** 70/10

**two [18]** 6/17 10/11 10/11 11/20 12/13 14/10 28/21 35/25 48/18 49/21 63/15 85/8 91/23 92/15 95/7 95/7 97/5 103/21

**two-part [1]** 14/10

**type [8]** 27/24 27/25 28/25 41/3 46/3 46/6 65/14 78/16 88/4

**types [5]** 40/16 40/19 46/5 91/18 92/5

**typos [1]** 39/13

# U

**U.S [2]** 32/15 90/6

**Uber [1]** 48/13

**Uh [1]** 75/17

**Uh-huh [1]** 75/17

**ultimately [1]** 74/5

**unclear [1]** 87/1

**unconscionable [5]** 41/11 73/13 73/15 74/7 74/18

**under [51]** 6/21 7/20 20/6 24/19 28/12 32/21 35/13 36/2 36/4 36/11 36/21 37/7 37/8 37/13 37/15 38/1 38/4 38/9 38/13 44/25 45/13 53/24 57/12 62/12 63/2 71/15 72/1 73/11 73/12 86/22 91/10 91/10 91/21 93/17 94/20 94/21 95/10 100/5 101/14 101/15 101/20 101/22 102/14 102/16 105/13 105/16 106/3

**underinsured [1]** 103/7

**understand [9]** 7/21 8/2 8/4 11/10 20/3 30/14 58/11 59/3 83/21

**understanding [1]** 5/15

**understood [2]** 9/20 107/6

**undisclosed [1]** 72/2

**undisputed [1]** 35/18

**unfair [3]** 41/14 73/17 74/10

**unfairness [1]** 41/19

**unfortunate [1]** 26/23

**unfortunately [1]** 27/15

**uniform [1]** 18/11

**uninsured [1]** 103/8

**United [2]** 53/24 85/6

**unjust [12]** 43/18 50/9 50/13 76/13 80/20 81/2 91/11 94/12 94/17 94/21 104/25 105/12

**unlawful [1]** 69/16

**unless [2]** 16/23 92/13

**unmitigated [2]** 41/21 41/21

**unpredictable [1]** 88/1

**unreasonably [4]** 67/9 79/22 79/23 79/23

**unrelated [2]** 14/16 85/16

**unsuccessful [1]** 44/19

**until [2]** 9/4 52/1

**unusual [3]** 10/9 53/23

**U**

**unusual... [1]** 81/19
**up [20]** 5/20 8/13 18/7 24/23 25/2 26/23 27/14 39/14 43/14 44/24 47/2 48/17 61/11 75/4 75/7 82/17 83/5 95/15 103/1 103/5
**updated [1]** 39/9
**upon [4]** 41/5 74/6 79/18 91/25
**urged [1]** 68/4
**us [25]** 8/18 39/12 54/17 68/4 80/7 81/3 92/18 93/14 96/3
**use [25]** 14/9 17/16 42/16 45/1 45/9 46/1 60/4 60/5 60/6 60/6 63/10 63/24 64/15 64/21 64/23 68/4 71/2 71/4 71/14 71/17 71/22 79/15 82/3 95/12 99/12
**used [5]** 17/22 23/2 63/20 65/18 93/7
**useful [1]** 67/5
**user [12]** 21/1 21/23 31/16 46/24 46/24 60/7 66/21 88/12 93/12 97/23 99/3 102/7
**user's [1]** 24/4
**user-generated [1]** 21/23
**users [23]** 23/21 23/21 25/5 28/21 38/12 38/16 39/18 40/7 42/18 48/24 49/5 60/6 62/10 66/6 66/19 67/6 88/1 88/3 88/10 94/9 94/19 97/20 99/3
**uses [1]** 88/19
**using [1]** 31/22
**usually [3]** 49/20 94/13 94/14
**Utah [1]** 90/14
**utilizes [1]** 65/5
**utilizing [1]** 71/10

**V**

**vacuum [3]** 30/12 30/23 94/4
**valid [1]** 94/16
**variable [2]** 64/1 88/1
**various [2]** 56/23 62/20
**vary [1]** 32/22
**vast [1]** 12/14
**VEGAS [6]** 3/1 53/8 56/25 56/25 57/2 57/5
**venture [1]** 30/24
**version [6]** 36/2 36/12 38/23 39/4 44/25 53/3
**versus [32]** 3/4 16/15 17/15 25/15 26/20 28/11 31/13 36/9 37/14 45/1 47/14 48/5 49/1 49/7 49/12 49/13 53/8 58/19 68/11 69/11 69/14 71/11 71/12 71/12 78/18 85/22

92/21 93/23
**very [25]** 6/18 9/15 13/10 22/3 27/13 31/15 34/18 47/21 51/19 54/2 60/19 64/20 67/7 74/16 82/11 82/14 82/15 83/4 89/1 89/7 92/3 92/13 93/22 94/22 108/1
**vice [6]** 2/5 2/6 2/10 2/11 5/1 12/6
**video [9]** 13/4 32/18 32/18 32/20 48/12 62/11 88/9 88/10 108/7
**videos [5]** 24/24 24/24 25/1 88/15 88/21
**view [2]** 85/1 102/6
**viewed [2]** 15/18 66/20
**voice [1]** 4/3
**voices [1]** 4/2
**voluntary [1]** 21/11

**W**

**Walden [1]** 19/17
**walk [1]** 96/5
**walking [1]** 12/2
**Walsh [1]** 3/17
**want [33]** 8/22 9/3 9/14 9/20 10/20 40/18 50/5 51/10 54/3 58/14 61/12 61/18 63/6 63/12 64/20 64/20 70/19 79/2 79/12 80/2 80/9 82/19 83/10 86/1 86/25 87/18 87/19 88/3 92/14 106/1 106/15 106/25 107/16
**wanted [5]** 44/9 60/18 62/15 76/25 87/11
**wanting [2]** 7/14 10/16
**wants [5]** 10/13 33/14 33/17 70/1 107/13
**warn [3]** 46/13 104/3 104/4
**warrant [1]** 33/25
**was [105]** 5/17 5/25 6/10 7/16 11/17 11/19 11/22 12/23 13/11 13/12 13/13 17/22 17/25 20/10 20/10 20/18 22/24 22/24 26/14 26/22 26/22 26/25 27/12 28/1 28/22 28/23 29/18 31/8 32/13 32/17 36/4 36/6 36/7 36/9 36/11 37/17 38/19 39/5 40/16 40/24 40/25 40/25 42/14 42/16 45/7 47/22 47/25 49/7 49/8 51/7 51/12 52/16 56/12 56/14 56/15 57/13 57/17 58/9 58/17 66/16 67/5 68/3 68/13 68/14 68/19 69/2 75/13 76/25 77/10 77/10 77/12 77/16 77/21 77/22 77/22 77/25 78/1 78/2 78/16 84/10 87/1 87/7 87/11 89/2 89/2 89/10 89/23 90/3 90/19

100/25 101/22 101/23 102/15 103/1 103/2 103/3 103/8 103/9 103/10 103/10 105/20
**Wasden [2]** 57/5 57/17
**wasn't [2]** 20/7 47/17
**waste [1]** 43/9
**way [49]** 7/2 7/3 7/10 9/12 10/14 10/5 11/5 11/5 12/21 14/23 16/18 16/20 22/15 23/12 23/14 23/17 23/17 23/18 26/12 29/4 29/5 30/1 30/2 30/4 30/16 30/22 30/23 31/2 45/2 51/20 52/19 55/2 56/6 56/9 58/2 58/24 59/18 59/21 61/2 61/24 63/6 64/6 66/12 67/9 67/13 67/20 68/20 69/10 69/21
**Wayfair [1]** 17/15
**ways [3]** 11/20 22/19 103/21
**we [183]**
**we'll [3]** 80/6 98/19 107/20
**we're [38]** 4/9 10/25 19/23 30/2 31/4 35/1 35/8 36/18 39/14 39/20 40/12 41/19 43/24 46/23 47/2 52/20 53/15 54/10 54/11 54/16 54/16 54/16 54/17 59/22 62/18 63/19 65/20 66/15 67/12 68/22 70/20 73/19 73/20 74/16 77/2 80/21 84/6 107/7
**we've [16]** 5/10 9/18 36/8 40/14 48/10 53/14 53/22 55/3 62/25 65/24 69/25 70/10 73/23 74/15 79/2 95/18
**weathering [1]** 5/22
**web [1]** 13/16
**website [1]** 93/10
**Webster's [1]** 93/10
**Welcome [1]** 5/5
**well [54]** 3/12 5/11 6/3 6/6 8/15 10/8 12/8 20/16 23/21 30/25 35/5 35/10 36/14 40/7 42/7 54/18 56/21 57/8 58/22 59/2 59/7 60/1 60/12 60/13 60/20 61/18 61/23 64/4 64/6 64/18 67/22 68/14 72/18 74/11 75/23 76/19 77/2 77/16 77/17 77/22 78/22 80/25 81/3 82/18 83/10 87/4 95/6 95/9 97/16 98/7 101/18 102/14 103/5 104/8
**well-being [3]** 40/7 64/4 72/18
**well-pled [3]** 35/5 35/10 42/7

**Wenger [1]** 107/7
**67/14 77/11**
**were [23]** 7/11 7/11 9/15 10/5 12/20 17/8 18/1 27/17 28/18 31/21 32/19 37/5 40/17 41/1 45/12 49/10 49/22 51/13 58/13 66/7 77/5 80/14 80/16
**weren't [1]** 39/6
**West [3]** 57/12 57/13 57/18
**what [134]**
**what's [5]** 15/19 27/3 44/10 60/22 104/5
**whatever [5]** 26/6 34/11 48/2 70/17 79/12
**whatsoever [2]** 15/11 34/9
**when [51]** 3/6 8/13 10/2 10/24 11/18 15/8 15/18 24/16 28/15 28/16 29/13 31/15 31/20 32/10 32/23 37/2 37/3 37/20 39/8 40/12 42/6 44/24 45/8 45/18 54/8 55/13 56/14 57/17 58/6 59/16 60/3 60/10 65/1 68/23 71/17 73/22 77/10 77/13 79/3 79/20 83/12 83/12 87/6 97/1 98/8 99/16 100/2 101/5 101/8 106/15 106/17
**where [62]** 4/21 8/23 9/25 12/24 13/13 13/15 13/17 13/23 14/3 16/5 16/22 16/22 19/5 29/17 33/2 35/24 36/9 37/2 40/16 43/24 52/11 53/4 55/1 55/5 55/5 55/6 56/1 58/13 59/13 59/22 60/10 60/10 62/20 63/1 63/17 64/12 65/11 70/22 71/13 73/2 73/15 74/7 75/13 75/15 76/23 78/10 79/14 80/4 80/21 84/14 84/19 85/23 86/5 86/6 86/6 87/23 88/19 89/20 96/20 98/3 100/19
**wherever [1]** 55/8
**whether [38]** 20/2 21/21 21/22 23/5 23/8 24/14 24/15 24/16 46/19 47/18 48/7 59/5 61/14 66/10 68/19 74/5 89/22 92/19 93/17 96/20 97/5 97/8 97/21 97/22 97/22 97/23 97/23 101/5 101/6 101/20 101/22 102/10 102/11 102/11 103/13 103/17 104/11 107/5
**which [52]** 7/1 9/5 9/8 20/14 22/20 24/22 25/16 28/2 28/6 29/2 29/17 31/22 32/9 32/25 35/8 40/16 41/5 42/1 44/20 47/21 47/24 48/6

50/14 51/17 53/2 53/10 53/15 53/21 54/3 55/21 58/15 59/14 62/10 62/23 67/12 69/16 71/16 74/17 75/19 79/14 85/19 86/7 88/22 89/25 90/18 91/25 91/25 92/3 93/11 101/17 102/7 102/21
**while [5]** 45/7 98/22 98/25 100/23 102/25
**who [16]** 4/25 7/7 7/18 10/13 37/2 44/4 50/19 50/24 54/20 60/14 75/22 79/9 94/19 99/12 104/12 104/13
**whoever [2]** 12/3 107/13
**whole [4]** 22/18 47/20 58/5 74/12
**Wholly [1]** 10/25
**whom [4]** 24/16 104/19 105/5 105/13
**whose [1]** 66/6
**why [62]** 6/2 10/15 35/3 39/5 39/22 46/11 47/19 64/25 67/10 77/21 84/6 84/9 86/25 92/10 94/21 103/18
**wide [1]** 8/2
**wife [1]** 57/9
**will [19]** 8/15 8/21 9/2 20/14 31/12 32/12 34/22 41/8 47/19 50/9 63/9 68/24 78/23 83/7 88/3 93/23 100/13 100/14 103/6
**WILLIAMS [13]** 2/9 4/23 4/23 7/18 8/13 12/11 34/21 62/16 72/25 82/10 83/8 95/19 108/11
**Wisconsin [1]** 47/23
**wish [1]** 88/5
**withdraw [1]** 21/22
**within [14]** 22/5 22/21 23/4 26/15 29/15 31/6 34/3 63/5 74/17 85/15 97/9 99/18 106/1 106/14
**without [10]** 59/6 59/8 60/16 64/23 67/5 67/10 72/20 76/7 88/11 98/13
**won't [3]** 9/4 43/9 57/18
**wonderful [1]** 51/13
**words [11]** 28/7 33/4 34/2 42/16 44/15 58/16 60/25 61/12 63/11 70/12 88/22
**work [5]** 42/11 42/14 42/19 72/10 106/13
**working [1]** 4/9
**works [4]** 23/20 30/11 30/22 42/4
**world [1]** 54/7
**worries [4]** 34/25 61/16 69/4 100/23
**would [92]** 6/9 6/11

**W**

**would... [90]**  6/11 6/12
6/12 6/16 6/17 6/20
6/25 7/1 7/20 7/23 8/3
17/9 17/10 17/25 18/17
19/3 19/5 19/8 19/12
23/2 23/3 23/3 25/15
29/25 34/12 35/6 35/21
39/21 42/5 46/7 47/9
47/9 48/2 53/10 53/25
54/5 54/23 54/25 59/10
62/8 62/17 64/15 65/21
66/12 68/19 70/2 71/11
73/6 74/21 75/18 76/20
78/8 78/23 78/25 79/7
79/9 79/17 80/20 81/4
81/8 86/3 87/5 88/5
89/5 91/6 91/10 92/12
93/19 96/2 96/17 98/5
98/7 98/11 98/11 99/23
100/8 101/13 101/15
101/25 102/5 103/25
104/1 104/13 104/21
105/2 105/4 105/17
106/13 106/17 107/11
**wouldn't [2]**  94/8
106/25
**wrap [1]**  34/6
**wrapping [1]**  48/17
**writ [1]**  18/8
**written [2]**  50/11 50/12
**wrong [3]**  22/16 85/18
85/21
**wrongful [3]**  37/17
50/2 80/14
**wrongs [1]**  43/25
**wrote [1]**  31/20

**X**

**XMission [3]**  16/14
17/1 18/5
**XXXI [1]**  1/6

**Y**

**Yahoo [2]**  26/20 28/11
**yeah [5]**  4/1 4/12 18/21
18/25 28/16
**year [2]**  22/3 57/2
**years [4]**  7/19 41/25
73/21 90/19
**yes [26]**  7/6 9/21 11/14
19/8 19/15 20/13 20/15
20/22 27/20 28/4 28/13
29/10 29/19 50/17 53/2
53/3 61/8 75/7 76/16
81/14 83/10 84/8 86/11
98/2 101/16 106/13
**YOLO [1]**  89/5
**you [273]**
**you'll [5]**  40/1 65/15
75/1 75/4 75/8
**you're [20]**  11/7 11/9
18/22 18/23 27/16 28/9
29/7 29/13 29/20 29/20
29/23 50/6 60/2 65/1
76/16 79/18 79/18
79/20 89/14 89/14
**you've [9]**  5/13 7/15
9/15 9/16 10/7 18/22

**young [9]**  38/12 38/16
39/18 56/19 63/21
63/22 63/23 66/6 88/1
**younger [1]**  73/21
**your [165]**
**yours [1]**  5/13
**yourself [1]**  79/19

**Z**

**Ziencik [2]**  48/5 49/6
**Zoom [5]**  3/14 13/1
13/12 56/12 56/14

# EXHIBIT 8

# The State of New Hampshire

**MERRIMACK COUNTY**                    **SUPERIOR COURT**

THE STATE OF NEW HAMPSHIRE

v.

META PLATFORMS, INC. and INSTAGRAM, LLC

Docket No.: 217-2023-CV-00594

## <u>ORDER</u>

The plaintiff, the State of New Hampshire, brings this suit against the defendants, Meta Platforms, Inc. and Instagram, LLC for violations of the Consumer Protection Act ("CPA"), products liability, and negligence. The State's claims arise out of Meta's use of certain design features and the impact of those features on children in New Hampshire. Meta moves to dismiss. The State objects. The Court held a hearing on this matter on June 13, 2024. The parties submitted notices of supplemental authority following the hearing. For the following reasons, Meta's motion is DENIED.

## I.    Standard

In reviewing a motion to dismiss, the Court "assume[s] the truth of the facts as alleged in the plaintiff's pleadings and construe[s] all reasonable inferences in the light most favorable to the plaintiff." <u>Barufaldi v. City of Dover</u>, 175 N.H. 424, 427 (2022). The Court "need not assume the truth of statements in the plaintiff's pleadings, however, that are merely conclusions of law." <u>Sanguedolce v. Wolfe</u>, 164 N.H. 644, 645 (2013). "The standard of review in considering a motion to dismiss is whether the plaintiff's allegations are reasonably susceptible of a construction that would permit recovery."

1

This is a Service Document For Case: 217-2023-CV-00594
Merrimack Superior Court
12/11/2024 8:52 AM

Barufaldi, 175 N.H. at 427.  "This threshold inquiry involves testing the facts alleged in the pleadings against the applicable law."  Id.  "The trial court may also consider documents attached to the plaintiff's pleadings, or documents, the authenticity of which are not disputed by the parties, official public records, or documents sufficiently referred to in the complaint."  Id.  The Court will grant the motion "if the facts pled do not constitute a basis for legal relief."  Id.

## II.    Background

Meta is a Delaware corporation.  (Compl. ¶ 19.)  Meta owns and operates the social media platform, Facebook, and owns and operates the social media platform, Instagram, through its wholly-owned subsidiary, Instagram, LLC.  (Id. ¶ 20.)  Instagram, LLC is also a Delaware corporation.  (Id. ¶ 21.)  The Court refers to the defendants collectively as "Meta" and to Facebook and Instagram as the "Social Media Platforms" or the "Platforms."

### A.  Usage of the Social Media Platforms

In 2023, Facebook had over 226 million active monthly users in the United States, representing 68% of the population, including over ten million of those users under eighteen.  (Id. ¶ 49.)   Nearly one million of those users lived in New Hampshire, representing 68% of residents, including 34,063 users under eighteen, representing 13.49% of the under-eighteen population.  (Id. ¶¶ 27, 49.)  That same year, Instagram had over 192 million active monthly users in the United States, over 58% of the population, with 32,389,032 under eighteen.  (Id. ¶ 50.)  733,019 of those users lived in New Hampshire, representing over 52% of residents, including 89,339 users under eighteen, representing 35% of the under-eighteen population.  (Id. ¶¶ 27, 50.)  In April

2

2023, Meta's internal data showed that 55,885 New Hampshire teenagers were active daily Instagram users.  (Id. ¶ 52.)  In 2022, 62% of teenagers reported using Instagram.  (Id. ¶ 51.)  The rate is higher for teenage girls.  (Id.)  Almost half of those teenagers reported checking Instagram at least once a day, 27% reported checking it several times a day, and 10% reported checking it almost constantly.  (Id.)

    B.  <u>Meta's Advertising</u>

To fully access the Social Media Platforms, users must agree to Meta's Terms of Use.  (Id. ¶ 35.)  By doing so, users consent to Meta collecting and using their data for monetization and creation of personalized algorithms.  (Id.)  Meta then sells advertising space to marketers and, utilizing user data, allows them to target users by location, demographics, interests, and behaviors.  (Id. ¶ 29.)  Meta also allows advertisers to target "designated market areas," which include Manchester, New Hampshire.  (Id. ¶ 30.)  In 2023, Meta derived $542,835,568 from advertisement revenue from users with ties to New Hampshire.  (Id.)  In addition to paying for advertisements, advertisers directly contract with "content creators," including children, to promote their products on Instagram.  (Id. ¶ 47.)

Meta's monetization centers on maximizing the amount of time users spend on the app and the amount of data collected from each user.  (Id. ¶ 33.)  Meta intentionally designs its Social Media Platforms to maximize user engagement, and, thus, maximize profits.  (Id.)  Meta monetizes user data by (1) selling targeted advertising and (2) feeding users personalized algorithms to maximize their time spent on the app.  (Id. ¶ 34.)

Meta is financially motivated to attract and maintain children on its Social Media Platforms because teenagers are "one of the most valuable advertising demographics." (Id. ¶ 42.) Since at least 2015, Meta has focused on increasing the time teens spend on its Social Media Platforms. (Id.) In 2019, one of Instagram's quarterly goals was to hit two million hours of teen watch time on IGTV (Instagram's former long-form video feature). (Id. ¶ 44.) Further, an internal email circulated in September 2018 revealed that Meta discusses its youngest users in terms of their "lifetime value" to the company. (Id. ¶ 45.) However, Meta has publicly denied placing monetary value on children. (Id. ¶ 46.) In 2021, Senator Amy Klobuchar asked Antigone Davis, Meta's Global Head of Safety, what Meta believed the lifetime monetary value of children users was, to which Ms. Davis responded, "that's just not the way we think about it" and "[t]hat's just not how we think about building products . . . for young people." (Id.) Instagram has become Meta's most successful social media platform in attracting and retaining child users. (Id. ¶ 48.) Because of that, the State alleges that "Meta intentionally includes manipulative design features in its Social Media Platforms that it knows are particularly effective in increasing compulsive and excessive use in teens." (Id. ¶ 53.)

C. Alleged Addictive Features

The State alleges that "Meta intentionally includes manipulative design features in its Social Media Platforms that it knows are particularly effective in increasing compulsive and excessive use in teens." (Id. ¶ 53.) Thus, the State asserts that Meta employs these design features to trick children into spending as much attention and time as possible on its Social Media Platforms and maximize Meta's profits. (Id. ¶ 56.) The United States Surgeon General has identified certain harmful design features that

overlap with those included in the State's complaint, including personalization algorithms, alerts, infinite scroll, and Reels.  (Id.)

      i.  <u>Personalization Algorithms</u>

Meta uses personalization algorithms across its Social Media Platforms, including on Instagram's Main Feed (the scrolling presentation of content immediately visible upon opening the app) and Explore Feed (another scrolling presentation of algorithmically curated content that can be optionally guided by a user's input of text in a search box).  (Id. ¶ 57.)  In 2016, Meta changed Instagram's user feeds to incorporate personalization algorithms.  (Id. ¶ 58.)  Previously, users' feeds were in reverse chronological order.  (Id.)

The personalization algorithms serve users categories of content based on a sequencing method psychologists refer to as "variable reinforcement schedules" or "variable reward schedules."  (Id.)  Variable reward schedules work by periodically delivering types of content in an unpredictable pattern that trigger a release of dopamine in the user.  (Id. ¶ 60.)  Dopamine is a neurotransmitter released in anticipation of a potential reward and is associated with pleasure.  (Id.)  However, dopamine neurons only fire for a relatively short period of time and, afterwards, an individual may become "disheartened and disengaged."  (Id.)  Meta's personalization algorithms manipulate the dopamine responses in its child users, inducing them to engage repeatedly with Meta's products.  (Id. ¶ 61.)

The State alleges that personalization algorithms are particularly effective on, and dangerous to, children because they have incomplete brain maturation, lack of impulse control, and reduced executive functions.  (Id. ¶ 63.)  The personalization

5

algorithm's ability to learn more about the user as they scroll allows it to display more of what will keep the user hooked, known as "presence amplification," pushing them into a "rabbit hole" of increasingly more extreme content. (Id. ¶¶ 65, 67.) When a user experiences preference amplification the absence of other, more moderate information makes it difficult for the user to get out of a rabbit hole. (Id. ¶ 68.) In 2021, Meta internally acknowledged how Instagram's personalization algorithms take children "into negative spirals & feedback loops that are hard to exit from." (Id.)

ii. Alerts

When a user installs the Instagram app on their phone, Instagram employs a range of alerts in response to certain in-app activities. (Id. ¶ 70.) Alerts are delivered to a user's phone via vibrations, visuals, sounds, in-app notifications, and emails. (Id. ¶ 71.) These alerts are designed to increase children's engagement by taking advantage of neurological and psychological phenomena to trigger sudden dopamine releases. (Id.) The alerts allow Meta to disrupt its users at any time to encourage them to return to the Social Media Platforms. (Id. ¶ 72.) The notifications trigger users' fear of missing out ("FOMO") and leads to them consistently checking the Social Media Platforms. (Id. ¶ 77.)

Alerts are harmful for children and Meta knows that "smartphone notifications cause inattention and hyperactivity among teens, and they reduce productivity and well-being." (Id. ¶ 74 (brackets omitted).) Research has shown teenagers check their phone on average 51 times per day, with some teens checking their phone over 400 times per day. (Id. ¶ 76.) During that period, the teenagers received a median of 237 notifications on their phones per day, with some users receiving as many as 4,500 in a day. (Id.)

6

While users are able to disable notifications, they are enabled by default and the addictive elements of the Social Media Platforms are a barrier for children to take the step to disable them.  (Id. ¶¶ 71, 77.)

      iii.   Infinite Scroll and Autoplay

In 2016, Instagram debuted "infinite scroll."  (Id. ¶ 78.)  Infinite scroll is a method of content delivery that partially displays additional content at the bottom of the user's screen, such that the user is typically unable to look at a single post in isolation, and automatically loads new content as the user scrolls.  (Id.)  This format makes it difficult for children to disengage with the Social Media Platform because there is no natural end point.  (Id. ¶ 79.)  Meta does not allow users to turn off infinite scroll.  (Id. ¶ 80.)  Similarly, Meta uses an "autoplay" feature on Instagram "Stories," which keeps the user watching unless the user takes affirmative action to disengage.  (Id. ¶ 81.)  Facebook users are able to turn off autoplay but disabling the feature on Instagram is difficult for users.  (Id. ¶ 82.)

      iv.   Ephemeral Content

In 2016, Meta started implementing ephemeral content features in its Social Media Platforms.  (Id. ¶ 84.)  Ephemeral content is only temporarily available to users with notifications and visual design cues indicating that the content will soon disappear forever.  (Id. ¶ 85.)  This type of content encourages users to frequently check the Social Media Platforms and induces a sense of FOMO in children.  (Id. ¶¶ 84–85.)  Two examples of ephemeral content are Instagram's "Stories," which contains content that is only available for a short time, and "Instagram Live," which contains content only available while the creator is live-streaming.  (Id. ¶¶ 87–88.)  Meta informs users of

Instagram Live content by sending a push notification to users that reads, "[@user] started a live video. Watch before it ends!" (Id. ¶ 89.) An executive summary circulated internally in 2016 indicated that the goals of live content were to increase the time users spent watching these videos, specifically teenagers. (Id. ¶ 90.)

  v.  <u>Reels</u>

In 2020 and 2021, Meta introduced "Reels" which present short-form videos based on data collected from each user. (Id. ¶ 92.) Similar to infinite scrolling, Reels automatically plays as the user swipes the screen to the next video. (Id. ¶ 93.) As of April 2023, Reels were limited to 15 to 90 second video clips. (Id.) The short nature of the videos and the frameless way it fills a user's screen ensure the user will not get bored and close the app. (Id.) Meta's investment in Reels was specifically designed to attract and increase youth engagement. (Id. ¶ 94.)

  D.  <u>Use of the Social Media Platforms and Corresponding Harm to Children</u>

The State alleges that the harms the Social Media Platforms cause all users are particularly acute in children. (Id. ¶ 101.) During adolescence, children's risk-taking behavior is at its peak and their self-esteem is vulnerable. (Id. ¶ 102.) Children's brain regions associated with a desire for risk-taking, attention, peer feedback, and reinforcement are sensitive and regions associated with maturity and impulse control are not fully developed. (Id.) For these reasons, teenagers are more susceptible to misinformation, peer pressure, and false images on social media. (Id.) The United States Surgeon General has recognized that "the current body of evidence indicates that while social media may have benefits for some children and adolescents, there are ample indicators that social media can also have a profound risk of harm to the mental

health and well-being of children and adolescents." (Id. ¶ 104.) Meta has considered but rejected design changes after finding that those changes would decrease the danger of harm to children, but also decrease engagement. (Id. ¶ 105.)

Children who use social media for at least five hours per day are many times more likely to have clinically relevant symptoms of depression than non-users. (Id. ¶ 106.) During the same period in which social media use increased, the rate of teenagers suffering from severe mental health problems and suicide, both nationally and in New Hampshire, also increased by significant margins. (Id. ¶¶ 116–17, Figures 2 and 3.) Frequent social media use has been associated with distinct changes in the developing brain in the amygdala, which is vital for impulse control and emotional regulation and could increase adolescent sensitivity to reward and punishment. (Id.) These brain changes track the changes experienced by people who become addicted to gambling or drugs. (Id. ¶ 107.) Frequent social media use is also linked to disruptions in children's sleep, which can cause or worsen depression and anxiety. (Id. ¶ 109–10.) Meta has been aware since 2019 that excessive social media use is correlated with sleep problems. (Id. ¶ 111.) In 2021, more than 75% of New Hampshire teenagers reported getting fewer than eight hours of sleep on an average school night, with more than 20% reporting getting five or fewer hours of sleep. (Id. ¶ 113.)

E. Meta's Knowledge of the Harms Caused by its Social Media Platforms

The State alleges that Meta is aware that a majority of its users suffer from problematic use of Social Media Platforms and that such use has a serious effect on users' sleep, relationships, mental health, and general well-being. (Id. ¶¶ 100, 111.) The State alleges that Meta is aware that teenagers are more susceptible to its

addictive design features and are more likely to excessively use its Platforms. (Id. ¶¶ 122–25.)

Meta's internal data supports these allegations. In 2020, internal Meta statistics showed that teenagers are 40% more likely to spend five or more hours per day, and at least 28 hours per week, on Instagram than non-teenagers. (Id. ¶ 123.) Meta's internal research concluded,

> Teen brains are much more sensitive to dopamine, one of the reasons that the risk of drug addiction is higher for adolescents and it's the same thing that keeps them scrolling and scrolling. Due to the immature brain, they have a much harder time stopping even though they want to—our own product foundation research has shown teens are unhappy with the amount of time they spend on our app.

(Id. ¶ 125.) In 2020, Meta started a project to better understand teenagers, including their brain development. (Id. ¶ 126.) Meta's research resulted in similar conclusions to those outlined supra Section D. (See generally id. ¶¶ 126–38.)

While the Social Media Platforms have "time-management tools," including notifications and reminders to stop scrolling, most users dismiss them. (Id. ¶ 140.) Meta knows those tools are ineffective at counteracting compulsive and excessive use. (Id.) Meta has considered but rejected design changes after finding that those changes would decrease the danger of harm to children, but also decrease engagement. (Id. ¶¶ 105, 141.)

F. Meta's Alleged Misrepresentations

Meta, through its own publications, public statements, and testimony of corporate officers, has stated that well-being of its users is a top priority. (Id. ¶¶ 144 ,150.) However, the State alleges these public statements are at odds with Meta's internal surveys, research, and reports, and, in some cases, with its own officers' testimony. (Id.

¶¶ 144-229.)  Specifically, the State alleges Meta has made misrepresentations regarding the safety of the Social Media Platforms, (id. ¶¶ 144–46, 165,) Meta's intention to prioritize well-being over user engagement, (id. ¶¶ 205–29,) and the prevalence of user exposure to harmful and predatory content served by Meta's algorithms, (id. ¶¶ 146–64.)

### III.    Analysis

The State brings claims against Meta for violations of the CPA (RSA 358-A:2) for unfair acts or practices for its manipulative and addictive design features (Count I), violations of the CPA (RSA 358-A:2) for deceptive practices (Count II), strict products liability for defective design (Count III), strict products liability for failure to warn (Count IV), and negligence (Count V).  Meta moves to dismiss all claims, arguing that this Court lacks personal jurisdiction over it, Section 230 of the federal Communications Decency Act and the First Amendment of the United States Constitution bar the State's claims, the two CPA counts fail to state a claim, and the State lacks standing to pursue its common law claims for strict products liability and negligence and does not state a viable claim under those theories.  The Court addresses each argument in turn.

### A.  Personal Jurisdiction

The standard of review on a motion to dismiss for lack of personal jurisdiction varies according to the case's procedural posture.  Seward v. Richards, 174 N.H. 401, 406 (2021).  "While the general rule applicable to motions to dismiss is that all facts properly pleaded by the plaintiff are deemed true . . . when those facts relate to personal jurisdiction, the plaintiff must offer affirmative proof."  Staffing Network, Inc. v. Pietropaolo, 145 N.H. 456, 457 (2000).  In the absence of an evidentiary hearing, the

Court applies a prima facie standard to determine whether personal jurisdiction is met. Id.

"Determining whether a court may exercise personal jurisdiction over a defendant contemplates a two-part analysis." Seward, 174 N.H. at 407. "First, the State's long-arm statute must authorize such jurisdiction. Second, the requirements of the federal Due Process Clause must be satisfied." Id. New Hampshire's long-arm statute, RSA 510:4, authorizes the exercise of personal jurisdiction to the extent permissible under the Due Process Clause. Id. Accordingly, the Court's analysis depends upon due process. Id.; RSA 510:4, I.

"Under the Federal Due Process Clause, a court may exercise personal jurisdiction over a non-resident defendant if the defendant has minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Seward, 174 N.H. at 407. "Minimum contacts is not necessarily a numbers game; in order to be subject to the jurisdiction of the forum state, a nonresident need only have one contact with the forum, so long as the contact is meaningful." Id. "Jurisdiction can be 'general,' where the defendant's contacts with the forum State are continuous and systematic, or 'specific,' where the cause of action arises out of or relates to the defendant's forum-based contacts." Id. Here, the parties solely address whether the Court can exercise specific personal jurisdiction over Meta. Accordingly, the Court focuses its analysis on that inquiry.

"To determine whether exercising specific personal jurisdiction over the defendant[] comports with due process, [the Court] examine[s] whether: (1) the contacts relate to the cause of action; (2) the defendant[] ha[s] purposefully availed [itself] of the

12

protection of New Hampshire's laws; and (3) it would be fair and reasonable to require the defendant[] to defend the suit in New Hampshire."  Seward, 174 N.H. at 407–08.  "Each factor must be evaluated on a case-by-case basis, and all three factors must be satisfied for the exercise of jurisdiction to be constitutional."  Id. at 408.  "Questions of specific jurisdiction are always tied to the particular claims asserted."  Id.

The Court begins with the relatedness factor.  "To satisfy the relatedness factor, there must be more than just an attenuated connection between the contacts and the claim; the defendant's in-state conduct must form an important, or at least material, element of proof in the plaintiff's case."  Id. at 409.  "The relatedness test is a flexible, relaxed standard, and the court's assessment of relatedness is informed by the concept of foreseeability."  Id.  For tort claims, the relatedness inquiry "focuses on whether the defendant's in-forum conduct caused the injury or gave rise to the cause of action."  United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 622 (1st Cir. 2001).  Further, to satisfy specific personal jurisdiction, "a plaintiff must link the defendant's suit-related conduct to the forum.  Mere market exploitation will not suffice."  Johnson v. TheHuffingtonPost.com, Inc., 21 F.4th 314, 324 (5th Cir. 2021).

Meta argues that the State's claims do not relate to Meta's contacts with New Hampshire.  The State's claims arise out of Meta's alleged addictive design features and its misrepresentations and omissions.  Meta contends that this conduct did not occur in New Hampshire and, therefore, it cannot serve as a basis for personal jurisdiction.  Meta rejects any attempt by the State to rely on its advertising and marketing to support personal jurisdiction because its advertising and marketing does not serve as a basis for the State's claims.  (Id.)  The State responds that its claims

13

arise directly out of Meta's contacts with New Hampshire, namely; its relationships with hundreds of thousands of New Hampshire residents, including children; the design features it implements on Social Media Platforms used by New Hampshire residents; and its deceptive conduct which has played a role in inducing New Hampshire residents' use of the Platforms.

In Walden v. Fiore, 571 U.S. 277, 279 (2014), the Supreme Court held that a Nevada court could not "exercise personal jurisdiction over a defendant on the basis that he knew his allegedly tortious conduct in Georgia would delay the return of funds to plaintiffs with connections to Nevada" where "the defendant had no other contacts with Nevada." The Walden Court noted that its holding was consistent with Calder v. Jones, 465 U.S. 783 (1984). Walden, 571 U.S. at 289–90. In Calder, the Court held that a California court could exercise personal jurisdiction over Florida defendants whose "intentional, and allegedly tortious, actions were expressly aimed at California." 465 U.S. at 785–86. Under Walden and Calder, the proper inquiry is not merely whether New Hampshire residents suffered an injury but whether Meta's conduct connects it to New Hampshire in a "meaningful way." Walden, 571 U.S. at 290.

The Supreme Court has referred to the following as a "paradigm example": the defendant "extensively promoted, sold, and serviced" vehicles in the forum states and the plaintiffs resided in the forum states, used the allegedly defective vehicles in the forum states, and suffered injuries in the forum states. Ford Motor Co. v. Mont Eighth Jud. Dist. Ct., 592 U.S. 351, 366 (2021). These facts created an "affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that t[ook] place." Id. at 370.

Meta's contacts with New Hampshire relate to the State's claims alleging harm caused by Meta's implementation of features on its Social Media Platforms used by New Hampshire residents and Meta's misrepresentations which have induced New Hampshire residents to use its Social Media Platforms. In coming to this conclusion, the Court relies on the following facts pleaded by the State. Meta offers an interactive Social Media Platform accessible to New Hampshire citizens. While users need not pay to use the Platforms, Meta harvests users' personal data. (Compl. ¶ 34.) Meta then sells targeted advertising, based on that collected data, and employs addictive features on the Platforms to increase the amount of user time spent, increasing the amount of data Meta can collect and sell advertising for. (Id.) It is this core business model which is alleged to have harmed New Hampshire children. Meta's contacts with New Hampshire—its service agreements with users, collection of personal data, and sale of advertising based on that data—are inherently connected with the use of addictive design features at issue in this matter which further its business model. In a similar manner to Ford Motor Co., Meta extensively promotes its Platforms in the forum state, enters service agreements and collects data of residents of the forum state, and those residents use Meta's Platforms in the forum state and suffered injuries in the forum state. Cf. 592 U.S. at 366.

The Court disagrees with Meta that its geographically targeted advertising and marketing are unrelated to the State's claims. Meta permits advertisers to target designated market areas, including Manchester, New Hampshire, and otherwise target users based on their location, demographics, interests, and behaviors. (Compl. ¶¶ 29–30, 38–39.) Meta is able to offer targeting advertising by harvesting users' data. (Id.)

This incentivizes Meta to keep users on its Platforms for the maximum amount of time to increase the amount of data harvested. To keep users on its Platforms, Meta employs the addictive design features that form the basis of the State's claims. This distinguishes the State's claims from matters in which a plaintiff's claims in no way relate to a defendant's use of geographically targeted advertising. See Johnson v. TheHuffingtonPost.com, Inc., 21 F.4th 314, 321 (5th Cir. 2021) (holding that the defendant's use of geographically targeted advertising did not relate to the plaintiff's libel claim).

Put simply, Meta derives its profits from users viewing and interacting with advertisements on its Social Media Platforms. To drive engagement, Meta designs and employs the addictive design features that form the basis of the State's claims. For this reason, Meta's targeted advertising efforts are not only related but integral to the State's claims.

For the foregoing reasons, assuming the facts alleged in the State's complaint as true and construing all inferences in the State's favor, the State has demonstrated the relatedness factor of the specific personal jurisdiction test.

The Court next turns to the purposeful availment prong of the specific personal jurisdiction test. "The second prong of the due process analysis considers whether the defendants have purposefully availed themselves of the protection of New Hampshire's laws." Seward, 174 N.H. at 411–12. "To satisfy the second requirement, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protection of that state's laws and making the defendant's involuntary presence before the state's

courts foreseeable." Id. ¶ 412. "Purposeful availment requires both foreseeability and voluntariness." Id. "Voluntariness requires that a defendant's contacts with the forum state proximately results from actions by the defendant." Id. "The contacts must be deliberate and not based on the unilateral actions of another party, and cannot be merely fortuitous, but rather, the defendants must have purposefully directed actions at New Hampshire." Id. "Foreseeability requires that the contacts must be of a nature such that a defendant could reasonably anticipate being haled into court here." Id.

Meta argues that its alleged conduct does not demonstrate that it purposefully availed itself of the protection of New Hampshire's laws because the conduct was not specifically directed at New Hampshire. The State responds that Meta purposefully directed commercial activities to New Hampshire by, (1) advertising, marketing, and distributing its Social Media Platforms to New Hampshire consumers and making substantial profits from selling user data, (2) entering into contracts with each of its New Hampshire users, and (3) encouraging children in New Hampshire to use its products.

In Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 773–74 (1984), the Court found that there was specific jurisdiction over the defendant publisher where it had no employees or offices in the forum, did not expressly aim its publication or conduct at the forum, and magazine sales in the forum made up only a small fraction of the defendant's total sales, but the defendant circulated 10,000 to 15,000 copies of its magazine to subscribers in the forum each month. The Court reasoned that the defendant "continuously and deliberately exploited" the forum's market. Keeton, 465 U.S. at 781. Because the defendant produced "a national publication aimed at a nationwide audience," there was "no unfairness in calling it to answer for the contents of

17

that publication wherever a substantial number of copies are regularly sold and distributed." Id.

The Keeton Court's reasoning applies here, despite Meta's arguments distinguishing operating the Social Media Platforms from physically distributing magazines. Meta's Platforms are accessible to New Hampshire users. More than that, in exchange for the use of the Platforms, Meta harvests users' personal information and sells it to advertisers, which advertise on the Platforms. See uBID, Inc. v. GoDaddy, Inc., 623 F.3d 421, 427–28 (7th Cir. 2010) (determining that website operator defendant had minimum contacts with the forum because it exploited the forum's market and engaged in extensive national advertising, despite the fact that it did not specifically target forum residents through advertising). Like the publisher in Keeton, Meta has specific connections with New Hampshire and furthers those connections each time it contracts with users to offer its Platforms in exchange for their data. This is voluntary contact with the forum state and its citizens. See Seward, 174 N.H. at 412. While Meta argues that its contacts with New Hampshire are based on the unilateral activity of New Hampshire users, its harvesting and sale of New Hampshire users' data causes the Court to disagree. For these reasons, it is foreseeable that Meta's contacts with New Hampshire are such that it should reasonably anticipate being haled into court here. See id.

The parties dispute the applicability of the sliding scale framework outlined by Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119 (W.D. Pa. 1997). The Court need not rely on Zippo's sliding scale framework because, as discussed, Meta has done more than operate a website accessible in the forum. This is not a case where the

defendant operates a website simply visible in the forum, see McBee v. Delica Co., Ltd., 417 F.3d 107, 124 (1st Cir. 2005), or an interactive website, see Gullen v. Facebook.com, Inc., No. 15 C 7681, 2016 WL 245910, at *3 (N.D. Ill. Jan. 21, 2016).[1] Rather, the State alleges that Meta designed an addictive application, collects personal data from New Hampshire users, sells that personal data to advertisers, and profits from advertisers' ability to target their advertisements to New Hampshire users based on their location and preferences learned from the data collected by Meta. (Compl. ¶¶ 36–38.) This is conduct directly targeted to New Hampshire. Meta's engagement in similar conduct elsewhere does is irrelevant to this Court's analysis. Therefore, the Court concludes that Meta has purposefully availed itself of jurisdiction in New Hampshire courts.

Lastly, the Court addresses the fairness and reasonableness of exercising jurisdiction over Meta. The third and final prong of the specific personal jurisdiction test asks, "whether it would be fair and reasonable to require the defendants to defend the suit in New Hampshire." Seward, 174 N.H. at 413. "For this determination, [the Court] examine[s] the five so-called 'gestalt factors,' which are: the burden on the defendant; the forum state's interest in adjudicating the dispute; the plaintiff's interest in obtaining convenient and effective relief; the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several states in furthering fundamental substantive social policies." Id.

---

[1] While Facebook.com was the defendant in Gullen, there were no similar facts, as are present in the State's complaint, about the defendant's profits derived from the forum, its collection of data for the purposes of advertising, or its sale of that data to advertisers.

Meta argues that forcing it to litigate in New Hampshire is unfair because its place of business in California is an appreciable distance from New Hampshire and attorneys general from 33 other states are pursuing similar litigation in a consolidated action in California (the "MDL Litigation"). See In re Social Media Adolescent Addiction/Personal Injury Prod. Liability Litig., No. 4:23-cv-05448-YDR, 4:23-cv-05885-YGR (N.D. Cal. Oct. 15, 2024). Meta asserts that efficiency calls for litigating the State's claim with the others in California. The State contends that the burdens of modern travel are minimal and that it is not unfair to require Meta to defend itself in the forum wherein the State seeks to protect hundreds of thousands of forum consumers.

The Court begins with the first gestalt factor: the burden on the defendant. While Meta is headquartered in California, it is a large corporation capable of defending itself anywhere. Meta's Social Media Platforms, Facebook and Instagram, had over 418 million combined users in the United States in 2023. "Because suit in a foreign jurisdiction always burdens a foreign company, the defendant must establish that the Court's exercise of jurisdiction would be onerous in a special, unusual, or other constitutionally significant way." State v. N. Atlantic Refining Ltd., 160 N.H. 275, 286 (2010). The Court cannot say, with Meta's vast reach including into New Hampshire as outlined supra, that exercising jurisdiction would be special, unusual, or constitutionally significant. With respect to the second factor, New Hampshire has a strong interest in obtaining relief in its courts for harms allegedly committed against its citizens. See Benitez-Allende v. Alcan Aluminio do Brasil, S.A., 857 F.2d 26, 31 (1st Cir. 1988). Further, "New Hampshire also has a strong interest in protecting the legitimacy of its court judgments." Seward, 174 N.H. at 413. The third factor also weighs in favor of

exercising jurisdiction because the State's interest in obtaining convenient and effective relief is furthered by providing it a means to pursue redress in its home courts. The fourth factor weighs against exercising jurisdiction because the most efficient resolution is the consolidated litigation of other similar suits in the multi-district litigation venued in California district court. Finally, exercising jurisdiction supports the "shared interest of the several states in furthering fundamental substantive social policies." The states have an interest in protecting their citizens from harm and obtaining relief in their own courts.

Accordingly, having considered the gestalt factors, the Court determines it is fair and reasonable to exercise jurisdiction over Meta.

Altogether, the Court determines it can exercise specific personal jurisdiction over Meta because it has purposefully availed itself of the Court's jurisdiction, its contacts with New Hampshire are related to the conduct underlying the State's claims, and it is fair and reasonable to exercise jurisdiction here. Seward, 174 N.H. at 407. Having found that the Court may exercise personal jurisdiction over Meta, the Court turns to Meta's arguments on the merits.

B. Section 230 of the Communications Decency Act

Meta argues that Section 230 of the Communications Decency Act ("Section 230") bars the State's claims because they treat Meta as a publisher of third-party content. Because Section 230 is an affirmative defense, dismissal is only proper if Meta's immunity is evident from the face of the complaint. Teatotaller, LLC v. Facebook, Inc., 173 N.H. 442, 449 (2020) (quoting Force v. Facebook, Inc., 934 F.3d 53, 63 n. 15 (2d Cir. 2019)).

In 1996, Congress enacted Section 230 "to promote the continued development of the Internet" and "to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material," among other policies. 47 U.S.C. § 230(b)(1), (4). To achieve these goals, Section 230 immunizes interactive computer service providers, like Meta, from legal claims that treat them as a publisher or speaker of third-party content. See 47 U.S.C. § 230(c)(1), (e)(3). While courts have interpreted Section 230 to "broadly immunize internet companies from liability . . . this immunity is not limitless." Calise v. Meta Platforms, Inc., 103 F.4th 732, 736 (9th Cir. 2024).

To determine whether Section 230 immunity applies to a given case, courts employ a three-prong test. Under this test, Section 230 only protects "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." Teatotaller LLC, 173 N.H. at 450 (quoting Universal Commc'n v. Lycos, Inc., 478 U.S. 413, 418 (1st Cir. 2007)); see also Calise, 103 F.4th at 740; Lemmon v. Snap, Inc., 995 F.3d 1085, 1091 (9th Cir. 2021); Barnes v. YAHOO!, Inc., 570 F.3d 1096, 1100–01 (9th Cir. 2009).

It is undisputed that Meta is a provider of an interactive computer service and therefore satisfies the first prong. To analyze the second and third prongs, the Court must determine whether it is evident from the face of the complaint that each of the State's claims treat Meta as a publisher or speaker of third-party content. This determination rests upon the State's theory of liability in each count. See Teatotaller,

22

LLC, 173 N.H. at 451; Calise, 103 F.4th at 740 (stating that courts must "examine each claim to determine whether a plaintiff's <u>theory of liability</u> would treat a defendant as a publisher or speaker of third-party content") (emphasis in the original).  Thus, the Court must examine Meta's duty under the State's theories of liability.  As explained by the Ninth Circuit in <u>Calise</u>,

> We must therefore examine two things in looking at duty.  First, what is the "right" from which the duty springs?  If it springs from something separate from the defendant's status as a publisher, such as from an agreement, or from obligations the defendant has in a different capacity, then [Section 230] does not apply.  Second, we ask what is this duty requiring the defendant to do?  If it obliges the defendant to "monitor third-party content"—or else face liability—then that too is barred by [Section 230].

<u>Id</u>. (cleaned up).

In <u>Lemmon</u>, the Ninth Circuit examined the duty of social media companies to design reasonably safe products.  There, the parents of two boys who died in a high-speed car accident sued Snap, Inc. ("Snap"), alleging that Snap negligently designed its social media platform, Snapchat.  <u>Lemmon</u>, 995 F.3d at 1087.  Like Instagram and Facebook, Snapchat is a social media platform that allows users to share photos and videos with other Snapchat users.  <u>See id</u>. at 1088.  To promote user engagement, Snapchat provides users with rewards such as "trophies, streaks, and social recognitions," but does not tell users how to earn these rewards.  <u>Id</u>.  At the time, Snapchat had developed a "speed filter," which allowed users to superimpose their real-life speed atop user-created content.  <u>Id</u>.  The plaintiffs alleged Snapchat knew or should have known that its users believed that Snapchat would reward them for posting a "snap" at 100 miles per hour or over.  <u>Id</u>. at 1089.  While Snapchat warned users not to use the filter while driving, the warnings proved ineffective.  <u>Id</u>. at 1090.  The trial

court dismissed the plaintiffs' amended complaint, ruling that Section 230 barred their claim. Id.

On appeal, the Ninth Circuit reversed the trial court's decision and concluded that the plaintiffs' claim did not treat Snap as a publisher or speaker of third-party content because the cause of action focused on Snap's duty, as a manufacturer, to design a reasonably safe product. Id. at 1091–92. The court explained,

> [The plaintiffs'] negligent design lawsuit treats Snap as a products manufacturer, accusing it of negligently designing a product (Snapchat) with a defect (the interplay between Snapchat's reward system and the Speed Filter). Thus, the duty that Snap allegedly violated "springs from" its distinct capacity as a product designer. This is further evidenced by the fact that Snap could have satisfied its "alleged obligation"—to take reasonable measures to design a product more useful than it was foreseeably dangerous—without altering the content that Snapchat's users generate. Snap's alleged duty in this case thus "has nothing to do with" its editing, monitoring, or removing of the content that its users generate through Snapchat.

Id. at 1092 (cleaned up). In its analysis, the court conceded that Snap, in some capacity, acted as a publisher or speaker of third-party content, but concluded that was not enough to confer immunity under Section 230. Id. The court explained,

> That Snap allows its users to transmit user-generated content to one another does not detract from the fact that the [plaintiffs] seek to hold Snap liable for its role in violating its distinct duty to design a reasonably safe product. As in Internet Brands, Snap "acted as the 'publisher or speaker' of user content by" transmitting [the boys'] snap, "and that action could be described as a 'but-for' cause of [the boys'] injuries." This is unsurprising: Snap "is an internet publishing business. Without publishing user content, it would not exist. But though publishing content is "a but-for cause of just about everything" Snap is involved in, that does not mean that the [plaintiffs'] claim, specifically, seeks to hold Snap responsible in its capacity as a "publisher or speaker." The duty to design a reasonably safe product is fully independent of Snap's role in monitoring or publishing third-party content."

Id. at 1092–93 (citing Doe v. Internet Brands, Inc., 824 F.3d 846, 853 (9th Cir. 2016)).

The Court finds this reasoning persuasive and applicable here. While the State's complaint alleges that New Hampshire children are exposed to harmful content while using the Social Media Platforms, the thrust of the State's allegations in Counts I, III, and V are based on Meta's duty as a manufacturer to design reasonably safe products and allege that Meta's own conduct regarding the design of those products is defective.[2] This duty is independent of Meta's role as a publisher of third-party content. While the Northern District of California decided differently in the MDL Litigation, wherein Meta is a defendant, see In re: Social Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig., 702 F.Supp.3d 809, 830–33 (N.D. Cal. 2023), the Court finds its decision today to be consistent with persuasive authority, as well as the language and purpose of Section 230, see 47 U.S.C. § 230(b)(3), (4); Calise, 103 F.4th at 736 (reasoning that immunity under Section 230 is not limitless); Lemmon, 995 F.3d at 1092–93 (holding that Section 230 did not bar negligent design claim); Internet Brands, 824 F.3d at 853 (holding that Section 230 did not bar failure to warn claim).

To be clear, Section 230 protects Meta against any claims where the alleged harm arises from the substance of third-party content posted on the Social Media Platforms. See Force, 934 F.3d at 66 (finding Facebook was protected under Section 230 for harm resulting from Hamas content); Dyroff v. Ultimate Software Grp., Inc., 934 F.3d 1093, 1098 (9th Cir. 2019) (finding the defendant was protected under Section 230 when a user died from fentanyl toxicity after purchasing fentanyl from another user on the defendant's online service). However, the State alleges that Meta's product design features, in and of themselves, are harmful to New Hampshire children regardless of the

---

[2] The Court separately analyzes whether the Social Media Platforms are "products" in Section V, infra, regarding products liability.

substance of the third-party content displayed.  (Compl. ¶¶ 238, 241-44, 249, 281-84, 301, 315.)  Thus, the Court determines that Section 230 does not bar the State's claims within Counts I, III, and V.

To the extent that Meta argues that Section 230 immunizes them against aspects of Counts II, IV, and V involving Meta's alleged misrepresentations and failures to warn, the Court disagrees.  These counts are not based on Meta's role as a publisher of third-party content.  Rather, the duty alleged to be breached arises out of Meta's knowledge that its products harm New Hampshire children.  Thus, Section 230 does not bar these claims.  See Doe v. Internet Brands, Inc., 824 F.3d 846, 852–53 (finding that Section 230 does not bar failure to warn claims); In re Social Media Adolescent Addiction/Personal Injury Pro. Liability Litigation, 702 F. Supp. 3d 809, 834 (N.D. Cal. 2023) (same); Hiam v. HomeAway.com, Inc., 267 F. Supp. 3d 338, 346–47 (D. Mass 2017); aff'd, 887 F.3d 542 (1st Cir. 2018) (reasoning that claims based on publisher's own speech are not barred by Section 230).

IV.   First Amendment

Meta contends that the First Amendment and Part I, Article 22 of the New Hampshire Constitution protect its editorial discretion to disseminate third-party speech and, thus, bar the State's claims.  The State contends that its claims are not barred because the conduct challenged is not protected speech but, rather, Meta's implementation of addictive design features.  However, Meta argues that because its "content publication algorithms and other design choices are simply the means by which Meta presents and arranges speech, they 'fall squarely within the core of the First

26

Amendment security.'"  (Def.'s Memo. ISO Mot. to Dismiss at 16) (citing <u>Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston</u>, 515 U.S. 557, 570 (1995)).

Like Section 230, the First Amendment protects publishers' discretion to disseminate third-party speech and categorically protects publishers from liability for injuries arising out of that speech.  <u>See</u> <u>Miami Hearld Pub'g Co. v. Tornillo</u>, 418 U.S. 241, 258 (1974); <u>Moody v. NetChoice, LLC</u>, 144 S.Ct. 2383, 2393 (U.S. 2024) (comparing social media company's content moderation to traditional publishers' editorial choices, which "also select and shape other parties' expression into their own curated speech products").  Many courts, including the MDL court, have held that certain publishing decisions made by social media companies trigger First Amendment scrutiny.  <u>See</u> <u>In re Social Media Adolescent Addiction/Personal Injury Pro. Liability Litigation</u>, 702 F. Supp. 3d at 836 (applying First Amendment protection to the timing and clustering of notifications of Meta's own content); <u>NetChoice, LLC v. Florida</u>, 34 F.4th 1196, 1203–04, 1210 (11th Cir. 2022) (finding that social media companies engaged in protected speech when they expressed their political views through content moderation practices).

Thus, the First Amendment, like Section 230, immunizes Meta against any claims alleging harm arising from the substance of third-party content, as that conduct falls within a traditional publishing role.  <u>See</u> <u>Tornillo</u>, 418 U.S. at 258; <u>Reno v. ACLU</u>, 521 U.S. 844, 870 (1997).  However, because the Court has concluded that the thrust of the State's claims seeks to hold Meta accountable for the harm caused by the alleged addictive design features themselves, regardless of the substance of the third-party content disseminated, the Court similarly finds that the First Amendment does not bar

the State's claims.  See In re Social Media Adolescent Addiction/Personal Injury Pro.

Liability Litigation, 702 F. Supp. 3d at 836 (stating that Meta's briefing ignored that

"much of the conduct alleged by plaintiff does not constitute speech or expression" and

"d[id] not explain how holding them liable in that context would be akin to making them

liable for speech").

V.   Consumer Protection Act

The State asserts two claims alleging that Meta violated New Hampshire's

Consumer Protection Act ("CPA"), RSA 358-A:2.  In the first, Count I, the State alleges

that Meta violated the CPA by intentionally incorporating addictive design features and

algorithms into its Social Media Platforms despite its knowledge of the harm children

suffer from those features.  (Compl. ¶ 238.)  The State also alleges, in Count II, that

Meta violated the CPA by engaging in deceptive acts or practices, in particular: (1)

deceptively representing that the Social Media Platforms are safe and failing to disclose

and/or concealing information indicating the Platforms are not safe; (2) misrepresenting

that the Social Media Platforms are not designed to hook children; and (3)

misrepresenting that Meta prioritizes user well-being over profits.  (Compl. ¶¶ 260–62.)

Meta moves to dismiss both CPA claims on the following grounds: (1) the State

failed to identify unlawful conduct that took place in New Hampshire; (2) Meta is exempt

from CPA liability because it falls under the CPA's publisher exception; (3) the alleged

unfair or deceptive practices are not alleged to have occurred in the conduct of trade or

commerce; (4) both counts fail to state a claim; and (5) the State is not entitled to

restitution.  The Court addresses each argument in turn.

28

a. <u>Conduct in or Directed at New Hampshire</u>

Meta contends that the State's CPA claims must fail because the State has not alleged that the underlying conduct occurred in New Hampshire. Meta cites the fact that its principal place of business is in California and the State does not allege that Meta maintains offices, employees, or assets in New Hampshire. The State responds that the "offending conduct" occurred within New Hampshire because Meta's alleged misrepresentations were received by New Hampshire consumers and Meta's design features affected New Hampshire users.

RSA 358-A:2 makes unlawful the use of "any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." "Trade" and "commerce" include "the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this state." RSA 358-A:1, II; <u>LaChance v. U.S. Smokeless Tobacco Co.</u>, 156 N.H. 88, 96 (2007) (emphasizing the broad sweep of the CPA indicated by the language, "any trade or commerce directly <u>or indirectly</u> affecting the people of this state"). "The limitation in RSA 358-A:2 to 'conduct of any trade or commerce within this state' has been interpreted to mean that the statute only applies to offending conduct that took place in New Hampshire." <u>Environamics Corp. v. Ferguson Enter., Inc.</u>, No. Civ. 00-579-JD, 2001 WL 1134727, at *4 (D.N.H. Sept. 24, 2001).

The following decisions demonstrate a spectrum of whether a defendant's conduct satisfies the "within this state" element of the CPA. In <u>LaChance</u>, the New

Hampshire Supreme Court held that the plaintiffs, who were purchasers of smokeless tobacco products from retail stores across New Hampshire, could bring a CPA claim against the defendants, who manufactured smokeless tobacco products and marketed them through in-store displays.  156 N.H. at 89 (addressing whether the plaintiff's claims satisfied the "trade or commerce" requirement, not specifically addressing the territorial requirement).  In Environamics, the court determined that the "within this state" requirement was satisfied where the defendant shipped a contaminated product to New Hampshire.  2001 WL 1134727, at *4.  Alternatively, the Precourt Court ruled that the defendant's conduct was not within the State of New Hampshire where it shipped its beef to a New York company which then incorporated the defendant's beef into another product which it distributed to New Hampshire.  Precourt v. Fairbank Reconstruction Corp., 856 F. Supp. 2d 327, 344 (D.N.H. 2012).

The Court determines that the State's allegations support that the conduct underlying the claims against Meta has a sufficient New Hampshire nexus.  The Court begins with the State's claims arising out of Meta's design features.  In 2023, Facebook and Instagram had 34,063 and 89,339 New Hampshire users under eighteen, respectively.  (Compl. ¶¶ 49–50.)  Meta also derived $542,835,568 from ad revenue sourced from New Hampshire users in 2023.  (Id. ¶ 40.)  Further, as explained above, supra Section A, Meta's algorithms are influenced by the data collected from New Hampshire users.  To say that Meta's alleged unfair or deceptive act or practice of incorporating addictive design features and algorithms into its Social Media Platforms used by tens of thousands of New Hampshire children is not conduct within this state is not credible.  Turning to the State's claims arising out of Meta's alleged

misrepresentations, the Court determines that the conduct likewise occurred "within this state" because New Hampshire children are alleged to have suffered from the impacts of Meta's misrepresentations and omissions.  (See id. ¶¶ 32, 261.)  Certain alleged misrepresentations are included on Meta's website, accessed by the tens of thousands of New Hampshire child users and New Hampshire adult users on a regular basis.  (See id. ¶ 145.)  For these reasons, the Court views the State's allegations as similar to those in LaChance and Environamics, satisfying the CPA's territorial requirement at the pleading stage.

The Court's decision is in accord with other jurisdictions that determined the CPA's territorial requirement was satisfied on a claim alleging a nationwide scheme under which New Hampshire citizens have suffered despite the conduct not directly occurring in New Hampshire.  See In re Niaspan Antitrust Litig., 42 F. Supp. 3d 735, 761 (E.D. Penn. 2014); In re Chocolate Confectionary Antitrust Litig., 749 F. Supp. 2d 244, 234–35 (M.D. Penn. 2010); In re DDAVP Indirect Purchaser Antitrust Litig., 903 F. Supp. 2d 198, 231 (S.D.N.Y. 2012).

b.  Publisher Exemption Under RSA 358-A:3, IV

Meta contends that it is exempt from liability under RSA 358-A because it is a publisher under RSA 358-A:3, IV.  The State argues that the exemption is inapplicable because the State seeks to hold Meta liable for its use of addictive design features and for its misrepresentations, not as a publisher of third-party content.

RSA 358-A:3 exempts certain persons or conduct from liability under RSA 358-A. One of those exceptions, RSA 358-A:3, IV, exempts from liability, "[p]ublishers, broadcasters, printers, or other persons engaged in the dissemination of information or

reproduction of printed or pictorial matter who publish, broadcast, or reproduce material without knowledge of its deceptive character." Cf. Karpinski v. Union Leader Corp., No. 18-cv-1214-PB, 2019 WL 3203144, at *8 (D.N.H. July 16, 2019) (analyzing RSA 358-A:3, IV where the suit arose out of the substance of an article published by the defendant newspaper).

The Court agrees with the State. For similar reasons outlined, supra Section B, addressing Meta's Section 230 arguments, the State seeks to hold Meta liable not for its publishing of certain content, but rather for the addictive features it implements into its Social Media Platforms and for the alleged misrepresentations it has made to the public. The State's CPA claims do not arise out of Meta's publishing of deceptive material. For that reason, RSA 358-A;3, IV does not apply.

### c. Conduct of Trade or Commerce

Meta argues that its alleged conduct does not constitute "conduct in any trade or commerce" because the State does not, and cannot, allege that users pay to use the Social Media Platforms. The State responds that Meta has engaged in "trade or commerce" in New Hampshire by exchanging the use of its Social Media Platforms for users' personal data.

"To determine whether the [CPA] applies to a particular transaction, [the Court] analyze[s] the activity involved, the nature of the transaction, and the parties to determine whether a transaction is a personal or business transaction." Hughes v. DiSalvo, 143 N.H. 576, 578 (1999) (declining to extend to the CPA to isolated sales of property by owners). The CPA defines "trade" and "commerce" as, "the advertising,

offering for sale, sale, or distribution of any services or any property . . . ."  RSA 358-A:1.  The Court must engage in statutory interpretation of the term "sale" in the CPA.

When engaging in statutory interpretation, the Court "first look[s] to the language of the statute itself, and, if possible, construe[s] that language according to it plain and ordinary meaning."  State v. Doyle, 176 N.H. 594, 597 (2024).  The Court "give[s] effect to every word of a statute whenever possible and will not consider what the legislature might have said or add language that the legislature did not see fit to include."  Id.  The Court "construe[s] all parts of a statute together to effectuate its overall purpose" and attempts to construe all parts "in harmony with the overall statutory scheme."  Id.

"Sale" is defined as "[t]he action or an act of selling or making over to another for a price; the exchange of a commodity for money or other valuable consideration."  Oxford English Dictionary, "Sale," July 2023; Matter of Carter, 2024 N.H. 30, ¶ 9 ("When a term is not defined in a statute, [the Court] look[s] to its common usage, using the dictionary for guidance.").  It is also defined as, "[t]he transfer of property or title for a price."  Black's Law Dictionary, "Sale," (12th ed. 2024).  Upon review of the plain meaning of "sale," the Court cannot say that it requires an exchange of money.  The Court declines to read words into the statute the legislature did not see fit to include.  See Doyle, 176 N.H. at 597.  Rather, a sale could be an exchange wherein consumers are able to access Meta's Social Media Platforms in exchange for a price—Meta's collection of their personal data.  While Meta does not charge for its product, it receives valuable consideration in the form of person information.  The State has alleged such an exchange, satisfying the "trade or commerce" element of the CPA at the pleading stage.  (See Compl. ¶ 34.)  The Court's conclusion is in accordance with the purpose of the

CPA: "to ensure an equitable relationship between consumers and persons engaged in business." Hughes, 143 N.H. at 578.

The Court notes that Meta originally relied upon a trial court decision from an Indiana court interpreting a similar state statute. See Indiana v. Tiktok, Inc., No. 02D02-2212-PL-400, 2023 WL 8481303, at *6 (Ind. Ct. Super. Nov. 29, 2023). That court determined that Tiktok's operation of an app, free to users, was not a "consumer transaction" under Indiana's comparable consumer protection act because users did not exchange money for use of the app. Id.; see also Ind. Code § 24-5-0.5-2(1) (defining a "consumer transaction" as "a sale, lease, assignment, award by chance, or other disposition of an item of personal property, real property, a service, or an intangible"). The Court of Appeals of Indiana reversed the trial court's decision, determining that Tiktok's business model of exchanging access to its content library for end-user personal data was a "consumer transaction." State v. Tiktok, Nos. 23A-PL-3110, 23A-PL-3111, 2024 WL 4340387, at *8–9 (Ind. Ct. App. Sept. 30, 2024). The court concluded that, "the plain and ordinary definition of the word 'sale,' which is not otherwise defined in the DCSA, includes any consideration to effectuate the transfer of property, not only an exchange of money." Id. at *9 (noting that an interpretation limiting the definition of the word "sale" to exchanges for money narrows the scope of the act beyond its plain terms, contrary to its requirement of liberal interpretation). The Court adopts a reasoning similar to that of the Indiana Court of Appeals, here.

    d.  Failure to State a Claim

Meta argues that the State fails to state a claim under either of its CPA counts. It contends that the State has failed to allege facts demonstrating the "rascality" of Meta's

34

conduct or that New Hampshire citizens suffered substantial injury from Meta's acts. The State responds that its allegations of Meta's conduct meet New Hampshire's rascality test and that the alleged harms to New Hampshire children's mental health suffices as substantial injury.

The CPA proscribes unfair and deceptive trade practices in general, RSA 358-A:2, and sets forth a list of specific types of conduct that qualify as unfair or deceptive trade practices, RSA 358-A:2, I–XVIII. Fat Bullies Farm, LLC v. Devenport, 170 N.H. 17, 24 (2017). Although the general provision is broadly worded, the New Hampshire Supreme Court has recognized that not all conduct in the course of trade or commerce falls within the scope of the CPA. Id.

"In determining which commercial actions not specifically delineated are covered by the act," the Court employs the "rascality" test. Id. "Under the rascality test, the objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Id. In addition to the rascality test, New Hampshire courts look to the federal courts' interpretation of the Federal Trade Commission Act for guidance. Id. The Federal Trade Commission considers: "(1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers . . . ." Id. The New Hampshire Supreme Court has found the rascality test unmet when a defendant was alleged to have engaged in conduct

common in the particular industry in which the parties engaged.  See Hair Excitement, Inc. v. L'Oreal U.S.A., Inc., 158 N.H. 363, 371 (2009).

    i.    Count I

In Count I, the State alleges that Meta committed unfair acts in violation of the CPA by intentionally incorporating addictive design features and algorithms into its Social Media Platforms despite knowledge of the harms suffered by child users of those features.  (Compl. ¶ 238.)  Meta contends that the State fails to state a claim on Count I because Meta's alleged manipulative and addictive design features are not unique to its Social Media Platforms and the State has not alleged a "substantial injury."  The State disagrees that Meta's design features need to be unique to be actionable under the CPA.  The State further asserts that non-monetary harm can suffice as a substantial injury, establishing an unfair act or practice.

Meta's contention that its design features do not satisfy the rascality test because they are well known to the public and other social media services use similar features is unpersuasive to the Court.  Of note, the fact that other social media services use similar features is not a fact pleaded in the complaint.  For that reason, the Court cannot consider it.  See Barufaldi, 175 N.H. at 427; Hair Excitement, Inc., 158 N.H. at 371 (reviewing the trial court's decision of the plaintiff's CPA claim on the merits, not at the motion to dismiss stage).  Further, while Meta's design features may be well known, the State alleges that Meta misrepresented and omitted information about the design features' addictive nature.  Accordingly, in viewing the facts in the light most favorable to the State, the Court cannot rule that the addictive nature of Meta's design features is known and understood by the public.

36

Therefore, the Court is left with the State's allegations that Meta intentionally incorporated addictive design features and algorithms into its Social Media Platforms. The State alleges Meta did so with an understanding of the harms suffered by children using the Platforms. Finally, the State alleges that Meta's acts and omissions have exploited children's psychological vulnerabilities for Meta's financial gain. The knowing exploitation of children's health for financial gain rises to "a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Hair Excitement, Inc., 158 N.H. at 369.

The Court next addresses Meta's argument that the State has not alleged a substantial injury. Relying on the Federal Trade Commission's test to determine whether conduct is unfair or deceptive, the New Hampshire Supreme Court requires a showing that the conduct causes substantial injury to consumers. Fat Bullies Farm, Inc., 170 N.H. at 24. The Court is unaware of precedent from the New Hampshire Supreme Court substantively analyzing the meaning or scope of "substantial injury." Accordingly, the Court turns to other jurisdictions' interpretations of the Federal Trade Commission Act.

In 1985, the Court of Appeals for the District of Columbia relied on a policy statement from the Federal Trade Commission which stated, "in most cases substantial injury would involve monetary harm and that 'ordinarily' emotional impact and other more subjective types of harm would not make a practice unfair." Am. Fin. Serv. Ass'n v. F.T.C., 767 F.2d 957, 972 (D.C. Cir. 1985). Further, the Commission's policy statement clarified that it is "not concerned with trivial or merely speculative harms." Id. The Commission also noted in correspondence with United States senators that it does

not "cover subjective examples of harm such as emotional distress or offenses to taste or social belief." Id. at n.18. However, an act or practice can cause 'substantial injury' by doing "a small harm to a large number of people, or if it raises a significant risk of concrete harm." Id.; F.T.C. v. Neovi, Inc., 604 F.3d 1150, 1157 (9th Cir. 2010).

The State has alleged harm sufficing to establish substantial injury under the CPA. The State alleges that use of Meta's Social Media Platforms "results in psychological and health harms among children, including increased rates of major depressive episodes, anxiety, sleep disturbances, suicide, and other mental health concerns." (Compl. ¶ 99.) The State also alleges that frequent social media use has been associated with distinct changes in the amygdala region of a developing brain. (Id. ¶ 106.) Even accepting a classification of the harms alleged by the State as "emotional distress," such allegations establish a substantial injury. The harm suffered by New Hampshire child users of the Social Media Platforms is not subjective or trivial. Rather, the State alleges that use of the Platforms causes serious injury to teenagers' health. This alleged harm is sufficiently concrete, see Neovi, Inc., 604 F.3d at 1157 (requiring that an injury be "concrete" to satisfy the substantial injury test), and serious to constitute substantial injury. See District of Columbia v. Meta Platforms, Inc., No. 2023-CAB-6550, at *34 (D.C. Super Ct. Sept. 9, 2024) (holding that the District alleged a substantial injury by alleging that Meta's addictive design features significantly increase rates of major depressive episodes anxiety, sleep disturbances, and other mental health disorders, including suicide, among children); F.T.C. v. Accusearch, Inc., No. 06-CV-105-D, 2007 WL 4356786, at *8 (D. Wy. Sept. 28, 2007) (ruling that, "while the substantial injury requirement may not *ordinarily* be met from emotional impact that

is 'trivial or merely speculative,' the evidence presented to the Court demonstrates a host of emotional harms that are substantial and real and cannot be fairly classified as either trivial or speculative").  Further, were the Court to accept the proposition that the harm alleged by the State is "small," which the Court is disinclined to do, a large number of people suffer from the harm, and, thus, the State has alleged a substantial injury. See id.

Accordingly, the State has stated a claim upon which this Court may grant relief on Count I of its complaint.

ii.  Count II

In Count II, the State alleges that Meta made misrepresentations to consumers, specifically: (1) deceptively representing that the Social Media Platforms are safe and failing to disclose and/or actively concealing information that they are not; (2) misrepresenting that the Social Media Platforms are not designed to hook children; and (3) misrepresenting that Meta prioritizes user well-being over profits.  (Compl. ¶ 262.) Meta argues that its subjective, generalized statements about the safety of the Social Media Platforms are statements of opinions or goals and cannot form the basis for a deceptive practices claim.  Meta also contends that Count II fails because the State did not allege with specificity that its misrepresentations were false or misleading, the State's allegations about Meta's prioritization of time spent are not material, and Meta's statements to Congress are not actionable.  The State disagrees, arguing that it alleged Meta's misrepresentations and omissions with sufficient specificity based on actionable deceptions.

First, the Court addresses Meta's argument that the State's deceptive practices claim must be pleaded with specificity. Meta relies on a New Hampshire superior court decision from 1999, a decision from the District Court for the District of New Hampshire, and a New Hampshire Supreme Court decision. First, the superior court order only briefly addresses the plaintiff's CPA claim and does not set out a standard of review separate from the plaintiff's claim for fraud. See Nichols v. Gen. Motors Corp., No. 99-C-566, 1999 WL 33292839, at *4–5 (N.H. Super. Ct. Dec. 13, 1999). Second, the federal court's decision applied a heightened pleading standard to the plaintiff's CPA claim after determining that a federal procedural rule required such standard for claims sounding in fraud. Micronics Filtration Holdings, Inc. v. Miller, No. 18-cv-303-JL, 2018 WL 4845749, at *6 (D.N.H. 2018). This Court need not consider rulings from other courts applying federal procedural rules rather than the rules this Court is bound by. Finally, Meta's reliance on Jay Edwards, Inc. v. Baker, 130 N.H. 41, 46–47 (1987), is misplaced because that decision specifically addresses the standard of review for claims of fraud, and does not discuss broader applicability of the standard to claims such as CPA claims.

Consequently, the Court applies the traditional standard of review on a motion to dismiss to Meta's motion to dismiss Count II of the State's complaint. See LaChance v. U.S. Smokeless Tobacco Co., 156 N.H. 88, 93–100 (2007) (employing the typical motion to dismiss framework to resolve an appeal of a trial court's grant of the defendant's motion for judgment on the pleadings—which are treated like motions to dismiss in New Hampshire—of the plaintiff's CPA claim); Snierson v. Scruton, 145 N.H. 73, 80–81 (2000) (applying a specificity test to the plaintiff's fraud and negligent

misrepresentation claims and then ruling that the plaintiff's CPA allegations "support[ed] a claim of unfair or deceptive trade practices" and not mentioning a specificity requirement).

The Court turns to Meta's argument that the State's claims arising out of alleged misrepresentations regarding the Social Media Platforms' safety are non-actionable statements of opinion, not misstatements of fact. The Court disagrees. Accepting the State's allegations as true, Meta's statements about the Social Media Platforms' safety went beyond mere puffery. See Hughes v. Panasonic Consumer Elecs. Co., Civ. Act. No. 10-846, 2011 WL 2976839, at *12 (D.N.J. July 21, 2011) (finding that alleged statements regarding "industry leading" characteristics were mere puffery insufficient to satisfy federal pleading standards). Rather, Meta is alleged to have known of the specific harms the Platforms caused child users and yet Meta reiterated the safety of the Platforms. Similarly, Meta prioritized users' time spent on the Platforms, knowing of the harm extended use of the Platforms caused, while making statements of its prioritization of safety and well-being. This goes beyond statements of corporate optimism. The Court finds these statements actionable because Meta is alleged to have known of specific harms, omitted the information from its public statements, and represented the opposite. Such conduct is subject to liability under the CPA.

The cases Meta cites are inapposite. See Morris v. Princess Cruises, Inc., 236 F.3d 1061, 1067–68 (9th Cir. 2001) (ruling that the plaintiff's claim for negligent misrepresentation was non-actionable where the plaintiff denied discussing the quality or nature of medical care on the cruise ship; the central issue of the claim). In particular, the Court finds decisions related to car manufacturers or ride-sharing

application companies' statements about the safety of their products distinct.[3]  A reasonable consumer understands the inherent danger in operating a car and receiving a car ride from a stranger.  However, the same is not true for use of social media applications.  The State alleges that Meta knew about dangers posed by the Social Media Platforms and misrepresented or omitted key facts about the Platforms' safety.  For that reason, a reasonable consumer does not have the same understanding of the dangers of social media as they might of the dangers of cars.  To put it plainly, the dangers posed to users by Meta's addictive design features are far less visible or obvious than those posed by riding in cars with strangers.  The Court also notes that several of the cases cited by Meta involve securities actions in which the analysis focused on the understanding of a reasonable investor.  Here, the Court must determine whether a reasonable consumer may have been misled by Meta's statements.  Viewing the State's allegations in the light most favorable to it, the Court concludes a reasonable consumer may have been so misled.  Accordingly, the Court is not persuaded by Meta's arguments and finds the State's allegations actionable.

Meta breaks down the rest of its argument into categories of statements related to: (1) prevalence of harmful content; (2) Project Daisy; (3) filters; (4) Meta's prioritization of time spent; and (5) other allegations generally alleging that Meta "deceived" and "misled" the public, consumers, and external researchers and regulators.  The State responds that particular statements or practices can deceive

---

[3] See In re Lyft Inc. Sec. Litig., 484 F. Supp. 3d 758, 770 (N.D. Cal. 2020); Azoulai v. BMW of N. Am. LLC, No. 16-cv-00589-BLF, 2017 WL 1354781, at *8 (N.D. Cal. 2017); In re Ford Motor Co. Sec. Litig., Class Action, 381 F.3d 563, 571 (6th Cir. 2004); Greater Houston Trans. Co. v. Uber Tech., Inc., 155 F. Supp. 3d 670, 683 (S.D. Tex. 2015); XYZ Two Way Radio Serv., Inc. v. Uber Tech., Inc., 214 F. Supp. 3d 179, 183–84 (E.D.N.Y. 2016).

while being vague or technically true. The State asserts that it has alleged a concerted, global effort to deceive through Meta's various statements about certain aspects of the Social Media Platforms. The State refers to similar allegations made against tobacco companies related to statements about the health hazards posed by consumption of their products. See King v. Philip Morris, Inc., No. 990C0856, 2000 WL 34016358, at *10 (N.H. Super. Ct. Nov. 2, 2000).

The Court is inclined to agree with the State that the proper approach is to view Meta's statements as a whole to determine whether the State has stated a claim that the statements are misrepresentations violative of the CPA. The Court concludes that the State has done so. The State has alleged that Meta's statements about the Social Media Platforms were designed to minimize the harmful effects Meta was aware the Platforms had on child users. (Compl. ¶ 4.) The Court's analysis is whether Meta's conduct attained "a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Fat Bullies Farm, LLC, 170 N.H. at 24. Meta's statements, whether they concerned the prevalence of harmful content, Project Daisy, filters, its prioritization of time spent on the Platforms, or more general deceiving or misleading statements, aimed to conceal the negative impacts of social media use on children, portray the Platforms as safe for children and indicate that Meta prioritized child safety. These statements are misleading such that they reach the required level of rascality at the pleading stage.

The Court lastly addresses Meta's arguments regarding statements it is alleged to have made in testimony to Congress. Meta contends that it cannot be liable for such statements because the First Amendment bars claims based on efforts to petition the

government, including congressional testimony, and any statements made to Congress were not made "in the conduct of any trade or commerce" as required by RSA 358:A-2.

Meta's first argument relies on the Noerr-Pennington doctrine which is "rooted in the Petition Clause of the First Amendment" and protects "an attempt to persuade the legislature or the executive to take particular action with respect to a law." United States v. Philip Morris USA Inc., 566 F.3d 1095, 1123 (D.C. Cir. 2009). The doctrine only covers activity "genuinely intended to influence government action." Id. Additionally, neither the doctrine nor the First Amendment protect petitions predicated on fraud or deliberate misrepresentation. Id. (collecting cases). Because the State has stated a claim that Meta's statements were misrepresentations, in violation of the CPA, they are not entitled to protection under Noerr-Pennington. The Court assumes the truth of the State's allegations: that Meta made statements to Congress which it knew were false or misleading. Accordingly, neither the Noerr-Pennington doctrine nor the First Amendment protect Meta's statements because they constitute deliberate misrepresentation.[4] See id.

The Court is likewise not persuaded by Meta's argument that the statements it made to Congress were not within "trade or commerce," and, consequently, are not actionable under the CPA. The CPA applies to "persons engaged in trade or commerce." Hughes v. DiSalvo, 143 N.H. 576, 578 (1999) (quoting Chase v. Dorais, 122 N.H. 600, 601 (1982)). "Remedies under the [CPA] are not available where the transaction is strictly private in nature, and is in no way undertaken in the ordinary

---

[4] The Court assumes, without deciding, that the Noerr-Pennington doctrine applies in this context as a defense to the State's CPA claim. However, the Court recognizes that some courts, see, e.g., Andrx Pharm., Inc. v. Elan Corp., PLC, 421 F.3d 1227, 1233 (11th Cir. 2005), have limited the applicability of the doctrine to antitrust actions (where the doctrine originated).

course of a trade or business." Id. (cleaned up).  Assuming all of the facts in the State's complaint as true, and construing all inferences in the State's favor, Meta's statements to Congress were a part of its overall scheme to conceal known harm stemming from children's use of the Social Media Platforms.  (Compl. ¶ 143–44, 188, 205–06.)  As discussed, this is a key aspect of Meta's business model.  Therefore, the State has pleaded sufficient facts to state a claim under the CPA arising from Meta's statements about the Platforms' safety.

       e.  Restitution

Finally, Meta alleges that the State is not entitled to restitution on its CPA claims because no user is alleged to have paid to use Meta's services.  The State disagrees, arguing that restitution need not be compensatory but may also be used to disgorge wrongdoers of funds unlawfully obtained.

RSA 358-A:4, III(a) permits the attorney general to bring suit against any person the attorney general has reason to believe has committed a violation of RSA 358-A.  In that suit, the attorney general "may petition the court for an order of restitution of money or property to any person or class of persons injured thereby."  RSA 358-A:4, III(a).

The New Hampshire Supreme Court has not addressed the scope of restitution under RSA 358-A:4, III(a).  In certain actions, New Hampshire has recognized the broader reach of restitution, including the disgorgement of the benefit derived by a defendant.  See In re Haller, 150 N.H. 427, 430 (2003) ("Restitution is an equitable remedy typically applied to contracts implied in law to disgorge the benefit of unjust enrichment.").  In the criminal context, the legislature has specifically defined restitution as "money or service provided by the offender to compensate a victim for economic loss

45

. . . ."  RSA 651:62, V.  Black's Law Dictionary defines "restitution" as "an ambiguous term, sometimes referring to the disgorging of something which has been taken and at times referring to compensation for injury done."  RESTITUTION, Black's Law Dictionary (12th ed. 2024).

In the Court's view, this determination requires an understanding of whether Meta has wrongfully received revenue from third-party advertisers from the increased time youth users spent on the Social Media Platforms as a result of Meta's alleged violations of the CPA.  The State's allegations indicate this inquiry would be answered in the affirmative, but the Court cannot definitively rule from the face of the complaint.  Accordingly, it declines to resolve this dispute at this juncture.

VI.    <u>Products Liability and Negligence</u>

The State alleges that Meta is liable for the defective design of its Social Media Platforms (Count III), its failure to warn about the risks associated with use of the Social Media Platforms (Count IV), and its negligence in its design, manufacturing, marketing, distributing, and labeling of its Social Media Platforms (Count V).  Meta moves to dismiss all three state common law claims, arguing that the State lacks standing to pursue such claims and each count fails to state a claim as a matter of law.  The State contends it has <u>parens</u> <u>patriae</u> standing to pursue its claims and it stated a claim under each theory.  Meta also argues that the State's strict products liability claims fail as a matter of law because the Social Media Platforms are not "products," that the State's negligence claim fails because the State has not alleged that Meta violated a duty of care, and that all of the State's common law claims fail because it did not sufficiently allege proximate causation.  The Court addresses each issue in turn.

a. Standing

"Parens patriae literally means 'parent of the country,' and refers traditionally to the role of the state as sovereign and guardian of persons under legal disability." State v. City of Dover, 153 N.H. 181, 185 (2006). The theory is "a concept of standing utilized to allow the state to protect 'quasi-sovereign' interests such as health, comfort and welfare of its citizens, interstate water rights, and the general economy of the state." Id. at 185–86. To satisfy parens patriae standing, "[f]irst, the state must assert an injury to a 'quasi sovereign' interest, an interest apart from the interests of particular private parties. Second, the state must allege injury to a 'substantial segment' of its population." Id. at 186. The Court addresses each inquiry in turn.

"Quasi-sovereign" interests are those "that the State has in the well-being of its populace," which must be "sufficiently concrete to create an actual controversy between the State and the defendant." Id. (citing Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592, 602 (1982)). For example, states have a quasi-sovereign interest "in the abatement of public nuisances, instances in which the injury to the public health and comfort is graphic and direct." Id. Courts have "generally interpreted the health and well-being category of quasi-sovereign interests broadly." Id. "A state also has a quasi-sovereign interest in preventing any injury or potential injury to the general health and well-being of its residents." Id.

In Dover, the New Hampshire Supreme Court ruled that "the State has a quasi-sovereign interest in protecting the health and well-being, both physical and economic, of its residents with respect to the statewide water supply." Id. The Court reasoned that "[t]he control and elimination of water pollution is a subject clearly within the scope of

47

the State's constitutional police power." Id. The Court also relied on the State's interest, as articulated by RSA 481:1, in providing "careful stewardship over all the waters lying within its boundaries." Id. Thus, the Court concluded that the State had a quasi-sovereign interest in protecting its waters from methyl tertiary butyl ether contamination. Id.

The State contends it has a quasi-sovereign interest in protecting children from Meta's operation of the Social Media Platforms which the State has alleged causes significant harm to New Hampshire children. The State has a quasi-sovereign interest in the health of its citizens. Id. The State has alleged that Meta's Social Media Platforms harm children. (Compl. ¶¶ 104–117.) In New Hampshire, 13.49% of the under-eighteen population are active monthly Facebook users and 35% are active monthly Instagram users. (Id. ¶¶ 49–50.) Teenagers in New Hampshire have also suffered from declining mental health since 2011. (Id. ¶¶ 118–19.) The State has an interest in protecting the mental health of its youngest population. The Court sees no reason to distinguish between physical and mental health in this context. See Dover, 153 N.H. at 186 (stating that the state has a quasi-sovereign interest in the physical health of its citizens); Snapp, 458 U.S. at 607 (same). Therefore, the Court determines that the State has pleaded sufficient facts to satisfy the quasi-sovereign interest prong of the parens patriae standing test.

The second inquiry is "whether a sufficiently substantial segment of the population is affected by the challenged conduct." Dover, 153 N.H. at 187. In Dover, 13.2% of the statewide water supplies were contaminated, corresponding to hundreds of public water systems and approximately 40,000 private water supplies. Id. The

48

Court determined that the foregoing data demonstrated that the contamination directly affected a substantial portion of the population of New Hampshire.  Id.  The Court noted that the State "clearly" met the substantial segment test.  Id.

Over a third of minors in New Hampshire are active Instagram users and 13% actively use Facebook.  While there is no particular number which satisfies the substantial segment prong, see People v. Peter & John's Pump House, Inc., 914 F. Supp. 809, 812 (N.D.N.Y. 1996) ("There is no numerical talisman to establish parens patriae standing . . . ."), the proportion of New Hampshire citizens impacted by Meta's Social Media Platforms exceeds the proportion impacted in Dover.  If the State "clearly" met the prong in Dover, then the State has met the same prong under the facts alleged here.  Further, while the State alleges teenage usage of the Social Media Platforms in 2023, future users will also be impacted by the same alleged products liability and negligence, increasing the segment of the population affected.  See New York, by James v. Niagara-Wheatfield Central Sch. Dist., __ F.4th __, __, No. 22-2178-cv, 2024 WL 4487669, at *7 (2d Cir. Oct. 15, 2024) (permitting consideration of future individuals who may be injured by the defendant's actions in the analysis of the substantial segment prong of the parens patriae test); Com. of Massachusetts v. Bull HN Info. Sys., Inc., 16 F. Supp. 2d 90, 97 (D. Mass. 1998) (recognizing the state's quasi-sovereign interest in preventing potential injury to the general health and well-being of its residents).  Accordingly, the Court determines that the State has pleaded sufficient facts to satisfy the substantial segment of the parens patriae standing test.

Some jurisdictions consider a third prong to the parens patriae test, requiring the State show that individuals could not obtain complete relief through private suits.  See

49

<u>Dover</u>, 153 N.H. at 187.  The reasoning underlying the third prong is to ensure that the state's interest is "sufficiently severe and generalized, it must stand apart from the interests of particular parties–in other words, the controversy must in substance implicate the state's interest in economic supervision, and not merely affect the fortunes of a limited class of her citizens."  <u>New York v. Facebook, Inc.</u>, 549 F. Supp. 3d 6, 22 (D.D.C. 2021) (citing <u>Snapp</u>, 458 U.S. at 607).  However, the New Hampshire Supreme Court has not applied this prong in its consideration of whether the State has standing. <u>See</u> <u>Dover</u>, 153 N.H. at 187 (declining to place the burden on the State to show whether the cities could obtain complete relief through the State's suit).  The Court has only employed the test when determining what types of damages the State may recover in a <u>parens</u> <u>patriae</u> suit.  <u>See</u> <u>State v. Hess Corp.</u>, 161 N.H. 426, 436–37 (2011) (ruling on an interlocutory transfer of a partial motion for summary judgment).

The Court declines to apply the third prong to the preliminary determination of the State's <u>parens</u> <u>patriae</u> standing at the motion to dismiss stage.  Therefore, because the State has met the two prongs of the <u>parens</u> <u>patriae</u> standing test, the State may pursue its common law claims against Meta on behalf of its citizens.

### b.  <u>Whether the Social Media Platforms are "Products"</u>

Meta argues that the State's strict products liability claims fail because the Social Media Platforms are not products and the harm the State alleges stems from intangible information and ideas, not products.  The State contends that categorizing the Social Media Platforms as products is a better reasoned approach, the Platforms are more appropriately considered products in the products/services dichotomy, and the harm the State alleges arises from design elements of the Platforms, not third-party content.

The New Hampshire Supreme Court has not defined what a product is under strict products liability.  However, it has adopted the Restatement (Second) of Torts to analyze other questions under strict products liability.  See Kelleher v. Marvin Lumber & Cedar Co., 152 N.H. 813, 831 (2005).  The parties both rely on the Restatement (Third) of Torts which specifically addresses what constitutes a product.  The Court likewise relies on the Restatement (Third) of Torts because of the New Hampshire Supreme Court's previous reliance on the Restatement's approach, the Restatement (Second) of Torts' silence on the issue of defining a product, and the parties' joint reliance on the Restatement (Third) of Torts.

The Restatement (Third) of Torts defines a product as, "tangible personal property distributed commercially for use or consumption."  Restatement (Third) of Torts: Prod. Liab. § 19 (1998).  Further, "[s]ervices, even when provided commercially, are not products."  Id.  However, items such as electricity are products "when the context of their distribution and use is sufficiently analogous to the distribution and use of tangible personal property that it is appropriate to apply the rules state in the Restatement."  Id.

Given the nature of the State's claims, the Social Media Platforms are products. The State alleges that the Platforms' design features harm users.  Meta's business model is operating social networking applications which allow users to share and view content and communicate with other users.  (Compl. ¶ 20.)  However, the Social Media Platforms are the vehicle through which Meta effectuates that business model.  Meta designs, develops, programs, markets, distributes, and profits from the Social Media Platforms.  (Id. ¶ 299.)  For this reason, the Platforms are akin to the distribution and

use of tangible property.  See Restatement (Third) of Torts: Prod. Liab. § 19 (1998).

Further, the Platforms are not services.  While users may experience a customized

display when engaging with the Platforms, the design features are uniform.

Consequently, Meta is not performing a unique service for every user of its Platforms.

   Other jurisdictions are in accord with the Court's analysis.  In Brookes v. Lyft Inc.,

the court ruled that the Lyft application was a product because, while Lyft's business

model was a transportation network company in which it connects riders with drivers,

Lyft designed and distributed the Lyft application to carry out that business model.  No.

50-2019-CA-004782-MB, 2022 WL 19799628, at *3 (Fla. Cir. Ct. Sept. 30, 2022).  The

court also noted that the plaintiff's claim was based on the design of the application

which Lyft designed, distributed, and placed into the stream of commerce.  Id. at *4; see

also In re Uber Technologies, Inc., Passenger Sexual Assault Litig., ___ F. Supp. 3d ___,

___, No. 3084 CRB, 2024 WL 4211217, at *23 (N.D. Cal. Aug. 15, 2024) (finding the

Uber application a product because the alleged defects in the application have similar

plausible analogues in tangible products); T.V. v. Grinder, LLC, No. 3:22-cv-864-MMH-

PDB, 2024 WL 4128796, at *26 (M.D. Fla. Aug. 13, 2024) (recommending a finding that

the defendant social networking application is a product because it designed its app for

its business, made design choices for the app, placed the app in the stream of

commerce, distributed the app in the global marketplace, marketed the app, and

generated revenue and profits from the app); cf. In re Social Media Adolescent

Addiction/Personal Injury Pro. Liability Litigation, 702 F. Supp. 3d at 849 (adopting a

defect-specific approach to determine whether the challenged functionalities of the

defendants' social media were products).  But see Social Media Cases, No. JCCP 525,

22STCV21355, 2023 WL 6847378, at \*16 (Cal. Super. Oct. 13, 2023) (determining that social media was not a product because applying the doctrine of products liability to social media does not align with the goals of the doctrine and interactions between social media companies and their users are different from traditional product sales).

The Court does not address at length Meta's argument that the State only alleges harm from intangible information delivered by the Social Media Platforms. As discussed <u>supra</u>, Section B, the State's claims are based on the Social Media Platforms' alleged defective and dangerous features, not the information contained therein. Accordingly, the State's products liability claim is based on harm caused by the product: the Social Media Platforms themselves.

      c. <u>Duty of Care</u>

Meta argues that the State's negligence claim fails because it does not allege a duty of care that Meta violated. The State responds that Meta owes a duty to everyone, and in particular its users, to exercise reasonable care not to subject others to an unreasonable risk of harm. Specifically, the State points to the duty to design reasonably safe products and the duty to warn of foreseeable risks in the chosen design.

"To recover for negligence, the plaintiff must demonstrate that the defendant owes a duty to him, that the defendant breached that duty, and that the breach proximately caused injury to him." <u>Robinson v. 1 Bouchard Street Realty</u>, ___ N.H. ___, ___, 2024 N.H. 59, ¶ 7. "Absent a duty, there is no negligence." <u>Id</u>. "Whether a duty exists in a particular case is a question of law." <u>Id</u>. "When charged with determining whether a duty exists in a particular case, [the Court] necessarily encounter[s] the

broader, more fundamental question of whether the plaintiff's interests are entitled to legal protection against the defendant's conduct." Grady v. Jones Lang LaSalle Constr. Co., 171 N.H. 203, 207 (2018). "In making this determination, [the Court] consider[s] whether the societal importance of protecting the plaintiff's interest outweighs the importance of immunizing the defendant from extended liability." Id.

"A person injured by a product may proceed against the seller or manufacturer of the product under a theory of negligence." 8 McNamara, New Hampshire Practice: Personal Injury — Tort and Insurance Practice § 8.09 (2024) (citing State v. Exxon Mobil Corp., 168 N.H. 211, 233–36 (2015)). "A manufacturer has a duty to act in a reasonable way in designing and manufacturing a product." Id. Thus, because Meta has designed a product, placed that product in the stream of commerce, marketed it, and profited from it, Meta has a duty to reasonably design the Social Media Platforms.

Meta argues that interactive communication services like the Platforms do not owe a duty of care for content publication or consumption. Meta also contends that it does not owe a duty to prevent harm caused by third parties. The Court's review of the State's claim for negligence, (see Compl. ¶¶ 314–20), indicates that the State bases its negligence claim on Meta's alleged design, manufacture, marking, distribution, and labeling of the Social Media Platforms and the resulting compulsive and excessive use of the Platforms. The claim does not mention harm caused by Meta's publication or users' consumption of content or harm caused by third parties. Accordingly, the Court finds Meta's arguments irrelevant. However, to the extent the State seeks to hold Meta liable for content it publishes on its Social Media Platforms, such liability is barred by Section 230, see supra Section III(B). On the other hand, for the reasons articulated

54

throughout this order, Meta can be held liable for its implementation of certain design features.

      d.  <u>Proximate Causation</u>

Meta argues that all of the State's common law claims fail because it does not sufficiently allege proximate causation. The State contends that its allegations—that (1) Meta's use of addictive design features causes users, particularly teenagers, to engage with the Social Media Platforms compulsively and excessively; and (2) compulsive and excessive use of the Platforms causes harm to children's mental health—suffice to establish proximate causation. The State acknowledges that its theory is broad but argues that it has provided detailed factual support.

"Proximate causation requires a court to determine whether the defendant should be legally liable for what he has caused." <u>Fish v. Homestead Woolen Mills, Inc.</u>, 134 N.H. 361, 364 (1991). "Liability for negligence is imposed only for injuries resulting from the particular hazard against which the duty of due care required protection to be given." <u>Id</u>. Generally, proximate causation is a question of fact. <u>Cecere v. Loon Mountain Recreation Corp.</u>, 155 N.H. 289, 295 (2007).

The Court determines that, in viewing the facts alleged in the light most favorable to the State and taking all reasonable inferences in its favor, the State has alleged proximate causation. In its complaint, the State has laid out how social media impacts young users' mental health, (Compl. ¶¶ 104–117), that New Hampshire teenagers use the Social Media Platforms, (<u>id</u>. ¶¶ 49–50), and that New Hampshire teenagers' mental health has declined since 2011, corresponding with Meta's acquisition of Instagram, (<u>id</u>. ¶¶ 98, 118–19). The State has alleged that Meta is aware of the addictive nature and

harmful impacts of the design of its Platforms.  (Id. ¶¶ 69, 78, 111, 122, 125, and 136.)

Viewing these allegations together, the State has sufficiently pleaded that Meta's

alleged design and implementation of addictive and dangerous features and

misrepresentations and omissions about the safety of the Platforms proximately caused

the worsening of teenage mental health in New Hampshire.

**VII.    Conclusion**

     For the foregoing reasons, Meta's motion to dismiss is DENIED.

**SO ORDERED.**

December 10, 2024
_____
**Date**

_____
**John C. Kissinger, Jr.**
**Presiding Justice**

Clerk's Notice of Decision
Document Sent to Parties
on 12/11/2024

56

# EXHIBIT 9

FILED 1st JUDICIAL DISTRICT COURT
Santa Fe County
6/21/2024 11:14 AM
KATHLEEN VIGIL CLERK OF THE COURT
Jacqueline Rosales Juarez

**FIRST JUDICIAL DISTRICT COURT
COUNTY OF SANTA FE
STATE OF NEW MEXICO**

STATE OF NEW MEXICO, EX REL.,
RAÚL TORREZ, ATTORNEY GENERAL,

     Plaintiff,

v.                         NO. D-101-CV-2023-02838

META PLATFORMS, INC.; INSTAGRAM, LLC;
META PAYMENTS, INC.; META PLATFORMS
TECHNOLOGIES, LLC; and
MARK ZUCKERBERG,

     Defendants.


### ORDER DENYING THE
### META DEFENDANTS' MOTION TO DISMISS

     This matter comes before the Court on the Motion to Dismiss (the "Motion") filed by

Defendants Meta Platforms, Inc.; Instagram, LLC; Meta Payments, Inc.; and Meta Platforms

Technologies, LLC (collectively, "Meta" or the "Meta Defendants"). The Meta Defendants filed

the Motion on March 1, 2024, along with Declarations of Nicholas Wong and Bradley W. Davis

in support of the Motion. Plaintiff State of New Mexico (the "State") filed its opposition brief on

March 19, 2024, along with several attachments. The Meta Defendants filed their reply brief on

April 8, 2024. The Meta Defendants filed a Notice of Supplemental Authority on May 24, 2024,

and the State filed a Notice of Supplemental Authority on May 28, 2024. The Court heard oral

argument on the Motion on May 30, 2024.

     Having reviewed and considered the Motion and attached declarations, the opposition

brief and attachments thereto, the reply brief, the arguments of counsel and all authority cited by

the parties both in their briefs, in their notices of supplemental authority and at oral argument, the

Court **DENIES** the Motion in its entirety for the reasons that follow:

1.      The Court finds that based on Rule 1-012(B)(6) and notice pleading standards the Motion is **DENIED**.

2.      With respect to Meta's arguments concerning *personal jurisdiction*, the Court finds that there are sufficiently pled activities in New Mexico in terms of data harvesting, advertisements, apps on phones and targeting of New Mexico consumers to render the Complaint inappropriate for dismissal on Rule 1-012(B)(6) grounds.

3.      With respect to Meta's arguments concerning application of *Section 230*, the Court understands that there are considerable issues related to the difference between design and other non-publisher activities and publisher activities, such as decisions about content, curation, and the like. Applying the standards applicable to a Rule 1-012(B)(6) motion, the Court DENIES Meta's Motion.

4.      With respect to Meta's arguments concerning application of the *First Amendment*, Meta's counsel pointed out at oral argument that the issues largely overlap with the Section 230 arguments and analysis, and there is ambiguity concerning whether Meta's conduct constitutes a decision or judgment related to content or product design non-speech issues. Applying the standards applicable to a Rule 1-012(B)(6) motion, the Court DENIES Meta's Motion.

5.      With respect to Meta's arguments concerning the elements of *public nuisance*, the Court notes that a spectrum exists between Judge Mathew's analysis in *State of New Mexico ex rel. Balderas v. Purdue Pharma L.P.*, No. D-101-CV-2017-02541 (1st Jud. Dist. June 15, 2022), and, for example, the decision of the Oklahoma supreme court in *State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719, 724-25 (Okla. 2021), concerning the existence of a public right. Applying the standards applicable to a Rule 1-012(B)(6) motion, the Court DENIES Meta's Motion.

6.      With respect to Meta's arguments concerning the *Unfair Practices Act*, at the Rule 1-012(B)(6) level the State has pled sufficient facts to state a claim, including facts alleging contracts for use and data-versus-use exchange and other things that are pled, which are sufficient to render dismissal inappropriate. Applying the standards applicable to a Rule 1-012(B)(6) motion, the Court DENIES Meta's Motion.

7.      At the conclusion of the Court's announcement of this ruling, counsel for Meta requested inclusion of language pursuant to NMSA 1978 § 39-3-4 (1999) sufficient to permit an interlocutory appeal of the Court's order on personal jurisdiction. The Court DENIES that request. The Court will move forward with the litigation and see if there are other decisions that warrant inclusion of such language, but, at this point, the delay attendant to an interlocutory appeal does not warrant inclusion of such language.

It is so **ORDERED** this 21st day of June, 2024.

_____

**HON. BRYAN BIEDSCHEID**

Submitted and Approved by:

**RAÚL TORREZ**
**ATTORNEY GENERAL OF NEW MEXICO**

*/s/ James W. Grayson*
**JAMES W. GRAYSON**
**CHIEF DEPUTY ATTORNEY GENERAL**
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
Phone: (505) 218-0850
Email: jgrayson@nmag.gov

**SERENA R. WHEATON**
**ASSISTANT ATTORNEY GENERAL**
New Mexico Department of Justice
Consumer & Environmental Protection Division
201 Third St. N.W., Suite 300
Albuquerque, NM 87102
Phone: (505) 490-4846
Email: swheaton@nmag.gov

**LINDA SINGER** (*pro hac vice*)
**DAVID I. ACKERMAN** (*pro hac vice*)
**MOTLEY RICE LLC**
401 9th St., NW, Suite 630
Washington, D.C. 20004
Phone: (202) 232-5504
Email: lsinger@motleyrice.com
Email: dackerman@motleyrice.com

*Attorneys for Plaintiff the State of New Mexico*

Approved as to form:

**COVINGTON & BURLING LLP**

By: *Approved as to Form via Email 06/18/24 @ 1:00pm MT*
Nathan E. Shafroth *(pro hac vice)*
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
Tel: (415) 591-7053
nshafroth@cov.com

Timothy C. Hester *(pro hac vice)*
One City Center
850 Tenth Street, NW
Washington, DC 20002-4956
Tel: (202) 662-5324
thester@cov.com

- and –

**HOLLAND & HART LLP**
John C. Anderson
Olga M. Serafimova
110 North Guadalupe, Suite 1
Santa Fe, New Mexico 87501
Tel: 505.988.4421
jcanderson@hollandhart.com
omserafimova@hollandhart.com

*Attorneys for Defendants*

# EXHIBIT 10

FILED 1st JUDICIAL DISTRICT COURT
Santa Fe County
5/12/2025 10:15 AM
KATHLEEN VIGIL CLERK OF THE COURT
Mayra Mendoza-Gutierrez

**STATE OF NEW MEXICO**
**COUNTY OF SANTA FE**
**FIRST JUDICIAL DISTRICT COURT**

NO. D-101-CV-2024-02131

STATE OF NEW MEXICO, EX REL.,
RAÚL TORREZ, ATTORNEY GENERAL,
     Plaintiff,
v.

SNAP INC.
     Defendant.

**ORDER DENYING**
**DEFENDANT'S MOTION TO DISMISS**

This matter comes before the Court on the Motion to Dismiss (the "Motion") filed by

Defendant Snap Inc. ("Snap"). Defendant filed the Motion on November 18, 2024. Plaintiff State

of New Mexico (the "State") filed its opposition brief on December 20, 2024. Defendant filed a

reply brief on January 27, 2025. Defendant filed a Notice of Supplemental Authority on March 7,

2025. The State filed a Notice of Supplemental Authority on April 9, 2025 and a Response to

Defendant's Notice of Supplemental Authority on April 17, 2025. The Court heard oral argument

on the Motion on April 22, 2025.

The Court has reviewed the briefing in this case in its entirety, reviewed the relevant

caselaw, and entertained oral argument. The Court **DENIES** the Motion in its entirety for the

reasons that follow:

The legal standard, as the Court understands it in New Mexico, is the following: A motion

to dismiss for failure to state a claim tests the legal sufficiency of the complaint, not the factual

allegations of the pleadings, which, for purposes of ruling on the motion, the Court must accept as

true. New Mexico is a notice-pleading state, requiring only that the plaintiff allege facts sufficient

to put the defendant on notice of its claims. A motion to dismiss should be granted only when it

1

appears that the plaintiff is not entitled to recover under any facts provable under the complaint. When reviewing a motion to dismiss, the court should accept all well-pleaded factual allegations in the complaint as true and resolve all doubts in favor of sufficiency of the complaint.

As to the Defendant's jurisdictional arguments, Snap is not subject to general jurisdiction in New Mexico. As to specific jurisdiction, the constitutional touchstone remains whether the Defendant purposefully established minimum contacts with the forum state. Sufficient minimum contacts satisfying due process exist where the defendant has a connection with the forum state and has acted in the state in such a manner that they should reasonably anticipate being haled into court there. In this case, Snap has purposefully availed itself of New Mexico. The claims relate to Snap's New Mexico conduct satisfying constitutional due process. The jurisdictional allegations are that Snap contracts with New Mexico users of its platform and with advertisers located in New Mexico, targeting New Mexico residents. Snap monetizes the personal data of its New Mexico users. Snap charges some users in New Mexico a fee for additional features, and Snap actively operates a social media platform that collects users' location information in New Mexico.

With regard to the State's public nuisance claim, the State alleges an interference with public health and safety that is actionable in public nuisance. Section 30-8-1 NMSA (1978) defines a public nuisance that is injurious to public health, safety, morals or welfare. The State's allegations are that Snap's conduct fosters child sexual exploitation, child mental health harms, and illegal drug and weapon trafficking which is unlawful and contrary to public policy. As to the causation argument, proximate cause is generally a question of fact for the jury.

Considering the Defendant's arguments as to the State's Unfair Practices Act ("UPA") claims and as alleged in the Complaint, consumer use of Snap's platforms is in connection with the sale of advertising and other goods and services. The UPA's advertising media exemption does

not apply to the State's claims. Snap was not publishing, broadcasting or reproducing third-party material when it allegedly made misleading statements and omissions to the public and to advertisers, as described in the Amended Complaint. The State's claims are pled with sufficient particularity under New Mexico law. The State's Amended Complaint alleges actionable misrepresentations as alleged. The State has alleged unconscionability because Snap's practices, as alleged, their policies and features, demonstrate that Snap has taken advantage of New Mexico consumers to a grossly unfair degree.

As to First Amendment arguments made by the Defendant, the State's claims and allegations do not interfere with free speech rights because the First Amendment does not protect deceptive and misleading commercial speech. The State claims that when Snap chose to make affirmative statements with material omissions that were deceptive and misleading because Snap conveyed a false impression that Snap's platform had child safety characteristics and benefits that it did not, Snap had a duty to disclose information that was material in its omission which deceived or tended to deceive consumers. The state's theory of liability does not fall under the Defendant's First Amendment arguments.

With regard to the Defendant's arguments related to Section 230 of the Communications Decency Act, 47 U.S.C. § 230(c)(1) ("Section 230"), the Court rules as follows: Section 230 immunity applies if: (1) the defendant is a provider of an interactive computer service and (2) the claims seek to hold the defendant liable by treating it as a publisher or speaker of (3) content provided by someone else. Where the claim does not depend on publishing or speaking, Section 230 is irrelevant. The State seeks relief from Snap's conduct in marketing and designing its platform to distribute content in a manner that violates state law and creates a public nuisance. This lawsuit is focused on Snap's own conduct, design decisions and features. Section 230 does

not preclude the State's claim that Snap affirmatively misrepresented the safety of its platform. The Court will not conduct a feature-by-feature analysis as requested by the Defendant because New Mexico is a notice-pleading state and the Court does not believe such an analysis is required at this stage of the proceedings.

Following the ruling, Defendant requested that the Court certify its ruling for interlocutory review pursuant to NMSA 1978, § 39-3-4(A). The Court will **GRANT** that request. This decision does not practically dispose of the merits of the action, and the Court believes the order or decision involves a controlling question of law as to which there is a substantial ground for difference of opinion and that an immediate appeal from the order or decision may materially advance the ultimate termination of the litigation. However, this decision will not stay the proceedings in District Court. The Parties will commence discovery if they haven't done so already and this matter will proceed unless, of course, the Court is ordered to stay the case by the Court of Appeals.

It is so **ORDERED**.

_____ _____
Hon. Matthew Justin Wilson

Submitted and Approved by:

**RAÚL TORREZ**
**ATTORNEY GENERAL OF NEW MEXICO**

_/s/ James W. Grayson_
JAMES W. GRAYSON
Chief Deputy Attorney General
JULIE ANN MEADE
Deputy Attorney General
JULIE SAKURA
ASTRID CARRETE
MALINA SIMARD-HALM
Assistant Attorneys General
New Mexico Department of Justice
408 Galisteo Street

4

Santa Fe, NM 87501
Phone: (505) 490-4060
jgrayson@nmdoj.gov
jmeade@nmdoj.gov
jsakura@nmdoj.gov
acarrete@nmdoj.gov
msimard-halm@nmdoj.gov

LINDA SINGER (*pro hac vice*)
DAVID I. ACKERMAN (*pro hac vice*)
MOTLEY RICE LLC
401 9th St., NW, Suite 630
Washington, D.C. 20004
Phone: (202) 232-5504
lsinger@motleyrice.com
dackerman@motleyrice.com
*Attorneys for Plaintiff the State of New Mexico*

Approved as to form:

**HOLLAND & HART LLP**

*/s/ Larry J. Montaño*
By: _____
     Larry J. Montaño
110 North Guadalupe, Suite 1
Santa Fe, New Mexico 87501
TEL:   (505) 954-7291
Email: lmontano@hollandhart.com

Kimberly Branscome (*pro hac vice*)
**PAUL, WEISS, RIFKIND,**
  **WHARTON & GARRISON LLP**
2029 Century Park East, Suite 2000
Los Angeles, CA 90067
TEL:   (310) 982-4350
Email: kbranscome@paulweiss.com

Amy L. Van Gelder (*pro hac vice*)
**SKADDEN, ARPS, SLATE,**
  **MEAGHER & FLOM LLP** 320 South Canal Street
Chicago, Illinois 60606-5707
TEL:   (312) 407-0903
Email: amy.vangelder@skadden.com

Jonathan H. Blavin (*pro hac vice forthcoming*)
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, 27th Floor
San Francisco, California 94105-3089
TEL:   (415) 512-4000
Email: Jonathan.Blavin@mto.com
**ATTORNEYS FOR DEFENDANT SNAP, INC.**

# EXHIBIT 11

**In The Matter Of:**

*PEOPLE OF THE STATE OF NEW YORK v.*
*TIKTOK*

---

*May 28, 2025*

---

*NYS SUPREME COURT - CIVIL BRANCH*
*60 Centre Street, Room 420*
*New York, New York  10007*

Original File 3M0528PEOPLE-NY.txt
**Min-U-Script®**

1

```
 1  SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF NEW YORK : CIVIL TERM  PART 45
 2  -------------------------------------------X
    THE PEOPLE OF THE STATE OF NEW YORK, by
 3  LETITIA JAMES, Attorney General of the
    State of New York,
 4                                Plaintiff,

 5               - against -

 6  TIKTOK INC., TIKTOK LLC, TIKTOK U.S. DATA
    SECURITY INC., TIKTOK PTE. LTD., TIKTOK,
 7  LTD., BYTEDANCE INC., BYTEDANCE LTD.,
                                  Defendants.
 8  -------------------------------------------X
    INDEX NO. 452749/24          60 Centre Street
 9                               New York, New York
                                 May 28, 2025
10

11  BEFORE:

12          THE HON. ANAR RATHOD PATEL, J.S.C.

13

14  APPEARANCES:

15  FOR THE PLAINTIFF:

16  STATE OF NEW YORK
    OFFICE OF THE ATTORNEY GENERAL
17  28 Liberty Street
    New York, New York  10005
18  BY: KEVIN WALLACE, Asst. Attorney General
        ALEX FINKELSTEIN, Asst. Attorney General
19      NATHANIEL KOSSLYN, Asst. Attorney General

20  FOR THE DEFENDANTS:

21  O'MELVENY & MYERS LLP
    1301 Avenue of the Americas, Suite 1700
22  New York, New York  10019
    BY: STEPHEN D. BRODY, ESQ., (pro hac vice)
23      JONATHAN D. HACKER, ESQ. (pro hac vice)
        VINODH JAYARAMAN, ESQ.
24                              JACK L. MORELLI
                                Senior Court Reporter
25
```

2

PROCEEDINGS

1            THE COURT:  Good morning.  We're here on the

2    case of People of the State of New York versus TikTok

3    Inc., et al.  Index 452749 of 2024.

4            Counsel, your appearances, please.

5            MR. WALLACE:  Kevin Wallace, from the Office of

6    Attorney General.

7            MR. FINKELSTEIN:  Alex Finkelstein, for the

8    plaintiffs.

9            MR. BRODY:  Steve Brody, for the defendants.

10            MR. HACKER:  Jonathan Hacker, for the

11    defendants.

12            MR. JAYARAMAN:  Vino Jayaraman, for the

13    defendants.

14            THE COURT:  And?

15            MR. KOSSLYN:  Nathaniel Kosslyn, for the

16    plaintiffs.

17            THE COURT:  Okay, counsel, thank you so much for

18    your e-mail yesterday with respect to how we're going to

19    proceed today.  I'm fine with those times.  So we'll

20    proceed with that schedule.  We'll make use of the lectern

21    over here for speaking.  And anything else before we get

22    started?

23            MR. BRODY:  Mr. Hacker and I propose to split

24    the argument for the defendants.  He's going to take about

25    13 minutes to focus on Section 230 immunity, and I plan to

- J L M -

3

PROCEEDINGS

1    take about seven minutes of the 20 to address the parens

2    patriae standing, product in the product liability claim,

3    as well as potentially touch on the COPPA preemption

4    issue.

5          Obviously, we stand on everything that we've

6    asserted in the brief.  If the Court has questions about

7    any of the other arguments, we'll be happy to address

8    them.

9          THE COURT:  Understood.  Thank you, Mr. Brody.

10          MR. WALLACE:  Your Honor, just to add, on behalf

11   of the plaintiffs, we were also going to divide our

12   argument.  I will be responding for the Office of the

13   Attorney General on the topics of the 230 immunity, the

14   First Amendment, and then parens patriae.  And to the

15   extent that we're going to discuss whether or not TikTok

16   constitutes a product.

17          Mr. Finkelstein will be handling, to the extent

18   that they come up, any issues dealing with the adequacy of

19   the allegations, as to the other claims including the

20   misrepresentation claims.

21          But realistically, we also stand on our papers.

22   So if something isn't covered by the plaintiffs, we may

23   well not cover it either.

24          THE COURT:  Very well.

25          MR. HACKER:  Good morning.  May it please the

- J L M -

4

PROCEEDINGS

1    Court, the State's claims allege that certain users suffer

2    harm from viewing third-party speech on the TikTok

3    platform, because of the way in which the platform

4    publishes that third-party speech.

5            According to the State, New York law requires

6    the platform to publish third-party videos users are less

7    likely to watch, in a different order, not as frequently,

8    for longer periods of time and/or with State mandated

9    breaks in between the videos.

10           If the State prevails on those claims, this

11   Court, Your Honor, will be required to revise and

12   supervise the TikTok platform's algorithm and other

13   publication tools, to fundamentally alter the experience,

14   the user experience, of both creating and viewing

15   third-party content published on the platform, to ensure

16   that users find that experience less engaging than they do

17   today.

18           Those claims on their face as pleaded by the

19   State unambiguously target publishing activity and they

20   are, therefore, barred by Section 230, as well as by the

21   First Amendment.

22           Now, at the start, Your Honor, I will

23   acknowledge that trial courts in some other jurisdictions

24   have allowed similar claims against internet platforms to

25   proceed.  But several of those ruling are on appeal,

- J L M -

5

PROCEEDINGS

1  including in cases where state high courts took the

2  unusual step of granting discretionary interlocutory

3  review.  But perhaps more important, Your Honor, this

4  Court is differently situated.

5          In this case, unlike in the others, there is

6  already a decision of the New York Court of Appeals in the

7  Shiamili case, I'll talk about in a moment, establishing

8  the controlling standard under Section 230.  And a

9  decision of the regional circuit, the 2nd Circuit,

10  applying, elaborating that standard in a case with

11  ultimately materially indistinguishable facts.

12          Those New York discussions establish guideposts

13  that should help this Court steer clear of the one

14  consistent error running through DC versus Meta, and

15  similar decisions cited by the State, which is the premise

16  that State claims survive Section 230, merely so long as

17  they allege harms from the platform's, quote, "own

18  conduct," end quote.

19          What the other decisions misunderstand, Your

20  Honor, and what the New York Court of Appeals had already

21  made clear in Shiamili, is that Section 230 does apply if

22  the platform's own conduct is the selection of which

23  third-party videos to display, and how to display them.

24  Because that conduct is quintessential publishing conduct

25  protected by Section 230.

- J L M -

6

PROCEEDINGS

1          THE COURT:  But here it's not just about the

2     selection, right?  I mean, as I understand it, the

3     complaint alleges at least six design features that are

4     unique to the TikTok platform.  So, I don't think that we

5     can say it's merely the selection.  It's the infinite

6     scroll, the beauty filters, all of that combination.

7          MR. HACKER:  First of all, the selection, the

8     algorithm is clearly the core of the State's claims.

9     That's what they spent the most time on.  They call it

10     themselves the central feature, so that's critical here.

11          I do agree that they challenge other features.

12     But all of those reasons we can explain and discuss, are

13     also publishing features.  Because they are decisions in

14     the main, decisions about how to display content.  We can

15     go through each of them, and we invite the Court to look

16     at them individually, like the social media MDL court did,

17     and consider each of them.  But I think that when you do,

18     you'll recognize that each of them, the algorithm is the

19     easiest and most important.  It's clearly about selection

20     of what content to publish and what content to exclude.

21     The other ones, for example, autoplay, infinite scroll --

22          THE COURT:  Isn't the whole point that the

23     content that's published, according to those algos, is

24     based on the user's preferences, not on TikTok's

25     preferences?

                         - J L M -

7

PROCEEDINGS

```
 1              MR. HACKER:  That's correct.  But it doesn't
 2    change the fact that that makes it publishing activity.
 3    That's absolutely entirely clear.  I mean, Force, the
 4    Force discussion, the 2nd Circuit's case in Force, has a
 5    very good discussion about this when it talks about the
 6    matchmaking algorithm that Facebook was using.  It's
 7    basically the same idea.  And the Court there says, that
 8    selecting which content to display and how, including a
 9    decision to select content based on a user preference,
10    rather than some political ideology of the platform,
11    selecting content and which ones to give to this user and
12    which ones to exclude from that user, is still publishing
13    by definition.  What Force says is, "Arranging and
14    distributing content to form connections and matches
15    between third-party speakers and reader viewers is an
16    essential result of publishing."
17              It's just like a newspaper organizing articles
18    by topic or editions by geography.  The newspaper doesn't
19    care, it's just trying to figure out how to identify for
20    users, if you're interested in sports, where you're going
21    to find sports.  If you're from the suburbs of Seattle and
22    you take the suburban edition.  That's not a judgment
23    about the content, it's a prediction about what content
24    the user is likely to identify.
25              The fact that an algorithm is automated may --
```

- J L M -

8

PROCEEDINGS

1    this is what Force says, might make, "The algorithm might

2    make more matches than other traditional print media

3    editorial decision, but it would, quote, 'turn Section 230

4    upside down,' end quote, to deny Section 230 immunity just

5    because platforms are, quote, 'especially adept at

6    performing the functions of publishers.'"

7          So, the algorithm is very good at identifying

8    what a particular viewer would like to read, or in this

9    case, view.  But that's still a decision that a publisher

10    makes about which content to provide to this viewer, which

11    content to postpone, which content to delay.

12          THE COURT:  You're comparing it to, in the

13    traditional sense, a newspaper, right?  If we're talking

14    about some sort of feature in a periodical that allows the

15    user to engage in sports articles, for example, that's one

16    thing.  But here, when you add that with infinite scroll,

17    for example, the issue is you have users who are addicted

18    then, because they just keep going, going and going and

19    going, regardless of content.

20          MR. HACKER:  But what is the user addicted to?

21    What the user to is addicted to the videos that the

22    algorithm is choosing to identify for that user.

23          THE COURT:  I think that's the fundamental

24    discrepancy in this case, right?  I think that the

25    straight argument is, that it's content agnostic, right?

- J L M -

9

PROCEEDINGS

1    I think that the line from Judge Scott's decision in the

2    DC case was, it doesn't matter if it's puppies or

3    pornography, an addiction is an addiction and you're just

4    keeping users engaged on TikTok.

5              MR. HACKER:  But, again, Force answered that.

6    An addiction is an addiction to videos because of the

7    videos you're selecting.  Let me -- pardon me.  Here is

8    what Force says, quote, "The algorithms take the

9    information provided by," in that case, "Facebook users

10   and match it to other users, based on objective factors

11   applicable to any content.  Whether it concerns soccer,

12   Piccaso or plumbers."  This is the puppies or porn line.

13             The Force case recognizes that, but it

14   understands that Judge Scott, and other decisions, are

15   literally getting this backwards.  Force goes on to say,

16   "Merely arranging and displaying other's contents on

17   Faceback through such algorithm, even if content is not

18   actively sought by other users, is not enough to hold

19   Facebook responsible as the developer or creator of that

20   content."

21             And the reason is, as Force and Shiamili

22   explain, arranging and distributing content is classic

23   publishing.  It doesn't matter, it's not about whether we

24   absolutely recognize, as the Force case recognized, it

25   doesn't matter if it's Picasso or puppies or golf or

- J L M -

10

PROCEEDINGS

1    movies, whatever it might be.  The point is, according to

2    the State, the algorithm is trying to identify content and

3    select content which is publishing, based on the user

4    preference.

5           Here is what they -- this is their own words,

6    paragraphs 66 and 67 of the complaint, explaining why they

7    think that the algorithm is bad.  "The central feature of

8    the TikTok platform is its recommendations system, which

9    is a complex series of algorithms that powers the For You

10   feed.  Users do not know what the next video will be, and

11   they struggle to resist the pull to continue using the

12   platform to find out."  That's the addiction theory, Your

13   Honor.

14          The next paragraph, "As one expert has

15   explained, the platform is able to find the piece of

16   content you're vulnerable to that will make you click,

17   that will make you watch.  But it doesn't mean that you

18   will really like it.  It's just the content that's most

19   likely to make you stay on the platform."

20          That's their theory.  They say, again, the

21   paragraph pages one and two of their brief, "The

22   algorithms feed users short form videos on topics that

23   will keep young people watching."  That's their theory of

24   the problem here, is that the algorithm is selecting

25   content that viewers are most likely to find engaging.

- J L M -

11

PROCEEDINGS

1      Now they say, it doesn't necessarily mean

2 content they'll like it, but it's contents that they will

3 find engaging.  That's the theory of addiction.  But the

4 theory of addiction, the only conduct, to use their

5 phrase, is publishing.  Those are publishing choices to

6 give a viewer a particular video that they will find

7 engaging and decide to give them, you know, not a

8 different video, because they are less likely to find that

9 engaging.

10      THE COURT:  Going back to my earlier question,

11 right, which is, I don't read the complaint or the State's

12 position to be, as I think that perhaps have been analyzed

13 in other decisions, that you look at each of these

14 features in a vacuum, right?  We talked about that.  So,

15 it's not the algo in and of itself that's problematic, you

16 got this algo that's feeding someone, let's take sports,

17 something innocuous, but then you add in the likes, the

18 comments, the scrolls, and that is what lends itself to

19 this addiction, right?

20      MR. HACKER:  I don't disagree with that

21 characterization of what they think the problem is.  The

22 problem analytically is all of that conduct, whether

23 viewed individually or collectively, is a publishing

24 process.  It's what a publisher does.  Here is what the MP

25 Court said in the 4th Circuit.  "Decisions about whether

- J L M -

12

PROCEEDINGS

 1   and how to display certain information provided by third

 2   parties are traditional editorial functions of publishers,

 3   notwithstanding the various methods they use in performing

 4   that task."

 5            So, we've talked about the algorithm which

 6   cannot be described in any other way as decisions about

 7   what third-party content to publish.  Then you look at the

 8   other features that are challenged, again, individually or

 9   collectively.  Each of them is a publishing decision

10   similar in kind to what a newspaper does in deciding where

11   to put an article.

12            THE COURT:  The beauty filter is a publishing

13   decision?

14            MR. HACKER:  I'm sorry?

15            THE COURT:  The beauty filter is a publishing

16   decision?

17            MR. HACKER:  That's a tool provided to a

18   creator.  We're not the ones who filter.  We provide the

19   tools so that a creator can edit his or her own content.

20   So, it's a classic publishing tool.  You say to creators,

21   here, you want to -- this is third-party content, your

22   content.  Here is something you can use.  So that when we

23   publish it, it will look the way you want it to look;

24   that's the filter.

25            The autoplay and infinite scroll literally,

                            - J L M -

13

PROCEEDINGS

1    explicitly decisions about how long videos are going to

2    play, when they are going to pop up, whether there is a

3    break between them.  In a sense, infinite, so called

4    infinite scroll is just like a TV channel, right?  You're

5    not forced to change channels.  The content just keeps

6    getting provided to you.

7         THE COURT:  It's not though, right?  Because

8    there is a big difference between putting on a show for

9    your child, versus giving them TikTok, right?  The

10   difference is, they are going to watch the show and then

11   the show is going to end, right?  But the TikTok platform

12   is designed to just keep it going.

13        MR. HACKER:  Not quite.  The TikTok platform,

14   it's like -- I don't want to overstate it.  There are

15   absolutely differences.  But these are short form videos

16   that come one after the other.  The user has to make a

17   choose to move onto the next video.  But on TV when the

18   show is over, a next show comes on.

19        THE COURT:  But that show isn't intended to keep

20   the viewer addicted.

21        MR. HACKER:  If the publisher, the TV channel,

22   the broadcaster is really good at his job, they are trying

23   to find shows that users will find most engaging.  That's

24   what they always do and they have always done that.  It

25   just so happens, this is what MP and Force are saying, the

- J L M -

14

PROCEEDINGS

1    internet platforms are really good at it, because they can

2    curate and make a personalized selection of TV shows, if

3    you will, short form videos, that viewers are most likely

4    to find engaging.

5              So, it's the same process as before, it's just

6    narrowed down, focused on individual users.  And they are

7    better at, because they have more information about the

8    user's preference, about identifying what they are most

9    likely to find engaging.  But that -- the fact that they

10   are better at it doesn't change the fact that it's still a

11   decision about what content to select and how to provide

12   it to them.  That's -- the story is the live content,

13   right?  Their argument is that it's unlawful in the State

14   of New York to only publish a live video.  And apparently

15   their argument is that you have to keep it in the memory

16   so that people can pull it up at a different time.  Their

17   argument is --

18             THE COURT:  Their argument is actually, and

19   don't let me misstate it, but that there are

20   misrepresentations about, right?  I mean, it's not the

21   live video itself.

22             MR. HACKER:  That's a categorically different

23   argument.  They are arguing that live itself, just its

24   existence is bad.  Because that's their FOMO point.  That

25   users have to jump on and see it because they're never

- J L M -

15

PROCEEDINGS

1    going to see it again.  It's just an argument that you

2    cannot have a live only video in the State of New York.

3    You choose to do that.  You can't choose to publish it

4    that way.  You have to make a different publishing choice.

5            The deception arguments are in a different

6    category, because those are claims about things that we

7    represent to the public about the safety of the platform

8    and the way that the platform works.

9            I do want to leave time for my colleague, Mr.

10   Brody.  But I'll just commend this Court to the Grindr

11   decision, which really summarizes the way 230, deception

12   claims work under 230.  There is sort of a categorical

13   difference between Section 230 does not immunize specific

14   promises about specific acts, particularly to specific

15   users.  But it does immunize general statements and

16   general asserted nondisclosures that are about the safety

17   of the platform and the general policies.  Because that's

18   just a backdoor way of challenging the policies themselves

19   which 230 protects.

20           THE COURT:  Thank you.

21           MR. HACKER:  Thank you.

22           MR. BRODY:  Good morning.  I will try to do this

23   in seven minutes or less.

24           THE COURT:  We always have a little bit of

25   flexibility.

                          - J L M -

16

PROCEEDINGS

1          MR. BRODY:  I think it's important to start in

2     talking about parens patriae standing, which is applicable

3     to Count Seven, Eight and Nine of the complaint, by noting

4     that Section 230 immunity is equally applicable to each of

5     those counts.  Each of those counts purport to state

6     claims for harms to individual users of the platform.

7     Harms that those users allegedly had suffered as a result

8     of their exposure to third-party content published

9     platform.

10          But at a threshold level, the Attorney General

11     lacks standing to pursue the parens patriae claims for

12     product liability or for negligence.  And it is clear and

13     explicit in the complaint in each of those counts, that

14     what the Attorney General is seeking to recover for here

15     are alleged harms to individual users, even going so far

16     as to assert a punitive damages claim in each of those

17     counts.

18          It fails for a very simple threshold reason,

19     which is that the Attorney General must establish that

20     aggrieved individuals do not have an adequate remedy at

21     law.  They clearly do here.  We know that.  Because

22     aggrieved individuals are pursuing claims against the

23     defendants here and other social media platforms in two

24     coordinated proceedings that are currently pending.

25          So, the State can't meet the requirement to show

- J L M -

17

PROCEEDINGS

1     the foundational element for parens patriae standing, and

2     this is actually really the core principle, it's a

3     judicial recognition of the power of the State to prevent

4     injury to those without the ability to pursue an adequate

5     remedy of law.

6          That's not pled in the complaint.  But this

7     isn't just a pleading failure because, again, as we know,

8     they are, in fact, individuals are, in fact, and have the

9     ability to pursue product liability and negligence claims.

10    I think that the two State By Abrams cases that are cited

11    in the briefing, that each reach a separate result on the

12    facts of those cases, are really instructive as to this

13    point.

14         The case involving the Conciliation and Appeals

15    Board found no parens patriae standing, where individuals

16    who were impacted, who should have had their rents reduced

17    due to a board determination of a diminution in services,

18    could bring claims for those rent reductions on their own.

19         That stands in contrast to the People By Abrams

20    versus 11 Cornwell Company case, that involved a case that

21    the state brought in the parens patriae capacity against a

22    partnership, a real estate partnership, that bought a

23    property to keep the state from developing a home for

24    intellectually disabled citizens.  And there the Court

25    specifically said, the individuals would not be able to

- J L M -

18

PROCEEDINGS

1   obtain complete relief because they would likely not be
2   able to show that they had standing to bring a claim under
3   housing discrimination laws, because they would be unable
4   to show that they were likely to be impacted by this
5   facility not opening, where the facility was going to
6   house, I think, eight to ten residents.  So in that case
7   clearly the requirement was met.  It's very clear that
8   it's not here, and those two cases illustrate that for us.
9           THE COURT:  What about with respect to future
10  users?
11          MR. BRODY:  Excuse me?
12          THE COURT:  Futures users at TikTok?
13          MR. BRODY:  So, future users, it's entirely
14  speculative.  I think that with respect to future users
15  you have to go back to the idea that these are product
16  liability claims.  And the requirement of a product
17  liability claim is that, you show a design defect, a
18  failure to warn, a manufacturing defect.  And we'll talk
19  about manufacturing defects that harmed the user.
20          So, the notion of a potential hypothetical
21  future user having the ability to assert a product
22  liability claim is foreign to product liability law.  It's
23  foreign to negligence law.  And it's in a situation where
24  the State's claims are derivative of the individuals on
25  whose behalf they are purporting to bring them.  You can't

- J L M -

19

PROCEEDINGS

1    say, well, there might be somebody in the future who can't

2    bring a claim today, who might want to bring a product

3    liability claim in the future.

4            If that person becomes the user of a platform

5    and wants to bring a claim, that person will have the

6    ability to seek redress in the event that person is

7    harmed.  This is not a case where every single person who

8    uses the application is, the platform, is alleged to have

9    suffered harm.

10           Now, Count Seven and Eight separately fail based

11   on the threshold -- separate threshold issue, which is

12   that an online entertainment web site, online

13   entertainment platform, is not a product for purposes of

14   product liability law.  And although the State cites

15   Patterson and Amagel, neither one of those cases actually

16   analyzed the issue.  Analyzed is this a tangible personal

17   product, tangible personal item, which is what the

18   restatement, their torts speaks to in addressing what a

19   product is.  That's Section 19.  A product is tangible

20   personal property distributed commercially or for use or

21   consumption.

22           It significantly, when you look at Comment D to

23   the restatement, what Comment D does is, it explains that

24   something like a newspaper, information that is being

25   transmitted is not a product for purposes of product

- J L M -

20

PROCEEDINGS

1    liability.

2            So, take the New York Times or even the online

3    version of the New York Times, that is not going to

4    qualify as a product.

5            THE COURT:  So, it has to be tangible.

6            MR. BRODY:  It has to be a tangible product.

7    There are limited exceptions that the restatement

8    recognizes, electricity --

9            THE COURT:  But you would agree that other

10   Courts have found, and I think that some of these

11   decisions are cited with Mr. Wallace's affirmation, that

12   online platforms such as, I think, that Lyft, for example,

13   those have been found to be products for purposes of

14   product liability claims, right?

15           So, where have those Courts gone wrong when

16   we're talking about today, where we've got Uber, Lyft, all

17   these sorts of online platforms?

18           MR. BRODY:  I think where they have gone wrong

19   is drawing a distinction that cannot be drawn here.  Which

20   is, and in the Uber and Lyft cases, the distinction that

21   has been drawn is, well, this is something that somebody

22   basically has to have it physically up in their vehicle

23   and be looking at it, or is unable to, you know, is unable

24   to provide -- so Lyft, the case basically is, you're

25   driving around and you have to be looking at this thing.

- J L M -

PROCEEDINGS

1    I don't think that makes it a product, and I don't think

2    that under the restatement meets the definition of a

3    product for product liability.  But I do think that that

4    is where the Court drew a distinction that this Court

5    cannot draw, with respect to something that allows

6    somebody to view third-party content.

7          So, I do want to last address, and I know that

8    I'm over time --

9          THE COURT:  Of course.

10         MR. BRODY:  -- by about a minute and a half

11   here.  I want to address the fact that the State has kind

12   of changed its COPPA claim to say, we're not actually

13   alleging a violation of the COPPA statute.  We are

14   asserting that you, defendants, misrepresented that you

15   complied with COPPA.

16         Now, that's a distinction without a difference.

17   And you can't transform a claim for noncompliance with the

18   law into a claim that you misrepresented your compliance

19   with a Federal Law.  And you certainly can't do that

20   without requiring this Court to consider whether the

21   defendants in this case, in fact, violated COPPA.

22         COPPA has an express preemption provision.  It

23   states that you cannot bring claims that are inconsistent

24   with --

25         THE COURT:  How is this inconsistent, though,

- J L M -

22

PROCEEDINGS

1      right?  Because while they are not alleging a violation of

2      COPPA, because of the reasons as set forth in your

3      briefing, we haven't provided notice, there is a

4      preemption clause, which I don't believe that the State

5      disputes.  But essentially the argument is, that you

6      collected young user data without parental consent.  How

7      is that inconsistent with COPPA?

8              MR. BRODY:  Because the State's claim is that

9      the defendants violated COPPA by doing so.  That's their

10     basis.

11             THE COURT:  But in the Jones v. Google case they

12     allow that.

13             MR. BRODY:  But -- and this is where you have to

14     draw the distinction between the statute itself as

15     applicable to the Attorney General.  And the Jones v.

16     Google case, which was addressing claims by private

17     citizens, the statute speaks explicitly to the fact that

18     if a State Attorney General believes that a defendant is

19     violating -- is engaging in any conduct that violates the

20     COPPA rule or its regulations, not explicitly, you know,

21     violates the statute, but any conduct that violates it, it

22     can bring an action in Federal Court.  The State hasn't

23     done that here.  It cannot bring that action at a time

24     when the Commission, the FTC, is bringing a claim, as is

25     the FTC through DOJ is here, having filed in August before

- J L M -

23

PROCEEDINGS

1   the State filed in October.  And it's very, very, easy to

2   see why that is entirely inconsistent with the COPPA

3   scheme that Congress set up and envisioned.  Where

4   Congress determined that in a case where the Federal

5   government is pursuing a COPPA claim, the Federal

6   government will be prosecuting that claim.  And the Court

7   hearing that claim will be the one to decide whether the

8   defendant has violated the COPPA statute.

9        If this case were to proceed under the claims

10  that have been pled, the Attorney General would be asking

11  this Court to decide whether defendants have violated

12  COPPA, and then in their view, lied about COPPA

13  compliance, I guess, as they have refashioned it in

14  opposition to the motion to dismiss.  And that would be

15  entirely inconsistent with what Congress envisioned for

16  how these claims have to be decided.  And that's explicit

17  in 15 U.S.C. 6504 D.

18       THE COURT:  So, if I were to find that the

19  allegations in the complaint that essentially are alleging

20  a violation of COPPA, right, that those are preempted,

21  then what do we do?  We just strike those allegations from

22  the complaint because there is no cause of action for it,

23  right?  And this is where we get into the rubric that

24  defendants have come up with these theories versus the

25  actual counts.

- J L M -

24

PROCEEDINGS

1          MR. BRODY:  Well, I think it's important in this

2     case for the reason that, given Section 230 immunity that

3     applies here, given the First Amendment argument, if

4     you -- it doesn't give the Attorney General the ability to

5     come to court and say, well, but, we're alleging that the

6     defendants collected data from children under the age of

7     13 in violation of privacy laws.  There is no -- they

8     can't come in and argue, well, that part should go forward

9     as a carve out to the Section 230 immunity, that has to be

10     out of the case.  We would ask the Court to strike those

11     allegations, and to say that the alleged noncompliance

12     with COPPA cannot be a part of this case going forward,

13     because it is preempted and it's inconsistent with the

14     statute.

15          THE COURT:  Would anything, though, prevent the

16     allegations that are, I kind of view the COPPA allegations

17     as two buckets, right?  One is misrepresentations about

18     collecting young user data, and then two is

19     misrepresenting compliance with COPPA, right?

20          So, if we find ultimately that that second

21     bucket is preempted, any reason why the first bucket

22     doesn't stay in, misrepresentations about collecting data?

23          MR. BRODY:  Right.  So, misrepresentations about

24     collecting data is just misrepresenting that the company

25     is complying with COPPA.  It's really a distinction

- J L M -

25

PROCEEDINGS

1    without a difference.

2              THE COURT:  But under our Consumer Protection

3    Law, isn't that a claim that they can pursue, right?  I

4    mean, our GBL 349 and 350 are consumer oriented market,

5    right?  Give material facts that would be misleading to a

6    reasonable consumer and allege injury.  That's all they

7    have to show.

8              MR. BRODY:  Well, I think in this case, though,

9    the problem is, what they are showing is you violated

10   COPPA.  And then, oh, you turned around and you lied about

11   whether you were violating COPPA or not.

12             First of all, there is, I don't -- they point to

13   paragraph 285 of the complaint as this supposed support

14   for this theory.  There is nothing in 285 or paragraph 285

15   of the complaint that says, here is what the defendant

16   said about their compliance with COPPA.

17             They do have a general statement, I think in

18   paragraph 255 of the complaint, where it says, you know,

19   where they say that.

20             THE COURT:  So, 285 I think is a different issue

21   that has to do with operational independence.  But I just

22   want to make sure I'm following the paragraph you want me

23   to look at.

24             MR. BRODY:  I think that 255, if I recall

25   correctly, is the other place.  And I'm doing this from

- J L M -

26

PROCEEDINGS

1       memory, I apologize.  Where they say, there is a

2       representation about non-collection of private

3       information.  But, again, that's based on, if you look at

4       every single one of the counts in their complaint, it's

5       about -- and it's Subsection C of every single one,

6       paragraph 300, Subsection C, I think is the first one

7       under the General Business Law, and same thing under the

8       Executive Law.  They say precisely noncompliance with

9       Federal law, with Federal Privacy Law, right?  And that's

10      what the complaint is.  It's that the allegation that the

11      platform complies with Federal Law is --

12              THE COURT:  Right, but 255 is different from

13      that, right?  255 identifies -- I'll just read it into the

14      record.  "As early as 2018, the platform privacy policy

15      stated, quote, 'the platform is not directed at children

16      under the age of 13,'" end quote.

17              And then they go on in the complaint to talk

18      about all things the platform does to target children

19      under 13.  I'm so trying to understand why those

20      allegations wouldn't survive.

21              MR. BRODY:  Well, that's, I mean, that's a

22      separate question.  Because the child directed claim,

23      taking that as a potentially separate claim, is clearly

24      barred by Section 230.  Because that's seeking to hold the

25      company liable for what it publishes on the web site.

                        - J L M -

27

PROCEEDINGS

1           If you look at, I mean, if you look at, going

2      back to the cases that Mr. Hacker talked about.  If you

3      look at Grindr, for example, it's, in fact, directly on

4      point as to why this would fall under Section 230.

5      Because you're talking about an alleged statement about

6      the third-party content on the platform.  And ultimately

7      it hinges on, and we see this through that entire section

8      of the complaint, it hinges on the allegation that the

9      third-party content that is published on the TikTok

10     platform is, in fact, directed to children under the age

11     of 13.  And so, to try to find any daylight between that

12     claim and Section 230, for the reasons that the Grindr

13     court explained, is something that is impossible to do.

14               THE COURT:  Thank you, Mr. Brody.

15               MR. BRODY:  Thank you.

16               MR. WALLACE:  Thank you, Your Honor.  Kevin

17     Wallace, for the New York Attorney General.

18               I'd like to begin by focusing on where we are

19     procedurally, which is on a motion to dismiss, and what

20     the burden is on a motion to dismiss.  I'm going to start

21     focusing on the Section 230 immunity argument.  Because

22     230 immunity is an affirmative defense.  We have decisions

23     from Federal Courts in New York, noting that dismissal is

24     only appropriate if the preemption is obvious on the face

25     of the complaint.

                           - J L M -

PROCEEDINGS

1          Now, the defendants rightly point out that

2     Courts will often decide Section 230 immunity at the

3     pleading stage, in order to protect web sites from what

4     they describe as costly and protracted legal battles.  I

5     actually prefer the other quote from Roommates, which

6     describes forcing web sites to face death by 10,000 duck

7     bites, but we get the idea.  That a suit in itself is a

8     harm that has an effect on the web site they are to be

9     protected from.

10          I think that realistically protecting TikTok

11     from a lawsuit, and from this lawsuit, is not realistic.

12     Broadly speaking, the cases are proceeding against TikTok

13     and other social media platforms on the same theories as

14     laid out in this complaint.  And we can talk about each of

15     the theories in a little bit more detail.  But the

16     decisions from both State and Federal Courts, from private

17     and governmental plaintiffs, are virtually unanimous.

18     That looking at the misrepresentation claims, that those

19     claims in the complaint, they are not barred by 230.  And

20     we kind of cite to those cases.

21          THE COURT:  Am I correct in, and I know that

22     both parties have provided some supplemental authority,

23     has any Court yet found that 230 bars the claims in

24     misrepresentation claims?

25          MR. WALLACE:  Misrepresentation, I don't believe

- J L M -

29

PROCEEDINGS

1    so.

2              THE COURT:  And of course, Mr. Brody, feel free

3    to address that when you go up as well, but I don't

4    believe so.

5              MR. WALLACE:  I would certainly say that the

6    weight of authority, whether it's unanimous or not, is

7    certainly on the misrepresentation claims are allowed to

8    proceed.

9              Now, on the failure to warn claims, like those

10   in Count Eight of the complaint, I will cite to Judge

11   Gonzalez Rogers in the Northern District of California

12   MDL.  She observed that, quote, "Among all the litigation

13   against social media companies proceeding in parallel to

14   this MDL, not one Court has yet to hold that Section 230

15   bars such failure to warn theories in general."

16             Then even on claims like the product liability

17   design defect, Count Seven, and the negligence claim on

18   Count Nine, almost no Courts are dismissing those claims

19   in their entirety.

20             Now, we think that the Courts, like the D.C.

21   Superior Court, Massachusetts Superior Court and the

22   California State Court that let claims proceed regardless

23   of the 230 prohibition, they have the better of the

24   argument.  But even Judge Gonzalez Rogers in the Northern

25   District of California, who found that certain features

- J L M -

30

PROCEEDINGS

1    were protected by Section 230, found that other features

2    at issue were not protected.

3          So, features that were not protected included

4    appearance altering filters; platform features that

5    hindered time restriction; failure to implement effective

6    parental controls and notifications, age verification

7    steps.  So those features, even though she thought other

8    features of the application were protected by 230, were

9    allowed to proceed.  Which would mean that those claims,

10   even if the Court were to adopt, say, the approach that

11   Judge Rogers took, the claims themselves, some portion of

12   them would survive.  So, the goal of protecting TikTok

13   from potential -- even having to answer to a claim, that

14   really falls away.

15         Now, the specific details of how the algorithm

16   works, how the features work, those are going to be in the

17   case, even if some of the substantive claims go away, and

18   we're looking at misrepresentation.

19         So, what we're really looking at is trying to

20   parse what they call theories of liability and early stage

21   on undeveloped record.  And while that sometimes happens

22   in 230 proceedings, that's not really appropriate here.

23   In fact, you know, under the CPLR Section 3025, we're

24   allowed to amend the complaint or we can amend the

25   complaint to conform to the evidence.  So, even if the

- J L M -

31

PROCEEDINGS

1   Court were to decide on the face of the complaint, maybe

2   this affects publishing or maybe it chills the First

3   Amendment right, discovery will still proceed in the same

4   way, and we still revisit these issues at a late stage of

5   litigation, either in summary judgment or at trial.

6           But what I do want to say is, that the majority

7   of the Courts looking at these issues, have found that 230

8   does not preclude these kinds of claims.  So, even

9   features like the For You feed or the infinite scroll, and

10  that would include both the Court in DC versus Meta, and

11  the State JCCP Coordinated Proceeding in California, which

12  I don't know that we cited or came up in the briefing, but

13  that is at 2003 WL 6847378.  And at page 31 it supposedly

14  says that, "As in Lemmon, plaintiff's claims based on the

15  interactive operational feature of defendant's platforms

16  do not seek to require that the defendants publish or

17  de-publish third-party content that is posted on those

18  platforms.  The features themselves allegedly operate to

19  addict and harm minor users of the platform, regardless of

20  the third-party content viewed by the minor."

21          That's really the key.  That our complaint is

22  effective regardless of the specific video that anyone is

23  looking at that.  And that's the analysis under Barnes.

24  And I just want to talk about Barnes, because I believe

25  Mr. Hacker said that New York is in a different position

- J L M -

32

PROCEEDINGS

1   than some of the other states.

2            THE COURT:  Because that case cites Barnes.

3            MR. WALLACE:  Shiamili adopts Barnes, which I

4   think that every case, Barnes has like a universal

5   approval rate by Courts.  And virtually every case cited

6   by the People and by the defendants is applying the Barnes

7   test.

8            THE COURT:  Yes.

9            MR. WALLACE:  And I think that TikTok is really

10  focusing on the second factor of Barnes.  No one is

11  debating factor one, right?  It's an interactive computer

12  service.  TikTok, I think, is focusing on two, as to

13  whether they're being treated as a publisher or a speaker.

14  And I think that, I think that you look at the courts in

15  D.C. and other locations, are really looking at that third

16  factor, whether they are being held liable for information

17  provided by another information content provider.  Whether

18  they are being held liable for something that another

19  person put up on the web site.

20            On two, maybe it is kind of a close issue.  I

21  think that maybe it would benefit from more factual

22  develop to decide whether what they are doing fits in the

23  classic publishing rubric.  But here, the way that the

24  complaint is pled, the claims are based on the design

25  features, not the content itself.  The features that

- J L M -

33

PROCEEDINGS

1    operate independently of whatever specific video is being

2    shown.

3             I think that the two cases that defendants cited

4    in their reply brief that came after the briefing had

5    already started, Grindr and MP, sort of highlight that.

6             In Grindr, the 9th Circuit case, the harm was

7    caused by specific third-party content.  Messages from

8    adult men that facilitated sexual encounters with minor.

9    The duties alleged there, and the Court described it,

10   quote, "Would require Grindr to monitor third-party

11   content and prevent adult communications to minors."

12            I don't think that our claims require the

13   monitoring or the taking down of any particular piece of

14   content, it's how it gets presented.

15            MP, again, that case alleged that the plaintiff

16   had been harmed when a third party read specific content

17   from another third party.  So, that they were reading

18   racist indoctrination, and that led them to engage in a

19   mass shooting.  That is relating to the specific type of

20   content that the user viewed.

21            The Court there in the 4th Circuit described as,

22   quote, "Demonstrating the claim would require, quote,

23   'demonstrating that the algorithm prioritizes one type of

24   content over another.'"

25            Again, we're here agnostic on the specific

                           - J L M -

34

PROCEEDINGS

1     content.

2              THE COURT:  Am I right to be thinking about it

3     as, and I had asked defendants' counsel about this

4     earlier, I don't think that I could -- I don't necessarily

5     adopt the analysis of, well, we've got to look at each

6     feature separately.  I think that the whole point is this

7     product or platform, depending on what the Court decides,

8     has adopted an array of feature that constitute some

9     platform in the product.  So, I think it's a combination

10    of features in and of itself that makes it so addictive.

11    It's not just a gray feed, it's not just the filters.

12             MR. WALLACE:  I think that's correct.  And I

13    think that in the end if we're looking at, are we -- is

14    the case going to bump up against 230 immunity, that's

15    really on, well, what is the relief?  And we're not --

16    we've proposed some relief.  We have claims for relief

17    that are in our complaint.  But we're still awaiting

18    factual development.  We're still awaiting expert reports.

19    And the Court on most of these claims is sitting in equity

20    and will have an ability to craft a particular relief that

21    is not just up or down on legal damages.  So, the 230

22    immunity issues can be accommodated throughout the case

23    and they don't need to be dealt with at this stage.

24             I think that looking at the -- it sort of works

25    both holistically or individually, to skip ahead a little

- J L M -

35

PROCEEDINGS

1    bit to the question of, is this a product.  There is sort

2    of not a clear answer from the Courts, either the

3    decisions cited by the defendants or us, it's to, is an

4    app also a product or is it something else.  And, you

5    know, in the MDL, Judge Gonzalez Rogers on the private

6    plaintiffs looked at, I'm going to treat sort of each of

7    these features that I am allowing to go forward

8    unchallenged as a product, and very detailed analysis.

9    So, you're sort of -- you can look at it holistically.  I

10   think that it sort of reaches the same point and you break

11   it up a little bit.

12          I will just add that realistically, because of

13   the features though, this case is much more similar to the

14   Lemmon case out of the 9th Circuit, where the product was

15   the filter, and that harm came to users from accessing the

16   filter.  Obviously here we have claims over filters.

17   Those are sort of the easiest to see.  Are they something

18   that is a product, a creation of the platform versus is

19   this something that is based on a user content, the kind

20   of Grindr type case.

21          Now, I think that the ways that the plaintiffs

22   are describing it is, that our claims are seeking to hold

23   them liable for a publication of third-party content just

24   because that's what the app is designed to do.  That but

25   for the publication of the third-party material, there is

- J L M -

36

PROCEEDINGS

1     no app really, there is no claim.  But that's not really

2     the way that the Courts have been analyzing this.  You

3     know, that sort of view was rejected by the Lemmon Court.

4     And this is at pages 1092 to 1093.  Saying that, "Snap in

5     that case was an internet publishing business.  Without

6     publishing user content, it would not exist.  But the

7     publishing content is a but for cause of just about

8     everything that Snap is involved in.  That does not mean

9     that the plaintiff's claims specifically seeks to hold

10    Snap responsible in its capacity as a publisher or

11    speaker.  The duty to design a reasonably safe product is

12    fully independent of Snap's role in monitoring and

13    publishing third-party content."

14          So, to the extent that the defendants are trying

15    to draw a factual distinction with Lemmon, that the harm

16    comes from viewing the content and not the feature of

17    application, I would just note that Mr. Hacker cited

18    paragraph 66 of the complaint in the language, "That users

19    don't know what the next video will be."  So they are not

20    addicted to any one video.  It's not they have to watch

21    the same video of puppies, it's the way that it's being

22    fed to them.  So, I think that that really is the kind of

23    thing that brings us more onto the Lemmon side of the case

24    law and less onto the Grindr side.

25          I think it's even more self-evident when you

- J L M -

PROCEEDINGS

1    look at, and this is discussed in the Force case, the sort

2    of Stratton Oakmont New York State case that prompted 230

3    to be passed in the first place.  Which essentially ruled

4    that because Prodigy had tried to filter some content,

5    they were responsible for whatever made it onto the

6    platform.  And the goal was, well, TikTok, any platform

7    may not get everything.  They may make decisions about

8    what we're going to allow.  But if they try and fail, we

9    want them to still try.

10           The goal really on 230 was the protection of

11   children.  So it's at least a little bit ironic that now

12   we have actions proceeding by states and private parties

13   seeking to protect youth and, you know, 230, it's maybe

14   the unintended consequence, but that's the claim that the

15   defendants have, that it's basically serving to limit the

16   protections available to youth and to parents.  I think

17   that I will leave it there.

18           I think that we didn't discuss the First

19   Amendment.  I think that I'll just say this very briefly

20   on the Moody case, which is, I think that even the

21   majority opinion recognized that sort of facial treatments

22   of algorithms and laws that might of affect how the

23   algorithm operates, doing it on a facial basis was not a

24   great idea.  They sent it back to the circuit courts.  And

25   that they acknowledged that on a preliminary record there

- J L M -

38

PROCEEDINGS

1    are differences in the products that Facebook was

2    offering.  This on 725 to 726.  And that curating a feed

3    and transmitting direct messages, one might think involved

4    different levels of editorial choice.  So that one creates

5    an expressive product and the other doesn't.

6         So, I think it really is suggesting we need to

7    get in there and deal with what the algorithm looks like.

8    I think that's really brought out by Justice Barrett's

9    concurrence, raising questions about how does the app and

10   the algorithm operate.  Is there use of AI?  Is there

11   foreign ownership?  None of those are sort of facially

12   addressed.

13        To the extent the First Amendment is an

14   affirmative defense, it's up to the defendants to bring

15   forward those facts and show that really what we're

16   looking at is expressive content and it needs to be

17   protected.

18        The last point I will hit is just on the two

19   questions of parens patriae and product liability.  On

20   parens patriae, a hundred percent the State is able to, it

21   is a quasi-sovereign interest that the State has.  So that

22   can mean, we are protecting interests that go beyond just

23   the people who have already been harmed, it can include

24   future users.  The suggestion would seem to be that parens

25   patriae, the State doesn't have a significant

- J L M -

39

PROCEEDINGS

1    quasi-sovereign interest in making sure that each

2    successive group of users of a product aren't harmed.

3    That the proposal is, the product is out there, teens can

4    use it.  They can get harm and they can sue.  And that's

5    very different from the two cases they cite, where there

6    was a confined group of people that were affected and

7    could get economic damages.  Or in the one case that

8    didn't, there was no economic damage because they might

9    have lost housing.

10           So, I think it definitely, the State has a

11   quasi-interest in protecting -- you know, thousands of

12   kids every year are getting phones and using platforms, in

13   protecting them.  Also, there are harms to the citizens of

14   the State and to the people who use this, that don't

15   result in monetary harm that can be recovered through the

16   cases.  People may not have developed, manifested an

17   economic harm that can be recovered through a case, but

18   may still obtain other harms.  And I think that we

19   described those in our complaint.

20           THE COURT:  So, on the issue of harm and injury,

21   right, specific to the operational independence claims,

22   what's the harm there, right?  So, the allegation is that

23   the platform is misrepresented, that a foreign government

24   has access to their data, right?

25           MR. WALLACE:  Yes.

                    - J L M -

40

PROCEEDINGS

1          THE COURT:  What's the injury there that's

2     required under our Consumer Protection?

3          MR. WALLACE:  I think that the injury, and Mr.

4     Finkelstein can say if I bollix this up a little bit, but

5     I think that it would be to the extent that consumer

6     relies upon a representation.  And I think that issue of

7     data security and access to foreign powers are certainly

8     in the news enough, that it could affect consumer

9     decisions.  Because those are misrepresentation claims

10    only, there is not a substantive claim to that.

11          THE COURT:  Right.

12          MR. WALLACE:  Going onto the product, I would

13    just say, that the defendants assert there is a universal

14    rule that their application is not a product.  And that's

15    definitely not the case.  The complaint alleges it's a

16    product and that there is specific defects within the

17    products.  The Lemmon case, which we think that they're

18    closest to, that was a product liability claim.  Judge

19    Gonzalez Rogers in the social media claim, and this is the

20    private plaintiffs' decision which is at 702 F.Supp3d 809,

21    conducts an extensive analysis starting at page 837 of,

22    "Are these products?"  She chooses to go feature by

23    feature and determine, is this feature a product that can

24    be subject to product liability.

25          I think it sort of gets to the same place,

- J L M -

41

PROCEEDINGS

1    because for each feature that is being alleged to harm

2    someone, is that a product?  Yes.  But to your point, is

3    the amalgamation of all these something that is a product

4    that is just different from a static web site where people

5    go.

6              THE COURT:  Or any other social media platform

7    for that matter, right?

8              MR. WALLACE:  Precisely.  And I will just add,

9    that the tangible, the question of whether or not it's

10   tangible is not determinative.  And here, you know, TikTok

11   is also distinguished it is an application.  You go to the

12   app store in Google or Apple and you don't purchase it but

13   you download the application.  And so this bears more to

14   the hallmarks of a product than others.  And I certainly

15   don't think that the sort of categorical standard that the

16   plaintiff set out really would preclude the claim.

17             I think that Mr. Finkelstein was going to

18   address a couple of points, and also address the question

19   about COPPA.

20             THE COURT:  Thank you, Mr. Wallace.

21             MR. FINKELSTEIN:  Good morning, Your Honor.  May

22   it please the Court, I would just like to go back to your

23   point earlier, that you have it absolutely right.  That

24   you should look at our complaint through the lens of the

25   claims, as opposed to TikTok's theories.  That even if one

- J L M -

42

PROCEEDINGS

1    misrepresentation, omission, deception is valid under any

2    of our claims, that the claims would survive.  And that

3    several State Courts and the Federal MDL have also looked

4    at similar allegations, and that these claims have all

5    survived, as you mentioned earlier.

6         But just to focus on the COPPA related issue.

7    Like we, as you were looking into the complaint,

8    paragraphs 252 through 255, mention some of the

9    misrepresentations that the defendants have made about

10   their data collection from children under 13, and about

11   whether or not they are directed to children.  And the MDL

12   has found that this is not barred by Section 230 because

13   data collection is not a publishing function.

14        Another thing is that their effort to

15   distinguish Jones is just not relevant here.  The fact

16   that it was a private plaintiff in Jones versus The State

17   Attorney General is not a relevant distinction.  The

18   California case --

19        THE COURT:  But why is it not a relevant

20   distinction?

21        MR. FINKELSTEIN:  Because the reasoning is

22   whether the cause of action is inconsistent with COPPA and

23   whether it's a private plaintiff or a State AG bringing a

24   consumer protection claim regarding misrepresentations as

25   to the compliance with COPPA, either way it is not

- J L M -

43

PROCEEDINGS

1    inconsistent with the statute to hold TikTok to their

2    representations regarding --

3              THE COURT:  So, your position is that you would

4    not have to establish a violation of COPPA in order to

5    assert this claim that there was a misrepresentation about

6    compliance with COPPA?

7              MR. FINKELSTEIN:  I think that we -- so we [sic]

8    said that the platform is not directed at children under

9    the age of 13.  And they also said that they will delete

10   the information and terminate the account.  In other

11   words, that we do not collect data.

12             THE COURT:  I'm looking at paragraph 254,

13   "TikTok also violates Federal Law that governs children

14   privacy known as the COPPA Act," right?  So, as I was

15   saying earlier with Mr. Brody, there are kind of two

16   allegations with respect to misrepresentations about the

17   platform being directed to children.  It's whether or not

18   it actually targeted children 13 and under, even though

19   there are policy statements saying it does not.  And then

20   there is compliance with COPPA, those are kind of separate

21   issues, right?

22             MR. FINKELSTEIN:  I think that's right, that's

23   fair to say.  But if it's a representation about whether

24   you are complying, that that can be different.  But if

25   someone were to write FDA approved on their product, when

- J L M -

44

PROCEEDINGS

1      it wasn't FDA approved, the Court could just look to

2      strike this, just to strike the advertisement and not take

3      the product off the market.

4              THE COURT:  Okay.

5              MR. FINKELSTEIN:  If the Court doesn't have any

6      other questions, then I think that we'll rest on our

7      papers.

8              THE COURT:  Nothing further.  Thank you,

9      counsel.  Let's just pause there for five minutes.

10             (Pause)

11             THE COURT:  Mr. Brody or Mr. Hacker.

12             MR. BRODY:  We're going to do this backwards,

13     Your Honor.  I think I only need about two minutes and

14     then Mr. Hacker will use the rest of our rebuttal time.

15             First on parens patriae standing.  The State

16     suggestion that there are some sort of ethereal harms out

17     there is inconsistent with the requirements of a failure

18     to warn, design defect or negligence claim, which actually

19     requires proof of harm caused by the allegedly offending

20     and challenged conduct, that doesn't work.

21             The idea that these are claims brought on behalf

22     of future users also doesn't meet the standard for parens

23     patriae standing, because there is no way to show that the

24     future user who happened to be harmed as a result and to

25     suffer that element, would not be able to bring their own

- J L M -

45

PROCEEDINGS

1   claim if they were, in fact, harmed.  And the complaint

2   itself specifically states those claims in terms of

3   causing harm to young users who actually do use the

4   platform in New York.  That's paragraph 338.

5              As an example, in the design defect claim,

6   paragraph 348, in the failure to warn claim as to the

7   product, I will just address the point that was made about

8   downloading an app to try and draw a distinction.  That is

9   not a distinction that applies and makes something a

10  product.  Just as, you know, receiving a newspaper doesn't

11  make the newspaper a product, for purposes of product

12  liability law.  Having a newspaper land on your doorstep,

13  downloading an app to your phone, it's impossible to draw

14  a distinction.  The restatement would not recognize that

15  distinction for product liability law.

16             Finally, as to COPPA preemption, I will note

17  that the Attorney General did not have an answer to the

18  question from the Court as to whether proceeding with the

19  claim of an alleged misrepresentation about compliance

20  with COPPA, would require the Court to actually decide the

21  underlying COPPA question.  The Attorney General didn't

22  have an answer to that question and clearly the Court

23  would.

24             THE COURT:  Thank you, Mr. Brody.

25             MR. HACKER:  Thank you for your patience, Your

- J L M -

46

PROCEEDINGS

1    Honor.  It's been a long morning.  Just a few points to

2    wrap things up.

3         I want to start with Your Honor's point, which I

4    fully appreciate, that as you read the complaint, it's the

5    combination of factors, not just of the algorithms

6    selecting that make it, allegedly make it addictive.  I

7    don't actually think it's clear whether the State would

8    say any one of them.  But I have no problem with reading

9    them as alleging only the combination, because that just

10   presents the question under 230, it doesn't answer any

11   question under 230.

12        Looking at them as a combination of factors

13   presents the question, are the factors that they say are

14   harmful individually or in combination, publishing acts.

15   Are they acts of publishing third-party content in

16   particular?  That has to be answered to determine whether

17   or not this combination is subject to immunity.  And

18   Shiamili and Force give us the standard for that.  And I

19   think it's important to kind of level set back with

20   Shiamili, because I think that the State is

21   misunderstanding Barnes factors two and three.  Then, yes,

22   Shiamili cites Barnes, but it describes the relevant

23   factor I think in a very helpful way.  It says, "Section

24   230 of bars lawsuits seeking to hold a service provider

25   liable for its exercise of a publisher's traditional

- J L M -

47

PROCEEDINGS

1    editorial function, such as deciding whether to publish,

2    withdraw, postpone or alter content.  Immunity applies

3    even when the ISP has an active, even aggressive role, in

4    making available content prepared by others."

5              Then Force elaborates that in Footnote 18.  It

6    says, "Section 230 applies to, quote, "Claims where the

7    duty that the plaintiff alleges that the defendant

8    violated" -- I think it's so helpful to think of what the

9    alleged duty is, "violate, derives from the defendant's

10   status or conduct as the publisher or speaker of

11   third-party content."

12             So, you're always asking when they say there is

13   a problem that the defendant has done something wrong, the

14   question every time is, okay, is the thing that is done

15   wrong an act of publishing third-party content?  That's

16   the only question.  It's either answered yes or it's

17   answered no.  And Shiamili and Force and a hundred other

18   cases, say there is a sort of an exception to that.

19             This is Barnes Section 3, which is, well, when

20   the act you're looking at, the act of what would otherwise

21   be publishing, is actually the platform publishing its own

22   content.  You're not publishing third-party content,

23   you're publishing your own content.  That's when even

24   though it might be publishing, it's not immunized by 230.

25   Because 230 only protects the acts of publishing

- J L M -

48

PROCEEDINGS

1    third-party content.  So, that's the question.

2            Then the State, you know, fairly and candidly

3    admits, that its argument there really turns on what you

4    understand the Lemmon case to be and the Lemmon

5    distinction, right?  They are wrapping themselves in

6    Lemmon and saying, well, in that case the features

7    themselves caused the harm.  And they think that they're

8    like Lemmon.  But Lemmon is a perfect illustration why

9    these claims are immunized by 230.  This conduct is

10   immunized by 230, and not the conduct in Lemmon.  In

11   Lemmon the harm was from the features, yes, the features

12   themselves.  Because the features themselves operated by

13   incentivizing creators to create dangerous and harmful

14   content.  Nobody had to -- no third-party content had to

15   be published, and no third-party content had to be viewed.

16           So, the Lemmon court says, that's not publishing

17   third-party content, it's just the features themselves

18   that causes harm without any act of publication of

19   third-party content.  And the Grindr case comes along, and

20   others too, but Grindr makes this distinction perfectly

21   clear.  In fact, Lemmon itself in Footnote 4 says

22   explicitly, now if the plaintiffs were complaining about

23   the videos published on the platform and viewing videos,

24   and the viewing the videos caused the harm, Section 230

25   would apply.  But that, of course, is exactly what the

- J L M -

49

PROCEEDINGS

1    State is alleging here.  They say, well, no, Grindr and MP

2    and other cases are different because they are about

3    particular content.  And this is a huge and critical

4    misunderstanding of 230.

5         You see this also in Judge Scott's decision and

6    some of the other decisions.  Nothing in 230 says

7    anything, not one word about liability for, quote,

8    "particular content" or "specific content," or as the

9    State just now put it, any one video being the problem.

10   Literally to the contrary, Section 230 says, it immunizes

11   against liability for any information provided by a

12   third-party provider.  If any information, it's broad and

13   it's, I think, going back to where I started with Shiamili

14   and Force and other cases.

15        The point is, 230 is providing immunity for acts

16   of publishing third-party content.  There are two

17   questions -- three.  The first one being, is it an

18   interactive service provider?  But then the question is,

19   well, were you publishing?  And is the thing that you were

20   publishing third-party content?  That's the end of the

21   inquiry.  230 doesn't ask, are you trying to impose

22   liability for specific videos, for particular videos,

23   particular type of videos?

24        What was going on in MP and Grindr and in other

25   cases where the Court applied 230, was not about

- J L M -

50

PROCEEDINGS

1       particular racist videos.  And in MP or Grindr, particular

2       abusive communications.  Those communications, those

3       videos, were not actionable in and of themselves.  That's

4       why the claims weren't about specific content.  When you

5       read the cases, the problem that was being asserted was

6       the mix of content that -- and the State properly quoted,

7       I think that it was from Grindr, the failure to monitor

8       and take down videos that would end up causing harm.  They

9       weren't objectionable in themselves, but the mix was

10      inappropriate was the allegation.

11              In MP there was too much racialized content,

12      there should have been less, different.  And in MP there

13      was too much of the abusive communication, should have

14      been less and different.  And that's the allegation here.

15      The harm is different.  The harm is that the videos you

16      are selecting and the way that you're presenting them,

17      choosing to present them through these other features, is

18      causing a different harm.  It's not the racist ideation or

19      child abuse, it's harm of addiction.

20              THE COURT:  The harm here doesn't derive from

21      the content, though.  I think that that's, you know, kind

22      of where this feels different than some of those other

23      cases.  The harm here derives from the addiction.

24              MR. HACKER:  But to be very clear, Your Honor,

25      there is no addiction without the content.  What they are

- J L M -

51

PROCEEDINGS

1    addicted to, their argument -- and this is why I read from

2    those passages.  Look at page one, two of their own brief.

3    The harm is the selection of videos that users are likely

4    to find engaging.  If the publishing function didn't

5    choose videos that the user would likely to find so

6    engaging, and present them in a way through the other

7    features that they found engaging, there would be no harm.

8    So, it's not addiction in the abstract.  The algorithm

9    doesn't create an addiction because somebody comes in and

10   says, it's a fancy algorithm, I'm addicted to it.  The

11   algorithm causes the alleged addiction because of the

12   content that's selected.  That's their allegation.

13         So, the harm comes from the content.  They say,

14   well, no it's not from specific content, it's not from

15   racist content or sexual content.  But what it is from, by

16   their account, is from addictive content.  They want the

17   platform to publish different videos to individual users.

18         THE COURT:  They don't want kids to be on the

19   platform all the time.

20         MR. HACKER:  Well, if they could ban the

21   platform, they would.  But that's clearly a violation of

22   all kinds of provisions.  What they want is to get to that

23   result by changing the stream of videos, right?  They are

24   not trying to impose a, you can only be on the platform

25   for one hour a day.  What they are saying is, because the

- J L M -

52

PROCEEDINGS

1   videos that are fed into the For You feed are so engaging,

2   the content is so engaging, children become, users become

3   addicted to it, right?  The way to change that, by their

4   allegation, this is not me saying it, it's their story, is

5   that users need to be fed different videos, at different

6   times, with different ancillary publishing devices, so

7   that they don't become addicted.

8                THE COURT:  I don't buy that.  And I don't think

9   that the complaint says this.  I don't think that the

10  allegation or theory is, let the kids stay on TikTok for

11  as long as they are.  Let's put aside the

12  misrepresentations about time, but let's show a different

13  thing.  That's not the allegation here.  And I don't think

14  that's the save either.

15               I think that the allegation is, you are

16  purposely employing devices, not you, TikTok, is purposely

17  employing devices which, you know, we can quibble later

18  about whether it's one feature or the cocktail of features

19  that are designed to keep them engaged in the platform,

20  which I understand maybe that's a publisher's job.  But,

21  again, we're not talking about a newspaper, we're talking

22  about -- go ahead.

23               MR. HACKER:  It's engaged them, I mean, I take

24  everything you say as an accurate description.  But with

25  respect, it's omitting two key factors.  Engaged on the

- J L M -

53

PROCEEDINGS

1    platform doing what?  And how are they engaged?  What gets

2    them engaged?  Doing what?  Is viewing third-party

3    content?  So, that's the job of a publisher, to publish

4    third-party content.  They can't dispute that that's the

5    issue here, that's what causes that.  And the how they are

6    doing that, is by sending to each user, identifying videos

7    they are most likely to find engaging.  Publishing

8    decisions.  That's -- and I totally agree with you, they

9    are not saying, we want -- we're going to impose a

10   separate time limit on watching.  What they are saying is,

11   we want to get to the result.  Our problem is users, teen

12   users are watching too many videos, right?  They are

13   watching too many videos.  There are no other harms like

14   Lemmon.  Not about viewing videos, they're watching too

15   many videos.  And if TikTok will change its algorithm so

16   that different videos are selected and present them in a

17   different way, then users won't find it so engaging and

18   watch it less.

19        THE COURT:  How does the algo work?  The algo

20   takes the user's preferences and is automatically

21   calibrated to spit out features or -- how does it work?

22        MR. HACKER:  The algorithm is one of the

23   features, right?  And at a high level, I'm not an

24   engineer, but basically, and this is their allegation, the

25   way that the algorithm works is, it takes a variety of

- J L M -

54

PROCEEDINGS

1      factors about a user's preference, their past viewing,

2      their amount of time they spend on certain videos, other

3      information that they could obtain about John Doe's

4      viewing preferences.  That's kind of on one side.  And on

5      the other side, there is the whole universe of content

6      that is theoretically available on the TikTok platform.

7      And the algorithm has a way of cutting through all that

8      and narrowing down and saying, here is John Doe.  We know

9      John Doe's set of preferences.  Here is the videos that

10     John Doe is most likely to like, to find engaging,

11     whatever that means --

12              THE COURT:  So, it's really --

13              MR. HACKER:  -- and here is videos that won't

14     be, so we're going exclude those.

15              THE COURT:  So, it's really then the user's kind

16     of editorial choices in some way, right?  It's the user

17     saying, here are my choices what I like, and the algorithm

18     is automatically calibrated according to those inputs?

19              MR. HACKER:  I wouldn't say automatic, it's

20     human beings that design the algorithms to match.  Yes,

21     it's a matchmaking.  I really commend this Court to the

22     discussion of how matchmaking works in the Force case.  I

23     don't believe that the State disagrees with that as what's

24     going on.  And it is the user preference.  But the

25     publication choice is, one, deciding that what you want to

- J L M -

PROCEEDINGS

55

1    publish is based primarily on user's preference and not

2    other things, you know, it's not a conservative magazine

3    or a nature magazine.  It's a general interest platform

4    that says to users, if you use our platform, and said to

5    creators, if you put your material on our platform, we're

6    going to match it with users who will most likely to find

7    engaging.  And it is a set of choices.  This is the

8    publication part of it.  It is a set of decisions of the

9    algorithm through its digitized mechanisms, makes in

10   deciding this video, John Doe will like this video.  He

11   might like this one, so we'll put it later in the queue.

12   You'll hate this one, we're never going to show it to him.

13   That's the process.

14        I mean, it's -- I don't think that it's possible

15   to describe publishing in any other way, as all the cases

16   do, including the Shiamili, as a process of deciding what

17   content to include, to postpone or exclude.  And that's

18   what the algorithm is doing in an automated way.

19        But, again, Force and MP tell us, I think it's

20   pretty obvious to me, that just because it's really good

21   at it, doesn't mean it's not publishing.  It is a set of

22   decisions designed to decide what content to publish.

23        Then you mentioned, so the algorithm doesn't

24   trigger the other features.  Not as far as I know or as

25   far as they allege.  The other features are all, we can go

- J L M -

56

PROCEEDINGS

1     through each of them, are all decisions about how to
2     display the content that the algorithm has selected.  So,
3     that's endless scroll, the --
4               THE COURT:  Likes.
5               MR. HACKER:  The Likes, the communication
6     between users.  If you look at the Dyroff case from the
7     9th Circuit, it goes through a number of these and very
8     effectively explains why they are all classic publication.
9     What a publisher does is decide, when you get a
10    third-party submission if you're a general interest
11    magazine, what you decide, in addition to deciding is this
12    a good article, will this appeal to my general interest
13    readers?  That one will not, I'm going to choose this one.
14              So, I've selected this one based on prediction
15    about what my readers' preferences.  Then you make a
16    decision where in the magazine am I going to put it.  How
17    many, you know, pages will I devote to it.  What font size
18    am I going to use.  What articles am I going to put it
19    next to that are likely to engage a reader to keep
20    reading.  Those are classic, traditional media decisions.
21              THE COURT:  But the difference is, those aren't
22    specific to that one user, right?  That's general --
23              MR. HACKER:  Exactly.  That's a descriptive
24    difference.  But for purposes of 230, it's not a legal
25    difference, it's just a way in which it makes them so

- J L M -

57

PROCEEDINGS

1    effective.

2           I would just add, you've been very generous with

3    time.  I just want to make one last point because the

4    question you raised about the deception claims and whether

5    any Court had found that Section 230 bars

6    misrepresentations.  I would say Grindr is a very good

7    example of a case that is not different from this one in

8    substance, for the reasons I've explained.  I do accept

9    that, you know, there is literally like the same claims

10   have been asserted in other cases.  And Courts have

11   allowed the deception claims to go forward there.  But

12   those same Courts have always allowed the substantive

13   claim to go forward.

14          If you've decided that the substantive claim is

15   not immunized by 230, I think that it just follows that

16   the misrepresentation claim wouldn't be -- the question

17   would be, once you recognize that the substantive claims

18   are attacking publishing of -- conduct that is publishing

19   of third parties, then the misrepresentation claims are

20   just perfectly ancillary to that.  Because they are just

21   another way of saying, well, you are implicitly or

22   explicitly saying it's safe when it's not.  For all the

23   reasons that we've challenged the underlying claims, and

24   so they can't -- they sort of stand and fall together,

25   would be our submission on that.

                          - J L M -

58

PROCEEDINGS

1          With that, I guess that I will end where they

2     started, which is the fact at the pleading stage, I think

3     that counsel correctly acknowledged, all the cases that

4     say, sort of the point of 230 is to eliminate not only

5     liability but also litigation because of the cost and the

6     chilling effect of publishing activity.  And that's

7     exactly what we have here.  Thank you for your time, Your

8     Honor.

9          THE COURT:  My pleasure.  Thank you, counsel.

10          Counsel, thank you so much for that excellent

11     argument.  It's 12:20 now.  I would like to break and come

12     back at 2:30 to render a ruling from the bench.  If it is

13     an inconvenience to come back in person, I'm happy to do

14     it virtually.  I'll leave it to you entirely what you want

15     to do, whatever you want.

16          MR. WALLACE:  The Attorney General is available

17     in person.

18          MR. BRODY:  We'll come back.

19          THE COURT:  Let's come back and be ready to roll

20     at 2:30.  Thank you very much.  I appreciate it.  Thank

21     you.

22          (Luncheon recess taken)

23          (Court stands in recess until 2:30 p.m.)

24

25

- J L M -

DECISION

59

```
 1          A F T E R N O O N   S E S S I O N
 2          THE COURT:  Good afternoon.  We're back on the
 3     record in the People of the State of New York versus
 4     TikTok Inc., et al., Index 452749 of 2024.
 5          Counsel, anything before the Court puts its
 6     decision on the record?
 7          MR. HACKER:  Yes, Your Honor.  Jonathan Hacker,
 8     for the defendant.  One minor housekeeping matter,
 9     regardless of housekeeping.  In the argument you asked,
10     Mr. Wallace and I addressed this question, of whether any
11     Court had dismissed just deception, misrepresentation.
12     Neither of us recall one example of the Court that did do
13     that, which was in the Washington case.
14          THE COURT:  Okay.
15          MR. HACKER:  The Court otherwise denied the
16     motion to dismiss, but did carve out, literally in
17     writing, statements that the platform is, quote, "Safe,
18     well-moderated and appropriate for children."  And the
19     Court said those were protected from liability by Section
20     230, citing Grindr.
21          THE COURT:  Citing what?
22          MR. HACKER:  Grindr.  There is no other
23     analysis.
24          THE COURT:  That would have been very recent.
25          MR. HACKER:  Yes, it was March 28.
                         - J L M -
```

60

## DECISION

1          THE COURT:  Thank you so much for running that
2    down.
3          MR. HACKER:  Thank you.
4          THE COURT:  I'm going to ask you bear with me.
5          Plaintiff commenced this action on October 8 of
6    2024 with the filing of the summons and complaint which
7    asserted nine causes of action.  Count One seeks to enjoin
8    repeated or persistent fraudulent business conduct under
9    Executive Law Section 6312, including misrepresenting to
10   consumers, expressly and by implication, that its platform
11   is safe and appropriate for teens and preteens.
12         Misrepresenting to consumers, expressly and by
13   implication, the effectiveness and built-in features
14   designed to combat addictive use, harms, including
15   parental controls, community standards and age
16   verification.
17         Misrepresentating to consumers, expressly and by
18   implication, that the platform is not directed to children
19   under 13 years old, and complies with Federal Privacy Law.
20   And failing to disclose the adverse health consequences of
21   the TikTok app and platform.
22         Counts Two and Four assert violations of New
23   York General Business Law 349.  Counts Three and Five
24   assert violations of General Business Law 350.  Count Six
25   asserts a violation of Federal Trade Commission Act

- J L M -

61

## DECISION

1    Section 5, which prohibits unfair or deceptive acts or

2    practices in or affecting commerce by -- and then it

3    refers to those same categories, misrepresentations, I

4    just read into the record, which there are four counts.

5           Seven asserts a product liability claim for

6    design defect.  Count Eight asserts a product liability

7    claim for failure to warn.  And Count Nine asserts a

8    negligence claim.

9           Defendants seek to dismiss the complaint

10   pursuant to CPLR 3211 (a) 7.  Defendants characterize the

11   counts, which are apparently six consumer protection

12   counts brought under New York State law.  And three

13   product liability claims based on their own formulated

14   rubric as being asserted under three theories.  The first

15   is the platform safety theory.  The second is the child

16   direction theory.  Third, operational independence theory.

17   The Court observes that the complaint does not assert

18   causes of action specific to the second or third theories.

19          The defendants' characterization of the

20   allegations in the complaint and attendant theories for

21   imposing liability, as elucidated by oral argument today,

22   turns on a failure to recognize that this case is not

23   about content, it is about a cocktail of design features

24   that are unique to the TikTok product, and alleged to

25   cause harm to young people, and for which TikTok is

- J L M -

62

DECISION

1    alleged to have made material misrepresentations to the

2    New York public.

3           These design features include, as alleged in the

4    complaint, the For You feed or recommendation system,

5    autoplay, infinite scroll, ephemeral content, which refers

6    to TikTok stories and LIVE, push notifications, likes,

7    comments, other attractions and effects, such as designs

8    and beauty filters.

9           In this respect, the Court finds that the

10   defendants cannot avail themselves of the protection

11   offered to publisher's content and in the traditional

12   sense.  Rather, the complaint sufficiently alleges that

13   TikTok employ as series of addictive design features to

14   maximize young user engagement with the platform, and

15   which results in harms to young users.  And that TikTok

16   misrepresented the safety of its platform to convince the

17   New York public that it was safe for young users.

18          Plaintiff's theory of the case, as set forth in

19   the complaint, is content neutral and focuses on the

20   defendants' application to design, which renders the

21   application itself addictive and harmful to young users.

22          I'm just going to road map and go through each

23   of the arguments that we went through today.  The headline

24   is, I am denying the motion to dismiss with respect to the

25   nine counts.  However, as we discussed during oral

- J L M -

63

DECISION

1    argument today, I'm going to strike the portions of the

2    complaint that allege misrepresentations for violation of

3    COPPA and the operational independent misrepresentations.

4    I am come back to that at the end, but I didn't want to

5    keep everyone on pins and needles.

6         A motion to dismiss pursuant to 3211 (a) 7,

7    pleadings are to be afforded a liberal construction.

8    Allegations are to be taken and true.  The plaintiff is

9    afforded every possible inference.  Any determination is

10   made only as to whether the facts as alleged fit within

11   any recognizable legal theory.  That's CSC Holdings v.

12   Samsung Electronics case, from the New York State Court of

13   Appeals, 2021.  The test is whether the proponent of the

14   pleading has a cause of action, not whether he has stated

15   one.

16        On Leon v. Martinez, Court of Appeals, 1994,

17   starting with Section 230 of the Federal Communications

18   Decency Act, the Court finds it does not immunize TikTok

19   from liability, because the causes of action are not

20   premised on third-party content and/or TikTok as a mere

21   publisher of third-party content.

22        Under Section 230, "No provider or user of an

23   interactive computer service shall be treated as a

24   publisher, speaker of any information provided by another

25   information content provider."

- J L M -

64

## DECISION

1         The Court applies the three-point standard set

2    forth in Barnes v. Yahoo to determine whether Section 230

3    immunity applies.  Barnes determined that Section 230 only

4    protects from liability when, one, a provider or user of

5    an interactive computer system; two, from a plaintiff

6    seeking to treat under, a state law cause of action, as a

7    publisher or speaker; three, of information provided by

8    another information content provider.

9         The Barnes court held that, quote, "What matters

10    is whether the cause of action inherently requires the

11    Court to treat the defendant as a publisher or speaker of

12    content provided by another.  To put it another way,

13    Court's must ask whether the duty that the plaintiff

14    alleges the defendant violated derives from the

15    defendants' status or conduct as a publisher or speaker,"

16    end quote.

17         In this respect the Barnes court determined that

18    the CDA does not provide general immunity from liability

19    deriving from third-party conduct.  See also Lemmon v.

20    Snap.  That's the 9th Circuit case from 2021.  Which held,

21    quote, "CDA immunity is also unavailable in this case

22    because the parents negligent design claim does not turn

23    on information provided by another information content

24    provider," end quote.  See also Homeaway.com, Inc. versus

25    the City of Santa Monica, also from the 9th Circuit of

- J L M -

65

DECISION

1    2019, which held that "It is not enough that third-party

2    content is involved."  And Courts reject use of a but for

3    test that would provide immunity under the CDA solely,

4    because a cause of action would otherwise have accrued but

5    for third-party content.

6           Interestingly and consistent with Mr. Wallace's

7    remarks today during oral argument, New York Courts have

8    recognized that Section 230 prohibits holding an

9    interactive computer service provider liable for any

10   action voluntarily taken in good faith to restrict access

11   to or availability of material that provider considers to

12   be obscene, lewd, lascivious, filthy, excessively violent,

13   harassing or otherwise objectionable.

14          Accordingly, Courts have construed Section 230

15   as authorizing broad immunity.  That is from the Word of

16   God fellowship, Inc. versus Vimeo.  That is a First

17   Department case from 2022.  Here, the allegations are

18   unrelated to the third-party content on TikTok, but focus

19   exclusively on the design feature of the application that

20   leads to compulsive and excessive use.  See DC v. Meta

21   case, Westlaw 11921682, which held that third-party

22   content was irrelevant to the claim.

23          Contrary to defendants' characterization, the

24   activity at issue is not limited to determining what

25   third-party content to publish.  See the Reply at page

- J L M -

66

DECISION

1       three.

2               Defendants rely on the Shiamili v. Real Estate

3       group of New York case.  This is the New York Court of

4       Appeals in 2011.  Where the Court determined that the

5       defendants were not alleged to be authors of the

6       defamatory content, but that they published, edited the

7       content and therefore, Section 230 immunity applied.  The

8       Shiamili Court considered that defendants did not become

9       content providers by virtue of moving comments, reposting

10      third-party content or adding headlines and illustration,

11      which the Court determined, quote, "Did not materially

12      contribute to the defamatory nature of the third-party

13      statements," end quote.  That is simply not what is being

14      alleged here.

15              Defendants' arguments are premised on the notion

16      that they're being held liable for failing to block or

17      remove content.  I refer you to defendants' memorandum of

18      law, page 10, or that the design features alleged are

19      merely a form of publishing activity.  That is not so.

20      The plaintiff seeks to hold the defendants liable for

21      their own actions and misrepresentations thereto.

22              The TikTok app features that are being

23      challenged, as the Court has previously observed, agnostic

24      to the content being published.  As Judge Scott aptly held

25      in a companion case brought in the Superior Court of

- J L M -

67

DECISION

1       District of Colombia, state entities seek to hold, quote,

2       "TikTok liable for this anticipation of dopamine," end

3       quote.  It is not the additional content, quote, "But to

4       this expectation and anticipation which is specifically

5       engineered by the algorithm as an ultimate goal of the

6       engine," end quote.  In Judge Scott's words, users are

7       being harmed by the time spent, and not by what they are

8       seeing.

9               The allegations asserted in connection with

10      Counts One through Six do not constitute information

11      provided by another information content provider, rather

12      the allegations in paragraphs 298 to 323, for example, are

13      specific to defendants' misrepresentations about its

14      safety and appropriateness for young users.  Its built-in

15      design features to combat addictive behavior.  That it was

16      not targeting children under 13 years.  And failure to

17      disclose the adverse health consequences associated with

18      the platform and its use.  See the Demetriades v. Yelp

19      case from California Court, 2014.

20              Accordingly, to the extent that the defendants

21      rely on the two recent cases that we discussed today, the

22      MP v. Meta case from the 4th Circuit, and the Doe v.

23      Grindr case from the 9th Circuit, for the proposition that

24      design features are a means of determining how to publish

25      third-party content to each user, were free to --

- J L M -

68

DECISION

1      defendants' opposition to page three, excuse me.

2              The Court finds that both cases are

3      distinguished because the harms alleged in those

4      complaints arose from third-party content.  Whereas here,

5      the harms alleged arise from the defendants' own conduct

6      and perhaps their own formulated content.  All of which is

7      intended to maximize user engagement to reap greater

8      advertising revenues.

9              Counts Seven, Eight and Nine likewise, are not

10     shielded by Section 230, because the harms caused by the

11     alleged design defects, based upon the design features we

12     discussed and as alleged in paragraph 65 through 145 of

13     the complaint, had nothing to do with third-party content

14     that TikTok publishes.  Courts have routinely held that

15     Section 230 does not preclude liability arising from

16     design features.  I refer you to the Lemmon v. Snap case

17     and the DC v. Meta case.

18             Accordingly, the Court finds that Section 230

19     does not bar plaintiff's claims.

20             I'm now going to turn to the issue of First

21     Amendment.  The Court finds that the First Amendment does

22     not shield plaintiff's claims, because the defendants'

23     actions as alleged in the complaint, do not constitute

24     protected speech.  The defendants' argument is premised on

25     the Supreme Court decision in Moody versus NetChoice,

- J L M -

69

## DECISION

1    which held that, quote, "To the extent that social media

2    platforms create expressive products, that receive the

3    First Amendment protection.  The First Amendment offers

4    protection when an entity engaging in an expressive

5    activity, including compiling and curating others' speech,

6    is directed to accommodate messages it would prefer to

7    exclude.  The editorial function itself is an aspect of

8    speech.  Or said just a bit differently, an entity

9    exercising editorial discretion in the selection and

10   presentation of content is engaged in speech activity."

11         The case here is not limited to curing

12   third-party content or the exercise of editor discretion,

13   let alone to curtail speech.  Rather, the complaint

14   alleges TikTok's algorithms and design features

15   automatically, and without expressive curation, create an

16   addictive environment that entices users to stay on the

17   app to the detriment of their own health.

18         The Court in Moody also expressly limited the

19   reach of its holding to algorithms and other features that

20   broadly prioritize or deprioritize content based on the

21   provider's preferences.  And it emphasized that it was not

22   deciding whether the First Amendment applied to algorithms

23   that display content based on the user's preferences.  And

24   that's, as we discussed from oral argument today, from

25   Justice Barrett's concurrence.

- J L M -

70

## DECISION

1      The Court finds that the complaint does not seek

2   to hold defendants liable for portraying necessarily their

3   own editorial choices, but rather, as plaintiff alleges,

4   the editorial choices of the user, such that the user

5   becomes trapped in an addictive echo chamber of

6   self-fulfillment and positive reenforcement.

7      Defendants' argument that the algorithm is

8   another form of curation or editing protected by Section

9   230 and the First Amendment, ignores the reality of the

10  algorithm itself.  Which as alleged, utilizes user's

11  preferences and the virality of certain content to

12  automatically recommend content.  Absent discovery in this

13  case, the Court could not determine at this stage whether

14  the defendants themselves edit and/or curate the speech

15  versus the algorithm and the users acting as the curators.

16  As alleged, defendants' sole input is to create an

17  algorithm that continuously curates videos for each user

18  based on the user's own preferences.  This explains the

19  very notion behind the For You page, in that it is for

20  you.  See the complaint at paragraph 66 through 69.

21      Accordingly, the Court finds that the First

22  Amendment does not bar plaintiff's claims.

23      I'm now going to turn to standing to assert the

24  product liability claims.  Under the doctrine of parens

25  patriae, a state has standing to bring a cause of action

- J L M -

71

DECISION

1    that otherwise properly can be brought only by private

2    parties, if the state can articulate an interest apart

3    from the interest of the particular private parties'

4    express the quasi-sovereign interest and allege injury to

5    a sufficiently substantial segment of the population.

6    That's from the People versus Grasso, 836 NYS2d 40, First

7    Department, 2007.

8         New York's profound interest in protecting

9    possible future victims, as well as the specified

10   complainant, was grounds for giving a parens patriae

11   standing in the People by Vacco versus Mid Hudson Medical

12   Group, that's from the Southern District of New York,

13   1995.

14        To assert parens patriae standing, the State or

15   Commonwealth must articulate a quasi-sovereign interest

16   distinct from the interest of the particular private

17   parties, such as an interest in health and well-being,

18   both physical and economic, of its residents in general.

19   That's from Purdue Pharma versus Kentucky, 704 F.3d 208,

20   215, 2nd Circuit of 2013.  Here the complaint sufficiently

21   alleges a quasi-sovereign interest, in that the actions of

22   TikTok threatened the health and welfare of the citizens

23   of the State of New York, and particularly of young users.

24        The plaintiff sufficiently alleges that it seeks

25   redress for injuries to current, former and future preteen

- J L M -

72

DECISION

1    and teen users of TikTok, who are otherwise unable to

2    obtain complete relief.

3        I refer you to the complaint paragraph seven,

4    wherein plaintiffs allege there are over 9.2 million

5    active TikTok platform users in New York.  Over

6    1.6 million active users in New York under the age of 18.

7        Accordingly, the Court determines that plaintiff

8    has standing to sue parens patriae.  The Court further

9    finds that TikTok is a product, as contemplated under New

10   York law, for purposes of asserting a products liability

11   claim.  Under New York law, social media platforms have

12   been held to be a product for purposes of products

13   liability.  Here, given the nature of the Attorney

14   General's claims, i.e., that TikTok's design features harm

15   users.  TikTok is appropriate deed as a product, in that

16   it designs, develops, markets, distributes its platform

17   through employing certain design features.  And the

18   products liabilities claims are not premised on the

19   third-party conduct -- content, excuse me.  Other

20   jurisdictions are in accord with this Court's

21   determination.

22       I refer you to the case of New Hampshire v.

23   Meta, pages 52 and 53 of that decision, which draws upon

24   companion cases that determine that the platform, such as

25   Lyft, Uber, Grindr and other social media platforms, are

- J L M -

73

DECISION

```
 1    products for purposes of sustaining products liability

 2    claims.

 3              The New York cases cited by defendants do not

 4    support their contention that social media platforms do

 5    not constitute products, as the injuries sustained by the

 6    plaintiffs in those cases were unrelated to the specific

 7    alleged defects in the platform and web site.

 8              I refer you to the Eberhart v. Amazon case from

 9    the Southern District in 2018, wherein the Court

10    determined, the coffeemaker that caused the plaintiff

11    Eberhart's injury was purchased on Amazon.com, where it

12    was described as a CoffeeGet6 cup 27 ounce French Press

13    Coffee Maker, with thick heat resistent glass.  The Court

14    found that Amazon offers evidence that the coffeemaker was

15    offered for sale by a company operating under the same

16    name, CoffeeGet.

17              Likewise, in Intellect Art Multimedia versus

18    Milewski, which is from the New York County Supreme Court,

19    2009, the Court found that it was plaintiff -- sorry,

20    defendant Milewski's purported posting that gave rise to

21    plaintiff's injuries, not certain design choices, as is

22    the case in the action before this Court.

23              I'm now going to turn to New York's Consumer

24    Protection Laws.  The Court finds that the plaintiff

25    sufficiently alleges actionable misrepresentations under
```

- J L M -

74

DECISION

1    GBL 349 and 350.  New York's Consumer Protection Act was
2    enacted to provide consumers with a means of redress for
3    injuries caused by unlawfully deceptive acts and
4    practices.  This legislation, much like its Federal
5    counterpart, the Federal Trade Commission Act is
6    intentionally broad, applying to virtually all economic
7    activity.  The statute seeks to secure honest marketplace,
8    where trust and not deception prevails.  This from Goshen
9    v. Mutual Life Insurance Company of New York, New York
10   Court of Appeals, 2002.
11           Pursuant to GBL Section 349 and 350, and
12   Executive Law 63 (12), plaintiffs must allege that
13   defendants' conduct is consumer oriented, misleading in a
14   material way under a reasonable consumer standard, and
15   resulted in an actual injury.
16           Here, the complaint alleges specific
17   misrepresentations that TikTok consistently told users
18   that it was safe and appropriate for teens and preteens,
19   and in various public forums, in addition to on
20   applications itself.  See paragraph 170 through 172 of the
21   complaint.  That built-in feature is combined to combat
22   addictive use and other harms, including parental
23   controls, community standards, and age verification were
24   effective.  That TikTok was not directed to children under
25   13 years old, and complied with Federal Privacy Law.  And

- J L M -

75

DECISION

1    by failing to disclose the adverse health consequences of

2    the TikTok app and platform.

3         Contrary to defendants' characterization, these

4    misrepresentations are alleged with specificity and

5    alleged to satisfy a reasonable consumer standard.  For

6    example, in written testimony to Congress on March 23rd

7    of 2023, CEO Shou Chew, who previously explained that he

8    is responsible for all strategic decisions at TikTok

9    stated, safety and wellness, in particular for teens, is a

10   core priority for TikTok.  See complaint at paragraph 172.

11        Another example, paragraph 178 of the complaint

12   asserts that an ad that teen accounts automatically have a

13   daily screen time limit of 60 minutes, does not convey

14   that the time limit could be easily bypassed either

15   temporarily or by inputting a passcode, or permanently by

16   disabling the tool.  See paragraph 179.

17        At paragraph 207, the complaint identifies

18   statements about TikTok's refresh feature, which would

19   lead to a completely new feed.  But it does not disclose,

20   but TikTok does not disclose that the algorithm, that

21   refresh feature was temporary, before reverting the user

22   back to their previous feed setting and preferences.  See

23   paragraph 208.

24        These specific misrepresentations, along with

25   other examples included in the complaint, establish that

- J L M -

76

## DECISION

1    defendants and/or their representative, made this
2    representation sufficient to survive the present motion to
3    dismiss.

4         I'm now going to turn to the child protection
5    claim and the COPPA preemption issue.  The Children's
6    Online Privacy Protection Act of 1998 is a Federal law
7    intended to protect the privacy and personal identifying
8    information of children age 13 and younger.  It explicitly
9    permits that, quote, "In any case in which the attorney
10   general of a state has reason to believe that an interest
11   of the residents of that state has been or is threatened
12   or adversely affected by engagement of any person in a
13   practice that violates any regulation of the Commission
14   prescribed under Section 6502 (b) at the top of this
15   title, the state, as parens patriae, may bring a civil
16   action on behalf of the residents of the state in the
17   district court of the United States of appropriate
18   jurisdiction.

19        "The before filing an action under paragraph (1)
20   of COPPA, however, with the attorney general, shall
21   provide to the Commission written notice of that action
22   and a copy of the complaint for that action."

23        The statute also includes a preemption clause
24   that provides, "No State or local government may impose
25   any liability inconsistent with the treatment of those

- J L M -

77

DECISION

1   activities or actions under the section."  That's at
2   Section 6502 (d)
3          Plaintiff alleges consumer protection claims
4   that TikTok did two things with respect to these child
5   protection claims.  First, that it misrepresented the
6   platform's compliance with COPPA.  And, two, that the
7   platform was directed at children -- that it
8   misrepresented that the platform was directed at children
9   under 13 years of age.  The plaintiff alleges that TikTok
10  violates COPPA by collecting personal information for
11  users 13 and younger, without first obtaining parental
12  consent.  Although the complaint does not assert any cause
13  of action for violation of COPPA.  That's at paragraphs
14  280 and 284.
15         With respect to the allegations that
16  plaintiff -- that defendants target users 13 and under,
17  plaintiff identifies various accounts and creators that
18  are marketed towards children on the platform and contain
19  child-oriented subject matter, such as My Little Pony,
20  Pokemon, Preteens Tonight Show, LOLSurprise, Bluey and
21  Kids Bop.
22         Defendants rebut that plaintiffs are trying to
23  circumvent the notice requirements of COPPA, which
24  plaintiffs do not plead that they satisfied by pleading
25  via consumer protection claims.

- J L M -

78

DECISION

1           Both parties rely on the Jones v. Google case

2      from the 9th Circuit.  In which the 9th Circuit considered

3      whether a group of plaintiffs, their children suing via

4      guardians, could sue under state law claims, alleging that

5      Google collected their personal information and behavior

6      without consent.  On appeal the Court addressed whether

7      COPPA preempts state law claims based on underlying

8      conduct that also violates COPPA's regulations.  Although

9      the children pled on the state law causes of action, the

10     Court found that they also allege that Google's data

11     collection activities violated COPPA and accordingly, the

12     Court held that COPPA's preemption clause did not bar the

13     state law causes of action that are parallel to or

14     prescribe the same conduct forbidden by COPPA.

15          The defendants distinguish this case because it

16     was brought on behalf of private plaintiffs and not

17     subject to the procedural scheme under COPPA.

18          Here, the Court finds that plaintiff has

19     sufficiently alleged that TikTok has made

20     misrepresentations that they do not target children 13

21     years and younger.  However, in order for plaintiff to

22     sustain a claim that there is misrepresentation of COPPA,

23     they necessarily have to show a violation of COPPA.  They

24     don't plead that they do so.  Nor do they plead that they

25     have complied with the procedural scheme under COPPA.

- J L M -

79

DECISION

1      Accordingly, the Court will strike the portions
2   of the complaint that assert misrepresentations for
3   failure to comply with COPPA.
4      Now, with respect to the operational
5   independence claims.  The plaintiff alleges that TikTok
6   made statements that are intended to and do create the
7   impression that TikTok operates independently of Bytedance
8   outside of China, and beyond the reach of the Chinese
9   govenment.  But TikTok is deliberately misleading
10  consumers with this false impression.  That's from the
11  complaint, paragraph 289.
12     The plaintiff brings no standalone cause of
13  action with respect to TikTok's relationship to ByteDance
14  and/or its independence from Chinese control.  Rather,
15  plaintiff appears to allege liability under New York's
16  Consumer Protection Law.  See complaint at paragraph 297.
17  At bottom, the plaintiff seeks to hold TikTok liable for
18  making affirmative representations about the accessibility
19  of user data by Chinese owned entities.
20     However, to state a claim under New York's
21  deceptive trade practices and consumer protection
22  statutes, a plaintiff must allege that it has engaged in
23  consumer oriented conduct that is misleading, and that
24  plaintiff suffered injury as a result of the alleged
25  deceptive act or practice.  See Cooper v. Anheuser-Busch

- J L M -

80

PROCEEDINGS

1    from the Southern District of New York, 2021.

2            Here, the complaint does not allege any actual

3    injury suffered by plaintiff as a result of these

4    misrepresentations associated with TikTok's operational

5    independence.  Accordingly, the Court strikes those

6    portions of complaint that alleges misrepresentations

7    thereto.

8            So with that, based upon the submissions in

9    connection with this motion, and based upon oral argument,

10   the Court denies defendants' motion to dismiss Counts One

11   through Nine of the complaint.  But as I indicated from

12   the outset, will strike those paragraphs in the complaint

13   with respect to misrepresentations of compliance with

14   COPPA and operational independence.

15           In our short form order that we'll cut today or

16   tomorrow, I will include the actual paragraphs we are

17   striking so that it's clear on the record, okay?

18           So with that, let me ask Mr. Brody, when would

19   you like to get your answer in?

20           MR. BRODY:  I would ask for 30 days, Your Honor.

21           THE COURT:  Mr. Wallace, is that reasonable?

22           MR. WALLACE:  No objection from Attorney

23   General.

24           THE COURT:  Defendant shall have 30 days from

25   today's date to file the answer.

                    - J L M -

PROCEEDINGS

1          Before we adjourn for the day, anything else we

2    need to discuss?

3          MR. WALLACE:  I don't think so.  Nothing from

4    plaintiff, Your Honor.

5          THE COURT:  Everything on discovery is going?

6          MR. BRODY:  It's going.

7          THE COURT:  Okay, very good.  Very good.

8    Counsel, again, I want to thank you for your time today,

9    your excellent preparation and argument.  I think that

10   both of you, both sides have memorized every paragraph in

11   the complaint, which is apparent, so I thank you for that.

12         Last but not least, if you would obtain a copy

13   of today's transcript, file it NYSCEF within 30 days.

14   Thank you.

15         (Proceedings concluded)

16              *           *           *

17   CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT.

18

19   ---/----------------------

20            JACK L. MORELLI, CM, CSR

21

22

23

24

25

                         - J L M -

# EXHIBIT 12

## IN THE DISTRICT COURT OF OSAGE COUNTY
## STATE OF OKLAHOMA

STATE OF OKLAHOMA, *ex rel.,*   )
GENTNER DRUMMOND,   )
ATTORNEY GENERAL OF   )
OKLAHOMA,   )
   )
          **Plaintiff,**   )
   )
**vs.**   )   **Case No. CJ-2023-180**
   )   **Judge Stuart Tate**
META PLATFORMS, INC. f/k/a   )
FACEBOOK, INC., and   )
INSTAGRAM, LLC, )   )
   )
          **Defendants.**   )

NOV 2 0 2024

## <u>ORDER ON DEFENDANTS' MOTION TO DISMISS</u>

The State filed its Petition on October 24, 2023 ("Petition" or "Pet."), alleging that Defendants

Meta Platforms, Inc. f/k/a Facebook, Inc., and Instagram, LLC ("Meta") intentionally designed their

Facebook and Instagram Platforms ("Platforms") to be addictive to adolescent users. The State alleges

that the design itself, as well as Meta's various misrepresentations and omissions regarding the

Platforms, amounted to unfair and deceptive trade practices prohibited by the Oklahoma Consumer

Protection Act ("OCPA"), 15 O.S. §§ 751-763. Meta filed a motion to dismiss on January 25, 2024

("Motion") raising four issues for determination by the Court: (1) whether Oklahoma has specific

personal jurisdiction over Meta; (2) whether the State's claims are barred by Section 230 of the

Communications Decency Act; (3) whether the State's claims are barred by the First Amendment of

the United States Constitution; and (4) whether the State pled facts sufficient to set out cognizable

claims for relief under the OCPA. The purpose of a Motion to Dismiss "is to test the law that governs

the claim, not the underlying facts." *Fox v. Mize,* 2018 OK 75. "The court examines only the

controlling law, not the facts." *Wilson v. State ex rel. State Election Bd.,* 2012 OK 2, ¶ 4, 270 P.3d 155,

157. "At the motion to dismiss stage, a court must "take all factual allegations in the petition as true

and draw all reasonable inferences therefrom." *Cates v. Integris Health Inc.*, 2018 OK 9. Motions to Dismiss are generally viewed with disfavor. *Lockhart v. Loosen*, 1997 OK 103. A Plaintiff is required neither to identify a specific theory of recovery nor to set out the correct remedy or relief to which it may be entitled. *Darrow v. Integris Health, Inc.*, 2008 OK 1. "If relief is possible under any set of facts that can be gleaned from the petition, the motion to dismiss should be denied." *Id.*, ¶ 7, 412 P.3d at 101. *Fox v. Mize*, 2018 OK 75. Unless the Court finds Oklahoma can prove no set of facts which warrant relief without doubt the Motion to Dismiss may not be sustained. *Nicholson v. Stitt*, 2022 OK 35. Relief is appropriate only when no cognizable legal theory will support the claims or that there are insufficient alleged facts to support any cognizable legal theory. *Id.* A petition may be dismissed for two reasons as a matter of law. First, when there is a lack of any cognizable theory, and second, when there are insufficient facts under a cognizable theory. See *Ridings v. Maze*, 2018 OK 18, and *Wilson v. State ex rel. State Election Board*, 2012 OK 2. It is proper to challenge the sufficiency of the petition asserting failure to give fair notice of the factual basis for jurisdiction. When challenging jurisdiction in a motion to dismiss, the plaintiff need only make a prima facia showing of personal jurisdiction. *Powers v. District Court of Tulsa County*, 2009 OK 91.

Having considered the parties' written submissions and oral argument, the Court finds as follows:

## I.      Oklahoma Has Specific Personal Jurisdiction Over Meta.

General jurisdiction is not at issue in this case. Oklahoma is not the state of incorporation or principal place of business of Meta. See *Daimler AG v. Bauman*, 571 US 117 (2014). The U.S. Supreme Court decided the case of *International Shoe Co. v. Washington*, 66 S. Ct. 154 in 1945. This decision significantly shaped the concept of personal jurisdiction in the United States. Prior to *International Shoe*, courts primarily relied on a strict territorial approach, requiring physical presence within the state for jurisdiction to apply. However, *International Shoe* introduced a new standard based on "minimum

2

contacts." The central idea behind *International Shoe* is that a court can assert personal jurisdiction over an out-of-state defendant if that defendant has sufficient minimum contacts with the forum state. These contacts must be such that it is fair and reasonable to subject the defendant to the state's jurisdiction. The Court emphasized that due process considerations under the Fourteenth Amendment require a connection between the defendant and the forum state. Thus began the idea of hailing litigants into a jurisdiction – not their home state – to answer claims. Post *International Shoe*, Courts could exercise specific jurisdiction over a defendant when the lawsuit arises from the defendant's contacts with the forum state. The evolution of the limits of jurisdiction since 1945 reveal whether jurisdiction over Meta is appropriate in this case. In response to *International Shoe*, states enacted "long-arm statutes." These statutes extend the personal jurisdiction of state courts over non-residents who engage in certain activities within or related to the state, even if they lack physical presence there. Jurisdiction is proper in Oklahoma on any basis consistent with the Constitution of this state and the Constitution of the United States. 12 O.S. §2004(F). Oklahoma courts may exercise specific personal jurisdiction over a non-resident defendant so long as: (1) the defendant "purposefully directed its activities at the residents of the forum"; (2) the claims asserted "arise out of or relate to" those activities; and (3) the exercise of personal jurisdiction would not "offend traditional notions of substantial justice and fair play." *Montgomery v. Airbus Helicopters, Inc.*, 2018 OK 17, ¶ 16, 414 P.3d 824, 829; *see also Galier v. Murco Wall Prod., Inc.*, 2022 OK 85, 528 P.3d 293, *cert. denied*, 143 S. Ct. 1086 (2023). The burden of proof rests on the State as plaintiff, but the State need only make a prima facie showing. *Id.*

## A. Meta Purposefully Directed Its Activities at Oklahoma Residents.

Meta argues that it does not purposefully direct its activities to Oklahoma residents, but rather it merely offers Oklahomans access to its Platforms, as it does for users in any state. The State alleges Meta had extensive and purposeful contacts with Oklahoma residents. For instance, the State alleges

3

that Meta: (1) enters into Terms of Service contracts with millions of Oklahomans to use its Platforms[1]; (2) collects the personal data of Oklahoma users and uses that information to sell targeted advertising to those Oklahomans[2]; (3) registered to do business in Oklahoma and interacts with Oklahoma political subdivisions, school districts, and health and fire departments to expand its reach into Oklahoma; (4) recruited and employs Oklahomans to work in the functional areas of Meta that are directly implicated in the State's allegations; and (5) solicited and paid Oklahoma users to create content on its Platforms to increase user engagement, maximize the amount of personal data Meta collects, and maximize Meta's ability to monetize that data by selling targeted advertisements. The State further alleges that Meta's sales of targeted advertisements using Oklahomans' personal data has exceeded $560,000,000, with more than $28,000,000 of those ad sales targeting minors.

The Court finds the State's allegations are sufficient to show that Meta "purposefully directed its activities" to Oklahoma residents. Meta's "contacts with Oklahoma were not random, isolated, or fortuitous[,]" but rather Meta "chose to reach out…and deliberately exploit the market in Oklahoma[.]" *Galier*, 2022 OK 85, ¶ 18, 528 P.3d at 299.

## B. The State's Claims Arise Out of or Relate to Meta's Contacts with Oklahoma.

Meta argues that the State's claims are unrelated to Meta's contracting with, advertising to, and collecting data from Oklahoma residents. The Court finds this argument unpersuasive. As alleged by the State, Meta's business model is driven by offering highly targeted, data-driven advertising using massive databases of information collected from consumers, including Oklahomans, who use its Platforms[3]. Pet., ¶¶ 67-70. The State further alleges that Meta seeks to capture and retain the attention

---

[1] It is estimated in 2020 Meta had reached 80% of Oklahomans under 35 years old. From 2019 to 2021 Meta showed a growth from 800,000 daily active users to more than 1,200,000 active users.

[2] Meta collected data for Instagram usage by Oklahoma users including the amount of time daily active teens spent on Instagram per day, teen "penetration" data, the ratio of teens who were active daily versus monthly, story participation rates, amount of "feed media" consumed per day by daily active teen users, "stories" active teen daily users consumed every day, market saturation reports for users under 35, percentage of Facebook Android monthly active users who are also on Instagram, and the reduction in monthly active users over a two month period.

[3] Oklahoma alleges the customized user experience is specific enough to target Osage County citizens with Osage County Tourism Department and Fairfax Community Foundation advertisements.

of adolescent users in particular, including those in Oklahoma, because that demographic is its most profitable. *Id.*, ¶¶ 75-87. Meta has allegedly (1) made this a priority despite knowing of the myriad harms that compulsive use can cause, (2) misled the public about the safety of its Platforms, and (3) concealed information about their harmful effects.

In short, the State alleges that Meta targeted adolescent Oklahomans who used its Platforms for those users' advertising value and did so in ways that violated the OCPA. It remains to be seen if the State can prove its allegations, but it has sufficiently pled that its claims arise out of Meta's contacts with Oklahoma residents. *See, e.g., Galier,* 2022 OK 85,¶ 24, 528 P.3d at 300 (quoting *Ford Motor Co. v. Montana Eighth Judicial District Court,* 141 S. Ct. 1017, 1027 (2021)).

### C. The Court's Exercise of Personal Jurisdiction Over Meta Does Not Offend Traditional Notions of Substantial Justice and Fair Play.

Finally, the Court finds that exercising specific personal jurisdiction over Meta is fair and reasonable under the circumstances of this case. Meta has entered into contracts with millions of Oklahomans to use its Platforms in exchange for their personal data. As a result, Meta earned more than half a billion dollars from targeted ad sales. Meta has recruited and employed Oklahomans, some of whom may have personal knowledge of the facts underlying the claims and defenses in this litigation. Based on its significant contacts with Oklahoma, Meta could reasonably anticipate being haled into court in Oklahoma and any burden associated with defending itself in Oklahoma court would be minimal. *See Galier,* 2022 OK 85,¶ 27, 528 P.3d at 301.

As a result of the foregoing, the Motion is denied as it pertains to personal jurisdiction.

### II. The State's Claims Are Not Precluded by 47 U.S.C. § 230.

Meta argues that it is entitled to immunity pursuant to Section 230 of the federal Communications Decency Act ("Section 230"), which provides in pertinent part that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). For Meta to

benefit from Section 230 immunity against the State's claims, it must meet three elements. "First, immunity is available only to a provider or user of an interactive computer service. Second, the liability must be based on the defendant's having acted as a publisher or speaker. Third, immunity can be claimed only with respect to information provided by another information content provider." *F.T.C. v. Accusearch Inc.*, 570 F.3d 1187, 1196 (10th Cir. 2009) (internal citations omitted).

Meta has provided the Court with several cases that find immunity under Section 230. Those cases are distinguishable and relate clearly to third-party content. Oklahoma is not attempting to hold Meta responsible for any third-party content in this suit. Therefore, the second element is dispositive here. The State has made clear that it is not seeking to treat Meta as "publisher or speaker" of information. Instead, it is seeking to hold Meta accountable for unlawfully designing its Platforms in a manner Meta knew to be harmful—for example, to induce compulsive use among adolescents in particular—and then presenting its Platforms as safe for adolescent use[4]. As the Arkansas Circuit Court correctly held in denying a similar motion to dismiss by Meta: "If that is ultimately proven to be true, the nature of the content shared on the platforms is irrelevant. This case is properly understood as a dispute over whether the design features of Meta's platforms harm adolescents."[5] While not dispositive, it is worth noting that other state courts faced with this same argument in cases brought by state Attorneys General have, without exception, reached the same conclusion, as reflected in the record before the Court. Meta misunderstands the fundamental difference between functioning as a conduit serving the digital social ether and the hugely influential and impactful digital platforms over which Meta has deliberate and exclusive design control, the design of which is at issue here. Accordingly, the Court finds that Meta has failed to establish the second element of immunity under 47 U.S.C. § 230 as a matter of law, and the Motion is therefore denied.

---

[4] Oklahoma alleges numerous internal communications acknowledging the platform designs themselves were harmful and efforts to address the design elements by individuals or groups of individuals within Meta were discounted, dismissed, or stopped.

[5] "Ruling on Defendants' Motion to Dismiss First Amended Complaint," *Arkansas v. Meta Platforms, Inc. et al.*, Circuit Court of Polk County, Arkansas Case No. 57CV-23-47 ("Arkansas Ruling").

III.    **The State's Claims Are Not Precluded by the First Amendment.**

Meta suggests that the State's claims are barred by the First Amendment. But the First Amendment does not shield a company from liability related to making intentional misrepresentations. *See, e.g., Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 637 (1980) ("Fraudulent misrepresentations can be prohibited and the penal laws used to punish such conduct directly."). Further, the State's claims related to design of the Platforms involve Meta's conduct, not speech. As its claims are pled, the State seeks hold Meta liable for its design of the Platforms, regardless of the content served to their users, and for its alleged misrepresentations and omissions about that design. As with Meta's Section 230 argument discussed above, state courts have been unanimous in rejecting this argument as well, as reflected in the record before the Court.

The U.S. Supreme Court's decision in *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 219 L. Ed. 2d 1075 (2024), does not change the analysis. *Moody* involved Florida and Texas laws restricting social media companies' ability to censor or otherwise disfavor posts on their platforms. Here, the State is not seeking to put any restrictions on content delivered on the Platforms. And in any event, the Supreme Court in *Moody* vacated "both decisions for reasons separate from the First Amendment merits, because neither Court of Appeals properly considered the facial nature of NetChoice's challenge." *Id.* at 2394. The Supreme Court also made clear that: "We... do not deal here with feeds whose algorithms respond solely to how users act online giving them the content they appear to want, without any regard to independent content standards." *Id.* at 2404 n. 5. Here, the State's claims relate to Meta's algorithms and various design elements built to induce compulsive use by young users. Therefore, by the Supreme Court's own words, *Moody* is inapplicable.

Accordingly, Meta has failed to establish that the State's claims are barred by the First Amendment as a matter of law, and the Motion is denied.

7

**IV.     The State Has Sufficiently Pled Facts Supporting Its Claims Under the OCPA.**

Meta moves to dismiss the State's claims on five grounds specific to the OCPA. Meta argues that (1) it simply publishes third-party content and is therefore not subject to the OCPA under 15 O.S. § 754, (2) its conduct did not occur "primarily and substantially" in Oklahoma, (3) the use of Meta's Platforms does not involve a "consumer transaction," (4) the State's claims were brought outside the applicable statute of limitations, and (5) the State failed to allege deceptive conduct on Meta's part.

With the understanding that "the OCPA is remedial in nature" and therefore "is to be liberally construed to effectuate its underlying purpose," *Patterson v. Beall*, 2000 OK 92, ¶ 28, 19 P.3d 839, 846, the Court finds Meta's arguments unpersuasive at this stage.

### A.  The OCPA Exemption for Publishers Does Not Apply to Meta's Conduct.

By its terms, the OCPA does not apply to publishers or others whose otherwise unlawful conduct "involves information that has been disseminated or reproduced on behalf of others without knowledge that it is an unlawful practice[.]" 15 O.S. § 754. Meta argues that the State is attempting to hold it liable for disseminating third-party content, which is specifically excluded from the OCPA. But this argument mischaracterizes the State's claims. Oklahoma's claims are content indifferent and focused on the design of Meta's platforms. The State alleges that Meta designed its own Platforms to be addictive and that it deceptively promoted them as safe for adolescents despite internal research showing otherwise. *E.g.*, Pet., ¶¶ 197, 214, 230. The claims as alleged by the State focus on Meta's own wrongful conduct rather than any unlawful practices by users of its Platforms.

### B.  Meta's Conduct Occurred Primarily and Substantially in Oklahoma.

The OCPA applies to unlawful practices that occur in Oklahoma. However, if the location of the unlawful practice is difficult to pinpoint or occurs in multiple states, then it must occur "primarily and substantially" in Oklahoma to be actionable under the OCPA. *See Cont'l Res., Inc. v. Wolla Oilfield*

8

*Servs., LLC,* 2022 OK 40, 510 P.3d 175. It is unclear from the record where the actual design of the Platforms took place, to the extent that can be ascertained at all. What is clear is the State alleges that Meta sought young Oklahomans to become Platform users, that those users were affected by Meta's design choices, and that Meta made misrepresentations and omissions about the safety of its Platform design. At the pleading stage, the State has sufficiently alleged that this conduct, as it relates to Meta's consumer transactions with young Oklahomans, took place primarily and substantially in Oklahoma.

### C. Use of Meta's Platforms Involves a Consumer Transaction Under the OCPA.

The OCPA is intended to proscribe unlawful conduct in the context of a "consumer transaction," defined broadly as the "advertising, offering for sale or purchase, sale, purchase, or distribution of any services or any property, tangible or intangible, real, personal, or mixed, or any other article, commodity, or thing of value wherever located, for purposes that are personal, household, or business oriented." 15 O.S. § 752(2). Meta argues that the use of its Platforms does not involve a consumer transaction because its Platforms are used free of charge. However, while users do not pay money to Meta, they must allow Meta to collect vast amounts of personal data in exchange for using the Platforms. Pet., ¶¶ 55-64. While a typical consumer transaction likely involves the payment of money, there is no such requirement in the OCPA. Accordingly, this bargained-for exchange to use Meta's Platforms satisfies the broad definition of "consumer transaction." *Accord State of Indiana v. TikTok Inc., et al.,* __ N.E.3d __, 2024 WL 4340387, *8-9, Case Nos. 23A-PL-3110 & 3111 (Ct. App. Ind. Sept. 30, 2024).

### D. The State's Claims Are Not Barred by a Statute of Limitations.

Meta argues that the State's claims are barred by a one-year statute of limitations found in 12 O.S. § 95(A)(4). The Court disagrees.

#### 1. *A General Statute of Limitations Does Not Apply Against the State Acting in Its Sovereign Capacity to Enforce a Public Right.*

Oklahoma law has long recognized that general statutes of limitations do not apply to actions brought by the State in its sovereign capacity to vindicate public rights. *See, e.g., State ex rel. Cartwright v. Tidmore*, 1983 OK 116, 674 P.2d 14. There is no dispute that the State brings these claims in its sovereign capacity. Meta argues only that the State's claims affect a class of individuals—users of Meta's Platforms—rather than the public generally. The State counters that it enforces the OCPA to protect all Oklahoma citizens from being targeted by unfair and deceptive trade practices, a clear public right.

The Court is persuaded that through these claims the State seeks to vindicate a public right. The Attorney General has exclusive authority to enforce the OCPA as *parens patriae* to protect the integrity of the marketplace in Oklahoma. *See State, ex rel., Edmondson v. BP America Inc., et al.*, CIV-09-0945, 2009 WL 10695372, at *2 (W.D. Okla. Oct. 29, 2009) ("Specifically, the Court finds that the [OCPA] provides enforcement mechanisms, not available to any particular citizen of Oklahoma, which allows the State to vindicate public rights in its quasi[-]sovereign capacity."). The fact that certain citizens might benefit more than others from the State's claims does not transform this public right into something less. *See State v. LG Electronics, Inc.*, 375 P.3d 636, 642-43 (Wash. 2016) (en banc) (rejecting limitations periods on state actions "merely because private individuals would benefit").

## 2. *Even if a Statute of Limitations Applies, the State's Claims Are Timely.*

In addition, the Court finds that the State's claims are timely even if a limitations period applies. First, the State sufficiently alleges that Meta's unlawful conduct is ongoing to this day. Pet., ¶¶ 28, 270, 346. Second, the State and Meta agree that they entered a tolling agreement going back to December 20, 2020. The Petition includes multiple allegations of unlawful conduct that occurred after this date. *E.g., id.*, ¶¶ 267, 282, 286, 290, 298, 325, 326, 335.

## D. The State Has Alleged Actionable Deceptive Conduct Under the OCPA.

Under the OCPA, an unlawful deceptive trade practice is "a misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person." 15 O.S. § 752(13). Meta contends that its alleged misrepresentations regarding the safety and design of its Platforms do not rise to this level, but instead are mere opinions or "puffery". In response, the State points to specific representations—and material omissions—as alleged in the Petition. For instance, the State alleges, *inter alia*, that Meta falsely claims that it does not build its products to be addictive (Pet. ¶ 375), that it does not direct people toward content that promotes eating disorders (Pet. ¶ 328), and that it does not allow its teams to set goals around increasing time spent on the Platforms (Pet. ¶¶ 339–340).

Motions to dismiss for failure to state a claim are "generally disfavored and granted only when there are no facts consistent with the allegations under any cognizable legal theory or there are insufficient facts under a cognizable legal theory." *Wilson v. State ex rel. State Election Bd.*, 2012 OK 2, ¶ 4, 270 P.3d 155, 157. At this point in the proceedings, the Court must take as true all of the State's allegations along with all reasonable inferences that can be drawn therefrom. *Id.* With this in mind, as well as the requirement that the OCPA be "liberally construed," *see Patterson v. Beall*, 2000 OK 92, ¶ 28, 19 P.3d at 846, the Court concludes that the State's allegations have sufficiently met the standard required to plead a deception claim under the OCPA.

For the foregoing reasons, Meta's Motion is DENIED.

Dated: November 19, 2024

_____
JUDGE OF THE DISTRICT COURT

## CERTIFICATE OF MAILING

I hereby certify that on the 30th day of November, 2024 I mailed by first class mail postage prepaid a copy of the foregoing instrument to:

Megan Rodgers
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306-2112

Mark W. Mosier
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956

Robert G. McCampbell
Nicholas ("Nick") V. Merkley
GABLEGOTWALS
BOK Park Plaza
499 West Sheridan Avenue, Suite 2200
Oklahoma City, OK 73102

Robert J. Carlson
Caleb J. Smith
Oklahoma Office of the Attorney General
15 West 6th Street, Suite 1000
Tulsa, OK 74119

Ethan A. Shaner
OKLAHOMA OFFICE OF THE
ATTORNEY GENERAL
313 N.E. 21st Street
Oklahoma City, OK 73105

Brenda Quillin
Bailiff

# EXHIBIT 13

ELECTRONICALLY FILED - 2025 May 06 3:34 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006018

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | FIFTH JUDICIAL CIRCUIT |
| COUNTY OF RICHLAND | ) | |
| | ) | |
| THE STATE OF SOUTH CAROLINA ex | ) | Civil Action No.  2024-CP-40-06018 |
| rel. Alan Wilson, in his official capacity as | ) | |
| Attorney General of the State of South | ) | |
| Carolina, | ) | |
| | ) | **OPINION AND ORDER** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TIKTOK INC., TIKTOK LLC, TIKTOK | ) | |
| PTE. LTD., TIKTOK LTD., BYTEDANCE | ) | |
| INC., and BYTEDANCE LTD., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This case is one of nearly two dozen filed by state attorneys general against TikTok Inc. and other related corporate entities alleging violations of state consumer protection laws. The TikTok Defendants (hereafter, "Defendants") filed a Motion to Dismiss the Complaint filed by the State of South Carolina, by and through its Attorney General Alan M. Wilson (hereafter, the "State). For the reasons below, the Court **DENIES** Defendants' Motion to Dismiss.

## LEGAL STANDARDS

To prevail on a motion to dismiss for failure to state a cause of action, a defendant must "demonstrate[] the plaintiff has failed 'to state facts sufficient to constitute a cause of action.'" *Williams v. Condon*, 347 S.C. 227, 232–33, 553 S.E.2d 496, 499 (Ct. App. 2001) (quoting S.C. R. Civ. P. 12(b)(6)). "The question to be considered is whether in the light most favorable to the plaintiff, and with every doubt resolved in his behalf, the complaint states any valid claim for relief." *Cowart v. Poore*, 337 S.C. 359, 364, 523 S.E.2d 182, 184–85 (Ct. App. 1999). "When

1

ELECTRONICALLY FILED - 2025 May 06 3:34 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006018

considering such motion, the court must regard all properly pleaded factual allegations as admitted." *Falk v. Sadler*, 341 S.C. 281, 286, 533 S.E.2d 350, 353 (Ct. App. 2000).

South Carolina Rule of Civil Procedure 12(b)(2) permits a motion to dismiss for "lack of jurisdiction over the person." In South Carolina, the "case law is settled that 'at the pre-trial stage of proceedings, the plaintiff need only make a prima facie showing" that personal jurisdiction exists, and that "[t]here is no 'other evidence' requirement for personal jurisdiction where the complaint itself demonstrates jurisdiction." *Mid-State Distributors, Inc. v. Century Importers, Inc.*, 310 S.C. 330, 332, 426 S.E.2d 777, 779 (S.C. 1993).

## ANALYSIS

### I.      Defendants Are Subject to Personal Jurisdiction in South Carolina

Defendants are subject to specific personal jurisdiction in South Carolina. "Because South Carolina treats its long-arm statute as coextensive with the due process clause, the sole question" in assessing jurisdiction is "whether the exercise of personal jurisdiction would violate due process." *Cockrell v. Hillerich & Bradsby Co*., 363 S.C. 485, 491, 611 S.E.2d 505, 508 (2005). "[D]ue process mandates that the defendant possess sufficient minimum contacts with the forum state, so that he could reasonably anticipate being haled into court there." *Id*. at 491–92, 611 S.E.2d at 508. Then, specific personal jurisdiction exists so long as the plaintiff's claims "arise out of *or relate to* the defendant's contacts with the forum" state, regardless of whether a "strict causal relationship" exists. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021) (citation omitted).

Here, both parts of the specific personal jurisdiction test are satisfied.

Defendants have created minimum contacts with South Carolina in at least three independent ways. First, Defendants have intentionally cultivated a significant, continuing, and

ELECTRONICALLY FILED - 2025 May 06 3:34 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006018

immensely profitable line of business in South Carolina by marketing and making its product available here. Second, Defendants enter into a contract with every South Carolinian who signs up for the TikTok app, and those ongoing contracts convey rights and impose obligations on both sides of the contract. Third, Defendants then collect consumer data pursuant to those contracts and uses that data to profit from South Carolina consumers by targeting third-party advertising at them.

These extensive and intentional business contacts with South Carolina are at least as significant as the contacts that the U.S. Supreme Court held established specific personal jurisdiction in *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 480 (1985). There, the Court held that one of Burger King's franchisees was subject to personal jurisdiction in Burger King's home state of Florida because he had entered into a contract with Burger King (the franchise agreement) that created an ongoing "relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida." *Id.* at 480. While "an individual's contract with an out-of-state party *alone* can[not] automatically establish sufficient minimum contacts," the Court explained, when the defendant "has created continuing obligations between himself and residents of the forum," then "he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by the benefits and protections of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *Id.* at 476, 478 (cleaned up). Similarly, the South Carolina Court of Appeals "has held South Carolina has jurisdiction over a party who entered into a contract that was to be partly performed within the State." *Cribb v. Spatholt*, 382 S.C. 490, 502, 676 S.E.2d 714, 720–21 (Ct. App. 2009).

These holdings control this case. Like the franchisee in *Burger King*, Defendants have "reach[ed] out" into South Carolina, by advertising its application in the State, making it available here, and entering contracts with numerous South Carolinians that "create continuing relationships

ELECTRONICALLY FILED - 2025 May 06 3:34 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006018

and obligations" with them. 471 U.S. at 473 (citation omitted). Defendants and each of their South Carolina customers knew from the beginning that their "contract . . . was to be partly performed within the State," because in exchange for providing each user ongoing access in South Carolina to the content it hosts, Defendants have received the continuous right to collect their data and use it to target them every day with South Carolina-specific ads. *Cribb*, 382 S.C. at 502, 676 S.E.2d at 720–21. Defendants thus exploit the "continuing relationships and obligations" it has forged with South Carolina consumers *every minute* that they use the application. *Burger King*, 471 U.S. at 473 (citation omitted).

Additionally, Defendants do a substantial volume of business in South Carolina, which independently supports specific personal jurisdiction. *See Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 773–74 (1984). Where a publisher sold an allegedly defamatory book in "approximately 315 bookstores in South Carolina," the Court of Appeals held that the publisher "has directed its activities at the residents of South Carolina, and it must reasonably anticipate being haled into court here in a libel action based on the contents of one of its publications." *Moosally v. W.W. Norton & Co.*, 358 S.C. 320, 335–36, 594 S.E.2d 878, 886 (Ct. App. 2004); *see also Cockrell*, 363 S.C. at 493, 611 S.E.2d at 509 (favorably citing *Moosally*). Similarly, the federal circuit courts have held in several cases that personal jurisdiction exists when a company engages in the "deliberate exploitation of the market in the forum state." *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 423 (7th Cir. 2010); *see also NBA Props., Inc. v. HANWJH*, 46 F.4th 614, 624–25 (7th Cir. 2022).

Third, Defendants are independently subject to personal jurisdiction here because they craft a South-Carolina-specific product that is targeted at South Carolina residents. Defendants actively target content and advertisements to South Carolina users based on their location. Compl. ¶ 19.

ELECTRONICALLY FILED - 2025 May 06 3:34 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006018

Where a company not only generally does business in a State but *specifically crafts a unique product* for that State and then sells it there, there can be no question that it has "'purposefully directed' [its] activities at residents of the forum" in a way that satisfies due process. *Burger King*, 471 U.S. at 472 (quoting *Keeton*, 465 U.S. at 774).

These connections to South Carolina supply sufficient minimum contacts for specific personal jurisdiction. That is why the overwhelming weight of authority from other jurisdictions supports states exercising jurisdiction over Defendants. An appellate court in Indiana recently "h[ad] little trouble concluding that Indiana's judiciary has specific personal jurisdiction over TikTok," reasoning that TikTok's "engagement with [its] end-users [in the forum state] is neither passive nor fleeting—TikTok uses the internet, to which its app is connected, to knowingly and repeatedly transmit data to and from each of those . . . end-users each and every hour of each and every day." *Indiana v. TikTok Inc.*, 245 N.E.3d 681, 690 (Ind. Ct. App. 2024); *see also* Pls'. Opp'n to Mot. to Dismiss at 17–18 ("State's Br.") (collecting cases).

This case also relates to Defendants' contacts with the State and so comports with the requirements of due process. *Ford*, 592 U.S. at 362. The State is challenging Defendants' representations about the age-appropriateness of its product—representations that are displayed when South Carolina consumers initially acquire the app. That connection *does* create a strict causal relationship between Defendants' actions and the State's claims, even though precedent instructs that a lesser "relating to" test is what applies. *Id*. Additionally, Defendants' large volume of South Carolina business plausibly "relates to" its alleged misrepresentations in South Carolina and the alleged design of its product to be intentionally addictive. Accordingly, specific personal jurisdiction exists over Defendants in this case.

ELECTRONICALLY FILED - 2025 May 06 3:34 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006018

Defendants' personal jurisdiction counterarguments are unavailing. It is irrelevant that Defendants may have established the same types of minimum contacts with other states as they have with South Carolina. The Due Process Clause protects defendants by limiting *the types of contacts* that support jurisdiction, not by limiting *the raw number of states where jurisdiction exists*. If Hustler magazine is "a national publication aimed at a nationwide audience," *Keeton*, 465 U.S. at 781, and if Ford "markets, sells, and services its products across the United States," *Ford*, 592 U.S. at 355, the fact that these contacts would support jurisdiction in many states—or even equally *in every state*—is obviously no reason to deny jurisdiction *in any state*. To hold otherwise would effectively eliminate specific personal jurisdiction for nationwide companies, forcing those wronged by such companies to sue only where the *company* is "essentially at home" and subject to general jurisdiction. *Id.* at 358 (quotation marks and citation omitted). That is not the law. Instead, due process prevents unfairness by limiting jurisdiction to those states where the defendant genuinely has minimum contacts and where the case relates to those contacts. That standard is satisfied here, and so it comports with the Constitution's due process guarantee for Defendants to be subject to jurisdiction in South Carolina for this case.

Nor is it true, as Defendants claim, that "the downloading actions of South Carolina residents" are the mere "unilateral activity of [ ]other part[ies]" and "insufficient" under the Due Process Clause to establish jurisdiction. Defs'. Mot. to Dismiss at 9 ("MTD") (quoting *Pitts v. Fink*, 389 S.C. 156, 165, 698 S.E.2d 626, 631 (Ct. App. 2010)). Jurisdiction here is based on *Defendants'* purposeful acts, not a third party's unilateral one. Given that Defendants have taken steps to market its application in South Carolina, make it available here, and profit from South Carolina consumers' use of it by collecting their data and targeting them with ads, the hundreds of thousands of resulting "downloading actions of South Carolina residents" are plainly not

ELECTRONICALLY FILED - 2025 May 06 3:34 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006018

"unilateral" at all. *Id.* These South Carolina residents did not decide to use Defendants' app out of the blue. And having "structured its sales activity in such a manner as to invite orders from [South Carolina] and developed the capacity to fill them," Defendants "cannot now point to its customers in [South Carolina] and tell us, 'It was all their idea.' " *NBA Props.*, 46 F.4th at 625 (cleaned up).

Defendants also claim that geo-targeting advertisements alone cannot confer personal jurisdiction, but that proposition is both not established as a legal matter, *see Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 803 (7th Cir. 2014), and irrelevant given the numerous *other* contacts also present here. Defendants do more than merely target ads at South Carolina users: they also tailor their experience of the TikTok platform as a whole based on their location data.

Specific personal jurisdiction exists over Defendants in this case.

## II. The Court Also Has Jurisdiction Over All Defendants' Corporate Affiliates.

Specific personal jurisdiction exists over *all* of the TikTok corporate defendants in this case based on the State's allegations that the six entities (TikTok Inc., TikTok LLC, TikTok Ltd., TikTok Pte Ltd., ByteDance Ltd., and ByteDance Inc.) are closely intertwined and "are all intimately involved in operating the TikTok Platform." Compl. ¶ 52. Because the Complaint alleges that each of the defendant entities "has actively formulated, participated in, approved, directed, or otherwise controlled the acts or practices" giving rise to the State's claims, *id.* ¶ 37, even where one of the entities was formally acting alone, it was allegedly serving as an agent for the others, making its conduct attributable to them. And "[t]he principle is firmly established that a foreign corporation doing business in this State through an agent is subject to in personam jurisdiction as if the corporation itself was doing business." *Engineered Prods. v. Cleveland Crane & Eng'g*, 262 S.C. 1, 7–8, 201 S.E.2d 921, 924 (1974).

ELECTRONICALLY FILED - 2025 May 06 3:34 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006018

### III.     SCUPTA Applies to Defendants' Conduct.

SCUTPA bars "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," S.C. Code. Ann. § 39-5-20(a), and it defines "trade" or "commerce" to include "the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this State." *Id.* § 39-5-10(b). The phrase applies broadly to "[e]very business occupation carried on for subsistence or profit and involving the elements of bargain and sale, barter, exchange, or traffic," *Health Promotion Specialists, LLC v. South Carolina Bd. of Dentistry*, 403 S.C. 623, 639, 743 S.E.2d 808, 816 (2013) (quoting *Trade or Commerce*, Black's Law Dictionary (9th ed. 2009)).

Here, the State reasonably alleges that "trade" or "commerce" encompasses Defendants' highly profitable distribution of its app, an "intangible" "service[ ] [or] . . . property." S.C. Code. Ann. § 39-5-10(b). In so holding, this Court also endorses the persuasive reasoning of the U.S. District Court for the Northern District of California in an analogous case about the Facebook and Instagram apps. That court held that the "exchange of users' use of Meta's platforms for their personal data" occurs "in the conduct of" Meta's " 'trade or commerce,' regardless of whether Meta's users pay for use of Facebook or Instagram," and that SCUTPA (along with eighteen other similarly worded state laws) thus applied to the alleged unfair or deceptive acts by Meta in that case. *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, Nos. 4:23-cv-05448-YGR, 4:23-cv-05885-YGR, 2024 WL 4532937, at *44 (N.D. Cal. Oct. 15, 2024). The same reasoning applies here.

ELECTRONICALLY FILED - 2025 May 06 3:34 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006018

**IV.    Defendants' Alleged Unfair and Deceptive Acts Are Actionable Under SCUPTA.**

Defendants claim that the actions the State alleges to have violated SCUPTA are not "unfair or deceptive acts or practices" under that Act, but that is not so. A deceptive act or practice under the statute is "a claim or representation that had the capacity or effect or tendency to deceive," *Clarkson v. Orkin Exterminating Co.*, 761 F.2d 189, 191 (4th Cir. 1985) (quoting *State ex rel. McLeod v. C&L Corp.*, 280 S.C. 519, 525, 313 S.E.2d 334, 338 (Ct. App. 1984)), and an unfair act or practice is one "which is offensive to public policy or which is immoral, unethical, or oppressive," *Wright v. Craft*, 372 S.C. 1, 23, 640 S.E.2d 486, 498 (Ct. App. 2006) (citation omitted).

The State alleges that Defendants deliberately designed their app to be highly addictive to younger users through particular features that prey upon children's well-known physiological and psychological features, and that Defendants did so despite knowing that these features were likely to cause a variety of significant, negative health effects for children. Compl. ¶¶ 150–59. Taking this allegation as true, the State has plausibly pled that this conduct is offensive to public policy.

Defendants' argument that the bulk of their alleged misrepresentations are not barred because SCUPTA reaches only "misstatements of fact rather than misstatements of opinion," MTD at 18 (quoting *Gilbert v. Mid-S. Mach. Co.*, 267 S.C. 211, 220, 227 S.E.2d 189, 193 (1976)) is unsupported by the law. That limitation does not exist in SCUTPA's text or the caselaw interpreting it.

Defendants also claim that SCUPTA does not apply to mere omissions, but precedent is to the contrary. Where a seller "[i]s aware" of a defect in its product and undertakes efforts "to conceal the severity of the defect," that establishes "circumstances or nature of dealings that give rise to a duty to speak" with at least enough plausibility to get past a motion to dismiss. *Harrell v.*

ELECTRONICALLY FILED - 2025 May 06 3:34 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006018

*BMW of N. Am., LLC*, 517 F. Supp. 3d 527, 540 (D.S.C. 2021) (cleaned up). The State's complaint alleges all of these things. *See, e.g.*, Compl. ¶¶ 11, 77–85.

Finally, the State has also adequately alleged that Defendants' statements touting their "Algo Refresh" feature were deceptive, based on the actual effects of that feature. *Id.* ¶¶ 244, 253. The complaint plausibly alleges that Defendants' promise to users of a "fresh start" was illusory, since they may "quickly [be] back in the same rabbit hole again even after using the Refresh feature." *Id.* ¶¶ 249, 258.

## V. The Communications Decency Act Does Not Bar the State's Claims.

Section 230 of the Communications Decency Act ("CDA") states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1); *see also id.* § 230(e)(3). The CDA "protects from liability (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Barnes v. Yahoo!*, 570 F.3d 1096, 1100–01 (9th Cir. 2009).

Here, the State sufficiently alleges that it is *not* seeking to hold Defendants accountable for the content created by "another information content provider" but instead for their own allegedly unfair and deceptive statements and acts. This is true with regard to the alleged addictiveness of the TikTok platform. Defendants are also not entitled to CDA immunity for their claims related to the age-appropriateness of the content available on its app. Those alleged misrepresentations are Defendants' "own acts," not protected by the CDA. *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1094 (9th Cir. 2021) (citation omitted); *see Demetriades v. Yelp, Inc.*, 175 Cal. Rptr. 3d 131, 145 (Cal. Ct. App. 2014) ("Nowhere does plaintiff seek to enjoin or hold Yelp liable for the statements of

ELECTRONICALLY FILED - 2025 May 06 3:34 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006018

third parties (i.e., reviewers) on its Web site. Rather, plaintiff seeks to hold Yelp liable for its own statements regarding the accuracy of its filter.").

At argument, Defendants cited two decisions so recent they could only be cited in the reply brief supporting this motion. The Court has considered these cases, but they do not change the direction of the relevant precedent. Rather, they are merely applications of the CDA consistent with prior caselaw. Both *Doe v. Grindr Inc.*, No. 24-475, 2025 WL 517817 (9th Cir. Feb. 18, 2025), and *M.P. ex rel. Pinckney v. Meta Platforms Inc.*, 127 F.4th 526 (4th Cir. 2025), apply the settled principle that when the harm the plaintiff complains of *comes from third-party content*, the CDA applies. Other cases had previously held the same. *See, e.g.*, *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116 (N.D. Cal. 2016); *Force v. Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019). Here, however, the harm alleged is plausibly in Defendants' own content that is separate from third-party content, and Defendants' more recent citations do not change that.

Even if Defendants were to be treated as a publisher with regard to the addictiveness count, it would not entitle them to CDA immunity. "[A] website may lose immunity under the CDA by making a material contribution to the creation or development of content." *Kimzey v. Yelp!*, 836 F.3d 1263, 1269 (9th Cir. 2016); *see also Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008). In other words, Defendants lose any CDA protections they might otherwise have "whenever [its] actions cross the line into substantively altering the content at issue in ways that make it unlawful." *Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110, 129 (4th Cir. 2022). Here, Defendants are alleged to have done just that. It is not the nature of any third-party content itself that allegedly violates SCUTPA, but rather Defendants' use of that content to feed its addiction-inducing algorithms, beauty filters, and the

ELECTRONICALLY FILED - 2025 May 06 3:34 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006018

other challenged features. Defendants' addictive design features alter the third-party content in a material (and harmful) way, removing any CDA immunity it might otherwise have had.

## VI.     The First Amendment Does Not Bar the State's Claims.

The First Amendment does not bar any of the State's claims.

First, the foreign defendants are not entitled to First Amendment rights. "[F]oreign organizations operating abroad . . . possess no rights under the First Amendment." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 436 (2020). The U.S. Supreme Court recently applied this rule unanimously to one of the foreign defendants here: "To the extent that ByteDance Ltd.'s asserted expressive activity occurs abroad, that activity is not protected by the First Amendment." *TikTok Inc. v. Garland*, Nos. 24-656, 24-657, 2025 WL 222571, at *4 n.2 (U.S. Jan. 17, 2025).

Second, Defendants' allegedly addictive design features are not speech but *conduct* Defendants undertake, and the First Amendment protects only inherently expressive conduct. *Rumsfeld v. FAIR, Inc.*, 547 U.S. 47, 65–66 (2006). Defendants' design features, however, do not convey any message or express any viewpoint. Many courts around the country have already held as much, *see* State's Br. at 44 (collecting cases), and this Court agrees.

Third, the First Amendment does not protect knowing misrepresentations in commerce, which is what the State alleges here. "[C]ommercial speech is not protected by the First Amendment unless it concerns lawful activity and is not misleading." *State ex rel. Wilson v. Ortho-McNeil-Janssen Pharms., Inc.*, 414 S.C. 33, 68, 777 S.E.2d 176, 194 (2015); *see also Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 623–24 (1995) ("[T]he government may freely regulate commercial speech that concerns unlawful activity or is misleading."); State's Br. at 46 (collecting cases).

The First Amendment does not protect Defendants from the State's Complaint.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Defendants' Motion to Dismiss is **DENIED**.

_____
The Honorable Daniel M. Coble
Chief Administrative Judge

April __, 2025
Columbia, South Carolina

ELECTRONICALLY FILED - 2025 May 06 3:34 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006018

ELECTRONICALLY FILED - 2025 May 06 3:34 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006018



Richland Common Pleas

**Case Caption:**   State Of South Carolina , plaintiff, et al vs   Tiktok Inc , defendant, et al

**Case Number:**   2024CP4006018

**Type:**   Order/Other

So Ordered

s/ Daniel Coble, 2774

Electronically signed on 2025-05-06 13:30:25    page 14 of 14

# EXHIBIT 14

## IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
## TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY, PART IV

STATE OF TENNESSEE ex rel. JONATHAN   )
SKRMETTI, ATTORNEY GENERAL and   )
REPORTER,   )
   )
      Plaintiff,   )   JURY DEMAND
   )
v.   )   No. 23-1364-IV
   )
META PLATFORMS, INC. and INSTAGRAM, )
LLC,   )
   )
      Defendants.   )

## ORDER ON MOTION TO DISMISS AMENDED COMPLAINT

On October 24, 2023, State of Tennessee, *ex rel.* Jonathan Skrmetti, Attorney General and Reporter ("State"), filed this Civil Enforcement Action against Defendants Meta Platforms, Inc. and Instagram, LLC (collectively, "Meta" or "Defendants"). The State amended its Complaint on July 16, 2024 ("Amended Complaint"). The Amended Complaint contains two claims: 1) unfairness under the Tennessee Consumer Protection Act; and 2) deception under the Tennessee Consumer Protection Act.[1] Both claims are based on the State's theory that the social media platform Instagram is unfairly and deceptively addictive and harmful, particularly to young people.

On August 30, 2024, Defendants filed a motion to dismiss the Amended Complaint pursuant to Rule 12.02(2) and 12.02(6) of the Tennessee Rules of Civil Procedure. Defendants assert that the Amended Complaint does not contain allegations sufficient to establish personal jurisdiction over either defendant; that Section 230 of the Communications Decency Act prohibits the State from imposing liability on Defendants; that the First Amendment to the United States Constitution prohibits the State from

---

[1] The State's lawsuit is part of a multi-state civil law enforcement effort involving several other states.

imposing civil liabilities on Defendants for their role in disseminating user content; and the Amended Complaint fails to state a claim for relief under the Tennessee Consumer Protection Act. The State opposed the motion. The motion to dismiss came before the Court for hearing on Friday, October 11, 2024.

## I. **Factual Allegations**

Both Meta and Instagram are Delaware corporations with principal places of business in Menlo Park, California. Instagram is a subsidiary of Meta. Meta owns, operates and controls several social technology services, including multiple social media platforms. Through its mobile application and website, Instagram offers consumers the opportunity to connect with friends, follow accounts, and explore various interests. On Instagram, consumers interact with different surfaces, which include the main Feed and Stories that display content posted by accounts the consumer follows. The Explore surface suggests new content to consumers; the Reels surface focuses on short-form videos; and the Direct Messaging surface allows consumers to send messages to one another. Instagram presents a customized display to each consumer based on the interests and preferences they express on Instagram, along with other data in Meta's possession.

To fully access Instagram, consumers must create an account. As part of the account creation process, consumers enter a contract with Meta. By entering that contract, consumers agree to comply with Instagram's Terms of Use ("Terms"). The Terms state, *inter alia*, that Instagram is a Meta product. Thus, the Terms constitute an agreement between the consumer and Meta. Consumers do not pay money to use Instagram. Instead, in exchange for the right to use Instagram, consumers agree to terms that power Meta's advertising business.

2

Meta's business model has made Meta one of the largest and most profitable advertising companies in the world. Meta reported earning $116.6 billion in revenue in 2022, with $23.2 billion in net income. Meta capitalizes on its ability to offer highly targeted, data-informed advertising opportunities, including opportunities based on consumers' location. Consumers are served targeted advertisements during their sessions on Instagram, and consumers see advertisements several times per minute. The advertisements Meta displays on Instagram are interwoven into most, if not all, of Instagram's surfaces. Viewing advertisements is a core part of the Instagram experience. Given this business model, Meta is motivated to maximize the time consumers spend on Instagram. The more time a consumer spends on Meta's platforms, the more advertising opportunities Meta can sell, and the more data Meta collects about the consumer. The increase in consumer time spent therefore significantly increases the profits Meta can make from the consumer.

Consumers under eighteen ("Young Users") are Meta's prized demographic and increasing Young Users' time spent on its platforms is one of Meta's goals. Meta pursues Young Users because Meta's advertising customers value that audience, as Young Users are more likely influenced by advertisements, may become lifelong customers, and set trends society emulates. Instagram is Meta's most popular application with the Young Users' demographic.

Instagram is popular among young Tennesseans. According to Meta's internal metrics, from July 2020 to June 2021, over 475,000 Tennessee teens used Instagram monthly and over 350,000 Tennessee teens used Instagram daily. Between October 2022 and April 2023, over 500,000 young adults in Tennessee used Instagram daily and over 800,000 young adults in Tennessee used Instagram monthly. Meta's internal metrics

show that Nashville and Memphis had the 21st and 22nd most teen Instagram users among U.S. cities in 2019.  According to the same metrics, Nashville had 67,728 daily active teen users;  80,410 weekly active teen users; and 88,221 monthly active teen users.  Memphis had 66,735 daily active teen users; 83,319 weekly active teen users; and 94,434 monthly active teen users.

Meta closely tracks Instagram's performance in Tennessee, including following metrics for Instagram usage in Tennessee, the amount of time Tennessee teens spend on Instagram per day, the percentage of Tennessee teens on Instagram, the ratio of Tennessee teen daily versus monthly active users, Tennessee teen monthly active user story participation rates, the amount of feed media daily active Tennessee teens consume per day on Instagram, the amount of stories that daily active Tennessee teens consume per day on Instagram, the percentage of Facebook Android monthly active users on Instagram, and the reduction in active users over a two month period.  As of 2020, Meta determined that Instagram had fully saturated the market for Tennesseans under 35 years of age.  That same year, Meta found that it had fully entered the teenage market in Tennessee.

In 2019, Meta conducted interviews with young consumers in Memphis to study that population's experience on Instagram.  Meta started the Teen Ecosystem Understand project in 2020 to study Young Users in order to deliver insights that would allow Meta to make Instagram increasingly irresistible to Young Users.  The Teen Ecosystem Understand and Consumer Market Research projects were two of many Meta initiatives to study Young Users and capture more of their time and attention.

The State argues that Instagram is not reasonably avoidable for many Young Users because it is highly addictive and designed to exploit Young Users' biologically

4

limited capacity for self-control. The State alleges that Instagram harms Young Users by, *inter alia*, negatively impacting their metal well-being and impairing their healthy development. Despite having overwhelming evidence showing that Instagram is addictive, the State asserts that Meta made decisions that facilitated Young Users' addiction to Instagram.

The State further alleges that Meta misled the public, including Tennesseans, about the addictive nature of the Instagram platform and the risks Instagram presents to its consumers, particularly Young Users, in three general ways. First, the State asserts that Meta knew that Instagram was harmful for consumers, and particularly Young Users, but it did not share that information with the public. Secondly, the State asserts that Meta created the façade that Instagram is a safe platform where harmful content is rarely encountered. Thirdly, the State asserts that Meta misled the public through misrepresentations about its commitment to well-being related products and features.

By allegedly designing and deploying Instagram in a manner that overwhelmed consumers' free and informed choice regarding how much time to spend on the Instagram platform and by allegedly deceiving consumers through statements, conduct, silence and action that Instagram is a safer platform than it is in reality, the State alleges Meta violated the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-104(a)&(b).

## II. Procedural History

The State filed the original Complaint in this action on October 24, 2023. Meta moved to dismiss the Complaint, which, by Order entered March 13, 2024, the Court denied. On April 12, 2024, Meta moved to certify the March 13, 2024 Order for interlocutory appeal under Tenn. R. App. P. 9, which the Court granted. By Order

entered June 3, 2024, the Court provided its statement of reasons for certifying all three questions presented for interlocutory appeal. On June 13, 2024, Meta filed its Rule 9 application with the Tennessee Court of Appeals. On June 14, 2024, the State moved to amend the Complaint. On June 24, 2024, the State responded to Meta's Rule 9 application in the Court of Appeals. On July 10, 2024, the Court of Appeals denied Meta's Rule 9 application.

The Amended Complaint adds allegations concerning Tennessee contacts based on internal Meta documents the State obtained in discovery. *See* Am. Comp., ¶¶ 83 (internal metrics on Instagram users in Nashville and Memphis); 91-94 (interview with Meta's Head of Global Safety on Tennessee Radio Network); 95-99 (in-person parent creator event hosted in Nashville); 100-03 (Meta's sponsorship of a National Charter Schools Conference in Nashville, an anti-bullying event, and a town hall); 104-07 (Meta's closely monitoring Instagram's reputation in Tennessee after The Covenant School shooting and a Tennessee teen's death by suicide). Further, considering recent amendments to the TCPA, the Amended Complaint requests additional relief. *See* Am. Compl, p. 77, ¶ d.

### III. <u>Standards</u>

A defendant may challenge the Court's exercise of personal jurisdiction through a motion to dismiss pursuant to Rule 12.02(2) of the Tennessee Rules of Civil Procedure. Although not required to do so, the defendant may support his or her motion with affidavits or other materials. *See Baskin v. Pierce & Allred Constr., Inc.*, 676 S.W.3d 554, 566 (Tenn. 2023)(citing *Crouch Ry. Consulting, LLC v. LS Energy Fabrication, LLC*, 610 S.W.3d 460, 470 (Tenn. 2020)). If the defendant does so, then the plaintiff must also submit affidavits or other materials to carry its burden. *See id.* "[T]he

submission of matters outside the pleadings does not convert the Rule 12.02(2) motion to dismiss into a motion for summary judgment." *Id.*

"When a defendant challenges the state's exercise of personal jurisdiction in this manner, the plaintiff bears the burden of establishing a prima facie case for personal jurisdiction over the defendant." *Id.* (citing *Crouch Ry. Consulting, LLC*, 610 S.W.3d at 470). This Court's decision regarding the exercise of personal jurisdiction over the defendant is a question of law. *See id.*

> When evaluating whether the plaintiff has established a prima facie case for personal jurisdiction, the trial court must accept the plaintiff's factual allegations as true and resolve all factual disputes in the plaintiff's favor. [*Crouch*, 610 S.W.3d at 470]; [*State v. NV Sumatra Tobacco Trading Co.*, 403 S.W.3d 726, 739 (Tenn. 2013)]. However, the court may disregard "allegations that are controverted by more reliable evidence and plainly lack credibility, conclusory allegations, or farfetched inferences." *Crouch*, 610 S.W.3d at 470 (citing [*First Cmty. Bank, N.A. v. First Tenn. Bank, N.A.*, 489 S.W.3d 369, 382 (Tenn. 2015)]. Ultimately, the court must determine whether the factual allegations in the plaintiff's complaint and any supporting materials establish, with reasonable particularity, sufficient contacts between the defendant and Tennessee. *First Cmty. Bank*, 489 S.W.3d at 383.

*Id.*

A motion to dismiss for failure to state a claim tests the legal sufficiency of the Complaint, admitting the truth of all relevant and material factual averments contained in the Complaint. *See Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 716 (Tenn. 1997). "[A] motion filed under Rule 12.02(6) tests 'the legal sufficiency of the complaint, not the strength of the plaintiff's proof or evidence.'" *Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 426 (Tenn. 2011). In deciding a motion to dismiss, courts are required to construe the Complaint liberally, treating all factual allegations as true and considering all reasonable inferences in the plaintiff's favor. *See Webb*, 346 S.W.3d at 427; *Tigg v. Perelli Tire Corp.*, 232 S.W.3d 28, 31-32 (Tenn. 2007). However,

"courts are not required to accept as true assertions that are merely legal arguments or 'legal conclusions' couched as facts." *Webb*, 364 S.W.3d at 426 (quoting *Riggs v. Burson*, 941 S.W.2d 44, 47-48 (Tenn. 1997)). Unless it appears from the pleadings and the applicable law that the plaintiff can prove no set of facts that would entitle the plaintiff to relief on his/her claim, a motion to dismiss for failure to state a claim should be denied. *See Bell ex rel. Snyder v. Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A.*, 986 S.W.2d 550, 554 (Tenn. 1999).

## IV. <u>Discussion</u>

Defendants assert that their motion to dismiss should be granted for four core reasons: 1) The State fails to allege sufficient facts to support personal jurisdiction; 2) the State's claims would impose liability on Meta by treating it as a publisher of third-party content on Instagram, which is barred by Section 230 of the Communications Decency Act; 3) the State seeks to hold Meta liable for the allegedly harmful consequences of user speech that Meta organizes and disseminates on Instagram, which is barred by the First Amendment; and 4) the Amended Complaint fails to state a claim under the TCPA.

### *Personal Jurisdiction*

The authority of courts to exercise personal jurisdiction over non-resident defendants is restricted by the Due Process Clause of the Fourteenth Amendment. *See Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d 635, 646 (Tenn. 2009). When a question regarding personal jurisdiction arises, courts are required to ascertain whether it is "fair and substantially just to both parties to have the case tried in the state where the plaintiff has chosen to bring the action." *Id.* "The plaintiff bears the ultimate burden of

8

demonstrating that the trial court may properly exercise personal jurisdiction over a defendant." *Id.* at 643.

Tennessee's long-arm statute permits the courts of this state to exercise jurisdiction upon "any basis not inconsistent with the constitution of this state or of the United States." Tenn. Code Ann. § 20-2-214(a)(6); *Wall Transp., LLC v. Damiron Corp.*, No. M2014-00487-COA-R3-CV, 2014 WL 7263778, at *3 (Tenn. Ct. App. Dec. 19, 2014). In order for a non-resident defendant to be subject to personal jurisdiction in Tennessee, the defendant must have "certain minimum contacts . . . such that the maintenance of a suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)(quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Those minimum contacts with the forum state may create two types of personal jurisdiction: 1) general personal jurisdiction, which requires a defendant to have continuous and systematic contact with the forum state; or 2) specific personal jurisdiction, which focuses only on "deliberate" and "significant" contacts in the forum state from which the claims at issue arise. *Miller v. AXA Winterthur Ins. Co.*, 694 F.3d 675, 678-79 (6th Cir. 2012).

For general personal jurisdiction to attach, a non-resident defendant's contacts with Tennessee must be so continuous and systematic as to render them essentially at home in Tennessee, and they must comply with traditional notions of fair play and substantial justice. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). A corporation's state of organization and principal place of business are paradigm bases for general jurisdiction. *See First Cmty. Bank N.A.*, 489 S.W.3d at 385. Merely "doing business" in the forum state is not sufficient to subject a non-resident defendant to jurisdiction there. *See id.* at 386.

Specific jurisdiction exists when a defendant has minimum contacts with the forum state and the cause of action arises out of those contacts. *See NV Sumatra Tobacco Trading Co.*, 403 S.W.3d at 744. "[C]ertain 'single or occasional acts' in the forum state may be sufficient to render a non-resident corporation subject to personal jurisdiction 'with respect to those acts, though not with respect to matters unrelated to the forum.'" *Id.* at 385 (quoting *Goodyear*, 564 U.S. at 923). Determining whether a forum state may exercise specific jurisdiction over a non-resident defendant requires a two-part analysis: 1) whether the defendant's activities in the state that give rise to the cause of action constitute sufficient minimum contacts with the forum state, and, if so, 2) whether the exercise of jurisdiction over the non-resident defendant is fair. *See id.* at 388.

"It is well established that, in order for a nonresident defendant's contacts with the forum state to be sufficient to give rise to personal jurisdiction there, those contacts must arise out of the defendant's own purposeful, deliberate actions directed toward the forum state." *Id.* at 389 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985)).

> This "purposeful availment" requirement ensures that a defendant will not be [hailed] into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts, or of the "unilateral activity of another party or a third person." Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant himself that create a "substantial connection" with the forum State. Thus where the defendant "deliberately" has engaged in significant activities within a State, or has created "continuing obligations" between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

*Burger King*, 471 U.S. at 475-76.

A defendant's connections with the forum state must not only be intentional, but also substantial enough to give rise to jurisdiction. *See Walden v. Fiore*, 571 U.S. 277,

284-85 (2014). This requires the Court to consider "the quantity of the contacts, their nature and quality, and the source and connection of the cause of action with those contacts." *Sumatra*, 403 S.W.3d at 759-60. Furthermore, in performing the minimum contacts analysis, courts must look to "the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden*, 571 U.S. at 285. A defendant's contacts with the plaintiff "cannot be the only link between the defendant and the forum." *Id.*

The State is not asserting that Meta is subject to general personal jurisdiction in Tennessee. The State's TCPA claims arise from its allegations that 1) Meta engineered dangerous product features into Instagram; and 2) Meta materially misrepresented Instagram's safety to the public. Broadly speaking, the State argues that this Court has specific jurisdiction over Meta because Meta chose to 1) make Instagram available in Tennessee; 2) enter contracts with hundreds of thousands of Tennesseans; 3) analyze Instagram's performance in Tennessee across several highly-granular metrics; 4) promote its brand in Tennessee; 5) study Tennessee consumers; and 6) deliver Tennessee-specific advertisements to Tennesseans. The Court now turns to the due process analysis to determine whether Meta has such minimum contacts with Tennessee to warrant the exercise of specific jurisdiction over it.

To establish the necessary minimum contacts, Meta must either purposefully direct its activities toward Tennessee or purposefully avail itself of the privileges of conducting activities in Tennessee; the claim must arise out of or relate to Meta's Tennessee-related activities; and the exercise of jurisdiction must be reasonable. *See AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1208 (9th Cir. 2020)(citation omitted); *S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968). "If any of the

11

three requirements is not satisfied, jurisdiction in the forum would deprive the defendant of due process of law." *Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 270 (9th Cir. 1995).

"'[P]urposeful availment' is something akin to a deliberate undertaking to do or cause an act or thing to be done in [Tennessee] or conduct which can be properly regarded as a prime generating cause of the effects resulting in [Tennessee], something more than a passive availment of [Tennessee] opportunities." *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 891 (6th Cir. 2002)(quoting *Khalaf v. Bankers & Shippers Ins. Co.*, 273 N.W.2d 811, 819 (Mich. 1978)). The State argues that Meta delivers Tennessee consumers a highly interactive and customized online experience in Tennessee. Through its consumers' assent to Instagram's Terms, Meta collects data from its consumers, including locational data, such as a consumer's GPS, Bluetooth signals, nearby Wi-Fi access points, beacons, and cell towers. Meta then uses that data to deliver its consumers a customized experience on Instagram.

Meta capitalizes on its ability to offer highly targeted, data-informed advertising opportunities, including opportunities based on consumers' locations. Consumers are served targeted advertisements during their sessions on Instagram, and consumers see advertisements several times per minute. Viewing advertisements is a core part of the Instagram experience. The more time a consumer spends on Meta's platforms, the more advertising opportunities Meta can sell, and the more data Meta collects about the consumer. Thus, the time a consumer time spends on Instagram significantly affects the profits Meta can make from the consumer.

A court may "hold [a defendant] answerable . . . for the contents of a website whose economic value turns, in significant measure, on its appeal to [forum residents]."

*Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1230 (9th Cir. 2011); *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 (1984). All manner of Tennessee entities - from Graceland to Dollywood, the Nashville Zoo to the Tennessee Aquarium, the Memphis Grizzlies to the Tennessee Titans, the *Knoxville News Sentinel* to *The Tennessean* - advertise on Instagram to reach a Tennessee audience and expand their business in Tennessee. Meta profits through its sale of Tennessee-targeted advertising opportunities.

The fact that these advertisements, among others, target Tennesseans indicates that Meta knows, either actually or constructively, about its Tennessee consumer base, and Meta exploits that base for commercial gain by selling the ability for advertisers to show their Tennessee-based advertisements to Tennessee consumers on Instagram. Hundreds of thousands of young adults consume Instagram in Tennessee. *See* Am. Compl., ¶ 82. This is a substantial viewer base. *See id.*, ¶ 110. A platform targets a forum if it "'continuously and deliberately exploit[s]' the forum's market for commercial gain, by operating 'a website whose economic value turns, in significant measure, on its appeal to [forum residents].'" *AMA Multimedia, LLC*, 970 F.3d at 1220 (Gould, J. dissenting)(quoting *Mavrix Photo, Inc.*, 647 F.3d at 1230).

Specific jurisdiction is insufficient to support personal jurisdiction for all claims but will support jurisdiction for a claim "sufficiently related to the defendant's activities in the state." *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 426 (7th Cir. 2010). Whether a claim is sufficiently related to a forum turns on "whether the relationship between the plaintiff's claim and the defendant's contacts with the state made it fair to call the defendant into court there." *Id.* at 427. Here, the Amended Complaint alleges that Meta used irresistible design features to capture an ever-increasing amount of Young Users' time and data, for the benefit of Meta's business. *See* Am. Compl., ¶ 5. Thus,

viewing advertisements is a core part of the Instagram experience, and the more time a consumer spends on Instagram, the more advertising opportunities Meta can sell and the more data Meta collects about the consumer.

Under Meta's business model, consumers agree to Instagram's Terms, which explain that Meta shows consumers ads that businesses and organizations pay Meta to promote. Advertisers tell Meta their business goal and the kind of audience they want to see their ads. Meta then uses consumers' personal data to create categories and charges advertisers to show ads to that category. In this way, Meta also custom tailors a consumer's ad experience on Instagram. Meta is motivated to maximize the time users spend on Instagram, because the more time a user spends on Instagram, the more advertising opportunities Meta can sell and the more profits Meta makes from the consumer in the form of advertising dollars.

Because advertisers wish to reach Young Users, Young Users are the prized demographic. Many of Meta's advertisers are willing to pay Meta for the opportunity to reach Young Users in a specific geographical market, such as Tennessee. As such, Meta is motivated to increase Young Users' time spent on Instagram. The State alleges that Meta designs Instagram to make it addictive to Young Users in order to ensure they will spend more time on Instagram, thereby economically benefitting Meta. Young Users' consumption of Instagram allegedly harms Young Users by negatively impacting their mental well-being and impairing their healthy development. These allegations demonstrate the nexus between the State's claims and Meta's Tennessee-related contacts.

Additionally, the State alleges that Meta used its research to develop sophisticated tools that hook consumers to Instagram and that Meta allegedly deceived consumers about the results of its research in various ways. The Amended Complaint alleges that

14

Meta conducted some of that research in Memphis, Tennessee. Additionally, the Amended Complaint alleges that Meta engaged *The Tennessean*'s editorial board to provide a positive, forward-looking message related to Meta's impact in Tennessee and hosted or participated in events in Tennessee to communicate that Instagram is safe for Young Users. This Tennessee-specific conduct relates to the State's claims that Meta offers a harmful product in Tennessee and misleads Tennesseans about its product's safety. As such, this litigation relates to Meta's Tennessee-related conduct.

Before concluding the analysis, the Court must determine whether an exercise of specific jurisdiction over Meta would offend traditional notions of "fair play and substantial justice." *Burger King*, 471 U.S. at 476. This requires to Court to analyze the "burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in efficiently resolving controversies, and the shared interest of the states in furthering fundamental substantive social policies." *uBID, Inc.*, 623 F.3d at 432. This case involves alleged violations of the TCPA. As such, most of these factors counsel in favor of allowing this Court to exercise specific personal jurisdiction over Meta. Furthermore, the burden on Meta of defending a lawsuit in Tennessee is minimal. Meta reports earnings in the billions and has a broad enough reach to operate its services on a global scale. The relationship between Meta, the State, and this litigation is close enough not to offend due process.

For the foregoing reasons, the Court determines that it has specific personal jurisdiction over Meta on the claims brought by the State related to Meta's Tennessee-related conduct. The motion to dismiss is respectfully denied on this ground.

15

*Communications Decency Act*

Meta seeks to dismiss the Amended Complaint pursuant to Section 230 of the Communications Decency Act, which directs that "[n]o provider or user of an interactive computer service shall be treated as a publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). "Section 230 of the Communications Decency Act . . . , titled 'Protection for private blocking and screening of offensive material,' was passed by Congress in 1996." *Soc. Media Cases*, Nos. JCCP 5225, 22STCV21355, 2003 WL 6847378, at *9 (Cal Super. Ct. Oct. 13, 2023).

Through Section 230, "Congress intended to create a blanket immunity from tort liability for online republication of third party content." *Id.* at *30 (citation omitted). "Section 230(c)(1) shields defendants who operate certain internet services from liability based on content created by a third party and published, displayed, or issued through the use of the defendant's services." *Cohen v. Facebook, Inc.*, 252 F. Supp. 3d 140, 155 (E.D.N.Y. 2017). By enacting Section 230, "Congress sought to prevent state and federal laws from interfering with the free exchange of information over the internet." *Daniel v. Armslist, LLC*, 386 Wis. 2d 449, 464 (2019); 47 U.S.C. § 230(e)(3). Section 230 is to be construed broadly. *See Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 19 (1st Cir. 2016).

The necessary components of an immunity claim under Section 230(c)(1) are: 1) the defendant is a provider or user of an interactive computer service; 2) the claim is based on information provided by another information content provider; and 3) the claim treats the defendant as the publisher or speaker of third-party content that forms the basis of the claim. *See Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100 (9th Cir. 2009), *as amended* (Sept. 28, 2009); *Cohen*, 252 F. Supp. 3d at 155-56 (citing *FTC v. LeadClick*

16

*Media, LLC*, 838 F.3d 158, 173 (2d Cir. 2016)). "Where a defendant establishes these requirements based on the face of a complaint, a motion to dismiss may be granted." *Cohen*, 252 F. Supp. 3d at 156.

Here, the first element is satisfied, because both Meta and Instagram are providers of an interactive computer service, as that term is defined by the Communications Decency Act. *See* 47 U.S.C. § 230(f)(2); *Doe v. MySpace*, 528 F.3d 413, 420-22 (5th Cir. 2008)(social networking site is an interactive computer service under Section 230). As such, whether Section 230 provides immunity to Meta and Instagram under the facts alleged here turns on the second and third elements. "Practically speaking, the second and third factor tend to overlap in significant ways." *In re Apple Inc. App Store Simulated Casino-Style Games Litig.*, 625 F. Supp. 3d 971, 978 (N.D. Cal. 2022). The second prong focuses on whether the State's claims stem from Meta's "status or conduct as a publisher or speaker." *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d 809, 826 (N.D. Cal. 2023)(quoting *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1091 (9th Cir. 2021)(quoting *Barnes*, 570 F.3d at 1107)). "A claim meets this prong where the claim is based on 'behavior that is *identical to* publishing or speaking.'" *Id.* (quoting *Barnes*, 570 F.3d at 1107)(emphasis in original).

> Critically, Section 230 does not create immunity simply because publication of third-party content is relevant to or a but-for cause of the plaintiff's harm. The issue is whether the defendant's alleged duty to the plaintiff could "have been satisfied without changes to the content posted by the website's users and without conducting a detailed investigation."

*Id.* (quoting *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851 (9th Cir. 2016)).

Publishing constitutes "deciding whether to publish or to withdraw from publication third-party content." *Lemmon*, 995 F.3d at 1092. It also includes "editorial

decisions and functions ancillary to the decision to make content available." *In re Soc. Media*, 702 F. Supp. 3d at 827.

> Thus, publishing has been found to involve reviewing and editing, such as reviewing material submitted for publication, perhaps editing it for style or technical fluency, and deciding whether to exclude material. In general, it is any conduct rooted in the common sense and common definition of what a publisher does.

*Id.* (internal quotations and citations omitted).

Section 230 also protects tools that filter, pick, choose, digest, and organize content. *See* 47 U.S.C.(f)(4)(A)-(C). Algorithms used to recommend content to users are protected by Section 230, because "tools meant to facilitate the communication and content of others" constitute publishing. *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019).

> Given the complexity with which online platforms function, it is not always clear whether a platform is merely acting as an interactive services provider and publisher of another's content, or if the platform's involvement or intervention in the posting or presentation of that content crosses the line into what courts generally refer to as "development."

*Id.* (quoting *Kimzey v. Yelp!, Inc.*, 836 F.3d 1263, 1269 (9th Cir. 2016)). If a platform provides "'neutral tools' for the creation or dissemination of content[,]" then Section 230 immunity applies. *In re Soc. Media*, 702 F. Supp. 3d at 828 (quoting *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1172 (9th Cir. 2008)). However, if the platform "materially alters the content," then "the tool is not neutral, and Section 230 does not bar liability." *Id.* (quoting *Roommates.Com*, 521 F.3d at 1174-75).

The State alleges that Instagram is not reasonably avoidable for many Young Users because Meta designed it to be highly addictive and to exploit Young Users' biologically limited capacity for self-control through an array of Instagram features such as notifications, ephemerality, auto-play and infinite scroll. Meta notifies Young Users

when another user follows them, likes their content, comments on their content, tags them, mentions them, sends them a message, or goes live. *See* Am. Compl., ¶ 147. Ephemeral content is only available on a temporary basis and not on a schedule convenient for the consumer. *See id.*, ¶ 154. The Stories feature displays user-created images, videos, and narratives for a maximum twenty-four hours before the content disappears. *See id.*, ¶ 155. Live gives users the ability to livestream videos during a specific session, after which the video is typically no longer available. *See id.*, ¶ 156.

Instagram partially displays additional content at the bottom of the user's screen, which allegedly makes it difficult for Young Users to disengage, because there is no natural end point to the display of new information. *See id.*, ¶¶ 165-66. Similar to infinite scroll, Stories show automatically and continuously play content, encouraging Young Users to remain on Instagram. *See id.*, ¶ 170. Videos on Reels automatically and perpetually play as the consumer swipes the screen up to the next video. Additional aspects of Reels, including the placement of the like, comment, save, and share buttons on top of the video allegedly reduce or prevent interruption and keep the consumer constantly viewing videos. *See id.*, ¶ 173.

The State alleges that Young Users' compulsive use of Instagram causes lack of sleep and related health outcomes, diminished in-person socialization skills, difficulty maintaining attention, increased hyperactivity, self-control challenges, increased depression and anxiety, and interruption of various brain development processes. *See* Am. Compl., ¶¶ 205-07, 210.

The Superior Court of California in *Social Media Cases* was presented with litigation against five companies operating social media platforms including Facebook, Instagram, YouTube, TikTok, and Snapchat. The plaintiffs alleged that, as children or

minor teenagers, they became addicted to the social media platforms as a result of the platforms' allegedly manipulative features that sought to maximize the time they spent on the sites and thereby maximize the platforms' advertising revenue. *See Soc. Media Cases*, 2023 WL 6847378, at *1. The plaintiffs alleged that, "as a result of their addiction, they suffered depression and anxiety, engaged in self-harm, became suicidal, and developed eating disorders." *Id.*

> For example, the Master Complaint alleges that TikTok is designed with "continuous scrolling," a feature of the platform that "makes it hard for users to disengage from the app," (Mast. Compl., ¶ 567) and that minor users cannot disable the "auto-play function" so that a "flow-state" is induced in the minds of the minor users (Mast. Compl., ¶ 590). The Master Complaint also alleges that some Plaintiffs suffer sleep disturbances because "Defendants' products, driven by IVR algorithms, deprive users of sleep by sending push notifications and emails at night, prompting children to re-engage with the apps when they should be sleeping." (Mast. Comp., ¶ 107 [also noting that disturbed sleep increases the risk of major depression and is associated with "future suicidal behavior in adolescents"].)

*Id.* at *31. "[T]he Master Complaint alleges harm from 'filters' and 'rewards' offered by Defendants. Plaintiffs allege, for example, that Defendants encourage minor users to create and post their own content using appearance-altering tools provided by Defendants that promote unhealthy 'body image issues.'" *Id.*

The court in *Social Media Cases* determined that the plaintiffs' claims were not barred by Section 230, "because the alleged wrongdoing does not 'treat[ ] [the provider] as the publisher or speaker of any information provided by another information content provider.'" *Id.* at *32 (quoting 47 U.S.C. § 230(c)(1)). Rather, the court determined the plaintiffs' allegations were "based on the allegedly addictive qualities of the interactive features of Defendants' social media sites[,]" which did not fall within the blanket

immunity of Section 230, because "Defendants are allegedly liable for their own actions, not for the content of third-party postings." *Id.*

"Section 230 does not bar a claim based on features of a social media site that have an adverse effect on users apart from the content of material published on the site." *Id.* at *30. "So long as providers are not punished for publishing third-party content, it is consistent with the purposes of Section 230 to recognize a common law duty that providers refrain from actions that injure minor users by inducing frequency and length of use of a social media platform to the point where a minor is addicted and can no longer control the information they receive from that platform." *Id.* at *32. "The duty to design a reasonably safe product is fully independent of [the platform's] role in monitoring or publishing third-party content." *Id.* at *33 (quoting *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1092-93 (9th Cir. 2021)).

*Social Media Cases* is instructive here. The State's claims based on the interactive operational features of Instagram[2] do not seek to require that Meta publish or de-publish any third-party content posted on Instagram. Rather, the features themselves allegedly operate to addict and harm Young Users, regardless of the particular third-party content viewed by the Young Users. Although the Amended Complaint contains allegations that could be read as seeking to hold Defendants liable for publishing third-party content, it also contains allegations that the harms to consumers complained of are caused by Meta's design and operation of Instagram. Viewing the Amended Complaint in the light most favorable to the State, the State's Amended Complaint sufficiently alleges that it was Meta's design of Instagram itself that caused Young Users to become

---

[2] The State's allegations concerning Instagram features that maximize Young Users' engagement do not challenge algorithms that decide what content to publish.

addicted and to suffer harm as a result.[3]  Because it appears from the factual allegations and the applicable law that the State could prove a set of facts that would entitle it to relief on its claims, the motion to dismiss Count 1 of the Amended Complaint premised on Section 230 is respectfully denied. *See Snyder*, 986 S.W.2d at 554.

For its deception claim, the State alleges that, by misrepresenting Instagram's safety, the incidence of harmful experiences on Instagram, and the efficacy of Instagram's well-being related platform features, Defendants engaged in deceptive practices prohibited by the TCPA.  The State further alleges that Defendants failed to disclose the harms associated with Instagram in general and with certain Instagram features, which Defendants knew had a harmful effect on consumers' mental health and well-being.  By allegedly downplaying the risks of Instagram use, Defendants purportedly led reasonable consumers to believe that Instagram is a safer platform than it really is.

Some of the State's deception claim could be construed as being based on specific third-party content (i.e., cyberbullying, harassment, self-harm, negative appearance and social comparison-provoking content, unwanted advances).  These allegations could be interpreted as being premised on Meta's role as a publisher, which would be prohibited under Section 230.  The Amended Complaint could also be construed as being based on conduct other than the publishing of third-party content, such as failing to disclose or misrepresenting platform features allegedly known to risk harm to Young Users.  Under the latter interpretation, liability is alleged to arise "from [Defendants'] knowledge, based on public studies or internal research, of the ways that their products harm" their

---

[3] It could very well be that a jury finds that Young Users became addicted to Instagram because of the third-party content posted thereon.  However, this Court's task, when presented with a motion to dismiss, is to test the legal sufficiency of the Amended Complaint, not the strength of the State's proof.  *See Webb*, 346 S.W.3d at 426.

consumers. *In re Soc. Media*, 702 F.Supp.3d at 834. As such, Section 230 immunity would not apply "because these adverse effects that allegedly should have been disclosed result from Meta's own conduct, not from any particular content displayed." *Soc. Media Cases*, 2023 WL 6847378, at *46.

Viewing the Amended Complaint in the light most favorable to the State, it appears from the factual allegations and the applicable law that the State could prove a set of facts that would entitle it to relief on its claims. *See Snyder*, 986 S.W.2d at 554. Accordingly, the motion to dismiss Count 2 of the Amended Complaint premised on Section 230 is respectfully denied.

### *First Amendment*

"The Free Speech Clause of the First Amendment . . . can serve as a defense in state tort suits." *Snyder v. Phelps*, 562 U.S. 443, 451 (2011). "[A]s a general matter, . . . government has no power to restrict expression [of speech] because of its message, its ideas, its subject matter, or its content." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790-91 (2011)(citation omitted). "[A] State possesses legitimate power to protect children from harm . . . but that does not include a free-floating power to restrict the ideas to which children may be exposed." *Id.* at 794-95 (citations omitted). "'Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them.'" *Id.* at 795 (quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 213-14 (1975)).

Under the First Amendment, the acts of dissemination, disclosing and publishing information are considered speech. *See In re Soc. Media*, 702 F. Supp. 3d at 835 (citing *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011); *Bartnicki v. Vopper*, 532 U.S. 514,

23

527 (2001)); *Newspaper Printing Corp. v. Galbreath*, 580 S.W.2d 777, 779 (Tenn. 1979)(First Amendment provides the freedom to publish constitutionally protected speech "as the publisher sees fit."). "It is undisputed that the First Amendment generally protects a publisher from liability where that publisher organized, compiled, and disseminated information that then harmed the plaintiff." *Soc. Media Cases*, 2023 WL 6847378, at *38. However, "the mere fact that the conduct at issue involves or includes speech does not necessarily shield a defendant from liability." *Id.* at *36.

While the Amended Complaint could be read to allege that consumers were harmed by third-party content found on Instagram, it is undisputed that there is no single type of content viewed by all consumers. Rather, the particular content viewed is custom tailored to each consumer. As such, the allegedly addictive and harmful features of Instagram are alleged to work regardless of the third-party content viewed. To this end, the Amended Complaint can be read to allege that it is the design and the way Instagram functions that makes it addictive and thus harmful to consumers, especially Young Users, or that certain design features (such as filters) directly harms Young Users, especially young women, not the content itself.

Under this interpretation, Defendants cannot be analogized to mere publishers of information. *See id.* at *38 ("Design features of the platforms (such as endless scroll or filters) cannot readily be analogized to mere editorial decisions made by a publisher."). Moreover, the Court "must make sure" it "carefully parse[s] . . . how the regulated activities actually function before deciding if the activity in question constitutes expression and therefore comes within the First Amendment's ambit." *Moody v.*

24

*NetChoice, LLC*, 144 S. Ct. 2383, 2411-12 (2024)(Jackson, J., concurring).[4] Thus, further factual development is necessary before Meta's First Amendment challenge can be fully and fairly addressed.

Viewing the Amended Complaint in the light most favorable to the State, it appears from the factual allegations and the applicable law that the State could prove a set of facts that would entitle it to relief on its claims. Accordingly, the motion to dismiss Count 1 of the Amended Complaint premised on the First Amendment is respectfully denied.

"Liability for failure to warn about specific third-party content could be interpreted as premised on Meta's role as publisher in violation of both Section 230 and the First Amendment." *Soc. Media Cases*, 2023 WL 6847378, at *46. However,

> [i]f a potential user were deterred from consuming content on Meta's platforms due to a warning about possible addiction, the deterrence would not be based on a government sanction of the content on the platforms. Therefore, the First Amendment is not implicated by failure to provide warnings concerning potential harms from features created by Defendants to maximize minors' usage.

*Id.*, at *47. "Similarly, the First Amendment does not bar a claim of failure to warn of potential injuries from Meta's social media platform design." *Id.*

Some of the State's deception claim allegations could be construed as being based on specific third-party content (i.e., cyberbullying, harassment, self-harm, negative appearance and social comparison-provoking content, unwanted advances). These allegations could be interpreted as being premised on Meta's role as a publisher, which would be prohibited under the First Amendment. However, the Amended Complaint

---

[4] *Moody* concerns a facial First Amendment challenge to Florida and Texas laws that regulate certain social media content moderation decisions, such as removing or deprioritizing posts or accounts based on their viewpoint. *Moody* does not control this enforcement action, as it concerns Meta's allegedly unfair design choices and misrepresentations to consumers, not governmental restriction on content and viewpoint.

could also be construed as being based on conduct other than the publishing of third-party content, such as failing to disclose or misrepresenting platform features allegedly known to risk harm to Young Users. Under the latter interpretation, liability is alleged to arise from Defendants' knowledge of the ways their products allegedly harm consumers, especially Young Users.[5]

The First Amendment does not protect Defendants from liability for their own failure to warn, as the adverse effects that allegedly should have been disclosed result from Defendants' own conduct, not from any particular third-party content displayed. Stated differently, Meta's potential liability springs from its capacity as a creator of features designed to maximize engagement for Young Users, not from its role as publisher. Taking the allegations in the Amended Complaint in the light most favorable to the State, it appears from the Amended Complaint's factual allegations and the applicable law that the State could prove a set of facts that would entitle it to relief on its deception claims.

Defendants assert that, to the extent the State identifies any misrepresentations made by Meta, as opposed to any omissions or failure to disclose, those statements are protected by the First Amendment. More specifically, Defendants assert that, to the

---

[5] In *NetChoice v. Bonta*, 113 F.4th 1101 (9th Cir. 2024), a trade association of online businesses sued the State of California for declaratory and injunctive relief, seeking to invalidate statutes requiring "covered businesses to identify and disclose to the government potential risks that minors might be exposed to potentially harmful content [online] and [to] develop a timed plan to mitigate or eliminate the identified risks before publication." *Id.* at 1117. The district court granted a preliminary injunction, holding that the challenged statutes likely violated the First Amendment. *See id.* at 1101. In affirming the district court's preliminary injunction, the 9th Circuit concluded that Plaintiff was likely to succeed in showing that the statutes facially violate the First Amendment because "the risk that businesses must measure and disclose to the government is the risk that children will be exposed to disfavored speech online." *Id.* at 1121. As stated above, the allegations in Amended Complaint can be construed as being based on conduct other than the publishing of third-party content, such as failing to disclose or misrepresenting platform features allegedly known to risk harm to Young Users. "If commercial speech is misleading . . . , it is not entitled to [First Amendment] protection." *Id.* at 1119. Furthermore, a statute "that compels businesses to measure and disclose to the government certain types of risks potentially created by their services might not create a problem." *Id.* at 1120-21.

extent the State's deception claim is based on statements made to Congress in response to questioning,[6] it is barred by the First Amendment under the *Noerr-Pennington* doctrine. *See* Am. Compl., ¶¶ 358-61, 381-83, 386-90, 394-400. The State asserts that its TCPA claims do not challenge Meta's efforts to petition the government; rather, Meta's congressional testimony is one example of a broader effort by Meta to develop trust among Tennesseans that Instagram is a safe place for Young Users. *See* Pl.'s Resp., p. 13.

> The *Noerr-Pennington* doctrine acknowledges that the right to petition the government is a freedom that is protected by the Bill of Rights. *See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 138 (1961). Under the *Noerr-Pennington* doctrine, civil actions are barred where the activity challenged under federal statute or state law consists of "petitioning legislatures, administrative bodies, and the courts," even if the defendant's actions had an "anticompetitive or otherwise injurious purpose or effect." *Hamilton v. Accu-Tek*, 935 F. Supp. 1307, 1316-17 (E.D.N.Y. 1996); *see United Mine Worker of Am. v. Pennington*, 381 U.S. 657 (1965). *Noerr-Pennington* has also been applied to bar liability in state common law tort claims, including negligence and products liability claims, for statements made in the course of petitioning the government. *See Hamilton*, 935 F. Supp. at 1317.

*Tuosto v. Phillip Morris USA Inc.*, No. 05 Civ. 9384(PKL), 2007 WL 2398507, at *5 (S.D.N.Y. Aug. 21, 2007).

> There are two exceptions to the protective reach of the *Noerr-Pennington* doctrine: the "mere sham" exception and the "unethical" exception. *See id.* Statements made in the course of petitioning Congress are considered a "mere sham" when the actor making the statements does not have a true interest in the outcome of the effort to influence government because the effort "is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Noerr*, 365 U.S. at 144; *see, e.g., Oregon Natural Res. Council v. Mohla*, 944 F.2d 531, 535 (9th Cir. 1991). The "unethical" exception denies *Noerr-Pennington* protection to statements made while petitioning the government "where the political activity involved illegal, corrupt or unethical means." *Hamilton*, 935 F. Supp. at 1317.

---

[6] The alleged statements were made in response to questions from Congress in part to persuade Congress of the public benefits of Meta's services and concerned potential efforts by Congress to pass legislation.

*Id.* "Notwithstanding the 'unethical' and 'mere sham' exceptions, *Noerr-Pennington* protection has been extended to all advocacy intended to influence government action, including to allegedly false statements." *Id.* (citations omitted).

The question of whether there should be absolute immunity for conduct including intentional misrepresentations or fraud should be analyzed under the sham exception. *See In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 614 (N.D. Cal. 2020); *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 645 (9th Cir. 2009); *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006). "Whether or not an otherwise non-actionable statement falls within the sham exception is generally a question of fact not appropriate for resolution on a motion to dismiss." *Id.* Additionally, while the *Noerr-Pennington* doctrine provides immunity from liability for simply petitioning government, the doctrine does not foreclose use of communications to government as evidence of, *inter alia*, knowledge, intent, or state of mind. *See In re Tylenol (Acetaminophen) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 181 F. Supp. 3d 278, 306 (E.D. Pa. 2016).

Regarding the State's claim that Meta created the false impression that Instagram is a safe platform where users were unlikely to experience significant harm and where users' mental health is protected, *see* Am. Compl., ¶ 24, Defendants assert that Meta's statements regarding safety or the prioritization of safety are statements of opinion entitled to First Amendment protection. "[S]tatements of opinion are protected by the First Amendment unless they 'imply a false assertion of fact.' Even seemingly factual statements 'are protected by the First Amendment if they cannot reasonably be

interpreted as stating actual facts about their target.'" *Berry v. Schmitt*, 688 F.3d 290, 303

(6th Cir. 2012)(quoting *Standing Comm. v. Yagman*, 55 F.3d 1430, 1438 (9th Cir. 1995)).

> "[A] company has a duty to disclose hard information but not soft
> information unless other criteria are met." *Weiner v. Tivity Health, Inc.*,
> 365 F. Supp. 3d 900, 913 (M.D. Tenn. 2019)(quoting *Zaluski v. United
> Am. Healthcare Corp.*, 527 F.3d 564, 572 (6th Cir. 2008)). "Hard
> information is typically historical information or other factual information
> that is objectively verifiable. Such information is to be contrasted with
> 'soft' information, which includes predications and matters of opinion."
> *Id.* (quoting *Zaluski*, 527 F.3d at 572). With regard to soft information, "a
> defendant may choose silence or speech based on the then-known factual
> basis, but it cannot choose half-truths." *Id.* (quoting *In re Ford [Motor
> Co. Sec. Litig.]*, 381 F.3d [563,] 569 [(6th Cir. 2004)]; *see also City of
> Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 675 (6th
> Cir. 2005)("the protections for soft information end where speech
> begins.")(internal citation omitted). "Thus, once a company has chosen to
> speak on an issue -- even an issue it had no independent obligation to
> address – it cannot omit material facts related to that issue so as to make
> its disclosure misleading." *Weiner*, 365 F. Supp. 3d at 913 (citation and
> internal quotations omitted).

*St. Clair Cnty. Emps. Ret. Sys. v. Acadia Healthcare Co., Inc.*, No. 3:18-cv-00988, 2023

WL 195370, at *4 (M.D. Tenn. Jan. 20, 2021).

The question of whether alleged misrepresentations or omissions are material is a

mixed question of law and fact that courts generally reserve for the trier of fact. *See id.* at

*6; *Helwig v. Vencor, Inc.*, 251 F.3d 540, 563 (6th Cir. 2001). "The courts are also more

inclined to send close cases to the jury when the representation at issue relates directly to

. . . safety." *Ladd by Ladd v. Honda Motor Co., Ltd.*, 939 S.W.2d 83, 100 (Tenn. Ct.

App. 1996). For these and the foregoing reasons, the motion to dismiss Count 2 of the

Amended Complaint on the grounds of First Amendment protection is respectfully

denied.

*TCPA*

The TCPA is to be interpreted and construed "in accordance with interpretations of 15 U.S.C.A. § 45(a)(1) by the Federal Trade Commission and the federal courts." *Tucker v. Sierra Builders*, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005)(citing Tenn. Code Ann. § 47-18-115). One purpose of the TCPA "is to provide additional, supplementary state law remedies to consumers victimized by unfair or deceptive business acts or practices that were committed in Tennessee in whole or in part." *Id.*; Tenn. Code Ann. §§ 47-18-102(2). "[T]he TCPA is explicitly remedial, and Tennessee courts are therefore required to construe it liberally to protect consumers in Tennessee and elsewhere." *Id.*

The TCPA specifically enumerates 62 unfair or deceptive acts or practices that are prohibited and deemed unlawful under the statute. *See* Tenn. Code Ann. § 47-18-104(b). A deceptive act or practice is "one that causes or tends to cause a consumer to believe what is false or that misleads or tends to mislead a consumer as to a matter of fact." *Tucker*, 180 S.W.3d at 116. An unfair act is "an act or practice [that] causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." *Id.* at 116-17. While these standards are legal matters for a court to determine, "whether a specific representation in a particular case is 'unfair' or 'deceptive' is a question of fact." *Id.* at 116.

Defendants argue that the State's TCPA claims fail because 1) the Amended Complaint does not allege that any unfair or deceptive acts or practices occurred in Davidson County; 2) the TCPA exempts entities that engage in the dissemination of information; 3) the Amended Complaint does not allege any acts or practices affecting the conduct of any trade or commerce; and 4) the alleged deceptions or

30

misrepresentations identified are not statements of fact and/or the Amended Complaint does not allege their materiality.

The Attorney General may bring a TCPA action or proceeding in any court of competent jurisdiction "in the county where the alleged unfair or deceptive act or practice took place, is taking place, or is about to take place, or in the county in which such person resides, has such person's principal place of business, conducts, transacts, or has transacted business[.]" Tenn. Code Ann. § 47-18-108(a)(4); Tenn. Code Ann. § 47-18-114. The Amended Complaint alleges that Davidson is a county in which alleged violations took place and where Defendants have conducted or transacted business. *See* Am. Compl., ¶¶ 35, 85-90, 95-99, 101-02, 113. Taking the allegations in the Amended Complaint in the light most favorable to the State, these allegations are sufficient to survive the motion to dismiss.

The TCPA does not apply to

[a] publisher, broadcaster, or other person principally engaged in the preparation or dissemination of information or the reproduction of printed or pictorial matter, who has prepared or disseminated such information or matter on behalf of others without notification from the attorney general that the information or matter violates or is being used as a means to violate this part[.]

Tenn. Code Ann. § 47-18-111(a)(2).

Defendants argue that Meta is principally engaged in the dissemination of information as described in this section; thus, it is exempt from the TCPA. This exemption applies in cases where a plaintiff seeks to hold a defendant liable for publishing third-party content and disseminating that information on behalf of others. As discussed more thoroughly above, the State's Amended Complaint can be interpreted as

31

seeking to hold Meta liable for its own misconduct, not for the third-party content Meta disseminates on others' behalf.

The TCPA is limited to unfair or deceptive acts or practices that affect the conduct of any trade or commerce. *See* Tenn. Code Ann. § 47-18-104(a). "'Trade,' 'commerce,' or 'consumer transaction' means the advertising, offering for sale, lease or rental, or distribution of any goods, services, or property, tangible or intangible, real, personal, or mixed, and other articles, commodities, or things of value wherever situated." Tenn. Code Ann. § 47-18-103(24). Thus, the TCPA guards against unfair or deceptive acts or practices that affect the advertising or distribution of services and other things of value wherever situated. Unfair or deceptive acts or practices affecting the conduct of any trade or commerce include "engaging in any . . . act or practice which is deceptive to the consumer or to any other person[.]" Tenn. Code Ann. § 47-18-104(b)(27). An exchange of money or transfer of valuable consideration is not a requirement written into the TCPA.

The Amended Complaint alleges that Meta engages in trade and commerce by offering advertisements and providing Instagram in Tennessee. *See* Am. Compl., ¶ 415. Meta allegedly employs unfair and deceptive tactics, such as designing and featuring Instagram in a manner that induces compulsive use, to fuel its collection of data from consumers, which it allegedly monetizes by selling targeted advertising. Allegedly, Meta intentionally exploits the developmental nature of Young Users' brains, causing them to spend more time on Instagram and creating an obstacle to their free choice. *See id.*, ¶ 420. Defendants also allegedly deprive consumers of free and informed choice regarding Instagram by withholding important information about and misrepresenting the degree to which Instagram induces compulsive use, the negative impact Instagram has on mental

health, the efficacy of Instagram's well-being features, and the frequency of harmful experiences on Instagram. *See id.*, ¶¶ 422, 429-31. These allegations meet the definition of unfair or deceptive acts or practices affecting the conduct of any trade or commerce under the TCPA.

Defendants argue that the Amended Complaint fails to allege deceptive practices or misrepresentations. Defendants contend that many of the identified statements are not statements of fact and, thus, cannot serve as the basis of a TCPA claim. The TCPA does not define "unfair" or "deceptive." Thus "the standards to be used in determining whether a representation is 'unfair' or 'deceptive' under the TCPA are legal matters to be decided by the courts." *Tucker*, 180 S.W.3d at 116. "However, whether a specific representation in a particular case is 'unfair' or 'deceptive' is a question of fact." *Id.* "Misrepresentations that would not be actionable as common-law fraud may nevertheless be actionable under the provisions of the . . . TCPA." *Id.* at 115. "The TCPA applies to any act or practice that is unfair or deceptive to consumers." *Id.* (citing Tenn. Code Ann. §§ 47-18-104(a), -104(b)(27)).

> Although Tennessee courts have not had many opportunities to construe the terms "unfair" and "deceptive" under the TCPA, the Federal Trade Commission and the federal courts have developed a substantial and finely honed body of law construing these terms in the context of the FTC Act. The General Assembly has instructed us to look to the federal understanding of these terms in interpreting them in the TCPA. Tenn. Code Ann. § 47-18-115. Accordingly, we may look to the federal law defining these key terms to determine how they should be applied in this case.
>
> The concept of deceptiveness is a broader, more flexible standard of actionable merchant misconduct than the traditional remedy of common-law fraud. A deceptive act or practice is one that causes or tends to cause a consumer to believe what is false or that misleads or tends to mislead a consumer as to a matter of fact. Thus, for the purposes of the TCPA and other little FTC acts, the essence of deception is misleading consumers by a merchant's statements, silence, or actions. JONATHAN SHELDON &

33

> CAROLYN L. CARTER, UNFAIR AND DECEPTIVE ACTS AND PRACTICES § 4.2.3.1, at 118-19 (5th ed. 2001) [hereinafter UNFAIR AND DECEPTIVE ACTS AND PRACTICES].
>
> The concept of unfairness is even broader than the concept of deceptiveness, and it applies to various abusive business practices that are not necessarily deceptive. UNFAIR AND DECEPTIVE ACTS AND PRACTICES § 4.3.3.1, at 156. In the 1994 legislation reauthorizing the Federal Trade Commission, Congress undertook to codify the Commission's policy statement on unfairness by stating that an act or practice should not be deemed unfair "unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C.A. § 45(n).
>
> To be considered "substantial," consumer injury must be more than trivial or speculative. *Tungate v. MacLean-Stevens Studios, Inc.*, 714 A.2d 792, 797 (Me. 1998); *Legg v. Castruccio*, 100 Md. App. 748, 642 A.2d 906, 917 (1994). Substantial injury usually involves monetary injury or unwarranted health and safety risks. UNFAIR AND DECEPTIVE ACTS AND PRACTICES § 4.3.2.2, at 154. Consumer injury will be considered substantial if a relatively small harm is inflicted on a large number of consumers or if a greater harm is inflicted on a relatively small number of consumers. *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1365 (11th Cir. 1988).
>
> Even if an act or practice causes or is likely to cause substantial injury, it will not be considered unfair unless the injury is not reasonably avoidable by consumers themselves. Consumers cannot reasonably avoid injury when a merchant's sales practices unreasonably create or take advantage of an obstacle to the free exercise of consumer decision-making. Practices that unreasonably interfere with consumer decision-making include (1) withholding important information from consumers, (2) overt coercion, or (3) exercising undue influence over a highly susceptible class of consumers. UNFAIR AND DECEPTIVE ACTS AND PRACTICES § 4.3.2.3, at 155.

*Tucker*, 180 S.W.3d at 116-17.

Company statements of opinion or puffery are "evaluated in context to determine if they convey more than just a generalized optimism." *Grae v. Corr. Corp. of Am.*, No. 3:16-CV-2267, 2017 WL 6442145, at *14 (M.D. Tenn. Dec. 18, 2017). "[V]ague statements not subject to verification by proof are generally deemed non-actionable

puffery. But 'opinion or puffery . . . in particular contexts when it is both factual and material . . . may be actionable.'" *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 674 (6th Cir. 2005)(quoting *Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999))(emphasis omitted); *see also Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989)("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation.").

Whether an alleged misrepresentation or omission is material is a mixed question of law and fact. *See St. Clair Cnty. Emps. Ret. Sys.*, 2021 WL 195370, at *6. "A claim is considered material if it 'involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding a product.'" *Kraft, Inc v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992)(quoting *Matter of Cliffdale Assocs.*, 103 F.T.C. 110, 1984 WL 565319, at *37 (FTC Mar. 23, 1984)). "A presumption of materiality is applied 'with three types of claims: (1) express claims; (2) implied claims where there is evidence that the seller intended to make the claim; and (3) claims that significantly involve health, safety, or other areas with which reasonable consumers would be concerned.'" *State ex rel. Slatery v. HRC Med. Ctrs., Inc.*, 603 S.W.3d 1, 24 (Tenn. Ct. App. 2019)(quoting *Kraft*, 970 F.2d at 322-23).

"Successfully pleading an actionable material misrepresentation or omission requires a plaintiff to allege facts demonstrating two things: (1) that a defendant made a statement or omission that was false or misleading; and (2) that this statement or omission concerned a material fact." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 470 (6th Cir. 2014). "[C]ontext must inform determinations of materiality." *St. Clair Cnty. Emps. Ret. Sys.*, 2021 WL 195370, at *6; *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d at 478

35

("[A]s we have said and the Supreme Court has made clear, context matters when analyzing materiality."). Given these principles and viewing the Amended Complaint in the light most favorable to the State, the Court declines to dismiss the Amended Complaint at this early stage, as a reasonable juror might conclude that Defendants' statements or omissions were actionable material misrepresentations.

Defendants assert that the State's allegations regarding the Bad Experiences and Encounters Framework ("BEEF") do not establish that the challenged statements regarding the Community Standard Enforcement Reports ("CSERs") are false or misleading. Defendants assert that the CSERs measure the prevalence of community-standards-violating content (i.e., the percentage of views that were of content violating Meta's community standards) whereas BEEF reports the percentage of users who self-report having seen content that falls into certain inherently subjective categories. Stated differently, BEEF does not address the same metrics as the CSERs; thus, Defendants contend BEEF does not contradict the CSERs.

The Amended Complaint alleges that the CSERs create the impression that Instagram is a safe platform on which harmful content is rarely encountered. *See* Am. Compl., ¶ 307-08. The Amended Complaint claims that Meta uses misleading terminology in the CSERs, which tout the prevalence of community-standards-violating conduct, rather than the higher prevalence of harmful content. *See id.*, ¶¶ 310-11. The Amended Complaint alleges that Meta exploits that confusion to inflate the CSERs' significance to consumers. *See id.*, ¶¶ 313-16; 318-19. The Amended Complaint further alleges that Meta's internal surveys, such as BEEF, make it clear that harmful content is much more prevalent on Instagram than the CSERs suggest. The Amended Complaint alleges that a former Meta executive testified under oath that Meta intentionally uses the

36

CSERs to create a misleading picture of the harmfulness of Meta's platforms. *See id.*, ¶¶ 333-39.

At this stage in the proceedings, the Court must take the State's factual allegations as true and consider all reasonable inferences in its favor. *See Webb*, 346 S.W.3d at 427. Whether the BEEF survey undermines the CSERs is a factual question for resolution at a later stage in the proceedings. *See FTC v. Wyndham Worldwide Corp.*, 10 F. Supp. 3d 602, 631 (D.N.J. 2014) *aff'd*, 799 F.3d 236 (3d Cir. 2015)("[T]he impression that a reasonable consumer would have had after reading the privacy policy seems to involve fact issues that the Court cannot resolve at this juncture."); *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1189 (N.D. Ga. 2008)("The meaning of an advertisement, the claims or net impressions communicated to reasonable consumers, is fundamentally a question of fact.").

As it appears from the factual allegations and the applicable law that the State could prove a set of facts that would entitle it to relief on its TCPA claims, the motion to dismiss the Amended Complaint on the grounds of failure to state a claim is respectfully denied.

## V. <u>Conclusion</u>

Defendants have sufficient minimum contacts with Tennessee for this Court to exercise specific personal jurisdiction over them. At this stage of the proceedings, the Court must view the Amended Complaint in the light most favorable to the State. Because the allegations in the Amended Complaint can be construed as being based on conduct other than the publishing of third-party content, Section 230 immunity and First Amendment protections do not bar the Amended Complaint. Additionally, it appears

from the factual allegations and the applicable law that the State could prove a set of facts that would entitle it to relief on its TCPA claims.

> [I]t must be remembered that we are addressing the standard in assessing the sufficiency of a single document filed at the very beginning of a case – the complaint. Our motion-to-dismiss jurisprudence reflects the principle that this stage of the proceedings is particularly ill-suited for an evaluation of the likelihood of success on the merits or of the weight of the facts pleaded, or as a docket-clearing mechanism.

*Webb*, 346 S.W.3d at 437. "The prima facie case . . . is an evidentiary standard, not a pleading requirement." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002).

For these and the foregoing reasons, the Court respectfully denies the motion to dismiss filed by Meta Platforms, Inc. and Instagram, LLC.

**IT IS SO ORDERED.**

RUSSELL T. PERKINS, CHANCELLOR

cc:    Matthew D. Janssen, Esq.
       Brian T. Phelps, Esq.
       Christopher A. Dunbar, Esq.
       Keaton Murphy, Esq.
       Robert E. Cooper, Esq.
       Jessalyn H. Zeigler, Esq.
       Courtney A. Hunter, Esq.
       Gregory L. Halperin, Esq.
       Christian J. Pistilli, Esq.



MAILED
10|17|24

# EXHIBIT 15

2024 WL 3741422 (Utah Dist.Ct.) (Trial Order)
District Court of Utah,
Third Judicial District.
Salt Lake County

UTAH DIVISION OF CONSUMER PROTECTION, Plaintiff,

v.

META PLATFORMS, INC., and Instagram, LLC, Defendants.

No. 230908060.
July 18, 2024.

**Order Denying Defendants' Motion to Dismiss**

Sean D. Reyes, Utah Attorney General, Douglas Crapo (14620), Peishen Zhou (18596), Assistant Attorneys General, 160 East 300 South, 5th Floor, Salt Lake City, Utah 84114, Tel: (801) 366-0310, crapo@agutah.gov, peishenzhou@agutah.gov, for plaintiff Utah Division of Consumer Protection.

Kent Holmberg, Judge.

**\*1  Tier III**

On June 11, 2024, the Court conducted a hearing on Defendant Meta Platforms, Inc., and Instagram, LLC's (collectively "Meta" or "Defendants") Motion to Dismiss. Plaintiff Utah Division of Consumer Protection (the "Division"), a subdivision of the Utah Department of Commerce, was present and represented by counsel, as were Defendants. Consistent with the oral ruling announced at the hearing, which is fully incorporated into this written Order, the Court hereby DENIES Meta's Motion to Dismiss in full.

**BACKGROUND**

On October 24, 2023, the Division filed a two-count Complaint against Meta, alleging violations of the Utah Consumer Sales Practices Act ("UCSPA"). Count I alleges that the Defendants engaged in unconscionable acts and practices exploiting children's neurological vulnerabilities by designing and continually refining addictive features on their social media platforms, Facebook and Instagram, to hook children into spending more time on those platforms. Count II alleges that the Defendants engaged in deceptive acts and practices by making material misrepresentations and omissions about the safety of their platforms, including the use of addictive design features.

The Complaint alleges that Meta operates social media platforms including Facebook and Instagram (the "social media platforms" or "platforms"). Compl. ¶¶ 16-18. The Complaint alleges that the foundation of Meta's business model with respect to these platforms is targeted advertising. *Id.* ¶¶ 35-38.

The Division further alleges Meta thus strives to maximize the time users spend on the platforms and the amount of data Meta can gather from users so that it can sell more advertisements. *Id.* According to the Complaint, teenagers are among the most valuable advertising demographics, and brands look to advertise where teenagers are engaging online. *Id.* ¶ 40. The Complaint further alleges that Meta has aggressively sought to attract teenagers to its platforms. *Id.* ¶¶ 41-47. According to the Complaint, one-third of the children in Utah are daily active users of Facebook, and over half of Utah children between the ages of ten and

nineteen use Instagram at least monthly. *Id.* ¶¶ 48, 51. The Division alleges that Meta makes more money when users spend more time on its products, creating an incentive to increase the time that Utah users spend on its platforms. *Id.* ¶¶ 35-38.

The Complaint goes on to allege that Meta has responded to this incentive by adding features that addict and consume the attention of Utah's children to the detriment of their wellbeing. *Id.* ¶ 53-113. This is the very heart of the claims in the Division's Complaint. The Division alleges that Meta has implemented a variety of addictive design features designed to trick children into spending as much time as possible on the platforms and that these features do cause harm to children. *Id.* The Division alleges excessive and compulsive use of the platforms leads to depression, anxiety, body dysmorphia, eating disorders, self-harm, suicidal ideation and poor sleep patterns. *Id.* ¶¶ 92-113, 119, 126-27, 155, 171, 205-10. The Complaint alleges that despite knowledge of these and other harms, Meta has repeatedly represented the safety of its platforms and knowingly concealed the dangers. *Id.* ¶¶ 134-228.

**\*2** The Division also alleges that Meta purposely directs commercial activities to Utah by maintaining data centers in the state, providing social networking services to Utah users, encouraging those users to view, like, and comment on posts exhibited on Meta's platforms, and selling advertising to companies which target Utah users. *Id.* ¶¶ 24-32. According to the Division, Meta has a business relationship with nearly 70 percent of Utahns through use of its algorithms and targeted alerts. *Id.* ¶¶ 4-5, 28.

The Complaint further alleges that Meta used features like personalized content, recommendation algorithms, distracting notifications, infinite scroll, reels, ephemeral content, and auto-play. *Id.* ¶¶ 237-39.

The Defendants filed a joint Motion to Dismiss the Complaint in its entirety on December 22, 2023. The Motion argued that (1) the State of Utah does not have personal jurisdiction over Meta; (2) the Division's claims would impose liability on the Defendants for publication of third-party content, which is barred by Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230; (3) the Division's claims would implicate Meta's right to freedom of speech under the First Amendment to the U.S. Constitution; (4) the Complaint fails to state a claim under the UCSPA because it provides immunity to entities that are engaged in the dissemination of information or the reproduction of printed or pictorial matter, Utah Code Section 13-11-22(1)(b), which the Defendants claim applies to them as a matter of law; (5) the Complaint cannot or does not allege that the Defendants undertook any conduct in connection with a consumer transaction as required by the UCSPA; and (6) the Complaint fails to allege facts establishing the elements of a claim for a deceptive or an unconscionable practice under the UCSPA.

**LEGAL STANDARD**

In addressing a motion to dismiss under Rule 12(b), a District Court must accept the factual allegations in the Complaint as true and consider them, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *St. Benedict s Dev. Co. v. St. Benedict's Hosp.,* 811 P.2d 194, 196 (Utah 1991). In other words, assuming all the facts in the Complaint are true, and any reasonable inferences added on top of those facts, the Defendants must show that, as a matter of law, the Division cannot make its claim. Dismissal is justified only when the allegations of a complaint clearly demonstrate that the plaintiff does not have a claim. In ruling on a motion to dismiss, a District Court makes no findings as to the ultimate strength of either a plaintiff's claims or a defendant's defenses, but instead accepts the facts in the Complaint as true. At the pleading stage, the Court is not making any decisions about how valid the Division's claims or the Defendants' defenses are. Both sides make their arguments, and all the Court considers is what is in the Complaint.

**CONCLUSIONS OF LAW**

**A. The Division Has Adequately Alleged Specific Personal Jurisdiction over Meta.**

First, on the issue of personal jurisdiction, the Division did not argue general jurisdiction, so only specific personal jurisdiction was at issue. Specific jurisdiction exists if (1) the Defendants purposefully availed themselves of the protection of Utah's laws,

including by directing activities at the forum; (2) the claim arises out of or relates to these forum-based contacts; and (3) the exercise of personal jurisdiction is fair and reasonable. *Synergetics v. Marathon Ranching Co.,* 701 P.2d 1106, 1110 (Utah 1985).

**\*3** First, has the Division established the purposeful direction prong of the test for specific personal jurisdiction by showing that the Defendants purposely availed themselves of the privilege of conducting activities within the State of Utah? The Division alleges that Meta purposefully directs commercial activities to Utah by maintaining data centers in the State, providing social networking services to Utah users, encouraging those users to view, like, and comment on posts exhibited on Meta's platform, and selling advertising to companies which target Utah users. Compl. ¶¶ 24-32.

It is true that the mere operation of a commercial website accessible to users nationally and internationally does not amount to purposeful direction, *e.g., Admar Int'l v. Eastrock, LLC,* 18 F.4th 783, 785 (5th Cir. 2021), but the Defendants are doing much more than merely operating a commercial website. In this case, the Complaint alleges that the Defendants have intentionally directed their activity or operation at Utah rather than just having the activity or operation accessible there. A party purposely avails itself of the benefits of conducting business in a state by deliberately engaging in significant activities within the state or by creating continuing obligations between themselves and residents of that state.

The Division has made a *prima facie* showing that the Defendants purposely availed themselves of the benefit of conducting business in Utah. According to the Division, Meta has a business relationship with nearly 70 percent of Utahns through the use of its algorithms and targeted alerts. Compl. ¶¶ 4-5, 28. The Complaint alleges that Meta deliberately and significantly engages with its Utah customers in a way that encourages their continuous use of the platforms to the benefit of the Defendants and their advertisers. The nature of the Defendants' contacts, which includes targeting Utahns with advertisements all in an effort to allegedly maximize profits from Utah customers, satisfies the purposeful availment requirement. The Complaint sufficiently alleges that Defendants purposely avail themselves of Utah law by serving content to, collecting data from, and targeting advertisements to Utah users-creating a Utah-specific experience inside the Defendants' social media apps.

Second, in evaluating personal jurisdiction the Court must examine whether the Defendants' contacts are sufficiently related to the claims in this case so that it can be said that the claim arises out of these contacts. The heart and soul of the Complaint alleges facts that draw a direct line between the Defendants' activities in this state and the alleged causes of action.

To name a few of the allegations in the Complaint, Meta operates social media platforms including Facebook and Instagram. Compl. ¶¶ 16-18. The foundation of their alleged business model with respect to these platforms is targeted advertising. *Id.* ¶¶ 35-38. The Division further alleges Meta thus strives to maximize the time users spend on the platforms and the amount of data Meta can gather from users so that it can sell more advertisements. *Id.* The Complaint alleges that teenagers are among the most valuable advertising demographics, and brands look to advertise where teenagers are engaging online. *Id.* ¶ 40. Consequently, according to the Complaint, Meta has aggressively sought to attract teenagers to its platforms. *Id.* ¶¶ 41-47. Continuing on with the allegations in the Complaint, one-third of the children in Utah are daily active users of Facebook. *Id.* ¶¶ 48, 51. Over half of Utah children between the ages of ten and nineteen use Instagram at least monthly. *Id.* The Division goes on to allege that Meta makes more money when users spend more time on its products, creating an incentive to increase the time that Utah users spend on their platforms. *Id.* ¶¶ 35-38.

**\*4** The Defendants argue that they do not specifically target Utah, and that may turn out to be a true fact; however, the allegations in the Complaint and the evidence that has been submitted to the Court supports the *prima facie* case that would establish personal jurisdiction.

The Complaint goes on to allege that Meta has responded to this incentive by adding features that addict and consume the attention of Utah's children to the detriment of their wellbeing. *Id.* ¶ 53-113. This is the very heart of the claims in the Division's complaint. The Division alleges that Meta has implemented a variety of addictive design features designed to trick children into spending as much time as possible on the platforms, and these features do cause harm to children. *Id.* It alleges excessive and compulsive use of the platforms leading to depression, anxiety, body dysmorphia, eating disorders, self-harm, suicidal ideation,

and poor sleep patterns. *Id.* ¶¶ 92-113, 119, 126-27, 155, 171, 205-10. The Complaint alleges that despite knowledge of these and other harms, Meta has repeatedly represented the safety of its platform and knowingly concealed the dangers. *Id.* ¶¶ 134-228.

Under the Complaint's allegations, the Defendants do target Utah. While they target other areas of the country as well, Defendants certainly target Utah and Utah youth both with targeted algorithms and by selling advertising targeted to Utah youth. The Defendants have a significant business presence in Utah, as alleged in the Complaint, to obtain Utah youth as customers, and harvest their data, which Defendants then sell and use to deliver advertisements directed at Utah youth.

The Defendants' arguments that they are not subject to the Court's jurisdiction lack any credibility. Utah has a strong interest in providing a forum to adjudicate its consumer protection laws, and it is entirely reasonable for the Defendants to expect that they would be haled into Utah court especially considering the extent to which the Defendants benefit from their business operations and customer base in Utah. So the Court concludes, with respect to personal jurisdiction, that based on the allegations of the Complaint (1) the Division has sufficiently distinguished *Bristol-Myers Squibb Co. v. Superior Court,* 582 U.S. 255, 264 (2017); (2) the Defendants purposefully availed themselves of the protection of Utah's laws, including by directing activities at the forum; (3) the Division's claims arise out of or relate to these forum-based contacts; and (4) the exercise of personal jurisdiction is fair and reasonable.

### B. As Alleged, the Division's Claims Are Not Foreclosed by Section 230 of the CDA.

Defendants next argued that they are immune from suit under Section 230 of the Communications Decency Act, 47 U.S.C. § 230. The CDA provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider," and provides immunity from state law causes of action that would hold them liable for information originating with a third-party. *Id.* The Defendants argued that they were doing nothing other than acting as a funnel or a pass-through entity for third-party content.

However, the allegations in the Complaint, if true, could entitle the Division to relief on its claims without implicating Section 230. Looking at the Complaint in a light most favorable to the Division, the Division's claims do not seek to treat Meta as a publisher or speaker. Although Meta does disseminate third-party content, the Division's claims rest on the Defendants' own acts: their use of features and practices to target children into spending excessive amounts of time on their platforms and their misrepresentations about the safety of those platforms. The Complaint alleges that Meta used features like personalized content, serving algorithms, destructive notifications, infinite scroll, reels, ephemeral content, and auto-play. *Id.* ¶¶ 237-39. The use of these features is alleged to have amounted to a violation of Utah law. *Id.*

**\*5** The Division also alleges that none of these features constitute traditional publishing activity, which generally involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content. The Complaint alleges that the methods of promotion in contrast to content moderation decisions are not publication. For example, the Division alleges that Meta's creation and use of content serving algorithms is not publishing, and the Court cannot conclude as a matter of law that that is an incorrect statement.

What is alleged goes well beyond typical publishing activities of reviewing, editing, and determining what content to publish or withdraw from a typical website or interactive computer service. As Judge Katzmann in the Second Circuit explained, "it strains the English language to say that in targeting and recommending [third-party content] to users-and thereby forging connections, developing new social networks-Facebook is acting as *'the publisher* of information provided by another information content provider.'" *Force v. Facebook, Inc.,* 934 F.3d 53, 76-77 (2d Cir. 2019) (Katzmann, C. J., concurring in part and dissenting in part) (quoting 47 U.S.C. § 230(c)(1)).

As to Count I: the content-serving algorithms and the use of notifications and alerts are not merely an act of publishing third-party content. As alleged, the notifications and alerts are Meta's own content. The use of infinite scroll and other features are likewise not only the publication of third-party content. Material contribution is also alleged sufficiently in the Complaint to put

the Defendants on notice that the material contribution exception to Section 230 may be involved here if, as a factual matter, the content has been altered in a material way.

Count II of the Complaint alleges that Meta made material misrepresentations and omissions about the platforms' safety, which also does not seek to treat Meta as the publisher of third-party content.

The Court can envision situations where Defendants may be exactly right and that the algorithms, disruptive notification, or infinite scroll, *et cetera,* may be nothing more than publishing activity, but the Complaint alleges that they are not focused on publishing activity. In a motion for summary judgment where the facts are in front of the Court, these features might qualify for Section 230 immunity. But at this stage, the Court must treat the allegations of a Complaint as true and the Division is alleging that these features, including algorithms, disruptive notifications, and more, amount to a violation of Utah law. At least as alleged, Section 230 does not foreclose the Division's claims at this stage. Meta may renew its Section 230 arguments at summary judgment or at trial.

### C. The First Amendment Does Not Bar the Division's Claims.

Defendants also argued that Count I violates their rights under the First Amendment. The Court agrees with the Division that the Complaint's allegations are content neutral. The Complaint is not focused on the substance of any third-party content, but instead is focused on the actions of the Defendants with respect to the addictive design features and with respect to their own misrepresentations. Count I does not seek to curtail any speech either of Meta or any third parties. The Court agrees that the Division adequately pled that the addictive design features for which the Division seeks to hold Meta liable are not even speech. They convey no message. They express no viewpoint. They use variable reward structures to feed content to each individual user. These are actions.

### D. The Division Has Adequately Pled UCSPA Violations.

**\*6** The Court finds that the Division has pled a cause of action under the UCSPA. First, Meta does not fall under the publisher and broadcaster exemption, Utah Code Section 13-11-22(1)(b). Similar to the CDA immunity argument, the Division's allegations do not seek to treat Meta as a publisher or a broadcaster or a printer of any third-party content. The Division is seeking to hold Meta liable for its use of the addictive design features and its own material misrepresentations and omissions.

Second, the Complaint also alleges a sale and/or a transfer sufficient to support a consumer transaction under the UCSPA, Utah Code Section 13-11-3(2)(a). The Division alleges facts that could support a conclusion the transaction involves a sale or transfer, including that Meta does not provide its products for free, that its business model allows it to turn attention into money, and that when users spend time on Meta's social media platforms, Meta harvests their personal data (including interests, religion, beliefs, and what they like to watch or buy). The Complaint alleges that Utah consumers' personal data has value to the Defendants as Meta has built an entire business model on enticing users to give up their personal data and their time as consideration for their services on the Defendants' platforms. The Court does not read anything into the Legislature's passage of the Social Media Regulation Act that somehow alters or sends a message concerning the UCSPA.

Third, concerning the arguments surrounding Count I, the Division's unconscionability count: claims of unconscionability under the UCSPA require a gross disparity in terms that are so one sided as to oppress or unfairly surprise an innocent party. The Division alleges that Meta developed and continually refined addictive design features and that it knowingly exploited certain neurological vulnerabilities in children. It goes on to detail these addictive design features, including dopamine-manipulating personalization algorithms, audio-visual and haptic alerts sent at all times of day or night, and various content presentation formats designed to discourage children's attempts to self-regulate and to disengage from the platforms. Giving all reasonable inferences to the pleading party, manipulating children in these ways in order to maximize time spent on the platforms and thus advertising revenue generated could certainly be found to be unconscionable. Meta argues that users are not unfairly surprised or

**Utah Div. of Consumer Protection v. Meta Platforms, Inc., 2024 WL 3741422 (2024)**

---

oppressed because they choose to use the service and are aware of the addictive design features, but the Complaint specifically alleges that Meta actively misrepresents and attempts to conceal that it manipulates children and exploits their neurological vulnerabilities with the addictive design features. So, as pled and giving all inferences to the Division, the Complaint does state a claim for unconscionability.

Regarding Count II, Meta argues that the Complaint's allegations fail to meet the heightened pleading standard for fraud, requiring that a party alleging deceptive conduct, "must state with particularity the circumstances constituting [the deceptive conduct]." Utah R. Civ. P. 9(c). The Court agrees that the rule on heightened pleading does apply, although not with respect to intent. That can be alleged generally. Much of the remainder of Defendants' arguments on this point are substantive attacks on what the evidence is or how it should be viewed, but at this stage, the Court must accept the allegations in the Complaint. After reviewing the Complaint, particularly Paragraphs 134 through 228, the Court finds that the Division has satisfied the heightened pleading standard for deceptive conduct allegations.

 **\*7**  The Court is also convinced that restitution is a remedy under the UCSPA, and therefore, the Court would not dismiss that remedy at this stage.

**CONCLUSION**

For these reasons, Defendants' Motion to Dismiss is DENIED in full.

*END OF ORDER*

**OFFICIAL SIGNATURE APPEARS AT TOP OF FIRST PAGE**

<u>Approved as to form:</u>

*/s/Douglas Crapo*

Douglas Crapo, Assistant Attorney General, Utah Attorney General's Office

*For Plaintiff Utah Division of Consumer Protection*

*/s/Megan Rodgers*

Megan Rodgers, Covington & Burling LLP

*For Defendants Meta Platforms, Inc., and Instagram, LLC*

---

**End of Document** 

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 16



IN THE THIRD JUDICIAL DISTRICT COURT

SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| UTAH DIVISION OF CONSUMER PROTECTION,<br><br>                Plaintiff,<br><br>vs.<br><br><br>TIKTOK INC.<br><br>                Defendant. | **ORDER DENYING DEFENDANT'S MOTION TO DISMISS**<br><br>Case No. 230907634<br><br>Honorable Richard Daynes<br><br>Tier III |

On September 10, 2024, the Court held a hearing on Defendant TikTok, Inc.'s ("TikTok") Motion to Dismiss the Complaint. This Court took the matter under advisement, and now issues its written opinion. For the reasons set forth below, the Court DENIES TikTok's Motion to Dismiss in full.

## BACKGROUND

On October 10, 2023, the Division of Consumer Protection of the State of Utah (the "Division") filed a three-count Complaint against TikTok Inc. alleging violations of the Utah Consumer Protection Act ("UCSPA"). Count One alleges "Unconscionable Acts or Practices Concerning Underage Consumers, Violation of Utah Consumer Sales Practices Act, Utah Code § 13-11-5." Count Two alleges "Deceptive Acts or Practices, Violation of Utah Consumer Sales

Practices Act, Utah Code § 13-11-4," basically stating that TikTok has deceptively misrepresented the actions it has taken to keep the application safe for children and persons of all ages. Count Three alleges, "Deceptive Acts or Practices, Violation of Utah Consumer Sales Practices Act, Utah Code § 13-11-4," principally stating that TikTok represents itself to be a company located, controlled and headquartered in the United States when it continues to be controlled by its China-based parent company, ByteDance.

On December 20, 2023, TikTok filed a motion to dismiss the Complaint, citing lack of both general and specific personal jurisdiction; that section 230 of the Communications Decency Act ("CDA") protects TikTok from liability; that application of UCSPA as alleged in the Complaint violates the First Amendment to the U.S. Constitution; that the UCSPA is impermissibly vague; and that the Complaint fails to state a claim of unconscionability. TikTok also asserts the challenged statements are not made in connection with a consumer transaction and do not constitute acts or practices.

## MOTION TO DISMISS STANDARD OF REVIEW

In Utah, pursuant to Utah Rules of Civil Procedure 12(b)(6), a Motion to Dismiss may be granted when there is a "failure to state a claim upon which relief can be granted," meaning the Court must assess whether the plaintiff's complaint, when viewed in the light most favorable to the plaintiff, contains sufficient factual allegations to state a viable legal claim under applicable law. Essentially, the court may only dismiss a case if the complaint demonstrates a complete lack of a legal basis for the claim, even if the facts alleged are accepted as true. *See St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 196 (Utah 1991). "A dismissal is a severe measure and should be granted . . . only if it is clear that a party is not entitled to relief under any state of facts which could be proved in support of its claim." *Am. W. Bank Members, L.C. v. State*, 2014 UT

2

49, ¶ 13, 342 P.3d 224. The Court must construe the complaint as pled under both Rules 8 and 12

of the Utah Rules of Civil Procedure liberally in favor of the plaintiff, meaning any doubts about

the sufficiency of the claim will be resolved in favor of allowing the case to proceed. *Russell v.*

*Standard Corp.,* 898 P.2d 263, 264 (Utah 1995) ("[W]e accept the factual allegations in the

complaint as true and consider them and all reasonable inferences to be drawn from them in a

light most favorable to the plaintiff."); *Gill v. Timm,* 720 P.2d 1352, 1353 (Utah 1986) ("Rule

8(a) is to be liberally construed when determining the sufficiency of a plaintiff's complaint.").

Mack v. Utah State Dep't of Com., Div. of Sec., 2009 UT 47, ¶ 17, 221 P.3d 194, 200, (referring

to the Utah Rules of Civil Procedure; *see also*, Utah R. Civ. P. 1, (stating, The Rules of Civil

Procedure "shall be liberally construed and applied to achieve the just, speedy and inexpensive

determination of every action.")

## I.    THE COURT HAS SPECIFIC PERSONAL JURISDICTION OVER TIKTOK.

### A. General Personal Jurisdiction

The Division has not argued for **general personal jurisdiction** as to this matter and so this

Court has generally only reviewed the case for specific personal jurisdiction. Nevertheless,

TikTok is not incorporated in the State of Utah and Utah is not the home forum state for

TikTok. Hence, there is no general personal jurisdiction over TikTok. However, as set forth

below, the Court does find specific personal jurisdiction.

### B. Specific Personal Jurisdiction

"[T]he evaluation of specific jurisdiction in Utah mandates a three-part inquiry: '(1)

the defendant's acts or contacts must implicate Utah under the Utah long-arm statute; (2) a

'nexus' must exist between the plaintiff's claims and the defendant's acts or contacts; and (3)

application of the Utah long-arm statute must satisfy the requirements of federal due

3

process.' " *Soma Medical Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1297 (10th Cir.1999) citing *Arguello v. Industrial Woodworking Mach. Co.,* 838 P.2d 1120, 1122 (Utah 1992), quoting *National Petroleum Mkt'g, Inc. v. Phoenix Fuel Co.*, 902 F.Supp. 1459, 1465 (D.Utah 1995)(citation omitted).

1.  Utah's Long Arm Statute:

  To have specific personal jurisdiction, Utah's long-arm statute must apply and allow its courts to reach out-of-state defendants. Additionally, the submission of jurisdiction must still comply with the Due Process Clause of the U.S. Constitution. Utah's long arm statute states:

> 78B-3-205.  Acts submitting person to jurisdiction.
>  Notwithstanding Section 16-10a-1501, any person or personal representative of the person, whether or not a citizen or resident of this state, who, in person or through an agent, does any of the following enumerated acts is subject to the jurisdiction of the courts of this state as to any claim arising out of or related to:
>
>  (1) the transaction of any business within this state;
>
>  (2) contracting to supply services or goods in this state;
>
>  (3) the causing of any injury within this state whether tortious or by breach of warranty... .

In this case, as alleged in the Complaint by the Division, all three of these elements set forth within Utah's long arm statute have been met. "[T]ransaction of business" is defined by Utah's long arm statute as "activities of a non-resident person, his agents, or representatives in this state which affect persons or businesses within the state of Utah." Utah Code Ann. § 78-27-23. TikTok intentionally transacts business within the state of Utah. TikTok sells advertising which is directed at Utah residents. TikTok enters agreements with the users of its app and provides individualized targeted content to each Utah customer. The Complaint

4

alleges injury to thousands of residents of Utah, and specifically children targeted by TikTok to continuously engage in using its application.

Utah's long arm statute applies in this circumstance to the extent that Due Process under the U.S. Constitution would allow. According to Utah Code § 78-27-22, Utah's long arm statute is intended "to assert jurisdiction over nonresident defendants to the fullest extent permitted by the due process clause of the Fourteenth Amendment to the United States Constitution." Due process should therefore be the next consideration in reviewing the jurisdictional element.

2. Due Process Evaluation:

To meet the requirements of due process, a court may assert specific jurisdiction if the following conditions are met: i) Purposeful Activities: The defendant has deliberately engaged in activities targeting the forum state or has otherwise established connections there. ii) Nexus: A nexus exists between the purposeful activities and the defendant's Utah contacts, iii) Reasonableness: Exercising personal jurisdiction over the defendant is reasonable and fair under the circumstances. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-478 (1985). A lack of physical presence cannot defeat personal jurisdiction. *Id.* at 476.

    i.    Purposeful Activities and ii Nexus:

In this case the Court finds that, as alleged in the Complaint, TikTok has purposefully conducted activity within the State of Utah and those activities relate to the claims set forth by the Division in its Complaint and response to the Motion to Dismiss. As alleged in the Complaint, the Division's claims "relate to" TikTok's profitable multi-billion-dollar business because TikTok designs its app to carefully cultivate user attention, allowing TikTok to

5

collect personal user data—including from Utahns—which in turn enables TikTok to offer more targeted and profitable advertisements. [Complaint] ¶¶ 3, 15–16.

TikTok makes its money selling ads— and TikTok makes more money when more users spend more time on its app, creating an incentive to increase the time that Utah users spend on its app. *Id.* TikTok has responded to that incentive by adding features that addict and consume the attention of Utah's children to the detriment of their well-being. *Id.* ¶¶ 2–4.

TikTok's alleged misrepresentations about the safety of and origin of its app are also intimately related to its forum contacts because the Complaint alleges that those statements targeted Utah children and their parents to maximize their use of TikTok's app and to keep them coming back. These claims go to the central claims in the Division's Complaint and are sufficient to find purposeful activity in Utah and a nexus. *See Inconnu Lodge v. Commbine.com LLC*, 214 F. Supp. 2d 1204, 1208–09 (D. Utah 2002) (finding that a domain name purchased by an out-of-state resident in order to extort money from Utah resident demonstrated defendants' efforts to "direct" their activity towards Utah).

The allegations, as argued and set forth in the Complaint, are sufficient to satisfy this requirement. The Court agrees with the Division that the Division's claims arise out of or relate to TikTok's contacts with Utah. *See Hood v. Am. Auto Care*, LLC, 21 F.4th 1216, 1222 (10th Cir. 2021); see also, *Burger King, Inc.* at 472.

3. **Fairness and Reasonableness:**

Even if there are sufficient contacts within the state, to satisfy due process a court must also confirm that asserting jurisdiction comports with "fair play and substantial justice." *Burger King Corp.*, at 476 (citation omitted). This involves considering several factors to

6

decide if it is suitable to proceed in the forum state. The factors to review include, first, whether it is an unreasonable burden on the Defendant to litigate in Utah. Second, the interest of the state in having the case heard in the forum-state. Third, the interest of the plaintiff in having the case heard in the forum-state. And finally, the court must also consider judicial efficiency and the interests of the interstate system.

1) It is not an unreasonable burden to have TikTok litigate in Utah. TikTok has failed to show that litigating in Utah would place it at a "severe disadvantage." *Burger King*, 471 U.S. at 478 (citation omitted). TikTok does not face any special burden in defending in Utah. By its own self-descriptions, it conducts a worldwide business and offers services throughout the United States. It has substantial yearly revenues, conducts significant business in Utah, and has signed up hundreds of thousands of Utah residents as its consumers. There is no reason to think that California, the state of TikTok's listed incorporation, has any special interest in litigating this matter there. The victims and many witnesses would be located in Utah and Utah law is the applicable law to be applied. It is not unfair to cause TikTok to defend itself in the jurisdiction of Utah where the central issues of the case involve the protection of hundreds of thousands of TikTok consumers which TikTok has cultivated in Utah.

Further, a denial of jurisdiction on due process grounds is only appropriate where litigation in the forum is so gravely difficult that it puts the defendant at a severe disadvantage. The Court does not find that circumstance to be present here based on the evidence presented. *Sher v. Johnson*, 911 F.2d 1357, 1365 (9th Cir. 1990). As a sophisticated technology company, TikTok is surely aware that many litigation burdens are eliminated entirely by modern technology. *See, e.g., World-Wide Volkswagen Corp. v. Woodson*, 444

7

U.S. 286, 293 (1980) ("[M]odern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity." (citation omitted)); *Pro Axess, Inc. v. Orlux Distrib., Inc.*, 428 F.3d 1270, 1280 (10th Cir. 2005).

Another factor to consider is the forum state's Interest and the plaintiff's interest in litigating the claim. *See Sher* at 1365. The Court finds that it is in the state of Utah's interest in resolving this dispute. The Complaint itself arises from claims of injury towards Utah residents in enforcing Utah's Consumer Sales Practices Act. The alleged victims of the defendant's conduct apparently includes hundreds of thousands of Utah citizens. Those citizens are alleged to use the TikTok application within the state of Utah. Thus, the case has been brought by the Division and it is in the Division's interest specifically to enforce Utah laws and to protect and seek recourse for Utah residents from the alleged unlawful activities of TikTok directed individually to each of those residents.

Finally, the court must also consider judicial efficiency and the interests of the interstate system. This involves assessing how efficiently the legal matter can be resolved and ensuring that the choice of forum does not unnecessarily complicate the legal proceedings. By examining these factors, the court ensures that asserting jurisdiction aligns with principles of fair play and substantial justice, which are core to due process under the Constitution. There is nothing here that would delay or cause issues with the interstate system of justice. While TikTok has alleged that forcing it into Utah's judicial system to litigate these claims could subject it to every jurisdiction in the U.S., the fact that TikTok has similar substantive contacts with virtually every jurisdiction does not sway this Court to

8

believe that judicial efficiency or the interests of interstate should free TikTok from specific personal jurisdiction.

According to the Complaint, TikTok has purposefully directed its activities toward Utah and established contacts with the forum state. TikTok knowingly and deliberately has entered into hundreds of thousands of contracts with its Utah users. Compl. ¶ 15. Thus, the Division has established the minimum contacts of TikTok required by the due process clause of the Fourteenth Amendment. *First Mortgage Corp. v. State Street Bank and Trust Co.*, 173 F. Supp.2d 1167, 1175 (D. Utah 2001) quoting *Harnischfeger*, 883 F.Supp. at 617-18. "[P]ersonal jurisdiction is established when 'a defendant clearly does business over the Internet,' such as entering into contracts which require the "knowing and repeated transmission of computer files over the Internet." *Patriot Systems, Inc. v. C-Cubed Corp.*, 21 F.Supp.2d at1324 (quoting *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119, 1123-24 (W.D.Pa.1997)). The Court therefore finds that the claims alleged in the Complaint sufficiently arise from TikTok's interactions with Utah, thereby justifying specific personal jurisdiction over the defendant. Additionally, exercising personal jurisdiction in Utah is considered reasonable and fair to TikTok. Therefore, the motion to dismiss for lack of personal jurisdiction is denied. Exercise of specific jurisdiction is appropriate in this context. The contacts are substantial and related to the suit sufficient to establish personal jurisdiction over defendant TikTok.

## II. The Division's Claim Under the UCSPA Does Not Fail to State a Claim.

TikTok has argued that the UCSPA does not apply in this case because there was no money exchanged and therefore this cannot be deemed a "consumer" transaction. For the

reasons listed below, the Court finds the conduct as alleged does meet the definition of a "consumer transaction." This issue is therefore without merit.

The UCSPA defines a "consumer transaction" stating:

(2) (a) "Consumer transaction" means a sale, lease, assignment, award by chance, **or other written or oral transfer or disposition of goods, services, or other property, both tangible and intangible** (except securities and insurance) **to, or apparently to, a person for:**

**(i) primarily personal, family, or household purposes; or**

(ii) purposes that relate to a business opportunity that requires:

(A) expenditure of money or property by the person described in Subsection (2)(a); and

(B) the person described in Subsection (2)(a) to perform personal services on a continuing basis and in which the person described in Subsection (2)(a) has not been previously engaged.

Utah Code § 13-11-3(2)(a).

TikTok argues that since its use of the application is provided for free, this is not a "consumer transaction." TikTok cites the Court to the definition as found in the MERRIAM-WEBSTER DICTIONARY (11th ed. 2020), arguing plain meaning. However, this definition does not comport with the legal definition as defined in the UCSPA. TikTok also cites to cases referring to the Indiana statute which has similar language to the UCSPA. Ind. Code Ann. § 24-5-0.5-2(1). Nevertheless, the UCSPA and Indiana's consumer protection statutes are not identical and the Utah Legislature has included the word "transfer" in the definition of a "consumer transaction," while Indiana's legislature did not. In reviewing this another court has found that, "in enacting the UCSPA the Utah Legislature eschewed the language of the model

10

act's definition of 'consumer transaction' in favor of a **broader** definition." *Iadanza v. Mather*, 820 F. Supp. 1371, 1380 (D. Utah 1993)(emphasis added).

The Utah Legislature has defined a "consumer transaction" to include a "written or oral **transfer** or disposition of goods, services or other property, both tangible and intangible." Such "transfer" requires no "expenditure of money" if those goods, services, or other property are provided for "primarily personal, family, or household purposes." *See* Utah Code § 13-11-3(2)(a).

Notwithstanding the legal definition as found in the UCSPA, a consumer transaction generally includes the transfer of any form of value in a transactional relationship. This is consistent with the Division's proffered definition of the term "Sale" under Webster's Third New International Dictionary 2003 (3d ed. 2002) which includes "a contract transferring . . . ownership of property from one person or corporate body to another for a price (as a sum of money **or any other consideration.**" (emphasis added). Further, the Utah Legislature has indicated that this Act should be "construed liberally…" Utah Code § 13-11-2. This Court is not convinced after a review of the definition under the UCSPA that the Utah Legislature intended to exclude transactions that did not include the exchange of money or involved an actual sale based on the language used to define a "consumer transaction."

During oral argument on the Motion to Dismiss, a great amount of emphasis was placed on the wording, of "or other written or oral transfer…" *Id.* TikTok has argued that the use of the word "or other" was intended therefore to refer back to the language "sale, lease, assignment, award by chance…" indicating therefore it must be for an exchange of money. The Court disagrees with this reading of the statute especially where the very next subparagraph refers specifically to "the expenditure of money." Under Utah Code § 13-11-3(2)**(a)(ii)**, the Utah

11

Legislature defined the term "consumer transaction" to include the "expenditure of money" when referring to the second alternative definition of a "consumer transaction." It defines this subsection as referring to "purposes that relate to a business opportunity that requires... **expenditure of money or property** by the person described in Subsection (2)(a)" *Id.* Had the Utah Legislature intended (2)(a)(i) to also include "expenditure of money," an "exchange of money" or some other specific exchange, to be apply equally under 13-11-3(2)(a)(i), they would have included that in the definition. The Legislature did not include this requirement, and the absence of this language indicates it was meant to be more broadly construed.

As alleged in the Complaint, TikTok makes millions of dollars in value from its consumers through its advertising revenue. See Compl. ¶ 16. TikTok therefore receives great value directly from its hundreds of thousands of Utah users in the form of personal data, information regarding their individual interests, and their time as they are engaged in the use of the TikTok application. The time, data, and information provided by the Utah consumers are documented and collected by TikTok which then uses that value to sell advertising space to marketers. See Compl. ¶ 15.

### III. The Division's Claims Are Not Foreclosed by Section 230 of the CDA

TikTok has argued that they are immune from suit under Section 230 of the Communications Decency Act, 47 U.S.C. § 230 passed in 1996 ("CDA"). The CDA provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider," and provides "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.* § 230(e)(3). Together, these provisions mean that a

12

company like TikTok is protected from liability when a plaintiff "seeks to treat [it], under a state law cause of action, as a publisher or speaker" of content posted on its app by a third party. *Id.*

TikTok contends under Section 230 that this Complaint targets TikTok in its role in publishing third-party content. However, when the Complaint is viewed in a light most favorable to the Division, the claims do not fail. The claims of the Division are not attempting to hold TikTok accountable as a publisher of user-generated content, but rather seeking recourse for the harmful algorithms that are causing injury to the application's users. It is therefore content neutral and not governed by Section 230 of the CDA. "It is not enough that third-party content is involved," and courts have "rejected use of a 'but-for' test that would provide immunity under the CDA solely because a cause of action would not otherwise have accrued but for the third-party content." *HomeAway.com, Inc. v. City of Santa Monica,* 918 F.3d 676, 682 (9th Cir. 2019); *see also Henderson v. Source for Pub. Data*, L.P., 53 F.4th 110, 122–23 (4th Cir. 2022).

Although TikTok distributes third-party content, the Division's claims are based on the Defendant's own actions employing features and practices that target children, resulting in excessive usage of their platforms, and making misleading statements about the safety of those platforms. The Complaint taken on its face alleges that TikTok used features under "a dopamine-inducing algorithm that spoon-feeds users a steady diet of highly personalized short-form videos, making it difficult for children to unplug, which TikTok amplifies with a series of manipulative features designed to keep users on the app." Compl. ¶ 27. These and other features give children the illusion of control, hide any effective tools to limit time spent on the app, and further amplify and incentivize compulsive, repeated use, which is especially unhealthy for kids whose brains are not yet fully formed." Compl. ¶37. The use of these features is alleged to have amounted to a violation of Utah law.

13

Similar to the Court's finding in *Utah Division of Consumer Protection v. Meta Platforms, Inc. and Instagram, LLC*, Case No. 230908060 (Order Denying Defendant's Motion To Dismiss, July 25, 2024), Judge Holmberg found in that case involving Meta and Instagram that it is possible this analysis could change if it becomes clearer that after further discovery in the case, that it is actually the content and not the algorithm that is at issue, then this issue may be addressed again in a motion for summary judgment or at trial. Judge Holmberg stated:

> The Court can envision situations where Defendant may be exactly right and that the algorithms, disruptive notification, or infinite scroll, et cetera, may be nothing more than publishing activity, but the Complaint alleges that they are not focused on publishing activity. In a motion for summary judgment where the facts are in front of the Court, these features might qualify for Section 230 immunity. But at this stage, the Court must treat the allegations of a Complaint as true and the Division is alleging that these features, including algorithms, disruptive notifications, and more, amount to a violation of Utah law. At least as alleged, Section 230 does not foreclose the Division's claims at this stage. TikTok may renew its Section 230 arguments at summary judgment or at trial.

Similarly here, there may be specific facts presented by TikTok that could change the analysis on whether this is a content-based rather than algorithm based harm. If these facts become clear, the defendant could present the issue once more in a motion for summary judgment or at trial, but at this stage, the Court must treat the Division's Complaint in a light most favorable to the plaintiff and as true, and therefore the motion to dismiss on this basis is denied.

## B. Count One is not barred by the First Amendment and the Free Speech Clause of the Utah Constitution.

The defendant also asserts that Count One infringes on TikTok's First Amendment rights. However, Count One does not seek to curtail any speech but rather to curtail the addictive features challenged. Count One does not seek to prevent or convey any message or viewpoint. The allegations in the Complaint are content-neutral. This means that the Complaint does not

target or criticize the specifics or nature of any third-party content available on the platform. Instead, it focuses on the actions taken by the Defendant regarding the addictive design features of the platform and their own misleading statements about its safety. Essentially, the issue isn't about the type of content shared on TikTok, but rather about TikTok's practices and representations that impact how the platform is used.

The Court therefore agrees with the Division in its memorandum that TikTok's use of these features is conduct, not speech, and "First Amendment doctrine permits regulating the conduct of an entity that hosts speech." *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 455 (5th Cir. 2022), *cert. granted in part sub nom. Netchoice, LLC v. Paxton*, 216 L. Ed. 2d 1313 (U.S. 2023).

**C. The UCSPA provision at issue in Count One is not impermissibly vague and is not in violation of the Due Process Clause and the First Amendment.**

While TikTok asserts that that the UCSPA's prohibition on "unconscionable act[s] or practice[s]" is unconstitutionally vague, this Court disagrees. See Mot. at 16 (citing Utah Code § 13-11-5). TikTok relies on a Colorado case, *Trail Ridge Ford, Inc. v. Colo. Dealer Licensing Bd.*, 543 P.2d 1245 (Colo. 1975). This Court finds the *Trail Ridge Ford, Inc.* case distinguishable and while it may be difficult for the Division to eventually establish these causes of action with the facts as alleged, this does not make it unconstitutionally vague. Other state courts have held that a ban on unconscionable consumers acts or practices is not unconstitutionally vague. *See State ex rel. Bryant v. R & A Inv. Co.,* 985 S.W.2d 299, 302 (Ark. 1999) (consumer protection statute's bar on "unconscionable" acts or practices not too vague). *See, e.g., Trade Comm'n v. Skaggs Drug Ctrs., Inc.*, 446 P.2d 958, 965 (Utah 1968) ("[W]e disagree with the trial court decision that the terms 'unfairly diverting trade from a competitor' and 'injuring a competitor' are vague and

ambiguous. The terms may present difficulties in application, but such difficulty is not sufficient to hold the Act unconstitutional.").

The Court therefore agrees that unlike the licensing statute in Trail Ridge, the bar on unconscionable practices in the UCSPA, a general consumer protection statute, is appropriate because the legislature "could not be expected to envision every conceivable violation" of the statute. *Bryant*, 985 S.W.2d at 302; see also Scott, 430 N.E.2d at 1018 ("[E]ffective regulation requires that the concept be flexible, defined on a case-by-case basis, in view of the futility of attempting to anticipate and enumerate all the unfair methods and practices that fertile minds might devise." (quotations, citations, and alterations omitted)). The Court therefore finds that the provision is not unconstitutionally vague.

**D. The Division's claim of unconscionability does not fail to state a claim under the UCSPA on the merits.**

TikTok next argues that Count One has failed to sufficiently allege an unconscionability claim and has not alleged any conduct that would rise to the level of "extreme unfairness" required for a claim of unconscionability. TikTok argues that unconscionability requires an absence of meaningful choice, gross inequality in bargaining power, oppression, unfair surprise, or overall imbalance. Mot. at 18.

In response, the Division has alleged in its memorandum that in the Complaint it states that TikTok has exploited children's neurological limitations using addictive design features to hook them into spending unhealthy amounts of time on the app. Compl. ¶¶ 5, 27. In reviewing the Complaint there is sufficient detail regarding these addictive features, which include personalized algorithms designed to manipulate dopamine releases in children's brains, use of an infinite scroll feature that makes it difficult for children to disengage, and push notifications sent

16

at all times of day and night. Id. ¶¶ 28–44. The allegations of manipulating children in these ways to maximize time spent on the app (and thus advertising revenue generated) meet the definition of unconscionable.

While TikTok argues that the motion to dismiss should be granted because there should be an "absence of meaningful choice" or "gross inequality in bargaining power." At this time there are sufficient facts pled by the Division to allow this count to proceed.

"[D]ismissal is a severe measure and should be granted . . . only if it is clear that a party is not entitled to relief under any state of facts which could be proved in support of its claim." *Am. W. Bank Members*, 2014 UT 49, ¶ 13, 342 P.3d 224 (citation omitted). Under the UCSPA, "[i]f it is claimed or appears to the court that an act or practice may be unconscionable, the parties shall be given a reasonable opportunity to present evidence as to its setting, purpose, and effect to aid the court in making its determination." Utah Code § 13-11-5(2). Based on the reasons as set forth above the Court declines to dismiss the UCSPA claim on the pleadings for failure to allege unconscionability.

## IV. The Division Does Not Fail to State a Claim in Count Two that TicTok Deceived Users about Its Safety and Content Moderation Practices.

After a review of the Complaint and the briefs filed in this matter the Court agrees with the Division and finds that Count Two does state a claim under the UCSPA and there are sufficient facts pled to sustain this count alleging deceptive conduct. To allege deceptive conduct, "a party must state with particularity the circumstances constituting [the deceptive conduct]." Utah R. Civ. P. 9(c); *see also Williams v. State Farm Ins. Co.*, 656 P.2d 966, 972 (Utah 1982). Rule 9(c) must be read consistently with "the fundamental purpose of our liberalized pleading rules [which] is to afford parties 'the privilege of presenting whatever legitimate contentions they

17

have pertaining to their dispute,' . . . subject only to the requirement that their adversary have 'fair notice of the nature and basis or grounds of the claim and a general indication of the type of litigation involved.'" *Williams*, 656 P.2d at 971 (citations omitted).

Rule 9(c) should be applied "with great liberality in sustaining the sufficiency of allegations stating a cause of action." *Id.* Thus, a complaint is sufficient if it "describe[s] the nature or substance of the acts or words complained of." *Id.*

Here, the Division's Complaint satisfies this requirement. The Complaint alleges numerous areas of deception, including as an example that TikTok represents that it proactively removes harmful content that violates its guidelines but further explains how these representations are deceptive because TikTok's approach is reactive, not proactive, and is completely ineffectual. Id. ¶¶ 68–111. Furthermore, these alleged misrepresentations are not just vague statements, but rather the Division identifies numerous examples of verifiable factual misrepresentations. For these reasons, the Court finds that the Division does state a claim in Count Two that TicTok deceived its users about its safety and content moderation practices and the motion to dismiss this allegation is denied.

### V. The Division Does Not Fail to State a Claim in Count Three that TikTok Deceived Users About the "Geographical Origin or Location" of Its Business.

Count Three, alleges that TikTok misrepresents itself as an independent U.S. company. While this may also be difficult to prove factually, based on the Complaint, this does state a claim under the UCSPA and should not be dismissed. The Division alleges that TikTok portrays itself as independent of its Chinese parent company, ByteDance, that "TikTok's CEO has claimed that he is responsible for all business operations and strategic decisions for TikTok," that TikTok states that it is a "myth" that "[d]ecisions about TikTok are made in Beijing," and that

18

TikTok encourages its employees and spokespeople to downplay its association with ByteDance and China. Compl. ¶¶ 139–42. The Division alleges those representations are deceptive because TikTok remains heavily controlled by, and cannot operate independently from, ByteDance.

TikTok argues that the Division's claims do not fall within the purview of UCSPA section 13-11-4(2)(w), which makes "misrepresent[ing] the geographical origin or location of the supplier's business" a deceptive practice. TikTok argues that "geographical origin" and "location" as used in the statute "simply mean the defendant's actual location." Mot. at 26–27. But the Court agrees with the Division that TikTok's argument improperly reads the word "origin" out of the statute. *See Turner v. Staker & Parson Cos.*, 2012 UT 30, ¶ 12, 284 P.3d 600. Thus, even if TikTok's "location" is in California, Compl. ¶ 10, the "origin" of its business—the locus of control—is alleged to be in China. As to TikTok's allegation that these facts may not be proven to be true or false, this is not the appropriate stage of the case to raise issues of fact and the Court accepts all facts as set forth in the Complaint as true and liberally construes this in the favor of the Plaintiff. As to whether this would be material to a reasonable customer, this is also an inappropriate time to raise this as an issue of fact and this should be allowed to move forward and give the Division a chance to establish those facts as alleged. The Division having alleged sufficient facts and allegations to support Count Three, the motion to dismiss this count is denied.

## Conclusion

For the foregoing reasons, Defendant's Motion to Dismiss is hereby DENIED in full. The case will proceed to trial for a full examination of the material facts and legal issues presented.

**It is so ordered.**

19

## CERTIFICATE OF NOTIFICATION

I certify that a copy of the attached document was sent to the following people for case 230907634 by the method and on the date specified.

MANUAL EMAIL: ISIUWA MABATAH MABATAHJ@BALLARDSPAHR.COM

MANUAL EMAIL: KEVIN HEINER KHEINER@WSGR.COM

MANUAL EMAIL: CONSTANDINOS HIMONAS DHIMONAS@WSGR.COM

MANUAL EMAIL: ALEXANDER H SOUTHWELL asouthwell@gibsondunn.com

MANUAL EMAIL: WINSTON YAW WEN CHAN wchan@gibsondunn.com

MANUAL EMAIL: BLAINE H EVANSON bevanson@gibsondunn.com

MANUAL EMAIL: PEISHEN ZHOU PEISHENZHOU@AGUTAH.GOV

MANUAL EMAIL: DOUGLAS CRAPO CRAPO@AGUTAH.GOV

MANUAL EMAIL: EMILY PENKOWSKI PEREZ epenkowski@edelson.com

MANUAL EMAIL: JIMMY ROCK jrock@edelson.com

MANUAL EMAIL: THEO BENJAMIN tbenjamin@edelson.com

MANUAL EMAIL: SHANTEL CHAPPLE KNOWLTON schappleknowlton@edelson.com

MANUAL EMAIL: CARINA WELLS SSHEPHERD@AGUTAH.GOV

MANUAL EMAIL: ROGER PERLSTADT rperlstadt@edelson.com

MANUAL EMAIL: JOHN FEENEY COYLE jfeeneycoyle@edelson.com

MANUAL EMAIL: TAYLOR MOSOLF TMOSOLF@AGUTAH.GOV


Date: _____     11/12/2024        /s/ CHARLENE MARTIN

                                          _____
                                                      Signature

# EXHIBIT 17

2024 WL 3741424 (Vt.Super.) (Trial Order)

Superior Court of Vermont.

Chittenden County

STATE OF VERMONT,

v.

META PLATFORMS, INC. and Instagram, LLC.

No. 23-CV-4453.

July 29, 2024.

**Ruling on Motion to Dismiss**

Helen M. Toor, Judge.

**\*1** Title: Motion to Dismiss (Motion: 3)

Filer: Kendall Alison Hoechst

Filed Date: January 19, 2024

The State brings this case against Meta (formerly Facebook) and its subsidiary Instagram, LLC, alleging violations of the Vermont Consumer Protection Act, 9 V.S.A. § 2451 et seq. The complaint alleges, inter alia, that Meta intentionally seeks to addict Instagram users under 18 ("Young Users") in a way that Meta knows is harmful to the users' physical and mental health, and misrepresents both its intentions and the harm it is knowingly causing. The State seeks injunctive relief, civil penalties, disgorgement of profits, investigative costs, and attorney's fees.

Meta and Instagram (jointly "Meta") argue that the case must be dismissed because (1) the State lacks personal jurisdiction over the company, (2) the claims are barred by the federal Communications Decency Act, (3) the claims are barred by the First Amendment, and (4) the allegations fail to state a valid claim under the Vermont Consumer Protection Act. The court heard oral argument on the motion to dismiss on July 3.

<u>**Summary of Relevant Allegations**</u>

The State alleges many facts in its 378-paragraph complaint. A few are summarized here for purposes of the discussion below. The court makes no finding as to their accuracy at the pleading stage.

Defendant Meta Platforms, Inc. is a social media company that derives 98% of its total revenue from advertising. Meta owns, operates, and controls Defendant Instagram, LLC, one of the most widely used social media platforms globally and in Vermont. Instagram's mobile application and website lets consumers-including Vermont consumers-create profiles from which they can post pictures and videos with captions, follow other Instagram users' profiles and posts, "like" and "comment" on other users' posts, "share" content that other users have posted, and communicate with other users privately through direct messaging. Meta collects data from Instagram users to algorithmically curate and personalize each user's experience, including the content displayed and recommendations on which other accounts to follow. It is estimated that 22 million teens-including approximately 62% of teens ages 13-17-log onto Instagram in the U.S. each day.

Meta profits by leveraging user data to sell advertising. Thus, its business model incentivizes it to maximize the amount of time that young users spend on Instagram, and that has been a priority for Meta throughout its corporate history. The State alleges that, despite Meta's knowledge of the harms to teens under eighteen ("Young Users") caused by excessive and compulsive Instagram use, Meta designed Instagram to be addictive to them through specific features and algorithms. Moreover, the State alleges that Meta has misled consumers about Instagram's design, concealed its internal findings about the degree to which Instagram intentionally causes Young Users to use the platform compulsively and excessively, and misled consumers about the degree to which it exposes Young Users to harmful content and experiences. The State contends that Meta's conduct constitutes unfair and deceptive acts and practices under the Vermont Consumer Protection Act.

**\*2** With respect to Vermont in particular, the complaint alleges that as of June 2021, over 40,000 Vermont teens used Instagram each month and almost 30,000 used it daily; at times more teens in Vermont used Instagram, per capita, than in any other state; Meta has focused research on Vermont teens and on Vermont as one of four targeted states; Meta has "sold advertising to both national businesses and Vermont businesses targeting Vermont markets;" Meta has "sought to refine Instagram in order to increase the engagement of Vermont teens, in particular;" has entered into at least tens of thousands of contracts with Vermonters including Young Users; and has used personal data from those users to target advertising to them from, inter alia, Vermont businesses. Complaint ¶¶ 15, 75, 76, 79-81, 84, 85.

<u>**Discussion**</u>

The question on a motion such as this is whether "it is beyond doubt that there exist no facts or circumstances that would entitle the plaintiff to relief." <u>Skaskiw v. Vermont Agency of Agric., 2014 VT 133, ¶ 6, 198 Vt. 187</u> (citation omitted). A court must "assume as true all facts as pleaded in the complaint, accept as true all reasonable inferences that may be derived from the plaintiff's pleadings, and assume as false all contravening assertions in the defendant's pleadings." <u>Id.</u> The question is "whether the bare allegations of the complaint are sufficient to state a claim." <u>Id.</u> "[T]he threshold a plaintiff must cross in order to meet our notice-pleading standard is exceedingly low." <u>Bock v. Gold, 2008 VT 81, ¶ 4, 184 Vt. 575</u> (quotation and citations omitted). Such motions "are disfavored and should be rarely granted." <u>Id.</u>

<u>**Personal Jurisdiction**</u>

Personal jurisdiction addresses whether a party can be sued in a particular state. It has two categories: "general" jurisdiction and "specific" jurisdiction. The former generally exists when the state is the defendant's home or primary place of business. As Meta is based in California, the parties agree that the issue here is specific jurisdiction.

A nonresident defendant is subject to specific jurisdiction when a defendant has "purposefully directed ... activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities." <u>Fox v. Fox, 2014 VT 100, ¶ 27, 197 Vt. 466</u> (quoting <u>Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985)</u>). It must be foreseeable "that the defendant's conduct and connection with the forum State are such that [it] should reasonably anticipate being haled into court there." Id. ¶ 29 (quoting <u>Burger King, 471 U.S. at 474</u>). "A corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State may be sued in that state when those products subsequently injure consumers; a publisher who distributes magazines in a distant State may fairly be held accountable in that forum for damages resulting there from an allegedly defamatory story, and parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to the other state's jurisdiction in connection with the consequences of their activities." <u>Id.</u> ¶ 28 (quotations omitted). "'Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice.'" <u>State v. Atl. Richfield Co., 2016 VT 22, ¶ 27, 201 Vt. 342</u> (quoting <u>Burger King, 471 U.S. at 476</u>).

The impact upon Vermonters is not sufficient to support jurisdiction: the question turns on Meta's actions. "The contacts must be the defendant's own choice and not random, isolated, or fortuitous," and they "must show that the defendant deliberately reached out beyond its home-by, for example, exploi[ting] a market in the forum State or entering a contractual relationship centered there." Ford Motor Co. v. Montana Eighth Jud. Dist. Ct., 592 U.S. 351, 359 (2021) (citation and quotations omitted) (brackets in original).

**\*3** The law regarding specific jurisdiction developed long before the internet, interactive websites, and apps existed. How the doctrine applies to the on-line world is an evolving area of law. *See, e.g.,* Douglas Co., Inc. v. My Brittany's LLC, No. 19-CV-1234-SM, 2020 WL 2768973, at \*6 (D.N.H. May 28, 2020) ("This area of the law is both evolving and decidedly unsettled."); McCleese v. WM. A. Natorp Co., No. 5:19-CV-34, 2019 WL 13396473, at \*4 (D. Vt. Oct. 24, 2019)("The Supreme Court has not yet directly addressed how traditional personal jurisdiction doctrine is affected by the internet."); Dist. of Columbia v. Facebook, Inc., No. 2018 CA 8715 B, 2019 WL 7212642, at \*8 (D.C. Super. May 31, 2019) ("The relationship between a defendant's online activity and its susceptibility to suit in a foreign jurisdiction remains ill-defined, and the United States Supreme Court has yet to offer guidance in this particular area."). It is clear that merely having a passive website that is "accessible to all does not create jurisdiction in every state. TheHuffingtonPost.com, Inc., 21 F.4th at 320 ("Grannies with cooking blogs do not, and should not, expect lawsuits from Maui to Maine."). Vermont residents' mere use of an app that is accessible to all cannot create jurisdiction here. The question is how much more is needed to subject an internet-based entity to jurisdiction in a particular state. Has Meta itself done enough to invite jurisdiction in Vermont?

The State relies initially upon a sliding scale test created over twenty years ago in Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119 (W.D. Pa. 1997). That case essentially held that the more interactive the activity, the greater the likelihood of personal jurisdiction. However, more recent cases have pointed out that such an analysis is out of pace with the changes in internet-based businesses over recent decades, and would sweep huge numbers of companies into its reach. *See, e.g.,* My Brittany's LLC, 2020 WL 2768973, at \*6. Nor was Zippo ever a controlling test.

Both sides point to multiple, more recent cases supporting their positions. Meta, for example, cites Fidrych v. Marriott Int'l, Inc., 952 F. 3d 124, 143 (4th Cir. 2020). There, the court found that because Marriott's reservation website was "accessible to all but targeted at no one in particular" it did not support personal jurisdiction in South Carolina. Meta also cites cases holding that merely posting ads for local businesses, or having local residents buy products through such ads, is not a basis for jurisdiction. Johnson v. TheHuffingtonPost.Com, 21 F.4[th] 314, 320 (5th Cir. 2021); Doshier v. Twitter, 417 F. Supp. 3d 1171, 1177-78 (E.D. Ark. 2019). The State cites, for example, an Arkansas case that found allegations that "Meta's features and targeted activities toward young Arkansans have significantly injured them by causing various harms and psychological injuries as well as addiction to the platform" were sufficient to support personal jurisdiction. Arkansas ex. Rel Griffin v. Meta Platforms, Inc., No. 57CV-23-47 (Ark. 18th Cir. Ct. June 13, 2024). It also points to District of Columbia v. Facebook, Inc., *supra,* at 10, which found that "Facebook's distribution of District of Columbia users' personal data for profit ... qualifies as systematic and continuous 'transactions' between Facebook and its consumers in the District of Columbia." The case law creates no clear test for when a company's on-line presence is sufficient to create jurisdiction in a particular state. The crux of the question is whether the complaint adequately alleges that Meta's own actions have such a connection to Vermont that the company "should [have] reasonably anticipate[d] being haled into court" here. Fox, 2014 VT 100, ¶ 29 (quotation omitted).

The State argues that Meta's acts were specifically directed towards Young Users in Vermont. Specifically, the State alleges that Meta has entered into contracts with many thousands of Vermonters (Complaint ¶¶ 50-52, 85), uses the data it collects from these thousands of Vermont users to sell advertising to Vermont businesses, including at least five specifically named in the complaint (id. ¶¶ 84-85 & nn. 38-39), and has specifically tracked and studied Young Users in Vermont as part of its attempt to increase their addiction to Instagram (id. ¶¶ 74-77, 79-81, 85, 89-111). The State also alleges that Meta has designed Instagram to target Young Users and to increase the amount of time they spend on the app (id. ¶¶ 119-20), and that it has misled the public about the addictiveness of the app and the mental health impacts of such addiction (id. ¶¶ 258-61). These last allegations, however, apply to Young Users everywhere, not just in Vermont.

**\*4** The court concludes that the allegations here are sufficient to establish a prima facie case for jurisdiction. Meta has done more than merely make its product available to the world at large on the internet. Unlike, for example, the Marriott case, Meta does not merely have a dropdown menu listing every state. Nor does it merely host ads for Vermont businesses. Nor is this a case of a company contracting with or selling a product to only a handful of customers in the state. Instead, as noted above, the State alleges that Meta has entered into contracts with tens of thousands of Vermonters, collected personal data from them to target advertising to them, adapted the content it provided them based upon that data, and sold the data about Vermonters to Vermont businesses to target Vermont users. Furthermore, the State alleges that Meta has specifically tracked and studied Young Users in Vermont as part of its attempt to increase their addiction to Instagram. Assuming such facts can be proved, they show direct targeting of Vermonters by Meta. This is not merely fortuitous, attenuated, or random contact. [1]

Meta argues that none of its contacts with Vermont are causally connected to the conduct at issue here: the alleged intentionally harmful design of Instagram, and the alleged misrepresentations and omissions. However, the State need not show a direct line of causation between Meta's acts of reaching into Vermont and the alleged injuries. "None of our precedents has suggested that only a strict causal relationship between the defendant's in-state activity and the litigation will do." Ford Motor Co., 592 U.S. at 362. There must only be a connection between the two. The States's allegations are that the harm to Young Users in Vermont is the result of Meta's research about and targeting of those users, and their resulting exposure to its harmfully designed algorithms. This is sufficient to establish a connection.

The court must next consider whether it is nonetheless unfair to require Meta to defend itself here. *See* Atl. Richfield, 2016 VT 22, ¶ 27. The relevant factors include "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." Burger King, 471 U.S. at 477. "[W]here a defendant who purposefully has directed [its] activities at forum residents seeks to defeat jurisdiction, [it] must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Id.

All that Meta points to in this regard is that there is already a multi-district suit in California, and there are no allegations in the complaint that witnesses or documents are here. No actual burden is cited, and given the allegations that it is a $116 billion company, *see* Compl. ¶ 72, the court cannot imagine that hiring Vermont lawyers and coming to Vermont for trial will be more than a drop in Meta's waters. Meta argues that Instagram is "available globally and thus the State's allegations could be made as to any state in the country." Motion at 8. That may be, but there is no rule that a company cannot be subject to suit in multiple jurisdictions. The court finds sufficient allegations to support personal jurisdiction.

### The Communications Decency Act

Meta next argues that Section 230 of the federal Communications Decency Act bars the claims here. 47 U.S.C. § 230(c)(1). That provision states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." For example, Meta is not considered the publisher of a social media influencer's posts. Meta thus argues that it is insulated from liability for any harm caused to Young Users by what is shown to them on Instagram.

**\*5** "Section 230 bars liability only if the cause of action seeks to impose liability for the provider's *publication* decisions regarding third party content-for example, whether or not to publish and whether or not to depublish." Social Media Cases, No. 22STCV21355, 2023 WL 6847378, at 11 (Cal. Super. Ct. Oct. 13, 2023). Thus, Meta may well be insulated from liability for injuries resulting from bullying or sexually inappropriate posts by Instagram users, but the State at oral argument made clear that it asserts no claims on those grounds. The question is whether it is insulated from liability for the claims that its own design independently harms Young Users. The State alleges that the intentional *addictiveness* itself harms Young Users' mental health, separate and apart from the *content* of what they see. Compl. ¶ 187-200. Likewise, the State alleges that Meta failed to warn

users (and parents) of the harm that their product can cause merely from overuse, separate and apart from the content. Id. ¶¶ 312-315. Unsurprisingly, both sides cite cases supporting their arguments.

The cases cited by Meta in its initial motion are not persuasive. Those cases involve claims that the *substance* of third-party content posted on the platform harmed the plaintiffs. *See, e.g.,* Force v. Facebook, Inc., 934 F.3d 53, 65 (2d Cir. 2019) (plaintiffs sought to hold Facebook liable for giving Hamas a forum with which to communicate, for bringing Hamas's message to interested parties, and for failing to delete content from Hamas members' Facebook pages); Klayman v. Zuckerberg, 753 F.3d 1354, 1355-56 (D.C. Cir. 2014) (plaintiff sued Facebook for failing to promptly remove pages from its platform); Johnson v. Arden, 614 F.3d 785, 787, 791 (8th Cir. 2010) (involving claims that "allegedly defamatory statements posted on an internet discussion board" by third parties harmed plaintiffs); Barnes v. Yahoo!, Inc., 570 F.3d 1096, 1102-03 (9th Cir. 2009), as amended (Sept. 28, 2009) (alleging that internet service provider should have removed certain content from its website); Dvroff v. Ultimate Software Grp., Inc., 934 F.3d 1093, 1097-98 (9th Cir. 2019) (alleging that website operator-through its algorithms and recommendations-was liable for plaintiff's son's heroin death resulting from drugs he obtained from interacting with third party drug dealer on website); Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 257 (4th Cir. 2009) (alleging that consumer affairs website was liable for allegedly defamatory statements posted on website by third parties). Section 230 plainly barred the claims in all of those cases. In its subsequent filings, Meta cites several other cases holding that algorithms that determine what content to show, or when, or how much, constitute publishing. However, with one exception, those cases also addressed injuries caused by the third-party content, not by the internet companies' own designs. The exception is In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig., No. 4:22-MD-03047-YGR, 2023 WL 7524912 (N.D. Cal. Nov. 14, 2023). In that case, the claims were very similar to those here: that the algorithms and other features created by the defendants caused children harmful addiction to the media and resulting mental heath problems.

The problem with such an analysis is that it ignores the language of the statute, which bars treating a company such as Meta as "the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). In other words, Meta cannot be held liable for the things said by someone else on Instagram. That is not what is alleged here. The State is not seeking to hold Meta liable for any content provided by another entity. Instead, it seeks to hold the company liable for intentionally leading Young Users to spend too much time on-line. Whether they are watching porn or puppies, the claim is that they are harmed by the time spent, not by what they are seeing. The State's claims do not turn on content, and thus are not barred by Section 230. *Accord,* Lemmon v. Snap, Inc., 995 F.3d 1085, 1092-94 (9th Cir. 2021) (no immunity under Section 230 because negligence claim for harmful design "does not seek to hold Snap liable for its conduct as a publisher or speaker"); Tennessee v. Meta Platforms, Inc., No. 23-1364-IV at 20-21 (Tenn. Chancery Ct., March 13, 2024) (Section 230 does not apply to claims that Meta misrepresented features they knew were harmful to Young Users); Social Media Cases, 2023 WL 6847378, at *31-32 (Where "[t]he features themselves allegedly operate to addict and harm minor users of the platforms regardless of the particular third-party content viewed by the minor user," Section 230 does not apply).

**\*6** The State's deception claim (Compl. ¶¶ 258-61) is also not barred by Section 230 for the same reason-it does not depend on third party content or traditional editorial functions. The State alleges that Meta has failed to disclose to consumers its own internal research and findings about Instagram's harms to youth, including "compulsive and excessive platform use." Compl. ¶ 259. The alleged failure to warn is not "inextricably linked to [Meta's] alleged failure to edit, monitor, or remove [] offensive content." Herrick v. Grindr LLC, 765 F. App'x 586, 591 (2d Cir. 2019); *see also* Doe v. Internet Brands, Inc., 824 F.3d 846, 851 (9th Cir. 2016) ("A ... warning that [defendant] generated would involve only content that [defendant] itself produced. Therefore, an alleged tort based on a duty that would require such a self-produced warning falls outside of section 230(c)(1)."); In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig., 2023 WL 7524912, at *16 ("The duty arises not from their publication of conduct, but from their knowledge, based on public studies or internal research, of the ways that their products harm children. Plaintiffs allege through these claims that defendants could meet this duty without making any changes to how they publish content, by providing warnings for any and all of the alleged defects."); Social Media Cases, 2023 WL 6847378, at *46 ("Meta could have fulfilled its duty to warn of these potential harms without referencing or deleting any content-the duty springs from its capacity as a creator of features designed to maximize engagement for minors, not from its role as publisher.").

## The First Amendment

The next argument is that Meta's exercise of editorial control over what is posted on Instagram is protected under the First Amendment. Motion at 22. Again, however, this fails to distinguish between Meta's role as an editor of content and its alleged role as a manipulator of Young Users' ability to stop using the product. The First Amendment does not apply to the latter. "[A] restriction on nonspeech or non-expressive conduct does not implicate the First Amendment and receives only rational basis scrutiny." Ruling on Mot. to Dismiss, State v. Clearview AI Inc., No. 226-3-20 Cncv, slip copy at 10-11 (Vt. Super. Ct. Sept. 10, 2020) (Ex. A to Pl.'s Opp'n) (citing Arcara v. Cloud Books, Inc., 478 U.S. 697, 706-07 (1986); Sorrell v. IMS Health Inc., 564 U.S. 552, 567 (2011)); *see also* Elane Photography, LLC v. Willock, 284 P.3d 428, 439 (N.M. App. Ct. 2012) ("the First Amendment does not apply when a law regulates conduct rather than expression"). Meta pointed at oral argument to the Supreme Court's recent ruling in Moody v. NetChoice, LLC, U.S. __, 144 S. Ct. 2383 (2024), which involved the application of the First Amendment to social media companies. Meta points to the comment there that "expressive activity includes presenting a curated compilation of speech originally created by others." Id. at 2400. As Meta acknowledged, that was merely dicta, but this court nonetheless takes no issue with the point. It does not change the result here. Unlike Moody, where the issue was government restrictions on content, as discussed above it is not the substance of the speech that is at issue here.

There is a separate claim here that Meta's alleged lies in testimony before Congress constitute actionable misrepresentations under the Consumer Protection Act. Meta argues that these are protected by the First Amendment right to petition the government. Meta cites several cases for the proposition that even false testimony to Congress is so protected. The first case cited does not so hold. It discusses venal motives, "sham" petitions (attempts to hurt a competitor), and conspiracies with the government, but not falsehoods. Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc., 858 F.2d 1075 (5th Cir. 1988). The others all address the question of antitrust suits and "sham" petitions. Mark Aero, Inc. v. Trans World Airlines, Inc., 580 F.2d 288 (8th Cir. 1978); Cheminor Drugs, Ltd. v. Ethyl Corp., 168 F.3d 119 (3d Cir. 1999); Kottle v. Nw. Kidney Centers, 146 F.3d 1056 (9th Cir. 1998). None address whether a consumer protection claim may be brought based upon false testimony before a government body. Moreover, it is a crime to knowingly lie under oath to Congress. 18 U.S.C. §§ 1001, 1621; U.S. v. Norris, 300 U.S. 564 (1937); United States v. Lattimore, 215 F.2d 847, 867-68 (D.C. Cir. 1954) ("Congress, the courts, and administrative bodies must not be misled, in their official action, by false testimony.") (Edgerton, J., concurring). The court is thus unpersuaded by Meta's claim that such lying is protected speech, and cannot say that "it is beyond doubt that there exist no facts or circumstances that would entitle the plaintiff to relief." Skaskiw, 2014 VT 133, ¶ 6. Dismissal on this basis is therefore inappropriate.

## The Consumer Protection Act

 **\*7** Meta's next argument is that the Vermont Consumer Protection Act does not apply here for various reasons. First, it argues that because Instagram is free, there is no seller, buyer, or commerce at issue.

Instagram is certainly engaging in commerce when it provides Instagram to Vermonters: "To be considered 'in commerce,' the transaction must take place in the context of [an] ongoing business in which the defendant holds himself out to the public." Foti Fuels, Inc. v. Kurrle Corp., 2013 VT 111, ¶ 21, 195 Vt. 524 (quotations and citation omitted). That is exactly what Meta does. Users of Instagram allegedly sign a contract agreeing to give Instagram access to personal information for advertising purposes in exchange for using the site. That sufficiently pleads a contractual business relationship between Instagram and each user. As Meta itself notes, the definition of consumer includes a person who "contracts" for goods or services. 9 V.S.A. § 2451a(1).

Meta's argument that there must be money changing hands is unsupported. Although the statute is not a model of clarity, it has different requirements for cases brought by individuals and those brought by the State. The State may bring actions when it has reason to believe that a defendant "is using or is about to use any method, act, or practice" that is an unfair or deceptive act in commerce. 9 V.S.A. §§ 2458, 2453. There is no requirement of a specific purchase and sale in such cases. In fact, such cases can be brought before any act has even taken place. Id. § 2458 (action may be filed when Attorney General believes an unfair act

"is about to" occur). Moreover, "proper defendant[s] includ[e] not only a seller or solicitor, but also an 'other violator,' a broad term ... " Elkins v. Microsoft Corp., 174 Vt. 328, 331 (2002) (allowing claim against product manufacturer despite there being no direct transaction between the consumer and the manufacturer). The State has sufficiently alleged acts covered by the statute.

Nor is the court persuaded by Meta's next argument: that the complaint fails to allege any actionable omissions or misrepresentations. Motion at 28-32. Meta argues that representations as to the safety of the site are mere statements of opinion, not fact, and cannot be the basis of a misrepresentation claim. See Webb v. Leclair, 2007 VT 65, ¶ 22, 182 Vt. 559; Heath v. Palmer, 2006 VT 125, ¶ 14, 181 Vt. 545; Winey v. William E. Dailey, Inc., 161 Vt. 129, 133 (1993). A general statement that "Instagram is safe" might well be opinion. However, the complaint has specific allegations that, for example, Meta falsely denied that it designed Instagram to get users to spend more time on the site, and falsely denied that it had any research to show the site is addictive. Complaint ¶¶ 306-312. Those are factual statements that can be proved or disproved, not opinion or puffery.

Next, Meta asserts that there are insufficient details as to what misrepresentations were made, when, and to whom. The complaint, however, identifies specific Congressional testimony, quarterly reports to the public, press releases, and intentional omissions of internal research and findings of harms posed by specific Instagram features. Id. ¶¶ 266-285; 292-302, 306-310, 328-336.

 *8 Meta also argues that there are no allegations to support a finding of materiality as to any misrepresentation or omissions. Specifically, Meta notes that the complaint does not say that any user would have chosen not to use Instagram had she known of all the falsehoods or omitted information. Motion at 33. To the contrary, the complaint alleges both that (1) "[i]f Meta publicly disclosed the known risks and harms of Instagram to youth, many consumers-including young users and their parents and guardians-would likely reject the product," and (2) the misrepresentations and omissions "were likely to have affected, and are likely to be affecting, consumers' decisions to use Instagram." Id. ¶¶ 28, 371. While general, these are sufficient allegations to survive a motion to dismiss.

Finally, Meta argues that the complaint lacks any allegations of unfair conduct, defined for purposes of the Consumer Protection Act as "'likely to cause substantial injury to consumers.'" See Fed. Trade Comm'n v. LeadClick Media, LLC, 838 F.3d 158, 168 (2d Cir. 2016) (quoting 15 U.S.C. § 45(n)); 9 V.S.A. § 2453(b); Christie v. Dalmig, 136 Vt. 597, 601 ("9 V.S.A. s 2453(b) mandates that the courts of this state be guided by the construction of similar terms contained in the Federal Trade Commission Act."). The parties dispute whether this is a required element of the State's case, but the court concludes that it is nonetheless adequately pled. The complaint alleges that Instagram has purposely been designed to affect Young Users, despite Meta knowing that such addiction causes a litany of physical and mental health problems for such users, including anxiety, depression, lack of sleep, suicidal thoughts and behaviors, and changes in brain structure. It is hard to see how such results, if proved, could *not* be considered substantial injury. The fact that most consumer protection cases involve financial injury does not preclude a finding of substantial injury based upon physical and mental harm. As another court has noted in interpreting the Federal Trade Commission Act, "although Congress has noted that consumer injury often involves monetary harm, and that mere '[e]motional impact and other more subjective types of harm' are ordinarily insufficient, these generalizations do not limit Section 5(n)'s reach only to tangible harms." Fed. Trade Comm'n v. Kochava Inc., 671 F. Supp. 3d 1161, 1174 (D. Idaho 2023) (quoting S. Rep. No. 103-130, at 13, 1993 WL 322671 (1993)); *see also* F.T.C. v. Accusearch, Inc., No. o6-CV-105-D, 2007 WL 4356786, at *8 (D. Wyo. Sept. 28, 2007), aff'd, 570 F.3d 1187 (10th Cir. 2009) ("while the substantial injury requirement may not *ordinarily* be met from emotional impact harm that is 'trivial or merely speculative,' the evidence presented to the Court regarding the sale of consumer phone records in particular demonstrates a host of emotional harms that are substantial and real and cannot fairly be classified as either trivial or speculative.").

## Order

The motion to dismiss is denied. Meta shall file its answer within 14 days, and the parties shall file a stipulated discovery schedule within 30 days thereafter. Electronically signed on July 28, 2024 pursuant to V.R.E.F. 9(d).

<<signature>>

Helen M. Toor

Superior Court Judge

---

### Footnotes

1    Meta also argues that there is no evidence that its actions in Vermont are different from its actions in every other jurisdiction. Reply at 5 ("The State does not allege any of this conduct was unique to Vermont."). Whether this matters is a question the court need not answer today: at this stage of the case the court has no evidence on which to determine the accuracy of such a claim.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 18

STATE OF WASHINGTON V. TIKTOK

Transcription of Audio Recording:

Motion Hearing

March 28, 2025

Audio Runtime:  1:20:49



```
 1                (Beginning of Audio Recording)

 2                THE COURT:  This is the matter of the State

 3    of Washington, Plaintiff, vs TikTok Inc., and others,

 4    Defendants.  The case number is 24-2-23100-5 SEA.

 5                Today is the 28th of March 2025.  Friday.

 6    Judge McCullough presiding from courtroom 4A of the

 7    Regional Justice Center.  The Courtroom doors are

 8    open, and the respective parties are appearing by

 9    Zoom.

10                From the previous comment, it appears that

11    the parties have been able to hear the Court.  So with

12    that, let me ask the persons representing the moving

13    party on the CR 12(b) motion to identify themselves

14    initially for this record.  Moving party.

15                MR. CALFO:  Good morning, Your Honor.

16                THE COURT:  Yes.

17                MR. CALFO:  Angelo Calfo on behalf of

18    defendants and the moving parties.

19                THE COURT:  All right, who else?

20                MR. ZARROW:  Good morning, Your Honor.

21    Jason Zarrow on behalf of defendants.  I am the -- I'm

22    the person who's subject to the pro hac vice

23    application.

24                THE COURT:  Thank you.

25                Good morning, Your Honor.  Steve Brody on
```



MOTION HEARING                                    March 28, 2025
STATE OF WASHINGTON V. TIKTOK                              3

```
 1   behalf of defendants and the moving parties.
 2           THE COURT:  B-R-O-D-Y, thank you.  Anyone
 3   else for the defendants?  All right, for plaintiffs.
 4   Who do we have?
 5           MR. KANADA:  Good morning, Your Honor.  Joe
 6   Kanada with the Attorney General's Office.
 7           THE COURT:  K-A-N-A-D-A.  Thank you.
 8           MR. O'CONNOR:  Good morning, Your Honor.
 9   Will O'Connor on behalf of the State of Washington.
10           THE COURT:  O apostrophe C-O-N-N-O-R.  And?
11           MR. ALLEN:  good morning, Your Honor.
12   Daniel Allen for the Washington Attorney General's
13   Office as well.
14           THE COURT:  A-L-L-E-N.
15           MR. ALLEN:  Yes, Your Honor.
16           THE COURT:  And there's another person.
17           MS. BURAZIN:  Yes.  Good morning, Your
18   Honor.  Kelsey Burazin, B-U-R-A-Z-I-N, for plaintiff
19   as well.
20           THE COURT:  All right, thank you very much.
21   I have an agenda here.  The first thing I have, Mr.
22   Zarrow, has to do with you in this incredible stack of
23   papers that I received on this case was this proposed
24   order granting motion for limited admission pursuant
25   to APR 8B.
```



1          And this is presented, Mr. Calfo, by you.
2    The Court has signed this order.  It was signed on
3    yesterday.  It hasn't been submitted to you.  But for
4    the record, Mr. Zarrow is admitted pursuant to this
5    particular order.  Anything else on that?
6          MR. ZARROW:  Thank you.
7          MR. CALFO:  No, Your Honor.  Thank you.
8          THE COURT:  The second preliminary that I
9    have has to do with something I received called a
10   stipulation on expert discovery.  This is a working
11   copy.  It's not clear to me.  This is signed
12   apparently by Mr. Kanada and by Lauren Kaplan, but
13   there's no signature line for the Court.
14         Can someone tell me what's going on with
15   this stipulation on expert discovery has a date of
16   March 24, 2025?
17         MR. KANADA:  Apologies, Your Honor.  We can
18   resubmit it with a signature page for you -- for the
19   Court.
20         THE COURT:  All right, Mr. Calfo, anything
21   else on that?
22         MR. CALFO:  No, Your Honor.  Thank you.
23         THE COURT:  All Right.  If you would, Mr.
24   Kanada, then take care of that.  And I am prepared to
25   sign that.



1          The third and principal item has to do with

2    the motion that's before for the Court.  I will tell

3    you that the parties have done a phenomenal job of

4    making sure that the Court had reading material and

5    that the Court has the issues before it.

6          I've read the materials.  I've read, to be

7    candid, the cases that I think are the most pertinent

8    relative to this motion and my intent, since you have

9    done such a great job in outlining these things by the

10   volumes of paper, I don't know who's going to argue

11   for Defense and who's going to argue for the State,

12   but I think that you can hit the highlights.

13          I'll reserve questions until the end.  If I

14   can, I'll make the ruling today.  If not, I'll let you

15   know that at the end of the session.  Do you think,

16   whoever the representative speakers are, that you can

17   hit the highlights in 15 minutes or less?  For the

18   Defense?

19          MR. ZARROW:  Your Honor, Jason Zarrow.  I

20   think I can hit the highlights in 15.

21          THE COURT:  All right.  And for the State?

22          MR. KANADA:  Yes, Your Honor.  So it would

23   be myself and Mr. O'Connor arguing for the State.  And

24   we'll do our best, but we think 15 minutes is doable.

25          THE COURT:  All right.  And Mr. Zarrow, you



1  will be able to reserve some time for rebuttal, if you

2  like.

3          MR. ZARROW:  Your Honor, will that come out

4  of the 15 or be in addition to?

5          THE COURT:  You would ask.  You can have

6  that in addition to.  But it'll be limited to

7  something like five minutes.

8          MR. ZARROW:  I was going to take less.  I

9  would take three.

10          THE COURT:  That would be fine with me.  All

11  right, again, let me thank you.  The materials were

12  very helpful, very thorough, very complete.  And

13  whoever your staff members are, make sure you give

14  them a raise for all the work that was done.  Okay,

15  Mr. Zarrow.

16          MR. ZARROW:  Your Honor, may it please the

17  Court, Jason Zarrow on behalf of defendants.  I have a

18  simple pitch for you today in an otherwise complex

19  case.  You are faced with two bodies of precedent, as

20  you know from looking at the materials.  Appellate

21  precedent compels the dismissal of the State's claims.

22  And the State, by contrast, relies on out of state

23  trial court decisions.

24          Our submission is the Court should follow

25  the appellate precedent and it should dismiss.  And



1   I'll start with the State's unfairness claim.

2          That claim alleges various features

3   comprising the platform are unfair because they

4   encourage compulsive use.  What does the State mean by

5   compulsive use?  It means that users spend too much

6   time watching third party videos on the platform.

7   That claim is straightforwardly barred by Section 230

8   of the Communications Decency Act.

9          Under Section 230, the provider of an

10  interactive computer service like the platform cannot

11  be held liable for acting as the publisher of third-

12  party content.  And the State's unfairness claim would

13  hold defendants liable for exactly that, for acting as

14  the publisher of third-party content.

15         I actually think this is a particularly easy

16  claim to resolve under Section 230, and that is

17  because the design features the State challenges are

18  how the platform publishes third-party content.  And I

19  can start with the recommendation algorithm, which I

20  understand to be the centerpiece of the State's claim.

21         The algorithm is how the platform decides

22  which videos to publish on which user's feed.  And

23  that is pure publishing activity, as multiple courts

24  have held, including the Fourth Circuit in the recent

25  MP case that we cited in our reply brief, the Second



MOTION HEARING                                          March 28, 2025
STATE OF WASHINGTON V. TIKTOK                                        8

 1  Circuit enforced.

 2          And I think an analogy to traditional media

 3  might help bring this point home.  Everyone can agree

 4  that a newspaper acts as a publisher when it decides

 5  which stories to publish.  I think everyone could also

 6  agree that a newspaper with multiple editions acts as

 7  a publisher when it selects stories to publish in

 8  editions.

 9          So you can imagine, for example, a newspaper

10  with a local edition by county that selects certain

11  stories for the King County edition and different

12  stories for the Spokane County edition.  That's

13  traditional publishing.  And that is fundamentally the

14  same as what's going on with the algorithm here, only

15  it's a little bit more granular.

16          It's localized by user.  Each user's feed is

17  like a bespoke paper.  And what the algorithm is doing

18  is selecting stories to publish -- to publish -- in

19  each of those individual papers.  And that is exactly

20  why it comes -- this is heartland publishing activity

21  that comes within Section 230.

22          Now, you've been presented a lot of state

23  trial court decisions, and we recognize that those

24  state trial court decisions, I think, have come out

25  the other way.  And I think what's getting lost in



MOTION HEARING                                    March 28, 2025
STATE OF WASHINGTON V. TIKTOK                              9

1  those state trial court decisions is that the fact

2  that when the State is suing an apparent (inaudible)

3  capacity, it's aggregating all these individual users

4  together and taking sort of a macro view at the

5  platform that loses focus on how the algorithm

6  actually works to publish content on each individual's

7  feed.

8         But each individual's feed, like I just

9  said, is just like a tiny little newspaper.  And what

10 the algorithm is doing is selecting content to publish

11 in each little tiny newspaper.  And that is

12 fundamentally publishing activity.

13        So if you zoom out and look at the platform

14 as a whole and abstract away all the individual feeds,

15 that's the kind of analysis that the state trial court

16 cases are applying.  But that's just not how the

17 platform works.

18        And the reason I think this is a

19 particularly easy case, and especially with respect to

20 the algorithm, is because it's just traditional

21 publishing.  It's deciding which story goes in which

22 edition of the paper.  The Jason Zarrow edition versus

23 anyone else's edition.

24        Same analysis applies to likes and comments.

25 That's another feature the State's challenging.  Likes



1  and comments are how users communicate to each other

2  that they like videos that other users have posted,

3  and the unfairness claim would hold defendants liable

4  for publishing one user's like or comment to another

5  user.

6          So if I liked Mr. Calfo's video, the

7  platform would publish to Mr. Calfo that I Jason

8  Zarrow like his content.  That is, again, pure

9  publishing activity between one individual user and

10  another, squarely protected by Section 230.

11          I'll just take one more example because I

12  know I'm hitting the highlights here.  TikTok Live and

13  stories, the State's complaint is that these features

14  make content available only for a limited period of

15  time, and that induces users to come back to the

16  platform to view the content before it expires.

17          Deciding how long content is going to remain

18  available is a traditional publishing activity, just

19  like a TV station's decision to run a live segment

20  only once instead of repeating it periodically.  The

21  same argument that the State is making about TikTok

22  live and stories could be made about TV station 20

23  years ago.  People need to sit around their TV, wait

24  for 8:00 p.m. for the show, the live news to come on,

25  because that's the only time the live news will come

1   out.

2           As the Ninth Circuit recognized in Barnes

3   case deciding when to publish content or here for how

4   long is a publisher's traditional editorial function.

5           Another way to look at this, and I'll stop

6   now with the examples, is to focus on the defendants'

7   duty.  That's what the Ninth Circuit says to do.  And

8   the one state appellate case also follows the Ninth

9   Circuit's test.

10          And if the Court thinks about this in terms

11  of duty, the State's unfairness claim would impose a

12  duty on defendants to publish third-party content

13  differently.  And we could take the algorithm as an

14  example.

15          If the Court thinks the recommendation

16  algorithm is unfair, the platform would have a duty to

17  publish different content to each user.  Instead of

18  serving -- I like tennis.  Instead of serving me lots

19  of tennis videos that I find engaging, the platform

20  would have a duty to serve me different content.

21  Racket ball, pickleball, what have you.

22          Same is true for likes and notifications.

23  The platform would have a duty not to publish those

24  between users or to alter how they're published.  Same

25  with time limited content like I was just talking



 1  about.  The platform would need to alter how long it

 2  publishes third-party content and so on.  Every single

 3  feature that the State is challenging falls within

 4  this analysis.

 5          As I read the State's opposition and the out

 6  of state cases, I think there are essentially three

 7  arguments in response, and I'll try to just tick

 8  through them pretty quickly for you.  The first is the

 9  argument that the State seeks to hold defendants

10  liable for their own acts, quote, and not content

11  posted by third-party users.

12          Your Honor, that's a false dichotomy that's

13  actually conflating the second and third elements of

14  the test.  As we explained in our reply, every single

15  Section 230 case involves the defendants' own acts.

16  The statute applies when the defendant acts as a

17  publisher.

18          So the first question you need to ask in

19  this case is, what is the challenged activity by the

20  defendant?  Is it publishing or is it not publishing?

21  As I just discussed, it's all publishing.  The second

22  question is, if it's publishing, what is the defendant

23  publishing?  Is it publishing third-party content or

24  is it publishing its own content?

25          And the reason I said this is an easy case



 1   is because those questions answer themselves based on

 2   the State's complaint.  All of this is publishing

 3   activity.  That's the activity.  When the State says

 4   the defendants' own acts, what it means is the

 5   defendants' own acts in publishing.  And then the

 6   question before the Court is, are defendants

 7   publishing third-party content, or are they publishing

 8   their own content?

 9           And it is very clear that all of the content

10   being published that users allegedly spend too much

11   time viewing is third-party content.

12           So this idea that the defendants' own acts

13   somehow take them outside the statutory immunity

14   doesn't -- it doesn't make a lot of sense when you

15   think about the test because the entire point is that

16   defendants are immunized when they act as the

17   publisher of third-party content.

18           I can give you a few examples from the case

19   law.  I know you've read them.  MP case was about the

20   defendants' own design.  That's the language in the

21   case of the Facebook algorithm.  In Grindr, the Ninth

22   Circuit applied Section 230 based on the defendants'

23   own acts in matching adults and minors.

24           And in YOLO, also a Ninth Circuit decision,

25   the defendants' own acts in creating an anonymous



1  message board were being challenged by the plaintiff's

2  claims.

3         The only time when a defendant's own act,

4  taken outside Section 230 is when those acts aren't

5  publishing, when the harm occurs independent of

6  publishing activity.  And that's the Lemmon case that

7  the State cites.  L-E-M-M-O-N.  And in that case, the

8  harm occurred, despite the fact that nobody posted a

9  video or viewed a video.  It was the defendants' own

10  acts, completely independent of publishing.

11         And the Ninth Circuit later made that clear

12  in the Grindr case that that's how -- that's the

13  correct reading of Lemmon.  And Lemmon itself makes

14  that clear.  As we pointed out in our reply brief, if

15  you look at footnote four of Lemmon, the Ninth Circuit

16  makes clear that Section 230 would apply -- would

17  apply -- if the claim was based on viewing third-party

18  videos, which is true of the State's claim here.

19         So the second argument I've seen in the case

20  law, and I think the State is making, is that the harm

21  here is caused exclusively by the platform's design

22  features and not by third-party content.  And this

23  goes to the element of the test that asks whether it's

24  third-party content or the defendants' own content.

25         And I think the State is just asking the



 1   wrong question.  The only question the statute is

 2   asking is whether the content being published is

 3   third-party content or is it content by the defendant,

 4   the defendants' own content.

 5          And I don't think there's any dispute in

 6   this case that the content defendants are publishing

 7   is third-party content.  And the harm in this case, if

 8   you want to think about it from that perspective, the

 9   harm in this case is that users view too much third-

10   party content.  And the causal mechanism of the harm

11   is defendants' publishing activity.

12          So the harm is viewing too much third-party

13   content.  The causal mechanism is defendants'

14   publishing activity.  And that is -- that's exactly

15   the point of Section 230.

16          I don't think there is any merit to the

17   State's suggestion that for some reason or another,

18   the publishing of third-party content in this case

19   takes the claim outside of Section 230 because the

20   harm, again, comes directly from viewing third-party

21   content.  That's the State's entire theory of the

22   case.

23          The third argument that I've seen in the

24   case law is that the challenge design features aren't

25   publishing.  And I'm not actually sure if the State is



 1  making this argument, but it's in the cases like the

 2  Utah case the State cites.

 3          If the State's making that argument, it is

 4  clearly wrong.  As I discussed up top, the design

 5  features in this case are traditional publishing

 6  activities.  Some of them are like including or

 7  excluding material from a newspaper.  Some of them are

 8  like organizing the newspaper.  You know, you put

 9  sports stories in the sports section, business stories

10  in the business section.  Some of it's like font size,

11  some of it's like how long a commercial is going to --

12  or how long a TV program is going to run, or how often

13  it's syndicated.

14          All of those are traditional publishing

15  activities.  So if the State is making the argument

16  that the challenge design features here are not

17  publishing, it is very clearly wrong.

18          And those are the highlights, Your Honor, of

19  our argument on the unfairness claim on Section 230.

20  I know you said you might reserve questions until the

21  end, but I would move on to the First Amendment unless

22  Your Honor would like to ask me --

23          THE COURT:  Go ahead.  No, I want you to go

24  ahead.

25          MR. ZARROW:  Sure.  So I'm going to stick



1   with the unfairness claim for the moment.  In

2   (inaudible) versus NetChoice, the Supreme court held

3   that how social media platforms organize and display

4   third-party content, that is how they publish content,

5   is expressive activity protected by the First

6   Amendment.  And that is exactly -- the State's primary

7   argument is that this is not expressive conduct

8   protected by the First Amendment.

9            That's just directly contrary to Moody.

10  There's no way to reconcile the State's argument with

11  what Moody says, that the creation of a compilation of

12  third-party material is in fact, expressive.

13           If you want to just take Moody out of the

14  picture for a second, we think the State's wrong about

15  Moody.  But if you just take it out of the picture,

16  it's also obvious that the State is wrong.  The

17  State's principal challenge, as I understand the

18  complaint, is to the recommendation algorithm.  The

19  State says there's no expressive conduct at issue in

20  this case, but the very nature of a recommendation

21  algorithm is to make recommendations which expresses

22  the recommendation that content is recommended.

23           I know that was saying the word

24  recommendation a lot, but the whole point of the

25  recommendation algorithm is to make a recommendation.



 1   It says, we think you will like this video, user.

 2   This video will appeal to you based on other videos

 3   you've watched, and that is expressive activity.

 4          And one of the principal reasons the First

 5   Amendment forecloses the State's unfairness claim is

 6   because the entire claim point of the State's

 7   unfairness claim is to blunt the expressive force of

 8   that message.

 9          The State says that defendants are too

10   effective in recommending content.  And, you know, we

11   give it -- we give examples in our brief of what the

12   State's argument would mean for the First Amendment if

13   it were correct.

14          The State says that the First Amendment only

15   applies to the inclusion or exclusion of material.  It

16   doesn't apply to any other types of expressive

17   activity in the publishing context.  As an initial

18   matter, that would be fatal to the State's own claim

19   because the recommendation algorithm does include and

20   exclude content on each user's feed.

21          But if that were true, the State would have

22   the power to dictate the organization of a newspaper.

23   It could decide where the stories need to be placed in

24   relation to each other, or the font size or anything

25   else in the paper.  I think everyone should be able to



 1  agree that that's not correct.  We pointed that out in

 2  our reply brief.

 3          But whether or not you want to think about

 4  this from first principles or through the Moody case,

 5  this is a clear violation of the First Amendment.  And

 6  then --

 7          THE COURT:  Let me ask you, are you

 8  suggesting that Moody, then, is -- favors your point

 9  or your position?  Because as I read it, they really

10  had some interesting comments about overreach,

11  particularly on the part of Texas in terms of

12  curtailing content.

13          MR. ZARROW:  Yes, I think Moody's on all

14  fours with this case.  Obviously, the State law is

15  different.  It operates differently.  But what Moody

16  says about why the First Amendment applies to

17  platforms applies equally here.

18          Like the fact that the State law is

19  different doesn't change the fact that when platforms

20  compile material, they are engaged in expressive

21  activity, especially when what they're doing is making

22  a recommendation that expresses a message.  This

23  content is recommended.

24          So I take the distinction that the law in

25  the Texas case, in the Florida case, both of those



1   laws are different than the State's CPA claim, but

2   it's not really that different.  And in any event, the

3   underlying principle articulated in Moody is that the

4   First Amendment applies to online platforms'

5   publishing activity, just like it does to traditional

6   publishing activity for print media.

7           And I would say one more thing about the

8   First Amendment.  I don't think there's any reason for

9   Your Honor to reach it.  You know, you're supposed to

10  resolve statutory questions before constitutional

11  questions.  I think the 230 question in this case is

12  pretty easy.  So I would encourage the Court not even

13  to reach the First Amendment question because the

14  Section 230 analysis is so straightforward.

15          I'll turn very, very quickly to the

16  unfairness CPA claim.  The State law argument.  Our

17  position as set out in the briefs is that the State's

18  theory here is entirely novel.  There's no support in

19  Washington law for the idea that an otherwise lawful

20  good or service can itself be declared unfair and

21  therefore that it's illegal to make available that

22  product in the State of Washington.

23          And the State's opposition brief confirms

24  the novelty of its position.  The State says it -- the

25  test that the State articulates for unfairness under



1  Washington law is some sort of ad hoc test where the

2  Attorney General and Court get to decide what's

3  unfair, unmoored from anything, just unfair whenever

4  you see it.  And that is not supported by any

5  Washington case law.  And it would render the

6  application in this particular case of the CPA

7  unconstitutional because there would be nothing that

8  guides a party to determine whether or not its conduct

9  was prohibited.  It can't just be a free-floating

10  concept of unfairness.

11          With that, I'll turn, unless the Court has

12  more questions about the unfairness claim, I'll turn

13  to the misrepresentation claims.

14          THE COURT:  Go ahead.

15          MR. ZARROW:  All right, so I'll start back

16  up at the top with Section 230.  And you've seen, I'm

17  sure, the Grindr case, Barnes, YOLO, the Ninth Circuit

18  cases, Washington appellate court, one Washington

19  appellate court that's applied, 230 follows those

20  cases.

21          And what those cases say is that for a

22  misrepresentation claim to be actionable under Section

23  230, there must be a specific promise akin to one that

24  would be enforceable in contract.  So Grindr, the most

25  recent Ninth Circuit case, holds that a general



1    statement that the app is designed to create a safe

2    and secure environment for its users was not a

3    specific promise and was barred by 230.

4              By contrast, in Barnes, a specific promise

5    to take down an indecent profile was held actionable

6    and not protected by 230.

7              In YOLO, a specific promise to unmask the

8    identities of anonymous users sending harassing

9    messages was not protected by 230 because it was a

10   specific promise.  That is the distinction the Ninth

11   Circuit has drawn, specific promises versus general

12   descriptions of content moderation policies.

13             And you might ask yourself, why does that

14   rule exist?  Why is the Ninth Circuit doing that?  And

15   the reason is so that a plaintiff can't avoid 230 by

16   repackaging a claim that the platform, for example,

17   failed to take down content into a failure to warn or

18   misrepresentation claim.

19             We all, I think, can agree that the failure

20   to take down content would be barred by 230.  What the

21   Ninth Circuit is saying is you can't just say the

22   defendant platform failed to warn that it wouldn't

23   take down every harmful third-party content on the

24   platform.

25             So the rule here is really about preventing



 1   repackaging of claims as warning or remissions claims

 2   to get around Section 230's bar.  And the way that's

 3   been operationalized is by distinguishing between

 4   specific promises and general promises.  And the

 5   promises in this case -- not promises -- the

 6   statements in this case are exactly the same types of

 7   general statements that the Ninth Circuit held were

 8   barred by 230 in Grindr.

 9             I'll just read some very quickly to you.  I

10   know you've seen the papers.  We care deeply about

11   your well-being.  Safety and wellness is a core

12   priority.  Safety for teenagers is a top priority.  We

13   take safety extremely seriously.  Safety features are

14   robust.  We have a safety by design mentality.  Those

15   are all general statements, no different than the

16   statement in Grindr that the app was designed to

17   create a safe and secure environment for its users.

18   And we set a bunch more of those types of statements

19   out in our brief.

20             So that is the -- those are the

21   misrepresentation claims.  The same basic rule applies

22   to the omissions claims under 230 as the Ninth

23   Circuit's construed it, as appellate courts have

24   construed it.  A provider has no duty to warn of

25   general dangers from the application.  So you don't

 1 | have a duty to just say like you could be harmed from

 2 | using my platform.

 3 |        And thus in Grindr, the Ninth Circuit held

 4 | that Grindr did not have a duty to warn about the risk

 5 | of sexual exploitation of children on the app.  Ninth

 6 | Circuit applied the same rule in the YOLO case.

 7 | There's no duty to warn of a general possibility of

 8 | harm resulting from use of the app, including

 9 | potential harm to children.

10 |        And there's sort of an exception to this

11 | rule, which is where the information that would

12 | trigger the duty to warn comes from elsewhere.  Like

13 | if you know -- if the defendant knows for some reason

14 | other than the content being posted on the app of a

15 | danger to a specific user, it could have an

16 | independent duty to warn.

17 |       But the State's omissions claim in this case

18 | are all the same -- are the same as the types of

19 | statements that the Ninth Circuit held in both YOLO

20 | and Grindr were not actionable under Section 230.

21 | It's just a duty to warn generally about the risk to

22 | minors on the application.  And for that reason the

23 | warning claims both of the misrepresentation variety

24 | and of the --

25 |       THE COURT:  Let me ask you about this no



MOTION HEARING                                          March 28, 2025
STATE OF WASHINGTON V. TIKTOK                                       25

 1   duty to warn.  Did I hear you say unless the defendant
 2   in this case knew of the danger or had some sense of
 3   what the danger was, is that -- is that your reading
 4   of --
 5            MR. ZARROW:  Independent of its function as
 6   a publisher of the platform.  So like in one of the
 7   cases that -- and I'm forgetting the name of the case
 8   right now, the defendant knew that there was a
 9   specific risk of harm from an external source of
10   information, and the claim could be based on that.
11            But the Ninth Circuit has also said there's
12   no general duty to warn of a possibility of harm to
13   its users.  So, no, like general statements.
14            THE COURT:  But some knowledge on the part
15   of the defendant, whatever the -- whoever the
16   defendant provider would be, would bring it closer to
17   the requirement.  Having to comply with the
18   requirement to warn is --
19            MR. ZARROW:  Knowledge that comes from a
20   source external to the platform?  Yes.
21            THE COURT:  And in this case, is it alleged,
22   as you understand it, that TikTok had some information
23   external to the platform about the danger?
24            MR. ZARROW:  I don't think so.  And I also
25   think the types of warnings in this case are the exact



MOTION HEARING                                        March 28, 2025
STATE OF WASHINGTON V. TIKTOK                                      26

1   type of generalized warnings that Grindr and YOLO say

2   wouldn't be actionable under Section 230.

3           And so just touch very briefly on the First

4   Amendment, and then I think I can conclude.  I'm not

5   exactly sure how much of my 15 minutes I've used, but

6   I would direct the Court to the Bonta case on

7   omissions.  That's the Ninth Circuit case, and that

8   case stands for a pretty simple proposition that I

9   think dovetails with our discussion right here about

10  omissions claims, which is, a defendant cannot be

11  compelled.  This is our compelled speech argument.  A

12  defendant cannot be compelled to offer an opinion,

13  like in this case, the opinion that the platform is

14  harmful to minors.

15          Defendant can be compelled, of course, to

16  make -- to speak incontrovertible facts.  But the

17  compulsion that the State seeks in this case is not an

18  incontrovertible fact.  Like there's a danger to your

19  finger from using a circular saw or something like

20  that.

21          What the State is trying to compel is an

22  opinion about the safety of the platform for its minor

23  users.  And that is what the Bonta case says.  It says

24  that kind of speech is protected, it is not

25  commercial, speech gets full First Amendment



1 | protection.  And that's what the State's trying to

2 | compel.

3 |            And Your Honor, with that, I'm happy to

4 | answer any of your questions.

5 |            THE COURT:  All right, thank you.  We'll get

6 | back to you.  Let's go to the plaintiff, Mr. Kanada.

7 |            MR. KANADA:  Thank you.  With the Court's

8 | permission, I'd like to display four slides, which I

9 | think will help expedite my argument here today.

10 |           THE COURT:  I'm sorry, your audio is a

11 | little bit fuzzy.  Can you do something on your end?

12 |           MR. KANADA:  Is it better, Your Honor?

13 |           THE COURT:  Yes, a little bit better.  Go

14 | ahead.

15 |           MR. KANADA:  Let me try to switch my source.

16 | Sorry about this, Your Honor.

17 |           Okay.  Is this better?

18 |           THE COURT:  I can hear you.

19 |           MR. KANADA:  Okay.  With the Court's

20 | permission, I have four slides which I think will

21 | expedite my argument and I'd like to share my screen.

22 |           THE COURT:  Go ahead.

23 |           MR. KANADA:  Your Honor, just to take a step

24 | back for a second and focus on what the high level --

25 |           THE COURT:  Nothing is shared at this point.



MOTION HEARING                                    March 28, 2025
STATE OF WASHINGTON V. TIKTOK                              28

1          MR. KANADA:  I will proceed without the

2     slides.  Apologies.

3          THE COURT:  All right.

4          MR. KANADA:  Okay.  So you know, Your Honor,

5     this case is about the way TikTok exploits youth.

6     It's about the addictive product features that TikTok

7     uses that takes advantage of their vulnerabilities.

8     And it is about the Statements TikTok makes to keep

9     users on the platform.

10          The longer children stay on TikTok's

11     platform, the more ads TikTok can serve them and the

12     more business that TikTok generates for itself.  Today

13     on this motion to dismiss, TikTok has a very high

14     burden to succeed.  It must show that there are no

15     facts under which the deception or unfairness claim

16     survives.

17          That's particularly important here with

18     TikTok, Section 230 and First Amendment claims.  For

19     the unfairness claim, the State alleges multiple

20     TikTok design features that are unfair.  If Section

21     230 is inapplicable to any single feature, the State's

22     claims survive.

23          For deception, the State alleges multiple

24     TikTok statements have the capacity to deceive.  If

25     the First Amendment is inapplicable to any of them,



1   the State's claim, again, survives.  It's therefore

2   not surprising that sister courts across the country

3   have denied motions to dismiss similar claims against

4   social media companies, including TikTok.

5           In its reply, TikTok asserts that this case

6   must be about content because children wouldn't watch

7   boring videos about "rocks or potatoes".  But again,

8   this ignores the complaint's allegation.  The

9   complaint alleges that TikTok's corset (phonetic)

10  design tactics do induce children to engage with the

11  platform, even if the content is boring when presented

12  with an endless scrolling array of videos, forced

13  autoplay of those videos, as well as the allure of

14  what might be next.

15          The State's alleged allegation is absolutely

16  that children are compelled to watch videos that they

17  otherwise wouldn't.  To the extent TikTok wants to

18  contend that it is content rather than the design

19  features that compels use, that's a factual contention

20  and argument that will have to wait for the

21  appropriate stage in this litigation.

22          Second, in its reply, TikTok, and in my

23  colleague's argument, TikTok's primary argument

24  regarding the state court decisions rejecting the

25  application 230 to Meta and TikTok is in effect to say

1   that the federal cases must be right and the State

2   cases must be wrong.

3           That's not the way we view it, Your Honor.

4   We think all those cases can be right simultaneously

5   and that they can be reconciled.  The results are

6   entirely consistent and not in tension.

7           The difference in outcome is apparent when

8   you look at the nature of the claims underlying the

9   federal decisions versus the state court decisions.

10  The overwhelming takeaway from the federal cases is

11  that there must be a direct link to between the

12  content of third parties and alleged harms.

13          Your Honor has seen a lot of cases from the

14  federal courts, most of them on 230 fall into three

15  categories:  harassment cases, sex crime cases, and

16  terrorism cases.

17          All of these cases involve specific

18  information posted online by a third party leading to

19  harm in the real world.  Section 230 therefore applies

20  to plaintiff's claim sought to hold the defendants

21  liable for the harms caused by that specific

22  information.

23          Here, the harm simply doesn't flow from the

24  specific content of videos on TikTok.  This case is

25  analogous to the Lemmon v. Snap case, which didn't



1   apply Section 230.  In Lemmon, Snapchat created a

2   speed filter feature which allowed users to overlay

3   their speed on the photo or video that the user was

4   posting to the platform.

5          So if I were currently to take and post a

6   snap of myself would show a picture of me with 0 miles

7   per hour overlaid on top of that picture.  This

8   feature encouraged users to post snaps of themselves

9   while driving at high speeds.  Unfortunately, this led

10  to fatal high speed accidents.  It was the existence

11  of the speed filter that was encouraging the reckless

12  driving.

13         Here, like in Lemmon, the complaint alleges

14  that the features themselves, regardless of the

15  content, encourage harmful behavior.  It is the

16  coercive design features which encourages the

17  compulsive use by children.

18         Lemmon also highlighted a common factor

19  courts consider when deciding whether Section 230

20  should apply.  Courts look to whether or not, in order

21  to avoid liability, a defendant must moderate and edit

22  content.  If they have to monitor and edit content,

23  then Section 230 applies.

24         In both Lemmon and this case, the answer is

25  no.  TikTok doesn't need to edit any specific video



 1   here or moderate any specific video in order to avoid

 2   liability.  To avoid liability, it simply needs to

 3   stop deploying the coercive design tactics on youth.

 4          I'd like to also point the Court to the

 5   Washington appellate case, State of Washington vs.

 6   Meta, which discussed Section 230 and made clear that

 7   there must be a direct connection between liability --

 8   pardon me, between the specific third-party content

 9   and liability.  This is State v. Meta Platforms, 560

10   P.3d 217 at page 246.

11          "A law is preempted under Section 230 if it,

12   one, makes the defendant liable for publishing certain

13   information to third parties, and two, seeks to impose

14   liability based on that information's improper

15   content."

16          So again, the Washington court makes clear

17   that there must be a link between the specific

18   information being posted and the liability for which

19   defendants are potentially being held.

20          One distinction that TikTok focuses on both

21   in its briefing and here today, is that, you know,

22   Lemmon stands for the proposition that the harm must

23   be caused without anyone ever viewing the plaintiff's

24   videos.

25          So again, we believe that it's, as a legal



1    matter, it's more whether or not the material must be

2    edited online.  But even assuming that is the primary

3    thrust and takeaway from Lemmon, here, as a factual

4    matter, the complaint does allege harm even if nobody

5    views the videos.

6           For example, the notification features.

7    Notification features can disturb the sleep and school

8    activity of children, even if the children never open

9    the app and never watch a video.  The real world

10   analogy is that if a phone on your nightstand is

11   ringing throughout the night, you're going to be tired

12   the next day, even if you never pick it up and hear

13   what the person on the other end of the line has to

14   say.

15          So that's Section 230 and the State's

16   unfairness claim.  We move on to the Section 230 in

17   the (inaudible) deception claim.  The deception claims

18   are even more clearly beyond the scope of Section 230

19   than the unfairness claim, since they are based on

20   TikTok's own statements that were deceptive rather

21   than statements for content of others.

22          The failure to warn cases relied on by

23   TikTok in its reply again today aren't applicable

24   because here we're combined -- the States are

25   combining affirmative misrepresentation statements



1  with omission of critical information, like the

2  State's complaint does.

3          We're not saying that TikTok has to disclose

4  information in a vacuum, but if it does describe its

5  content moderation policies, it must do so accurately,

6  which we allege was not done.

7          I'd like to move on to the First Amendment,

8  but if the Court has specific questions on Section

9  230, I can also --

10          THE COURT:  Keep going.

11          MR. KANADA:  Thank you, Your Honor.  So

12  again, starting with the unfairness claim, like the

13  Section 230 immunity defense, the First Amendment also

14  doesn't bar the State's claims since there's no

15  content, in this case speech, involved from TikTok.

16  TikTok is only entitled to First Amendment protection

17  if the activity at issue is TikTok's expressive

18  activity that conveys a TikTok message or TikTok

19  content.

20          None of the corset design tactics in the

21  complaint, let alone all of them, convey a message by

22  TikTok.  In its reply, TikTok says that recommendation

23  system conveys the message that users may be

24  interested in the recommended content.

25          As a factual matter, that's inconsistent



 1 | with the allegations of the complaint.  The State
 2 | alleges that the recommendation system provides
 3 | content that will keep the users on for as long as
 4 | possible.  Keeping the users on as long as possible is
 5 | different than content users may like, and this
 6 | distinction matters.
 7 |          For example, divisive or extreme content, a
 8 | user might not like it, but it might actually keep
 9 | them on the platform for longer than necessary.  The
10 | real world analogy here is you're driving down the
11 | road, down the highway and there's a car crash.  Many
12 | people rubberneck and cannot resist the urge to look
13 | at the car crash.  Nobody likes the image of a car
14 | crash, but for whatever reason people can't look away.
15 | Similar with divisive and extreme content.
16 |          So as a factual matter, and as the way the
17 | complaint is alleged, there is that distinction
18 | between content users like and the recommendation
19 | system which is trying to keep them on for as long as
20 | possible.
21 |          Second factual point I'd like to make is
22 | that the complaint also alleges that users were
23 | dissatisfied with what they were seeing and when that
24 | happened, they wanted a feature that would allow them
25 | to reset their feed.



1          They thought that TikTok's refresh feature,

2    because of the way TikTok described it, would allow

3    them to do that and would allow them to restart and

4    have a brand new feed to provide them new material.

5    They were going down a rabbit hole and they wanted to

6    get out, so they wanted to refresh their feed.

7          Unbeknownst to them, that was only

8    temporary, and they would snap them back, revert back

9    to the prior version of the recommendation system, and

10   provide them the type of content that they were seeing

11   before they elected to try to get away from that

12   content.

13          So again, as a factual matter, the

14   recommendation system focuses on what will keep the

15   user on the platform as long as possible, not what the

16   user will necessarily like.

17          And as a legal matter, this distinction

18   between a recommendation system that maximizes based

19   on time versus a recommendation system that provides

20   things that users will like.  This distinction matters

21   legally.  I point the Court to the second NetChoice

22   versus Bonta case.  There are two, one involving the

23   California Age Appropriate Design Code act, and the

24   second one involving a law around algorithms.

25          I point the Court to NetChoice vs. Bonta,



MOTION HEARING                                    March 28, 2025
STATE OF WASHINGTON V. TIKTOK                            37

 1   2024 West Law 5264045 as dealing with this exact same
 2   situation.  Moody -- the Moody case carved out the
 3   scenario where the recommendation systems only focused
 4   on what was being inputted by users.  They carved out
 5   that put it aside.  Well, NetChoice versus Bonta, the
 6   December 31st, 2024, case, picks up right there
 7   because that is exactly the question it is looking at.

 8            And NetChoice vs. Bonta walks through all
 9   the key cases relied on by defendant Moody, Miami
10   Herald, Turner Broadcasting, and Sorrell to describe
11   the contours of the First Amendment's application to
12   traditional newspaper media.

13            And then the Court goes on to caution that
14   it can't simply blindly import rules from traditional
15   publishing to modern technology.  And then it focuses
16   and hones in on the exact situation presented here
17   where there's a recommendation system that only
18   responds to user input and its goal is to maximize
19   their time.

20            And the Court notes that it acknowledges an
21   algorithm that is designed to recommend content people
22   might like might be expressive, but if it's designed
23   to only maximize time, there's no expressive content
24   there, and therefore the First Amendment shouldn't
25   apply.



MOTION HEARING                                    March 28, 2025
STATE OF WASHINGTON V. TIKTOK                              38

 1          Finally, even if the recommendation system
 2   does implicate expressive TikTok speech, the State
 3   satisfies (inaudible).  As we noted on our brief,
 4   there's an important government interest here, and it
 5   is narrowly, pardon me, substantially related to the
 6   issue, the role that the government has here.
 7          TikTok's only response in its reply brief is
 8   alleged without support, that our complaint is trying
 9   to impact content that all users see.  Again, our
10   complaint is not focused on all users.  It's focused
11   on minors, just like the government interest that we
12   have here is to protect minors.  And so we think
13   intermediate scrutiny, even if were to be applied,
14   will be satisfied here.
15          I'm going to move on to the First Amendment.
16   Unless the Court has some questions on Section 230.
17          THE COURT:  Go ahead.
18          MR. KANADA:  Thank you.  Starting with
19   deception.  The deception claims.  The State's
20   deception claims -- pardon me, Your Honor.
21          So for the State's deception claims, I want
22   to start with one small point, which is in its reply
23   brief, TikTok argues that the State has conceded our
24   omissions claims.  That's not the case.  If you look
25   at the State's brief of page 13, lines 22 to 23, we



1   clearly state that TikTok's alleged deceptive

2   statements and omissions regarding the safety risks

3   and addictive nature of its platform implicate

4   commercial speech.

5           So just wanted to, as an administrative

6   matter, point out that we've in no way abandoned our

7   omissions claims.

8           But more generally, the deception claims are

9   one aspect of this case that do indicate TikTok speech

10  because it involves TikTok statements, namely what we

11  allege as deceptive statements.

12          However, as we detailed in our brief, it's

13  well established that deception -- that deceptive

14  commercial speech is not entitled to First Amendment

15  protection.  TikTok doesn't appear to dispute that,

16  but rather they then go on to argue essentially that

17  their statements are not deceptive.  This raises a

18  factual dispute which we think is inappropriate for

19  this stage of the litigation.

20          And then I would like to conclude with just

21  a few last comments.  You know, the thrust of my

22  colleagues' arguments here today are that because

23  TikTok is involved in publishing activity, Section 230

24  and the First Amendment should bar State's claims.

25  That is not enough.



 1              For Section 230, it must be publishing
 2    activity combined with liability based on third-party
 3    content.  For the First Amendment publishing activity
 4    is enough.  There must be an expressive TikTok message
 5    underlying that publication activity.
 6              With that, I will pass it along to my
 7    colleague Mr. O'Connor, unless the Court has questions
 8    on either Section 230 or the First Amendment.
 9              THE COURT:  Mr. O'Connor.
10              MR. O'CONNOR:  Thank you, Your Honor.  My
11    piece of this should be very brief.  I'm here to
12    handle the specific arguments that TikTok has raised
13    under the Consumer Protection Act.  And really the
14    only issue that opposing counsel has hit on is that
15    the State's claim for unfairness is just untethered to
16    anything, unmoored in such a novel claim.
17              The only point I want to hit on there, Your
18    Honor, is that this case in the State's unfairness
19    claim is about TikTok specifically targeting children
20    with coercive design tactics, specifically trying to
21    exploit psychological vulnerabilities in children.
22              So this case is about the protection of
23    children and the exploitation of children.  Your
24    Honor, there is precedent wherever the Court wants to
25    look regarding that it's within the public's interest

1   to protect children, to prevent companies from

2   exploiting children.

3           The Court can look to laws such as child

4   labor laws, prohibitions on children drinking alcohol,

5   smoking, gambling would be obviously related to the

6   current case before the Court.  There's a recognition

7   in the law, this is a clear, established, public

8   policy that young people, children, are not fully

9   developed and should be prohibited from certain

10  activities.

11          Also, Your Honor, just really quickly, you

12  can also find precedent in U.S. Supreme Court case

13  law.  I have a cite, 405 U.S. 233 which is FTC versus

14  Sperry and Hutchinson.  This is significant because

15  this case established the S&H factors, the very

16  factors in federal law that TikTok is trying to argue

17  that the Court should really bind itself to when it

18  analyzes unfairness.

19          And in Sperry and Hutchinson, it talks about

20  a prior Supreme Court case where there was the

21  exploitation of children by a vendor who was selling

22  candy, inferior quality candy to the kids at lower

23  quantities, but it had kind of a gambling element to

24  it.  The FTC moved and said this was non-fair

25  practice.  And the Supreme Court said, absolutely.

1  This deals with the protection of children, the

2  exploitation of children.  This is an unfair act.

3        Under federal law, and federal law is more

4  narrow in regards to unfairness than Washington State

5  law.  And with that, Your Honor, I will rest unless

6  the Court has any questions.

7        THE COURT:  One minute.

8        Mr. Kanada and Mr. O'Connor, your specific

9  response to defense counsel's reference to Grindr and

10  the specific versus the general promise to do

11  something, did you have a comment about that as it

12  relates to misrepresentation?

13        As I understood defense counsel's point in

14  Grindr, there was a general -- well, there's a

15  distinction between the general statement and then

16  something that's more specific in terms of promising

17  to take something down.  As I understood it, the

18  general promise or the general description of safety

19  and so forth doesn't expose the defendant to liability

20  under 230.  Could either of you speak to that?

21        MR. KANADA:  I'm happy to, Your Honor.  I

22  think one important factor to keep in mind here is

23  that in Washington, the standard is deceptive net

24  impression.  So you need to look at the totality of

25  the many statements the State points to in its



 1  complaint as being misleading and look at the overall

 2  impression.  We provided numerous, numerous

 3  statements, all going to product safety.  So it wasn't

 4  a single isolated statement, but multiple statements

 5  over time by executives as part of a long campaign to

 6  convince the public that its products were safe.

 7       So we think it's distinguishable by one way

 8  because, one, multiple statements from multiple people

 9  over time, as well as the --

10       THE COURT:  What were some of those?  Kind

11  of.  Remind the Court what were some of those multiple

12  statements.

13       MR. KANADA:  I'm going to phone a friend

14  here.  Will, do you happen to have those in front of

15  you?

16       MR. O'CONNOR:  So throughout the years, Your

17  Honor, TikTok made various statements trying to

18  convince the public that its platform was safe for

19  teenagers.  And those ranged from general statements

20  of the safety, general statements of kind of our

21  platform is appropriate for teenagers to use, but also

22  to very specific.

23       Because context is important here.  Your

24  Honor, at a certain point, the public started to get

25  very concerned about addictive and compulsive use of



1 | the TikTok platform by teens.  And to combat that,

2 | TikTok put out several advertising campaigns,

3 | testified in front of Congress, put public statements

4 | on its website basically saying that TikTok was safe

5 | for teens and that it was rolling out certain safety

6 | features in order to combat addictive and compulsive

7 | use.

8 | Some specific examples that are highlighted

9 | in the complaint are TikTok in 2023 implemented what

10 | it said was a 60-minute time limit for all teen

11 | accounts.  Your Honor, the State alleges, and again,

12 | you know, we are at the pleading stage of 12(b)(6).

13 | The State alleges in the complaint that this purported

14 | time limit was not a time limit at all because

15 | teenagers could easily move around it.  All they had

16 | to do was put a pin to avoid it and to continue to

17 | watch videos.  They could disable the app.

18 | Your Honor, the State also alleges that

19 | TikTok had internal data that suggested that it knew

20 | that this type of -- what it purported as a safety

21 | feature was largely ineffective.  And so that's just

22 | one specific example of the type of deceptive

23 | statements.

24 | But overall, looking at the overall net

25 | impression, TikTok for years was very much trying to



MOTION HEARING                                    March 28, 2025
STATE OF WASHINGTON V. TIKTOK                              45

1   convey to the public amidst growing public concern

2   that TikTok was safe for young users.

3           THE COURT:  Is that same analysis applicable

4   to this -- I read something in the State's brief about

5   protecting 13-year-olds and 13 and under versus 13 to

6   17, what you would claim, maybe what you would coin or

7   use the term for as an illusory protection.  Is it the

8   same analysis?

9           MR. O'CONNOR:  Well, if I'm not

10  understanding.  So I believe that the statement that

11  the -- there are a lot of different claims of

12  deception, and there have been a lot of different

13  statements about different and distinct products and

14  tools that TikTok has rolled out.  I believe what the

15  Court was referring to was kind of the 13 and under

16  actual kind of platform that TikTok --

17          THE COURT:  Right.

18          MR. O'CONNOR:  The point of the Court that

19  these promises, these ad campaigns to the public that

20  TikTok was safe, that it was taking all these steps to

21  make sure that the platform was safe for young

22  children were absolutely illusory.  Yes, I would agree

23  with that statement, Your Honor.

24          THE COURT:  All right.  And Mr. Kanada,

25  anything else before I go back to defense?



MOTION HEARING                                          March 28, 2025
STATE OF WASHINGTON V. TIKTOK                                      46

 1          MR. KANADA:  I did have one small point to
 2   make.  You asked TikTok's counsel if there was any
 3   allegations of the complaint involving external
 4   information, information from -- not from the platform
 5   that would have given them knowledge of the harms.
 6   And we do have some allegations.  I point the Court to
 7   paragraphs 141, 151, 154, and 190.
 8          These paragraphs talk about research, about
 9   harmful aspects of some of the features, talks about
10   addiction, the impact on sleep, both internal and
11   external research on these issues that is not based on
12   moderating or monitoring the platform.
13          THE COURT:  So are you suggesting that this
14   is information that was known to TikTok?
15          MR. KANADA:  Correct.  Some of it is
16   TikTok's own research.
17          THE COURT:  Okay, so harmful effects known
18   by TikTok based on their own research is the
19   allegation?
20          MR. KANADA:  Yes, Your Honor.
21          THE COURT:  All right, thank you.
22          Rebuttal, Mr. Zarrow?
23          MR. ZARROW:  Your Honor, I want to make
24   three points, and I'm going to focus them on Section
25   230.  And of course, I'm happy to answer any questions



 1  the Court has.

 2         The first is, as I understand the State's

 3  principal argument, it's that we're at the dismissal

 4  stage, so the Court shouldn't resolve this case on 230

 5  grounds.  That's exactly contrary to the point of

 6  Section 230, which is an immunity from suit.

 7         All of the major 230 cases, like Grindr, the

 8  recent MP case, are dismissal cases.  And that's

 9  actually built into the statute.  The statute says,

10  and this is subsection (e)(3), no cause of action may

11  be brought that is contrary to Section 230's

12  prohibition on treating a platform as a publisher or

13  speaker.  So it is absolutely imperative to resolve

14  the 230 issue at the pleading stage.

15         Second point is about the unfairness claim.

16  State's argument today was actually a little bit

17  different than the argument in the brief.  The brief's

18  argument was all about TikTok's own acts.  And the

19  argument today was that the harm needs to flow from

20  "specific content posted on TikTok".  And as I

21  understood the State's argument, it was saying, you

22  need to ask whether the harm is coming from the

23  underlying substance of third-party videos or

24  something like that.

25         That is just incorrect.  That is not what



1   the case law says.  I would direct the Court to Force

2   (phonetic).  That's a Second Circuit case.  And the

3   Grindr case.  In Grindr, the alleged harm was matching

4   between adults and minors, no specific underlying

5   content.

6          And you know, even better than the cases, is

7   the statute itself that -- sort of important to go

8   back to the text of the statute, no provider or user

9   of an interactive computer service shall be treated as

10  the publisher or speaker of any information provided

11  by another information content provider.  There is

12  nothing in there about specific information provided

13  by another information content provider.

14         The State would have the Court read words

15  into the statute.  What the statute says and what it

16  means is that the Court essentially needs to ask two

17  questions.  What is the activity being challenged?  Is

18  it publishing or is it not publishing?  In this case,

19  it's publishing.

20         Second question.  If it's publishing, what

21  is being published, is it third-party content, or is

22  it the defendants' own content?  In this case, it is

23  third-party content.  That's how all of the leading

24  cases analyze this.  And that's precisely why you

25  should resolve the unfairness claim at the dismissal



 1  stage.

 2          This analysis into harm flowing from

 3  underlying specific content is completely unmoored

 4  from the statute.

 5          And the third point is on the deception

 6  claim.  And in my view, opposing counsel made my

 7  argument for me in two ways.  The first is, counsel

 8  said that the deception claim is based on "a

 9  description of content moderation policies".  That's

10  the theory of the deception claim.

11          But Grindr actually uses that exact same

12  language and says that Section 230 bars a deception

13  claim that is based on the defendants' description of

14  its content moderation policies.  The State's counsel

15  today used the exact same language that Grindr says

16  cannot form the basis of a 230 claim.

17          The other argument that counsel made is that

18  the net impression of everything TikTok said take

19  somehow takes this case outside Section 230.  That is

20  not correct.  If the net impression is general, right,

21  it's a general statement, it is still protected by

22  Section 230.  And counsel for the State said today

23  that the net impression of all of defendants'

24  statements is that TikTok is safe for young users.

25  And that is exactly the type of general statement that

 1  Grindr said is protected by Section 230.

 2        So the arguments that counsel made today to

 3  the Court prove, under just a straightforward

 4  application of Grindr, that the deception claim is

 5  barred.

 6        And then I'll conclude with one thought.  We

 7  are not arguing that defendants are immune from

 8  everything -- from any type of claim simply because we

 9  are an internet platform.  That is not correct.  That

10  is not the argument we're presenting to you.

11        The argument we are presenting to you is

12  that we are being -- is that we are immune from being

13  held liable for publishing third-party content.  And

14  the State's entire claim here is that TikTok --

15  defendants violated Washington law because of the way

16  in which it published third-party content.  A

17  straightforward application of the statute's plain

18  text or the leading appellate cases resolves this case

19  in our favor.

20        THE COURT:  What about this notion that the

21  deception claim has to do only with the safety?  Are

22  there other, Mr. Zarrow, deception claims that you

23  think also should be barred by operation of Section

24  230?

25        MR. ZARROW:  Well, Your Honor, I think the



1  State's position on its own claim is that when you add

2  a bunch of these general statements together, they

3  convey the net impression that the platform is safe.

4  And that's exactly what -- that's the State's

5  description today of its claim.  And that's what

6  Grindr says is barred by Section 230.

7            So I'm just -- I'm taking as a given what

8  the State says.  The State's saying our claim is that

9  the platform overall misrepresented that it's safe,

10  and Grindr says that kind of claim is barred.

11            THE COURT:  Anything else from the State on

12  that particular issue?

13            MR. O'CONNOR:  Yes, Your Honor.  I would say

14  that's a misrepresentation and mischaracterization of

15  the State's complaint.  Just very briefly, Your Honor,

16  we do take a position that these repeated, you know,

17  claims that TikTok was safe are actionable given the

18  overall deceptive net impression.

19            But also, you can look throughout the

20  complaint, there are very concrete statements that we

21  are saying are deceptive.  I spoke to one of them.

22  The 60-minute time limit.  We copied and pasted the

23  advertiser that TikTok rolled out in our complaint.

24  The refresh feature, we copied and pasted in the

25  complaint the exact way that TikTok was claiming that



MOTION HEARING                                                    March 28, 2025
STATE OF WASHINGTON V. TIKTOK                                                  52

```
 1   this feature functioned.  And it absolutely has the
 2   capacity to deceive under the Consumer Protection Act.
 3   These were not general, vague, inactionable
 4   statements.  And so with that, Your Honor --
 5            THE COURT:  So are you telling me that
 6   safety can be teased out from the 60-minute and the
 7   refresh or not?
 8            MR. O'CONNOR:  Yes.  So I think, first of
 9   all, Your Honor, I think that it is relevant to, you
10   know, the deception of these more specific claims.
11   But the State also takes the position that repeated --
12   I think safety isn't -- when a company states our
13   product is safe for young users, I disagree with the
14   statement that that is an inactionable, you know,
15   statement under the CPA.
16            But, Your Honor, we have other, very
17   concrete, specific deception claims in our complaint
18   as well.
19            THE COURT:  Thank you.  The person bringing
20   the motion would have the last 30 seconds.
21            MR. ZARROW:  Your Honor, making a statement
22   that is general a lot of times does not save that
23   statement from the rule in Grindr.  Neither does the
24   net impression rule.  If the net impression is just a
25   general description of a platform's content moderation
```



MOTION HEARING                                    March 28, 2025
STATE OF WASHINGTON V. TIKTOK                              53

1  policy also barred by 230.

2          But I want to conclude, I guess where I

3  began, which is if you look at the appellate case law,

4  Grindr and P (phonetic) are the most recent examples,

5  you will see an analysis that is incompatible, just a

6  mode of analysis that is incompatible with what the

7  State is asking the Court to do.

8          The State is asking to focus on things that

9  are not present in the statute and are not present in

10  the case law when applying Section 230.  So we just

11  encourage the Court to apply the statute as it's

12  written and as it's been construed and to apply it at

13  the dismissal stage, where the immunity is most

14  important.

15          THE COURT:  Thank you very much.  We're just

16  going to go off the record for about five minutes, and

17  I'll be right with you.

18          (Off the record at 11:42 a.m.)

19          (On the record at 11:52 a.m.)

20          THE COURT:  Okay, I think everyone's back.

21  Thank you very much.  I needed to go back and review

22  some of my notes taken this morning compared to some

23  notes that were taken in preparation for the session

24  today.  So again, let me thank all of the

25  participants.



MOTION HEARING                                      March 28, 2025
STATE OF WASHINGTON V. TIKTOK                                    54

1          MR. O'CONNOR:  Your Honor, I can't hear you.
2    I don't know if anyone else has that issue, but I just
3    wanted to flag that.
4          THE COURT:  All right.
5          MR. O'CONNOR:  Can everyone else hear it?
6          MR. ZARROW:  I think it's on mute.  I see
7    the little red microphone with the slash through it.
8          MR. O'CONNOR:  Oh, yeah, you're on mute,
9    Your Honor.
10         THE COURT:  All right.  Somebody else is
11   operating my equipment, so hold on.  Testing one.  All
12   right, thank you very much.
13         What I was saying when I didn't realize I
14   was on mute was thank you again for the presentations.
15   I needed the time to review my notes from the session
16   this morning as well as the notes that were taken in
17   preparation for the morning.
18         I appreciate, again, the research, the
19   arguments, all of the publications, and your time this
20   morning.
21         So I'm going to start with the fact that
22   this is a Civil Rule 12(b)(6) motion.  All of the
23   parties are aware and very familiar with it.  There's
24   a federal statute or rule that's close to it.  So
25   whether you're from Washington State or not, the



1   general premise is the same.

2              This allows for a dismissal where there is a

3   failure to state a claim upon which relief can be

4   granted.  This is, in some ways, similar to a summary

5   judgment motion in the sense that there is a burden

6   that the moving party has to meet in order to close

7   the courthouse door to a particular claim.

8              And in this 12(b)(6), the standard that

9   needs to be met includes a couple of things we have to

10  look at.  Is it possible that facts could be

11  established to support the allegations?  Parties have

12  indicated that that's the State standard, as opposed

13  to the federal standard, which is higher, which

14  requires some plausibility as opposed to possibility.

15             Under the 12(b)(6) analysis, the facts are

16  to be read in the light most favorable to the

17  plaintiffs.  And that particular statement is

18  reiterated in Lemmon vs Snap Inc.  That case that

19  we've talked about.  995 Federal 3rd 1085, factual

20  allegations, presumed true, and reasonable inferences

21  are in the plaintiff's favor.

22             So there is an uphill battle for the person

23  who is asking the Court to remove the complaints or to

24  dismiss the complaint.

25             We then move to the question of what was the



MOTION HEARING                                              March 28, 2025
STATE OF WASHINGTON V. TIKTOK                                          56

1  complaint?  There are a couple of elements here.  One

2  was that there was deception.  The other, we're

3  talking about unfairness, according to the complaint.

4          Very quickly, the deception, according to

5  the State of Washington plaintiff, would include such

6  things as fake time management, illusory protective

7  tools, whether or not you can easily bypass certain

8  things, whether or not when you turn the phone, when

9  you're not looking at the phone, whether or not,

10  basically, you're not going to be engaged with the

11  phone.

12          And the allegation, which must be taken as

13  true at this point or should be given some weight at

14  this point, is that the children can be kept awake

15  because there's this notion that the young people

16  whose brains are underdeveloped are waiting for

17  affirmation from the others who might be engaged with

18  TikTok.

19          There's targeting that's supposed to go on,

20  according to the plaintiff.  And again, taking

21  advantage of the immature brain.  One of the cases

22  that was given to the Court by the plaintiff was out

23  of Washington, D.C., and this was in the Superior

24  Court of the District of Columbia.

25          I only use this not for precedent, but



MOTION HEARING                                          March 28, 2025
STATE OF WASHINGTON V. TIKTOK                                        57

1   because it was a very interesting way that the

2   dopamine hit was described on page 65 of that

3   particular decision is stated this way.  These

4   dopamine hits, again, akin to the slot machine that

5   the Court mentioned during our earlier colloquy, this

6   anticipation of dopamine, which the algorithm is

7   designed to provide as a reward, is the issue.

8          And so the addiction is not to the content,

9   but to this expectation and anticipation which is

10  specifically engineered by the algorithm as an

11  ultimate goal of the engine.

12         And it goes on to say at page 66, and the

13  ultimate goal is in disrupting what has been termed

14  this habit loop, this cue, routine, and reward, the

15  loop that causes disruption and harm, and so the

16  engine, according to the District, is designed to give

17  young users immediate gratification and boost rewards,

18  encouraging this excessive routine use of the app.

19         So at this stage, it is not clear to me that

20  the content is the subject of the complaint.  At this

21  point, the complaint addresses what I will term as the

22  architecture or the pattern or the scheme which is

23  designed to keep the children involved and to use the

24  term from the District Court of D.C. to keep the

25  dopamine running and to keep them engaged.



1        So it is not a matter of content, so the

2   First Amendment is not implicated.  This is not a

3   matter of moderating TikTok's content.  So the 230

4   protection does not really apply here.

5        I will say again that under 47 USC Section

6   230, the activity of the defendant in this case would

7   be protected only -- and then the three steps that the

8   two sides have mentioned, if the defendant is a

9   provider and that the defendant seeks -- that the

10  plaintiff seeks to treat the defendant as a publisher

11  of third-party information.

12       This is not third-party information that's

13  before the Court.  This is a pattern.  Again, this is

14  a scheme that's being alleged.  And so it's premature,

15  in my opinion, to dismiss the case and that dismissal

16  would be denied.

17       The Court would note also that some of the

18  likes that the young people would be exposed to that

19  keeps the phone buzzing and so forth, that can't be

20  necessarily contributed or attributed to the

21  defendant.  But to the degree that that is third-party

22  content, I find that that would be secondary to the

23  main issue.

24       As it pertains to the First Amendment,

25  historically, we are talking about messaging, we're



1   talking about the exchange of ideas, we're talking

2   about whether or not something is happening to impede

3   the exchange of ideas in the marketplace and so forth.

4   And that is not what we have here.

5            As was argued, fraudulent or deceptive

6   speech is not protected.  And that is what we are

7   looking at.

8            We talked about Moody.  From my perspective,

9   the main thing, the main -- the gist of Moody versus

10  NetChoice, again, was whether or not Texas and Florida

11  tried to moderate content.  I don't see that in this

12  case at this stage.

13           And even if we did use the First Amendment

14  analysis, it certainly survives the intermediate

15  scrutiny because there is an important governmental

16  interest relative to protecting children.  And this

17  scheme that the State has doesn't go farther than it

18  needs to in order to attain that objective.

19           The final point I would make is that the

20  promise of safety, as the Defense has indicated, is

21  one that I think has to fall under the analysis of

22  230.  The indication from TikTok that the program is

23  safe is a general statement.  It's not one that's

24  specific, no specific promise.

25           And so it's very different than some of the



1  other ones that we've had.  So that particular one can

2  be teased out and should be teased out.  The promise

3  that it's safe in and of itself would be protected by

4  230.  But the other elements of the promise of

5  safety -- let me strike that.

6           The issue as to whether or not the TikTok

7  was safe is a general statement and in and of itself

8  would not be appropriate under Section 230.  But

9  combined with the other issues that the State has

10  mentioned, it would be -- it could be considered, but

11  it cannot be a standalone issue.

12           I've looked at the other issues in terms of

13  Civil Rule 9(b) and all of the other things, and I

14  think based on what I have read, what I have heard,

15  and what the burden of proof is in this case that

16  the -- except as I have mentioned the motion to

17  dismiss under Civil Rule 12(b)(6) is denied.

18           I have an order that was submitted by the

19  State, and I can just sign that, indicating that the

20  parties were present, and I'll make whatever

21  adjustments I have to relative to that one point.

22           Is there anything else for the moving party

23  at this point?

24           MR. ZARROW:  No Your Honor.

25           THE COURT:  From this -- from the defense at



1   this point -- the defense of the motion.  Anything

2   else from the State?

3           MR. KANADA:  No, Your Honor, thank you.

4           THE COURT:  All right.  Thank you.  That

5   concludes this matter.

6           MR. ZARROW:  Thank you Your Honor.

7           MR. KANADA:  Thank you, Your Honor.

8           MR. O'CONNOR:  Thank you.

9           (End of Audio Recording)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1               CERTIFICATE OF TRANSCRIPTIONIST

2

3          I WENDY K. SAWYER, hereby certify that I was

4    authorized to and did transcribe the provided

5    recording and that the foregoing transcript is a true

6    transcript of said electronic recording to the best of

7    my ability.

8          I FURTHER CERTIFY that I am not a relative,

9    employee, attorney, or counsel of any of the parties,

10   nor am I a relative or employee of any of the parties'

11   attorneys or counsel connected with the action, nor am

12   I financially interested in the action.

13

14          DATED this 2nd day of April, 2025.

15

16

17   _____

18   WENDY K. SAWYER, CDLT

19

20

21

22

23

24

25



# EXHIBIT 19

## IN THE CIRCUIT COURT OF THE STATE OF OREGON

## FOR MULTNOMAH COUNTY

STATE OF OREGON, ex rel. ELLEN F.
ROSENBLUM, Attorney General for the
State of Oregon,

        Plaintiff,

v.

TIKTOK INC., a California corporation;
TIKTOK U.S. DATA SECURITY INC., a
Delaware corporation; TIKTOK LLC, a
Delaware limited liability company; and
BYTEDANCE INC., a Delaware
corporation,

        Defendants.

No. 24CV-48473

**OPINION and ORDER on
DEFENDANTS TIKTOK INC.,
TIKTOK U.S. DATA SECURITY INC.,
TIKTOK LLC, and BYTEDANCE
INC.'S MOTION TO DISMISS**

## INTRODUCTION

The State of Oregon brings this action under the Oregon Unlawful Trade Practices Act

against Defendants TikTok Inc., TikTok U.S. Data Security Inc., TikTok LLC, and

ByteDance Inc. (collectively, "TikTok"). TikTok moves to dismiss the complaint for lack of

personal jurisdiction, because the alleged misconduct constitutes expressive activity protected

under federal law and the First Amendment, and for failure to state a claim under the Oregon

Unlawful Trade Practices Act.

///

## ORDER

For the reasons discussed herein, Defendants' Motion to Dismiss is DENIED in part, and GRANTED in part.

Defendants' Motion to Dismiss for lack of personal jurisdiction is DENIED. The Attorney General has established minimum contacts with the forum that are adequately "related to" each claim to support this court's exercise of personal jurisdiction over TikTok.

Section 230 of the Communications and Decency Act (§ 230) bars the entirety of the Attorney General's first claim because it targets acts of publication that have been immunized from liability by an act of Congress. Regarding the Attorney General's second claim, § 230 bars any misrepresentation claim based upon TikTok's purported failure to properly moderate content, make false claims regarding platform safety, or fail to adhere to its "community guidelines." However, where the complaint alleges misrepresentations about safety products or features, those claims may proceed. Regarding the Attorney General's third claim, § 230 bars any omission allegations concerning purported failures to disclose harmful information about children's use of the product, generalized dangers to children from using the product, or its compliance with its internal community guidelines. However, § 230 does not bar the Attorney General from reasserting claims that TikTok failed to disclose information about the effectiveness of safety tools it publicly promoted.

The First Amendment also bars the entirety of the Attorney General's first claim because it seeks to impose liability on the platform's publishing and editing functions, which are protected as expressive conduct. However, the First Amendment does not bar the Attorney General's second claim given that Oregon courts have already concluded that the Oregon Unlawful Trade Practices Act (UTPA) prohibition on misrepresentations in consumer

products is consistent with the First Amendment. The court also holds that the First Amendment bars liability for TikTok's general failure to affirmatively disclose purported dangers or defects. Yet, insofar as the Attorney General is alleging misrepresentation by omission regarding specific safety features, those allegations survive First Amendment scrutiny.

Finally, the court concludes that the Attorney General has sufficiently pleaded facially valid UTPA claims.

## FACTS[1]

The Attorney General's allegations against TikTok broadly fall into three categories: unconscionable conduct, misrepresentations, and omissions. The misrepresentations and omissions primarily relate to the platform's effect on children, and whether TikTok took sufficient steps to address those harms.

Regarding unconscionable conduct, the Attorney General alleges TikTok's platform uses various practices to form addictive habits in young users. Some of those practices include a content recommendation system and an "infinite scroll" function intended to give users a continuous flow of content based on their prior interactions. Compl. ¶¶ 63, 64, 71. This endless feed immerses users, making it harder for them to manage their time on the app. *Id.* ¶ 72. The platform also utilizes intermittent variable rewards ("IVRs") — "likes," "follows," and "comments" (*Id.* ¶¶ 54, 55); "stories"—videos only available for 24 hours; "LIVE"—live

---

[1] The court's recitation of facts is taken from the complaint (Compl.), Defendants' Motion to Dismiss (Defendants' Motion), Attorney General's Response to Defendants' Motion to Dismiss (Attorney General's Response), and Defendants' Reply Brief in Support of Motion to Dismiss (Defendants' Reply). Of course, where contested between the parties, only facts in the complaint are assumed true, and the Attorney General is entitled to the benefit of all inferences that can reasonably be drawn from those facts. The court does not adopt any facts articulated in this opinion as true for any other purpose.

streams only available while happening; and "push notifications"—messages sent to users outside the app to prompt engagement. *Id.* ¶¶ 72-79.

The Attorney General couples these allegations with claims that TikTok is aware of the damage caused to young people by excessive social media usage, including interference with productivity, loss of analytical ability, and increased anxiety. Despite this knowledge, TikTok repeatedly rejected internal safety recommendations. *Id.* ¶¶ 115, 119. For instance, in 2022, TikTok employees designed a "non-personalized feed" to address user safety and compulsive usage. The feature was ultimately abandoned due to its potential negative business impacts. *Id.* ¶ 120. According to the Attorney General, even when TikTok did take steps to increase user safety, those steps were consistently balanced against the company's usage metrics. For example, a September 2021 document limited the impact of any safety features to a "maximum 5% drop-in stay time." *Id.* ¶ 161.

Regarding the misrepresentation allegations, the Attorney General contends TikTok misrepresents both the platform's risks to young users and its efforts to mitigate them. For example, CEO Shou Chew testified before Congress in 2023 that "Safety and wellness-in particular for teens-is a core priority for TikTok." *Id.* ¶ 139. Discussing content moderation, CEO Chew testified that "anything that is violative and harmful we remove." Consistent with those assurances, TikTok has repeatedly professed that its "community guidelines" are utilized to ensure that content containing seductive performances by minors, drugs, gore, and physically dangerous behavior is removed or not allowed. *Id.* ¶ 139. However, despite these assurances, such content is frequently marked "not recommended" rather than removed and remains on the platform. *Id.* ¶ 213.

The Attorney General has also taken issue with TikTok's platform description on Apple's App Store and Google Play. TikTok represented itself as having "Infrequent/Mild" instances of sexual content and nudity, alcohol, tobacco, or drug use/references. *Id.* ¶ 241. These representations earned the platform a "12+" age rating on the App Store and a "Teen" rating on Google Play. The Attorney General alleges that these representations are inconsistent with the findings of a study by *The Wall Street Journal,* where nearly three dozen automated accounts registered to user aged 13 to 15 were shown pornography, sex shop ads, and videos regarding drug and alcohol use. *Id.* ¶¶ 240-251.

Regarding the omission allegations, the Attorney General claims TikTok withholds information from users and parents by omitting key details about the efficacy of its safety tools. As one such example, CEO Chew spoke in April 2023 at a TED Talk about how users on the platform for too long are sent videos encouraging them to log off. While holding out these safeguards in public, leadership behind the scenes viewed the function as merely a "good talking point" and "not altogether effective." *Id.* ¶¶ 145, 146. The Attorney General also alleges TikTok omits important information regarding its content moderation. For example, TikTok does not disclose to users that its content moderation policies are generally only applied to videos and that moderators only review 0.25% of user comments. *Id.* ¶ 227. Also, to promote the adequacy of its moderation, TikTok publishes its "proactive removal" rate, which measures the rate at which content is removed once identified, but not how much harmful content is detected overall. Internally, these metrics are considered "largely misleading" as they do not account for missed content. *Id.* ¶ 228. Similarly, TikTok advertises a 60-minute daily screen limit on teen accounts. However, TikTok fails to mention that this limit does not function as a hard cap, but rather as a

stop sign, with teens able to resume using the app after entering a passcode. The limit can also be disabled entirely. *Id.* ¶¶ 150-153.

Finally, the Attorney General focuses upon TikTok's various editing features, arguing that programs such as "Retouch" pose various dangers for which the company fails to provide adequate warnings to users or their parents. *Id.* ¶ 172. Employees have suggested implementing various safeguards, including banners signifying modified videos or providing educational information about image disorders, but these suggestions have not been implemented. *Id.* ¶ 171.

## OPINION

TikTok urges this court to dismiss the complaint on four grounds. First, TikTok argues this court lacks personal jurisdiction over TikTok. Second, TikTok argues § 230 immunizes online platforms, including itself, from liability for the publication of third-party content. Third, TikTok argues its publication activities are entitled to First Amendment protection. Fourth, TikTok argues the Attorney General has failed to state valid claims under the UTPA.

## I.    Personal Jurisdiction

When a defendant moves to dismiss for lack of personal jurisdiction, a plaintiff bears the burden to allege and prove facts sufficient to establish jurisdiction over a particular defendant. *Cox v. HP*, 368 Or. 477, 501 (2021) (*Cox I*). When evaluating personal jurisdiction, a court must "assume the truth of all well-pleaded allegations in the record" and "construe[s] pleadings and affidavits liberally to support jurisdiction." *Munson v. Valley Energy Inv. Fund, U.S., LP*, 264 Or. App. 679, 700 (2014) (quotations omitted). Circumstantial evidence and reasonable inferences must be construed in plaintiffs' favor. *State v. Fancher*, 27 Or. App. 91 (1976). Plaintiffs, however, cannot rest on conclusory allegations. *Sutherland v. Brennan*, 131 Or. App. 25, 30 (1994). The test is not mechanical but instead calls for a "highly realistic"

approach that recognizes that specific jurisdiction "can be established in a wide variety of circumstances." *M.C. v. Quest Glob., Inc.,* 328 Or. App. 378, 83 (2023). If the motion is based upon matters outside the pleadings, "all parties will be given a reasonable opportunity to present affidavits, declarations, and other evidence, and the court may determine the existence or nonexistence of the facts supporting the asserted defenses or may defer any determination until further discovery or until trial on the merits." ORCP 21A(2)(b). Importantly, personal jurisdiction is claim-specific, meaning the Attorney General must establish each claim independently.[2]

In Oregon, personal jurisdiction over nonresidents is governed by ORCP 4. ORCP 4D confers personal jurisdiction when an in-state injury arises from an out-of-state act or omission. ORCP 4L, known as the catch-all provision, covers any circumstances not specified in the specific provisions of ORCP 4B through K and for which it is permissible to exercise jurisdiction over a nonresident. "Oregon courts may only extend personal jurisdiction to the extent it is compatible with the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *Cox I,* 368 Or. at 480–81. Because Oregon's long-arm statute "confers jurisdiction to the extent permitted by due process," the analyses under the long-arm statute and federal Due Process Clause "collapse into one." *Id.*

The United States Supreme Court has articulated two independent tests for personal jurisdiction that satisfy due process: (1) the "traditional test," also known as the "minimum

---

[2] While the Ninth Circuit has yet to answer whether personal jurisdiction is claim-specific, a review of relevant authorities instructs that it is. For example, in *Evergreen Int'l Airlines, Inc. v. Anchorage Advisors, LLC,* 2012 U.S. Dist. LEXIS 118737, *26 (2012), the Honorable Paul Papak found that it was based on his evaluation of sister circuits. In *Fiore v. Walden,* 688 F.3d 558, 593 (9th Cir. 2012), Judge Ikuta, writing for the dissent, noted that "[w]e analyze personal jurisdiction on a claim-by-claim basis." Consequently, this court will undertake an independent evaluation of each of the Attorney General's three claims for personal jurisdiction.

contacts" or "purposeful availment test," *see Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474

(1985), and (2) the "effects test," *see Calder v. Jones,* 465 U.S. 783 (1984).[3] Under the

traditional test, a plaintiff must show that the defendant has "minimum contacts" with the forum

such that it "purposefully avail[ed] itself of the privilege of conducting activities within the

forum" and "invoke[ed] the benefits and protections of [the forum's] laws." *Toys "R" Us, Inc. v.*

*Step Two, S.A.,* 318 F.3d 446, 451 (3rd Cir. 2003). Second, a plaintiff's claims must "arise out of

or relate to" at least some of those contacts, evidencing "a strong relationship among the

defendant, the forum, and the litigation," *Hepp v. Facebook,* 14 F.4th 204, 208 (3d Cir. 2021).

Oregon courts have similarly articulated the test as: (1) a defendant has "minimum contacts"

with Oregon; (2) the litigation "arises out of or relates to" the minimum contacts; and (3) the

exercise of jurisdiction comports with "fair play and substantial justice."[4] *M. C.,* 328 Or. App. at

382-83.

To establish "minimum contacts," an Oregon plaintiff must establish: (1) "the defendant

must have purposefully directed its activities at this state," and (2) "the litigation must arise out

of or relate to at least one of those activities." *Robinson v. Harley Davidson Motor Co.,*

---

[3] To establish personal jurisdiction under the *Calder* "effects" test, the Attorney General would have to allege and establish that TikTok's tortious conduct was "focused" on Oregon. *Keeton v.*
*Hustler Mag., Inc.,* 465 U.S. 770, 780 (1984). Unlike the traditional test, the *Calder* "effects" test requires a plaintiff to plead facts establishing that: (1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum; and (3) the defendant expressly aimed his tortious conduct at the forum. *See Calder,* 465 U.S. at 788-89. While the *Calder* effects test and the purposeful availment tests are generally analytically distinct, the Ninth Circuit has occasionally blurred the line. *See Briskin v.*
*Shopify, Inc.,* 2025 U.S. App. LEXIS 9410, *22 (9th Cir. 2025) ("[O]ur cases do not impose a rigid dividing line between "purposeful direction and purposeful availment, and the first prong of the personal jurisdiction test 'may be satisfied by purposeful availment, by purposeful direction, or by some combination thereof.").

[4] Regarding the third prong, TikTok bears the burden to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *M. C.* 328 Or. App. at 385. The fair play and substantial justice inquiry is fact-specific and requires balancing several articulated factors. Neither of TikTok's pleadings sought to address this prong. The court holds that TikTok has failed to establish that exercising personal jurisdiction over it would not comport with fair play and substantial justice.

354 Or. 572, 594 (2013) (en banc), *abrogated on other grounds by Cox I*. Minimum contacts exist "when the defendant has purposefully availed itself of the privilege of conducting activities in Oregon or purposefully directed its activities at residents of Oregon." *M. C.,* 328 Or. App. at 383. The purpose of the "minimum contacts" requirement is to prevent "foreign defendants from being hailed into local courts because of 'random, fortuitous, or attenuated contacts' with the forum state or the 'unilateral activity' of a plaintiff." *Id.* In *State ex rel Michelin v. Wells,* 294 Or. 296, 302 (1982), the Oregon Supreme Court held that the term "minimum" means "at least one contact with the forum state which is substantively relevant to the cause of action."

Along with "minimum contacts," a plaintiff seeking to establish personal jurisdiction in Oregon must also show that the instant litigation is "related to" the minimum contacts. *See Robinson,* 354 Or. at 594. The "related to" requirement can be met in two ways: (1) if there is a "but-for" causal link between the defendant's actions and the plaintiff's claims, and litigation was "reasonabl[y] foreseeab[le]" under the circumstances, or (2) if there is a close enough "relationship among the defendant, the forum[], and the litigation," such as when a defendant "systematically served" a market. *Cox I,* 368 Or at 493 &" 503. For this prong, the Attorney General must establish that its allegations of "coercive design tactics" and misleading statements about consumer safety "relate to" the purported minimum contacts.

The Attorney General contends it has established personal jurisdiction for three independent reasons. *See* Compl. ¶¶ 10-11.3. First, the Attorney General contends that thousands of Oregonians use the platform "every hour of each and every day." Attorney General's Response at 24. Second, the Attorney General contends that thousands of user agreements between Oregon consumers and TikTok establish more than sufficient minimum contacts. Third, the Attorney General asserts that TikTok sells advertising specifically targeted at Oregonians and

numerous Oregon-based businesses. As discussed *supra*, for a finding of personal jurisdiction, these contacts must "relate to" the tortious conduct alleged in each count.

A. The Attorney General Has Alleged Conduct Establishing Personal Jurisdiction for the Unconscionability Claims (Count 1).

The Attorney General urges the court to find personal jurisdiction for its unconscionability claim based on TikTok's substantial advertising efforts within the state, coupled with the reality that thousands of Oregonians have entered into user agreements with TikTok, many of whom use the platform each day to produce and consume content. However, it is not enough that Oregonians use TikTok, even if some of that use is due to TikTok's extensive advertising efforts. Instead, the Attorney General must show that TikTok's contacts are "related to" its unconscionability claims. The "related to" requirement can be met in either of two ways: (1) there is a "but-for" causal link between TikTok's efforts to engage Oregon consumers and the Attorney General's unconscionability allegations, and this litigation was "reasonably foreseeable" as a consequence, or (2) TikTok's relationship with Oregon and Multnomah County is sufficiently extensive that this court can conclude that TikTok "systemically serves" the jurisdiction. *See Cox I*, 368 Or. at 493, 503.

Comparing this case to a multitude of similar lawsuits involving online companies, TikTok urges the court to reject the Attorney General's interpretation of *Cox I* because such a broad conception of personal jurisdiction within the context of a globally available online platform would destroy the very concept of personal jurisdiction. "The State does not allege that any of the design features that allegedly render the platform unconscionable were developed in Oregon or were used to single out Oregon residents in particular for special treatment." Defendants' Motion at 9. According to TikTok, a website operator cannot be said to have

"purposefully directed" conduct toward a forum state if it "simply wants as many responses as possible but is indifferent to the physical location of the responder." Defendants' Motion at 10 (citing *XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 847 (10th Cir. 2020)). If "accessibility" of a website "alone" were enough to establish jurisdiction, then "jurisdiction would have no limit." *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 320 (5th Cir. 2021) (Holding that forum residents "clicking ads and buying things" on website insufficient to establish jurisdiction.).

TikTok urges the court to look to *XMission, L.C.*, a case involving a digital marketing company sued by an internet service provider because the marketing company was sending thousands of spamish emails through the internet service provider's servers. Seeking dismissal, the *XMission, L.C.* defendants argued Utah lacked personal jurisdiction given that the emails were sent nationwide. The *XMission, L.C.* court agreed: "Purposeful direction may. . . be established . . . when an out-of-state defendant's intentional conduct targets and has substantial harmful effects in the forum state." *XMission, L.C.*, 955 F.3d at 845 (citations omitted). According to *XMission, L.C*, for personal jurisdiction, an internet provider must have deliberately directed its conduct at an audience in the forum state or intended to harm residents of the forum state.

Similarly, in *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 320 (5th Cir. 2021), a Texas resident sued the Huffington Post for calling him a white nationalist and Holocaust denier. Dismissing the case for lack of personal jurisdiction, the Fifth Circuit first focused on whether the website was "interactive"—that is, whether the site interacted with its visitors, sending and receiving information from them. Finding that the Huffington Post was, the *Johnson* court next evaluated whether the forum state was "the focal point both of the [alleged libel] and the harm suffered." *Johnson,* 21 F.4th at 318. "HuffPost is interactive, but its story about

Johnson has no ties to Texas. The story does not mention Texas. It recounts a meeting that took place outside Texas, and it used no Texan sources. Accordingly, we lack jurisdiction over HuffPost with respect to Johnson's libel claim." *Id.* at 319.

Despite neither being strictly on point nor binding precedent, the challenge facing the Attorney General is amply demonstrated in *Johnson* and *XMission, L.C.* Even if TikTok undertook extensive targeted advertising efforts in the state, and those efforts resulted in more users being exposed to the platform and its allegedly coercive design features, is that sufficient for personal jurisdiction if the platform features themselves were not *focused exclusively on* Oregonians? The court understands *Cox* does not require such an explicitly direct link. "As *Ford Motor Co.* makes clear, due process will not '*always* require proof of causation—i.e. proof that the plaintiff's claim came about because of the defendant's in-state conduct.' There will be at least some cases in which the 'relationship among the defendants, and the litigation' is 'close enough to support specific jurisdiction' in the absence of a but-for causal link.'" *Cox I,* 368 Or. at 494 (citations omitted). Suggesting that trial courts should focus equally on foreseeability and but-for causation, *Cox I* emphasized that "[t]he animating principle behind the relatedness requirement is the notion of a tacit quid pro quo that makes litigation in the forum reasonably foreseeable." *Id.* (citing *Robinson*, 354 Or. at 594).

In *Briskin v. Shopify*, 135 F.4th 739 (2025), the Ninth Circuit, *en banc*, recently reinforced this court's conclusion that *Cox I* does not require the allegedly coercive design features to have been exclusively focused on Oregonians. Focusing on the *Calder* effects test, the *Briskin* court rejected many of the same arguments TikTok is making here. *Briskin* involved a class action brought by a California man alleging that the online retailer Shopify had implanted browser cookies that tracked his physical location, collected his shopping habits, and created a

consumer profile that Shopify then sold. Shopify argued the suit lacked personal jurisdiction

because the allegedly tortious conduct was encoded into its products, accessed by every internet

user that utilized its services, and no conduct was directed at California consumers. Much like

TikTok, Shopify argued that any harm incurred by plaintiffs was mere happenstance arising from

the California consumers' choice to do business with a merchant that contracted with Shopify.

The *Briskin* court not only rejected the argument, it overruled any precedent that could be

construed as supporting it:

> We now take this opportunity to overrule [any] cases that require some sort of differential
> treatment of the forum state for a finding of "express aiming" of the defendant's allegedly
> tortious conduct. Such a requirement runs contrary to longstanding Supreme Court
> authority. Moreover, requiring differential targeting would have the perverse effect of
> allowing a corporation to direct its activities toward all 50 states yet to escape specific
> personal jurisdiction in each of those states for claims arising from or relating to their
> relevant contacts in the forum state that injure that state's residents. We, therefore, hold
> that an interactive platform "expressly aims" its wrongful conduct toward a forum state
> when its contacts are its "own choice and not random, isolated, or fortuitous," even if that
> platform cultivates a "nationwide audience[] for commercial gain."

*Id.* at *40-41.

Turning from causation to foreseeability—the second evaluation required under *Cox I*—

this court notes TikTok's pleadings mostly disregard the company's sustained, extensive

advertising and outreach in the Portland area. TikTok has sought to run advertising through

many Oregon organizations and businesses, including the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ These efforts establish

that TikTok "purposefully availed itself of the privilege of conducting activities in Oregon or purposefully directed its activities at residents of Oregon." *M.C.,* 328 Or. App. at 383.

As alleged, a multitude of Oregonians entered into user agreements with TikTok, and thereafter consume content on the platform, due to TikTok's advertising efforts. Given that these individuals spend thousands of hours on TikTok, it is "reasonably foreseeable" that TikTok may be sued in Oregon courts over the platform's design features. Furthermore, it is eminently clear that there is a close relationship with the forum that TikTok "systemically serves." For these reasons, the court concludes that the Attorney General has established minimum contacts with the forum and these contacts are sufficiently "related to" the unconscionability claims to establish personal jurisdiction. Defendants' Motion to Dismiss Count 1 is DENIED on this ground.

## B. The Attorney General Has Sufficiently Alleged Foreseeability to Establish Personal Jurisdiction for the Affirmative Misrepresentation Claims (Count 2).

The Attorney General's second claim alleges that TikTok made several affirmative misrepresentations in public statements regarding the safety of its products. *See* Compl. ¶¶ 139-147. As personal jurisdiction is claim-specific, for the Attorney General to establish personal jurisdiction for its second claim, the Attorney General must establish that these misrepresentations "arise out of or relate to" the minimum contacts. In other words, it is not enough that the Attorney General alleges thousands of Oregonians use TikTok and TikTok made deceptive statements. Rather, the Attorney General must credibly allege that TikTok's deception led to Oregon user engagement and that this litigation was "reasonably foreseeable." *See Cox I,* 368 Or. at 493 and 503. Also, unlike the court's evaluation of the unconscionability claim, the court cannot rely on TikTok's substantial in-state advertising efforts to establish minimum

contacts or foreseeability. While the Attorney General could credibly claim a direct causal link between TikTok's advertising and user engagement, there is no corresponding but-for link between TikTok's misrepresentations and its advertising efforts. Even if TikTok's allegedly deceptive statements and its advertising efforts move in the same direction, one does not establish the other.

In *Ford Motor Co. v. Montana Eight Jud. Dist. Ct.,* 592 U.S. 351, 365 (2021), two product-liability suits were consolidated stemming from car accidents in separate jurisdictions involving cars manufactured and sold outside those jurisdictions. While Ford acknowledged its vast business empire "purposefully avail[ed] itself of the privilege of conducting activities" within each forum, the company nonetheless argued its activities in each forum were insufficiently connected to the suits given that the specific cars involved in each crash had not been designed, manufactured, or sold in that state. Writing for the Court, Justice Kagan ultimately rejected Ford's causation-only approach:

> None of our precedents has suggested that only a strict causal relationship between the defendant's in-state activity and the litigation will do. As just noted, our most common formulation of the rule demands that the suit "arise out of *or relate to* the defendant's contacts with the forum." The first half of that standard asks about causation; but the back half, after the "or," contemplates that some relationships will support jurisdiction without a causal showing. . .. [W]e have never framed the specific jurisdiction inquiry as always requiring proof of causation—*i.e.*, proof that the plaintiff's claim came about because of the defendant's in-state conduct.

*Ford Motor Co.,* 592 U.S. at 362. Turning to Ford's advertising efforts, Justice Kagan had little trouble concluding that given Ford's expansive business efforts within each forum, the respective trial court's findings of specific jurisdiction were warranted.

In *Cox v. HP Inc.,* 317 Or. App. 27, 33 (2022) ("*Cox II*"), a plaintiff sued several companies after he was injured when a hydrogen generator exploded. One of those companies, Proton Energy Systems, successfully moved to dismiss for lack of personal jurisdiction because

their component part was neither manufactured nor shipped into Oregon. Mindful of *Ford Motor Co.'s* instruction that there must be a "strong relationship among the defendant, the forum, and the litigation," the appellate panel framed the inquiry as three questions: (1) whether the defendant's Oregon contacts "connected it to other prospective purchasers," (2) whether the defendant's Oregon contacts were so systemic as to connect the defective product to sales or marketing efforts in Oregon, and (3) whether the protection of Oregon laws benefited the defendant in bringing its product to market. Given that there was little evidence the defendant had marketed its products in Oregon, linked its marketing efforts to the purchase of that specific product, or defendant benefited from Oregon laws, the *Cox II* panel rejected personal jurisdiction.

TikTok urges the court to conclude the same based upon the Attorney General's purported failure to establish, with any degree of reasonableness, that Oregonian's contacts with TikTok are "related to" the misrepresentations. As TikTok points out, each deceptive act alleged by the Attorney General occurred outside the state, none of the statements were focused on Oregon consumers, and each statement was general and discussed a product universally available. For TikTok, this level of generalized conduct can hardly be construed as purposeful availment.

While the court readily acknowledges that the causal link between TikTok's public statements and Oregonians' decision to use the platform is tenuous, the court's reading of *Cox I, Cox II, Ford Motor Co,* and *Shopify, Inc.,* nonetheless compel the conclusion that personal jurisdiction is appropriate. Specifically, the court finds that the nature and extent of the alleged misrepresentations, combined with the volume of TikTok's daily commercial activity in Multnomah County, satisfies *Cox I* and *Shopify, Inc.* At this stage, well-pleaded facts in a

complaint are assumed true and the nonmoving party is entitled to the benefit of all inferences that can reasonably be drawn from those facts. *See, e.g.*, *Granewich* 329 Or. at 51. The Attorney General's complaint alleges, among various provisions, that "███████████████

████████████████████████████████████████████████████████████████████████

███████████████ Compl. ¶ 35. "TikTok tells users in the United States, including in Oregon, particularly youth and parents, that its platform is safe, well-moderated, and appropriate for young users." *Id.* ¶ 137.[5] The Attorney General alleges that TikTok's misrepresentations not only caused consumer harms the UTPA aims to remedy, but also contributed to some of those Oregon users (or their parents) signing up for the platform. Both *Ford* and *Shopify, Inc.,* suggest that kind of causal connection can be sufficient. *See Ford Motor Co.,* 592 U.S. at 362 ("[O]ur most common formulation of the rule demands that the suit "arise out of *or relate to* the defendant's contacts with the forum."); *Shopify, Inc.,* 135 F.4th at *40-41 ("We, therefore, hold that an interactive platform 'expressly aims' its wrongful conduct toward a forum state when its contacts are its 'own choice' and not 'random, isolated, or fortuitous,' even if that platform cultivates a 'nationwide audience[] for commercial gain.'"). Similarly, the court finds *Cox II's* three-part analysis supports a finding of personal jurisdiction in this circumstance, especially the conclusion that Oregon's laws afford TikTok substantial benefits in the dissemination of its product.

///

---

[5] *See also* Compl. ¶ 37 ("████████████████████████████████████████

████") (*emphasis in original*); *Id.* ¶ 12 ("Venue is appropriate in Multnomah County because TikTok has committed acts prohibited by the UTPA in Multnomah County, and a large number of young users harmed by TikTok's acts or omissions reside in Multnomah County.").

For the foregoing reasons, the court concludes that the Attorney General has established minimum contacts with the forum and that those contacts are adequately "related to" the misrepresentation claim to establish personal jurisdiction. Defendants' Motion to Dismiss Count 2 (and Count 3) is DENIED on this ground.[6]

## II.    Section 230 of the Communications Decency Act

The operative section of § 230, titled "Protection for Good Samaritan blocking and screening of offensive material," is divided into two working parts. The first broadly states that no service provider "shall be treated as the publisher or speaker of any information provided by another information content provider," or, more colloquially, by a third-party user of the service. § 230(c)(1). The second protects actions taken by a service provider to moderate and restrict material it "considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." § 230(c)(2). The law expressly preempts any state laws with which it may conflict. § 230(e)(3) ("No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with [the Act]"). Although § 230 is broad, it does not provide "a general immunity from liability deriving from third-party content." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100 (9th Cir. 2009). It does, however, ensure that online platforms are immune from liability for any harms arising out of "reviewing, editing, and deciding whether to publish or withdraw from publication third-party content." *Smith v. Airbnb, Inc.*, 316 Or. App. 378, 383 (2021). As applied to state law claims, § 230 "protects from liability (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of

---

[6] The court adopts the same factual and legal analysis regarding the Attorney General's omission claims as it does for the misrepresentation claims and comes to the same conclusion.

information provided by another information content provider." *Smith*, 316 Or. App. at 385 (citing *Barnes*, 570 F.3d at 1100-01.). The second prong requires an evaluation of whether a plaintiff's claims are grounded in the defendant's status or conduct as a publisher. The third prong requires an evaluation of whether the cause of action targets "content provided by another." *Barnes*, 570 F.3d at 1102. In short, a website cannot be held liable "for material posted on the website by someone else." *Smith*, 316 Or. App. at 384 (quoting *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 850 (9th Cir 2016)). However, services can still be liable under traditional tort theories if those theories do not require the services to exercise some kind of publication or editorial function. *Barnes,* 570 F.3d at 1102. After all, § 230 immunity is extraordinarily powerful, granting complete immunity where it applies and, in the process, preempting even the will of the people as expressed in their state legislatures. Consequently, a court must "ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.' If it does, section 230(c)(1) precludes liability." *Barnes,* 570 F.3d at 1102. If it does not, a suit may proceed.

## A. § 230 Bars the Attorney General's Unconscionability Claims (Count 1).

The fundamental allegation of the Attorney General's unconscionability claim is that various platform features are "addictive," meaning they entice younger users to spend excessive time viewing content generated by third-party users. Recognizing the § 230 hurdle, the Attorney General crafted the Complaint to focus its allegations away from third-party content and towards "coercive design tactics." Compl. ¶¶ 255-61. "The Attorney General [] 'alleges physical and mental health harm to young users from [TikTok's] design features themselves … and not from the viewing of any specific third-party content…" Attorney General's Response at 30 (citations omitted). Placed within the context of the second *Barnes* inquiry, the

Attorney General argues the unconscionability claims are treating TikTok less as a publisher and more as a website engineer distributing coercively designed products such as infinite scroll, autoplay, and incessant notifications.

The "ordinary meaning" of "publisher" includes an online platform's use of "tools such as algorithms that are designed to match [third-party] information with a consumer's interests." *People of Illinois, v. TikTok Inc., et al.*, No 2024CH09302, \*18 (Cook Cty. Ch. Div., June 12, 2025) (*citing Force v. Facebook, Inc.,* 934 F.3d 53, 66 (2nd Cir. 2019)). The reason for this broad definition is that a key function of an online platform is to decide what content to select, how to organize it, and how to present it to users. *Id.* Decisions that are "part and parcel of [a website's] overall design and operation"—and that "reflect choices about what content can appear on the website and what form"—"fall within the purview of traditional publisher functions." *Id.* (*citing Fields v. Twitter, Inc.,* 217 F. Supp. 3d 1116, 1124 (N.D. Cal. 2016).

In *Airbnb, Inc.,* the Oregon Court of Appeals analyzed § 230 immunity within the context of vicarious and premises-liability claims involving a property rented out through Airbnb. Specifically, plaintiff contended that the trial court erred when it granted § 230 immunity because "Airbnb acted as a curator of its website entries" by "creating a special search category" for listings with hot tubs and "highlighting" those listings; "adding icons" to rental listings with hot tubs; asking "targeted questions" and "encourage[ing] individuals to specify whether their property has a hot tub, which is displayed in the listing," and allowing individuals listing their property to "choos[e] answers from drop-down menus." *Airbnb, Inc.,* 316 Or. App. at 382. In other words, the plaintiff argued that since Airbnb was curating the content of others, § 230 immunity was inappropriate. Focusing on when a service provider becomes a content provider, the *Airbnb, Inc.* panel articulated the inquiry as an evaluation of whether a provider "helps to

develop [the] unlawful content" and whether it "contributes materially to the alleged illegality of the [content]." *Id.* at 387. As an example, immunity would be potentially lost if a website operator edited a user's post to change its meaning, thereby transforming an innocent message into a libelous one. Turning to Airbnb's conduct, as there was no allegation that the website had materially contributed to the alleged unlawfulness of the advertisement, the court concluded that § 230 immunity was appropriate.

In *M.P. v. Meta Platforms, Inc.*, 127 F.4th 516 (4th Cir. 2025), the Fourth Circuit addressed a set of similar issues after the high-profile killing of nine parishioners by Dylann Roof at the Mother Emanuel AME Church in Charleston, South Carolina. One of the decedent's children sued Facebook, alleging that Facebook's algorithm recommended harmful content that contributed to the radicalization of Roof. According to the plaintiff, Facebook's algorithm reflected design choices made by the company, and those choices played a substantial role in Roof's radicalization because they ensured Roof received more radicalized content. *M.P.,* 127 F.4th at 521. In other words, the plaintiff sought to evade § 230 by arguing that the gravamen of the lawsuit was not the content that Roof had consumed, but the algorithm and design choices made by Facebook. The Fourth Circuit rejected the characterization:

> While there is widespread concern about Facebook's use of its algorithm to arrange and sort racist and hate-driven content, acts of arranging and sorting content are integral to the function of publishing. … The fact that Facebook uses an algorithm to achieve the same result of engagement does not change the underlying nature of the act that it is performing. Decisions about whether and how to display certain information provided by third parties are traditional editorial functions of publishers, notwithstanding the various methods they use in performing that task.

*M.P.,* 127 F.4th at 526.

In the recent case, *Doe v. Grindr Inc.,* 128 F.4th 1148 (2025), the Ninth Circuit arrived at a similar place, albeit by a slightly different path. *Grindr Inc.* involved a 15-year-old boy who

had signed up for the Grindr dating app by representing him as being over 18 years old. Thereafter, the plaintiff alleges he was consecutively raped by four men he met on the platform. To evade § 230, the plaintiff crafted his claims focused on the platform's purported safety features and public pronouncements about those features. "The theory underpinning Doe's claims for defective design, defective manufacturing, and negligence faults Grindr for facilitating communication among users for illegal activity, including the exchange of child sexual abuse material." 128 F.4th at 1152-53. Crucial to this court's analysis, the plaintiff's claims in *Grindr Inc.* focused on product design claims—alleging that Grindr breached a duty not to design or manufacture defective products that matched minors with predators, matched users based on geographic data, and allowed Doe to communicate with abusive adults. *Id.* The Ninth Circuit rejected the plaintiff's effort to turn the focus away from content dissemination and toward product design: "Though defendant 'used features and functions, including algorithms, to analyze user posts on [the website] and recommended other user groups,' these neutral features were 'meant to facilitate the communication and content of others' and were 'not content in and of themselves.'" *Id.* at 1098. Because Grindr was acting in its capacity as a publisher, and third-party communications caused harm to the victim, the Ninth Circuit held that Grindr was immune. *See also Angelilli v. Activision Blizzard, Inc.,* 2025 WL 1184247, \*3-4 (N.D. Ill. Apr 23, 2025) ("To the extent Plaintiffs bring claims premised on the addictiveness of these user-generated games, Section 230 shields Roblox Corp. from liability….Section 230 immunizes social media platforms from claims premised on the socializing effects and impacts of speech by the platform's users."); *contra People of Illinois, v. TikTok Inc., et al.*, No 2024CH09302, \*19-21 (Concluding TikTok is not a publisher of third-party content because complaint alleges platform algorithm is content agnostic).

The Attorney General urges this court to look to a different Ninth Circuit case, an Oregon district court case, and a case out of the D.C. Circuit. In *Lemmon v. Snap, Inc.,* 995 F.3d 1085 (9th Cir. 2021), a decedent estate sued the parent company of Snapchat over allegations the popular platform led to a deadly vehicle accident. Specifically, plaintiffs alleged that the "Speed Filter," an application that enabled Snapchat users to record their speed, incentivized the decedents to race in a manner that ultimately led to their death. Rejecting the defendants' claims of § 230 immunity, the *Lemmon* court found the parents' amended complaint did not seek to hold Snap liable for its conduct as a publisher or speaker because the platform feature which was alleged to have caused the harm didn't involve anyone viewing content. Unfortunately for the Attorney General, *Lemmon*, unlike the case-at-bar, involved harms that occurred solely due to a design feature of the platform itself. By comparison, the Attorney General's allegations of certain "coercive design tactics" —infinite scroll, autoplay, and incessant notifications—involve harms caused not by the design of the platform itself, but by consuming too much third-party content disseminated through its features.

In *A.M. v. Omegle.com, LLC,* 614 F. Supp. 3d 814 (D. Or. 2022), an eleven-year-old sued the owners of a free online chat room after the minor was sexually assaulted by a man met on the site. The plaintiff alleged negligence due to product defects and a lack of warning. Rejecting § 230 immunity, Judge Mosman agreed with the plaintiff that the publication of content was ultimately immaterial because liability stemmed not from the content exchanged, but from the negligent design of a product that *matched* minors and adults. "Plaintiff's contention is that the product is designed [in] a way that connects individuals who should not be connected (minor children and adult men) and that it does so before any content is exchanged between them." *Omegle.com,* 614 F. Supp. at 820. Like the claims at issue in *Lemmon*, Judge Mosman concluded

that the central contention in *Omegle* was not that content had harmed the plaintiff, but that the affirmative act of matching adults and minors had.[7]

In *Dist. of Columbia v. Meta Platforms, Inc.,* No. 2023-CAB-6550, 2023 WL 11921682, at *1 (D.C. Super. 2023), the District of Columbia sued Meta Platforms, Inc., and Instagram, LLC, upon substantially the same grounds as the instant suit, including alleged unfair trade practices due to addictive and manipulative design features that increase children's time on the platforms. Substantially relying upon *Lemmon*, the Honorable Neal E. Kravitz agreed with the district that § 230 immunity only applies to "harms arising from particular third-party content published on their platforms." *Meta Platforms, Inc.*, 2023 WL 11921682, *10. While this court acknowledges that the controversy before Judge Kravitz is directly analogous, and thus so is his analysis, this court respectfully declines to follow his decision just as he declined to follow the decision of another judge with whom he disagreed. The Attorney General's cabining of § 230 immunity only to the viewing of particularly harmful third-party content is not only inconsistent with *Airbnb Inc.*, *Grindr Inc.*, and *M.P.,* but it also fails to address the reality that the gravamen of the Attorney General's claims is that the harm caused to children stems from viewing *content*.[8] "Compulsive use of the Platform is harmful, especially [to] younger users. Compulsive use correlates with many negative mental health effects, such as loss of analytical skills, memory formation, contextual thinking, conversational depth, and empathy, as well as increased anxiety." Compl. ¶ 6. Even assuming every word of that is true, it is true because of TikTok's effective

---

[7] Post *Grindr* and *M.P.,* it is unclear to this court whether even this rationale would survive § 230 scrutiny.

[8] In *People of Illinois, v. TikTok Inc., et al.*, No 2024CH09302, *19-21, the Honorable Michael T. Mullen considered whether, for purposes of § 230, TikTok should be considered a publisher or, alternatively, a software design firm with a faulty platform. While Judge Mullen's opinion was thoughtful and thorough, this court does not subscribe to his conclusion. TikTok's use of a content-agnostic algorithm does not mean it is not a publisher of third-party content; rather, it means it's a content-agnostic publisher.

efforts at content publication and dissemination. Through § 230, the United States Congress decided to immunize those acts from liability.

Despite the Attorney General's efforts to characterize this case differently, the court agrees with TikTok that the entirety of the Attorney General's allegations of unconscionable conduct involve TikTok's publishing acts. The platform's "algorithms," "autoplay," "infinite scroll," and incessant notifications are all content amplification features meant to publish content in a manner that increases user engagement. Even "Retouch" and its other filters, products that alter third-party content, are themselves content-neutral.[9] None change the content in such a way as to reasonably conclude that TikTok is now the content creator.[10] As the primary function of § 230 is to confer immunity over decisions related to the publishing of third-party content, and because that conduct is the gravamen of the Attorney General's unconscionability claim, Defendants' Motion to Dismiss Count 1 is GRANTED on this ground.

## B. § 230 Confers Immunity Regarding Some of the Attorney General's Affirmative Misrepresentation Allegations (Count 2).

Section (e) of the UTPA provides that a company engages in an unlawful practice if, as a part of its business, it represents that services have "uses, benefits, quantities or qualities" that the services do not have. The Attorney General alleges that various safety assurances made by TikTok's CEO, on its website, and in publications were false and misleading, and therefore constituted prohibited acts. TikTok responds that any promises about user safety and data

---

[9] *See Angelilli* 2025 WL 1184247, *3 ("This is true even though Roblox provides users with tools to create these games, as a service provider does not become liable as a content creator simply because it 'provides neutral tools that a user exploits' to tortious ends.").

[10] *See* Compl. ¶ 64 (TikTok's recommendation system is content-agnostic or, in TikTok's own words, "content-neutral." A TikTok document states that the recommendation system "doesn't care about the content – it doesn't have an agenda. It doesn't qualitatively understand" what content it shows users.).

security, and alleged non-compliance with those promises, involved editorial decisions made by the platform about content dissemination entitled to § 230 immunity.

> Numerous courts have held that § 230 bars claims seeking to hold platforms liable for not removing third-party content as aggressively as their own policies allegedly require. This is true no matter how the claim is styled—including, as here, when the Attorney General styles the claim as one challenging "deceptive" acts or practices or the "failure to disclose.

Defendants' Motion at 20-21 (citations omitted). According to the Attorney General, TikTok has it "exactly backwards" because the Attorney General's claim does not require TikTok to make any editorial decisions, but rather to refrain from misrepresenting the decisions it does make. "The UTPA prohibits TikTok from representing to consumers that it takes certain steps to ensure user safety that it does not, in fact, take. ... TikTok can correct these misrepresentations without changing how it monitors, approves, or deletes third-party content." Plaintiff's Response at 35 (citations omitted).

In *Grindr Inc.*, along with his defective design claims, the plaintiff alleged: "[n]egligent misrepresentation, as Grindr negligently misrepresented that the App was designed to create a safe and secure environment for its users." 128 F.4th at 1152. Ultimately upholding § 230 immunity, the *Grindr Inc.* panel focused this portion of its inquiry on whether the plaintiff's theory of liability was based on general statements regarding safety and content moderation or more specific promises or representations about safety features. If liability were tied to general promises like creating a "safe and secure environment for its users," such statements are too vague and too closely related to content creation to support liability. However, if a provider makes specific promises such as agreeing to take down indecent profiles impersonating a plaintiff, *see Barnes v. Yahoo!, Inc.,* 570 F.3d 1096, 1099 (9th Cir. 2009), or promises to unmask the identities of users sending harassing messages, *see Estate of Bride ex rel. Bride v.*

*YOLO Techs., Inc.,* 112 F.4th 1168, 1173 (9th Cir. 2024), then a company can be held accountable for the specific promise or representation. As *Grindr Inc.* involved efforts to attach liability to general statements about a safe and secure platform, the Ninth Circuit affirmed conferral of § 230 immunity.

By comparison, in *Estate of Bride,* three minor children and the estate of a fourth child brought claims related to a Snapchat application, which they alleged led to extreme harassment and bullying. According to the plaintiff, because a central feature of the application was anonymity, Snapchat promised to ban and unmask users disseminating inappropriate content or sending harassing messages. However, it turned out those promises were ineffective, and little effort was put into enforcing them. Refusing to confer § 230 immunity, the *Estate of Bride* panel concluded the crucial distinction came down to whether the platform was being held liable for a specific promise or representation, or whether the plaintiff was seeking to attach liability to the more generic act of content moderation. "While yes, online content is involved in these facts, and content moderation is one possible solution for YOLO to fulfill its promise, the underlying duty being invoked by the Plaintiffs is the promise itself. Therefore, the misrepresentation claims survive." 112 F.4th at 1179.

In this case, the allegations regarding affirmative misrepresentations can be properly classified into two groups, only one of which enjoys § 230 immunity. Insofar as the Attorney General alleges TikTok failed to properly moderate content, made false claims regarding platform safety, or failed to adhere to its own "community guidelines," *Grindr Inc.* applies, and those allegations must be dismissed.[11] However, where the complaint alleges specific misrepresentations about particular safety products or features, the court concludes

---

[11] These include the allegations set forth in the Compl. ¶¶ 139(a) – (e), (g), ¶¶ 141-143, ¶¶ 206-224, ¶ 208, ¶ 209, ¶ 210, and ¶ 211.

*Estate of Bride* applies and those claims may proceed.[12]  If the Attorney General seeks to issue

an amended complaint, it must evaluate whether each claim is a credible allegation of a specific

misrepresentation tied to a specific safety design feature. General assurances about product

safety, even towards children, are too analogous to the promise in *Grindr Inc.* that the company

was creating a "safe and secure environment for its users." 128 F.4[th] at 1154.

## C.  § 230 Bars Some of the Allegations in the Attorney General's Omission Claims (Count 3).

Throughout the complaint, the Attorney General alleges TikTok violated the UTPA when

it repeatedly and systemically failed to disclose known harms to its young users and their

parents.  Corporate liability due to lack of disclosure can occur in two different contexts.  A

failure to warn claim generally involves a common-law duty to warn customers about known

harms. An omissions-based deceptive trade practice claim, by comparison, is tied to affirmative

statements with a tendency to mislead. Focusing on various cases analyzing failure to warn

claims under § 230, the Attorney General argues knowing commercial omissions are never

entitled to § 230 immunity.[13] TikTok emphatically disagrees, arguing not only that § 230 applies,

but also that immunity in commercial omissions cases is broad.

In *Grindr Inc.*, the plaintiff sought liability over the company's purported failure to warn

Doe about the general risk of child sexual exploitation on the platform. The *Grindr Inc.* court,

interpreting *Estate of Bride* to mean that service providers only have a duty to warn when a

---

[12] These include the allegations set forth in the Compl. ¶¶ 145-158 and ¶¶ 170-205. The question of immunity for ¶ 139(f), and ¶¶ 160-169 will depend on if TikTok made specific inaccurate statements about them.

[13] *See* Attorney General's Response at 35-36 ("TikTok's 'failure to warn' cases are [] unpersuasive, [sic] because the Attorney General alleges that TikTok failed to disclose known material defects in its app, including 'coercive design tactics' and harmful beauty filters, not that it failed to warn users about 'bad' third-party content.").

provider is aware of a "known conspiracy operating independent of the site's publishing function," concluded that § 230 immunity applies. According to *Grindr Inc.*, when an internet publisher has knowledge regarding "a general possibility of harm" involving one of its products, § 230 ensures it cannot face liability for the decision to not publicize that danger. "Doe does not allege that Grindr had independent knowledge of a conspiracy, and Grindr's role as a publisher of third-party content does not give it a duty to warn users of 'a general possibility of harm resulting from the *App*." 128 F.4th at 1154. *Grindr Inc.* instructs that while a company may be held liable for a failure to warn, the danger must be specific, identifiable, and actionable. Insofar as the Attorney General alleges TikTok failed to publicize its knowledge and concerns regarding its products' "general possibility of harm," *Grindr Inc.* compels this court to dismiss those allegations under § 230. *See also, Estate of Bride,* 112 F.4th 1168 at 1180-81 ("[T]here was no conspiracy to harm that could be defined with any specificity. It was merely a general possibility of harm resulting from use of the YOLO app, which largely exists anywhere on the internet. We cannot hold YOLO responsible for the unfortunate realities of human nature.").

In *Meta Platforms, Inc.*, Judge Kravitz reached a different conclusion.[14] After discussing the difference between a failure to warn claim and a commercial omission claim, Judge Kravitz concluded that § 230 protection only applies to failure to warn claims. "The deceptiveness of

---

[14] The Attorney General also urges the court to look to *Omegle* and *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851 (9th Cir. 2016). While *Omegle* did involve allegations related to a failure to warn, Judge Mosman did not address the issue in his opinion. In *Internet Brands, Inc.*, an aspiring model sued a website used in the modeling industry after she was raped by two individuals that lured her in with a fake audition. Filing the suit in state court, Doe alleged negligence by failure to warn because when Internet Brands bought the platform, they learned that it had been involved in litigation related to the two rapists and how they were utilizing the website for criminal purposes. The assault occurred a couple of months after the company became aware of the criminal activity. On appeal, the Ninth Circuit reversed the district court's dismissal. Noting that Jane Doe herself posted her profile, her lawsuit did not seek to hold the company liable for anything in that profile, nor blame them for failing to remove any postings, the court concluded that the lawsuit wasn't about content. Despite the Attorney General's insistence to the contrary, there is little relevant to the current inquiry the court can draw from *Internet Brands, Inc.*

these omissions is tied to Meta's own allegedly false, incomplete, and otherwise misleading representations, not to Meta's publication of any particular third-party content. . .. Meta would not have to change the content it publishes or engage in any content moderation to avoid liability for future omissions claims. Rather, Meta can simply stop making affirmative misrepresentations about the nature of the third-party content it publishes, or it can disclose the material facts within its possession to ensure that its representations are not misleading or deceptive within the meaning of the CPPA." *Meta Platforms, Inc.,* 2023 WL 11921682, at \*11. The court interprets *Grindr Inc.* as compelling the opposite result.

Substantively the same as the court's holding regarding affirmative misrepresentations, the court interprets *Grindr Inc.* as requiring the dismissal of any omission allegation regarding child usage, generalized dangers to children from using the product, its design features, or from the platform's compliance with community guidelines—acts which are related to the immunized publication of third-party content.[15] However, the court holds that § 230 does not bar the State from re-alleging any omission claims related to the efficacy of safety tools it affirmatively touted.[16]

### III. The First Amendment in the Internet Age

"[W]hatever the challenges of applying the Constitution to ever-advancing technology, the basic principles [of the First Amendment] do not vary." *Brown v. Entm't Merchants Ass'n,* 564 U.S. 786, 790 (2011). The First Amendment serves as a defense against claims that seek to attach liability to constitutionally protected speech. *Snyder v. Phelps*, 562 U.S. 443, 458-59

---

[15] These include the allegations set forth in the Compl. ¶ 140, ¶ 144, ¶ 159, ¶¶ 170-173, and ¶¶ 225-252.
[16] These include the allegations set forth in the Compl. ¶¶ 145-158 and ¶¶ 170-205. The question of immunity for Compl. ¶ 139(f), and ¶¶ 160-169 will depend on if TikTok made specific inaccurate statements about them.

(2011). Both the "creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011). To the extent that social-media platforms create expressive products, they receive First Amendment protection. *Moody v. NetChoice, LLC*, 603 U.S. 707, 716 (2024). That protection extends to an entity compiling and curating others' speech into an expressive product of its own. *Id.* at 731. Deciding which speech will be included or excluded from a compilation—and then organizing and presenting the included items—is also an expressive activity. None of that changes just because a compiler includes most items and excludes just a few. *Id.* at 732. Furthermore, the government cannot get its way just by asserting an interest in better balancing the marketplace of ideas. *Id.* In case after case, the Supreme Court has barred the government from forcing a private speaker to present views it wished to spurn to rejigger the expressive realm. *Id.* at 733.

A. The First Amendment Bars the Attorney General's Unconscionability Claims (Count 1).

The First Amendment protection for expressive editorial judgments made by traditional media and publishing entities applies equally to online platforms that disseminate and make expressive choices about how to display third-party user-generated content. *Moody,* 603 U.S. at 738. The First Amendment protects more than "the choice of material to go into a newspaper" or the programs a television news network chooses to run. *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974). It also protects "decisions made as to limitations on the size . . . of the paper" and the arrangement of its contents, which are "editorial" judgments about *how* the material is presented. *Id.* A platform's expressive choices about "which third-party content" an online platform's viewer feed "will display," or "how the display will be ordered and organized" are what "give the feed a particular expressive quality." *Moody,* 603 U.S. at 738. The First Amendment prohibits a state's attempt to regulate or alter how an online platform chooses

"the views [it] will, and will not, convey." *Id.* at 738 – 39. According to Justice Kagan,

regulations that seek to impose any kind of content moderation, including promoting or de-

platforming purportedly noxious viewpoints, impermissibly interfere with protected speech:

> The individual messages may originate with third parties, but the larger offering is the
> platforms. It is the product of a wealth of choices about whether—and, if so, how—to
> convey posts having a certain content or viewpoint. Those choices rest on a set of beliefs
> about which messages are appropriate and which are not (or which are more appropriate
> and which are less so). And in the aggregate, they give the feed a particular expressive
> quality.

*Id.* at 738. Over and over again, the Supreme Court has afforded First Amendment protection to

the "editorial function itself." *See, e.g., Denver Area Educ. Telcoms. Consortium v. FCC,*

518 U.S. 727, 737 (1996), *Miami Herald Pub. Co.,* 418 U.S. at 258. This includes protections

against forcing a company to offer a forum for alternative viewpoints in its newsletter.

*See, e.g., Pac. Gas & Elec. Co. v. Pub. Utils. Comm 'n,* 475 U.S. 1, 4, 20-21 (1986);

*Hurley v. Irish-American Gay,* 515 U.S. 557, 559, 581 (1995).

TikTok argues the Attorney General's claim is a disguised effort to regulate how TikTok

disseminates content, and in so doing, infringes on the "editorial choices" that the platform

makes when it publishes third-party content. Defendants' Motion at 22 (citing *Moody,*

603 U.S. at 726-743). Accordingly, the Attorney General's efforts to impose liability for

platform features that curate and disseminate speech violate the First Amendment because they

attach liability to the platform's publication function. "These features are how the platform

exercises its '[t]raditional publish[ing] and edit[ing]' discretion to 'select and shape other parties'

expression into [its] own curated speech products.'" Defendants' Motion at 22-23 (citing *Moody,*

603 U.S. at 717).

The Attorney General responds that it is not seeking to generate liability for content

dissemination, only "coercive design tactics" that express nothing. Efforts to encourage children

to use the platform constantly and compulsively through various content-agnostic programming don't implicate First Amendment protections because the app isn't considering content and doesn't have an agenda, nor commercial or political goals. "That TikTok is in the business of distributing videos does not shield it from liability for its non-expressive conduct; as the Supreme Court has held, 'speech accompanying punishable conduct does not transform conduct into expression." Plaintiff's Response at 36-37 (citation omitted). Furthermore, as the Attorney General points out, all the cases cited by TikTok, including *Moody*, involve challenges to governmental regulation of content, not efforts to hold a company liable for the dissemination of content.[17]

In *Angelilli*, the Honorable April M. Perry sought to determine whether Roblox, a popular video game, was entitled to First Amendment protections against claims that its world-building features were designed to be addictive for adolescent brains. After determining that § 230 shields Roblox Corp. from liability for hosting third-party content, Judge Perry evaluated whether Roblox's content—its characters, skins, and game creation tools—also enjoys First Amendment protection. Concluding that they do, Judge Perry was emphatic in rejecting one of the primary arguments now put forth by the Attorney General, namely that Roblox Corp was being held liable for conduct, not the dissemination of content. "[T]he primary tortious conduct alleged by Plaintiffs is the way the Roblox world and its characters are designed, and the First Amendment is not so feeble that it can be circumvented by framing acts of creation as 'conduct' rather than expression." 2025 WL 1184247, *5. Judge Perry was equally dismissive of

---

[17] *See Meta Platforms*, 2023 WL 11921682, *12 ("These cases are not controlling here, however, because all of them involved state action that interfered with messaging or other expressive conduct-a critical element that is not present in the case before this court.").

the plaintiff's argument that Roblox can prevent injuries to its consumers without changing
content:

> This is about as persuasive as saying the First Amendment would not be implicated by a
> mandate that authors not end chapters on cliffhangers because moving a chapter heading
> does not affect a book's content. The reason video games allegedly injured Plaintiffs is
> because they were so engaging that D.G. could not stop playing. If Plaintiffs' allegations
> are accepted as true, to remove the engaging elements of the game would be to
> fundamentally alter a user's playing experience."

*Id.* at *6. The court finds itself far more aligned with the analysis of Judge Perry in *Angelilli* than

Judge Kravitz in *Meta Platforms.* First Amendment protections are not solely predicated upon

whether the speaker intends to convey a message.[18] As the Attorney General acknowledges, it

cannot lawfully "tell media companies what content they could or could not publish."

Attorney General's Response at 38. That is just as true if the Attorney General were trying to

suppress certain viewpoints as if it were trying to control *how* the media presents its content. If

the Attorney General were to prevail on its claims, TikTok's platform would need to change its

recommendation system so as to make it less "compulsive." In other words, TikTok would be

required to change how it publishes content to customers. A platform's expressive choices about

"which third-party content" an online platform's viewer feed "will display," or "how the display

will be ordered and organized," are what "give the feed a particular expressive quality." *Moody*,

603 U.S at 738.[19] The First Amendment protects more than "the choice of material to go into a

---

[18] *Contra Meta Platforms*, 2023 WL 11921682, *13 ("[T]he District's unfair trade practice claims
challenge Meta's use of addictive design features without regard to the content Meta provides, and Meta
has failed to articulate even a broad or vague message it seeks to convey through the implementation of
its design features. So although regulations of community norms and standards sometimes implicate
expressive choices, the design features at issue here do not.").

[19] The court acknowledges the limits of quoting from *Moody* as the opinion expressly limited its reach to
algorithms and other features that prioritized or deprioritized content based on the provider's preferences,
noting that it was not deciding whether the First Amendment applies to algorithms that display content
based on the user's preferences: "We therefore do not deal here with feeds whose algorithms respond
solely to how users act online-giving them the content they appear to want, without any regard to
independent content standards." *Id.* at 736, n.5.

newspaper" or the programs a television news network chooses to run. *Miami Herald Pub. Co.*, 418 U.S. at 258. It also protects "decisions made as to limitations on the size . . . of the paper" and the arrangement of its contents, which are "editorial" judgments about how the material is presented. *Id.* Just as the Attorney General cannot manufacture liability against the Oregonian for editorial decisions regarding how it disseminates information, it cannot sue TikTok for it either. The court holds that the Attorney General's unconscionability claim violates the First Amendment, and wholly independent of this court's holding regarding § 230, Defendants' Motion to Dismiss Count 1 is GRANTED. [20]

## B. The First Amendment Does Not Bar the Attorney General's Affirmative Misrepresentation Claims (Count 2).

Rather than offering a substantive argument as to why the First Amendment bars the Attorney General's misrepresentation claims, TikTok seeks to merge its misrepresentation claims into its more substantive omission arguments. TikTok seeks to frame the debate as one of deception in general, rather than addressing specific alleged misrepresentations. TikTok argues the Attorney General's claims would impermissibly require TikTok to warn its users about the alleged risks of the platform, a form of relief barred by the First Amendment. The court disagrees. In *State ex rel. Rosenblum v. Living Essentials, LLC*, 371 Or. 23, 51 & 58-59 (2023), the Oregon Supreme Court held that the UTPA prohibition on misrepresentations in consumer products is consistent with the First Amendment. "[W]e conclude that paragraph (1)(e)'s prohibition on false representations about the 'sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities' of a good, service, or real estate, made in the course of

---

[20] The First Amendment also bars liability for expressive content generated by TikTok employees themselves on so-called shadow accounts unless the Attorney General can credibly allege the content tortiously injured Oregonians. *See* Compl. ¶¶ 111-113.

business, is not facially unconstitutional." *State ex rel. Rosenblum*, 371 Or. at 51. As TikTok

makes no substantive arguments for why its position or the Attorney General's claim is

distinguishable, Defendants' Motion to Dismiss Count 2 is DENIED on this ground.

## C. The First Amendment Bars Some of the Attorney General's Omission Claims (Count 3).

The Attorney General's omission claims can be properly understood as coming in two

distinct flavors: (1) TikTok's failure to provide contrary information when, or following,

affirmatively touting features of the platform, especially safety features; and (2) the failure to

disseminate information about the harmful effects of over usage of the platform by young

people. TikTok seeks to conflate the two inquiries into the more general affirmative duty to

disclose harmful information about itself. Unsurprisingly, the Attorney General chooses to focus

on those portions of the allegations that highlight when TikTok made purportedly affirmative

representations while hiding contrary information. As is often the case, each party is correct

about the skirmish on the battlefield of its choosing.

TikTok directs the court to *NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024) for

the proposition that states cannot require online providers of third-party content to warn users

about general risks associated with those platforms. *Bonta* involved a challenge to California's

Age-Appropriate Design Code Act, a set of regulations that required online platforms to file

periodic reports with the California Attorney General self-disclosing any products or services

that were likely to be accessed by children and the kinds of harm that could result. The *Bonta*

panel began its review by noting that "[i]t is well-established that the First Amendment protects

'the right to refrain from speaking at all, and that 'the forced disclosure of information, even

purely commercial information, triggers First Amendment scrutiny.'" 113 F.4th at 1117

(citations omitted). Rejecting an argument put forth by California that the regulation wasn't

censorship because it required the reporting of harms and data management practices, not content, the *Bonta* panel held that First Amendment scrutiny was required even when laws deputize private actors to disclose information about themselves. Applying strict scrutiny because the law regulated far more than just commercial speech—it required businesses to opine on harms caused by third-party speech disconnected from any economic transaction—the *Bonta* panel struck down the law. "[T]he [statute] appears to meet none of the three *Bolger* factors: (1) the reports are not advertisements, (2) they require businesses to go beyond opining about their products or services to opine on highly controversial issues of public concern and then take steps to censor material that the company has deemed sufficiently harmful, and (3) businesses do not have a clear economic motivation to provide these opinions or perform this state-required censorship." *Id.* at 1120 (*citing Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60, 66 (1983)).

As *Bonta* involved a facial challenge to a statutory reporting obligation rather than a suit seeking to attach liability, the court acknowledges that an analytical comparison is not straightforward. Nonetheless, the *Bonta* Panel's instruction that states cannot compel a platform to speak by forcing it to warn users about alleged "risks" of the platform's features and its user-generated content endures even within this different context. "Requiring a company to publicly condemn itself is undoubtedly a more 'effective' way for the government to stigmatize and shape behavior than for the government to have to convey its views itself, but that makes the requirement more constitutionally offensive, not less so." *Nat'l Ass'n of Mfrs. v. S.E.C.,* 800 F3d 518, 530 (D.C. Cir. 2015). Insofar as the Attorney General's omission claims seek to attach liability to TikTok's failure to "disclose" alleged "defects and nonconformities" that

supposedly caused "compulsive and unhealthy use of addiction to [the platform]," that relief is not permitted under the First Amendment.[21]

Turning to the safer ground of misrepresentation by omissions, the Attorney General argues that this kind of commercial speech is not afforded free speech protections. "If commercial speech is misleading or related to illegal activity, it is not entitled to protection." *Bonta*, 113 F.4th at 1119. "Under the First Amendment, states may regulate false or deceptive commercial speech." *Living Essentials, LLC*, 371 Or. at 58. The first test for determining whether a regulation of commercial speech violates the First Amendment is to evaluate whether the speech is misleading, that is whether it is "more likely to deceive the public than to inform it." *Id*. at 59. As the Attorney General correctly points out, the UTPA itself expressly imposes liability on a business that "fails to disclose any known material defect or material nonconformity" when delivering goods or services. ORS 646.608(1)(t). In so much as the Attorney General's claims involve specific statements made by TikTok about product safety that were misrepresentations by omission, these allegations do not violate the First Amendment.[22]

## IV.    The Unlawful Trade Practices Act

Oregon's pleading standards require that a complaint contain "[a] plain and concise statement of the ultimate facts constituting a claim for relief." ORCP 18A. Courts will dismiss a claim where a plaintiff "fail[s] to state ultimate facts sufficient to constitute a claim" and/or where a plaintiff fails to commence an action "within the time limited by statute." ORCP 21A(1)(h) and (i). When a party urges dismissal under ORCP 21(A)(1)(h) and (i), the

---

[21] These include the allegations set forth in the Compl. ¶140, ¶144, ¶159, ¶¶ 170-173, and ¶¶ 225-252.
[22] These include the allegations set forth in the Compl. ¶¶ 145-158 and ¶¶ 170-205. The question of immunity for Compl. ¶ 139(f), and Compl. ¶¶ 160-169 will depend on whether TikTok made specific inaccurate statements about them.

reviewing court must focus on the text of the complaint, the facts in the complaint are assumed true, and the nonmoving party is entitled to all reasonable inferences from those facts. *See, e.g., Granewich v. Harding,* 329 Or. 47, 51 (1999). A plaintiff need only plead ultimate facts which are "fact[s] from which legal conclusions are drawn." *Fearing v. Bucher*, 328 Or. 367, 375 fn.5 (1999). To survive a motion to dismiss for failure to state a claim, a complaint must include some allegation of material fact regarding each material element of the claim. *McAlpine v. Multnomah Cnty.*, 131 Or. App. 136, 138 (1994). However, "[e]ven vague allegations on an element of a claim for relief are sufficient to survive a motion to dismiss." *Bank of New York Mellon v. Lash*, 303 Or. App. 456, 462 (2020).

A. The Attorney General Sufficiently Alleges Unconscionability Under UTPA (Count 1).

The UTPA provides that a person engages in an unlawful trade practice if the person "[e]mploys an unconscionable tactic in connection with selling, renting or disposing of real estate, goods or services, or collecting or enforcing an obligation." ORS 646.607(1). Section 646.605(9) supplies a non-exhaustive list of unconscionable tactics. "Unconscionable" as used in the statute "takes its meaning from the legal doctrine of unconscionability." *Gordon v. Rosenblum*, 361 Or. 352, 366 (2017). Oregon courts have applied that doctrine in "a variety of contexts" to "avoid enforcing or creating circumstances that are unfair, unjust, or shocking to the conscience, such as when one person exploits a more favorable bargaining position to take advantage of another." *Id.* at 361-62. "Under Oregon law, the bar for establishing unconscionability has, historically, been a high one." *Meunier v. Nw. Mut. Life Ins. Co.*, 51 F. Supp 3d 1023, 1033 (D. Or. 2014). However, the legislature intended the courts to "interpret the UTPA liberally to protect consumers." *Clark v. Eddie Bauer LLC,* 371 Or. 177, 186 (2023). Unconscionable tactics "include but are not limited to" several articulated

stratagems, such as knowingly "tak[ing] advantage of a customer's physical infirmity, ignorance, illiteracy or inability to understand the language of the agreement." ORS 646.605(9).

For the Attorney General, taking advantage of children is consistent with the examples provided in the statute's text, and using UTPA in the manner they now seek is consistent with the goal of ensuring minors are not taken advantage of within the marketplace. The Attorney General alleges that TikTok has implemented "coercive design tactics" to exploit young users' unique psychological vulnerabilities, and in so doing, caused compulsive use of platform in violation of the UTPA and its statutory protections for Oregon consumers.

TikTok urges this court to dismiss the claim for several reasons, the most fundamental of which is that the Attorney General is seeking to use UTPA to accomplish policy objectives in a manner wholly inconsistent with the statute's text, legislative history, and case law. Interpreting the Attorney General's allegations as broadly as possible, TikTok characterizes the Attorney General's position as being that the platform itself is unconscionable. "[T]he State claims that the platform *itself*, as it is currently designed, is unconscionable. To Defendants' knowledge, no Oregon court has ever held that a lawful good or service itself constitutes an 'unconscionable tactic.' This court should not be the first." TikTok's Motion at 27. According to TikTok, if Oregon wants to ban TikTok, it must do so through the political process. However, if the Attorney General is allowed to utilize the UTPA to generate liability for product design features, then this court is assisting in effectuating an end-around the legislative process to bar a popular product. TikTok rhetorically asks, what stops the Attorney General from doing the same against any product it deems unsavory? "If a good or service is so manifestly harmful that (in the State's view) it is unconscionable to offer it for public consumption at all—even though the

Legislature has not seen fit to ban it—then consumers can use their own agency and decide not to use it." Defendants' Motion at 28-29.

Stepping away from policy arguments for a moment, this court focuses, as it must, on the language of the UTPA. TikTok is correct that neither ORS 646.607(1) nor ORS 646.605(9) list out unconscionable product features. Consequently, this court must "look at the common law doctrine of unconscionability" to determine whether a product feature can be considered unconscionable within the meaning of the UTPA. *See Gordon,* 361 Or. at 361-62. At common law, unconscionability is an equitable doctrine that allows courts to avoid enforcing or creating circumstances that are unfair, unjust, or shocking to the conscience, such as when one person exploits a more favorable bargaining position to take advantage of another. *Id.* Although today the doctrine appears most often in contract law,[23] historically the doctrine has been applied in many areas of law where courts sought to avoid what they perceived as unfair outcomes. *Id.* at 362. Oregon courts have followed that pattern and applied the doctrine in a variety of contexts. For example, the Court of Appeals has held that a remedy may be appropriate when a person "takes unconscionable and inequitable advantage" of another by appropriating information learned through a contractual relationship. *Kamin v. Kuhnau*, 232 Or. 139, 155 (1962). In probate proceedings, a court may consider as void dispositions in a will that result from a person taking "unconscionable advantage" of the testator. *Moran v. Bank of Calif., N.A.*, 206 Or. 358, 371 (1956). When sitting in equity, a court may deny relief to a party whose unconscionable conduct constitutes "unclean hands." *Taylor et ux v. Grant et al*, 204 Or. 10, 26

---

[23] "Procedural unconscionability refers to the conditions of contract formation and focuses on two factors: oppression and surprise." *Livingston v. Metropolitan Pediatrics, LLC*, 234 Or. App. 137, 151 (2010). Substantive unconscionability, by comparison, "generally refers to the terms of the contract, rather than the circumstances of formation, and focuses on whether the substantive terms contravene the public interest or public policy." *Bagley v. Mt. Bachelor, Inc.*, 356 Or. 543, 555 (2014).

(1955). In property disputes, "any form of unconscionable conduct, artifice, concealment, or questionable means" may justify imposing a constructive trust. *Marston v. Myers et ux*, 217 Or. 498, 509 (1959), And when construing statutes, a court may seek to avoid "unconscionable results." *Parr v. Dept. of Revenue*, 276 Or. 113, 116 (1976).

In *Gordon*, while the primary question—whether there existed a consumer relationship between the parties—is inapplicable here, the Court of Appeals had occasion to address how trial courts should interpret "unconscionable tactics" given the UTPA's common-law ancestry. "In light of the common-law history of the doctrine, which shows extensive application, and the statutory history, which shows an expanding meaning at the time the UTPA was enacted, we cannot conclude that the doctrine of unconscionability or the term 'unconscionable tactics' has such a limitation. Thus, the meaning of the term 'unconscionable tactics' itself provides no basis for excluding plaintiffs' conduct from the reach of the UTPA." *Id.* at 363-64. While not strictly binding given the different facts and legal arguments, the court interprets *Gordon's* analysis as determinative. Just as the *Gordon* court dismissed the defendant's efforts at cabining UTPA to specifically enumerated theories, this court is compelled to dismiss TikTok's efforts to do the same. Like *Gordon*, this case involves allegations of unconscionable tactics employed towards potential consumers. At this stage of litigation, that constitutes a sufficiently valid UTPA claim to proceed. Defendants' Motion to Dismiss Count 1 is DENIED on this ground.

## B. The Attorney General Sufficiently Alleges Misrepresentation and Deception Under the UTPA (Counts 2 & 3).

ORS 646.608(1)(b) makes it unlawful to "cause[] likelihood of confusion or misunderstanding" as to a product's "source, sponsorship, approval, or certification." Section (1)(e) further provides that it is unlawful to "represent[]" that products have certain

attributes—that is, "sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities"—that they "do not have." The word "representation" is defined in the UTPA as "any manifestation of any assertion by words or conduct, including, but not limited to, a failure to disclose a fact." ORS 646.608(2). Thus, the crux of a violation under ORS 646.608(1)(e) is a misleading assertion about various attributes that, by their nature, can have the potential to affect a purchasing decision, such as sponsorship, approval, characteristics, ingredients, uses, benefits, quantities, or qualities. The statute does not expressly say whether it is limited to attributes that have that potential, or whether it reflects a legislative judgment that every misrepresented characteristic—regardless of how innocuous—has the potential to mislead and should constitute a violation of the UPTA. At the very least, the plain text does not foreclose the former interpretation. *State ex rel. Rosenblum v. Living Essentials, LLC,* 313 Or. App. 176, 187-188 (2021) (reversed on other grounds). Under the UTPA, only statements that "are specific and objective, that is, susceptible to being proven true or false, such that they are likely to induce [sic] consumer reliance," are actionable. *State ex rel. Rosenblum v. Living Essentials, LLC*, 335 Or. App. 30, 43 (2024). Statements that are merely "general, exaggerated, or subjective" are not. *See id.*

TikTok urges the court to dismiss the second and third claims because the Attorney General's theories of deception often rely upon generic terms and phrases such as "[s]afety and wellness—in particular for teens—is a core priority for TikTok"; "we take safety, especially for teenagers, extremely seriously"; and "it's important that our platform remain a safe, supportive, and joyful place for our community." Compl. ¶¶ 139(b), (d), (g). Relying primarily upon *Living Essentials, LLC*, TikTok urges this court to reject any effort by the state to attach liability to vague, "general," and indefinite terms. Defendants' Motion at 33 (citing *Living*

*Essentials, LLC*, 335 Or. App. at 43). The same is true for statements specifically concerning the platform's safety features, such as that "[w]e launch great products with a safety-by-design mentality." Compl. ¶ 159. For TikTok, these sorts of statements—that a particular feature is made with a "safety-by-design mentality"—do not suggest a specific quality but are general, subjective statements "reasonably to be expected of a seller as to the degree of quality of his product, the truth or falsity of which cannot be precisely determined." *Living Essentials, LLC*, 335 Or. App. at 43.

Like the court's conclusion above, the Attorney General urges the court to reject TikTok's position primarily because of the phase of litigation. More specifically, the Attorney General argues that TikTok is really making an argument regarding "puffery," and therefore it should be addressed at a later stage in the proceedings. "[W]hether a statement is puffery is a question of fact," which is not normally appropriate for resolution on a motion to dismiss. *Living Essentials, LLC*, 335 Or. App. at 42; *see also Guirma v. O'Brien*, 259 Or. App. 778, 787 (2013) ("questions of fact" could not "be resolved on a motion to dismiss"). Furthermore, according to the Attorney General, TikTok is cherry-picking portions of statements, most of which include far more actionable and specific promises. The Attorney General points to two specific examples:

- TikTok represents that it removes certain content that violates its Community Guidelines. Compl. ¶ 207. TikTok either removes this content or it does not. (In many cases, it does not.) *Id.* ¶ 213; see *Living Essentials, LLC*, 335 Or. App. at 46 ("Amino acids either improve focus and mood, or they do not.").
- TikTok represents that it imposes an automatic 60-minute screentime limit on teen users. Compl. ¶ 149. TikTok either limits teens' use to 60 minutes, or it does not. (It does not.) *Id.* ¶ 150.

Plaintiff's Reply at 45. The court agrees. Determinations about how customers will interpret

TikTok's various public statements are fact-intensive inquiries best left to other phases of this

proceeding. Defendants' Motion to Dismiss Counts 2 and 3 are DENIED on this ground.


So ORDERED.

This 13th day of June 2025.

Hon. Bryan B. Francesconi
Multnomah County Circuit Court

# EXHIBIT 20

IN THE SUPREME COURT
OF THE STATE OF VERMONT

| | | |
|---|---|---|
| STATE OF VERMONT, | ) | |
| | ) | |
| Plaintiff/Appellee, | ) | |
| | ) | |
| v. | ) | No. 24-AP-295 |
| | ) | |
| META PLATFORMS, INC. and | ) | Appealed from 23-CV-04453 |
| INSTAGRAM, LLC, | ) | |
| | ) | |
| Defendants/Appellants. | ) | |

**META PLATFORMS, INC. AND INSTAGRAM, LLC'S MOTION FOR
PERMISSION TO APPEAL PURSUANT TO V.R.A.P 5(b)(7)(A)**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION ............................................................................. 1

ISSUES FOR INTERLOCUTORY APPEAL ...................................... 3

BACKGROUND .............................................................................. 3

    A.   Factual Background ........................................................ 3

    B.   Procedural History ......................................................... 4

STANDARD OF REVIEW ................................................................ 6

ARGUMENT .................................................................................. 6

I.    There Are Substantial Grounds for a Difference of Opinion on the
Superior Court's Rulings. ....................................................... 6

    A.   The First Amendment Ruling Is Subject to Reasonable
Disagreement. ............................................................... 7

    B.   The Section 230 Ruling Is Also Subject to Reasonable
Disagreement. ............................................................. 10

II.   The Superior Court's Order Involves Controlling Questions of
Law and an Appeal Would Materially Advance the Termination
of the Litigation. .................................................................. 14

    A.   The First Amendment and Section 230 Issues Involve
Controlling Questions of Law That Should Be Decided Now...... 14

    B.   The Superior Court Erred When It Declined to Permit
Appellate Review on These Questions. ......................... 16

CONCLUSION ............................................................................. 19

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Children's Health Def. v. Meta Platforms, Inc.*,
112 F.4th 742 (9th Cir. 2024) ..........................................................8

*Christie v. Dalmig, Inc.*,
136 Vt. 597, 396 A.2d 1385 (1979) ............................................ 18

*Doe v. Snap, Inc.*,
2022 WL 2528615 (S.D. Tex. July 7, 2022) ............................... 11

*Dyroff v. Ultimate Software Grp., Inc.*,
934 F.3d 1093 (9th Cir. 2019) ............................................... 11, 12

*Est. of Bride by & through Bride v. Yolo Techs., Inc.*,
112 F.4th 1168 (9th Cir. 2024) ............................................. 12, 13

*In re Facebook, Inc.*,
625 S.W.3d 80 (Tex. 2021) ..................................................... 12, 16

*Fair Hous. Council of San Fernando Valley v.*
*Roommates.Com, LLC*,
521 F.3d 1157 (9th Cir. 2008) (en banc) ................................ 3, 16

*Fields v. Twitter, Inc.*,
217 F. Supp. 3d 1116 (N.D. Cal. 2016) ....................................... 12

*Force v. Facebook, Inc.*,
934 F.3d 53 (2d Cir. 2019) .................................................... 11, 12

*FTC v. Match Grp., Inc.*,
2022 WL 877107 (N.D. Tex. Mar. 24, 2022) .............................. 12

*Green v. Miss United States of Am., LLC*,
52 F.4th 773 (9th Cir. 2022) ..................................................... 2, 15

*Herrick v. Grindr LLC*,
765 Fed. App'x 586 (2d Cir. 2019) ............................................. 13

ii

*Hillerby v. Town of Colchester,*
  167 Vt. 270, 706 A.2d 446 (1997) ............................................................... 16

*Hustler Mag., Inc. v. Falwell,*
  485 U.S. 46 (1988) ...................................................................................... 10

*Jones v. Dirty World Ent. Recordings LLC,*
  755 F.3d 398 (6th Cir. 2014) ....................................................................... 11

*Jordan v. Nissan N. Am., Inc.,*
  2004 VT 27, 176 Vt. 465, 853 A.2d 40 ............................................... 9, 10, 18

*L.W. v. Snap Inc.,*
  675 F. Supp. 3d 1087 (S.D. Cal. 2023) ......................................................... 11

*Lama v. Meta Platforms, Inc.,*
  __ F. Supp. 3d __, 2024 WL 2021896 (N.D.N.Y. May 6, 2024) .................. 13

*Lewis v. Caraballo,*
  98 F.4th 521 (4th Cir. 2024) ........................................................................ 16

*Libercent v. Aldrich,*
  149 Vt. 76, 539 A.2d 981 (1987) .................................................................. 16

*M.P. v. Meta Platforms, Inc.,*
  692 F. Supp. 3d 534 (D.S.C. 2023) .............................................................. 11

*In re Montpelier WWTF Discharge Permit,*
  No. 22-2-08VTEC, 2009 WL 8427878
  (Vt. Super. Aug. 10, 2009) .......................................................................... 17

*Moody v. NetChoice, LLC,*
  144 S. Ct. 2383 (2024) ......................................................................*passim*

*N.Y. Times Co. v. Sullivan,*
  376 U.S. 254 (1964) ................................................................................ 9, 15

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,*
  591 F.3d 250 (4th Cir. 2009) ....................................................................... 16

*NetChoice, LLC v. Bonta,*
  113 F.4th 1101 (9th Cir. 2024) ...................................................................... 8

*NetChoice, LLC v. Reyes*,
 __ F. Supp. 3d __, 2024 WL 4135626 (D. Utah. Sept. 10, 2024).....................8

*Noble v. Off. of Child Support*,
 168 Vt. 349, 721 A.2d 121 (1998) ............................................................... 16

*In re Pyramid Co. of Burlington*,
 141 Vt. 294, 449 A.2d 915 (1982) .......................................................*passim*

*Ricci v. Teamsters Union Loc. 456*,
 781 F.3d 25 (2d Cir. 2015) ........................................................................ 16

*Rollins v. Dignity Health*,
 2014 WL 6693891 (N.D. Cal. Nov. 26, 2014)............................................. 15

*Snyder v. Phelps*,
 562 U.S. 443 (2011)......................................................................................9

*In re Soc. Media Adolescent Addiction/Pers. Inj.*
 *Prods. Liab. Litig.*,
 702 F. Supp. 3d 809 (N.D. Cal. 2023) .........................................................2

*In re Soc. Media Adolescent Addiction/Pers. Injury*
 *Prods. Liab. Litig.*,
 __ F. Supp. 3d __, 2024 WL 4532937 (N.D. Cal. Oct. 15, 2024) ...................2

*State v. Atl. Richfield Co.*,
 No. 340-6-14, 2015 WL 5176800 (Vt. Super. May 22, 2015) ...................... 17

*State v. Colby*,
 2009 VT 28, 972 A.2d 197............................................................................ 15

*State v. DeLaBruere*,
 154 Vt. 237, 557 A.2d 254 (1990) ............................................................... 15

*State v. McCann*,
 149 Vt. 147, 541 A.2d 75 (1987) ..................................................................6

*State v. Wheel*,
 148 Vt. 439, 535 A.2d 328 (1987) ............................................................... 14

*Stowe Aviation, LLC v. Agency of Com. & Cmty. Dev.*,
 2024 VT 11, 312 A.3d 1017...........................................................................6

iv

*V.V. v. Meta Platforms, Inc.*,
2024 WL 678248 (Conn. Super. Ct. Feb. 16, 2024) .................................... 13

*Vt. Nat. Bank v. Clark*,
156 Vt. 143, 588 A.2d 621 (1991) ........................................................... 6, 17

**Constitutional Provision**

U.S. Const. amend. I ..................................................................*passim*

**Statutes**

18 U.S.C. § 1001(a) ........................................................................9

Communications Decency Act, 47 U.S.C. § 230 .......................................*passim*

Vermont Consumer Protection Act, 9 V.S.A. § 2453(a) ...........................*passim*

**Other Authority**

V.R.A.P. 5(b) ...............................................................................*passim*

# INTRODUCTION

The State seeks to hold Meta liable under Vermont law for how Instagram—a social media service used by billions of people around the world—publishes third-party content. The State alleges that certain "design features" of Instagram constitute unfair acts and practices under the Vermont Consumer Protection Act ("VCPA"), 9 V.S.A. § 2453(a), because they allegedly cause Vermont teens to become addicted to Instagram. For example, the State challenges Meta's use of an "Algorithmic Recommendation System" to select, arrange, and display to each user third-party content because that publishing feature allegedly "capture[s] more and more of that user's time and attention." Appendix ("App.") 0044, ¶¶ 122-23.

Meta moved to dismiss this civil enforcement action by invoking its federal constitutional and statutory rights. The superior court denied Meta's motion to dismiss, holding that it could exercise personal jurisdiction over Meta in this case, and that the First Amendment to the U.S. Constitution and Section 230 of the Communications Decency Act, 47 U.S.C. § 230, do not bar any portion of the State's claims. App. 0122-33. Following that ruling, the superior court approved an appeal to this Court under V.R.A.P. 5(b)(1) regarding whether it could exercise personal jurisdiction over Meta in this case. An immediate appeal on personal jurisdiction was warranted because, as the superior court acknowledged, "the scope of personal jurisdiction over on-line entities which are accessible in every state is an unresolved issue in the courts." App. 0137. And "a contrary ruling" by this Court "would terminate the litigation and avoid lengthy discovery, motion practice and a potential trial." *Id.*

The superior court denied Meta's Rule 5(b) motion as to its rulings on the First Amendment and Section 230. *Id.* at 0138-39. In so ruling, the court did not deny that its rulings on these issues were subject to reasonable disagreement. For good reason: Just three months ago, the U.S. Supreme Court concluded that social media companies like Meta are engaged in expressive conduct protected by the First Amendment when they "make choices about what third-party speech to display and how to display it"—including when they "include and exclude, organize and prioritize" user-

1

generated content to present each user a "curated" feed of content. *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2393 (2024). The superior court reached the opposite result, holding that Meta is not engaged in protected speech when it selects, organizes, and prioritizes user-generated content for users in Vermont. App. 0132.

The superior court's Section 230 ruling is also subject to reasonable disagreement. In holding that Section 230 did not bar the State's challenge to Meta's so-called "design features," the superior court recognized that its decision conflicted with a decision by a federal multidistrict litigation ("MDL") court based on "very similar" claims. *Id.* at 0129 (citing *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d 809 (N.D. Cal. 2023) ("*In re Soc. Media*")). And just last week, the MDL court applied its past Section 230 ruling to narrow *nearly identical* consumer protection claims brought by thirty-five state attorneys general in a multistate suit. *See In re Soc. Media Adolescent Addiction/Pers. Injury Prods. Liab. Litig.*, __ F. Supp. 3d __, 2024 WL 4532937, at *15-18 (N.D. Cal. Oct. 15, 2024) ("*Multistate Suit*").

Despite the reasonable grounds for disagreement, the superior court denied certification on the First Amendment and Section 230 issues. Because these issues "would not resolve the entire case," the superior court concluded that "an immediate appeal of th[ese] issues" would not "materially advance the termination of the litigation." App. 0121. But the court erred in reaching this result because this Court has held that an immediate appeal materially advances the termination of litigation so long as it could "significantly narrow[] the range of issues, claims, or defenses at trial." *In re Pyramid Co. of Burlington*, 141 Vt. 294, 303-04, 449 A.2d 915, 919-20 (1982). If Meta were to prevail on its First Amendment or Section 230 arguments, one of the State's two claims would be dismissed in its entirety, and the other claim would be substantially narrowed. Indeed, the superior court itself recognized that "the issues might be narrowed" if this Court were to reverse. App. 0138.

Permitting an immediate appeal on the First Amendment and Section 230 issues is particularly warranted given the importance of resolving those issues as early as possible. The First Amendment protects against "unnecessary *litigation* that chills speech." *Green v. Miss United States of*

*Am., LLC*, 52 F.4th 773, 800 (9th Cir. 2022) (emphasis in original).  And Section 230 provides "immunity from suit," which means that "[c]lose cases . . . must be resolved in favor of immunity, lest we cut the heart out of section 230 by forcing websites to face death by ten thousand duck-bites." *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1174-75 (9th Cir. 2008) (en banc).

Given the importance of the rights at stake, the likelihood that the superior court erred in denying Meta's motion to dismiss, and the fact that the personal jurisdiction ruling has already been certified for appeal, this Court should grant Meta's motion for permission to appeal and decide the personal jurisdiction, First Amendment, and Section 230 issues together.

## ISSUES FOR INTERLOCUTORY APPEAL[1]

1. Whether the First Amendment to the U.S. Constitution bars the State's claims because they would hold Meta liable for selecting, prioritizing, and displaying user-generated speech and petitioning Congress.
2. Whether Section 230 of the Communications Decency Act bars the State's claims insofar as they seek to impose liability on Meta for its publishing activities, such as selecting, prioritizing, and displaying third-party content.

## BACKGROUND

### A.    Factual Background

Meta operates Instagram, which billions of people—including teenagers—use to connect and communicate with others online.  App. 0016-17, ¶¶ 41-42.  Instagram users can host, arrange, and disseminate a diverse array of user-generated content, including photos and videos.  *Id.* at 0016-17, 0051, ¶¶ 42, 149-50.  Every user's experience on Instagram is unique, with

---

[1] Meta maintains its pending appeal before this Court addressing the superior court's certification of its personal jurisdiction question under V.R.A.P. 5(b)(1).  *See* 24-AP-295.  As provided for in V.R.A.P. 5(b)(7)(A), Meta additionally appeals the First Amendment and Section 230 questions that the district court declined to certify in the same order.

the content provided to each user reflecting the user's interests and activities on Instagram. *Id.* at 0018, ¶ 44.

Instagram selects, organizes, and displays third-party content to individual users through so-called "design features." Those features include algorithms, which organize and recommend content to users, *id.* at 0043-44, ¶¶ 121-24; notifications, which alert users to new content or when other users engage with their content, *id.* at 048-50, ¶¶ 136-46; "infinite scroll" and "auto-play," which present users with seemingly endless content automatically, *id.* at 0044-47, ¶¶ 125-35; and ephemeral content, which disappears from the service after a set period, *id.* at 0046-52, ¶¶ 147-55. Although Meta's community standards forbid certain "harmful content," *id.* at 0012, ¶ 22, such content has been created, shared, and viewed by users on Instagram. *E.g.*, *id.* at 0069, 0083, ¶¶ 213-19, 265.

## B.    Procedural History

On October 24, 2023, the State filed a civil lawsuit against Meta asserting two claims under the VCPA. Claim One alleges that Meta engaged in unfair practices by designing Instagram to be addictive. Claim Two alleges that Meta engaged in deceptive practices by making material misrepresentations and omissions about Instagram's safety and the harmful content accessible on the service. The superior court held oral argument on Meta's motion to dismiss on July 3, 2024, and denied the motion on July 29, 2024.

On personal jurisdiction, the superior court held that the State's allegations were sufficient to establish a prima facie case for specific personal jurisdiction. App. 0126-27. It reasoned that Meta had purposefully availed itself of Vermont by allegedly entering into contracts with Vermont users, collecting data to target advertisements and personalize content, selling data about users, and "track[ing] and stud[ying] Young Users in Vermont." *Id.* at 0126. As to whether the State's claims arise out of or relate to Meta's alleged Vermont contacts, the superior court held that the alleged harm to Vermont users was "the result of Meta's research" and "their resulting exposure to its harmfully designed algorithms." *Id.* at 0127.

On the First Amendment, the superior court held that the First Amendment did not bar the State's claims because Meta's "role as an editor of content" was separate from "its alleged role as a manipulator of Young Users' ability to stop using" Instagram. *Id.* at 0131. Distinguishing the U.S. Supreme Court's recent decision in *Moody*, the superior court reasoned that, unlike *Moody*, the State does not complain about "the substance of the speech" available on Instagram, and so *Moody* does not apply. App. 0132. The superior court further held that allegedly providing false testimony to Congress was outside of any "protected speech." *Id.* at 0132-33.

Finally, on Section 230, the superior court concluded that it did not bar the State's suit because the State seeks to impose liability on Meta for "intentionally leading Young Users to spend too much time on-line," rather than for publishing third-party content. *Id.* at 0130. Because the State's "claim is that [Young Users] are harmed by the time spent, not by what they are seeing," the claims "do not turn on content, and thus are not barred by Section 230." *Id.* The superior court also held that the State's deception claim does not depend on third-party content, and so Meta's alleged failure to warn of purportedly harmful content and Instagram's allegedly addictive qualities was not barred by the statute. *Id.* at 0130-31.

On August 12, 2024, Meta filed a timely motion for permission to appeal the superior court's personal jurisdiction, First Amendment, and Section 230 rulings under V.R.A.P. 5(b)(1). On October 14, 2024, the superior court "granted [the motion] as to the question of personal jurisdiction but denied as to the First Amendment and Section 230." App. 0139. The superior court held that Meta "correct[ly]" identified personal jurisdiction as a controlling question of law, that would terminate the litigation if the Vermont Supreme Court issued a contrary ruling, and for which the issue remained "unresolved" by the courts. *Id.* at 0137-38. But the superior court denied the motion as to the First Amendment and Section 230 based solely on the ground that "the court cannot say that an immediate appeal would materially advance the termination of the litigation." *Id.* at 0139.

Meta files this motion seeking permission to appeal the superior court's denial of certification of the First Amendment and Section 230 questions. *See* V.R.A.P. 5(b)(7)(A).

5

## STANDARD OF REVIEW

V.R.A.P. 5(b)(1) provides that a superior court "must" grant permission to appeal an interlocutory order if it finds that: (1) "the order . . . involves a controlling question of law," (2) a "substantial ground for [a] difference of opinion" exists, and (3) "an immediate appeal may materially advance the termination of the litigation." V.R.A.P. 5(b)(1)(A)-(B). The superior court's denial of a motion for interlocutory appeal is reviewed for "an abuse of discretion, or a failure to exercise discretion." *State v. McCann*, 149 Vt. 147, 151, 541 A.2d 75, 77 (1987) (citation and internal quotation marks omitted); *see also* V.R.A.P. 5(b)(7)(A).

A court abuses its discretion when it "has withheld its discretion entirely or has exercised it for clearly untenable reasons or to a clearly untenable extent." *Stowe Aviation, LLC v. Agency of Com. & Cmty. Dev.*, 2024 VT 11, ¶ 11, 312 A.3d 1017 (citation and internal quotation marks omitted). A ruling is "founded upon 'clearly untenable reasons'" when it is "based on [a] mistaken understanding of law." *Vt. Nat. Bank v. Clark*, 156 Vt. 143, 147, 588 A.2d 621, 623 (1991).

## ARGUMENT

### I. There Are Substantial Grounds for a Difference of Opinion on the Superior Court's Rulings.

Interlocutory review of Meta's First Amendment and Section 230 arguments is appropriate because there is "substantial ground for difference of opinion" on both. V.R.A.P. 5(b)(1)(A). This Court has explained that this requirement is satisfied where "a reasonable appellate judge could vote for reversal of the challenged order." *In re Pyramid*, 141 Vt. at 307, 449 A.2d at 922. That standard is easily met here. Courts across the country are grappling with how to apply both to cases like this. Indeed, in the order certifying its personal jurisdiction ruling for appeal, the superior court did not dispute that Meta's First Amendment and Section 230 arguments present "substantial ground for difference of opinion." *See* App. 0138-39.

6

## A.    The First Amendment Ruling Is Subject to Reasonable Disagreement.

In denying Meta's motion to dismiss, the superior court held that the First Amendment does not protect Meta's "exercise of editorial control over what is posted on Instagram." App. 0131. It also held that the First Amendment does not apply to the State's allegations that Meta made misleading statements to Congress. *Id.* at 0132-33. Both these holdings are subject to reasonable disagreement, as the superior court acknowledged, and should be reviewed by this Court alongside whether Meta is subject to personal jurisdiction in Vermont for the State's claims.

**Editorial Discretion.** Just three months ago, the U.S. Supreme Court observed that "the First Amendment . . . does not go on leave when social media are involved." *Moody*, 144 S. Ct. at 2394. In *Moody*, the Supreme Court concluded that, when social media services make "choices about what third-party speech to display and how to display it," they engage in speech protected by the First Amendment. *Id.* at 2393. The superior court reached the opposite result here. It held that, in making choices about what third-party speech to display on Instagram and how to display it, Meta is *not* engaged in protected speech. App. 0132. Reasonable jurists could disagree with the trial court's determination that *Moody* does not control the State's claims.

In *Moody*, the Supreme Court recognized that social-media services make choices about whether to "include and exclude [and] organize and prioritize" third-party content, "and in making millions of those decisions each day, produce their own distinctive compilations of expression." *Id.* By "select[ing] and shap[ing] other parties' expression into their own curated speech," the Court continued, social-media services are "engaged in expression" and "government efforts to alter an edited compilation of third-party expression are subject to judicial review for compliance with the First Amendment." *Id.* That analysis should be treated as controlling here, because the State seeks to impose liability on Meta for its editorial judgments, including its decisions regarding the "presentation of content." App. 0043-53, 0113-15, ¶¶ 121-62, 374.

The superior court, however, distinguished *Moody* on the ground that

7

"the issue [in *Moody*] was government restrictions on content." App. 0132. But the Supreme Court's analysis did not turn on the content of user posts. Instead, the Court explained that the state laws there—like the State's claims here—sought to impose liability on social media companies based on "whether and how third-party posts are presented to other users. Or otherwise put, the laws limit the platforms' capacity to engage in content moderation—to filter, prioritize, and label the varied messages, videos, and other content their users wish to post." *Moody*, 144 S. Ct. at 2393. The Court stressed that, by "[d]eciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items," social media services were engaged in protected "expressive activity" independent of the third-party content. *Id.* at 2402. In other words, the State's challenge to how *all* content is published, at scale, is no less of a First Amendment issue than an attack on the substance of individual pieces of content.

Jurists could reasonably disagree with the superior court's conclusion that *Moody* is distinguishable because the issue there involved restrictions on content generally, rather than restrictions on "[t]he editorial function." *Id.* at 2401-02. Indeed, other courts have already applied *Moody* to protect the First Amendment rights of social media services where the state law at issue did not regulate the underlying third-party content. *See, e.g.*, *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1118 (9th Cir. 2024) (state law requiring online services to submit reports that "opine on potential harm to children" likely violated the First Amendment because "the Supreme Court recently affirmed 'that laws curtailing editorial choices by online platforms must meet the First Amendment's requirements.'" (quoting *Moody*, 144 S. Ct. at 2393) (cleaned up)); *NetChoice, LLC v. Reyes*, __ F. Supp. 3d __, 2024 WL 4135626, at *8-10 (D. Utah. Sept. 10, 2024) (state law likely unconstitutional because it "implicate[d] social media companies' First Amendment rights," and interfered with "social media companies' abilities to collage user-generated speech into their 'own distinctive compilations of expression'" (quoting *Moody*, 144 S. Ct. at 2393) (cleaned up), *appeal docketed*, No. 24-4100 (10th Cir. Oct. 11, 2024)); *Children's Health Def. v. Meta Platforms, Inc.*, 112 F.4th 742, 759

8

(9th Cir. 2024) (affirming Meta's right "to use its platform to promote views it finds congenial and to refrain from promoting views it finds distasteful.").

**Congressional Testimony.** Reasonable jurists could also disagree about whether the First Amendment protects Meta from liability under the VCPA for testimony before the U.S. Congress. Although the superior court noted that "it is a crime to knowingly lie under oath to Congress," App. 0133 (citing 18 U.S.C. § 1001), Meta has never argued that "lying" to Congress is protected speech. Instead, Meta argues only that the First Amendment prevents the State from imposing liability on its statements made to Congress under a statute that does not require the State to prove that Meta was "lying." *See Jordan v. Nissan N. Am., Inc.*, 2004 VT 27, ¶ 5, 176 Vt. 465, 853 A.2d 40 ("no intent to deceive or mislead need[s] to be proven" to establish liability under the VCPA).

The Supreme Court has repeatedly held that the First Amendment prohibits imposing liability on a speaker for making false statements on matters of public concern unless the false statements were made with "actual malice"—*i.e.*, knowingly and intentionally. *See, e.g.*, *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964) (holding Alabama libel per se standard unconstitutional because the First Amendment "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct" absent actual malice); *Snyder v. Phelps*, 562 U.S. 443, 459 (2011) (setting aside jury verdict for intentional infliction of emotional distress because picketing outside of soldier's funeral was First Amendment protected activity). The federal criminal statute identified by the trial court is consistent with this case law because it criminalizes making false statements "knowingly and willfully." 18 U.S.C. § 1001(a).

A reasonable jurist could conclude that the State's claims here sweep too broadly and therefore violate bedrock First Amendment principles. The challenged congressional testimony addressed issues of public concern and arose in the specific context of petitioning the government. *E.g.*, App. 0093-95, ¶¶ 288-98 (describing Meta employees' testimony regarding Instagram's safety). The statements are therefore entitled to "special protection" under the First Amendment. *See Snyder*, 562 U.S. at 458 (holding speech "at a public place on a matter of public concern" is "entitled to 'special protection'

9

under the First Amendment"). Yet because the VCPA permits liability for statements that would mislead a reasonable consumer, *Jordan*, ¶ 5, 176 Vt. at 468, 853 A.2d at 43, the State's claims would impose liability on Meta without any proof that the statements were knowingly and willfully false. Whether Meta can be punished for congressional testimony under a statute that effectively imposes strict liability for speech on matters of public concern is subject to reasonable disagreement. *See Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 52 (1988) ("[A] rule that would impose strict liability on a publisher for false factual assertions would have an undoubted 'chilling' effect on speech relating to public figures that does have constitutional value.").

In sum, there is "substantial ground for difference of opinion" on the superior court's First Amendment rulings. V.R.A.P. 5(b)(1)(A). The superior court did not hold otherwise. App. 0138.

### B. The Section 230 Ruling Is Also Subject to Reasonable Disagreement.

In denying Meta's motion to dismiss, the superior court held that Section 230 does not bar either the State's unfairness claim or the omissions portion of its misrepresentation claim. App. 0128-31. Reasonable jurists could disagree—and have disagreed—on both parts of this ruling.

**Unfairness Claim.** The State alleges that Meta engaged in an unfair practice in violation of the VCPA because certain features that Instagram uses to publish third-party content—recommendation algorithms, ephemeral content, infinite scroll and autoplay, and notifications—cause users to become addicted to using Instagram. App. 0043-54, ¶¶ 121-63. In holding that Section 230 does not bar this claim, the superior court observed that "both sides cite cases supporting their arguments." App. 0128. Most notably, the superior court acknowledged that its decision conflicts with the MDL court's ruling that Section 230 bars claims challenging the same Instagram features that the State challenges here. *Id.* The MDL court recently reaffirmed that view in cases brought by thirty-five state attorneys general, holding that Section 230 barred their "unfair" consumer protection claims—the same claim at issue here—insofar as those claims are challenging the same

10

publication features Section 230 bars. *See Multistate Suit*, 2024 WL 4532937, at *15-18.

The superior court disagreed with the MDL court because, in the superior court's view, the MDL court's analysis "ignores the language of the statute." App. 0130. But reasonable jurists could conclude that the MDL decision follows the statutory language because it gives effect to the plain and ordinary meaning of "publisher." Consistent with the statutory text, courts have adopted a "capacious conception of what it means to treat a website operator as [a] publisher." *Force v. Facebook, Inc.*, 934 F.3d 53, 65 (2d Cir. 2019). "[A] publisher's traditional editorial functions" include "deciding whether to publish, withdraw, postpone or alter content," *Jones v. Dirty World Ent. Recordings LLC*, 755 F.3d 398, 407 (6th Cir. 2014). It also includes organizing, curating, and disseminating third-party content. *See Moody*, 144 S. Ct. at 2393 (recognizing that "traditional publishers and editors" perform these activities).

The MDL court's decision shows that reasonable jurists can disagree—and have disagreed—on whether Section 230 bars the State's claims. *See Multistate Suit*, 2024 WL 4532937, at *15-18. That conclusion is reinforced by the decisions of other courts, which have held that Section 230 bars challenges to the same publishing activity at issue here:

- ***Algorithms.*** Several courts have concluded that Section 230 bars claims challenging a website's use of algorithms that organize and select the third-party content published to users. *E.g.*, *Force*, 934 F.3d at 66; *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019); *M.P. v. Meta Platforms, Inc.*, 692 F. Supp. 3d 534, 536-37 (D.S.C. 2023), *appeal docketed*, No. 23-1880 (4th Cir. 2023).

- ***Ephemeral Content.*** Courts have also concluded that Section 230 bars challenges to ephemeral content because deciding how long to publish something is an editorial decision. *E.g.*, *L.W. v. Snap Inc.*, 675 F. Supp. 3d 1087, 1095-96 (S.D. Cal. 2023); *Doe v. Snap, Inc.*, 2022 WL 2528615, at *14 (S.D. Tex. July 7, 2022), *aff'd*, 2023 WL 4174061 (5th Cir. June 26, 2023), *cert. denied*, 144 S. Ct. 2493 (2024).

- ***Infinite Scroll/Auto-Play.*** Courts have held challenges to content publication features like "infinite scroll" and "auto-play" are barred by Section 230 because they make more information available to users, and "making information more available, is, again, an essential part of traditional publishing." *Force*, 934 F.3d at 70; *see also Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1124 (N.D. Cal. 2016) (quoting *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 21 (1st Cir. 2016)).

- ***Notifications.*** Courts have also held that Section 230 bars liability for notifications to users because they, too, "facilitate the communication and content of others" and thus the provider "act[s] as a publisher of others' content" in supplying them. *Dyroff*, 934 F.3d at 1098; *see also FTC v. Match Grp., Inc.*, 2022 WL 877107, at *7-8 (N.D. Tex. Mar. 24, 2022).

As these decisions reflect, reasonable jurists could conclude that Section 230 bars the State's claims purportedly based on Instagram's "design features."

**Failure to Warn.** The superior court also held that Section 230 did not bar the State's claims for failure to warn about the allegedly addictive nature of Instagram. App. 0130-31. But just as a reasonable jurist could hold that Section 230 barred the State's challenges to certain Instagram publication features, a reasonable jurist could hold that Section 230 bars claims purporting to impose a duty to warn of alleged harms caused by those same publication features.

Many courts have held that Section 230 necessarily bars claims for failure to warn of an allegedly harmful "design feature" where claims targeting the same underlying feature are barred. Indeed, until recently, "every published decision" had rejected efforts to evade Section 230 by recasting claims barred by Section 230 as based on a service's failure to "warn" or "protect" users "from the dangers posed by" content. *In re Facebook, Inc.*, 625 S.W.3d 80, 93-95 (Tex. 2021) (listing cases and noting "unanimous view of other courts" on this issue); *see also Est. of Bride by & through Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1179-80 (9th Cir. 2024) (concluding the Section 230 prohibited plaintiffs' allegations of a failure-to-

warn of alleged harm tied to an application feature that allowed users to send messages anonymously); *Herrick v. Grindr LLC*, 765 Fed. App'x 586, 591 (2d Cir. 2019) (Section 230 barred failure-to-warn claim that was "inextricably linked" to barred claim about the service's design); *Lama v. Meta Platforms, Inc.*, __ F. Supp. 3d __, 2024 WL 2021896, at *6 (N.D.N.Y. May 6, 2024) (failure-to-warn claim dismissed because it was "inherently based on third-party content"); *V.V. v. Meta Platforms, Inc.*, 2024 WL 678248, at *10 (Conn. Super. Ct. Feb. 16, 2024) ("[A]llegations of failure to warn of an application's potential danger do not remove the 'publisher' status.").

In the months since the superior court's order denying Meta's motion to dismiss, other courts have issued additional decisions that are contrary to the superior court's reasoning. For example, in *Estate of Carson Bride v. Yolo Techs., Inc.*, 112 F.4th 1168 (9th Cir. 2024), the plaintiffs alleged that the online service should have warned plaintiffs about potential risks associated with using the service. *Id.* at 1175. The Ninth Circuit held that Section 230 barred the failure-to-warn claim because the "general possibility of harm" plaintiffs alleged "essentially fault[ed] [the service] for not moderating content in some way, whether through deletion, change, or suppression," which is forbidden by Section 230. *Id.* at 1180-81.

In reaching the contrary conclusion, the superior court relied on the ruling from the MDL court, which held that Section 230 did not bar failure-to-warn (or omissions-based) claims. App. 0131. Although the MDL court has denied Meta's motion to dismiss omissions-based misrepresentation claims brought by state attorneys general, the court acknowledged that, "[w]ith respect to the alleged omissions, a tension exists and the law is still developing," *Multistate Suit*, 2024 WL 4532937, at *19, and that the states allege "novel theories [that] test the boundaries of an area of law in some flux," *id.* at *22. The MDL court's analysis further supports that reasonable jurists can disagree on this ruling.

13

## II. The Superior Court's Order Involves Controlling Questions of Law and an Appeal Would Materially Advance the Termination of the Litigation.

This Court should review the superior court's holdings on the First Amendment and Section 230 alongside personal jurisdiction because each issue presents a "controlling question of law" that "may materially advance the termination of this litigation." V.R.A.P. 5(b)(1). A question of law is "controlling" where "reversal would have a substantial impact on the litigation, either by saving substantial litigation time, or by significantly narrowing the range of issues, claims, or defenses at trial." *In re Pyramid*, 141 Vt. at 303-04, 449 A.2d at 919-20. And interlocutory review may "materially advance the termination of the litigation" where the appeal would "advance the *ultimate* termination of a case," especially as compared to the time and expense of litigating the case in the normal course. *Id.* at 305, 921 (emphasis in original). Because these two elements overlap, they are often considered together. *See, e.g.*, *State v. Wheel*, 148 Vt. 439, 440, 535 A.2d 328, 329 (1987) (addressing these elements together).

The superior court denied certification on the ground that it could not determine whether an interlocutory appeal of First Amendment and Section 230 could "materially advance the termination of the litigation," despite acknowledging that "the issues might be narrowed" if this Court were to reverse. App. 0138-39. The superior court abused its discretion in reaching this result.

### A. The First Amendment and Section 230 Issues Involve Controlling Questions of Law That Should Be Decided Now.

Vermont courts have routinely granted permission to appeal First Amendment rulings and denials of immunities like Section 230. An immediate appeal here could protect the federal constitutional and statutory rights that Meta asserts in this case.

**First Amendment.** Whether the First Amendment bars the State's claims presents a controlling question of law that, if decided in Meta's favor, would materially advance the litigation. Reversal would, at minimum, save

14

"substantial litigation time" by "significantly narrowing the range of issues" as the litigation proceeds. *In re Pyramid*, 141 Vt. at 303-04, 449 A.2d at 920.

If Meta is correct that the superior court's First Amendment ruling is contrary to U.S. Supreme Court precedent, it would bar the State's first claim in its entirety and its second claim in substantial part. Appellate guidance now has the potential to save the parties and Vermont courts significant time and expense through discovery, further dispositive motions briefing, trial, post-trial motions, and inevitable appeal. *Id.* at 305, 449 A.2d at 920-21; *see also Rollins v. Dignity Health*, 2014 WL 6693891, at *4 (N.D. Cal. Nov. 26, 2014) (noting an immediate appeal of certified issue would materially advance the litigation because its resolution would "clearly impact the course of further motions and discovery").

Moreover, an immediate appeal is necessary to protect Meta's First Amendment rights. Because "the First Amendment's protections extend to not only unconstitutional laws, but also to unnecessary litigation that chills speech," the First Amendment's application to this case must be resolved "at the earliest possible junction." *Green*, 52 F.4th at 800. The State's lawsuit and the "fear of damage awards" threaten to chill Meta's protected activity, *see N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 277 (1964), because the State's claims seek to regulate Meta's editorial decisions about how to prioritize and display third-party content so that Meta will disseminate less content to users. For this reason, Vermont courts have frequently granted permission to appeal First Amendment issues.[2]

**Section 230.** Much like the First Amendment, whether Section 230 bars the State's claims also presents a controlling question of law that may materially advance the litigation if resolved in Meta's favor.

Section 230 provides interactive computer services like Meta not just a "defense to liability," but an "*immunity from suit*," which is "effectively lost if

---

[2] *See, e.g., State v. Colby*, 2009 VT 28, ¶¶ 4, 6-15, 972 A.2d 197 (answering under V.R.A.P. 5(a) whether a person who engaged in "uninvited political speech" could be convicted of violating a state law that prohibited the "disturb[ance] of a lawful assembly or meeting . . ."); *State v. DeLaBruere*, 154 Vt. 237, 246, 249-70, 557 A.2d 254, 261-72 (1990) (addressing whether Vermont's compulsory education statute violated the Free Exercise Clause of the United States and Vermont Constitutions).

a case is erroneously permitted to go to trial." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009) (emphasis in original); *see also Ricci v. Teamsters Union Loc. 456*, 781 F.3d 25, 26 (2d Cir. 2015) (similar). Entitlement to statutory immunity is a pure question of law. *Lewis v. Caraballo*, 98 F.4th 521, 528 (4th Cir. 2024). That legal question is controlling—and resolving it now could materially advance the litigation— because reversal would significantly narrow the scope of the State's claims, and corresponding discovery resulting in significant time and cost savings to the parties and Vermont courts.

An immediate appeal of the superior court's Section 230 ruling is necessary to protect Meta's statutory immunity from suit. Because Section 230 "protect[s] websites not merely from ultimate liability, but [also] from having to fight costly and protracted legal battles," *Roommates.Com*, 521 F.3d at 1175, Section 230's application must be resolved at the earliest opportunity. *E.g.*, *In re Facebook*, 625 S.W.3d at 87 (granting mandamus relief to correct erroneous denial of motion to dismiss under Section 230). Although Vermont courts have rarely had occasion to apply Section 230, they have consistently granted permission to appeal where immunity questions are at issue.[3]

## B.   The Superior Court Erred When It Declined to Permit Appellate Review on These Questions.

The superior court declined to permit appellate review on Meta's arguments about the First Amendment and Section 230 because "it [was] not clear at this stage how much discovery would be reduced or how much time would be saved" if the litigation was narrowed by these defenses. App. 0138-39. But the superior court acknowledged that, if this Court were to reverse, "the issues might be narrowed" on remand. *Id.* at 0138. That is enough for certification. *See In re Pyramid*, 141 Vt. at 303-04, 449 A.2d at 919-20

---

[3] *See, e.g.*, *Noble v. Off. of Child Support*, 168 Vt. 349, 721 A.2d 121 (1998) (sovereign immunity); *Hillerby v. Town of Colchester*, 167 Vt. 270, 706 A.2d 446 (1997) (municipal tort immunity); *Libercent v. Aldrich*, 149 Vt. 76, 539 A.2d 981 (1987) (official immunity).

(certification is merited when issues would "narrow[] the range of issues, claims, or defenses at trial"). By failing to grapple with the issue, the superior court abused its discretion by denying certification "based on [a] mistaken understanding of" Rule 5(b)'s requirements. *Vt. Nat. Bank*, 156 Vt. at 147, 588 A.2d at 623.

Interlocutory appeals under Rule 5(b) are not limited to issues that would necessarily resolve the entire case. Instead, an issue warrants interlocutory appeal so long as "reversal would have a substantial impact on the litigation, either by saving substantial litigation time, or by significantly narrowing the range of issues, claims, or defenses at trial." *In re Pyramid*, 141 Vt. at 303-04, 449 A.2d at 919-20. Reversal on the First Amendment or Section 230 would achieve all of those objectives.

Reversal would significantly narrow the claims in the case. As the superior court acknowledged, if Meta prevailed on either the First Amendment or Section 230, only a portion of the State's deception claim would remain. App. 0138-39. That means that Count I of the Complaint— the "unfairness" claim—would be dismissed in its entirety. And Count II— the deception claim—would be dismissed in substantial part. The omissions portion of the deception claim would be dismissed, leaving only the State's allegations of affirmative misrepresentations. *Id.* In a case involving only two claims, a ruling that results in dismissal of one claim in its entirety and the other in substantial part would "have a substantial impact on the litigation . . . by significantly narrowing the claims." *In re Pyramid*, 141 Vt. at 303-04, 449 A.2d at 919-20; *see also State v. Atl. Richfield Co.*, No. 340-6-14 WNCV, 2015 WL 5176800, at *2 (Vt. Super. May 22, 2015) (interlocutory appeal may materially advance litigation where appeal could "narrow[] the scope of the case," which could affect "discovery and trial time"); *In re Montpelier WWTF Discharge Permit*, No. 22-2-08VTEC, 2009 WL 8427878 (Vt. Super. Aug. 10, 2009) (certifying order for interlocutory appeal even where appeal was "unlikely" to end litigation because "the ultimate resolution of this appeal at least has the prospect of being advanced by a final ruling on the legal issues addressed in the Decision"). The superior court acknowledged that "the issues might be narrowed" following appeal. App. 0138. That is enough to warrant an immediate appeal.

17

Reversal would significantly narrow the "range of issues" in the case. *Id.* The State's unfairness claim requires the parties to litigate, among other issues, whether the alleged unfair "design" of Instagram (i) offends public policy, (ii) is immoral, unethical, oppressive or unscrupulous, and (iii) causes substantial injury to consumers. *Christie v. Dalmig, Inc.*, 136 Vt. 597, 601, 396 A.2d 1385, 1388 (1979). But if this Court holds that the First Amendment or Section 230 precludes the State's unfairness claim, then none of these issues would remain in the case. The State's misrepresentation claim does not require proof of any of those elements, but instead presents different issues, including that (i) Meta made a representation or omission that was likely to mislead consumers, (ii) consumers' interpretation of the representation would be reasonable under the circumstances, and (iii) the misleading representation was material in that it affects consumers' purchasing decisions. *Jordan*, 2004 VT 27, ¶ 5, 176 Vt. 465, 853 A.2d 40. So even if the misrepresentation claim remained in the case, dismissal of the unfairness claim would significantly narrow the issues.

Even if Rule 5(b) required a movant to show that reversal on appeal would reduce discovery, that requirement would also be satisfied. The superior court stated that, regardless of whether the State could proceed on both of its claims or solely on an affirmative-misrepresentation claim, "[m]uch of the discovery needed would appear to be the same." App. 0139. That is incorrect. The discovery necessary to litigate only the State's affirmative-misrepresentation claim is necessarily narrower than the discovery for both claims together. As discussed above, for the unfairness claims, the parties may litigate numerous issues—such as whether Instagram's "design" offends public policy or is immoral, unethical, or oppressive—that are not relevant to the misrepresentation claim. As a result, discovery related to those issues is necessary only if the unfairness claim remains in the case.

In contrast, if only the affirmative-misrepresentation claim proceeds, discovery and trial would focus only on each individual challenged statement, and would center on facts such as the veracity of the statement and the speaker's knowledge at the time of the statement. Accordingly, reversal on

18

appeal would significantly narrow the discovery—not to mention also narrowing the claims and issues and saving substantial litigation time.

## CONCLUSION

This Court should grant Meta's motion for permission to appeal on the First Amendment and Section 230 issues under V.R.A.P. 5(b)(7)(A).

Dated at Burlington, Vermont this 28th day of October, 2024.

By:   /s/ Kendall Hoechst
Kendall Hoechst, Esq.
Ritchie E. Berger, Esq.
Anne Rosenblum, Esq.
Dinse P.C.
209 Battery Street, P.O. Box 988
Burlington, VT 05402
(802) 864-5751
khoechst@dinse.com
rberger@dinse.com
arosenblum@dinse.com

Timothy C. Hester, *pro hac vice*
Mark W. Mosier, *pro hac vice*
   *forthcoming*
Covington & Burling LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
thester@cov.com
mmosier@cov.com

*Counsel for Defendants/Appellants*

# EXHIBIT 21

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
**https://www.courts.nh.gov**
### RULE 7 NOTICE OF DISCRETIONARY APPEAL

This form should be used <u>only</u> for an appeal from a final decision on the merits issued by a superior court or circuit court in (1) a post-conviction review proceeding; (2) a proceeding involving the collateral challenge to a conviction or sentence; (3) a sentence modification or suspension proceeding; (4) an imposition of sentence proceeding; (5) a parole revocation proceeding; (6) a probation revocation proceeding; (7) a landlord/tenant action or a possessory action filed under RSA chapter 540; (8) an order denying a motion to intervene; or (9) a domestic relations matter filed under RSA chapters 457 to 461-A, except that an appeal from the first final order should be filed on a Rule 7 Notice of Mandatory Appeal form.

---

1. COMPLETE CASE TITLE AND CASE NUMBERS IN TRIAL COURT

**The State of New Hampshire v. Meta Platforms Inc. and Instagram, LLC,**
**Docket No. 217-2023-CV-00594**

---

2. COURT APPEALED FROM AND NAME OF JUDGE(S) WHO ISSUED DECISION(S)

**Superior Court - Merrimack County, The Honorable John C. Kissinger, Jr.**

---

3A. APPEALING PARTY: NAME, MAILING ADDRESS, E-MAIL ADDRESS, AND TELEPHONE NUMBER.

**Meta Platforms Inc. and Instgram, LLC**

**1 Hacker Way**
**Menlo Park, CA 94025**

E-Mail address: _____

Telephone number: _____

---

3B. APPEALING PARTY'S COUNSEL: NAME, BAR ID NUMBER, FIRM NAME, MAILING ADDRESS, E-MAIL ADDRESS, AND TELEPHONE NUMBER.

**Michael A. Delaney (NH Bar No. 10504)**
**Christopher J. Walsh (NH Bar No. 276784)**

**McLane Middleton, PA**
**900 Elm Street - PO Box 326**
**Manchester, NH 03105**

E-Mail address: **michael.delaney@mclane.com**

Telephone number: **(603) 625-6464 ext**

---

4A. OPPOSING PARTY: NAME, MAILING ADDRESS, E-MAIL ADDRESS, AND TELEPHONE NUMBER.

**The State of New Hampshire**

**New Hampshire Department of Justice**
**Office of the Attorney General**
**1 Granite Place South**
**Concord, NH 03301**

E-Mail address: _____

Telephone number: _____

---

4B. OPPOSING PARTY'S COUNSEL: NAME, BAR ID NUMBER, FIRM NAME, MAILING ADDRESS, E-MAIL ADDRESS, AND TELEPHONE NUMBER.

**Brandon H. Garod (NH Bar No. 21164)**
**Kevin P.J. Scura (NH Bar No. 270199)**

**New Hampshire Department of Justice**
**Office of the Attorney General**
**1 Granite Place South**
**Concord, NH 03301**

E-Mail address: **brandon.h.garod@doj.nh.gov**

Telephone number: **(603) 271-3650 ext**

---

Case Name: **The State of New Hampshire v. Meta Platforms Inc. and Instagram, LLC, Docket No. 217-202**

**RULE 7 NOTICE OF DISCRETIONARY APPEAL**

5. NAMES OF ALL OTHER PARTIES AND COUNSEL IN TRIAL COURT

**See Attachment A for all other counsel in the trial court**

---

6. DATE OF CLERK'S NOTICE OF DECISION OR SENTENCING.

**12/11/2024**

DATE OF CLERK'S NOTICE OF DECISION ON POST-TRIAL MOTION, IF ANY.

---

7. CRIMINAL CASES: DEFENDANT'S SENTENCE AND BAIL STATUS

**N/A**

---

8. APPELLATE DEFENDER REQUESTED?          YES or NO: **No**

IF YOUR ANSWER IS YES, YOU MUST CITE STATUTE OR OTHER LEGAL AUTHORITY UPON WHICH CRIMINAL LIABILITY WAS BASED AND SUBMIT A CURRENT REQUEST FOR A LAWYER FORM (FINANCIAL STATEMENT). SEE SUPREME COURT RULE 32(4).

---

9. IS ANY PART OF CASE CONFIDENTIAL?          YES or NO: **No**

IF SO, IDENTIFY WHICH PART AND CITE AUTHORITY FOR CONFIDENTIALITY.
SEE SUPREME COURT RULE 12.

---

10. IF ANY PARTY IS A CORPORATION LIST THE NAMES OF PARENTS, SUBSIDIARIES AND AFFILIATES.

**Meta Platforms Inc. is parent of Instagram, LLC. The two collectively have hundreds of subsidiaries and affiliates. Given the volume, a complete list is not included but can be provided if needed.**

---

11. DO YOU KNOW OF ANY REASON WHY ONE OR MORE OF THE SUPREME COURT JUSTICES WOULD BE DISQUALIFIED FROM THIS CASE?          YES or NO: **No**

IF YOUR ANSWER IS YES, YOU MUST FILE A MOTION FOR RECUSAL IN ACCORDANCE WITH SUPREME COURT RULE 21A.

---

12. IS A TRANSCRIPT OF TRIAL COURT PROCEEDINGS NECESSARY FOR THIS APPEAL? SEE SUPREME COURT RULE 15, COMMENT.
          YES or NO: **No**

IF YOUR ANSWER IS YES, YOU MUST COMPLETE THE TRANSCRIPT ORDER FORM ON PAGE 4 OF THIS FORM.

Case Name: **The State of New Hampshire v. Meta Platforms Inc. and Instagram, LLC, Docket No. 217-202**

<u>RULE 7 NOTICE OF DISCRETIONARY APPEAL</u>

13. NATURE OF CASE AND RESULT (Limit two pages double-spaced; please attach or include.)
    For this section and section 14, you may choose to use the five-page, single-spaced Additional Information Pages form. The five-page Additional Information Pages form is available on the judicial branch website: <u>Forms - Supreme Court | New Hampshire Judicial Branch (nh.gov)</u>

14. ISSUES ON APPEAL (Limit eight pages double-spaced; please attach or include.)
    You may choose to use the same five-page, single-spaced Additional Information Pages form identified in section 13.
    The New Hampshire Supreme Court reviews each discretionary notice of appeal and decides whether to accept the case, or some issues in the case, for appellate review. The following acceptance criteria, while neither controlling nor fully describing the court's discretion, indicate the character of the reasons that will be considered.

   1. The case raises a question of first impression, a novel question of law, an issue of broad public interest, an important state or federal constitutional matter, or an issue on which there are conflicting decisions in New Hampshire courts.
   2. The decision below conflicts with a statute or with prior decisions of this court.
   3. The decision below is erroneous, illegal, and unreasonable or was an unsustainable exercise of discretion.

    Separately number each issue you are appealing and for each issue: (a) state the issue; (b) explain why the acceptance criteria listed above support acceptance of that issue; and (c) if a ground for appeal is legal sufficiency of evidence, include a succinct statement of why the evidence is alleged to be insufficient as a matter of law.

15. ATTACHMENTS
    Attach to or include with this notice of appeal the following documents in order: (1) a copy of the trial court decision or order from which you are appealing; (2) the clerk's notice of the decision below; (3) any court order deciding a timely post-decision motion; and (4) the clerk's notice of any order deciding a timely post-decision motion.

    Do not attach or include any other documents with this notice of appeal. Any other documents you wish to submit must be included in a <u>separate</u> Appendix, which must have a table of contents on the cover and consecutively numbered pages.

16. CERTIFICATIONS
    I hereby certify that every issue specifically raised has been presented to the court below and has been properly preserved for appellate review by a contemporaneous objection or, where appropriate, by a properly filed pleading. To the extent that an unpreserved issue is raised as plain error, I hereby certify that I have specifically identified that issue as plain error in section 14.

**/s/ Michael A. Delaney**
Appealing Party or Counsel

    I hereby certify that on or before the date below, copies of this notice of appeal were served on all parties to the case and were filed with the clerk of the court from which the appeal is taken in accordance with Supreme Court Rules 5(1) and 26(2) and with Rule 18 of the Supplemental Rules of the Supreme Court.

<u>01/10/2025</u>
Date

**/s/ Michael A. Delaney**
Appealing Party or Counsel

**Case Name:** The State of New Hampshire v. Meta Platforms Inc. and Instagram, LLC, Docket No. 217-202

<u>RULE 7 NOTICE OF DISCRETIONARY APPEAL</u>

## TRANSCRIPT ORDER FORM

INSTRUCTIONS:
1. If a transcript is necessary for your appeal, you <u>must</u> complete this form.
2. List each portion of the proceedings that must be transcribed for appeal, e.g., entire trial (see Supreme Court Rule 15(3)), motion to suppress hearing, jury charge, etc., and provide information requested.
3. Determine the amount of deposit required for each portion of the proceedings and the total deposit required for all portions listed. Do <u>not</u> send the deposit to the Supreme Court. You will receive an order from the Supreme Court notifying you of the deadline for paying the deposit amount to the court transcriber. Failure to pay the deposit by the deadline may result in the dismissal of your appeal.
4. The transcriber will produce a digitally-signed electronic version of the transcript for the Supreme Court, which will be the official record of the transcribed proceedings. The parties will be provided with an electronic copy of the transcript in PDF-A format. A paper copy of the transcript may also be prepared for the court.

| PROCEEDINGS TO BE TRANSCRIBED (Please confirm dates with Trial Court) | | | | | |
|---|---|---|---|---|---|
| PROCEEDING DATE (List each day separately, e.g. 5/1/11; 5/2/11; 6/30/11) | TYPE OF PROCEEDING (Motion hearing, opening statement, trial day 2, etc.) | NAME OF JUDGE | LENGTH OF PROCEEDING (in .5 hour segments, e.g.,1.5 hours, 8 hours) | RATE (standard rate unless ordered by Supreme Court) | DEPOSIT |
| | | | | X $170.00 | $ |
| | | | | X $170.00 | $ |
| | | | | X $170.00 | $ |
| | | | | X $170.00 | $ |
| | | | | X $170.00 | $ |
| | | | | X $170.00 | $ |
| | | | | X $170.00 | $ |
| | | | | X $170.00 | $ |
| | | | | X $170.00 | $ |
| | | | | X $170.00 | $ |
| | | | | **TOTAL DEPOSIT** | **$** |

| PROCEEDINGS PREVIOUSLY TRANSCRIBED | | | | | |
|---|---|---|---|---|---|
| PROCEEDING DATE (List date of each transcript volume) | TYPE OF PROCEEDING (Motion hearing, opening statement, trial day 2, etc.) | NAME OF JUDGE | NAME OF TRANSCRIBER | DO ALL PARTIES HAVE COPY (YES OR NO) | DEPOSIT FOR ADDITIONAL COPIES |
| | | | | | TBD |
| | | | | | TBD |
| | | | | | TBD |

**NOTE:** The deposit is an estimate of the transcript cost. After the transcript has been completed, you will be required to pay an additional amount if the final cost of the transcript exceeds the deposit. Any amount paid as a deposit in excess of the final cost will be refunded. The transcript will not be released to the parties until the final cost of the transcript is paid in full.

## **Attachment A – Section 5**

## NAMES OF ALL OTHER COUNSEL IN TRIAL COURT

**Additional Counsel for Defendants Meta Platforms, Inc. and Instagram, LLC**

Gregory L. Halperin, *pro hac vice*
Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018
ghalperin@cov.com

Mark W. Mosier, *pro hac vice*
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
mmosier@cov.com

**Additional Counsel for Plaintiff the State of New Hampshire**

Mary F. Stewart (Bar No. 10067)
Brandon F. Chase (Bar No. 270844)
New Hampshire Department of Justice,
Office of the Attorney General
1 Granite Place South
Concord, NH 03301

Jimmy Rock, *pro hac vice*
Edelson PC
1255 Union St. NE, 7th Floor
Washington, DC 20002

Shantel Chapple Knowlton, *pro hac vice*
Theo Benjamin, *pro hac vice*
Emily Penkowski Perez, *pro hac vice*
Roger Perlstadt, *pro hac vice*
Edelson PC
350 North LaSalle St., Ste. 1400
Chicago, IL 60654

**Attachment B – Section 13**

**NATURE OF CASE AND RESULT**

Facebook and Instagram are two of the most widely used social media services in the world, connecting billions of people.  These services host, arrange, and disseminate an array of user-generated content.  Every user's experience is unique, reflecting, among other things, their own choices and activities on the platforms.

The State sued Meta Platforms, Inc. and Instagram, LLC (collectively, "Meta").  The Complaint alleges Meta engaged in unfair and deceptive trade practices based on so-called "design features," Compl. ¶ 5, including those that notify users when others interact with their content or post content; prioritize and arrange content; and control how and for how long content is displayed after it is published, *id.* ¶¶ 56−97.  The State also alleges that some third-party content harms young users by causing, for example, "negative social comparison" or "body dissatisfaction." *Id.* ¶¶ 170−76.  The Complaint brings two counts under the Consumer Protection Act, RSA chapter 358-A, two counts for strict products liability, and one count for negligence.

Meta moved to dismiss.  As relevant here, Meta argued that the Complaint failed to allege conduct sufficient to support the exercise of

personal jurisdiction over Meta under the Due Process Clause of the U.S. Constitution. Meta also argued that the State's claims are barred by Section 230 of the Communications Decency Act, 47 U.S.C. § 230, because they seek to impose liability on Meta for its role in publishing third-party content.[1]

The superior court denied Meta's motion to dismiss. As to personal jurisdiction, the court held that Meta's contacts with New Hampshire related to the State's claims because Meta makes its applications available to users in the State—even though Meta does not target the State differently than any other jurisdiction. *See* Order Denying Motion to Dismiss (Dec. 10, 2024) ("Order") at 11−21. As to Section 230, the court held that, although the statute applies to Meta as an interactive computer service provider, the State's claims would not hold Meta liable as a publisher of third-party content because the alleged harms arise from Meta's own conduct, *i.e.*, its use of certain "features" to publish third-party content. Order at 21−26. The court therefore held that Section 230 immunity did not bar the State's claims. *Id.*

---

[1] Meta also argued that the State's claims infringe on Meta's First Amendment rights and that the State's products liability-related counts fail because the challenged services—Facebook and Instagram—are not "products" under law. Meta has requested that the superior court grant an interlocutory appeal of those rulings.

**Attachment C – Section 14**

**ISSUES ON APPEAL**

**1. Whether the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution permits a New Hampshire court to exercise specific jurisdiction over Meta based on Meta's operation of generally accessible online services or alleged forum contacts that are no different from its contacts with every other forum and do not relate to the State's claims.**

This Court has recognized that personal "jurisdiction is not only separate" from the merits of a case, "but also preliminary, and reasonable procedure demands that it be finally decided before other issues of the litigation are reached." *Mosier v. Kinley*, 142 N.H. 415, 424, 702 A.2d 803, 809 (1997) (cleaned up). This Court should decide the personal jurisdiction issue now because the ruling below violates due process and would subject virtually every website operator to suit in every state. Indeed, in an almost identical case brought by the State of Vermont, the trial court denied Meta's motion to dismiss for lack of personal jurisdiction, and the Vermont Supreme Court recently granted interlocutory appeal of that issue. *See* Entry Order, *Vermont v. Meta Platforms, Inc.*, No. 24-AP-295 (Vt. Dec. 23, 2024). The same result is warranted here.

The superior court incorrectly concluded that "the exercise of specific personal jurisdiction" over Meta "comports with due process." *See Red Oak Apartment Homes, LLC v. Strategis Floor & Décor, Inc.*, 173 N.H. 529, 533–34, 243 A.3d 891, 895 (2020). Due process demands that a "defendant has purposefully directed its activities at residents of the forum, and [that] the litigation results from alleged injuries that arise out of or relate to those activities." *Skillsoft Corp. v. Harcourt General, Inc.*, 146 N.H. 305, 309, 770 A.2d 1115, 1119 (2001) (cleaned up). Neither condition has been satisfied. The alleged forum contacts—such as Facebook's and Instagram's accessibility in the State; Meta's requirement that users agree to terms before use; and its practice of allowing businesses to pay for advertising—are not specific to New Hampshire. *Contra* Order at 18. Nor do the alleged contacts "relate to" the State's claims. Those claims stem from so-called "design features" and purported misrepresentations and omissions—not Meta's advertising or marketing practices, nor its terms of use. *Contra id.* at 15–16.

The decision below conflicts with many others holding that the contacts and claims alleged here are insufficient to establish personal jurisdiction. For example, other courts have held that a website's terms of service do not establish purposeful availment where, as here, the contract is

formed by a user intentionally seeking out the service and where, as here, users in all forums agree to the same terms. *See, e.g.*, *Old Republic Ins. Co. v. Continental Motors, Inc.*, 877 F.3d 895, 910 (10th Cir. 2017). Similarly, a plaintiff's claims do not "relate to" those alleged contracts where, as here, there are no allegations that the terms are unfair or deceptive. *See, e.g.*, *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1212 & n.9 (9th Cir. 2020).

Nor have courts considered the collection of user data and the practice of allowing businesses to pay for targeted advertising sufficient to confer personal jurisdiction. *See, e.g.*, *Kuan Chen v. U. S. Sports Acad., Inc.*, 956 F.3d 45, 58–59 (1st Cir. 2020) (websites that advertise to residents of a state cannot show personal jurisdiction merely because the website is "available everywhere"). Courts have also found personal jurisdiction unsupported where, as here, a website operates the same way across jurisdictions. *See, e.g.*, *Hasson v. FullStory, Inc.*, 114 F.4th 181, 191–92 (3d Cir. 2024) (dismissing where defendant was not alleged to have expressly aimed session replay code at the forum different from any other jurisdiction); *Rosenthal v. Bloomingdales.com, LLC*, 101 F.4th 90, 97–98 (1st Cir. 2024) (similar); *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 321–22, 324 (5th Cir. 2021) ("To target . . . user[s] everywhere . . . is to target no place at all.").

Likewise, for the superior court to exercise personal jurisdiction for the State's misrepresentation and omissions claim, the challenged statements must have been specifically directed at or made in the forum. *See Murphy v. Erwin-Wasey, Inc.*, 460 F.2d 661, 664 (1st Cir. 1972); *see also, e.g.*, *Clemens v. McNamee*, 615 F.3d 374, 380 (5th Cir. 2010) (statements must be "made in" or "directed to" residents of a particular state "more than residents of any [other] state"). But the State has not alleged that to be the case here.

This Court should therefore exercise its discretion to review the question of personal jurisdiction and hold that jurisdiction is lacking.

**2. Whether Section 230 of the Communications Decency Act, 47 U.S.C. § 230, bars the State's claims insofar as they seek to impose liability on Meta for publishing activities such as selecting, prioritizing, and displaying third-party content.**

The superior court's determination that Section 230 does not bar the State's claims also warrants immediate review. That ruling contravenes federal law and in conflict with an abundance of caselaw. And the ruling is immediately appealable under Rule 7 because Section 230 provides Meta with immunity from suit.

11

This Court has recognized that the denial of a motion to dismiss premised on "immunity from suit" is "immediately appealable under the collateral order doctrine" because such immunity is "effectively lost if a case is erroneously permitted to go to trial." *Richardson v. Chevrefils*, 131 N.H. 227, 231, 552 A.2d 89, 92 (1988) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)). The Section 230 ruling is immediately appealable because this Court has already held that Section 230 "confers immunity from suit." *Banaian v. Bascom*, 175 N.H. 151, 158, 281 A.3d 975, 980 (2022).

Under the collateral order doctrine, a trial court's order is immediately appealable, even if it does not conclude the litigation, where it (1) "conclusively determine[d] the disputed question," (2) "resolve[d] an important issue completely separate from the merits of the action," and (3) would "be effectively unreviewable on appeal from a final judgment." *Will v. Hallock*, 546 U.S. 345, 349 (2006). All three criteria are met here.

*First*, the "denial of a motion to dismiss is conclusive as to" an immunity from suit. *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996). And here, the court expressly held "that Section 230 does not bar the State's claims." Order at 25−26.

12

*Second*, the threshold legal question of whether Section 230 bars the State's claims is entirely separate from the merits of the action. Courts can and do resolve this issue at this stage of litigation and without regard to the merits of the claims. *See, e.g.*, *Banaian*, 175 N.H. at 158, 281 A.3d at 980 (affirming dismissal of plaintiff's tort claims because of Section 230 immunity); *Atkinson v. Meta Platforms, Inc.*, No. 20-17489, 2021 WL 5447022, at *3 (9th Cir. Nov. 22, 2021) (Because Section 230 bars plaintiff's claim, "we need not reach its merits.").

*Third*, the superior court's order would be unreviewable on appeal from a final judgment. Section 230 expressly states that "*[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.*" 47 U.S.C. § 230(e)(3) (emphasis added). Thus, as this Court recognizes, "the statute's plain language confers immunity from suit." *See Banian*, 175 N.H. at 158, 281 A.3d at 980.[2] As an immunity from suit, not just liability, Section 230 is meant to protect Meta from "costly and protracted legal battles." *See Fair Hous. Council of San*

---

[2] The overwhelming majority of courts to consider the issue have also held that Section 230 provides immunity from suit. *See, e.g.*, *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009) (Section 230 is an "immunity from suit rather than a mere defense to liability." (cleaned up)); *Jones v. Dirty World Ent. Recordings LLC*, 755 F.3d 398, 408 (6th Cir. 2014) (same); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1125 (9th Cir. 2003) (same).

*Fernando Valley v. Roommates.Com*, LLC, 521 F.3d 1157, 1175 (9th Cir. 2008). That protection is lost once a case proceeds past a motion to dismiss, subjecting Meta to burdensome and unnecessary discovery. *Id.*[3]

Immediate review is warranted here because the superior court's Section 230 ruling conflicts with this Court's "expansive view of the publisher's role." *See Teatotaller, LLC v. Facebook, Inc.*, 173 N.H. 442, 452, 242 A.3d 814, 822 (2020) (internal quotation marks omitted). Section 230 prohibits causes of action that "require[] the court to treat the defendant as the publisher or speaker of content provided by another." *Id.* at 451. The court below held that the State's unfair practices and tort claims do not treat Meta as a publisher because they target the so-called "design features" – i.e., the means by which Meta implements its editorial discretion, as allegedly harmful. Order at 25. Indeed, it is through these so-called "design features," including algorithms, notifications, and content delivery tools, that Meta organizes, curates, and disseminates—*i.e.*, publishes—user-generated content. As such, the claims necessarily hold Meta liable for its role as a publisher. The court similarly held that Section 230 did not bar the State's

---

[3] Meta submits that the Section 230 ruling is also reviewable under Supreme Court Rule 11 and can provide a Rule 11 Petition for Original Jurisdiction if needed.

misrepresentations and omissions claims because they were based on "Meta's knowledge that its products harm New Hampshire children," not on its "role as a publisher." Order at 26. But the State's alleged harms are inextricably linked to user-generated content on Meta's services, as the allegations in the complaint demonstrate. *See, e.g.*, Compl. ¶ 195 (alleging the existence of "violent content, content encouraging negative self-perception and body image issues, [and] bullying content").

In holding that Section 230 immunity does not apply, the court's order conflicts with many others barring similar claims.[4] Most prominently, a federal court overseeing multidistrict litigation recently held that Section 230 bars similar unfairness claims brought by over 30 states challenging the same features that the State challenges here. *In re Soc. Media Adolescent Addiction/Pers. Injury Prods. Liab. Litig.*, __ F. Supp. 3d __, 2024 WL 4532937 (N.D. Cal. Oct. 15, 2024), *appeals filed*. The opportunity to resolve this conflict—and to correct the flawed decision below—supports review.

---

[4] *See, e.g.*, *Force v. Facebook, Inc.*, 934 F.3d 53, 66, 70 (2d Cir. 2019) (algorithms and "making . . . more [content] available"); *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019) (algorithms and notifications); *Doe v. Snap, Inc.*, 2022 WL 2528615, at *14 (S.D. Tex. July 7, 2022) (ephemeral content), *aff'd*, 2023 WL 4174061 (5th Cir. June 26, 2023), *cert. denied*, 144 S. Ct. 2493 (U.S. July 2, 2024); *Est. of Bride by & through Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1180 (9th Cir. 2024) (publishing features).

15

# The State of New Hampshire

**MERRIMACK COUNTY**                    **SUPERIOR COURT**

THE STATE OF NEW HAMPSHIRE

v.

META PLATFORMS, INC. and INSTAGRAM, LLC

Docket No.: 217-2023-CV-00594

## <u>ORDER</u>

The plaintiff, the State of New Hampshire, brings this suit against the defendants, Meta Platforms, Inc. and Instagram, LLC for violations of the Consumer Protection Act ("CPA"), products liability, and negligence. The State's claims arise out of Meta's use of certain design features and the impact of those features on children in New Hampshire. Meta moves to dismiss. The State objects. The Court held a hearing on this matter on June 13, 2024. The parties submitted notices of supplemental authority following the hearing. For the following reasons, Meta's motion is DENIED.

## I.    Standard

In reviewing a motion to dismiss, the Court "assume[s] the truth of the facts as alleged in the plaintiff's pleadings and construe[s] all reasonable inferences in the light most favorable to the plaintiff." <u>Barufaldi v. City of Dover</u>, 175 N.H. 424, 427 (2022). The Court "need not assume the truth of statements in the plaintiff's pleadings, however, that are merely conclusions of law." <u>Sanguedolce v. Wolfe</u>, 164 N.H. 644, 645 (2013). "The standard of review in considering a motion to dismiss is whether the plaintiff's allegations are reasonably susceptible of a construction that would permit recovery."

1

This is a Service Document For Case: 217-2023-CV-00594
Merrimack Superior Court
12/11/2024 8:52 AM

Barufaldi, 175 N.H. at 427. "This threshold inquiry involves testing the facts alleged in the pleadings against the applicable law." Id. "The trial court may also consider documents attached to the plaintiff's pleadings, or documents, the authenticity of which are not disputed by the parties, official public records, or documents sufficiently referred to in the complaint." Id. The Court will grant the motion "if the facts pled do not constitute a basis for legal relief." Id.

## II.    Background

Meta is a Delaware corporation. (Compl. ¶ 19.) Meta owns and operates the social media platform, Facebook, and owns and operates the social media platform, Instagram, through its wholly-owned subsidiary, Instagram, LLC. (Id. ¶ 20.) Instagram, LLC is also a Delaware corporation. (Id. ¶ 21.) The Court refers to the defendants collectively as "Meta" and to Facebook and Instagram as the "Social Media Platforms" or the "Platforms."

### A.  Usage of the Social Media Platforms

In 2023, Facebook had over 226 million active monthly users in the United States, representing 68% of the population, including over ten million of those users under eighteen. (Id. ¶ 49.) Nearly one million of those users lived in New Hampshire, representing 68% of residents, including 34,063 users under eighteen, representing 13.49% of the under-eighteen population. (Id. ¶¶ 27, 49.) That same year, Instagram had over 192 million active monthly users in the United States, over 58% of the population, with 32,389,032 under eighteen. (Id. ¶ 50.) 733,019 of those users lived in New Hampshire, representing over 52% of residents, including 89,339 users under eighteen, representing 35% of the under-eighteen population. (Id. ¶¶ 27, 50.) In April

2

2023, Meta's internal data showed that 55,885 New Hampshire teenagers were active daily Instagram users.  (Id. ¶ 52.)  In 2022, 62% of teenagers reported using Instagram. (Id. ¶ 51.)  The rate is higher for teenage girls.  (Id.)  Almost half of those teenagers reported checking Instagram at least once a day, 27% reported checking it several times a day, and 10% reported checking it almost constantly.  (Id.)

    B.  <u>Meta's Advertising</u>

    To fully access the Social Media Platforms, users must agree to Meta's Terms of Use.  (Id. ¶ 35.)  By doing so, users consent to Meta collecting and using their data for monetization and creation of personalized algorithms.  (Id.)  Meta then sells advertising space to marketers and, utilizing user data, allows them to target users by location, demographics, interests, and behaviors.  (Id. ¶ 29.)  Meta also allows advertisers to target "designated market areas," which include Manchester, New Hampshire.  (Id. ¶ 30.)  In 2023, Meta derived $542,835,568 from advertisement revenue from users with ties to New Hampshire.  (Id.)  In addition to paying for advertisements, advertisers directly contract with "content creators," including children, to promote their products on Instagram.  (Id. ¶ 47.)

    Meta's monetization centers on maximizing the amount of time users spend on the app and the amount of data collected from each user.  (Id. ¶ 33.)  Meta intentionally designs its Social Media Platforms to maximize user engagement, and, thus, maximize profits.  (Id.)  Meta monetizes user data by (1) selling targeted advertising and (2) feeding users personalized algorithms to maximize their time spent on the app.  (Id. ¶ 34.)

3

Meta is financially motivated to attract and maintain children on its Social Media Platforms because teenagers are "one of the most valuable advertising demographics." (Id. ¶ 42.) Since at least 2015, Meta has focused on increasing the time teens spend on its Social Media Platforms. (Id.) In 2019, one of Instagram's quarterly goals was to hit two million hours of teen watch time on IGTV (Instagram's former long-form video feature). (Id. ¶ 44.) Further, an internal email circulated in September 2018 revealed that Meta discusses its youngest users in terms of their "lifetime value" to the company. (Id. ¶ 45.) However, Meta has publicly denied placing monetary value on children. (Id. ¶ 46.) In 2021, Senator Amy Klobuchar asked Antigone Davis, Meta's Global Head of Safety, what Meta believed the lifetime monetary value of children users was, to which Ms. Davis responded, "that's just not the way we think about it" and "[t]hat's just not how we think about building products . . . for young people." (Id.) Instagram has become Meta's most successful social media platform in attracting and retaining child users. (Id. ¶ 48.) Because of that, the State alleges that "Meta intentionally includes manipulative design features in its Social Media Platforms that it knows are particularly effective in increasing compulsive and excessive use in teens." (Id. ¶ 53.)

C. Alleged Addictive Features

The State alleges that "Meta intentionally includes manipulative design features in its Social Media Platforms that it knows are particularly effective in increasing compulsive and excessive use in teens." (Id. ¶ 53.) Thus, the State asserts that Meta employs these design features to trick children into spending as much attention and time as possible on its Social Media Platforms and maximize Meta's profits. (Id. ¶ 56.) The United States Surgeon General has identified certain harmful design features that

4

overlap with those included in the State's complaint, including personalization algorithms, alerts, infinite scroll, and Reels.  (Id.)

### i. Personalization Algorithms

Meta uses personalization algorithms across its Social Media Platforms, including on Instagram's Main Feed (the scrolling presentation of content immediately visible upon opening the app) and Explore Feed (another scrolling presentation of algorithmically curated content that can be optionally guided by a user's input of text in a search box).  (Id. ¶ 57.)  In 2016, Meta changed Instagram's user feeds to incorporate personalization algorithms.  (Id. ¶ 58.)  Previously, users' feeds were in reverse chronological order.  (Id.)

The personalization algorithms serve users categories of content based on a sequencing method psychologists refer to as "variable reinforcement schedules" or "variable reward schedules."  (Id.)  Variable reward schedules work by periodically delivering types of content in an unpredictable pattern that trigger a release of dopamine in the user.  (Id. ¶ 60.)  Dopamine is a neurotransmitter released in anticipation of a potential reward and is associated with pleasure.  (Id.)  However, dopamine neurons only fire for a relatively short period of time and, afterwards, an individual may become "disheartened and disengaged."  (Id.)  Meta's personalization algorithms manipulate the dopamine responses in its child users, inducing them to engage repeatedly with Meta's products.  (Id. ¶ 61.)

The State alleges that personalization algorithms are particularly effective on, and dangerous to, children because they have incomplete brain maturation, lack of impulse control, and reduced executive functions.  (Id. ¶ 63.)  The personalization

5

algorithm's ability to learn more about the user as they scroll allows it to display more of what will keep the user hooked, known as "presence amplification," pushing them into a "rabbit hole" of increasingly more extreme content. (Id. ¶¶ 65, 67.) When a user experiences preference amplification the absence of other, more moderate information makes it difficult for the user to get out of a rabbit hole. (Id. ¶ 68.) In 2021, Meta internally acknowledged how Instagram's personalization algorithms take children "into negative spirals & feedback loops that are hard to exit from." (Id.)

      ii. <u>Alerts</u>

When a user installs the Instagram app on their phone, Instagram employs a range of alerts in response to certain in-app activities. (Id. ¶ 70.) Alerts are delivered to a user's phone via vibrations, visuals, sounds, in-app notifications, and emails. (Id. ¶ 71.) These alerts are designed to increase children's engagement by taking advantage of neurological and psychological phenomena to trigger sudden dopamine releases. (Id.) The alerts allow Meta to disrupt its users at any time to encourage them to return to the Social Media Platforms. (Id. ¶ 72.) The notifications trigger users' fear of missing out ("FOMO") and leads to them consistently checking the Social Media Platforms. (Id. ¶ 77.)

Alerts are harmful for children and Meta knows that "smartphone notifications cause inattention and hyperactivity among teens, and they reduce productivity and well-being." (Id. ¶ 74 (brackets omitted).) Research has shown teenagers check their phone on average 51 times per day, with some teens checking their phone over 400 times per day. (Id. ¶ 76.) During that period, the teenagers received a median of 237 notifications on their phones per day, with some users receiving as many as 4,500 in a day. (Id.)

While users are able to disable notifications, they are enabled by default and the addictive elements of the Social Media Platforms are a barrier for children to take the step to disable them. (Id. ¶¶ 71, 77.)

### iii. Infinite Scroll and Autoplay

In 2016, Instagram debuted "infinite scroll." (Id. ¶ 78.) Infinite scroll is a method of content delivery that partially displays additional content at the bottom of the user's screen, such that the user is typically unable to look at a single post in isolation, and automatically loads new content as the user scrolls. (Id.) This format makes it difficult for children to disengage with the Social Media Platform because there is no natural end point. (Id. ¶ 79.) Meta does not allow users to turn off infinite scroll. (Id. ¶ 80.) Similarly, Meta uses an "autoplay" feature on Instagram "Stories," which keeps the user watching unless the user takes affirmative action to disengage. (Id. ¶ 81.) Facebook users are able to turn off autoplay but disabling the feature on Instagram is difficult for users. (Id. ¶ 82.)

### iv. Ephemeral Content

In 2016, Meta started implementing ephemeral content features in its Social Media Platforms. (Id. ¶ 84.) Ephemeral content is only temporarily available to users with notifications and visual design cues indicating that the content will soon disappear forever. (Id. ¶ 85.) This type of content encourages users to frequently check the Social Media Platforms and induces a sense of FOMO in children. (Id. ¶¶ 84–85.) Two examples of ephemeral content are Instagram's "Stories," which contains content that is only available for a short time, and "Instagram Live," which contains content only available while the creator is live-streaming. (Id. ¶¶ 87–88.) Meta informs users of

7

Instagram Live content by sending a push notification to users that reads, "[@user] started a live video. Watch before it ends!" (Id. ¶ 89.) An executive summary circulated internally in 2016 indicated that the goals of live content were to increase the time users spent watching these videos, specifically teenagers. (Id. ¶ 90.)

     v.  <u>Reels</u>

In 2020 and 2021, Meta introduced "Reels" which present short-form videos based on data collected from each user. (Id. ¶ 92.) Similar to infinite scrolling, Reels automatically plays as the user swipes the screen to the next video. (Id. ¶ 93.) As of April 2023, Reels were limited to 15 to 90 second video clips. (Id.) The short nature of the videos and the frameless way it fills a user's screen ensure the user will not get bored and close the app. (Id.) Meta's investment in Reels was specifically designed to attract and increase youth engagement. (Id. ¶ 94.)

    D.  <u>Use of the Social Media Platforms and Corresponding Harm to Children</u>

The State alleges that the harms the Social Media Platforms cause all users are particularly acute in children. (Id. ¶ 101.) During adolescence, children's risk-taking behavior is at its peak and their self-esteem is vulnerable. (Id. ¶ 102.) Children's brain regions associated with a desire for risk-taking, attention, peer feedback, and reinforcement are sensitive and regions associated with maturity and impulse control are not fully developed. (Id.) For these reasons, teenagers are more susceptible to misinformation, peer pressure, and false images on social media. (Id.) The United States Surgeon General has recognized that "the current body of evidence indicates that while social media may have benefits for some children and adolescents, there are ample indicators that social media can also have a profound risk of harm to the mental

health and well-being of children and adolescents." (Id. ¶ 104.) Meta has considered but rejected design changes after finding that those changes would decrease the danger of harm to children, but also decrease engagement. (Id. ¶ 105.)

Children who use social media for at least five hours per day are many times more likely to have clinically relevant symptoms of depression than non-users. (Id. ¶ 106.) During the same period in which social media use increased, the rate of teenagers suffering from severe mental health problems and suicide, both nationally and in New Hampshire, also increased by significant margins. (Id. ¶¶ 116–17, Figures 2 and 3.) Frequent social media use has been associated with distinct changes in the developing brain in the amygdala, which is vital for impulse control and emotional regulation and could increase adolescent sensitivity to reward and punishment. (Id.) These brain changes track the changes experienced by people who become addicted to gambling or drugs. (Id. ¶ 107.) Frequent social media use is also linked to disruptions in children's sleep, which can cause or worsen depression and anxiety. (Id. ¶ 109–10.) Meta has been aware since 2019 that excessive social media use is correlated with sleep problems. (Id. ¶ 111.) In 2021, more than 75% of New Hampshire teenagers reported getting fewer than eight hours of sleep on an average school night, with more than 20% reporting getting five or fewer hours of sleep. (Id. ¶ 113.)

     E.  Meta's Knowledge of the Harms Caused by its Social Media Platforms

The State alleges that Meta is aware that a majority of its users suffer from problematic use of Social Media Platforms and that such use has a serious effect on users' sleep, relationships, mental health, and general well-being. (Id. ¶¶ 100, 111.) The State alleges that Meta is aware that teenagers are more susceptible to its

9

addictive design features and are more likely to excessively use its Platforms.  (Id. ¶¶ 122–25.)

Meta's internal data supports these allegations.  In 2020, internal Meta statistics showed that teenagers are 40% more likely to spend five or more hours per day, and at least 28 hours per week, on Instagram than non-teenagers.  (Id. ¶ 123.)  Meta's internal research concluded,

> Teen brains are much more sensitive to dopamine, one of the reasons that the risk of drug addiction is higher for adolescents and it's the same thing that keeps them scrolling and scrolling.  Due to the immature brain, they have a much harder time stopping even though they want to—our own product foundation research has shown teens are unhappy with the amount of time they spend on our app.

(Id. ¶ 125.)  In 2020, Meta started a project to better understand teenagers, including their brain development.  (Id. ¶ 126.)  Meta's research resulted in similar conclusions to those outlined supra Section D.  (See generally id. ¶¶ 126–38.)

While the Social Media Platforms have "time-management tools," including notifications and reminders to stop scrolling, most users dismiss them.  (Id. ¶ 140.)  Meta knows those tools are ineffective at counteracting compulsive and excessive use.  (Id.)  Meta has considered but rejected design changes after finding that those changes would decrease the danger of harm to children, but also decrease engagement.  (Id. ¶¶ 105, 141.)

F.  Meta's Alleged Misrepresentations

Meta, through its own publications, public statements, and testimony of corporate officers, has stated that well-being of its users is a top priority.  (Id. ¶¶ 144 ,150.)  However, the State alleges these public statements are at odds with Meta's internal surveys, research, and reports, and, in some cases, with its own officers' testimony.  (Id.

10

¶¶ 144-229.)  Specifically, the State alleges Meta has made misrepresentations regarding the safety of the Social Media Platforms, (id. ¶¶ 144–46, 165,) Meta's intention to prioritize well-being over user engagement, (id. ¶¶ 205–29,) and the prevalence of user exposure to harmful and predatory content served by Meta's algorithms, (id. ¶¶ 146–64.)

## III.    Analysis

The State brings claims against Meta for violations of the CPA (RSA 358-A:2) for unfair acts or practices for its manipulative and addictive design features (Count I), violations of the CPA (RSA 358-A:2) for deceptive practices (Count II), strict products liability for defective design (Count III), strict products liability for failure to warn (Count IV), and negligence (Count V).  Meta moves to dismiss all claims, arguing that this Court lacks personal jurisdiction over it, Section 230 of the federal Communications Decency Act and the First Amendment of the United States Constitution bar the State's claims, the two CPA counts fail to state a claim, and the State lacks standing to pursue its common law claims for strict products liability and negligence and does not state a viable claim under those theories.  The Court addresses each argument in turn.

### A.  Personal Jurisdiction

The standard of review on a motion to dismiss for lack of personal jurisdiction varies according to the case's procedural posture.  Seward v. Richards, 174 N.H. 401, 406 (2021).  "While the general rule applicable to motions to dismiss is that all facts properly pleaded by the plaintiff are deemed true . . . when those facts relate to personal jurisdiction, the plaintiff must offer affirmative proof."  Staffing Network, Inc. v. Pietropaolo, 145 N.H. 456, 457 (2000).  In the absence of an evidentiary hearing, the

11

Court applies a prima facie standard to determine whether personal jurisdiction is met. Id.

"Determining whether a court may exercise personal jurisdiction over a defendant contemplates a two-part analysis." Seward, 174 N.H. at 407. "First, the State's long-arm statute must authorize such jurisdiction. Second, the requirements of the federal Due Process Clause must be satisfied." Id. New Hampshire's long-arm statute, RSA 510:4, authorizes the exercise of personal jurisdiction to the extent permissible under the Due Process Clause. Id. Accordingly, the Court's analysis depends upon due process. Id.; RSA 510:4, I.

"Under the Federal Due Process Clause, a court may exercise personal jurisdiction over a non-resident defendant if the defendant has minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Seward, 174 N.H. at 407. "Minimum contacts is not necessarily a numbers game; in order to be subject to the jurisdiction of the forum state, a nonresident need only have one contact with the forum, so long as the contact is meaningful." Id. "Jurisdiction can be 'general,' where the defendant's contacts with the forum State are continuous and systematic, or 'specific,' where the cause of action arises out of or relates to the defendant's forum-based contacts." Id. Here, the parties solely address whether the Court can exercise specific personal jurisdiction over Meta. Accordingly, the Court focuses its analysis on that inquiry.

"To determine whether exercising specific personal jurisdiction over the defendant[] comports with due process, [the Court] examine[s] whether: (1) the contacts relate to the cause of action; (2) the defendant[] ha[s] purposefully availed [itself] of the

12

protection of New Hampshire's laws; and (3) it would be fair and reasonable to require the defendant[] to defend the suit in New Hampshire." Seward, 174 N.H. at 407–08. "Each factor must be evaluated on a case-by-case basis, and all three factors must be satisfied for the exercise of jurisdiction to be constitutional." Id. at 408. "Questions of specific jurisdiction are always tied to the particular claims asserted." Id.

The Court begins with the relatedness factor. "To satisfy the relatedness factor, there must be more than just an attenuated connection between the contacts and the claim; the defendant's in-state conduct must form an important, or at least material, element of proof in the plaintiff's case." Id. at 409. "The relatedness test is a flexible, relaxed standard, and the court's assessment of relatedness is informed by the concept of foreseeability." Id. For tort claims, the relatedness inquiry "focuses on whether the defendant's in-forum conduct caused the injury or gave rise to the cause of action." United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 622 (1st Cir. 2001). Further, to satisfy specific personal jurisdiction, "a plaintiff must link the defendant's suit-related conduct to the forum. Mere market exploitation will not suffice." Johnson v. TheHuffingtonPost.com, Inc., 21 F.4th 314, 324 (5th Cir. 2021).

Meta argues that the State's claims do not relate to Meta's contacts with New Hampshire. The State's claims arise out of Meta's alleged addictive design features and its misrepresentations and omissions. Meta contends that this conduct did not occur in New Hampshire and, therefore, it cannot serve as a basis for personal jurisdiction. Meta rejects any attempt by the State to rely on its advertising and marketing to support personal jurisdiction because its advertising and marketing does not serve as a basis for the State's claims. (Id.) The State responds that its claims

13

arise directly out of Meta's contacts with New Hampshire, namely; its relationships with hundreds of thousands of New Hampshire residents, including children; the design features it implements on Social Media Platforms used by New Hampshire residents; and its deceptive conduct which has played a role in inducing New Hampshire residents' use of the Platforms.

In Walden v. Fiore, 571 U.S. 277, 279 (2014), the Supreme Court held that a Nevada court could not "exercise personal jurisdiction over a defendant on the basis that he knew his allegedly tortious conduct in Georgia would delay the return of funds to plaintiffs with connections to Nevada" where "the defendant had no other contacts with Nevada." The Walden Court noted that its holding was consistent with Calder v. Jones, 465 U.S. 783 (1984). Walden, 571 U.S. at 289–90. In Calder, the Court held that a California court could exercise personal jurisdiction over Florida defendants whose "intentional, and allegedly tortious, actions were expressly aimed at California." 465 U.S. at 785–86. Under Walden and Calder, the proper inquiry is not merely whether New Hampshire residents suffered an injury but whether Meta's conduct connects it to New Hampshire in a "meaningful way." Walden, 571 U.S. at 290.

The Supreme Court has referred to the following as a "paradigm example": the defendant "extensively promoted, sold, and serviced" vehicles in the forum states and the plaintiffs resided in the forum states, used the allegedly defective vehicles in the forum states, and suffered injuries in the forum states. Ford Motor Co. v. Mont Eighth Jud. Dist. Ct., 592 U.S. 351, 366 (2021). These facts created an "affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that t[ook] place." Id. at 370.

Meta's contacts with New Hampshire relate to the State's claims alleging harm caused by Meta's implementation of features on its Social Media Platforms used by New Hampshire residents and Meta's misrepresentations which have induced New Hampshire residents to use its Social Media Platforms. In coming to this conclusion, the Court relies on the following facts pleaded by the State. Meta offers an interactive Social Media Platform accessible to New Hampshire citizens. While users need not pay to use the Platforms, Meta harvests users' personal data. (Compl. ¶ 34.) Meta then sells targeted advertising, based on that collected data, and employs addictive features on the Platforms to increase the amount of user time spent, increasing the amount of data Meta can collect and sell advertising for. (Id.) It is this core business model which is alleged to have harmed New Hampshire children. Meta's contacts with New Hampshire—its service agreements with users, collection of personal data, and sale of advertising based on that data—are inherently connected with the use of addictive design features at issue in this matter which further its business model. In a similar manner to Ford Motor Co., Meta extensively promotes its Platforms in the forum state, enters service agreements and collects data of residents of the forum state, and those residents use Meta's Platforms in the forum state and suffered injuries in the forum state. Cf. 592 U.S. at 366.

The Court disagrees with Meta that its geographically targeted advertising and marketing are unrelated to the State's claims. Meta permits advertisers to target designated market areas, including Manchester, New Hampshire, and otherwise target users based on their location, demographics, interests, and behaviors. (Compl. ¶¶ 29–30, 38–39.) Meta is able to offer targeting advertising by harvesting users' data. (Id.)

This incentivizes Meta to keep users on its Platforms for the maximum amount of time to increase the amount of data harvested.  To keep users on its Platforms, Meta employs the addictive design features that form the basis of the State's claims.  This distinguishes the State's claims from matters in which a plaintiff's claims in no way relate to a defendant's use of geographically targeted advertising.  See Johnson v. TheHuffingtonPost.com, Inc., 21 F.4th 314, 321 (5th Cir. 2021) (holding that the defendant's use of geographically targeted advertising did not relate to the plaintiff's libel claim).

Put simply, Meta derives its profits from users viewing and interacting with advertisements on its Social Media Platforms.  To drive engagement, Meta designs and employs the addictive design features that form the basis of the State's claims.  For this reason, Meta's targeted advertising efforts are not only related but integral to the State's claims.

For the foregoing reasons, assuming the facts alleged in the State's complaint as true and construing all inferences in the State's favor, the State has demonstrated the relatedness factor of the specific personal jurisdiction test.

The Court next turns to the purposeful availment prong of the specific personal jurisdiction test.  "The second prong of the due process analysis considers whether the defendants have purposefully availed themselves of the protection of New Hampshire's laws."  Seward, 174 N.H. at 411–12.  "To satisfy the second requirement, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protection of that state's laws and making the defendant's involuntary presence before the state's

16

courts foreseeable."  Id. ¶ 412.  "Purposeful availment requires both foreseeability and voluntariness."  Id.  "Voluntariness requires that a defendant's contacts with the forum state proximately results from actions by the defendant."  Id.  "The contacts must be deliberate and not based on the unilateral actions of another party, and cannot be merely fortuitous, but rather, the defendants must have purposefully directed actions at New Hampshire."  Id.  "Foreseeability requires that the contacts must be of a nature such that a defendant could reasonably anticipate being haled into court here."  Id.

Meta argues that its alleged conduct does not demonstrate that it purposefully availed itself of the protection of New Hampshire's laws because the conduct was not specifically directed at New Hampshire.  The State responds that Meta purposefully directed commercial activities to New Hampshire by, (1) advertising, marketing, and distributing its Social Media Platforms to New Hampshire consumers and making substantial profits from selling user data, (2) entering into contracts with each of its New Hampshire users, and (3) encouraging children in New Hampshire to use its products.

In Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 773–74 (1984), the Court found that there was specific jurisdiction over the defendant publisher where it had no employees or offices in the forum, did not expressly aim its publication or conduct at the forum, and magazine sales in the forum made up only a small fraction of the defendant's total sales, but the defendant circulated 10,000 to 15,000 copies of its magazine to subscribers in the forum each month.  The Court reasoned that the defendant "continuously and deliberately exploited" the forum's market.  Keeton, 465 U.S. at 781.  Because the defendant produced "a national publication aimed at a nationwide audience," there was "no unfairness in calling it to answer for the contents of

17

that publication wherever a substantial number of copies are regularly sold and distributed." Id.

The Keeton Court's reasoning applies here, despite Meta's arguments distinguishing operating the Social Media Platforms from physically distributing magazines. Meta's Platforms are accessible to New Hampshire users. More than that, in exchange for the use of the Platforms, Meta harvests users' personal information and sells it to advertisers, which advertise on the Platforms. See uBID, Inc. v. GoDaddy, Inc., 623 F.3d 421, 427–28 (7th Cir. 2010) (determining that website operator defendant had minimum contacts with the forum because it exploited the forum's market and engaged in extensive national advertising, despite the fact that it did not specifically target forum residents through advertising). Like the publisher in Keeton, Meta has specific connections with New Hampshire and furthers those connections each time it contracts with users to offer its Platforms in exchange for their data. This is voluntary contact with the forum state and its citizens. See Seward, 174 N.H. at 412. While Meta argues that its contacts with New Hampshire are based on the unilateral activity of New Hampshire users, its harvesting and sale of New Hampshire users' data causes the Court to disagree. For these reasons, it is foreseeable that Meta's contacts with New Hampshire are such that it should reasonably anticipate being haled into court here. See id.

The parties dispute the applicability of the sliding scale framework outlined by Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119 (W.D. Pa. 1997). The Court need not rely on Zippo's sliding scale framework because, as discussed, Meta has done more than operate a website accessible in the forum. This is not a case where the

18

defendant operates a website simply visible in the forum, see McBee v. Delica Co., Ltd., 417 F.3d 107, 124 (1st Cir. 2005), or an interactive website, see Gullen v. Facebook.com, Inc., No. 15 C 7681, 2016 WL 245910, at *3 (N.D. Ill. Jan. 21, 2016).[1] Rather, the State alleges that Meta designed an addictive application, collects personal data from New Hampshire users, sells that personal data to advertisers, and profits from advertisers' ability to target their advertisements to New Hampshire users based on their location and preferences learned from the data collected by Meta.  (Compl. ¶¶ 36–38.)  This is conduct directly targeted to New Hampshire.  Meta's engagement in similar conduct elsewhere does is irrelevant to this Court's analysis.  Therefore, the Court concludes that Meta has purposefully availed itself of jurisdiction in New Hampshire courts.

Lastly, the Court addresses the fairness and reasonableness of exercising jurisdiction over Meta.  The third and final prong of the specific personal jurisdiction test asks, "whether it would be fair and reasonable to require the defendants to defend the suit in New Hampshire."  Seward, 174 N.H. at 413.  "For this determination, [the Court] examine[s] the five so-called 'gestalt factors,' which are: the burden on the defendant; the forum state's interest in adjudicating the dispute; the plaintiff's interest in obtaining convenient and effective relief; the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several states in furthering fundamental substantive social policies."  Id.

---

[1] While Facebook.com was the defendant in Gullen, there were no similar facts, as are present in the State's complaint, about the defendant's profits derived from the forum, its collection of data for the purposes of advertising, or its sale of that data to advertisers.

Meta argues that forcing it to litigate in New Hampshire is unfair because its place of business in California is an appreciable distance from New Hampshire and attorneys general from 33 other states are pursuing similar litigation in a consolidated action in California (the "MDL Litigation"). See In re Social Media Adolescent Addiction/Personal Injury Prod. Liability Litig., No. 4:23-cv-05448-YDR, 4:23-cv-05885-YGR (N.D. Cal. Oct. 15, 2024). Meta asserts that efficiency calls for litigating the State's claim with the others in California. The State contends that the burdens of modern travel are minimal and that it is not unfair to require Meta to defend itself in the forum wherein the State seeks to protect hundreds of thousands of forum consumers.

The Court begins with the first gestalt factor: the burden on the defendant. While Meta is headquartered in California, it is a large corporation capable of defending itself anywhere. Meta's Social Media Platforms, Facebook and Instagram, had over 418 million combined users in the United States in 2023. "Because suit in a foreign jurisdiction always burdens a foreign company, the defendant must establish that the Court's exercise of jurisdiction would be onerous in a special, unusual, or other constitutionally significant way." State v. N. Atlantic Refining Ltd., 160 N.H. 275, 286 (2010). The Court cannot say, with Meta's vast reach including into New Hampshire as outlined supra, that exercising jurisdiction would be special, unusual, or constitutionally significant. With respect to the second factor, New Hampshire has a strong interest in obtaining relief in its courts for harms allegedly committed against its citizens. See Benitez-Allende v. Alcan Aluminio do Brasil, S.A., 857 F.2d 26, 31 (1st Cir. 1988). Further, "New Hampshire also has a strong interest in protecting the legitimacy of its court judgments." Seward, 174 N.H. at 413. The third factor also weighs in favor of

20

exercising jurisdiction because the State's interest in obtaining convenient and effective relief is furthered by providing it a means to pursue redress in its home courts. The fourth factor weighs against exercising jurisdiction because the most efficient resolution is the consolidated litigation of other similar suits in the multi-district litigation venued in California district court. Finally, exercising jurisdiction supports the "shared interest of the several states in furthering fundamental substantive social policies." The states have an interest in protecting their citizens from harm and obtaining relief in their own courts.

Accordingly, having considered the gestalt factors, the Court determines it is fair and reasonable to exercise jurisdiction over Meta.

Altogether, the Court determines it can exercise specific personal jurisdiction over Meta because it has purposefully availed itself of the Court's jurisdiction, its contacts with New Hampshire are related to the conduct underlying the State's claims, and it is fair and reasonable to exercise jurisdiction here. Seward, 174 N.H. at 407. Having found that the Court may exercise personal jurisdiction over Meta, the Court turns to Meta's arguments on the merits.

B. Section 230 of the Communications Decency Act

Meta argues that Section 230 of the Communications Decency Act ("Section 230") bars the State's claims because they treat Meta as a publisher of third-party content. Because Section 230 is an affirmative defense, dismissal is only proper if Meta's immunity is evident from the face of the complaint. Teatotaller, LLC v. Facebook, Inc., 173 N.H. 442, 449 (2020) (quoting Force v. Facebook, Inc., 934 F.3d 53, 63 n. 15 (2d Cir. 2019)).

21

036

In 1996, Congress enacted Section 230 "to promote the continued development of the Internet" and "to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material," among other policies. 47 U.S.C. § 230(b)(1), (4). To achieve these goals, Section 230 immunizes interactive computer service providers, like Meta, from legal claims that treat them as a publisher or speaker of third-party content. See 47 U.S.C. § 230(c)(1), (e)(3). While courts have interpreted Section 230 to "broadly immunize internet companies from liability . . . this immunity is not limitless." Calise v. Meta Platforms, Inc., 103 F.4th 732, 736 (9th Cir. 2024).

To determine whether Section 230 immunity applies to a given case, courts employ a three-prong test. Under this test, Section 230 only protects "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." Teatotaller LLC, 173 N.H. at 450 (quoting Universal Commc'n v. Lycos, Inc., 478 F.3d 413, 418 (1st Cir. 2007)); see also Calise, 103 F.4th at 740; Lemmon v. Snap, Inc., 995 F.3d 1085, 1091 (9th Cir. 2021); Barnes v. YAHOO!, Inc., 570 F.3d 1096, 1100–01 (9th Cir. 2009).

It is undisputed that Meta is a provider of an interactive computer service and therefore satisfies the first prong. To analyze the second and third prongs, the Court must determine whether it is evident from the face of the complaint that each of the State's claims treat Meta as a publisher or speaker of third-party content. This determination rests upon the State's theory of liability in each count. See Teatotaller,

22

037

LLC, 173 N.H. at 451; Calise, 103 F.4th at 740 (stating that courts must "examine each claim to determine whether a plaintiff's theory of liability would treat a defendant as a publisher or speaker of third-party content") (emphasis in the original).  Thus, the Court must examine Meta's duty under the State's theories of liability.  As explained by the Ninth Circuit in Calise,

> We must therefore examine two things in looking at duty.  First, what is the "right" from which the duty springs?  If it springs from something separate from the defendant's status as a publisher, such as from an agreement, or from obligations the defendant has in a different capacity, then [Section 230] does not apply.  Second, we ask what is this duty requiring the defendant to do?  If it obliges the defendant to "monitor third-party content"—or else face liability—then that too is barred by [Section 230].

Id. (cleaned up).

In Lemmon, the Ninth Circuit examined the duty of social media companies to design reasonably safe products.  There, the parents of two boys who died in a high-speed car accident sued Snap, Inc. ("Snap"), alleging that Snap negligently designed its social media platform, Snapchat.  Lemmon, 995 F.3d at 1087.  Like Instagram and Facebook, Snapchat is a social media platform that allows users to share photos and videos with other Snapchat users.  See id. at 1088.  To promote user engagement, Snapchat provides users with rewards such as "trophies, streaks, and social recognitions," but does not tell users how to earn these rewards.  Id.  At the time, Snapchat had developed a "speed filter," which allowed users to superimpose their real-life speed atop user-created content.  Id.  The plaintiffs alleged Snapchat knew or should have known that its users believed that Snapchat would reward them for posting a "snap" at 100 miles per hour or over.  Id. at 1089.  While Snapchat warned users not to use the filter while driving, the warnings proved ineffective.  Id. at 1090.  The trial

23

court dismissed the plaintiffs' amended complaint, ruling that Section 230 barred their claim.  Id.

On appeal, the Ninth Circuit reversed the trial court's decision and concluded that the plaintiffs' claim did not treat Snap as a publisher or speaker of third-party content because the cause of action focused on Snap's duty, as a manufacturer, to design a reasonably safe product.  Id. at 1091–92.  The court explained,

> [The plaintiffs'] negligent design lawsuit treats Snap as a products manufacturer, accusing it of negligently designing a product (Snapchat) with a defect (the interplay between Snapchat's reward system and the Speed Filter).  Thus, the duty that Snap allegedly violated "springs from" its distinct capacity as a product designer.  This is further evidenced by the fact that Snap could have satisfied its "alleged obligation"—to take reasonable measures to design a product more useful than it was foreseeably dangerous—without altering the content that Snapchat's users generate.  Snap's alleged duty in this case thus "has nothing to do with" its editing, monitoring, or removing of the content that its users generate through Snapchat.

Id. at 1092 (cleaned up).  In its analysis, the court conceded that Snap, in some capacity, acted as a publisher or speaker of third-party content, but concluded that was not enough to confer immunity under Section 230.  Id.  The court explained,

> That Snap allows its users to transmit user-generated content to one another does not detract from the fact that the [plaintiffs] seek to hold Snap liable for its role in violating its distinct duty to design a reasonably safe product.  As in Internet Brands, Snap "acted as the 'publisher or speaker' of user content by" transmitting [the boys'] snap, "and that action could be described as a 'but-for' cause of [the boys'] injuries."  This is unsurprising: Snap "is an internet publishing business.  Without publishing user content, it would not exist.  But though publishing content is "a but-for cause of just about everything" Snap is involved in, that does not mean that the [plaintiffs'] claim, specifically, seeks to hold Snap responsible in its capacity as a "publisher or speaker."  The duty to design a reasonably safe product is fully independent of Snap's role in monitoring or publishing third-party content."

Id. at 1092–93 (citing Doe v. Internet Brands, Inc., 824 F.3d 846, 853 (9th Cir. 2016)).

The Court finds this reasoning persuasive and applicable here. While the State's complaint alleges that New Hampshire children are exposed to harmful content while using the Social Media Platforms, the thrust of the State's allegations in Counts I, III, and V are based on Meta's duty as a manufacturer to design reasonably safe products and allege that Meta's own conduct regarding the design of those products is defective.[2] This duty is independent of Meta's role as a publisher of third-party content. While the Northern District of California decided differently in the MDL Litigation, wherein Meta is a defendant, see In re: Social Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig., 702 F.Supp.3d 809, 830–33 (N.D. Cal. 2023), the Court finds its decision today to be consistent with persuasive authority, as well as the language and purpose of Section 230, see 47 U.S.C. § 230(b)(3), (4); Calise, 103 F.4th at 736 (reasoning that immunity under Section 230 is not limitless); Lemmon, 995 F.3d at 1092–93 (holding that Section 230 did not bar negligent design claim); Internet Brands, 824 F.3d at 853 (holding that Section 230 did not bar failure to warn claim).

To be clear, Section 230 protects Meta against any claims where the alleged harm arises from the substance of third-party content posted on the Social Media Platforms. See Force, 934 F.3d at 66 (finding Facebook was protected under Section 230 for harm resulting from Hamas content); Dyroff v. Ultimate Software Grp., Inc., 934 F.3d 1093, 1098 (9th Cir. 2019) (finding the defendant was protected under Section 230 when a user died from fentanyl toxicity after purchasing fentanyl from another user on the defendant's online service). However, the State alleges that Meta's product design features, in and of themselves, are harmful to New Hampshire children regardless of the

---

[2] The Court separately analyzes whether the Social Media Platforms are "products" in Section V, infra, regarding products liability.

substance of the third-party content displayed. (Compl. ¶¶ 238, 241-44, 249, 281-84, 301, 315.) Thus, the Court determines that Section 230 does not bar the State's claims within Counts I, III, and V.

To the extent that Meta argues that Section 230 immunizes them against aspects of Counts II, IV, and V involving Meta's alleged misrepresentations and failures to warn, the Court disagrees. These counts are not based on Meta's role as a publisher of third-party content. Rather, the duty alleged to be breached arises out of Meta's knowledge that its products harm New Hampshire children. Thus, Section 230 does not bar these claims. See Doe v. Internet Brands, Inc., 824 F.3d 846, 852–53 (finding that Section 230 does not bar failure to warn claims); In re Social Media Adolescent Addiction/Personal Injury Pro. Liability Litigation, 702 F. Supp. 3d 809, 834 (N.D. Cal. 2023) (same); Hiam v. HomeAway.com, Inc., 267 F. Supp. 3d 338, 346–47 (D. Mass 2017); aff'd, 887 F.3d 542 (1st Cir. 2018) (reasoning that claims based on publisher's own speech are not barred by Section 230).

IV.  First Amendment

Meta contends that the First Amendment and Part I, Article 22 of the New Hampshire Constitution protect its editorial discretion to disseminate third-party speech and, thus, bar the State's claims. The State contends that its claims are not barred because the conduct challenged is not protected speech but, rather, Meta's implementation of addictive design features. However, Meta argues that because its "content publication algorithms and other design choices are simply the means by which Meta presents and arranges speech, they 'fall squarely within the core of the First

Amendment security.'" (Def.'s Memo. ISO Mot. to Dismiss at 16) (citing Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston, 515 U.S. 557, 570 (1995)).

Like Section 230, the First Amendment protects publishers' discretion to disseminate third-party speech and categorically protects publishers from liability for injuries arising out of that speech. See Miami Hearld Pub'g Co. v. Tornillo, 418 U.S. 241, 258 (1974); Moody v. NetChoice, LLC, 144 S.Ct. 2383, 2393 (U.S. 2024) (comparing social media company's content moderation to traditional publishers' editorial choices, which "also select and shape other parties' expression into their own curated speech products"). Many courts, including the MDL court, have held that certain publishing decisions made by social media companies trigger First Amendment scrutiny. See In re Social Media Adolescent Addiction/Personal Injury Pro. Liability Litigation, 702 F. Supp. 3d at 836 (applying First Amendment protection to the timing and clustering of notifications of Meta's own content); NetChoice, LLC v. Florida, 34 F.4th 1196, 1203–04, 1210 (11th Cir. 2022) (finding that social media companies engaged in protected speech when they expressed their political views through content moderation practices).

Thus, the First Amendment, like Section 230, immunizes Meta against any claims alleging harm arising from the substance of third-party content, as that conduct falls within a traditional publishing role. See Tornillo, 418 U.S. at 258; Reno v. ACLU, 521 U.S. 844, 870 (1997). However, because the Court has concluded that the thrust of the State's claims seeks to hold Meta accountable for the harm caused by the alleged addictive design features themselves, regardless of the substance of the third-party content disseminated, the Court similarly finds that the First Amendment does not bar

27

the State's claims.  See In re Social Media Adolescent Addiction/Personal Injury Pro.

Liability Litigation, 702 F. Supp. 3d at 836 (stating that Meta's briefing ignored that

"much of the conduct alleged by plaintiff does not constitute speech or expression" and

"d[id] not explain how holding them liable in that context would be akin to making them

liable for speech").

V.    Consumer Protection Act

The State asserts two claims alleging that Meta violated New Hampshire's

Consumer Protection Act ("CPA"), RSA 358-A:2.  In the first, Count I, the State alleges

that Meta violated the CPA by intentionally incorporating addictive design features and

algorithms into its Social Media Platforms despite its knowledge of the harm children

suffer from those features.  (Compl. ¶ 238.)  The State also alleges, in Count II, that

Meta violated the CPA by engaging in deceptive acts or practices, in particular: (1)

deceptively representing that the Social Media Platforms are safe and failing to disclose

and/or concealing information indicating the Platforms are not safe; (2) misrepresenting

that the Social Media Platforms are not designed to hook children; and (3)

misrepresenting that Meta prioritizes user well-being over profits.  (Compl. ¶¶ 260–62.)

Meta moves to dismiss both CPA claims on the following grounds: (1) the State

failed to identify unlawful conduct that took place in New Hampshire; (2) Meta is exempt

from CPA liability because it falls under the CPA's publisher exception; (3) the alleged

unfair or deceptive practices are not alleged to have occurred in the conduct of trade or

commerce; (4) both counts fail to state a claim; and (5) the State is not entitled to

restitution.  The Court addresses each argument in turn.

28

a. <u>Conduct in or Directed at New Hampshire</u>

Meta contends that the State's CPA claims must fail because the State has not alleged that the underlying conduct occurred in New Hampshire. Meta cites the fact that its principal place of business is in California and the State does not allege that Meta maintains offices, employees, or assets in New Hampshire. The State responds that the "offending conduct" occurred within New Hampshire because Meta's alleged misrepresentations were received by New Hampshire consumers and Meta's design features affected New Hampshire users.

RSA 358-A:2 makes unlawful the use of "any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." "Trade" and "commerce" include "the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this state." RSA 358-A:1, II; <u>LaChance v. U.S. Smokeless Tobacco Co.</u>, 156 N.H. 88, 96 (2007) (emphasizing the broad sweep of the CPA indicated by the language, "any trade or commerce directly <u>or indirectly</u> affecting the people of this state"). "The limitation in RSA 358-A:2 to 'conduct of any trade or commerce within this state' has been interpreted to mean that the statute only applies to offending conduct that took place in New Hampshire." <u>Environamics Corp. v. Ferguson Enter., Inc.</u>, No. Civ. 00-579-JD, 2001 WL 1134727, at *4 (D.N.H. Sept. 24, 2001).

The following decisions demonstrate a spectrum of whether a defendant's conduct satisfies the "within this state" element of the CPA. In <u>LaChance</u>, the New

29

Hampshire Supreme Court held that the plaintiffs, who were purchasers of smokeless tobacco products from retail stores across New Hampshire, could bring a CPA claim against the defendants, who manufactured smokeless tobacco products and marketed them through in-store displays. 156 N.H. at 89 (addressing whether the plaintiff's claims satisfied the "trade or commerce" requirement, not specifically addressing the territorial requirement). In Environamics, the court determined that the "within this state" requirement was satisfied where the defendant shipped a contaminated product to New Hampshire. 2001 WL 1134727, at *4. Alternatively, the Precourt Court ruled that the defendant's conduct was not within the State of New Hampshire where it shipped its beef to a New York company which then incorporated the defendant's beef into another product which it distributed to New Hampshire. Precourt v. Fairbank Reconstruction Corp., 856 F. Supp. 2d 327, 344 (D.N.H. 2012).

The Court determines that the State's allegations support that the conduct underlying the claims against Meta has a sufficient New Hampshire nexus. The Court begins with the State's claims arising out of Meta's design features. In 2023, Facebook and Instagram had 34,063 and 89,339 New Hampshire users under eighteen, respectively. (Compl. ¶¶ 49–50.) Meta also derived $542,835,568 from ad revenue sourced from New Hampshire users in 2023. (Id. ¶ 40.) Further, as explained above, supra Section A, Meta's algorithms are influenced by the data collected from New Hampshire users. To say that Meta's alleged unfair or deceptive act or practice of incorporating addictive design features and algorithms into its Social Media Platforms used by tens of thousands of New Hampshire children is not conduct within this state is not credible. Turning to the State's claims arising out of Meta's alleged

30

misrepresentations, the Court determines that the conduct likewise occurred "within this state" because New Hampshire children are alleged to have suffered from the impacts of Meta's misrepresentations and omissions.  (See id. ¶¶ 32, 261.)  Certain alleged misrepresentations are included on Meta's website, accessed by the tens of thousands of New Hampshire child users and New Hampshire adult users on a regular basis.  (See id. ¶ 145.)  For these reasons, the Court views the State's allegations as similar to those in LaChance and Environamics, satisfying the CPA's territorial requirement at the pleading stage.

The Court's decision is in accord with other jurisdictions that determined the CPA's territorial requirement was satisfied on a claim alleging a nationwide scheme under which New Hampshire citizens have suffered despite the conduct not directly occurring in New Hampshire.  See In re Niaspan Antitrust Litig., 42 F. Supp. 3d 735, 761 (E.D. Penn. 2014); In re Chocolate Confectionary Antitrust Litig., 749 F. Supp. 2d 244, 234–35 (M.D. Penn. 2010); In re DDAVP Indirect Purchaser Antitrust Litig., 903 F. Supp. 2d 198, 231 (S.D.N.Y. 2012).

　　　　b.  Publisher Exemption Under RSA 358-A:3, IV

Meta contends that it is exempt from liability under RSA 358-A because it is a publisher under RSA 358-A:3, IV.  The State argues that the exemption is inapplicable because the State seeks to hold Meta liable for its use of addictive design features and for its misrepresentations, not as a publisher of third-party content.

RSA 358-A:3 exempts certain persons or conduct from liability under RSA 358-A. One of those exceptions, RSA 358-A:3, IV, exempts from liability, "[p]ublishers, broadcasters, printers, or other persons engaged in the dissemination of information or

reproduction of printed or pictorial matter who publish, broadcast, or reproduce material without knowledge of its deceptive character." Cf. Karpinski v. Union Leader Corp., No. 18-cv-1214-PB, 2019 WL 3203144, at *8 (D.N.H. July 16, 2019) (analyzing RSA 358-A:3, IV where the suit arose out of the substance of an article published by the defendant newspaper).

The Court agrees with the State. For similar reasons outlined, supra Section B, addressing Meta's Section 230 arguments, the State seeks to hold Meta liable not for its publishing of certain content, but rather for the addictive features it implements into its Social Media Platforms and for the alleged misrepresentations it has made to the public. The State's CPA claims do not arise out of Meta's publishing of deceptive material. For that reason, RSA 358-A;3, IV does not apply.

### c. Conduct of Trade or Commerce

Meta argues that its alleged conduct does not constitute "conduct in any trade or commerce" because the State does not, and cannot, allege that users pay to use the Social Media Platforms. The State responds that Meta has engaged in "trade or commerce" in New Hampshire by exchanging the use of its Social Media Platforms for users' personal data.

"To determine whether the [CPA] applies to a particular transaction, [the Court] analyze[s] the activity involved, the nature of the transaction, and the parties to determine whether a transaction is a personal or business transaction." Hughes v. DiSalvo, 143 N.H. 576, 578 (1999) (declining to extend to the CPA to isolated sales of property by owners). The CPA defines "trade" and "commerce" as, "the advertising,

offering for sale, sale, or distribution of any services or any property . . . ."  RSA 358-A:1.  The Court must engage in statutory interpretation of the term "sale" in the CPA.

When engaging in statutory interpretation, the Court "first look[s] to the language of the statute itself, and, if possible, construe[s] that language according to it plain and ordinary meaning."  State v. Doyle, 176 N.H. 594, 597 (2024).  The Court "give[s] effect to every word of a statute whenever possible and will not consider what the legislature might have said or add language that the legislature did not see fit to include."  Id.  The Court "construe[s] all parts of a statute together to effectuate its overall purpose" and attempts to construe all parts "in harmony with the overall statutory scheme."  Id.

"Sale" is defined as "[t]he action or an act of selling or making over to another for a price; the exchange of a commodity for money or other valuable consideration."  Oxford English Dictionary, "Sale," July 2023; Matter of Carter, 2024 N.H. 30, ¶ 9 ("When a term is not defined in a statute, [the Court] look[s] to its common usage, using the dictionary for guidance.").  It is also defined as, "[t]he transfer of property or title for a price."  Black's Law Dictionary, "Sale," (12th ed. 2024).  Upon review of the plain meaning of "sale," the Court cannot say that it requires an exchange of money.  The Court declines to read words into the statute the legislature did not see fit to include.  See Doyle, 176 N.H. at 597.  Rather, a sale could be an exchange wherein consumers are able to access Meta's Social Media Platforms in exchange for a price—Meta's collection of their personal data.  While Meta does not charge for its product, it receives valuable consideration in the form of person information.  The State has alleged such an exchange, satisfying the "trade or commerce" element of the CPA at the pleading stage.  (See Compl. ¶ 34.)  The Court's conclusion is in accordance with the purpose of the

33

CPA: "to ensure an equitable relationship between consumers and persons engaged in business." Hughes, 143 N.H. at 578.

The Court notes that Meta originally relied upon a trial court decision from an Indiana court interpreting a similar state statute. See Indiana v. Tiktok, Inc., No. 02D02-2212-PL-400, 2023 WL 8481303, at *6 (Ind. Ct. Super. Nov. 29, 2023). That court determined that Tiktok's operation of an app, free to users, was not a "consumer transaction" under Indiana's comparable consumer protection act because users did not exchange money for use of the app. Id.; see also Ind. Code § 24-5-0.5-2(1) (defining a "consumer transaction" as "a sale, lease, assignment, award by chance, or other disposition of an item of personal property, real property, a service, or an intangible"). The Court of Appeals of Indiana reversed the trial court's decision, determining that Tiktok's business model of exchanging access to its content library for end-user personal data was a "consumer transaction." State v. Tiktok, Nos. 23A-PL-3110, 23A-PL-3111, 2024 WL 4340387, at *8–9 (Ind. Ct. App. Sept. 30, 2024). The court concluded that, "the plain and ordinary definition of the word 'sale,' which is not otherwise defined in the DCSA, includes any consideration to effectuate the transfer of property, not only an exchange of money." Id. at *9 (noting that an interpretation limiting the definition of the word "sale" to exchanges for money narrows the scope of the act beyond its plain terms, contrary to its requirement of liberal interpretation). The Court adopts a reasoning similar to that of the Indiana Court of Appeals, here.

    d.  Failure to State a Claim

Meta argues that the State fails to state a claim under either of its CPA counts. It contends that the State has failed to allege facts demonstrating the "rascality" of Meta's

conduct or that New Hampshire citizens suffered substantial injury from Meta's acts. The State responds that its allegations of Meta's conduct meet New Hampshire's rascality test and that the alleged harms to New Hampshire children's mental health suffices as substantial injury.

The CPA proscribes unfair and deceptive trade practices in general, RSA 358-A:2, and sets forth a list of specific types of conduct that qualify as unfair or deceptive trade practices, RSA 358-A:2, I–XVIII.  Fat Bullies Farm, LLC v. Devenport, 170 N.H. 17, 24 (2017).  Although the general provision is broadly worded, the New Hampshire Supreme Court has recognized that not all conduct in the course of trade or commerce falls within the scope of the CPA.  Id.

"In determining which commercial actions not specifically delineated are covered by the act," the Court employs the "rascality" test.  Id.  "Under the rascality test, the objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce."  Id.  In addition to the rascality test, New Hampshire courts look to the federal courts' interpretation of the Federal Trade Commission Act for guidance.  Id.  The Federal Trade Commission considers: "(1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers . . . ."  Id.  The New Hampshire Supreme Court has found the rascality test unmet when a defendant was alleged to have engaged in conduct

35

common in the particular industry in which the parties engaged.  See Hair Excitement, Inc. v. L'Oreal U.S.A., Inc., 158 N.H. 363, 371 (2009).

      i.   Count I

In Count I, the State alleges that Meta committed unfair acts in violation of the CPA by intentionally incorporating addictive design features and algorithms into its Social Media Platforms despite knowledge of the harms suffered by child users of those features.  (Compl. ¶ 238.)  Meta contends that the State fails to state a claim on Count I because Meta's alleged manipulative and addictive design features are not unique to its Social Media Platforms and the State has not alleged a "substantial injury."  The State disagrees that Meta's design features need to be unique to be actionable under the CPA.  The State further asserts that non-monetary harm can suffice as a substantial injury, establishing an unfair act or practice.

Meta's contention that its design features do not satisfy the rascality test because they are well known to the public and other social media services use similar features is unpersuasive to the Court.  Of note, the fact that other social media services use similar features is not a fact pleaded in the complaint.  For that reason, the Court cannot consider it.  See Barufaldi, 175 N.H. at 427; Hair Excitement, Inc., 158 N.H. at 371 (reviewing the trial court's decision of the plaintiff's CPA claim on the merits, not at the motion to dismiss stage).  Further, while Meta's design features may be well known, the State alleges that Meta misrepresented and omitted information about the design features' addictive nature.  Accordingly, in viewing the facts in the light most favorable to the State, the Court cannot rule that the addictive nature of Meta's design features is known and understood by the public.

Therefore, the Court is left with the State's allegations that Meta intentionally incorporated addictive design features and algorithms into its Social Media Platforms. The State alleges Meta did so with an understanding of the harms suffered by children using the Platforms. Finally, the State alleges that Meta's acts and omissions have exploited children's psychological vulnerabilities for Meta's financial gain. The knowing exploitation of children's health for financial gain rises to "a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Hair Excitement, Inc., 158 N.H. at 369.

The Court next addresses Meta's argument that the State has not alleged a substantial injury. Relying on the Federal Trade Commission's test to determine whether conduct is unfair or deceptive, the New Hampshire Supreme Court requires a showing that the conduct causes substantial injury to consumers. Fat Bullies Farm, Inc., 170 N.H. at 24. The Court is unaware of precedent from the New Hampshire Supreme Court substantively analyzing the meaning or scope of "substantial injury." Accordingly, the Court turns to other jurisdictions' interpretations of the Federal Trade Commission Act.

In 1985, the Court of Appeals for the District of Columbia relied on a policy statement from the Federal Trade Commission which stated, "in most cases substantial injury would involve monetary harm and that 'ordinarily' emotional impact and other more subjective types of harm would not make a practice unfair." Am. Fin. Serv. Ass'n v. F.T.C., 767 F.2d 957, 972 (D.C. Cir. 1985). Further, the Commission's policy statement clarified that it is "not concerned with trivial or merely speculative harms." Id. The Commission also noted in correspondence with United States senators that it does

37

not "cover subjective examples of harm such as emotional distress or offenses to taste or social belief."  Id. at n.18.  However, an act or practice can cause 'substantial injury' by doing "a small harm to a large number of people, or if it raises a significant risk of concrete harm."  Id.; F.T.C. v. Neovi, Inc., 604 F.3d 1150, 1157 (9th Cir. 2010).

The State has alleged harm sufficing to establish substantial injury under the CPA.  The State alleges that use of Meta's Social Media Platforms "results in psychological and health harms among children, including increased rates of major depressive episodes, anxiety, sleep disturbances, suicide, and other mental health concerns."  (Compl. ¶ 99.)  The State also alleges that frequent social media use has been associated with distinct changes in the amygdala region of a developing brain. (Id. ¶ 106.)  Even accepting a classification of the harms alleged by the State as "emotional distress," such allegations establish a substantial injury.  The harm suffered by New Hampshire child users of the Social Media Platforms is not subjective or trivial.  Rather, the State alleges that use of the Platforms causes serious injury to teenagers' health.  This alleged harm is sufficiently concrete, see Neovi, Inc., 604 F.3d at 1157 (requiring that an injury be "concrete" to satisfy the substantial injury test), and serious to constitute substantial injury.  See District of Columbia v. Meta Platforms, Inc., No. 2023-CAB-6550, at *34 (D.C. Super Ct. Sept. 9, 2024) (holding that the District alleged a substantial injury by alleging that Meta's addictive design features significantly increase rates of major depressive episodes anxiety, sleep disturbances, and other mental health disorders, including suicide, among children); F.T.C. v. Accusearch, Inc., No. 06-CV-105-D, 2007 WL 4356786, at *8 (D. Wy. Sept. 28, 2007) (ruling that, "while the substantial injury requirement may not *ordinarily* be met from emotional impact that

38

is 'trivial or merely speculative,' the evidence presented to the Court demonstrates a host of emotional harms that are substantial and real and cannot be fairly classified as either trivial or speculative").  Further, were the Court to accept the proposition that the harm alleged by the State is "small," which the Court is disinclined to do, a large number of people suffer from the harm, and, thus, the State has alleged a substantial injury.  See id.

Accordingly, the State has stated a claim upon which this Court may grant relief on Count I of its complaint.

### ii.   Count II

In Count II, the State alleges that Meta made misrepresentations to consumers, specifically: (1) deceptively representing that the Social Media Platforms are safe and failing to disclose and/or actively concealing information that they are not; (2) misrepresenting that the Social Media Platforms are not designed to hook children; and (3) misrepresenting that Meta prioritizes user well-being over profits.  (Compl. ¶ 262.)  Meta argues that its subjective, generalized statements about the safety of the Social Media Platforms are statements of opinions or goals and cannot form the basis for a deceptive practices claim.  Meta also contends that Count II fails because the State did not allege with specificity that its misrepresentations were false or misleading, the State's allegations about Meta's prioritization of time spent are not material, and Meta's statements to Congress are not actionable.  The State disagrees, arguing that it alleged Meta's misrepresentations and omissions with sufficient specificity based on actionable deceptions.

First, the Court addresses Meta's argument that the State's deceptive practices claim must be pleaded with specificity. Meta relies on a New Hampshire superior court decision from 1999, a decision from the District Court for the District of New Hampshire, and a New Hampshire Supreme Court decision. First, the superior court order only briefly addresses the plaintiff's CPA claim and does not set out a standard of review separate from the plaintiff's claim for fraud. See Nichols v. Gen. Motors Corp., No. 99-C-566, 1999 WL 33292839, at *4–5 (N.H. Super. Ct. Dec. 13, 1999). Second, the federal court's decision applied a heightened pleading standard to the plaintiff's CPA claim after determining that a federal procedural rule required such standard for claims sounding in fraud. Micronics Filtration Holdings, Inc. v. Miller, No. 18-cv-303-JL, 2018 WL 4845749, at *6 (D.N.H. 2018). This Court need not consider rulings from other courts applying federal procedural rules rather than the rules this Court is bound by. Finally, Meta's reliance on Jay Edwards, Inc. v. Baker, 130 N.H. 41, 46–47 (1987), is misplaced because that decision specifically addresses the standard of review for claims of fraud, and does not discuss broader applicability of the standard to claims such as CPA claims.

Consequently, the Court applies the traditional standard of review on a motion to dismiss to Meta's motion to dismiss Count II of the State's complaint. See LaChance v. U.S. Smokeless Tobacco Co., 156 N.H. 88, 93–100 (2007) (employing the typical motion to dismiss framework to resolve an appeal of a trial court's grant of the defendant's motion for judgment on the pleadings—which are treated like motions to dismiss in New Hampshire—of the plaintiff's CPA claim); Snierson v. Scruton, 145 N.H. 73, 80–81 (2000) (applying a specificity test to the plaintiff's fraud and negligent

misrepresentation claims and then ruling that the plaintiff's CPA allegations "support[ed] a claim of unfair or deceptive trade practices" and not mentioning a specificity requirement).

The Court turns to Meta's argument that the State's claims arising out of alleged misrepresentations regarding the Social Media Platforms' safety are non-actionable statements of opinion, not misstatements of fact. The Court disagrees. Accepting the State's allegations as true, Meta's statements about the Social Media Platforms' safety went beyond mere puffery. See Hughes v. Panasonic Consumer Elecs. Co., Civ. Act. No. 10-846, 2011 WL 2976839, at *12 (D.N.J. July 21, 2011) (finding that alleged statements regarding "industry leading" characteristics were mere puffery insufficient to satisfy federal pleading standards). Rather, Meta is alleged to have known of the specific harms the Platforms caused child users and yet Meta reiterated the safety of the Platforms. Similarly, Meta prioritized users' time spent on the Platforms, knowing of the harm extended use of the Platforms caused, while making statements of its prioritization of safety and well-being. This goes beyond statements of corporate optimism. The Court finds these statements actionable because Meta is alleged to have known of specific harms, omitted the information from its public statements, and represented the opposite. Such conduct is subject to liability under the CPA.

The cases Meta cites are inapposite. See Morris v. Princess Cruises, Inc., 236 F.3d 1061, 1067–68 (9th Cir. 2001) (ruling that the plaintiff's claim for negligent misrepresentation was non-actionable where the plaintiff denied discussing the quality or nature of medical care on the cruise ship; the central issue of the claim). In particular, the Court finds decisions related to car manufacturers or ride-sharing

41

application companies' statements about the safety of their products distinct.[3]  A reasonable consumer understands the inherent danger in operating a car and receiving a car ride from a stranger.  However, the same is not true for use of social media applications.  The State alleges that Meta knew about dangers posed by the Social Media Platforms and misrepresented or omitted key facts about the Platforms' safety.  For that reason, a reasonable consumer does not have the same understanding of the dangers of social media as they might of the dangers of cars.  To put it plainly, the dangers posed to users by Meta's addictive design features are far less visible or obvious than those posed by riding in cars with strangers.  The Court also notes that several of the cases cited by Meta involve securities actions in which the analysis focused on the understanding of a reasonable investor.  Here, the Court must determine whether a reasonable consumer may have been misled by Meta's statements.  Viewing the State's allegations in the light most favorable to it, the Court concludes a reasonable consumer may have been so misled.  Accordingly, the Court is not persuaded by Meta's arguments and finds the State's allegations actionable.

Meta breaks down the rest of its argument into categories of statements related to: (1) prevalence of harmful content; (2) Project Daisy; (3) filters; (4) Meta's prioritization of time spent; and (5) other allegations generally alleging that Meta "deceived" and "misled" the public, consumers, and external researchers and regulators.  The State responds that particular statements or practices can deceive

---

[3] See In re Lyft Inc. Sec. Litig., 484 F. Supp. 3d 758, 770 (N.D. Cal. 2020); Azoulai v. BMW of N. Am. LLC, No. 16-cv-00589-BLF, 2017 WL 1354781, at *8 (N.D. Cal. 2017); In re Ford Motor Co. Sec. Litig., Class Action, 381 F.3d 563, 571 (6th Cir. 2004); Greater Houston Trans. Co. v. Uber Tech., Inc., 155 F. Supp. 3d 670, 683 (S.D. Tex. 2015); XYZ Two Way Radio Serv., Inc. v. Uber Tech., Inc., 214 F. Supp. 3d 179, 183–84 (E.D.N.Y. 2016).

while being vague or technically true.  The State asserts that it has alleged a concerted, global effort to deceive through Meta's various statements about certain aspects of the Social Media Platforms.  The State refers to similar allegations made against tobacco companies related to statements about the health hazards posed by consumption of their products.  See King v. Philip Morris, Inc., No. 990C0856, 2000 WL 34016358, at *10 (N.H. Super. Ct. Nov. 2, 2000).

The Court is inclined to agree with the State that the proper approach is to view Meta's statements as a whole to determine whether the State has stated a claim that the statements are misrepresentations violative of the CPA.  The Court concludes that the State has done so.  The State has alleged that Meta's statements about the Social Media Platforms were designed to minimize the harmful effects Meta was aware the Platforms had on child users.  (Compl. ¶ 4.)  The Court's analysis is whether Meta's conduct attained "a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce."  Fat Bullies Farm, LLC, 170 N.H. at 24.  Meta's statements, whether they concerned the prevalence of harmful content, Project Daisy, filters, its prioritization of time spent on the Platforms, or more general deceiving or misleading statements, aimed to conceal the negative impacts of social media use on children, portray the Platforms as safe for children and indicate that Meta prioritized child safety.  These statements are misleading such that they reach the required level of rascality at the pleading stage.

The Court lastly addresses Meta's arguments regarding statements it is alleged to have made in testimony to Congress.  Meta contends that it cannot be liable for such statements because the First Amendment bars claims based on efforts to petition the

government, including congressional testimony, and any statements made to Congress were not made "in the conduct of any trade or commerce" as required by RSA 358:A-2.

Meta's first argument relies on the Noerr-Pennington doctrine which is "rooted in the Petition Clause of the First Amendment" and protects "an attempt to persuade the legislature or the executive to take particular action with respect to a law." United States v. Philip Morris USA Inc., 566 F.3d 1095, 1123 (D.C. Cir. 2009). The doctrine only covers activity "genuinely intended to influence government action." Id. Additionally, neither the doctrine nor the First Amendment protect petitions predicated on fraud or deliberate misrepresentation. Id. (collecting cases). Because the State has stated a claim that Meta's statements were misrepresentations, in violation of the CPA, they are not entitled to protection under Noerr-Pennington. The Court assumes the truth of the State's allegations: that Meta made statements to Congress which it knew were false or misleading. Accordingly, neither the Noerr-Pennington doctrine nor the First Amendment protect Meta's statements because they constitute deliberate misrepresentation.[4] See id.

The Court is likewise not persuaded by Meta's argument that the statements it made to Congress were not within "trade or commerce," and, consequently, are not actionable under the CPA. The CPA applies to "persons engaged in trade or commerce." Hughes v. DiSalvo, 143 N.H. 576, 578 (1999) (quoting Chase v. Dorais, 122 N.H. 600, 601 (1982)). "Remedies under the [CPA] are not available where the transaction is strictly private in nature, and is in no way undertaken in the ordinary

---

[4] The Court assumes, without deciding, that the Noerr-Pennington doctrine applies in this context as a defense to the State's CPA claim. However, the Court recognizes that some courts, see, e.g., Andrx Pharm., Inc. v. Elan Corp., PLC, 421 F.3d 1227, 1233 (11th Cir. 2005), have limited the applicability of the doctrine to antitrust actions (where the doctrine originated).

44

course of a trade or business." Id. (cleaned up). Assuming all of the facts in the State's complaint as true, and construing all inferences in the State's favor, Meta's statements to Congress were a part of its overall scheme to conceal known harm stemming from children's use of the Social Media Platforms. (Compl. ¶ 143–44, 188, 205–06.) As discussed, this is a key aspect of Meta's business model. Therefore, the State has pleaded sufficient facts to state a claim under the CPA arising from Meta's statements about the Platforms' safety.

e. Restitution

Finally, Meta alleges that the State is not entitled to restitution on its CPA claims because no user is alleged to have paid to use Meta's services. The State disagrees, arguing that restitution need not be compensatory but may also be used to disgorge wrongdoers of funds unlawfully obtained.

RSA 358-A:4, III(a) permits the attorney general to bring suit against any person the attorney general has reason to believe has committed a violation of RSA 358-A. In that suit, the attorney general "may petition the court for an order of restitution of money or property to any person or class of persons injured thereby." RSA 358-A:4, III(a).

The New Hampshire Supreme Court has not addressed the scope of restitution under RSA 358-A:4, III(a). In certain actions, New Hampshire has recognized the broader reach of restitution, including the disgorgement of the benefit derived by a defendant. See In re Haller, 150 N.H. 427, 430 (2003) ("Restitution is an equitable remedy typically applied to contracts implied in law to disgorge the benefit of unjust enrichment."). In the criminal context, the legislature has specifically defined restitution as "money or service provided by the offender to compensate a victim for economic loss

45

. . . ."  RSA 651:62, V.  Black's Law Dictionary defines "restitution" as "an ambiguous term, sometimes referring to the disgorging of something which has been taken and at times referring to compensation for injury done."  RESTITUTION, Black's Law Dictionary (12th ed. 2024).

In the Court's view, this determination requires an understanding of whether Meta has wrongfully received revenue from third-party advertisers from the increased time youth users spent on the Social Media Platforms as a result of Meta's alleged violations of the CPA.  The State's allegations indicate this inquiry would be answered in the affirmative, but the Court cannot definitively rule from the face of the complaint. Accordingly, it declines to resolve this dispute at this juncture.

VI.   <u>Products Liability and Negligence</u>

The State alleges that Meta is liable for the defective design of its Social Media Platforms (Count III), its failure to warn about the risks associated with use of the Social Media Platforms (Count IV), and its negligence in its design, manufacturing, marketing, distributing, and labeling of its Social Media Platforms (Count V).  Meta moves to dismiss all three state common law claims, arguing that the State lacks standing to pursue such claims and each count fails to state a claim as a matter of law.  The State contends it has <u>parens</u> <u>patriae</u> standing to pursue its claims and it stated a claim under each theory.  Meta also argues that the State's strict products liability claims fail as a matter of law because the Social Media Platforms are not "products," that the State's negligence claim fails because the State has not alleged that Meta violated a duty of care, and that all of the State's common law claims fail because it did not sufficiently allege proximate causation.  The Court addresses each issue in turn.

46

a. Standing

"Parens patriae literally means 'parent of the country,' and refers traditionally to the role of the state as sovereign and guardian of persons under legal disability." State v. City of Dover, 153 N.H. 181, 185 (2006). The theory is "a concept of standing utilized to allow the state to protect 'quasi-sovereign' interests such as health, comfort and welfare of its citizens, interstate water rights, and the general economy of the state." Id. at 185–86. To satisfy parens patriae standing, "[f]irst, the state must assert an injury to a 'quasi sovereign' interest, an interest apart from the interests of particular private parties. Second, the state must allege injury to a 'substantial segment' of its population." Id. at 186. The Court addresses each inquiry in turn.

"Quasi-sovereign" interests are those "that the State has in the well-being of its populace," which must be "sufficiently concrete to create an actual controversy between the State and the defendant." Id. (citing Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592, 602 (1982)). For example, states have a quasi-sovereign interest "in the abatement of public nuisances, instances in which the injury to the public health and comfort is graphic and direct." Id. Courts have "generally interpreted the health and well-being category of quasi-sovereign interests broadly." Id. "A state also has a quasi-sovereign interest in preventing any injury or potential injury to the general health and well-being of its residents." Id.

In Dover, the New Hampshire Supreme Court ruled that "the State has a quasi-sovereign interest in protecting the health and well-being, both physical and economic, of its residents with respect to the statewide water supply." Id. The Court reasoned that "[t]he control and elimination of water pollution is a subject clearly within the scope of

47

the State's constitutional police power." Id. The Court also relied on the State's interest, as articulated by RSA 481:1, in providing "careful stewardship over all the waters lying within its boundaries." Id. Thus, the Court concluded that the State had a quasi-sovereign interest in protecting its waters from methyl tertiary butyl ether contamination. Id.

The State contends it has a quasi-sovereign interest in protecting children from Meta's operation of the Social Media Platforms which the State has alleged causes significant harm to New Hampshire children. The State has a quasi-sovereign interest in the health of its citizens. Id. The State has alleged that Meta's Social Media Platforms harm children. (Compl. ¶¶ 104–117.) In New Hampshire, 13.49% of the under-eighteen population are active monthly Facebook users and 35% are active monthly Instagram users. (Id. ¶¶ 49–50.) Teenagers in New Hampshire have also suffered from declining mental health since 2011. (Id. ¶¶ 118–19.) The State has an interest in protecting the mental health of its youngest population. The Court sees no reason to distinguish between physical and mental health in this context. See Dover, 153 N.H. at 186 (stating that the state has a quasi-sovereign interest in the physical health of its citizens); Snapp, 458 U.S. at 607 (same). Therefore, the Court determines that the State has pleaded sufficient facts to satisfy the quasi-sovereign interest prong of the parens patriae standing test.

The second inquiry is "whether a sufficiently substantial segment of the population is affected by the challenged conduct." Dover, 153 N.H. at 187. In Dover, 13.2% of the statewide water supplies were contaminated, corresponding to hundreds of public water systems and approximately 40,000 private water supplies. Id. The

48

Court determined that the foregoing data demonstrated that the contamination directly affected a substantial portion of the population of New Hampshire. Id. The Court noted that the State "clearly" met the substantial segment test. Id.

Over a third of minors in New Hampshire are active Instagram users and 13% actively use Facebook. While there is no particular number which satisfies the substantial segment prong, see People v. Peter & John's Pump House, Inc., 914 F. Supp. 809, 812 (N.D.N.Y. 1996) ("There is no numerical talisman to establish parens patriae standing . . . ."), the proportion of New Hampshire citizens impacted by Meta's Social Media Platforms exceeds the proportion impacted in Dover. If the State "clearly" met the prong in Dover, then the State has met the same prong under the facts alleged here. Further, while the State alleges teenage usage of the Social Media Platforms in 2023, future users will also be impacted by the same alleged products liability and negligence, increasing the segment of the population affected. See New York, by James v. Niagara-Wheatfield Central Sch. Dist., __ F.4th __, __, No. 22-2178-cv, 2024 WL 4487669, at *7 (2d Cir. Oct. 15, 2024) (permitting consideration of future individuals who may be injured by the defendant's actions in the analysis of the substantial segment prong of the parens patriae test); Com. of Massachusetts v. Bull HN Info. Sys., Inc., 16 F. Supp. 2d 90, 97 (D. Mass. 1998) (recognizing the state's quasi-sovereign interest in preventing potential injury to the general health and well-being of its residents). Accordingly, the Court determines that the State has pleaded sufficient facts to satisfy the substantial segment of the parens patriae standing test.

Some jurisdictions consider a third prong to the parens patriae test, requiring the State show that individuals could not obtain complete relief through private suits. See

Dover, 153 N.H. at 187. The reasoning underlying the third prong is to ensure that the state's interest is "sufficiently severe and generalized, it must stand apart from the interests of particular parties–in other words, the controversy must in substance implicate the state's interest in economic supervision, and not merely affect the fortunes of a limited class of her citizens." New York v. Facebook, Inc., 549 F. Supp. 3d 6, 22 (D.D.C. 2021) (citing Snapp, 458 U.S. at 607). However, the New Hampshire Supreme Court has not applied this prong in its consideration of whether the State has standing. See Dover, 153 N.H. at 187 (declining to place the burden on the State to show whether the cities could obtain complete relief through the State's suit). The Court has only employed the test when determining what types of damages the State may recover in a parens patriae suit. See State v. Hess Corp., 161 N.H. 426, 436–37 (2011) (ruling on an interlocutory transfer of a partial motion for summary judgment).

The Court declines to apply the third prong to the preliminary determination of the State's parens patriae standing at the motion to dismiss stage. Therefore, because the State has met the two prongs of the parens patriae standing test, the State may pursue its common law claims against Meta on behalf of its citizens.

   b. Whether the Social Media Platforms are "Products"

Meta argues that the State's strict products liability claims fail because the Social Media Platforms are not products and the harm the State alleges stems from intangible information and ideas, not products. The State contends that categorizing the Social Media Platforms as products is a better reasoned approach, the Platforms are more appropriately considered products in the products/services dichotomy, and the harm the State alleges arises from design elements of the Platforms, not third-party content.

50

The New Hampshire Supreme Court has not defined what a product is under strict products liability.  However, it has adopted the Restatement (Second) of Torts to analyze other questions under strict products liability.  See Kelleher v. Marvin Lumber & Cedar Co., 152 N.H. 813, 831 (2005).  The parties both rely on the Restatement (Third) of Torts which specifically addresses what constitutes a product.  The Court likewise relies on the Restatement (Third) of Torts because of the New Hampshire Supreme Court's previous reliance on the Restatement's approach, the Restatement (Second) of Torts' silence on the issue of defining a product, and the parties' joint reliance on the Restatement (Third) of Torts.

The Restatement (Third) of Torts defines a product as, "tangible personal property distributed commercially for use or consumption."  Restatement (Third) of Torts: Prod. Liab. § 19 (1998).  Further, "[s]ervices, even when provided commercially, are not products."  Id.  However, items such as electricity are products "when the context of their distribution and use is sufficiently analogous to the distribution and use of tangible personal property that it is appropriate to apply the rules state in the Restatement."  Id.

Given the nature of the State's claims, the Social Media Platforms are products.  The State alleges that the Platforms' design features harm users.  Meta's business model is operating social networking applications which allow users to share and view content and communicate with other users.  (Compl. ¶ 20.)  However, the Social Media Platforms are the vehicle through which Meta effectuates that business model.  Meta designs, develops, programs, markets, distributes, and profits from the Social Media Platforms.  (Id. ¶ 299.)  For this reason, the Platforms are akin to the distribution and

use of tangible property.  See Restatement (Third) of Torts: Prod. Liab. § 19 (1998).

Further, the Platforms are not services.  While users may experience a customized

display when engaging with the Platforms, the design features are uniform.

Consequently, Meta is not performing a unique service for every user of its Platforms.

Other jurisdictions are in accord with the Court's analysis.  In Brookes v. Lyft Inc.,

the court ruled that the Lyft application was a product because, while Lyft's business

model was a transportation network company in which it connects riders with drivers,

Lyft designed and distributed the Lyft application to carry out that business model.  No.

50-2019-CA-004782-MB, 2022 WL 19799628, at *3 (Fla. Cir. Ct. Sept. 30, 2022).  The

court also noted that the plaintiff's claim was based on the design of the application

which Lyft designed, distributed, and placed into the stream of commerce.  Id. at *4; see

also In re Uber Technologies, Inc., Passenger Sexual Assault Litig., __ F. Supp. 3d __,

__, No. 3084 CRB, 2024 WL 4211217, at *23 (N.D. Cal. Aug. 15, 2024) (finding the

Uber application a product because the alleged defects in the application have similar

plausible analogues in tangible products); T.V. v. Grinder, LLC, No. 3:22-cv-864-MMH-

PDB, 2024 WL 4128796, at *26 (M.D. Fla. Aug. 13, 2024) (recommending a finding that

the defendant social networking application is a product because it designed its app for

its business, made design choices for the app, placed the app in the stream of

commerce, distributed the app in the global marketplace, marketed the app, and

generated revenue and profits from the app); cf. In re Social Media Adolescent

Addiction/Personal Injury Pro. Liability Litigation, 702 F. Supp. 3d at 849 (adopting a

defect-specific approach to determine whether the challenged functionalities of the

defendants' social media were products).  But see Social Media Cases, No. JCCP 525,

52

22STCV21355, 2023 WL 6847378, at *16 (Cal. Super. Oct. 13, 2023) (determining that social media was not a product because applying the doctrine of products liability to social media does not align with the goals of the doctrine and interactions between social media companies and their users are different from traditional product sales).

The Court does not address at length Meta's argument that the State only alleges harm from intangible information delivered by the Social Media Platforms. As discussed supra, Section B, the State's claims are based on the Social Media Platforms' alleged defective and dangerous features, not the information contained therein. Accordingly, the State's products liability claim is based on harm caused by the product: the Social Media Platforms themselves.

     c. <u>Duty of Care</u>

Meta argues that the State's negligence claim fails because it does not allege a duty of care that Meta violated. The State responds that Meta owes a duty to everyone, and in particular its users, to exercise reasonable care not to subject others to an unreasonable risk of harm. Specifically, the State points to the duty to design reasonably safe products and the duty to warn of foreseeable risks in the chosen design.

"To recover for negligence, the plaintiff must demonstrate that the defendant owes a duty to him, that the defendant breached that duty, and that the breach proximately caused injury to him." <u>Robinson v. 1 Bouchard Street Realty</u>, ___ N.H. ___, ___, 2024 N.H. 59, ¶ 7. "Absent a duty, there is no negligence." <u>Id</u>. "Whether a duty exists in a particular case is a question of law." <u>Id</u>. "When charged with determining whether a duty exists in a particular case, [the Court] necessarily encounter[s] the

53

068

broader, more fundamental question of whether the plaintiff's interests are entitled to legal protection against the defendant's conduct." Grady v. Jones Lang LaSalle Constr. Co., 171 N.H. 203, 207 (2018). "In making this determination, [the Court] consider[s] whether the societal importance of protecting the plaintiff's interest outweighs the importance of immunizing the defendant from extended liability." Id.

"A person injured by a product may proceed against the seller or manufacturer of the product under a theory of negligence." 8 McNamara, New Hampshire Practice: Personal Injury — Tort and Insurance Practice § 8.09 (2024) (citing State v. Exxon Mobil Corp., 168 N.H. 211, 233–36 (2015)). "A manufacturer has a duty to act in a reasonable way in designing and manufacturing a product." Id. Thus, because Meta has designed a product, placed that product in the stream of commerce, marketed it, and profited from it, Meta has a duty to reasonably design the Social Media Platforms.

Meta argues that interactive communication services like the Platforms do not owe a duty of care for content publication or consumption. Meta also contends that it does not owe a duty to prevent harm caused by third parties. The Court's review of the State's claim for negligence, (see Compl. ¶¶ 314–20), indicates that the State bases its negligence claim on Meta's alleged design, manufacture, marking, distribution, and labeling of the Social Media Platforms and the resulting compulsive and excessive use of the Platforms. The claim does not mention harm caused by Meta's publication or users' consumption of content or harm caused by third parties. Accordingly, the Court finds Meta's arguments irrelevant. However, to the extent the State seeks to hold Meta liable for content it publishes on its Social Media Platforms, such liability is barred by Section 230, see supra Section III(B). On the other hand, for the reasons articulated

54

throughout this order, Meta can be held liable for its implementation of certain design features.

### d. Proximate Causation

Meta argues that all of the State's common law claims fail because it does not sufficiently allege proximate causation. The State contends that its allegations—that (1) Meta's use of addictive design features causes users, particularly teenagers, to engage with the Social Media Platforms compulsively and excessively; and (2) compulsive and excessive use of the Platforms causes harm to children's mental health—suffice to establish proximate causation. The State acknowledges that its theory is broad but argues that it has provided detailed factual support.

"Proximate causation requires a court to determine whether the defendant should be legally liable for what he has caused." Fish v. Homestead Woolen Mills, Inc., 134 N.H. 361, 364 (1991). "Liability for negligence is imposed only for injuries resulting from the particular hazard against which the duty of due care required protection to be given." Id. Generally, proximate causation is a question of fact. Cecere v. Loon Mountain Recreation Corp., 155 N.H. 289, 295 (2007).

The Court determines that, in viewing the facts alleged in the light most favorable to the State and taking all reasonable inferences in its favor, the State has alleged proximate causation. In its complaint, the State has laid out how social media impacts young users' mental health, (Compl. ¶¶ 104–117), that New Hampshire teenagers use the Social Media Platforms, (id. ¶¶ 49–50), and that New Hampshire teenagers' mental health has declined since 2011, corresponding with Meta's acquisition of Instagram, (id. ¶¶ 98, 118–19). The State has alleged that Meta is aware of the addictive nature and

55

harmful impacts of the design of its Platforms.  (Id. ¶¶ 69, 78, 111, 122, 125, and 136.)

Viewing these allegations together, the State has sufficiently pleaded that Meta's

alleged design and implementation of addictive and dangerous features and

misrepresentations and omissions about the safety of the Platforms proximately caused

the worsening of teenage mental health in New Hampshire.

**VII.     Conclusion**

For the foregoing reasons, Meta's motion to dismiss is DENIED.

**SO ORDERED.**

December 10, 2024
_____
**Date**

_____
**John C. Kissinger, Jr.**
**Presiding Justice**

Clerk's Notice of Decision
Document Sent to Parties
on  12/11/2024

# EXHIBIT 22

Jonathan O. Hafen (6096)
David C. Reymann (8495)
Kade N. Olsen (17775)
Tammy M. Frisby (17992)
Parr Brown Gee & Loveless, P.C.
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
jhafen@parrbrown.com
dreymann@parrbrown.com
kolsen@parrbrown.com
tfrisby@parrbrown.com

Timothy C. Hester
Mark W. Mosier*
Covington & Burling LLP
850 Tenth Street, NW
Washington, DC 20001
Telephone: 202-662-6000
thester@cov.com
mmosier@cov.com

Megan L. Rodgers
Covington & Burling LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306
Telephone: 650-632-4700
mrodgers@cov.com

Attorneys for Defendants Meta Platforms, Inc., and Instagram, LLC
*Pro hac vice forthcoming

## SUPREME COURT OF THE STATE OF UTAH

| | |
|---|---|
| UTAH DIVISION OF CONSUMER PROTECTION, | **PETITION FOR PERMISSION TO APPEAL FROM INTERLOCUTORY ORDER** |
| *Plaintiff/Respondent,* | **(Subject to Assignment to the Court of Appeals)** |
| v. | |
| META PLATFORMS, INC. and INSTAGRAM, LLC, | Appellate Case No. _____ |
| *Defendants/Petitioners.* | On Petition for Permission to Appeal an Interlocutory Appeal from the Third Judicial District Court |
| | Honorable Kent Holmberg |
| | District Court No. 230908060 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... ii

ISSUES PRESENTED, PRESERVATION & STANDARD OF REVIEW ................................. 1

INTRODUCTION ...................................................................................... 1

BACKGROUND ........................................................................................ 3

ARGUMENT ........................................................................................... 5

I.     The District Court's Order Involves Meta's Substantial Rights, and an Interlocutory Appeal Would Better Serve the Administration of Justice. ........... 5

II.    Interlocutory Review May Dispose of the Litigation in Its Entirety. ................. 7

     A.    Personal Jurisdiction Is Lacking in This Case. ....................................... 7

     B.    The First Amendment Ruling Conflicts with U.S. Supreme Court Precedent. ................................................................................ 12

     C.    Section 230 Bars Most of the Division's Claims. ................................. 15

RETENTION STATEMENT ........................................................................ 20

CONCLUSION ...................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AMA Multi-Media v. Wanat*,
970 F.3d 1201 (9th Cir. 2020) ........................................................9, 10

*Anderson Dev. Co. v. Tobias*,
2005 UT 36, 116 P.3d 323 ........................................................7, 15

*Anderson v. TikTok*,
637 F. Supp. 3d 276 (E.D. Pa. 2022) ........................................17

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) ........................................16

*Bartnicki v. Vopper*,
532 U.S. 514 (2001) ........................................15

*Blessing v. Chandrasekhar*,
988 F.3d 889 (6th Cir. 2021) ........................................11

*Bristol-Myers Squibb Co. v. Super. Ct.*,
582 U.S. 255 (2017) ........................................11

*Clemens v. McNamee*,
615 F.3d 374 (5th Cir. 2010) ........................................11

*Div. of Consumer Prot. v. TikTok*,
No. 230907634 (Utah 3d Jud. Dist. Ct. filed Oct. 10, 2023) ........................20

*Doe v. Snap, Inc.*,
No. H-22-00590, 2022 WL 2528615 (S.D. Tex. July 7, 2022) ........................18

*Doshier v. Twitter, Inc.*,
417 F. Supp. 3d 1171 (E.D. Ark. 2019) ........................9

*Dyroff v. Ultimate Software Grp., Inc.*,
934 F.3d 1093 (9th Cir. 2019) ........................17, 18, 19

*E.R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
365 U.S. 127 (1961) ........................................14

*Elrod v. Burns*,
427 U.S. 347 (1976) ........................................6

*Evans v. Huffington Post.com, Inc.*,
No. 1:19-cv-536, 2022 WL 21320601 (S.D. Miss. Apr. 27, 2022) ........................10

*In re Facebook, Inc.*,
625 S.W.3d 80 (Tex. 2021) ........................................................................6, 19

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
521 F.3d 1157 (9th Cir. 2008) ....................................................................6, 19

*Force v. Facebook*,
934 F.3d 53 (2d Cir. 2019) ..............................................................16, 17, 18, 19

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
592 U.S. 351 (2021) ......................................................................................7

*FTC v. Match Grp., Inc.*,
No. 3:19-CV-2281, 2022 WL 877107 (N.D. Tex. Mar. 24, 2022) ........................18

*General Steel Domestic Sales, LLC v. Chumley*,
840 F.3d 1178 (10th Cir. 2016) ......................................................................6

*Georgalis v. Facebook, Inc.*,
324 F. Supp. 3d 955 (N.D. Ohio 2018) ..............................................................8

*Hancock v. The True and Living Church of Jesus Christ of Saints of the Last
Days*, 2005 UT App 314, 118 P.3d 297 ..............................................................7

*Hassell v. Bird*,
420 P.3d 776 (Cal. 2018) ................................................................................6

*Hepp v. Facebook*,
14 F.4th 204 (3d Cir. 2021) ............................................................................9

*Herrick v. Grindr LLC*,
765 Fed. App'x 586 (2d Cir. 2019) ..................................................................19

*Houghton v. Dep't of Health*,
2005 UT 63, 125 P.3d 860 (2005) ....................................................................6

*Raser Techs. Inc. ex rel. Houston Phx. Grp. v. Morgan Stanley & Co.*,
2019 UT 44, 449 P.3d 150 ..............................................................................11

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., Inc.*,
515 U.S. 557 (1995) ......................................................................................13

*Johnson v. TheHuffingtonPost.com*,
21 F.4th 314 (5th Cir. 2021) ....................................................................9, 10, 11

*Jones v. Dirty World Ent. Recordings LLC*,
    755 F.3d 398 (6th Cir. 2014) ....................................................17

*Keeton v. Hustler Magazine, Inc.*,
    465 U.S. 770 (1984) ...............................................................11

*Keisel v. Westbrook*,
    2023 UT App 163, 542 P.3d 536 ...........................................15

*Kimzey v. Yelp!, Inc.*,
    836 F.3d 1263 (9th Cir. 2016) ...............................................19

*L.W. v. Snap Inc.*,
    675 F. Supp. 3d 1087 (S.D. Cal. 2023)..............................18, 19

*Mallory Eng'g v. Ted R. Brown Assoc.*,
    618 P.2d 1004 (Utah 1980)......................................................5

*Manwill v. Oyler*,
    11 Utah 2d 433, 361 P.2d 177 (1961)......................................7

*Miami Herald Publ'g Co. v. Tornillo*,
    418 U.S. 241 (1974) ...............................................................13

*Moody v. NetChoice, LLC*,
    144 S. Ct. 2383 (2024).................................................. *passim*

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) .................................................................5

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
    591 F.3d 250 (4th Cir. 2009) ...................................................6

*Pac. Gas & Elec. Co. v. Public Util. Comm'n of Cal.*,
    475 U.S. 1 (1986)...................................................................13

*Peck v. State*,
    2008 UT 39, 191 P.3d 4 ...........................................................7

*Perfect 10, Inc. v. CCBill LLC*,
    488 F.3d 1102 (9th Cir. 2007) ...............................................15

*Richards v. Cox*,
    2019 UT 57, 450 P.3d 1074 .....................................................1

*Ruhrgas AG v. Marathon Oil Co.*,
    526 U.S. 574 (1999)................................................................5

*Shrader v. Biddinger*,
    633 F.3d 1235 (10th Cir. 2011) ...................................................................8

*In re Social Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*,
    __ F. Supp. 3d __, 2023 WL 7524912 (N.D. Cal. Nov. 14, 2023) ...................17, 18

*Starways, Inc. v. Curry*,
    1999 UT 50, 980 P.2d 204 .........................................................................7

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994) ...............................................................................13

*United Mine Workers of Am. v. Pennington*,
    381 U.S. 657 (1965) ...............................................................................14

*V.V. v. Meta Platforms, Inc.*,
    No. CV-23-5032685, 2024 WL 678248 (Conn. Super. Ct. Feb. 16, 2024)............20

*Venuti v. Cont'l Motors Inc.*,
    2018 UT App 4, 414 P.3d 943 ....................................................................7

*Vora v. Dionne*,
    No. 22-cv-00572-CNS-MDB, 2022 WL 14813723 (D. Colo. Oct. 26, 2022) .........6

*Walden v. Fiore*,
    571 U.S. 277 (2014).............................................................................8, 10

*West v. Thomson Newspapers*,
    872 P.2d 999 (Utah 1994).........................................................................15

## Constitutional Provisions

U.S. Const. amend I .................................................................... *passim*

U.S. Const. amend XIV ................................................................ *passim*

## Statutes

Communications Decency Act Section 230, 47 U.S.C. § 230............................. *passim*

Utah Consumer Sales Practice Act, Utah Code § 13-11-5 ...................................2, 3, 20

Pursuant to Rule of Appellate Procedure 5(c)(3), Defendants Meta Platforms, Inc. and Instagram, LLC (collectively, "Meta") hereby petition for permission to appeal an order entered by the Third Judicial District Court for Salt Lake County denying Meta's Motion to Dismiss ("Order") (Addendum A).  Meta seeks to appeal the Order's rulings on personal jurisdiction, the First Amendment to the U.S. Constitution, and Section 230 of the Communications Decency Act, 47 U.S.C. § 230 ("Section 230").

## ISSUES PRESENTED, PRESERVATION & STANDARD OF REVIEW

1.      Whether the Due Process Clause of the U.S. Constitution permits a Utah court to exercise personal jurisdiction over Meta in this case.

2.      Whether the First Amendment to the U.S. Constitution bars the Division's claims because they would hold Meta liable for selecting, prioritizing, and displaying user-generated speech, making statements of opinion, and petitioning Congress.

3.      Whether Section 230 of the Communications Decency Act bars the Division's claims insofar as they seek to impose liability on Meta for its publishing activities, such as selecting, prioritizing, and displaying third-party content.

These issues were raised and decided in the district court's Order.  *See* Add. A.  This Court reviews the denial of a motion to dismiss for "correctness," affording no deference to the district court.  *Richards v. Cox*, 2019 UT 57, ¶ 7, 450 P.3d 1074.  This petition is timely because it was filed within 21 days of the Order's entry.  *See* Utah R. App. P. 5(a).

## INTRODUCTION

The Utah Division of Consumer Protection (the "Division") seeks to hold Meta liable under Utah law for how Facebook and Instagram publish third-party content.  The

Division claims that Facebook and Instagram have "design features" that constitute unfair acts and practices under the Utah Consumer Sales Practice Act, Utah Code § 13-11-5 ("UCSPA"), because they allegedly cause Utah teens to become addicted to the services. In particular, the Division challenges Meta's use of "content-personalization algorithms" to select, arrange, and display third-party content that allegedly will "maximize time spent" by users viewing content on the services. *E.g.*, Compl. ¶ 36, Dkt. No. 40.

Meta moved to dismiss this civil enforcement action by invoking its rights under the First and Fourteenth Amendments to the U.S. Constitution and its federal statutory immunity under Section 230 of the Communications Decency Act. The district court denied Meta's motion in full. That ruling warrants an immediate appeal because Meta seeks to vindicate its substantial rights under the First and Fourteenth Amendments and its federal statutory immunity from suit under Section 230. An interlocutory appeal would serve the administration of justice by saving the parties and the courts valuable time and resources, because reversal would require dismissal or narrowing the Division's suit.

The district court also erred. On personal jurisdiction, the forum contacts that the district court found sufficient to establish jurisdiction over Meta are not "purposefully directed" at Utah in a unique or specific way, nor do they "relate to" the Division's claims. The district court's First Amendment ruling conflicts with the U.S. Supreme Court's recent decision in *Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (2024), which concluded that social media companies like Meta engage in First Amendment protected expression when they "make choices about what third-party speech to display and how to display it"—including when they "include and exclude, organize and prioritize" user-generated content to present

2

a "curated" content feed. *Id.* at 2393. The district court, however, held that Meta's choices about what third-party speech to display and how to display it "are not even speech." Order 13. And the district court denied Meta's immunity under Section 230 because it held that Meta could be liable for its "own acts," *id.* 11, but that ignores that the "acts" at issue are publishing activity immunized by Section 230.

Given the importance of the rights at stake—and the likelihood that the district court erred in denying Meta's motion to dismiss—this petition should be granted.

## BACKGROUND

Meta operates Facebook and Instagram, which billions of people—including teenagers—use to connect and communicate with others online. Compl. ¶¶ 2, 16, 48. Facebook and Instagram allow users to post a wide range of content, including photos, videos, and messages. *Id.* ¶¶ 17–18, 29. These services organize and present third-party content to users to reflect their interests and activities. *Id.* ¶¶ 4, 36, 56. Among other publishing methods, the services use algorithms to organize and recommend content to users, *id.* ¶¶ 56, 61; notifications to alert users to new content or when other users engage with their content, *id.* ¶¶ 68, 71; "infinite scroll" and "auto-play," which present users with new content automatically, *id.* ¶¶ 74–75, 77, 87; and ephemeral content, which disappears from the service after a set period, *id.* ¶¶ 80–83.

On October 24, 2023, the Division filed a civil lawsuit against Meta asserting two counts under the UCSPA. Count One alleges that Meta engaged in unconscionable acts and practices by designing Facebook and Instagram to be addictive. *Id.* ¶¶ 229–41. Count Two alleges that Meta engaged in deceptive acts and practices by misrepresenting and

omitting information about the risks of engaging with its social media services. *Id.* ¶¶ 242–51. The district court entered an order denying Meta's motion to dismiss on July 25, 2024.

**Personal Jurisdiction.** The district court held that the Division made a *prima facie* showing of specific personal jurisdiction. Order 10. In the district court's view, the Division established that Meta had purposely availed itself of Utah by "serving content to, collecting data from, and targeting advertisements to Utah users," "selling advertising to companies which target Utah users," and "maintaining data centers in the State." *Id.* at 7–8, 10. The district court determined that those alleged forum contacts "related to" the Division's claims because such practices "maximize the time users spend" on Facebook and Instagram, which in turn allows Meta to make more advertising revenue. *Id.* at 8–9.

**First Amendment.** The district court held that the First Amendment did not apply because the challenged "design features" "are not even speech[,]… convey no message[,]… and express no viewpoint." *Id.* at 13. The district court summarily rejected Meta's First Amendment challenges to the Division's misrepresentation claim, stating only that the misrepresentation claim "is focused on [Meta's] actions. *Id.*

**Section 230.** The district court reasoned that Section 230 did not bar the Division's suit because the Division's claims "rest on … [Meta's] own acts" rather than its dissemination of third-party content. *Id.* at 11. The district court also held that Meta's alleged omissions about its services' safety did not treat Meta as the "publisher" of third-party content and thus were outside of Section 230. *See id.*

4

## ARGUMENT

This Court may grant an appeal from an interlocutory order when the order "involves substantial rights and may materially affect the final decision," or when immediate review "will better serve the administration and interests of justice." Utah R. App. P. 5(g). Both factors justify interlocutory appeal here.

## I. The District Court's Order Involves Meta's Substantial Rights, and an Interlocutory Appeal Would Better Serve the Administration of Justice.

Meta seeks an interlocutory appeal to vindicate rights that are clearly substantial— its constitutional rights under the First and Fourteenth Amendments and its federal statutory immunity from suit under Section 230. An interlocutory appeal would serve the administration of justice by saving the parties and the courts time and resources because reversal on the issues presented would require dismissal of the Division's suit, or at least significantly narrow the litigation.

**Substantial rights.** Each of the rights at issue protect Meta not only from ultimate liability, but also from the burden of unnecessary litigation. Personal jurisdiction is "an essential element of the jurisdiction of a [trial] court, without which the court is powerless to proceed to an adjudication." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (cleaned up). If Utah courts lack jurisdiction over Meta here, continuing this litigation would ignore Meta's substantial right to be free from the burdens of litigation in a foreign forum. *See Mallory Eng'g v. Ted R. Brown Assoc.*, 618 P.2d 1004, 1009 (Utah 1980). Likewise, because the "fear of damage awards" can chill First Amendment-protected activity, *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 277 (1964), "[t]he loss of First

Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976). And Section 230 "protect[s] websites not merely from ultimate liability, but [also] from having to fight costly and protracted legal battles." *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1174–75 (9th Cir. 2008).[1]

**Administration of justice.** If personal jurisdiction is lacking in this case, the case must be dismissed. Resolving that issue now would save the parties and the courts significant time and expense through discovery, further dispositive motions briefing, trial, post-trial motions, and inevitable appeal. *See, e.g.*, *Vora v. Dionne*, No. 22-cv-00572-CNS-MDB, 2022 WL 14813723, at *4 (D. Colo. Oct. 26, 2022) ("[J]udicial economy and resources would plainly be wasted if the Court allowed discovery to proceed, only to later determine that this case must be dismissed for a lack of personal jurisdiction."). Or if the Court agreed with Meta on its First Amendment or Section 230 arguments, the Division's claims would be substantially narrowed. Meta's First Amendment and Section 230 arguments would bar the Division's first claim in its entirety and its second claim in substantial part. That result would narrow the range of disputed issues, saving the parties and the courts significant time and expense. *Houghton v. Dep't of Health*, 2005 UT 63,

---

[1] Federal and state courts have held that Section 230 provides immunity from suit. *See, e.g.*, *Roommates.Com*, 521 F.3d at 1174–75; *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009) (Section 230 is an "*immunity from suit*," which is "effectively lost if a case is erroneously permitted to go to trial." (emphasis original)); *Hassell v. Bird*, 420 P.3d 776, 791 (Cal. 2018) (same); *In re Facebook, Inc*., 625 S.W.3d 80, 87 (Tex. 2021) (granting mandamus relief and ordering dismissal of claims under Section 230). The contrary ruling in *General Steel Domestic Sales, LLC v. Chumley*, 840 F.3d 1178 (10th Cir. 2016), is an outlier.

¶ 27, 125 P.3d 860 (2005) (interlocutory review warranted because court's order "will have the effect of either expanding or contracting the scope of discovery," which will have a "meaningful effect" on the parties").

For these reasons, Utah courts have granted interlocutory appeals on the issues that Meta seeks to appeal.[2]  The Court should do so again here.

## II.     Interlocutory Review May Dispose of the Litigation in Its Entirety.

This Court should grant interlocutory review because there is a "high likelihood" that the Division's suit "can be finally disposed of" or narrowed by correcting the district court's legal errors on personal jurisdiction, the First Amendment, and Section 230. *Manwill v. Oyler*, 11 Utah 2d 433, 435, 361 P.2d 177 (1961).

### A.     Personal Jurisdiction Is Lacking in This Case.

The Division alleged numerous purported contacts between Meta and Utah, but those contacts can give rise to specific jurisdiction only if: (1) they demonstrate that Meta has "purposefully avail[ed]" itself of Utah, and (2) the Division's claims "arise out of or relate to" those contacts.  *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021).   None of the alleged forum contacts the district court identified meet these requirements because they were not purposefully directed at Utah in a way that was unique or specific to the forum, or they did not relate to the Division's claims.

---

[2] *See, e.g.*, *Venuti v. Cont'l Motors Inc.*, 2018 UT App 4, ¶¶ 1, 6, 414 P.3d 943 (personal jurisdiction); *Starways, Inc. v. Curry*, 1999 UT 50, ¶ 1, 980 P.2d 204 (same); *Anderson Dev. Co. v. Tobias*, 2005 UT 36, ¶ 28, 116 P.3d 323 (First Amendment); *Hancock v. The True and Living Church of Jesus Christ of Saints of the Last Days*, 2005 UT App 314, ¶1, 118 P.3d 297 (same); *cf. Peck v. State*, 2008 UT 39, ¶ 1, 191 P.3d 4 (statutory immunity).

**"Business Relationship" with Utahns.** As the district court acknowledged (Order 7), Meta's operation of social media services that are accessible in Utah is not enough to confer personal jurisdiction. *See, e.g.*, *Shrader v. Biddinger*, 633 F.3d 1235, 1241 (10th Cir. 2011) ("The maintenance of a web site does not in and of itself subject the owner or operator to personal jurisdiction, even for actions relating to the site, simply because it can be accessed by residents of the forum state."). Personal jurisdiction turns on the defendant's contacts with the forum, not the unilateral decisions of Utah residents to use Meta's services. *See Walden v. Fiore*, 571 U.S. 277, 285–86 (2014).

The district court nevertheless held that it could exercise personal jurisdiction because many Utahns have accessed Facebook and Instagram from Utah. Order 8. The court described the users and Meta as having a "business relationship," but the Complaint does not allege any relationship beyond Utahns being "active users" of Meta's services. Compl. ¶ 28. But just as the unilateral actions of one forum resident cannot create jurisdiction over a website operator, the actions of many forum residents are similarly insufficient. *See, e.g.*, *Georgalis v. Facebook, Inc.*, 324 F. Supp. 3d 955, 960 (N.D. Ohio 2018) (no jurisdiction over Meta despite "millions of Facebook users in Ohio").

**Selling and Targeting Advertisements.** The district court further held that Meta targeted Utah users by "selling advertising to [Utah] companies" and "targeting advertisements to Utah users." Order 7–8, 10. But neither selling nor targeting advertisements to Utahns confers specific personal jurisdiction over the Division's claims.

Meta's sale of ad space to advertisers is irrelevant to the jurisdictional analysis because those sales and ads are unrelated to the Division's unconscionable and deceptive

practices claims. The Division does not allege that anyone has become addicted to viewing third party advertisements, or that any of those advertisements were deceptive or contained misrepresentations. Rather, the Division contends that Meta is incentivized to "maximize the time users spend" on Facebook and Instagram to increase advertising revenue. Order 8–9. Courts have rejected the sale of advertisements to forum-based businesses as a basis for personal jurisdiction where, as here, the plaintiff's claims are not related to the sale of the advertisements themselves. *E.g.*, *Johnson v. TheHuffingtonPost.com*, 21 F.4th 314, 321, 324 (5th Cir. 2021) (rejecting inclusion of advertising sales in personal jurisdiction analysis because advertising "neither produced nor relate[d] to" plaintiff's libel claim); *Hepp v. Facebook*, 14 F.4th 204, 208 (3d Cir. 2021) (because defendants did not "use[] [plaintiff's] likeness to sell advertising," "the alleged contacts d[id] not relate to" plaintiff's misappropriation claim); *Doshier v. Twitter, Inc.*, 417 F. Supp. 3d 1171, 1177–78 (E.D. Ark. 2019) (rejecting as a grounds for jurisdiction that "Twitter does business over the internet by contracting with Arkansas advertisers and by distributing those advertisements to Arkansas residents who use the Twitter platform.").

The same is true of Meta's delivery of targeted advertising to Utahns. Targeting advertisements to a forum resident does not constitute purposeful availment because the website operator does not display advertising to users in the forum any differently from its display of advertising to users in other states. As those courts have observed, "[t]o target users everywhere, as those ads do, is to target no place at all." *See, e.g.*, *Johnson*, 21 F.4th at 321–22; *AMA Multi-Media v. Wanat*, 970 F.3d 1201, 1211 (9th Cir. 2020) (rejecting personal jurisdiction because "all users in every forum received advertisements directed at

them"); *Evans v. Huffington Post.com, Inc.*, No. 1:19-cv-536, 2022 WL 21320601, at *7 (S.D. Miss. Apr. 27, 2022) (geotargeting advertisements did not show purposeful direction because defendants "treat[ed] Mississippians like everyone else").

**Tailored Content.** The district court held that Meta targeted Utah by "serving content to" Utah users to "creat[e] a Utah-specific experience" on Meta's services. Order 7. But providing content to users, as informed by their interactions on the service, does not constitute targeting *a forum*. The Division does not allege that Meta's services curated and prioritized content to Utah users any differently from how it personalizes and delivers content to users in other states. Other courts have rejected arguments that such functionality, which is common across a wide range of content delivery platforms, including news websites, constitutes purposeful availment. *E.g.*, *Johnson*, 21 F.4th at 321–22; *AMA*, 970 F.3d at 1211; *accord Walden*, 571 U.S. at 286, 290–91 (declining to find jurisdiction where "the effects of [defendant's] conduct on [plaintiffs] are not connected to the forum State" because plaintiffs could have alleged harm "wherever else they might have traveled").

**Data Centers.** The district court held that Meta targeted Utah by "maintaining data centers in the State." Order 7. But that too is insufficient to confer jurisdiction over the Division's unconscionability and deception claims because the Division does not allege how the centers relate to this litigation. *See* Decl. of Bradley W. Davis ¶ 4, Dkt. No. 73 Ex. 1 ¶ 4 (data center is "exclusively focused on non-public infrastructure maintenance and operations"). The U.S. Supreme Court has made clear that a "corporation's continuous activity … within a state is not enough to support the demand that the corporation be

10

amenable to suits unrelated to that activity." *Bristol-Myers Squibb Co. v. Super. Ct.*, 582 U.S. 255, 264 (2017) (cleaned up). Indeed, in *Bristol-Myers*, it was immaterial that the defendant had in California five research laboratories, a small government affairs office, and hundreds of employees because such forum contacts did not "relate to" the plaintiffs' product liability claims. *See id.* at 259. Personal jurisdiction was lacking there, and it is also lacking here.[3]

**Misrepresentations.** The Division alleges Meta made material misrepresentations, but it does not allege that any misrepresentations were made *in Utah* or specifically directed *at Utahns*. Such misrepresentations do not confer jurisdiction because "allegations of out-of-state conduct that happen to have effects that ripple into Utah cannot, by themselves, establish jurisdiction." *Raser Techs. Inc. ex rel. Houston Phx. Grp. v. Morgan Stanley & Co.*, 2019 UT 44, ¶ 51, 449 P.3d 150. Following the same logic, courts routinely require misrepresentations be directed at the forum to establish jurisdiction. *See, e.g.*, *Blessing v. Chandrasekhar*, 988 F.3d 889, 905 (6th Cir. 2021) ("personal jurisdiction is absent when the communication was not specifically directed at the forum"); *Clemens v. McNamee*, 615

---

[3] The district court concluded that the Division "sufficiently distinguished *Bristol-Myers Squibb*," Order 10, but neglected to say how. To the extent the district court was persuaded the Division's invocation of *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984), *see* Mot. to Dismiss Hearing Transcript at 19, such reliance is misplaced because *Keeton* involved the sale and shipment of physical goods into the forum. *See Johnson*, 21 F.4th at 325 ("Sending tens of thousands of magazines to a state [as in *Keeton*] is an affirmative act that displays the publisher's specific intent to target that state with what the magazines contain," but "*websites are different*.") (emphasis added). Indeed, the Supreme Court has rejected such a broad reading of *Keeton*. *See Bristol-Myers Squibb*, 582 U.S. at 266 (distinguishing *Keeton*).

F.3d 374, 380 (5th Cir. 2010) (no personal jurisdiction where statements were not "made in Texas or directed to Texas residents any more than residents of any state").

In sum, Utah courts cannot exercise personal jurisdiction over Meta based on nationwide activities that do not involve any specific targeting of the forum.

### B. The First Amendment Ruling Conflicts with U.S. Supreme Court Precedent.

The district court held that the First Amendment does not apply to Meta's "design features" because the functions they perform—selecting, prioritizing, and displaying third-party content—"are not even speech." Order 13. The district court also concluded that the First Amendment does not apply to the Division's misrepresentation claim because the Division is "focused on [Meta's] actions" in allegedly making misrepresentations. *Id.* The district court was incorrect on both points.

**Editorial Discretion.** The district court's determination that Meta's recommendation algorithms and other challenged features fall outside of the First Amendment's protection is contrary to U.S. Supreme Court precedent.

In *Moody*, the Supreme Court reviewed cases from the Fifth and Eleventh Circuits and "consider[ed] whether two state laws regulating social-media platforms … facially violate the First Amendment." 144 S. Ct. at 2393. The Court vacated the underlying decisions and remanded the cases for the lower courts to apply a proper facial analysis. *Id.* at 2399. In so doing, the Supreme Court found it "necessary to say more about how the First Amendment relates to the laws' content-moderation provisions, to ensure that the facial analysis proceeds on the right path." *Id.* "That need [was] especially stark for the

Fifth Circuit," which had "held that the content choices the major [social media services] make for their main feeds are 'not speech' at all." *Id.*

In conducting this First Amendment analysis, the Court observed that "the First Amendment … does not go on leave when social media are involved." *Id.* at 2394. To the contrary, "[t]o the extent that social-media platforms create expressive products, they receive the First Amendment's protection." *Id.* at 2393. The Court noted that, "[i]n constructing certain feeds, those platforms make choices about what third-party speech to display and how to display it. They include and exclude, organize and prioritize—and in making millions of those decisions each day, produce their own distinctive compilations of expression." *Id.* By "select[ing] and shap[ing] other parties' expression into their own curated speech," social-media services are "engaged in expression" and "government efforts to alter an edited compilation of third-party expression are subject to judicial review for compliance with the First Amendment." *Id.*

Even before *Moody*, the U.S. Supreme Court had repeatedly held that "[a] private party's collection of third-party content into a single speech product … is itself expressive, and intrusion into that activity must be specially justified under the First Amendment." 144 S. Ct. at 2401 (discussing *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974); *Pac. Gas & Elec. Co. v. Public Util. Comm'n of Cal.*, 475 U.S. 1 (1986); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994); and *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, (1995)). *Moody* was a straightforward application of that precedent. "Like the editors, cable operators, and parade organizers … the major social-

13

media platforms are in the business, when curating their feeds, of combining 'multifarious voices' to create a distinctive expressive offering." 144 S. Ct. at 2405.

Like the Fifth Circuit, the district court erred when it held that the Division's claims—which directly challenge Meta's decisions regarding how to select and display third-party content—"are not even speech" and therefore do not implicate the First Amendment. The Division seeks to impose liability on Meta for its editorial judgments, including its decisions regarding the "scrolling presentation of algorithmically-curated content." *E.g.*, Compl. ¶ 54. *Moody*—and all of the Supreme Court precedent on which it relies—demonstrates that the Division's claims infringe on Meta's First Amendment rights. The district court erred in holding otherwise.

**Misrepresentation Claim.** As for the multiple First Amendment problems with the Division's misrepresentation claim, the district court essentially ignored them. It included only a passing reference to the claim being "focused on the actions" of Meta in making its "own misrepresentations." Order 13. That description does not resolve the First Amendment problems with the claim.

Nowhere does the district court grapple with the Division's attempt to hold Meta liable in part for its statements to Congress. The U.S. Supreme Court has repeatedly held that the First Amendment generally bars claims based on efforts to petition the government, which necessarily includes providing testimony to Congress. *See, e.g.*, *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965) (efforts to influence public officials are not illegal, "regardless of intent or purpose"); *E.R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 145 (1961) (defendant could not be liable for

14

"attempt[ing] to bring about the passage of laws" even if it "deliberately deceived the public and public officials"); *see also Anderson*, 2005 UT 36, ¶ 26 (applying *Noerr-Pennington* immunity to petitioning activity).

Nor did the district court address the issue raised by Meta below that the Division challenges statements of opinion regarding diffuse and unverifiable concepts like "safety." Mot. to Dismiss, Dkt. No. 73 at 20-21. That oversight, too, is a problem of constitutional magnitude. *See, e.g.*, *Keisel v. Westbrook*, 2023 UT App 163, ¶ 36, 542 P.3d 536 ("The First Amendment to the United States Constitution [] protects statements of opinion, and this protection is even more pronounced in matters of public concern."); *West v. Thomson Newspapers*, 872 P.2d 999, 1013-15 (Utah 1994) (also protected under Utah Constitution).

None of this is alleviated by the district court's suggestion that speech is not protected if it can be recast as conduct. To the contrary, "if the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category." *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (cleaned up).

As a result, the district court has left for discovery and trial a broad swath of constitutionally protected speech that should never have made it past the pleadings stage. That raises precisely the chilling effects that warrant early intervention by this Court.

### C.    Section 230 Bars Most of the Division's Claims.

Section 230 provides "broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user." *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007) (cleaned up). Section 230 immunity applies if (1) the defendant is a "provider … of an interactive computer service";

and the claim (2) seeks to hold the defendant liable as a "publisher or speaker" of (3) content provided by someone else. *See id.*; *see also* 47 U.S.C. § 230(c)(1). There is no dispute that Meta satisfies the first element. But the district court erred in holding that the remaining two elements are not satisfied here.

*First*, the district court erred in holding that the Division's "claims do not seek to treat Meta as a publisher." Order 11. The court concluded that Meta would not be treated as a publisher because "the Division's claims rest on the Defendant's own acts." *Id.* But in applying Section 230 to a claim, "court must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status *or conduct* as a 'publisher or speaker.'" *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101–02 (9th Cir. 2009) (emphasis added). The Division cannot avoid Section 230 by asserting that it is challenging Meta's "own acts," Order 11, because the challenged conduct is protected publishing activity.

The district court's holding that the Division's claims would not treat Meta as a publisher turned on an overly narrow interpretation of publishing activity. *Id.* The court concluded that Section 230 applies only to "reviewing, editing, and determining what content to publish or withdraw," because those are the "typical publishing activities" performed by "a typical website." *Id.* But contrary to the district court's narrow view, courts have adopted a "capacious conception of what it means to treat a website operator as [a] publisher." *Force v. Facebook*, 934 F.3d 53, 65 (2d Cir. 2019).

Consistent with the statutory text, courts have held that "a publisher's traditional editorial functions" include "deciding whether to publish, withdraw, postpone or alter content," *Jones v. Dirty World Ent. Recordings LLC*, 755 F.3d 398, 407 (6th Cir. 2014),

16

and also include "monitoring, screening, arrangement, promotion and distribution of that content," *Anderson v. TikTok*, 637 F. Supp. 3d 276, 281 (E.D. Pa. 2022). Indeed, the Supreme Court reaffirmed in *Moody* that such conduct—organizing, curating, and disseminating third-party content—is protected publishing activity. *See* 144 S. Ct. at 2393 ("traditional publishers and editors" have long made "distinctive complications of expression"). Indeed, the district court's analysis also directly conflicts with the federal multidistrict litigation ("MDL") court's ruling on nearly identical claims. *In re Social Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*, __ F. Supp. 3d __, 2023 WL 7524912, at *13–16 (N.D. Cal. Nov. 14, 2023). That court—like many others—held that Section 230 bars claims challenging all of the "features" at issue here.

**Recommendation Algorithms.** Section 230 bars claims challenging a website's use of algorithms to recommend particular third-party content to users. Recommendation algorithms are editorial "tools meant to facilitate the communication and content of others." *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019). A website "acts as a publisher" when using such algorithms, *id.*, because they perform an "essential" publishing function by "arranging and distributing third-party information," *Force*, 934 F.3d at 66. For that reason, the MDL court held that Section 230 bars challenges to defendants' recommendation algorithms (including Meta's) because it is "indistinguishable from publishing, it is the means through which defendants publish third-party content to users." *In re Social Media*, 2023 WL 7524912, at *14; *see also Anderson*, 637 F. Supp. 3d at 280 (algorithm facilitated "the actions of a publisher").

17

**Other Challenged Features.**  Section 230 also bars imposing liability for the other features the Division challenges.  The Division seeks to impose liability on Meta for "ephemeral content" because the Division disagrees with Meta's decision to depublish certain third-party content after 24 hours.  Compl. ¶ 68.  But the decision of whether and when to publish or depublish content is a publishing decision even under the district court's narrow interpretation.  Unsurprisingly, courts have repeatedly held that Section 230 bars such challenges.  *See In re Social Media*, 2023 WL 7524912, at *13–15; *L.W. v. Snap Inc.*, 675 F. Supp. 3d 1087, 1097 (S.D. Cal. 2023); *Doe v. Snap, Inc.*, No. H-22-00590, 2022 WL 2528615, at *14 (S.D. Tex. July 7, 2022), *aff'd*, No. 22-20543, 2023 WL 4174061 (5th Cir. June 26, 2023), *cert. denied*, 144 S. Ct. 2493 (U.S. July 2, 2024).  Section 230 bars challenges to content-publication features, like "infinite scroll" and "auto-play," because "making information more available" to users is "an essential part of traditional publishing."  *E.g.*, *In re Social Media*, 2023 WL 7524912, at *13–15; *Force*, 934 F.3d at 70.  And Section 230 bars liability for push notifications and likes because they, too, "facilitate the communication and content of others" and thus Meta "act[s] as a publisher of others' content" in supplying them.  *E.g.*, *Dyroff*, 934 F.3d at 1098; *see also In re Social Media*, 2023 WL 7524912, at *13–15; *FTC v. Match Grp., Inc.*, No. 3:19-CV-2281, 2022 WL 877107, at *7–8 (N.D. Tex. Mar. 24, 2022).

*Second*, the district court incorrectly concluded that Meta's selection, prioritization, and display of user-generated content make Meta the creator or developer of that content.  Order 12.  Courts have uniformly rejected similar arguments because such "features and functions" are "tools meant to facilitate the communication and content of

18

others," and not "content in and of themselves." *Dyroff*, 934 F.3d at 1098. For that reason, the "proliferation and dissemination of content" through such features "does not equal creation or development of content." *Kimzey v. Yelp!, Inc.*, 836 F.3d 1263, 1270–71 (9th Cir. 2016); *see also Force*, 934 F.3d at 70 (Facebook's use of recommendation algorithms does not make Facebook "the 'develop[er]' or 'creat[or]' of that [third-party] content").[4]

**Failure to Warn.** The district court erroneously held that Section 230 did not bar the Division's claims for failure to warn about the allegedly addictive nature of Meta's services. Order 12. Just as Section 230 bars the Division's challenges to certain features, Section 230 bars claims purporting to impose a duty to warn of alleged harms caused by those same features.

Many courts have held that Section 230 necessarily bars failure-to-warn claims when such claims would require warning of risks associated with "publishing activities." *E.g.*, *L.W.*, 675 F. Supp. 3d at 1101. Indeed, until recently, "every published decision" had rejected efforts to evade Section 230 by recasting claims barred by Section 230 as based on a service's failure to "warn" or "protect" users "from the dangers" allegedly posed by Section 230-protected activity. *In re Facebook Inc.*, 625 S.W.3d at 93–95 (listing cases and noting "unanimous view of other courts" on this issue); *see also Herrick v. Grindr LLC*, 765 Fed. App'x 586, 591 (2d Cir. 2019). Contrary to the district

---

[4] The district court also misunderstood Section 230's "material contribution" test. Order 12. In *Roommates.Com*, the Ninth Circuit explained that an interactive computer service "helps to develop unlawful content, and thus falls within the exception to section 230, if it contributes materially to the alleged illegality of the conduct." 521 F.3d at 1168. The Division asserts no such allegations here.

court's reasoning, "allegations of failure to warn of an application's potential danger do not remove the 'publisher' status." *V.V. v. Meta Platforms, Inc.*, No. CV-23-5032685, 2024 WL 678248, at *10 (Conn. Super. Ct. Feb. 16, 2024). If Plaintiffs could plead around Section 230 by characterizing their claims as based on an alleged "failure to warn" of the challenged publishing features, this exception to Section 230 would swallow the rule.

## RETENTION STATEMENT

This Court should retain and decide this petition rather than transferring it to the Court of Appeals. It raises important and recurring questions about specific personal jurisdiction, the First Amendment, and Section 230 immunity that will affect the parties' dispute and future cases. *E.g.*, *Div. of Consumer Prot. v. TikTok*, No. 230907634 (Utah 3d Jud. Dist. Ct. filed Oct. 10, 2023) (alleging social media service violated the UCSPA).

## CONCLUSION

For the foregoing reasons, this Court should grant Meta's petition for permission to appeal the district court's order denying Meta's motion to dismiss.

Dated this 15th day of August, 2024.

Respectfully submitted,

/s/ David C. Reymann
**PARR BROWN GEE &
LOVELESS, P.C**

Jonathan O. Hafen (6096)
David C. Reymann (8495)
Kade N. Olsen (17775)
Tammy M. Frisby (17992)

Parr Brown Gee & Loveless, P.C.
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
jhafen@parrbrown.com
dreymann@parrbrown.com
kolsen@parrbrown.com
tfrisby@parrbrown.com

**COVINGTON & BURLING LLP**

Timothy C. Hester
Mark W. Mosier
Covington & Burling LLP
850 Tenth Street, NW
Washington, DC 20001
Telephone: 202-662-6000
thester@cov.com
mmosier@cov.com

Megan L. Rodgers
Covington & Burling LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306
Telephone: 650-632-4700
mrodgers@cov.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of August, 2024, I caused the foregoing

*Petition for Permission to Appeal from Interlocutory Order* to be served via email on the

following:

>    Douglas Crapo (crapo@agutah.gov)
>    Michael Gadd (mgadd@agutah.gov)
>    Peishen Zhou (peishenzhou@agutah.gov)
>    UTAH OFFICE OF THE ATTORNEY GENERAL
>
>    Jimmy R. Rock (jrock@edelson.com)
>    Roger Perlstadt (rperlstadt@edelson.com)
>    Theo Benjamin (tbenjamin@edelson.com)
>    Emily Penkowski Perez
>    (epenkowski@edelson.com)
>    Jean Larsen (jlarsen@edelson.com)
>    EDELSON PC

>    *Attorneys for Respondent Utah Division of Consumer Protection*

/s/ David C. Reymann

**<u>ADDENDUM A</u>**

**The Order of the Court is stated below:**
**Dated:** July 25, 2024          /s/  KENT HOLMBERG
                09:49:07 AM          District Court Judge



**SEAN D. REYES**

UTAH ATTORNEY GENERAL

Douglas Crapo (14620)

Peishen Zhou (18596)

Assistant Attorneys General

160 East 300 South, 5th Floor

Salt Lake City, Utah 84114

Tel: (801) 366-0310

crapo@agutah.gov

peishenzhou@agutah.gov

*Attorneys for Plaintiff Utah Division of Consumer Protection*

---

### THIRD JUDICIAL DISTRICT COURT,

### SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| **UTAH DIVISION OF CONSUMER PROTECTION**, | **ORDER DENYING DEFENDANTS' MOTION TO DISMISS** |
| *Plaintiff,* | Case No.: 230908060 |

| | |
|---|---|
| v. | Honorable Kent Holmberg |
| **META PLATFORMS, INC.**, and | **Tier III** |
| **INSTAGRAM, LLC**, | |
| *Defendants.* | |

On June 11, 2024, the Court conducted a hearing on Defendant Meta Platforms, Inc., and Instagram, LLC's (collectively "Meta" or "Defendants") Motion to Dismiss. Plaintiff Utah Division of Consumer Protection (the "Division"), a subdivision of the Utah Department of Commerce, was present and represented by counsel, as were Defendants. Consistent with the oral ruling announced at the hearing, which is fully incorporated into this written Order, the Court hereby DENIES Meta's Motion to Dismiss in full.

**BACKGROUND**

On October 24, 2023, the Division filed a two-count Complaint against Meta, alleging violations of the Utah Consumer Sales Practices Act ("UCSPA"). Count I alleges that the Defendants engaged in unconscionable acts and practices exploiting children's neurological vulnerabilities by designing and continually refining addictive features on their social media platforms, Facebook and Instagram, to hook children into spending more time on those platforms. Count II alleges that the Defendants engaged in deceptive acts and practices by making material misrepresentations and omissions about the safety of their platforms, including the use of addictive design features.

The Complaint alleges that Meta operates social media platforms including Facebook and Instagram (the "social media platforms" or "platforms"). Compl. ¶¶ 16–18. The Complaint alleges that the foundation of Meta's business model with respect to these platforms is targeted advertising. *Id.* ¶¶ 35–38.

The Division further alleges Meta thus strives to maximize the time users spend on the platforms and the amount of data Meta can gather from users so that it can sell more advertisements. *Id.* According to the Complaint, teenagers are among the most valuable advertising demographics, and brands look to advertise where teenagers are engaging online. *Id.* ¶ 40. The Complaint further alleges that Meta has aggressively sought to attract teenagers to its platforms. *Id.* ¶¶ 41–47. According to the Complaint, one-third of the children in Utah are daily active users of Facebook, and over half of Utah children between the ages of ten and nineteen use Instagram at least monthly. *Id.* ¶¶ 48, 51. The Division alleges that Meta makes more money

3

when users spend more time on its products, creating an incentive to increase the time that Utah users spend on its platforms. *Id.* ¶¶ 35–38.

The Complaint goes on to allege that Meta has responded to this incentive by adding features that addict and consume the attention of Utah's children to the detriment of their wellbeing. *Id.* ¶ 53–113. This is the very heart of the claims in the Division's Complaint. The Division alleges that Meta has implemented a variety of addictive design features designed to trick children into spending as much time as possible on the platforms and that these features do cause harm to children. *Id.* The Division alleges excessive and compulsive use of the platforms leads to depression, anxiety, body dysmorphia, eating disorders, self-harm, suicidal ideation and poor sleep patterns. *Id.* ¶¶ 92–113, 119, 126–27, 155, 171, 205–10. The Complaint alleges that despite knowledge of these and other harms, Meta has repeatedly represented the safety of its platforms and knowingly concealed the dangers. *Id.* ¶¶ 134–228.

The Division also alleges that Meta purposely directs commercial activities to Utah by maintaining data centers in the state, providing social networking services to Utah users, encouraging those users to view, like, and comment on posts exhibited on Meta's platforms, and selling advertising to companies which target Utah users. *Id.* ¶¶ 24–32. According to the Division, Meta has a business relationship with nearly 70 percent of Utahns through use of its algorithms and targeted alerts. *Id.* ¶¶ 4–5, 28.

The Complaint further alleges that Meta used features like personalized content, recommendation algorithms, distracting notifications, infinite scroll, reels, ephemeral content, and auto-play. *Id.* ¶¶ 237–39.

The Defendants filed a joint Motion to Dismiss the Complaint in its entirety on December 22, 2023. The Motion argued that (1) the State of Utah does not have personal jurisdiction over Meta; (2) the Division's claims would impose liability on the Defendants for publication of third-party content, which is barred by Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230; (3) the Division's claims would implicate Meta's right to freedom of speech under the First Amendment to the U.S. Constitution; (4) the Complaint fails to state a claim under the UCSPA because it provides immunity to entities that are engaged in the dissemination of information or the reproduction of printed or pictorial matter, Utah Code Section 13-11-22(1)(b), which the Defendants claim applies to them as a matter of law; (5) the Complaint cannot or does not allege that the Defendants undertook any conduct in connection with a consumer transaction as required by the UCSPA; and (6) the Complaint fails to allege facts establishing the elements of a claim for a deceptive or an unconscionable practice under the UCSPA.

## LEGAL STANDARD

In addressing a motion to dismiss under Rule 12(b), a District Court must accept the factual allegations in the Complaint as true and consider them, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 196 (Utah 1991). In other words, assuming all the facts in the Complaint are true, and any reasonable inferences added on top of those facts, the Defendants must show that, as a matter of law, the Division cannot make its claim. Dismissal is justified only when the allegations of a complaint clearly demonstrate that the plaintiff does not have a claim. In ruling on a motion to dismiss, a District Court makes no findings as to the ultimate strength of either a plaintiff's claims or a defendant's defenses, but instead accepts the

facts in the Complaint as true. At the pleading stage, the Court is not making any decisions about how valid the Division's claims or the Defendants' defenses are. Both sides make their arguments, and all the Court considers is what is in the Complaint.

**CONCLUSIONS OF LAW**

**A.        The Division Has Adequately Alleged Specific Personal Jurisdiction over Meta.**

First, on the issue of personal jurisdiction, the Division did not argue general jurisdiction, so only specific personal jurisdiction was at issue. Specific jurisdiction exists if (1) the Defendants purposefully availed themselves of the protection of Utah's laws, including by directing activities at the forum; (2) the claim arises out of or relates to these forum-based contacts; and (3) the exercise of personal jurisdiction is fair and reasonable. *Synergetics v. Marathon Ranching Co.*, 701 P.2d 1106, 1110 (Utah 1985).

First, has the Division established the purposeful direction prong of the test for specific personal jurisdiction by showing that the Defendants purposely availed themselves of the privilege of conducting activities within the State of Utah? The Division alleges that Meta purposefully directs commercial activities to Utah by maintaining data centers in the State, providing social networking services to Utah users, encouraging those users to view, like, and comment on posts exhibited on Meta's platform, and selling advertising to companies which target Utah users. Compl. ¶¶ 24–32.

It is true that the mere operation of a commercial website accessible to users nationally and internationally does not amount to purposeful direction, *e.g.*, *Admar Int'l v. Eastrock, LLC*, 18 F.4th 783, 785 (5th Cir. 2021), but the Defendants are doing much more than merely operating a commercial website. In this case, the Complaint alleges that the Defendants have intentionally directed their activity or operation at Utah rather than just having the activity or

operation accessible there. A party purposely avails itself of the benefits of conducting business in a state by deliberately engaging in significant activities within the state or by creating continuing obligations between themselves and residents of that state.

The Division has made a *prima facie* showing that the Defendants purposely availed themselves of the benefit of conducting business in Utah. According to the Division, Meta has a business relationship with nearly 70 percent of Utahns through the use of its algorithms and targeted alerts. Compl. ¶¶ 4–5, 28. The Complaint alleges that Meta deliberately and significantly engages with its Utah customers in a way that encourages their continuous use of the platforms to the benefit of the Defendants and their advertisers. The nature of the Defendants' contacts, which includes targeting Utahns with advertisements all in an effort to allegedly maximize profits from Utah customers, satisfies the purposeful availment requirement. The Complaint sufficiently alleges that Defendants purposely avail themselves of Utah law by serving content to, collecting data from, and targeting advertisements to Utah users—creating a Utah-specific experience inside the Defendants' social media apps.

Second, in evaluating personal jurisdiction the Court must examine whether the Defendants' contacts are sufficiently related to the claims in this case so that it can be said that the claim arises out of these contacts. The heart and soul of the Complaint alleges facts that draw a direct line between the Defendants' activities in this state and the alleged causes of action.

To name a few of the allegations in the Complaint, Meta operates social media platforms including Facebook and Instagram. Compl. ¶¶ 16–18. The foundation of their alleged business model with respect to these platforms is targeted advertising. *Id.* ¶¶ 35–38. The Division further alleges Meta thus strives to maximize the time users spend on the platforms and the amount of

data Meta can gather from users so that it can sell more advertisements. *Id.* The Complaint alleges that teenagers are among the most valuable advertising demographics, and brands look to advertise where teenagers are engaging online. *Id.* ¶ 40. Consequently, according to the Complaint, Meta has aggressively sought to attract teenagers to its platforms. *Id.* ¶¶ 41–47. Continuing on with the allegations in the Complaint, one-third of the children in Utah are daily active users of Facebook. *Id.* ¶¶ 48, 51. Over half of Utah children between the ages of ten and nineteen use Instagram at least monthly. *Id.* The Division goes on to allege that Meta makes more money when users spend more time on its products, creating an incentive to increase the time that Utah users spend on their platforms. *Id.* ¶¶ 35–38.

The Defendants argue that they do not specifically target Utah, and that may turn out to be a true fact; however, the allegations in the Complaint and the evidence that has been submitted to the Court supports the *prima facie* case that would establish personal jurisdiction.

The Complaint goes on to allege that Meta has responded to this incentive by adding features that addict and consume the attention of Utah's children to the detriment of their wellbeing. *Id.* ¶ 53–113. This is the very heart of the claims in the Division's complaint. The Division alleges that Meta has implemented a variety of addictive design features designed to trick children into spending as much time as possible on the platforms, and these features do cause harm to children. *Id.* It alleges excessive and compulsive use of the platforms leading to depression, anxiety, body dysmorphia, eating disorders, self-harm, suicidal ideation, and poor sleep patterns. *Id.* ¶¶ 92–113, 119, 126–27, 155, 171, 205–10. The Complaint alleges that despite knowledge of these and other harms, Meta has repeatedly represented the safety of its platform and knowingly concealed the dangers. *Id.* ¶¶ 134–228.

9

Under the Complaint's allegations, the Defendants do target Utah. While they target other areas of the country as well, Defendants certainly target Utah and Utah youth both with targeted algorithms and by selling advertising targeted to Utah youth. The Defendants have a significant business presence in Utah, as alleged in the Complaint, to obtain Utah youth as customers, and harvest their data, which Defendants then sell and use to deliver advertisements directed at Utah youth.

The Defendants' arguments that they are not subject to the Court's jurisdiction lack any credibility. Utah has a strong interest in providing a forum to adjudicate its consumer protection laws, and it is entirely reasonable for the Defendants to expect that they would be haled into Utah court especially considering the extent to which the Defendants benefit from their business operations and customer base in Utah. So the Court concludes, with respect to personal jurisdiction, that based on the allegations of the Complaint (1) the Division has sufficiently distinguished *Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255, 264 (2017); (2) the Defendants purposefully availed themselves of the protection of Utah's laws, including by directing activities at the forum; (3) the Division's claims arise out of or relate to these forum-based contacts; and (4) the exercise of personal jurisdiction is fair and reasonable.

> **B.** **As Alleged, the Division's Claims Are Not Foreclosed by Section 230 of the CDA.**

Defendants next argued that they are immune from suit under Section 230 of the Communications Decency Act, 47 U.S.C. § 230. The CDA provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider," and provides immunity from state law causes

of action that would hold them liable for information originating with a third-party. *Id.* The

Defendants argued that they were doing nothing other than acting as a funnel or a pass-through

entity for third-party content.

However, the allegations in the Complaint, if true, could entitle the Division to relief on

its claims without implicating Section 230. Looking at the Complaint in a light most favorable to

the Division, the Division's claims do not seek to treat Meta as a publisher or speaker. Although

Meta does disseminate third-party content, the Division's claims rest on the Defendants' own

acts: their use of features and practices to target children into spending excessive amounts of

time on their platforms and their misrepresentations about the safety of those platforms.  The

Complaint alleges that Meta used features like personalized content, serving algorithms,

destructive notifications, infinite scroll, reels, ephemeral content, and auto-play. *Id.* ¶¶ 237–39.

The use of these features is alleged to have amounted to a violation of Utah law. *Id.*

The Division also alleges that none of these features constitute traditional publishing

activity, which generally involves reviewing, editing, and deciding whether to publish or to

withdraw from publication third-party content. The Complaint alleges that the methods of

promotion in contrast to content moderation decisions are not publication. For example, the

Division alleges that Meta's creation and use of content serving algorithms is not publishing, and

the Court cannot conclude as a matter of law that that is an incorrect statement.

What is alleged goes well beyond typical publishing activities of reviewing, editing, and

determining what content to publish or withdraw from a typical website or interactive computer

service. As Judge Katzmann in the Second Circuit explained, "it strains the English language to

say that in targeting and recommending [third-party content] to users—and thereby forging

connections, developing new social networks—Facebook is acting as 'the *publisher* of information provided by another information content provider.'" *Force v. Facebook, Inc.*, 934 F.3d 53, 76–77 (2d Cir. 2019) (Katzmann, C. J., concurring in part and dissenting in part) (quoting 47 U.S.C. § 230(c)(1)).

As to Count I: the content-serving algorithms and the use of notifications and alerts are not merely an act of publishing third-party content. As alleged, the notifications and alerts are Meta's own content. The use of infinite scroll and other features are likewise not only the publication of third-party content. Material contribution is also alleged sufficiently in the Complaint to put the Defendants on notice that the material contribution exception to Section 230 may be involved here if, as a factual matter, the content has been altered in a material way.

Count II of the Complaint alleges that Meta made material misrepresentations and omissions about the platforms' safety, which also does not seek to treat Meta as the publisher of third-party content.

The Court can envision situations where Defendants may be exactly right and that the algorithms, disruptive notification, or infinite scroll, *et cetera*, may be nothing more than publishing activity, but the Complaint alleges that they are not focused on publishing activity. In a motion for summary judgment where the facts are in front of the Court, these features might qualify for Section 230 immunity. But at this stage, the Court must treat the allegations of a Complaint as true and the Division is alleging that these features, including algorithms, disruptive notifications, and more, amount to a violation of Utah law. At least as alleged, Section 230 does not foreclose the Division's claims at this stage. Meta may renew its Section 230 arguments at summary judgment or at trial.

### C.    The First Amendment Does Not Bar the Division's Claims.

Defendants also argued that Count I violates their rights under the First Amendment. The Court agrees with the Division that the Complaint's allegations are content neutral. The Complaint is not focused on the substance of any third-party content, but instead is focused on the actions of the Defendants with respect to the addictive design features and with respect to their own misrepresentations. Count I does not seek to curtail any speech either of Meta or any third parties. The Court agrees that the Division adequately pled that the addictive design features for which the Division seeks to hold Meta liable are not even speech. They convey no message. They express no viewpoint. They use variable reward structures to feed content to each individual user. These are actions.

### D.    The Division Has Adequately Pled UCSPA Violations.

The Court finds that the Division has pled a cause of action under the UCSPA. First, Meta does not fall under the publisher and broadcaster exemption, Utah Code Section 13-11-22(1)(b). Similar to the CDA immunity argument, the Division's allegations do not seek to treat Meta as a publisher or a broadcaster or a printer of any third-party content. The Division is seeking to hold Meta liable for its use of the addictive design features and its own material misrepresentations and omissions.

Second, the Complaint also alleges a sale and/or a transfer sufficient to support a consumer transaction under the UCSPA, Utah Code Section 13-11-3(2)(a). The Division alleges facts that could support a conclusion the transaction involves a sale or transfer, including that Meta does not provide its products for free, that its business model allows it to turn attention into money, and that when users spend time on Meta's social media platforms, Meta harvests their

personal data (including interests, religion, beliefs, and what they like to watch or buy). The Complaint alleges that Utah consumers' personal data has value to the Defendants as Meta has built an entire business model on enticing users to give up their personal data and their time as consideration for their services on the Defendants' platforms. The Court does not read anything into the Legislature's passage of the Social Media Regulation Act that somehow alters or sends a message concerning the UCSPA.

Third, concerning the arguments surrounding Count I, the Division's unconscionability count: claims of unconscionability under the UCSPA require a gross disparity in terms that are so one sided as to oppress or unfairly surprise an innocent party. The Division alleges that Meta developed and continually refined addictive design features and that it knowingly exploited certain neurological vulnerabilities in children. It goes on to detail these addictive design features, including dopamine-manipulating personalization algorithms, audio-visual and haptic alerts sent at all times of day or night, and various content presentation formats designed to discourage children's attempts to self-regulate and to disengage from the platforms. Giving all reasonable inferences to the pleading party, manipulating children in these ways in order to maximize time spent on the platforms and thus advertising revenue generated could certainly be found to be unconscionable. Meta argues that users are not unfairly surprised or oppressed because they choose to use the service and are aware of the addictive design features, but the Complaint specifically alleges that Meta actively misrepresents and attempts to conceal that it manipulates children and exploits their neurological vulnerabilities with the addictive design features. So, as pled and giving all inferences to the Division, the Complaint does state a claim for unconscionability.

Regarding Count II, Meta argues that the Complaint's allegations fail to meet the heightened pleading standard for fraud, requiring that a party alleging deceptive conduct, "must state with particularity the circumstances constituting [the deceptive conduct]." Utah R. Civ. P. 9(c). The Court agrees that the rule on heightened pleading does apply, although not with respect to intent. That can be alleged generally. Much of the remainder of Defendants' arguments on this point are substantive attacks on what the evidence is or how it should be viewed, but at this stage, the Court must accept the allegations in the Complaint. After reviewing the Complaint, particularly Paragraphs 134 through 228, the Court finds that the Division has satisfied the heightened pleading standard for deceptive conduct allegations.

The Court is also convinced that restitution is a remedy under the UCSPA, and therefore, the Court would not dismiss that remedy at this stage.

## CONCLUSION

For these reasons, Defendants' Motion to Dismiss is DENIED in full.

### *END OF ORDER*

### OFFICIAL SIGNATURE APPEARS AT TOP OF FIRST PAGE

Approved as to form:

*/s/ Douglas Crapo*

Douglas Crapo, Assistant Attorney General, Utah Attorney General's Office

*For Plaintiff Utah Division of Consumer Protection*

_/s/ Megan Rodgers_

Megan Rodgers, Covington & Burling LLP

_For Defendants Meta Platforms, Inc., and Instagram, LLC_

**CERTIFICATE OF SERVICE**

I certify that I caused a true and correct copy of the foregoing **PROPOSED ORDER DENYING DEFENDANTS' MOTION TO DISMISS** to be delivered by the Court's electronic filing system, which electronically transmitted notice of the filing to all counsel this July 18, 2024.

*/s/ Douglas Crapo*

# EXHIBIT 23

Deno G. Himonas (5483)
Jeremy M. Brodis (16006)
Kevin G. Heiner (16835)
**WILSON SONSINI GOODRICH &**
**ROSATI, P.C.**
15 W. South Temple, Ste 1700
Salt Lake City, Utah 84101
Tel.: 801.401.8510
dhimonas@wsgr.com
jbrodis@wsgr.com
kheiner@wsgr.com

Daniel M. Petrocelli*
Lauren F. Kaplan*
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067
Tel.: 310.553.6700
dpetrocelli@omm.com
lkaplan@omm.com

Stephen D. Brody*
Jonathan D. Hacker*
Martha F. Hutton*
**O'MELVENY & MYERS LLP**
1625 Eye Street N.W.
Washington, DC 20006
Tel.: 202.383.5167
sbrody@omm.com
jhacker@omm.com
mhutton@omm.com

*Pro hac vice forthcoming*

*Attorneys for Defendant-Petitioner TikTok Inc.*

---

## IN THE SUPREME COURT FOR THE STATE OF UTAH

| | |
|---|---|
| **UTAH DIVISION OF CONSUMER PROTECTION**, | **PETITION FOR PERMISSION TO APPEAL FROM INTERLOCUTORY ORDER** |
| *Plaintiff-Respondent,* | **(Subject to assignment to the Court of Appeals)** |
| v. | |
| **TIKTOK INC.**, | Appellate Case No.: _____ |
| *Defendant-Petitioner.* | District Court Case No. 230907634 (Hon. Richard Daynes) |

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................. 1

MATERIAL FACTS ........................................................................... 3

ISSUES PRESENTED, PRESERVATION & STANDARD OF REVIEW ..................... 4

REASONS WHY INTERLOCUTORY REVIEW SHOULD BE GRANTED ................. 5

    I.    THE ORDER INVOLVES SUBSTANTIAL RIGHTS THAT SHOULD BE ENFORCED AT THE THRESHOLD OF LITIGATION, NOT ITS CONCLUSION ........................................................................... 5

    II.    THE DISTRICT COURT ERRONEOUSLY REJECTED TTI'S SUBSTANTIAL THRESHOLD DEFENSES ............................... 7

        A.    The Entire Suit Is Barred Because The District Court Lacks Specific Personal Jurisdiction Over TTI ............................. 7

        B.    Counts I And II Are Barred By The First Amendment .................. 11

        C.    Counts I And II Are Barred By CDA § 230 .................................... 14

        D.    All Of The Claims Rest On A Misinterpretation Of The UCSPA ... 17

REASONS WHY INTERLOCUTORY REVIEW WOULD MATERIALLY ADVANCE TERMINATION OF THE LITIGATION ................................... 19

CONCLUSION ................................................................................. 20

CERTIFICATE OF COMPLIANCE ................................................... 22

CERTIFICATE OF SERVICE ............................................................ 23

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adv. Tactical Ordinance Sys., LLC v. Real Action Paintball, Inc.*,
   751 F.3d 796 (7th Cir. 2014) ..................................................... 9

*AMA Multimedia, LLC v. Wanat*,
   970 F.3d 1201 (9th Cir. 2020) ............................................. 9, 10

*Anderson Dev. Co. v. Tobias*,
   2005 UT 116, P.3d 323 ............................................................ 6

*Barnes v. Yahoo!, Inc.*,
   570 F.3d 1096 (9th Cir. 2009) ................................................ 14

*Beckman v. Match.com*,
   668 F. App'x 759 (9th Cir. 2016) ........................................... 17

*Bennett v. Google, Inc.*,
   2017 WL 2692607 (D.D.C. June 21, 2017) ............................ 17

*Berry v. Nat'l Med. Servs., Inc.*,
   205 P.3d 745 (Kan. App. 2009) .............................................. 19

*Blessing v. Chandrasekhar*,
   988 F.3d 889 (6th Cir. 2021) .................................................. 11

*Bristol-Myers Squibb Co. v. Super. Ct.*,
   582 U.S. 255 (2017) ................................................................. 7

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985) ................................................................. 5

*Calder v. Jones*,
   465 U.S. 783 (1984) ................................................................. 7

*Calise v. Meta Platforms, Inc.*,
   103 F.4th 732 (9th Cir. 2024) .................................................. 6

*Claridge v. RockYou, Inc.*,
   785 F. Supp. 2d 855 (N.D. Cal. 2011) .................................... 19

*Doe v. MySpace, Inc.*,
   528 F.3d 413 (5th Cir. 2008) ............................................ 14, 17

*Doshier v. Twitter, Inc.*,
   417 F. Supp. 3d 1171 (E.D. Ark. 2019) ................................... 9

*Dyroff v. Ultimate Software Grp., Inc.*,
   934 F.3d 1093 (9th Cir. 2019) ..................................... 6, 15, 16

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
   521 F.3d 1157 (9th Cir. 2008) .................................................. 6

*FITn40, LLC v. Glanbia Nutritionals (Ir.) Ltd.*,
   2022 WL 79910 (D. Utah Jan. 7, 2022) .............................. 8, 11

ii

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Force v. Facebook, Inc.*,
  934 F.3d 53 (2d Cir. 2019) ................................................................. 16

*Fulbright & Jaworski v. Eighth Jud. Dist. Ct.*,
  342 P.3d 997 (Nev. 2015) ..................................................................... 5

*Green v. Miss United States of Am., LLC*,
  52 F.4th 773 (9th Cir. 2022) .......................................................... 6, 17

*Hasson v. FullStory, Inc.*,
  114 F.4th 181 (3d Cir. 2024) ................................................................ 9

*Houghton v. Dep't of Health*,
  2008 UT 86, 206 P.3d 287 .................................................................... 3

*In re Facebook Priv. Litig.*,
  791 F. Supp. 2d 705 (N.D. Cal. 2011) ................................................ 19

*In re Facebook, Inc.*,
  625 S.W.3d 80 (Tex. 2021) .................................................................... 6

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.*,
  702 F. Supp. 3d 809 (N.D. Cal. 2023) ................................................ 16

*Inconnu Lodge v. Commbine.com LLC*,
  214 F. Supp. 2d 1204 (D. Utah 2002) ................................................. 11

*J. McIntyre Mach., Ltd. v. Nicastro*,
  564 U.S. 873 (2011) .............................................................................. 5

*Johnson v. TheHuffingtonPost.com, Inc.*,
  21 F.4th 314 (5th Cir. 2021) ................................................................. 9

*Jones v. Dirty World Entm't Recordings LLC*,
  755 F.3d 398 (6th Cir. 2014) .............................................................. 14

*Klayman v. Zuckerberg*,
  753 F.3d 1354 (D.C. Cir. 2014) .......................................................... 15

*Mallory Eng'g v. Ted R. Brown Assoc.*,
  618 P.2d 1004 (Utah 1980) ................................................................... 5

*Miami Herald Publ'g Co. v. Tornillo*,
  418 U.S. 241 (1974) ............................................................................ 12

*Moody v. NetChoice, LLC*,
  144 S. Ct. 2383 (2024) ........................................................ 2, 12, 13, 16

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
  591 F.3d 250 (4th Cir. 2009) ................................................................ 6

*NetChoice, LLC v. Paxton*,
  49 F.4th 439 (5th Cir. 2022) ................................................................. 2

*NetChoice, LLC v. Reyes*,
  2024 WL 4135626 (D. Utah Sept. 10, 2024) ................................. 13, 14

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*New York Times Co. v. Sullivan,*
    376 U.S. 254 (1964) ............................................................................... 6

*Pac. Gas & Elec. Co. v. Public Util. Comm'n of Cal.,*
    475 U.S. 1 (1986) ................................................................................. 12

*Patriot Sys., Inc. v. C-Cubed Corp.,*
    21 F. Supp. 2d 1318 (D. Utah 1998) .................................................... 10

*Raser Techs., Inc. v. Morgan Stanley & Co., LLC,*
    2019 UT 449 P.3d 150 ........................................................................ 7, 8

*Ruhrgas AG v. Marathon Oil Co.,*
    526 U.S. 574 (1999) ............................................................................... 5

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.,*
    549 U.S. 422 (2007) ............................................................................... 5

*State ex rel. A.T.,*
    2001 UT 82, 34 P.3d 228 ..................................................................... 19

*State v. Jones,*
    407 P.2d 571 (Utah 1965) .................................................................... 18

*State v. Ririe,*
    2015 UT 37, 345 P.3d 1261 ................................................................... 4

*Venuti v. Cont'l Motors Inc.,*
    2018 UT App 4, 414 P.3d 943 ............................................................... 6

*Wozniak v. YouTube, LLC,*
    319 Cal. Rptr. 3d 597 (Cal. Ct. App. 2024) ........................................ 17

*XMission, L.C. v. Fluent LLC,*
    955 F.3d 833 (10th Cir. 2020) ......................................................... 9, 11

*Zeran v. Am. Online, Inc.,*
    129 F.3d 327 (4th Cir. 1997) .......................................................... 14, 15

**Statutes**

28 U.S.C. § 230(c)(1) ................................................................................. 15

47 U.S.C. § 230(c)(1) ................................................................................. 15

Utah Code § 13-11-3(2)(a) .................................................................. 17, 19

Utah Code § 13-11-4 .................................................................................. 17

Utah Code § 13-11-5 .............................................................................. 1, 17

**Other Authorities**

*Assignment,* Merriam-Webster Dictionary .............................................. 18

*Lease,* Merriam-Webster Dictionary ....................................................... 18

*Sale,* Merriam-Webster Dictionary ......................................................... 18

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Selling*, Merriam-Webster Dictionary ............................................................................ 18

**Rules**

Utah R. App. P. 5(c)(1)(D) ......................................................................................... 19

Utah R. App. P. 5(g) ................................................................................................... 5

Pursuant to Rule of Appellate Procedure 5(a), Defendant TikTok Inc. ("TTI"), hereby petitions for permission to appeal an order entered by the Third Judicial District Court for Salt Lake County denying TTI's Motion to Dismiss ("Order") (Addendum A).

## INTRODUCTION

TTI is a non-resident corporation that provides an online entertainment platform in the United States. The TikTok platform publishes user-generated videos, which can be viewed by users worldwide, including Utah residents. In this suit, the Utah Division of Consumer Protection (the "Division") seeks to regulate the manner in which the platform publishes globally-accessible third-party content. According to the Division, the platform violates the Utah Consumer Sales Practices Act ("UCSPA"), Utah Code § 13-11-5, because it uses "algorithms" and other "design features" to select, organize, and display user-generated content in a manner that allegedly causes users to spend harmfully excessive time viewing such content. The Division also alleges that TTI misrepresents the risks of viewing content on the TikTok platform and TTI's "location and origin."

The Division's suit is deeply flawed, both legally and factually, but several stark threshold problems warrant this Court's immediate attention.

*First*, the State of Utah cannot exercise personal jurisdiction over TTI because the suit is not based on conduct TTI expressly aimed at Utah. The district court asserted jurisdiction based on allegations that Utah residents are harmed by using the globally-accessible TikTok platform, ignoring a wealth of precedent holding that providing a generally-available website cannot subject a defendant to personal jurisdiction in every state where it can be accessed. That error should be reviewed now, because TTI's right

1

to be free from the wrongful assertion of judicial power cannot be adequately vindicated after a final judgment, once judicial power has *already* been imposed.

*Second*, the Division's principal claims target expressive publishing activity protected by the First Amendment, as the U.S. Supreme Court held just this year in *Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (2024). Not only did the district court fail to follow or even acknowledge *Moody*, it relied solely on *NetChoice, LLC v. Paxton*, 49 F.4th 439 (5th Cir. 2022) ("*NetChoice*"), which *Moody vacated and sharply criticized*. 144 S. Ct. at 2399, 2409. According to *Moody*, *NetChoice*'s holding that platforms' content recommendation systems are not "speech"—the holding cited by the district court here—reflects "a serious misunderstanding of First Amendment precedent and principle." *Id.* at 2399. The interests of justice strongly favor immediate review to correct the district court's erroneous reliance on *NetChoice* and to enforce the expressive rights recognized in *Moody*. As courts have consistently recognized, First Amendment rights should be adjudicated at the threshold of litigation when possible, because the litigation process itself chills the expressive conduct the First Amendment is meant to protect.

*Third*, the same publishing activity protected by the First Amendment is also immunized from liability by § 230 of the federal Communications Decency Act ("CDA"), as another array of precedent has held. The district court again did not acknowledge those precedents, much less explain why they do not apply here. Much like First Amendment protections, the entire point of § 230 immunity—to encourage online platforms to publish third-party expression without fear of liability for their publishing activity—will be largely lost if TTI must endure lengthy litigation before its statutory

2

immunity as "publisher" is enforced.

*Fourth*, the UCSPA does not apply to the free download and use of the TikTok platform. A number of courts have held that state consumer-protection statutes cannot be invoked to challenge the way in which online platforms publish user-generated content, and for good reason: allowing such claims would install state courts as de facto regulators of the internet. In fact, the UCSPA by its own terms applies only to "consumer transaction[s]," which does not encompass accessing an online platform for free.

Because interlocutory review here would "get directly at and dispose of the issues as quickly as possible consistent with thoroughness and efficiency in the administration of justice," *Houghton v. Dep't of Health*, 2008 UT 86, ¶ 14, 206 P.3d 287 (quotation omitted), the petition should be granted.

## MATERIAL FACTS

California-based TTI operates the TikTok platform, an online entertainment platform that is free to download and use and that allows users to create, share, and comment on videos created by other users. Compl. ¶¶ 1-2, 10, 15, 19, 21, Dkt. No. 1. The platform uses a personalized recommendation system to present users with a selection of user-generated content that they are likely to enjoy. *Id.* ¶¶ 28-30. The Division's complaint primarily challenges the way in which the TikTok platform chooses content to present to users, alleging that certain features of the platform, including its recommendation system, are "addictive" and thus "unconscionable" in violation of the UCSPA. *Id.* ¶¶ 153-160.

The Division asserts three claims under the UCSPA. Count I alleges that certain

design features of the TikTok platform—principally its video recommendation system—are "addictive" and thus "unconscionable" under the UCSPA. Compl. ¶¶ 153-160. Count II alleges that TTI has made misrepresentations on a nationwide basis about the TikTok platform's safety, its content moderation policies, and its recommendation system. *Id.* ¶¶ 161-165. Count III alleges that TTI has misrepresented its relationship with ByteDance, its alleged China-based parent company. *Id.* ¶¶ 166-71.

TTI filed a motion to dismiss the complaint, which was denied on November 12, 2024. TTI timely filed this petition for interlocutory review.

### ISSUES PRESENTED, PRESERVATION & STANDARD OF REVIEW

1. Whether the Due Process Clause permits Utah courts to exercise personal jurisdiction over TTI where the Complaint does not allege facts establishing that TTI expressly aimed suit-related acts at Utah.

2. Whether the First Amendment protects TTI from liability for its expressive choices in selecting, organizing, and displaying third-party content on the TikTok platform.

3. Whether CDA § 230 immunizes TTI from liability for the manner in which it selects, organizes, and displays third-party content on the TikTok platform.

4. Whether the free download and use of the TikTok platform constitutes a "consumer transaction" under the UCSPA.

These issues were raised in TTI's motion to dismiss and were decided in the district court's Order. Add. A. This Court reviews that Order "de novo, yielding no deference to its analysis." *State v. Ririe*, 2015 UT 37, ¶ 5, 345 P.3d 1261.

4

## REASONS WHY INTERLOCUTORY REVIEW SHOULD BE GRANTED

An interlocutory appeal is warranted because the district court's Order deprives TTI of "substantial rights," and "the administration and interests of justice" strongly favor enforcing those rights now.  Utah R. App. P. 5(g).

## I.  THE ORDER INVOLVES SUBSTANTIAL RIGHTS THAT SHOULD BE ENFORCED AT THE THRESHOLD OF LITIGATION, NOT ITS CONCLUSION

The rights at stake in the Order and raised in this Petition are more than "substantial"—they are foundational Due Process, First Amendment, and federal statutory rights, and to protect them fully, courts must enforce them at the threshold, rather than awaiting the end of long and costly litigation.

Personal jurisdiction is a "threshold question," *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 433 (2007), because "due process protects the individual's right to be subject only to lawful power," *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 884 (2011), and a state cannot exercise judicial power over a non-resident that lacks sufficient relevant connections to the state, *see Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73 (1985).  Absent such connections, the state cannot "require him to conduct his defense in th[e] state," *Mallory Eng'g v. Ted R. Brown Assoc.*, 618 P.2d 1004, 1009 (Utah 1980), meaning that state courts are "powerless to proceed to an adjudication," *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999).  The right to appeal after final judgment is thus "inadequate to correct an invalid exercise of personal jurisdiction over a defendant."  *Fulbright & Jaworski v. Eighth Jud. Dist. Ct.*, 342 P.3d 997, 1001 (Nev. 2015).  Only an interlocutory appeal can prevent the unlawful

imposition of judicial process. *See Venuti v. Cont'l Motors Inc.*, 2018 UT App 4, ¶ 1, 414 P.3d 943 (interlocutory appeal to review allegedly improper exercise of personal jurisdiction).

A similar concern applies to First Amendment defenses. The U.S. Supreme Court's decision in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), and "countless other cases" recognize that "the First Amendment's protections extend to not only unconstitutional laws, but also to unnecessary *litigation* that chills speech," which is why "federal courts have emphasized the importance of resolving First Amendment cases at the earliest possible junction." *Green v. Miss United States of Am., LLC*, 52 F.4th 773, 800 (9th Cir. 2022); *see also Anderson Dev. Co. v. Tobias*, 2005 UT 36, 116 P.3d 323 (interlocutory appeal to review denial of First Amendment defense).

The same is true for § 230: "whether or how much ... immunity" § 230 provides is a "threshold issue." *Calise v. Meta Platforms, Inc*., 103 F.4th 732, 738 (9th Cir. 2024). Because § 230 not only protects websites "from ultimate liability," but also "from having to fight costly and protracted legal battles," *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1174-75 (9th Cir. 2008), § 230 immunity is "effectively lost if a case is erroneously permitted to go to trial," *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009). Courts thus frequently ensure that § 230 immunity is enforced at the pleading stage. *See*, *e.g.*, *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1101 (9th Cir. 2019) (affirming dismissal under § 230); *In re Facebook, Inc.*, 625 S.W.3d 80, 87 (Tex. 2021) (granting mandamus and ordering dismissal of claims under § 230).

## II. THE DISTRICT COURT ERRONEOUSLY REJECTED TTI'S SUBSTANTIAL THRESHOLD DEFENSES

The district court's Order errs most prominently by rejecting TTI's First Amendment defenses solely on the basis of the Fifth Circuit's *NetChoice* decision. The district court did not even *acknowledge* the Supreme Court's opinion in *Moody* vacating and criticizing *NetChoice*, let alone recognize the dispositive effect of *Moody* on the Division's principal liability theory. That error by itself would justify interlocutory review, but the error does not stand alone. The denial of TTI's personal jurisdiction and § 230 defenses, and its misinterpretation of the UCSPA, also contravene significant authority the district court ignored. These errors, too, warrant interlocutory review.

### A. The Entire Suit Is Barred Because The District Court Lacks Specific Personal Jurisdiction Over TTI

The Division concedes that Utah cannot exercise "general" personal jurisdiction over TTI. Order 3. The question instead is whether Utah courts can exercise "specific" or "suit-related" jurisdiction over TTI. They cannot.

Specific jurisdiction arises only when "the defendant's suit-related conduct" creates "a substantial connection with the forum State." *Raser Techs., Inc. v. Morgan Stanley & Co., LLC*, 2019 UT 44, ¶¶ 34, 36, 449 P.3d 150 (quotation omitted). Even "continuous activity … within a state" will not make a non-resident corporation "amenable to suits unrelated to that activity." *Bristol-Myers Squibb Co. v. Super. Ct.*, 582 U.S. 255, 264 (2017) (cleaned up). To determine whether a defendant's suit-related conduct creates a substantial connection with Utah, this Court applies the "effects test" from *Calder v. Jones*, 465 U.S. 783 (1984). Under this test, "the defendant must have (1)

7

committed an intentional act, which was (2) expressly aimed at the forum state, and (3) caused harm, the brunt of which is suffered and which the defendant knows is likely to be suffered in the forum state." *Raser*, 2019 UT 44, ¶ 48 (quotation omitted). The question thus is not simply whether a defendant's conduct had foreseeable harmful effects within the state, but whether "those effects are the product of a defendant *purposefully reaching into the state*." *Id.* ¶ 52 (emphasis added). In other words, the forum state must be the "focal point" of the conduct targeted in the suit. *Id.* ¶ 45 (quotation omitted).

In *Raser*, this Court rejected specific jurisdiction in a suit alleging that the defendant manipulated the price of a stock that traded on a national exchange "in every state, including Utah." *Id.* ¶ 56. The defendant knew that many affected shareholders resided in Utah, and hundreds of residents, multiple Utah counties, and "[d]ozens of Utah companies" were harmed by the alleged manipulation. *Id.* Those alleged connections did not trigger specific jurisdiction, this Court held, because they addressed only *harms* in Utah, not *suit-related conduct expressly aimed* at Utah. *Id.* As the Court put it, the "defendant's *conduct* must connect him to the forum in some meaningful way," and allegations of "price manipulation on a national exchange do not, standing alone, describe conduct that connects any individual defendant to Utah in a meaningful way." *Id.*

This Court has not yet decided how the foregoing principles apply to online platforms. But many federal courts have applied the same standards to conclude that merely providing a generally-available website that is "accessible to individuals in a particular state does not, on its own, support the exercise of specific personal jurisdiction" by that state. *FITn40, LLC v. Glanbia Nutritionals (Ir.) Ltd.*, 2022 WL

8

79910, at *4 (D. Utah Jan. 7, 2022); *see, e.g., Hasson v. FullStory, Inc.*, 114 F.4th 181, 188-92 (3d Cir. 2024); *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 320 (5th Cir. 2021); *Adv. Tactical Ordinance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 803 (7th Cir. 2014). As the Tenth Circuit put it, the effects test "cannot be satisfied if the website host … simply wants as many responses as possible but is indifferent to the physical location of the responder." *XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 847 (10th Cir. 2020). Instead, website content may give rise to personal jurisdiction only if it is "directed specifically at a forum state audience or otherwise make[s] the forum state the focal point of the message." *Id.* at 845-47; *see Doshier v. Twitter, Inc.*, 417 F. Supp. 3d 1171, 1178 (E.D. Ark. 2019) (no jurisdiction where online platform "is accessible nationwide" and does not "specific[ally] target[]" Arkansas). Were it otherwise, every state in which an online platform "is accessed" could assert jurisdiction over the platform, and "the defense of personal jurisdiction … would no longer exist" for nationwide platforms. *XMission*, 955 F.3d at 844-45.

Applying these principles, the Ninth Circuit concluded that a non-U.S. defendant's operation of a pornography website did not trigger specific jurisdiction in the United States even though (1) nearly 20% of the website's traffic came from U.S. users, (2) those users agreed to the site's terms of service, (3) the site's users were "more likely to upload content produced in the United States," (4) the defendant had geo-targeted advertisements to U.S. users, and (5) the defendant had registered U.S. domain names. *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1210 (9th Cir. 2020). Despite those contacts, the court held that the site "lack[ed] a forum-specific focus" because the defendant did

9

not specifically tailor the site to U.S. users. *Id.* at 1210.

Although the foregoing precedents would foreclose specific jurisdiction here, the district court did not acknowledge any of them. The court instead cited only one case that addressed whether personal jurisdiction may be based on the operation of a website or mobile app (Order 9)—and that case *squarely rejected* the district court's position. In *Patriot Sys., Inc. v. C-Cubed Corp.*, 21 F. Supp. 2d 1318 (D. Utah 1998), the plaintiff sought to assert jurisdiction because the defendant "transacted business in [Utah] by maintaining an Internet website, accessible by anyone in Utah, through which to advertise and market its allegedly infringing software." *Id.* at 1324. The court found that general connection insufficient and dismissed the case for lack of personal jurisdiction. *Id.*

Contrary to the district court's ruling, it is irrelevant that TTI displays advertisements on its platform, and that "TikTok makes its money selling ads." Order 6. According to the district court, those ads trigger specific jurisdiction because the Division's suit challenges features of the TikTok platform that enable TTI "to collect personal data—including from Utahns—which in turn enables [TTI] to offer more targeted and more profitable advertisements" to third parties. Order 5-6. The flaw in that analysis is obvious: the district court did not and could not find that the challenged features were *expressly aimed* at Utah. The features instead are inherent to the overall platform, which is accessible worldwide, including in Utah—just as the nationally traded stock in *Raser* was foreseeably traded in Utah, and just as the website in *AMA* was foreseeably accessible in the United States.

The district court also justified specific jurisdiction over TTI based on alleged

misrepresentations to Utah users about the safety and origin of the TikTok platform. Order 6. But again, the court cited no alleged representations "directed particularly at Utah residents," as required for specific jurisdiction. *FITn40*, 2022 WL 79910, at *5; *see XMission*, 955 F.3d at 845 (specific jurisdiction triggered only when website "deliberately directed its message at an audience in the forum state and intended harm to the plaintiff occurring primarily or particularly in the forum state" (quotation omitted)); *Blessing v. Chandrasekhar*, 988 F.3d 889, 905 (6th Cir. 2021) (rejecting jurisdiction where communication "was not specifically directed at the forum").

The district court's reliance on *Inconnu Lodge v. Commbine.com LLC*, 214 F. Supp. 2d 1204 (D. Utah 2002), again illustrates its error. In *Inconnu*, the defendants registered a domain name "for no other purpose than to extort money from" specific persons residing in Utah. *Id.* at 1209. Because the defendants "purposefully directed [their] activities at residents of the forum state," specific jurisdiction was triggered. *Id.* at 1208. Here, by contrast, the Division alleges no suit-related conduct specifically aimed at Utah residents. The Division instead asserts only that Utah residents are harmed by viewing content on a globally-accessible platform. But because Utah is not the focal point of the platform, its alleged effects on users in Utah do not suffice to trigger jurisdiction.

## B. Counts I And II Are Barred By The First Amendment

Count I of the Division's complaint alleges that certain design features of the TikTok platform—mainly the algorithms it employs to recommend videos to users— cause users to become "addicted" to viewing videos on the platform. According to the

district court, the recommendation features are not expressive activity protected by the First Amendment because they do not "prevent or convey any message or viewpoint." Order 15. As support, the court cited only the Fifth Circuit's decision in *NetChoice* for the proposition that recommendation algorithms are "conduct, not speech," and thus are unprotected by the First Amendment. Order 15.

The court's ruling is inexplicable. *NetChoice* was *vacated* by the Supreme Court in *Moody*, which pronounced a "stark need" to correct the very premise cited by the district court, *viz.*, "that the content choices the major [online platforms] make for their main feeds are 'not speech' at all." 144 S. Ct. at 2399. According to *Moody*, that premise reflects "a serious misunderstanding of First Amendment precedent and principle." *Id.* In fact, *Moody* holds, platforms' use of tools to curate, recommend, and present users with third-party content is fully protected expressive activity. *Id.* at 2403-04 (First Amendment protects use of "algorithms" to "select[] and rank[]" the "posts or videos (plus advertisements)" displayed "on a user's customized feed or recommendations list").

As *Moody* explains, long before the expansion of online platforms, the Court had consistently held that a "private party's collection of third-party content into a single speech product … is itself expressive, and intrusion into that activity must be specially justified under the First Amendment." *Id.* at 2401; *see Pac. Gas & Elec. Co. v. Public Util. Comm'n of Cal.*, 475 U.S. 1 (1986); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974). That rule, *Moody* emphasizes, "does not go on leave when social media are involved." 144 S. Ct. at 2394. Analogizing to "[t]raditional publishers," "cable

operators, and parade organizers," *Moody* recognizes that online platforms "are engaged in expression" when they construct user "feeds," which require "choices about what third-party speech to display and how to display it." *Id.* at 2393, 2399 n.3, 2405. "Deciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own." *Id.* at 2402. In other words, platforms' decisions about how to "include and exclude, organize and prioritize" third-party content results in "their own distinctive compilations of expression" protected by the First Amendment. *Id.* And that rule applies fully to laws—like the law invalidated in *Moody* itself—intended to alter the expressive compilation of ideas conveyed to minors. *See Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 794 (2011) (First Amendment does not grant states "free-floating power to restrict the ideas to which children may be exposed").

*Moody* was properly applied by Chief Judge Shelby in *NetChoice, LLC v. Reyes*, 2024 WL 4135626 (D. Utah Sept. 10, 2024), appeal docketed, No. 24-4100 (10th Cir.), which involved a statute—the Utah Minor Protection in Social Media Act—addressing many of the same practices the Division challenges. That statute would have required social media companies to "disable" certain "features that prolong user engagement." *Id.* at *3-4. The court explained that even "well-intentioned legislation that regulates speech based on content must satisfy a tremendously high level of constitutional scrutiny" given the "First Amendment's paramount place in our democratic system." *Id.* at *1. Under *Moody*, the court held, decisions social media companies make "about how to construct and operate their platforms," including about the tools they use to publish third-party

speech, constitute "protected speech." *Id.* at *8. And the State's asserted interest in "protecting minors from the mental-health and personal privacy-related harms associated with extensive social media use" did not satisfy the First Amendment's "exacting standard." *Id.*

Count I of the Division's Complaint asserts the same state interest and challenges the same online platform activities. The district court's refusal to dismiss cannot be reconciled with either *Moody* or *Reyes*, and the district court did not suggest otherwise. It instead relied entirely on the erroneous *NetChoice* decision expressly rejected by *Moody*. The court's failure to apply controlling, dispositive U.S. Supreme Court precedent to dismiss Count I warrants interlocutory review.[1]

## C. Counts I And II Are Barred By CDA § 230

Congress enacted § 230 "to promote the free exchange of information and ideas over the Internet." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1099-1100 (9th Cir. 2009). Section 230 addresses the "threat" and "obvious chilling effect" that "tort-based lawsuits pose," *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330-331 (4th Cir. 1997), to an "uninhibited, robust, and wide-open internet," *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 415 (6th Cir. 2014). Section 230 responds by providing "broad immunity" to "Web-based service providers for all claims" "arising from the publication of user-generated content." *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008).

---

[1] A similar analysis applies to Count II. As explained in Part II.C., *infra*, while Count II nominally alleges that TTI misrepresented the risks of viewing content on the TikTok platform, Count II in substance impermissibly attacks expressive decisions about how to publish that content.

Under § 230, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). TTI indisputably qualifies as a "provider" of "an interactive computer service" under § 230. *See Dyroff v. Ultimate Software Grp.*, 934 F.3d 1093, 1097 (9th Cir. 2019). As such, § 230 "mandates dismissal" of claims that seek to hold TTI liable for "information provided by another information content provider," where TTI allegedly acted "as the 'publisher or speaker' of that information." *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014) (quoting 28 U.S.C. § 230(c)(1)). That rule requires dismissal of both Counts I and II.

The district court declined to dismiss Count I under § 230 because, in the court's view, that Count is "not seeking to hold [TTI] accountable as publisher of user-generated content, but rather seeking recourse for the harmful algorithms that are causing injury to the application's users." Order 13. According to the district court, users are not allegedly harmed by the user-generated videos themselves, but by platform features that cause users to view *too much* video content. *Id.*

That analysis misses the point: as the Division's complaint makes clear, the allegedly harmful platform features are tools used to select, organize, and display videos to users, i.e., *publishing* tools. And § 230 bars "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions." *Zeran*, 129 F.3d at 330. As many courts have recognized, the "ordinary meaning" of "publisher" encompasses an online platform's use of "tools such as algorithms that are designed to match [third-party] information with a consumer's interests," which are "an essential part

15

of traditional publishing." *Force v. Facebook, Inc.*, 934 F.3d 53, 63, 65-66 (2d Cir. 2019); *see Moody*, 144 S. Ct. at 2405 (use of "algorithms" to organize and feed content is publishing activity); *Dyroff*, 934 F.3d at 1097 (publishing "features and functions" of online platforms include "algorithms" that provide "recommendations and notifications" to users about third-party content that may match their interests). That rule was applied recently by a federal court coordinating hundreds of cases with claims alleging that TTI and other online platforms use "algorithms to promote addictive engagement" with third-party content. *In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.*, 702 F. Supp. 3d 809 (N.D. Cal. 2023). The court dismissed the claims, explaining that § 230 "immunizes defendants" against challenges to "whether, when, and to whom to publish third-party content," which are "traditional editorial functions that are essential to publishing," whether "done by an algorithm or an editor." *Id.* at 831, 833.

The district court did not acknowledge the foregoing precedents or explain how Count I survives their logic. The court simply quoted a decision by Judge Holmberg denying a motion to dismiss similar claims brought against Meta. Order 14. But that decision likewise does not cite or analyze any of the leading authorities on § 230. This Court should grant review to clarify Utah law and make clear that § 230 immunizes online platforms from challenges to their exercise of traditional publishing functions.

Section 230 also requires dismissal of Count II, which alleges that TTI misrepresented the safety of the TikTok platform because the platform does not fully comply with TTI's own representations about how its publishing functions operate. As courts have recognized, a claim alleging that a platform did not adhere closely enough to

16

its own statements about its publishing process inherently attacks that process itself, which § 230 prohibits.  *See Wozniak v. YouTube, LLC*, 319 Cal. Rptr. 3d 597, 618-19 (Cal. Ct. App. 2024) (rejecting claim that platform violated its own "general policies or statements" concerning user safety and data security because they were made in platform's "capacity as publisher"); *Beckman v. Match.com*, 668 F. App'x 759, 759 (9th Cir. 2016) (rejecting misrepresentation claims based on platform's alleged non-compliance with own safety policies because the "basis for each of those claims is [the service's] role as a publisher of third-party information"); *accord Green*, 318 F.3d at 471; *MySpace*, 528 F.3d at 416, 419-22.  As one court observed in rejecting a claim alleging that a platform did "not enforce" its own "prohibitions regarding the content of third party user material," a rule allowing a platform to be held "liable for establishing standards and guidelines would ultimately create a powerful disincentive for service providers to establish any standards or ever decide to remove objectionable content, which [§ 230] was enacted to prevent."  *Bennett v. Google, Inc.*, 2017 WL 2692607, at *2 (D.D.C. June 21, 2017).  The same analysis applies here.  Count II should be dismissed.

### D.    All Of The Claims Rest On A Misinterpretation Of The UCSPA

Each of the Division's claims requires that the alleged unconscionable or deceptive acts occur "in connection with a consumer transaction."  Utah Code §§ 13-11-4, -5.  The UCSPA defines a "consumer transaction" in relevant part as a "sale, lease, assignment, award by chance, or other written or oral transfer or disposition of goods, services, or other property."  *Id.* § 13-11-3(2)(a).  The district court held that free access to the TikTok platform constitutes a "consumer transaction" because TTI receives users'

"personal data" when they use the TikTok platform.  Order 9-12.

That incredibly capacious definition of "consumer transaction" would subject virtually *all* websites and apps to the UCSPA.  It would in effect transform the UCSPA into a general Internet-regulation statute, which cannot be what the Legislature intended in enacting the UCSPA in 1973, decades before the widespread availability of the Internet.  The district court reasoned that the definition of "consumer transaction" should be "construed broadly" (Order 11), but the UCSPA is quasi-criminal in nature, so it "should be strictly construed against the authority invoking it and liberally in favor of the one against whom it is asserted."  *State v. Jones*, 407 P.2d 571, 572 (Utah 1965).

The statute's text does not compel the district court's broad construction.  The UCSPA's definition of "consumer transaction" contemplates payment of some sort and a reallocation of rights.  This is evident from the terms used in the statute—sale, lease, assignment.  *See Sale*, Merriam-Webster Dictionary (last accessed Dec. 3, 2024) ("the act of selling"), https://www.merriam-webster.com/dictionary/sale; *Selling*, Merriam-Webster Dictionary (last accessed Dec. 3, 2024), https://www.merriam-webster.com/dictionary/selling ("to give up (property) to another for something of value (such as money)"); *Lease*, Merriam-Webster Dictionary (last accessed Dec. 3, 2024), https://www.merriam-webster.com/dictionary/lease ("to grant by lease," which is "a contract by which one conveys real estate, equipment, or facilities for a specified term and for a specified rent"); *Assignment*, Merriam-Webster Dictionary (last accessed Dec. 3, 2024), https://www.merriam-webster.com/dictionary/lease ("law: the transfer of property").  To be sure, the statute also adds the catchall phrase "or other … transfer or

18

disposition." Utah Code § 13-11-3(2)(a). But under the *esjudem generis* interpretative canon, these terms should be construed to be "of the same kind or class" as the terms that precede them. *State ex rel. A.T.*, 2001 UT 82, ¶ 12, 34 P.3d 228. Here, they should be interpreted to involve some sort of payment and reallocation of rights.

Courts applying other states' consumer-protection statutes have held that those statutes do not apply where there is no exchange of money. *E.g.*, *Berry v. Nat'l Med. Servs., Inc.*, 205 P.3d 745, 752 (Kan. App. 2009) ("consumer transactions" under consumer protection law require exchange of money), *aff'd*, 292 Kan. 917 (2011); *In re Facebook Priv. Litig.*, 791 F. Supp. 2d 705, 715-17 & n.10 (N.D. Cal. 2011) (dismissing consumer protection claims because plaintiffs "received [Facebook's] services for free" and rejecting argument that users pay for using platform through collection of their data because personal information is not "currency" or "a form of property"), *aff'd*, 572 F. App'x 494 (9th Cir. 2014); *Claridge v. RockYou, Inc.*, 785 F. Supp. 2d 855, 864 (N.D. Cal. 2011) (dismissing consumer-protection claim because plaintiff "did not purchase or lease any goods or services" from app developer, rejecting argument that personal information constituted "currency and property"). The same result should obtain here.

## REASONS WHY INTERLOCUTORY REVIEW WOULD MATERIALLY ADVANCE TERMINATION OF THE LITIGATION

There is no doubt here that interlocutory review "may materially advance the termination of the litigation." Utah R. App. P. 5(c)(1)(D).

If this Court were to follow the many precedents holding that a state cannot exercise specific jurisdiction based on allegations that state residents were harmed by a

generally-available website not expressly aimed at the state, this entire litigation would be terminated immediately. Rejecting the court's overly broad construction of "consumer transaction" under the UCSPA would have the same result.

Review of the First Amendment and § 230 issues raised here would also advance termination of the suit by, at a minimum, significantly narrowing the legal and factual issues that remain subject to dispute. For example, if this Court concludes—as it must, consistent with *Moody*—that the challenged design features of the TikTok platform constitute expressive publishing activity, Count I would be barred at a minimum. And dismissing Count I obviously would narrow the litigation substantially: discovery and factfinding about the purpose, efficacy, and effect of the platform's publishing activity would be irrelevant and inappropriate. If the Court agrees that Count II also must be dismissed, the litigation would be further simplified: there would be no need for difficult, subjective inquiry into how closely the TikTok platform adheres to such vague, opinion-based statements as whether it provides a "safe environment" or whether TTI "works to support the well-being" of users. Compl. ¶ 165(a-b).

## CONCLUSION

The petition for interlocutory appeal should be granted.

Respectfully submitted,

Dated:  December 3, 2024                    /s/ *Deno G. Himonas*

Deno G. Himonas (5483)
Jeremy M. Brodis (16006)
Kevin G. Heiner (16835)
**WILSON SONSINI GOODRICH &
ROSATI, P.C.**
15 W. South Temple, Ste 1700
Salt Lake City, Utah 84101
Tel.: 801.401.8510
dhimonas@wsgr.com
jbrodis@wsgr.com
kheiner@wsgr.com

Daniel M. Petrocelli*
Lauren F. Kaplan*
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067
Tel.: 310.553.6700
dpetrocelli@omm.com
lkaplan@omm.com

Stephen D. Brody*
Jonathan D. Hacker*
Martha F. Hutton*
**O'MELVENY & MYERS LLP**
1625 Eye Street N.W.
Washington, DC 20006
Tel.: 202.383.5167
sbrody@omm.com
jhacker@omm.com
mhutton@omm.com

*\* Pro hac vice forthcoming*

*Attorneys for Defendant-Petitioner
TikTok Inc.*

**CERTIFICATE OF COMPLIANCE**

The foregoing Petition For Permission To Appeal From Interlocutory Order complies with the page limitation of Rule 5 and the type-volume limitation of Rule 27 of the Utah Rules of Appellate Procedure, as it does not exceed 20 pages in length and has been prepared using 13-point Times New Roman, a proportionally-spaced typeface.

DATED this 3rd day of December 2024.


*/s/ Kevin G. Heiner*
Kevin G. Heiner

## CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2024, a true and correct copy of the foregoing

was served on the following by email:

Douglas Crapo (crapo@agutah.gov)
Taylor Mosolf (tmosolf@agutah.gov)
Peishen Zhou (peishenzhou@agutah.gov)
Carina Wells (cwells@agutah.gov)
*Assistant Attorneys General*
160 East 300 South, 5th Floor
Salt Lake City, Utah 84114

Jimmy Rock (jrock@edelson.com)
EDELSON PC
1255 Union Street NE, 7th Floor
Washington, DC 20002

Theo Benjamin (tbenjamin@edelson.com)
Emily Penkowski Perez (epenkowski@edelson.com)
Roger Perlstadt (rperlstadt@edelson.com)
EDELSON PC
350 North LaSalle Street, Suite 1400
Chicago, Illinois 60654

*Attorneys for Plaintiff-Respondent Utah Division of Consumer Protection*

/s/ Kevin G. Heiner
Kevin G. Heiner

EXHIBIT 24

VERMONT SUPREME COURT                                    Case No.        24-AP-295
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org



**ENTRY ORDER**

DECEMBER TERM,   2024

State of Vermont v. Meta Platforms, Inc. et          }        APPEALED FROM:
al.*                                                  }
                                                      }        Superior Court, Chittenden Unit, Civil Division
                                                      }
                                                      }        CASE NO. 23-CV-04453

In the above-entitled cause, the Clerk will enter:

Defendants filed a motion in the civil division under Vermont Rule of Appellate Procedure 5(b)(1) requesting permission to appeal an interlocutory order denying their motion to dismiss. They sought review of the court's rulings regarding: (1) personal jurisdiction; (2) application of Section 230 of the federal Communications Decency Act (CDA), 47 U.S.C. § 230, to the State's claims; and (3) application of the First Amendment to the U.S. Constitution and Article 13 of the Vermont Constitution to the State's claims.

The trial court "must permit an appeal from an interlocutory order or ruling" if it finds that "(A) the order or ruling involves a controlling question of law about which there exists substantial ground for difference of opinion; and (B) an immediate appeal may materially advance the termination of the litigation." V.R.A.P. 5(b)(1). Here, the court granted permission to appeal its ruling on personal jurisdiction, concluding that the requirements of Rule 5(b)(1)(A) and (B) were satisfied. However, it denied defendants' requests to appeal its rulings on their CDA and constitutional arguments, finding that an immediate appeal would not materially advance the termination of the litigation. Defendants then filed a motion in this Court requesting permission to appeal these two interlocutory rulings pursuant to Rule 5(b)(7)(A).

We conclude that the requirements of Rule 5(b)(1)(A) and (B) are satisfied as to the civil division's interlocutory ruling on personal jurisdiction, and therefore accept the appeal of this issue. See V.R.A.P. 5(b)(6)(B). However, defendants have not shown that the civil division abused its discretion in denying their request for immediate appeal of its interlocutory rulings under the CDA and the U.S. and Vermont Constitutions. State v. Haynes, 2019 VT 44, ¶ 33, 210 Vt. 417 ("[T]he trial court has discretion in granting or denying interlocutory appeal, and this Court reviews for an abuse of that discretion."). Defendants did not demonstrate that immediate appeal of these rulings would materially advance the termination of the litigation as required under Rule 5(b)(1)(B). Because a failure to satisfy any one of the Rule 5(b)(1) criteria precludes interlocutory appeal, defendants' motion for permission is denied. In re Pyramid Co. of Burlington, 141 Vt. 294, 302 (1982).

Within fourteen days of entry of this order, defendants shall pay any required entry fee, file with this Court an appellants' docketing statement, and order transcripts from an approved transcription service or file a statement indicating that no transcripts are necessary for the appeal. See V.R.A.P. 3(e), 5(b)(6)(B), 10(b). Defendants' failure to comply with this order may result in dismissal of the appeal without further notice.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Harold E. Eaton, Jr., Associate Justice

_____
Karen R. Carroll, Associate Justice

_____
Nancy J. Waples, Associate Justice

# EXHIBIT 25

# THE STATE OF NEW HAMPSHIRE

# SUPREME COURT

**In Case No. 2025-0022, <u>State of New Hampshire v. Meta Platforms, Inc. & a.</u>, the court on February 18, 2025, issued the following order:**

Notice of appeal is declined.  <u>See</u> Rule 7(1)(B).

Under Supreme Court Rule 7(1)(B), the supreme court may decline to accept a notice of discretionary appeal from the superior or circuit court.  No appeal, however, is declined except by unanimous vote of the court with at least three justices participating.

This matter was considered by each justice whose name appears below.  If any justice who considered this matter believed the appeal should have been accepted, this case would have been accepted and scheduled for briefing.

The declination is without prejudice to the filing of a future appeal in compliance with the rules of this court that raises the issues contained in this appeal.

<u>Declined</u>.

MacDonald, C.J., and Bassett, Donovan, and Countway, JJ., concurred.

**Timothy A. Gudas,
Clerk**

Distribution:
Merrimack County Superior Court, 217-2023-CV-00594
Honorable John C. Kissinger, Jr.          Attorney General
Michael A. Delaney, Esq.                  Shantel Chapple Knowlton, Esq.
Gregory L. Halperin, Esq.                 Emily Penkowski Perez, Esq.
Mark W. Mosier, Esq.                      Roger Perlstadt, Esq.
Christopher J. Walsh, Esq.                Jimmy R. Rock, Esq.
Theo Benjamin, Esq.                       Kevin P. Scura, Esq.
Brandon F. Chase, Esq.                    Mary Frances Stewart, Esq.
Brandon H. Garod, Esq.                    File

EXHIBIT 26

The Order of the Court is stated below:
**Dated:** October 18, 2024          /s/  John A. Pearce
                08:41:33 AM              Justice

IN THE SUPREME COURT OF THE STATE OF UTAH

---oo0oo---

| | |
|---|---|
| INSTAGRAM, LLC and META PLATFORMS, INC., Petitioners, v. UTAH DIVISION OF CONSUMER PROTECTION, Respondent. | ORDER Case No. 20240875-SC |

---oo0oo---

This matter is before the Court upon a petition for permission to appeal from an interlocutory order filed August 15, 2024, and the response filed on September 18, 2024 .

Pursuant to Utah Rule of Appellate Procedure 5, the petition for permission to appeal from an interlocutory order is denied.

**End of Order – Signature at the Top of the First Page**

# EXHIBIT 27

**The Order of the Court is stated below:**
**Dated:** February 10, 2025 /s/ JILL M. POHLMAN
04:04:18 PM Justice

## IN THE SUPREME COURT OF THE STATE OF UTAH

---oo0oo---

|  |  |
|---|---|
| TIKTOK INC.,<br>Petitioner,<br>v.<br>UTAH DIVISION OF CONSUMER<br>PROTECTION,<br>Respondent. | ORDER<br><br>Case No. 20241276-SC |

---oo0oo---

This matter is before the Court upon a petition for permission to appeal from an interlocutory order, filed December 3, 2024, and the response filed on January 17, 2025.

Pursuant to Rule 5 of the Utah Rules of Appellate Procedure, the petition for permission to appeal from an interlocutory order is denied.

**End of Order – Signature at the Top of the First Page**

# EXHIBIT 28

64

NOTIFY

## COMMONWEALTH OF MASSACHUSETTS

**SUFFOLK, ss.**  
**SUPERIOR COURT**  
**Civil No. 23-2397-BLS1**

### COMMONWEALTH
**Plaintiff**

**vs.**

### META PLATFORMS, INC., & another[1]
**Defendants**

## MEMORANDUM AND ORDER
## ON MOTION FOR REPORT

The Commonwealth contends that Meta Platforms, Inc. and Instagram, LLC (together, "Meta") designed and uses (or used) addictive system features on Instagram and made a variety of false public statements about how Meta prioritizes and safeguards youth health and safety. It brings claims against Meta for violating G.L. c. 93A, § 2, in a number of ways, and for public nuisance. These claims are remarkably similar to quite a number of other suits filed around the country.

Meta moved to dismiss the case. In October, I denied that motion. See Memorandum and Order on Motion to Dismiss (Oct. 17, 2024) (Docket #43) ("the October Order").[2] While simultaneously pursuing various interlocutory appellate remedies,[3] Meta now asks this court to report the October Order to the Appeals Court. For the reasons set out below, the motion is denied.

---

[1]      Instagram, LLC.

[2]      See Commonwealth v. Meta Platforms, Inc., 2024 WL 4648435 (Mass. Super. Oct. 17, 2024).

[3]      See pending Appeals Court proceedings captioned Commonwealth v. Meta Platforms, Inc., 2024-P-1473, and Commonwealth v. Meta Platforms, Inc., 2024-J-0724.

## DISCUSSION

"[T]he appellate courts[ ] traditional[ly] abhor[ ] piecemeal appellate review." Morrissey v. New England Deaconess Ass'n -- Abundant Life Communities, Inc., 458 Mass. 580, 594-595 (2010), quoting Long v. Wickett, 50 Mass. App. Ct. 380, 387 (2000) (internal quotations omitted). See Business Interiors Floor Covering Business Trust v. Graycor Constr. Co. Inc., 494 Mass. 216, 228 (2024) ("appellate court will reject attempts to obtain piecemeal review of trial rulings that do not represent final dispositions on the merits"), quoting Fabre v. Walton, 436 Mass. 517, 520-521 (2002).

Notwithstanding this appellate reticence, a Superior Court judge may report "an interlocutory finding or order" to the Appeals Court under the Massachusetts Rules of Civil Procedure in the following limited circumstances: (i) "where the parties agree in writing as to all the material facts;" or (ii) "[i]f the trial court is of opinion that" the court's order "so affects the merits of the controversy that the matter ought to be determined by the appeals court before any further proceedings in the trial court." Mass. R. Civ. P. 64(a). See, e.g., Zaniboni v. Massachusetts Trial Ct., 465 Mass. 1013, 1014 (2013) (rescript) (report discharged where trial court rulings "do not present issues of such a serious nature as to overcome the appellate courts' reluctance to engage in piecemeal appellate review"); Peerless Ins. Co. v. Hartford Ins. Co., 34 Mass. App. Ct. 534, 535 (1993) (report discharged in absence of "finding or order by the judge thought by him so to affect the merits of the controversy that there is no point in proceeding in the trial court until the validity of the finding or order is passed upon") (and cases cited).

The factual predicate for a report under Rule 64(a) is not present here. The parties, of course, have not agreed on all material facts. In fact, the facts are very much in dispute at this

preliminary stage. On the record presented with respect to the October Order, no answer had yet been filed.[4]

Moreover, I am <u>not</u> of the opinion that the October Order so affects the merits of this case that the October Order ought to be reviewed by the Appeals Court before any further trial court proceedings. First, several aspects of the Commonwealth's case survive Meta's legal challenges under Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230, and the First Amendment. For example, the claim that Meta violated G.L. c. 93A by its own various false public statements rests on long-established caselaw outside the scope of the CDA and is not subject to a First Amendment challenge. See, e.g., October Order at 10, 19-20.

Second, the portions of the October Order that construe or apply the CDA and the First Amendment in the context of Meta's design and deployment of Instagram's functionality are consistent with the majority of, and the most cogent, decisions on the topic from around the country. See generally <u>Id</u>. at 13-19. Accord Commonwealth's Opposition to Defendants' Motion for a Report at 3-6 & n.2 (Dec. 6, 2024) (Docket #59).

Third, even if certain portions of the October Order could be successfully challenged under the CDA or the First Amendment at this stage, the dismissal of those portions of the Commonwealth's claims would not materially narrow the scope of the discovery relevant to the remaining claims or materially delimit the scope of the case generally. I simply cannot find any reason to delay this matter with an appeal of this court's interlocutory October Order. Indeed, proceeding with discovery may well prove that several bases for Meta's requested report (and

---

[4]     A cursory review of the defendants' Answer filed after the October Order reveals defendants' broad disagreement with large swaths of factual allegations in the Commonwealth's Complaint. See, e.g., Defendants' Answer and Affirmative Defenses ¶¶ 1-3, 6-10, 65-300 (Nov. 25, 2024) (Docket #48).

interlocutory appeal) prove to be moot after a fuller development of the factual record through discovery and trial.

## ORDER

Defendants' Motion for a Report (Docket #57) is **DENIED**.

Dated: January 9, 2025

Peter B. Krupp
Justice of the Superior Court

# EXHIBIT 29

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | | |
|---|---|---|
| **DISTRICT OF COLUMBIA,** | ) | |
| **Plaintiff** | ) | |
| | ) | **Case No. 2023-CAB-6550** |
| **v.** | ) | |
| | ) | **Judge Neal E. Kravitz** |
| | ) | |
| **META PLATFORMS, INC.,** *et al.***,** | ) | |
| **Defendants** | ) | |

## ORDER DENYING DEFENDANTS' MOTION FOR INTERLOCUTORY APPEAL

Meta has asked the court to certify for possible interlocutory appellate review two questions arising from the court's order of September 9, 2024 denying Meta's motion to dismiss: (1) whether the First Amendment bars the District's claims under the Consumer Protection Procedures Act insofar as the claims seek to hold Meta liable for selecting, prioritizing, and displaying user-generated content; and (2) whether Section 230 of the Communications Decency Act bars the District's claims to the extent the claims would treat Meta as the publisher of user-generated content. Meta contends that interlocutory appellate review is appropriate under D.C. Code § 11-721(d) because these are controlling questions of law as to which there are substantial grounds for a difference of opinion and because an immediate appeal from the court's ruling would materially advance the ultimate termination of the litigation.

The District has filed an opposition to Meta's motion. The District argues that the questions Meta wishes to raise in an interlocutory appeal are not controlling questions of law within the meaning of § 11-721(d) because the District's claims—and the merits of Meta's affirmative defenses under the First Amendment and Section 230—rely heavily on facts that need to be fleshed out in discovery. The District argues further that there are no substantial grounds for a difference of opinion on the First Amendment and Section 230 questions, given the

many state court decisions that are in agreement with this court's ruling. Finally, the District argues that a reversal of this court's ruling on the First Amendment and Section 230 issues would not materially advance the termination of the litigation because the reversal would not result in the dismissal of all claims alleged in the complaint and discovery on the remaining claims would be essentially the same as it would be if the entire complaint remained in place.

Meta has filed a reply.

## Discussion

D.C. Code § 11-721(d) authorizes a judge of this court to certify that an interlocutory or otherwise unappealable order or ruling "involves a controlling question of law as to which there is substantial ground for a difference of opinion and that an immediate appeal from the ruling or order may materially advance the ultimate termination of the litigation." If the judge so certifies and a party petitions the Court of Appeals within the following ten days, then the Court of Appeals has discretion to permit the appeal. *Id*. Interlocutory appellate review by certification, however, "is intended to be exceptional and not merely a means of accelerated review for what may appear to be a difficult issue." *Medlantic Health Care Group, Inc. v. Cunningham*, 755 A.2d 1032, 1034 (D.C. 2000). The procedure is to be employed "sparingly" and only where "the disadvantages inherent in piecemeal [appellate] review [are] substantially outweighed by the possibility of mitigating what might otherwise be protracted and expensive litigation." *Plunkett v. Gill*, 287 A.2d 543, 544 (D.C. 1972).

The court concludes that Meta's motion should be denied. The court acknowledges that Meta's First Amendment and Section 230 defenses raise issues of law that were appropriately addressed at the motion to dismiss stage and that could be proper subjects of appellate review. The court also acknowledges that the questions Meta wishes to raise on appeal have been

decided in less than unanimous fashion by the handful of state and federal trial court judges around the country who have considered them. The court agrees with the District, however, that the merits of Meta's First Amendment and Section 230 defenses may ultimately be determined by facts unearthed in discovery, thereby casting doubt on Meta's assertion that the court's ruling at the pleading stage raises "controlling questions of law" within the meaning of § 11-721(d). The court also agrees with the District that an interlocutory appeal would not materially advance the termination of the litigation even if the appeal resulted in the reversal of the court's ruling. As the District argues, its deception- and misrepresentation-based claims alleged in Count II of the complaint would survive even if the Court of Appeals were to reverse this court's ruling on the First Amendment and Section 230, and discovery on those surviving claims would still include detailed inquiries into the dangers posed by the design features allegedly implemented by Meta for the purpose of addicting children to Meta's social media platforms despite Meta's extensive knowledge of the features' devastating effects on children's health and well-being. Therefore, although a reversal on interlocutory appeal would narrow the claims in the case, the court is not persuaded that it would not materially simplify the discovery or trial process or otherwise hasten the completion of the litigation. Finally, while the court cannot predict how the Court of Appeals would resolve an interlocutory appeal, the court notes that a growing number of state court judges who have addressed virtually the same First Amendment and Section 230 arguments advanced by Meta in this case have issued rulings consistent with this court's order of September 9, 2024. This emerging case law may make it more likely that an interlocutory appeal would be rejected on the merits, notwithstanding the contrary ruling from the judge overseeing the multi-district litigation in federal court. In reality, therefore, an interlocutory appeal—which would freeze this litigation for months, if not years, while the Court of Appeals considered the

issues raised—might very well be more likely to delay than to speed up the resolution of this case.

For all of these reasons, it is this 25th day of November 2024

**ORDERED** that the motion is **denied**.


Neal E. Kravitz, Associate Judge
(Signed in Chambers)


Copies to:
Adam R. Teitelbaum, Esq.
Jimmy R. Rock, Esq.
Kevin J. Vermillion, Esq.

John J. DeBoy, Esq.
Timothy C. Hester, Esq.
Christian J. Pistilli, Esq.