**No. 24-7032**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

IN RE SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL
INJURY PRODUCTS LIABILITY LITIGATION

———————————

THE PEOPLE OF THE STATE OF CALIFORNIA, ET AL.,
*Plaintiffs-Appellees,*

v.

META PLATFORMS INC., ET AL.,
*Defendants-Appellants.*

———————————

On Appeal from the United States District Court for the
Northern District of California, Oakland Division
No. 4:23-cv-05448 (MDL No. 3047)
Hon. Yvonne Gonzalez Rogers, District Court Judge

———————————

**BRIEF OF THE ELECTRONIC PRIVACY INFORMATION
CENTER, COMMON SENSE MEDIA, CYBERSECURITY FOR
DEMOCRACY, THE TECH JUSTICE LAW PROJECT, AND
LEGAL SCHOLARS AS *AMICI CURIAE* IN SUPPORT OF
PLAINTIFFS-APPELLEES AND AFFIRMANCE IN PART AND
REVERSAL IN PART**

———————————

Megan Iorio
Tom McBrien
ELECTRONIC PRIVACY
INFORMATION CENTER
1519 New Hampshire Ave. NW
Washington, DC 20036
(202) 483-1140
iorio@epic.org

June 30, 2025                    *Attorneys for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, *amici curiae* the Electronic Privacy Information Center, Common Sense Media, Cybersecurity for Democracy, and the Tech Justice Law Project state that they have no parent corporation and that no publicly held corporation owns 10% or more of their stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................................. i

TABLE OF AUTHORITIES ......................................................................... iii

INTEREST OF THE *AMICI CURIAE* ........................................................... 1

SUMMARY OF THE ARGUMENT ................................................................... 4

ARGUMENT ................................................................................. 7

    I.    Section 230 only prevents claims that would force internet companies into the moderator's dilemma. ........................................ 7

        A.    Congress enacted Section 230 to prevent the moderator's dilemma ................................................................... 8

        B.    The Ninth Circuit has cabined Section 230 to claims that would cause the moderator's dilemma. ........................................ 14

    II.    The States' unfair and deceptive trade practice claims do not force Meta into the moderator's dilemma. ........................................ 19

        A.    Section 230 does not bar the States' deceptive trade practice claims. ............................................................... 19

        B.    Section 230 does not bar the States' unfair trade practice claims. ............................................................... 21

    III.    Denying Meta Section 230 protections will not destroy the internet .................................................................. 34

CONCLUSION ............................................................................... 40

CERTIFICATE OF COMPLIANCE ................................................................. 41

CERTIFICATE OF SERVICE ..................................................................... 42

# TABLE OF AUTHORITIES

## Cases

*Barnes v. Yahoo!, Inc.*,
    570 F.3d 1096 (9th Cir. 2009)......................................................... passim

*Calise v. Meta Platforms, Inc.*,
    103 F.4th 732 (9th Cir. 2024) ....................................................... passim

*Cubby, Inc. v. CompuServe, Inc.*,
    776 F. Supp. 135 (S.D.N.Y.1991) ........................................................ 11

*Dennis v. MyLife.Com, Inc.*,
    No. 20-cv-954, 2021 WL 6049830 (D.N.J. Dec. 20, 2021)............... 42

*Doe v. Internet Brands*,
    824 F.3d 846 (9th Cir. 2016)................................................ 8, 17, 40, 42

*Dyroff v. Ultimate Software Grp., Inc.*,
    934 F.3d 1093 (9th Cir. 2019).............................................................. 29

*Fair Hous. Council of San Fernando v. Roommates.com, LLC*,
    521 F.3d 1157 (9th Cir. 2008)...................................................... 7, 15, 41

*Gonzalez v. Google*,
    598 U.S. 617 (2023).................................................................... 43, 44

*Herrick v. Grindr, LLC*,
    765 F. App'x 586 (2d Cir. 2019)........................................................ 42

*HomeAway.com, Inc. v. City of Santa Monica*,
    918 F.3d 676 (9th Cir. 2019).......................................................... passim

*Lemmon v. Snap*,
    995 F.3d 1085 (9th Cir. 2021)......................................................... passim

*Quinteros v. Innogames*,
    No. 22-35333, 2024 WL 132241 (9th Cir. Jan. 8, 2024).................. 43

*Stratton Oakmont, Inc. v. Prodigy Services Co.*,
    31063/94, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995).... 9, 10, 12

*Twitter, Inc. v. Taamneh*,
    598 U.S. 471 (2023)................................................................................ 44

*United States v. EZ Lynk Sezc*,
No. 21-cv-1986 (MKV), 2024 WL 1349224 (S.D.N.Y. Mar. 28, 2024)
.................................................................................................. 42

*United States v. Stratics Networks Inc.*,
No. 23-CV-0313-BAS-KSC, 2024 WL 966380 (S.D. Cal. Mar. 6,
2024).......................................................................................... 42

**Statutes**

47 U.S.C. §230(c) .................................................................... 13

**Other Authorities**

141 Cong. Rec. H8470 (daily ed. Aug. 4, 1995) ........................... 13

Adam Mosseri, *Shedding More Light on How Instagram Works*,
Instagram.com (June 8, 2021)............................................... 24

Akos Lada, Meihong Wang & Tak Yan, *How Machine Learning Powers
Facebook's News Feed Ranking Algorithm*, Facebook (Jan. 26,
2021).................................................................................... 25

Alex Kantrowitz, *Snapchat Was 'An Existential Threat' to Facebook —
Until an 18-Year-Old Developer Convinced Mark Zuckerberg to
Invest in Instagram Stories*, Business Insider (Apr. 7, 2020) ........ 31

Brent Skorup & Jennifer Huddleston, *The Erosion of Publisher Liability
in American Law, Section 230, and the Future of Online Curation*,
72 Okla. L. Rev. 635 (2020).................................................... 10

Brett Frischmann & Susan Benesch, *Friction-In-Design Regulation as
21st Century Time, Place, and Manner Restriction* 25 Yale J.L. &
Tech. 376 (2023) ...................................................................... 22

Common Sense Media & University of Michigan C.S. Mott's Children's
Hospital, *Constant Companion: A Week in the Life of a Young
Person's Smartphone Use* (2023) ...................................... 22, 30

Compl., *Spence v. Meta Platforms*, No. 3:22-cv-03294, 2022 WL 3572368
(N.D. Cal. June 6, 2022) ........................................................ 33

Jay Chadha, *The Rise of Infinite Scrolling in Software Design* (2024)... 23

Jia Tolentino, *The Age of Instagram Face*, New Yorker
(Dec. 12, 2019).......................................................................... 28

iv

Olivier Sylvain, *Platform Realism, Informational Inequality, and Section 230 Reform*, 131 Yale L. J. Forum 475 (2021) ..................... 16

Restatement (Second) of Torts § 581 .............................................. 9

S. 652, 104th Cong. § 402(a)(2) ..................................................... 11

*See* Mattha Busby, *Social Media Copies Gambling Methods 'To Create Psychological Cravings,'* Guardian (May 8, 2018) ........................... 33

Tatum Hunter, *Should Women Use Beauty Filters Online? We All Have Opinions*, Wash. Post (Sept. 20, 2023) ................................. 28

TikTok, *Notifications* ...................................................................... 30

U.S. Patent No. 10,783,157 .............................................................. 22

U.S. Patent No. 8,751,636 B2 ......................................................... 29

U.S. Patent No. 9,537,811 ............................................................... 31

Vladislav Vorotilov & Ilnur Shugaepov, *Scaling the Instagram Explore Recommendations System*, Facebook (Aug. 9, 2023) ...................... 25

## INTEREST OF THE *AMICI CURIAE*

The Electronic Privacy Information Center ("EPIC") is a public interest research center in Washington, D.C., established in 1994 to focus public attention on emerging privacy and civil liberties issues.[1]

Common Sense Media is a nonpartisan, nonprofit organization dedicated to improving the lives of kids and families by providing the trustworthy information, education, and independent voice they need to thrive.

Cybersecurity for Democracy (C4D) is a research-based, nonpartisan, and independent multi-university center for problem-driven research and research-driven policy. C4D conducts cutting-edge cybersecurity research to better understand the effects of algorithms and AI tools on large online networks and works with platforms and regulators to help all parties understand the implications of our findings and develop solutions.

---

[1] All parties consent to the filing of this brief. In accordance with Rule 29, the undersigned states that no party or party's counsel authored this brief in whole or in part nor contributed money intended to fund the preparation of this brief. No outside person contributed money intended to fund the preparation of this brief.

The Tech Justice Law Project ("TJLP") is a legal initiative of Campaign for Accountability, a 501(c)(3) nonpartisan, nonprofit organization. TJLP works to ensure that legal and policy frameworks are responsive to emergent technologies and their societal effects.

The legal scholars who join this brief are some of the foremost experts on Section 230, platform governance, and digital rights. Signatories list their affiliations for identification purposes only. The brief does not reflect the views of their institutions.

Susan Benesch
Faculty Associate, Berkman Klein Center for Internet & Society
Harvard University

Gaia Bernstein
Technology Privacy and Policy Professor of Law
Co-Director, Institute for Privacy Protection and the Gibbons Institute
for Law Science and Technology
Seton Hall University

Danielle Keats Citron
Jefferson Scholars Foundation Schenck Distinguished Professor in Law
University of Virginia

Brett M. Frischmann
Charles Widger Endowed University Professor in Law, Business and
Economics
Villanova University

Jerry Kang
Ralph and Shirley Shapiro Distinguished Professor of Law
University of California, Los Angeles

Frank Pasquale
Professor of Law
Cornell University

Neil Richards
Koch Distinguished Professor in Law
Director, Cordell Institute
Washington University

Katherine J. Strandburg
Alfred Engelberg Professor of Law
Faculty Director, Information Law Institute
New York University

Olivier Sylvain
Professor
Fordham Law School
Senior Policy Research Fellow, Knight First Amendment Institute at
Columbia University

Zephyr Teachout
Professor
Fordham Law School

Ari Ezra Waldman
Professor of Law
University of California, Irvine

## SUMMARY OF THE ARGUMENT

Congress passed Section 230 to prevent internet companies that host user-generated content from facing the "moderator's dilemma," not to broadly immunize everything related to the publishing of user-generated content. Understanding what the moderator's dilemma is and how Section 230 prevents it is crucial for understanding the proper scope of Section 230's coverage.

The moderator's dilemma occurs when an internet company's choice to moderate user-generated content on their platform leads to a duty to ensure that the platform contains no unlawful content. To mitigate their liability risk, companies must choose to either proactively monitor and remove all potentially offending content, forego content moderation altogether, or stop hosting user-generated content. All options are bad for the online speech environment. Companies that choose not to moderate content leave platforms full of harmful and low-quality content they might otherwise have removed. Companies that decide to moderate have to proactively monitor user speech and block or remove anything that could potentially carry liability, likely preventing users from discussing wide swaths of controversial but important topics.

4

Further, the duty to proactively monitor for and remove all unlawful speech from an online forum is so onerous that many companies would find it impossible and be forced to shut down, drastically limiting the forums available for user speech.

In the early days of the internet, a court decision in an online defamation case threatened to impose the moderator's dilemma on platforms that host user-generated content. Congress recognized that tying a beneficial practice (content moderation) to heightened liability risk (strict liability for all user-generated content) would discourage content moderation and otherwise harm the online speech environment. Congress passed Section 230 with the specific and limited purpose of preventing claims that would force internet companies into the moderator's dilemma. Congress did not intend to give internet companies blanket immunity for every claim related to publishing user-generated content.

The Ninth Circuit has captured this principle in its interpretation of prong two of the *Barnes v. Yahoo* test: a claim does not "treat" an ICS "as the publisher" of user-generated content unless it (1) would necessarily require them to monitor all user-generated content and

remove any tortious or otherwise illegal materials to escape liability, and (2) is imposed simply because the company publishes or moderates user-generated content. Claims that involve publication activities, user-generated content, or neutral tools are not prohibited by Section 230 unless they meet both of these criteria. Because the claims in this case would not require monitoring, editing, or removing user-generated content to avoid liability, Section 230 does not apply.

Denying Meta Section 230 protections in this case will not destroy speech and innovation on the internet. Instead, it will protect speech and innovation while incentivizing companies to design and run their services in ways that benefit users. This Court's refusal to expand Section 230's scope in various other cases has not resulted in the dire consequences industry forewarned. The real danger to the internet is in widely immunizing harmful, avoidable behavior from some of society's most powerful corporations.

# ARGUMENT

## I. SECTION 230 ONLY PREVENTS CLAIMS THAT WOULD FORCE INTERNET COMPANIES INTO THE MODERATOR'S DILEMMA.

The moderator's dilemma forces internet companies to make a "grim choice": either remove all unlawful user-generated content, remove none, or stop hosting user-generated content. *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 684 (9th Cir. 2019). Preventing the moderator's dilemma was Congress's "principal or perhaps the only purpose" in enacting Section 230. *Fair Hous. Council of San Fernando v. Roommates.com, LLC*, 521 F.3d 1157, 1163 n.12 (9th Cir. 2008) (en banc). This Court has interpreted Section 230, particularly prong two of its *Barnes v. Yahoo!, Inc.* analysis, to give effect to this limiting principle. 570 F.3d 1096 (9th Cir. 2009). Section 230 does not apply unless a claim alleges that an internet company had a duty to (1) monitor, edit, or remove user-generated content, (2) solely because of its decision to publish or moderate user-generated content. If a claim does not satisfy both criteria, it is not blocked by Section 230. This means that Section 230 does not bar a claim simply because it relates to the publishing of user-generated content. *See Calise v. Meta*

*Platforms, Inc.*, 103 F.4th 732, 742 (9th Cir. 2024); *Lemmon v. Snap*, 995 F.3d 1085, 1092–93 (9th Cir. 2021); *HomeAway.com*, 918 F.3d at 682; *Doe v. Internet Brands*, 824 F.3d. 846, 853 (9th Cir. 2016); *Barnes*, 570 F.3d at 1108. Section 230 also does not bar every claim involving a neutral tool. *Lemmon*, 995 F.3d at 1094. A close focus on the moderator's dilemma can help a court understand the proper application of the *Barnes* test and to successfully distinguish between claims barred by Section 230 and claims that are not.

### A. Congress enacted Section 230 to prevent the moderator's dilemma.

The "objective meaning" of Section 230 "depend[s] on the backdrop against which Congress enacted it." *Calise*, 103 F.4th at 738. Congress passed Section 230 in response to a defamation case that treated an internet service provider as the "publisher" and not the "distributor" of user-generated content. *Id.* at 739 (discussing *Stratton Oakmont, Inc. v. Prodigy Services Co.*, 31063/94, 1995 WL 323710, at *4 (N.Y. Sup. Ct. May 24, 1995)). "Publisher" has an established meaning in tort law, and courts "must presume that when Congress uses common-law terms, it intended to incorporate their well-settled meanings." *Id.* at 738. In tort

law, a publisher can be held liable "for anything it communicates, even negligently, to a third party." *Id.* at 739 (citing Restatement (Second) of Torts § 577 cmt. a, 630 (Am. L. Inst. 1938)); *see also Prodigy*, 1995 WL 323710, at *3. Publishers thus have a duty to monitor for tortious materials at common law. Distributors, on the other hand, can only be held liable if a plaintiff establishes that the defendant knew they were disseminating tortious material. *Calise*, 103 F.4th at 739 (citing Restatement (Second) of Torts § 581).

The key distinction between a publisher and a distributor is the level of editorial control the entity exerts over the content it disseminates. Newspapers are traditionally treated as publishers of their news articles and op-eds because they exert high levels of editorial control over those materials. *See Prodigy*, 1995 WL 323710, at *4. Newsstands and libraries, on the other hand, are typically treated as distributors because they are not involved in deciding the content of the publications they disseminate. *See id.* That means that distributors, unlike publishers, cannot reasonably vet the contents of every publication they distribute. Thus, if improperly subjected to the same strict liability as a publisher, a distributor's only option to avoid liability

9

would be to steer away from disseminating anything involving controversial topics, publishers, or speakers. *See* Brent Skorup & Jennifer Huddleston, *The Erosion of Publisher Liability in American Law, Section 230, and the Future of Online Curation*, 72 Okla. L. Rev. 635, 643–49 (2020). In other words, they would be forced into the overly censorial choice in the moderator's dilemma.

In the early days of the internet, courts had to decide whether websites that hosted tortious user-generated content should be treated as the publishers or distributors of that content. One court recognized that websites that declined to alter or remove any user-generated content should be treated as distributors because they were not exercising editorial control. *See Cubby, Inc. v. CompuServe, Inc.*, 776 F. Supp. 135, 140 (S.D.N.Y.1991). But in *Stratton Oakmont v. Prodigy Services*, the court treated an internet service provider, Prodigy, as a publisher because it promulgated and enforced content guidelines, such as bans on obscenity, on its online bulletin boards. *Prodigy*, 1995 WL 323710, at *2. The court found that Prodigy's decision to moderate content rendered it a publisher; the company thus had a duty to monitor for and remove tortious materials on its platform that it

breached by hosting defamatory content. *Id.* at *4; *see also Calise*, 103 F.4th at 739 (discussing the *Prodigy* decision.)

The combination of the outcomes in *CompuServe* and *Prodigy* created the moderator's dilemma: to avoid massive tort liability, a website that wished to host user-generated content had to choose between foregoing content moderation altogether or adopting an onerous process of monitoring, editing, and removing any possibly unlawful user-generated content. This disincentivized content moderation and the hosting of user-generated content.

The *Prodigy* decision sent shockwaves through the ongoing Congressional debate over the Communications Decency Act ("CDA"), the law that would eventually include Section 230. Senators Exon and Coats recognized that, by imposing content moderation obligations on websites, the CDA could risk turning all websites into publishers with dangerously high liability risks. *See* 141 Cong. Rec. 16024–25 (June 14, 1995). They added several defenses to the CDA, such as section (f)(4), which would ensure that compliance with the CDA would not, alone, cause an internet company to be treated as a publisher. *See* S. 652, 104th Cong. § 402(a)(2) (adding § 223(f)(4)) (1995) (codified at 47

11

U.S.C.A. § 223(f)(1) (West)). The following exchange illustrates the Senators' intent and includes an example of a contemporaneous use of the phrase "treat" as a "publisher" of user-generated content to mean imposing a publisher's duty to remove all tortious content from a platform:

> Mr. COATS. I understand that in a recent N.Y. State decision, Stratton Oakmont versus Prodigy, the court held that an online provider who screened for obscenities was exerting editorial content control. This led the court to treat the online provider as a publisher, not simply a distributor, and to therefore hold the provider responsible for defamatory statements made by others on the system. I want to be sure that the intent of the amendment is not to hold a company who tries to prevent obscene or indecent material under this section from being held liable as a publisher for defamatory statements for which they would not other-wise have been liable.
>
> Mr. EXON. Yes; that is the intent of the amendment.
>
> Mr. COATS. And am I further correct that the subsection (f)(4) defense is intended to protect companies from being put in such a catch-22 position? If they try to comply with this section by preventing or removing objectionable material, we don't intend that a court could hold that this is assertion of editorial content control, such that the company must be *treated under the high standard of a publisher* for the purposes of offenses such as libel.

Mr. EXON. Yes; that is the intent of section (f)(4).

141 Cong. Rec. 16024–25 (June 14, 1995) (emphasis added).

Representatives Cox and Wyden were similarly concerned that *Prodigy* would disincentivize "Good Samaritan" companies from voluntarily moderating content and developing filtering technologies that would enable parents to control what their children saw online. They titled Section 230, their amendment to the CDA, "Protection for 'Good Samaritan' Blocking and Screening of Offensive Material." *See* 47 U.S.C. §230(c). Rep. Cox explained that he sought to protect "computer Good Samaritans from taking on liability such as occurred in the *Prodigy* case in New York." 141 Cong. Rec. H8470 (daily ed. Aug. 4, 1995). The representatives were aware that *Prodigy*'s outcome— imposing a publisher's duty on websites because they moderated content—would be "a massive disincentive" to content moderation. 141 Cong. Rec. 22045 (daily ed. Aug. 4, 1995) (statement of Rep. Cox). Thus, the purpose of Section 230 was "to help the internet grow" into a vibrant forum for user speech and to "encourage internet companies to monitor and remove offensive content without fear that they would

13

'thereby becom[e] liable for all defamatory or otherwise unlawful messages that they didn't edit or delete.'" *Calise*, 103 F.4th at 739 (quoting *Roommates.com*, 521 F.3d at 1163).

### B. The Ninth Circuit Has cabined Section 230 to claims that would cause the moderator's dilemma.

To avoid turning Section 230 into a "limitless" immunity from liability, *Calise*, 103 F.4th at 739 (quoting *Barnes*, 570 F.3d at 1100), the Ninth Circuit has cabined Section 230 to claims that would lead to the moderator's dilemma. This is particularly reflected in the Court's *Barnes* prong two analysis. In determining whether a claim "treats" a company "as the publisher" of user-generated content, the Court "looks to the legal duty" underlying the claim and "examine[s] two things." *Id.* at 742. One is whether satisfying the duty "necessarily require[s] an internet company to monitor user-generated content" and to edit or remove offending content. *HomeAway.com*, 918 F.3d at 682; *see also Calise*, 103 F.4th at 742. Second is whether the source of the duty—"the 'right' from which the duty springs"—is a company's decision to host or moderate user-generated content. *Calise*, 104 F.4th at 742. When the answer to both questions is "yes", a company has no choice but to over-

14

censor to ensure no unlawful content remains, abandon content moderation, or stop hosting user-generated content. If, instead, the duty can be satisfied without monitoring, editing, or removing content, or if it springs from "something separate from the defendant's status as a publisher," like an agreement or their obligations as a product designer, *see id.* (citing *Barnes*, 570 F.3d at 1107; *Lemmon*, 995 F.3d at 1092), the duty does not force the company to choose between one of the options in the moderator's dilemma.

A claim whose underlying duty could be discharged without monitoring, removing, or editing user-generated content gives a company a compliance option outside the undesirable choices in the moderator's dilemma. For example, in *Internet Brands*, the defendant was alleged to have a duty to warn users of a specific known threat to their safety, which the company learned of through outside sources. *Internet Brands*, 824 F.3d. at 849. Discharging this duty would have required the defendant to issue a warning, not to monitor, edit, or remove any user-generated content, so Section 230 did not apply. *Id.* at 852–53. Issuing a warning is not one of the options in the moderator's

dilemma and does not have the speech-stultifying effects that Section 230 was meant to prevent.

The same was true in *HomeAway.com*, in which a city ordinance prohibited home rental websites from brokering transactions for rentals not licensed by the city. The ordinance imposed a duty to not broker certain rentals but did not require companies to remove the listings. *HomeAway.com*, 918 F.3d at 679–80, 682. Companies could thus comply with the ordinance by disabling bookings for unlicensed rentals without monitoring or removing any listings, so Section 230 did not apply. *Id.* at 682–83. Because the companies could not be held liable for the listings themselves, the moderator's dilemma was not implicated.

The moderator's dilemma is also not implicated when a company is alleged to have a nonpublishing duty—that is, a duty that does not spring from a company's choice to host or moderate user-generated content. *See* Olivier Sylvain, *Platform Realism, Informational Inequality, and Section 230 Reform*, 131 Yale L. J. Forum 475, 497–500 (2021). For example, in *Barnes v. Yahoo*, the Court refused to apply Section 230 to a promissory estoppel claim that would have required Yahoo to remove a tortious post. *Barnes*, 570 F.3d at 1109. This was

because the duty sprung from Yahoo's promise to remove the tortious post, not the mere fact that Yahoo published user-generated content. *Id.*; *see also Calise*, 103 F.4th at 742. When a company promises to remove user-generated content, it defines the scope of its duty to moderate and can limit the scope of its duty by limiting the scope of its promise or by not making any promise at all. In Yahoo's case, it was "easy for Yahoo to avoid liability: it need only disclaim any intention to be bound." *Barnes*, 570 F.3d at 1108.

Contrasting the other claim at issue in *Barnes*—a negligent undertaking claim blocked by Section 230—demonstrates that the source of a duty matters. The negligent undertaking claim, like the promissory estoppel claim, alleged that Yahoo had a duty to remove offending profiles. *Id.* at 1102–03. But unlike the promissory estoppel claim, the negligent undertaking claim attached as soon as Yahoo "undertook" the service of moderating third-party content. *Id.* at 1107. That is, the source of the duty was Yahoo's decision to moderate content, and the duty required Yahoo to remove offending material—a quintessential publishing duty.

17

Duties arising from a company's role as a product designer also generally do not trigger Section 230. The choices a company makes in designing a product, even a publishing-related product, are not always synonymous with moderating or hosting content. For instance, in *Lemmon v. Snap*, the Court held that Snap could face a negligent design claim for choosing to design and release a tool for users to alter the appearance of their photos and videos. Product designers "have a specific duty to refrain from designing a product that poses an unreasonable risk of injury or harm to consumers." *Lemmon*, 995 F.3d at 1092. Those "acting solely as publishers . . . have no similar duty." *Id.* Thus, when a plaintiff brings a defective design claim against such a company, "[t]he duty underlying such a claim differs markedly from the duties of publishers as defined in the CDA" because it "'springs from' [the company's] distinct capacity as a product designer." *Id.* (quoting *Barnes*, 570 F.3d at 1107). Allowing for liability in such circumstances would not require companies to touch user-generated content at all— companies would have to refrain from releasing tools until they took "reasonable measures to design a product more useful than it was foreseeably dangerous." *Id.* This might delay the release of new tools, or

18

result in fewer tools being released, but it does not lead to the dire speech consequences of the moderator's dilemma: companies engaging in censorship, abandoning content-moderation, or refusing to host user-generated content altogether.

## II. THE STATES' UNFAIR AND DECEPTIVE TRADE PRACTICE CLAIMS DO NOT FORCE META INTO THE MODERATOR'S DILEMMA.

The States' unfair and deceptive trade practice claims do not force Meta into the moderator's dilemma. They allege that Meta violated duties that spring from its status and conduct as a product designer, not a publisher. To discharge the duties alleged in these claims, Meta would need to accurately describe its product or make alternative design choices, not monitor, edit, or remove user-generated content.

### A. Section 230 does not bar the States' deceptive trade practice claims.

Section 230 does not bar the States' deceptive trade practice claims because they fault Meta for its own statements and omissions, not for users' harmful content. The States' deceptive trade practice claims allege that Meta had a duty not to mislead the public about the nature of its products and services. 2-SER-391 ¶846. The source of this duty is Meta's role as a consumer-facing company that issues

19

statements about its products. Meta allegedly violated this duty by knowingly misrepresenting important aspects of its services' design and function. For example, the States allege that Meta publicly claims to design its platform in a way to prioritize users' well-being over its own profits when, in reality, it knowingly does the opposite. *Id.* They also allege that the company publicly denied that its products are designed to be habit-forming while privately doing the opposite, commissioning neuroscience studies to evaluate which design features induced the greatest dopamine response in young users. *Id.* These claims are about Meta's own allegedly misleading speech and conduct, not harmful user-generated content, so Section 230 does not apply.

Notably, none of these allegations would force Meta into the moderator's dilemma. Meta could discharge its alleged duties by truthfully describing its services in public, not by monitoring, editing, or removing user-generated content. Being truthful is not one of the "grim" options that Section 230 protects against. *See* Section I, *supra*. The States' deception claims should not be barred.

**B.    Section 230 does not bar the States' unfair trade practice claims.**

The States' unfair trade practice claims are also not barred by Section 230. The claims spring from Meta's role as a business, not from its publication or moderation of content. To discharge its alleged duties, Meta could remove certain product features or choose alternative designs for those features. Because the design choices at issue are not synonymous with content moderation and making alternative choices would not "necessarily require" Meta to monitor, edit, or remove any content, the claims do not trigger Section 230. *HomeAway.com*, 918 F.3d at 682. Indeed, most of these duties *cannot* be satisfied by monitoring, editing, or removing any content.

Examining each claim as applied to specific trade practices demonstrates that Meta could discharge its duty under each claim without being forced into the moderator's dilemma.

Infinite Scroll and Autoplay

Infinite scroll is a design feature that allows companies to provide a continuous content feed. According to Meta's patent for a continuous content feed, the company's platforms can deliver a never-ending

stream of content to a user's device in a way that feels seamless. U.S. Patent No. 10,783,157 (filed June 15, 2018) (issued Sep. 22, 2020).[2] The feed updates in real-time as the user scrolls, so there's always more content ready without noticeable loading delays. *Id.* Through the autoplay feature, Meta's platforms automatically play the next video or piece of content in users' feeds so they don't have time to decide whether to watch. *See* Common Sense Media & University of Michigan C.S. Mott's Children's Hospital, *Constant Companion: A Week in the Life of a Young Person's Smartphone Use* 29, 32 (2023).[3] Both design features reduce "friction" points that provide a user with a natural opportunity to decide to end their app session. *See id.*; *see also* Brett Frischmann & Susan Benesch, *Friction-In-Design Regulation as 21st Century Time, Place, and Manner Restriction* 25 Yale J.L. & Tech. 376, 394 (2023).

---

[2] https://image-ppubs.uspto.gov/dirsearch-public/print/downloadPdf/10783157.

[3] https://www.commonsensemedia.org/sites/default/files/research/report/2023-cs-smartphone-research-report_final-for-web.pdf.

This is similar to how casinos banish natural light and clocks from their interiors, incentivizing gamblers to lose track of time.

If implementing infinite scroll and autoplay in young users' feeds is an unfair trade practice, then Meta would discharge its duty by selecting alternative designs, not by monitoring or editing user-generated content. Instead of automatically loading new content at the end of a feed, Meta could load new content only when users give a clear affirmative signal that they want to see more. And instead of automatically playing videos in a feed, Meta could play video when users click the "play" button.

Both of these alternative designs have historically been the norm on platforms—even Meta's. Some feeds used to "run out" when users had viewed all new content from their social connections. Before companies introduced infinite scroll, companies paginated feeds, so users had to click on a "next page" button to view more posts. *See* Jay Chadha, *The Rise of Infinite Scrolling in Software Design* (2024) (B.S.

thesis, University of Virginia).[4] The norm for video playback has historically been to allow the user to decide whether and when to play a video.

Usage-Maximizing Recommender Systems

Many social media platforms, including Meta's, build a usage-maximizing objective into their feed algorithm systems. In Meta's help pages describing how Facebook and Instagram feed systems work, it says, "In Feed, the five interactions we look at most closely are how likely you are to spend a few seconds on a post, comment on it, like it, reshare it, and tap on the profile photo." Adam Mosseri, *Shedding More Light on How Instagram Works*, Instagram.com (June 8, 2021).[5]

Meta's systems predict the likelihood of a user engaging in any of these usage behaviors, and then the feed algorithm ranks items to maximize the likelihood of these behaviors on the part of the user,

---

[4] https://www.perfectcorp.com/consumer/blog/selfie-editing/instagram-filter-alternative#:~:text=Skinny%20Face%20Filter.%20The%20app%20automatically%20detects,part%20of%20your%20face%20easily%20and%20instantly.

[5] https://about.instagram.com/blog/announcements/shedding-more-light-on-how-instagram-works.

tweaking and updating the model as time goes on. *See* Vladislav Vorotilov & Ilnur Shugaepov, *Scaling the Instagram Explore Recommendations System*, Facebook (Aug. 9, 2023)[6]; Akos Lada, Meihong Wang & Tak Yan, *How Machine Learning Powers Facebook's News Feed Ranking Algorithm*, Facebook (Jan. 26, 2021).[7]

Meta's usage maximization tool for its feed algorithm system serves the company's goal of maximizing the user attention that it can sell to advertisers, and the high-engagement usage that it particularly maximizes for is well aligned with the click-through style of advertising that Meta sells. Meta's feed algorithm systems are attempting to drive specific, observable behaviors on the part of users that support the company's business goals of maximizing ad revenue. This stands in stark contrast to earlier recommender systems, which were typically optimized for goals that were explicitly user-centered, such as stated preference or relevance.

---

[6] https://engineering.fb.com/2023/08/09/ml-applications/scaling-instagram-explore-recommendations-system/.
[7] https://engineering.fb.com/2021/01/26/ml-applications/news-feed-ranking/.

The States' claim alleges that Meta has a duty to not design its recommender algorithms to maximize for usage without limit. Meta could satisfy this duty through several alternative designs. For instance, instead of optimizing for usage, Meta could optimize for relevance to the user or some other explicitly stated user preference. Making this change would not require Meta to filter any content out of the system, nor would it require Meta to otherwise monitor, edit, or remove any content.

The district court erred in relying on *Dyroff* to hold that internet companies cannot be held liable for harms caused by their recommender systems under Section 230. *Dyroff* only held that, under prong three of the *Barnes* test, companies do not materially contribute to illegal content through their content-neutral recommender systems. *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098–1099 (9th Cir. 2019). The States' claims allege something different: that certain aspects of Meta's recommender system are harmful no matter what content they serve, not that Meta's recommender systems materially contribute to the illegality of user-generated content. *Dyroff* is thus inapposite.

What's more, recommender systems are complex and have many different components which, in turn, involve many different ex ante design choices. A claim that alleges that a company must change one component in a particular way might trigger Section 230 while a claim alleging a flaw in another component might not. It is thus important for courts to analyze claims involving recommender systems at the level of the specific claim, feature of the recommender system targeted by the claim, and alternative design choices because complying with some obligations might involve monitoring, editing, or removing content, while others might not.

Appearance-Altering Filters

Meta provides users with the ability to apply filters to their photos to alter the way they look. The States' complaint explains that Instagram offers several filters that change the shape and features of a user's face or body, similar to the photoshopping and airbrushing of yore. *See* 2-SER-308 ¶¶364–68. Appearance-altering filters can shave down a user's natural baby fat, shrink their nose, and make their eyes pop. *See* Jia Tolentino, *The Age of Instagram Face*, New Yorker (Dec. 12,

2019).[8] Many of the filters reproduce the effects of cosmetic surgery. *See* 2-SER-304–06 ¶¶333–52. Meta's own product teams and outside experts warned the company of the dangers these features posed to young girls. *Id.* Teen girls themselves report that beauty filters on Instagram "can intensity social comparison and body image issues." Tatum Hunter, *Should Women Use Beauty Filters Online? We All Have Opinions*, Wash. Post (Sept. 20, 2023).[9]

To discharge its alleged duties regarding appearance-altering filters, Meta could stop offering such filters, automatically label filtered content so users know that the content has been altered, and/or provide a warning about the negative effects of prolonged use of filters. None of these choices would require Meta to monitor, edit, or remove user content. Thus, for similar reasons as the product design claim for a dangerous driving filter in *Lemmon*, and the failure to warn users of

---

[8] https://www.newyorker.com/culture/decade-in-review/the-age-of-instagram-face.

[9] https://www.washingtonpost.com/technology/2023/09/20/beauty-filter-criticism-benefits-tiktok/.

known dangers claim in *Internet Brands*, the unfair trade practice claim related to appearance-altering filters does not trigger Section 230.

Disruptive Notifications

According to Meta's patent governing notifications, Meta uses a system that figures out the best times to send notifications to users so they are more likely to respond to them. U.S. Patent No. 8,751,636 B2 (filed Dec. 22, 2010) (issued June 10, 2014). Clicking on a notification brings a user to the platform, which increases use and time spent on the platform. In determining when to send users' notifications, Meta's system considers where the user is located, what they have clicked on before, and how often they engage with previous notifications. *Id.* Then, the system ranks possible notifications and spaces them out, limiting how many notifications are sent in a given time window. *Id.* It also adjusts over time based on how the user responds—if they start ignoring alerts, the system holds back notifications. Internal company documents show that Meta designs and uses its notification system to induce a "fear of missing out" and to nudge users to spend more time on-platform. *See* 2-SER-331 ¶515. Research shows that teen users receive an average of 237 notifications per day on their phone. Common

Sense Media & University of Michigan C.S. Mott's Children's Hospital, *supra*, at 6.

Meta could alter how notifications are delivered without monitoring, editing, or removing any user-generated content. Notifications could be batched to be sent less frequently altogether, instead of batching to maximize for user response. Notifications could also be sent only during certain parts of the day. Several platforms have blackout periods when they will not send notifications to users they know are minors. For instance, TikTok has a blackout period between 9 PM or 10 PM (depending on age) and 8 AM for minor users. TikTok, *Notifications*.[10]

Ephemerality

Ephemerality design features delete user-generated content when a condition is met—for instance, when a certain amount of time has elapsed after the poster shares the content or immediately after the recipient views the content. Meta integrated ephemeral design into

---

[10] https://support.tiktok.com/en/using-tiktok/messaging-and-notifications/notifications.

Instagram's "Live" and "Stories" features to copy and compete with competitor Snapchat's disappearing story feature. Alex Kantrowitz, *Snapchat Was 'An Existential Threat' to Facebook — Until an 18-Year-Old Developer Convinced Mark Zuckerberg to Invest in Instagram Stories*, Business Insider (Apr. 7, 2020).[11] According to Snap's patent governing ephemerality, users can create and share temporary photo or video messages, which are grouped together into what the company calls an "ephemeral gallery." U.S. Patent No. 9,537,811 (filed October 2014) (issued January 2017). Each message in the gallery is only viewable for a limited time before it automatically disappears. *Id.* The gallery itself also has a time limit, so the whole collection eventually expires, even if some messages within the collection have not expired. Users can control who sees the gallery and for how long, and the system may show visual indicators—like countdowns—to let viewers know how much time is left before a message disappears. Ephemeral messages and galleries that disappear within a certain, short time period can

---

[11] https://www.businessinsider.com/how-developer-mark-zuckerberg-invented-instagram-stories-copied-snapchat-2020-4.

create "fear of missing out." This may encourage users to engage with the platform more frequently than they might otherwise like and reinforce patterns of problematic use.

The unfair trade practice claim alleges that Meta had a duty to not use ephemerality to encourage problematic use. Meta could satisfy this duty by eliminating ephemerality or deploying an alternative design that would minimize problematic use. For example, instead of a user's post automatically disappearing after 24 hours, the same post could be visible to the user's friends or followers only one time when they next open Instagram or Facebook, whenever that happens to be, and then disappear. Discharging this duty would not require Meta to monitor, edit, or remove any content—in fact, turning off ephemerality would involve Meta *leaving up* content the ephemerality feature would have removed.

Algorithms Based on Intermittent Variable Reinforcement Schedules

The States claim that Meta engaged in an unfair trade practice by implementing intermittent variable reinforcement schedules (IVRSs) into its recommender algorithms. Pulling from a basic concept of operant conditioning popularized by the gambling industry, an IVRS is

one of the most effective ways to condition human responses to a particular stimulus by injecting uncertainty over when the subject receives a reward based on a particular action. In Meta's case, the company deploys algorithms that crunch user-specific signals to create an IVRS tailored to that person. *See* Mattha Busby, *Social Media Copies Gambling Methods 'To Create Psychological Cravings,'* Guardian (May 8, 2018).[12] As one Meta employee remarked, "Intermittent rewards are most effective (think slot machines), reinforcing behaviors that become especially hard to extinguish." Compl. ¶ 110, *Spence v. Meta Platforms*, No. 3:22-cv-03294, 2022 WL 3572368 (N.D. Cal. June 6, 2022).

The States allege Meta has a duty to design its platforms' recommender algorithms in a way that does not manipulate users. This would require Meta to stop using IVRSs. Eliminating this harmful design would not require monitoring, editing, or removing any content, so Section 230 does not apply.

---

[12] https://www.theguardian.com/technology/2018/may/08/social-media-copies-gambling-methods-to-create-psychological-cravings.

Other Design Features

A similar analysis holds for the other design choices the States allege are unfair, such as quantification and display of "Likes" and the ability for one user to create multiple profiles. The States' claims allege that Meta had a duty to design these features in a way that did not encourage problematic use, and to satisfy this duty, Meta would need to change how it designs and offers these features, not monitor, edit, or remove any user-generated content.

## III. DENYING META SECTION 230 PROTECTIONS WILL NOT DESTROY THE INTERNET.

Section 230 plays an important role in protecting online speech, but an overbroad interpretation of the law is harmful and unnecessary for the law's purposes. This Court's experience proves that a properly tailored interpretation of Section 230 does not destroy the ability to speak or innovate online. Instead, a proper interpretation provides internet companies with protections from the moderator's dilemma while also nudging them to adopt more pro-social business practices.

The lack of negative repercussions following this Court's previous decisions not to grant Section 230 immunity proves that narrow

interpretations of Section 230 do not stifle online speech or destroy online businesses. When this Court recognized that online home rental companies must comply with local regulations against brokering rentals for unregistered properties, *Homeaway.com*, 918 F.3d at 683, it did not cause online rental platforms to fold. When this Court said that app developers still have a duty to design safe products, *see Lemmon*, 995 F.3d at 1092–93, platforms did not adopt draconian measures to crack down on user-generated content. When this Court found that websites still have a duty to warn users about known dangers to their safety, *see Internet Brands*, 824 F.3d at 853, it did not destroy web forums. And when this Court held that social media companies have a duty to abide by content moderation promises they make to users, *see Barnes*, 570 F.3d at 1109, it did not destroy social media.

Denying Meta Section 230 protection in this case will not stifle speech or destroy social media. The alternative design choices described in Section II would not force platforms to censor any topics or viewpoints, nor would they disincentivize content moderation or the hosting of user-generated content. Making different design choices is also very doable. A few social media platforms have already

implemented some of the alternative designs described in Section II, with no reported negative impacts on speech, such as TikTok's notification "quiet hours." Some of the other alternative designs were the predominant models just a few years ago, such as relevance-maximization and pagination in feeds.

Refusing to apply Section 230 to platforms' harmful design decisions is actually good for society because it will lead companies to design their platforms in more pro-social ways. This Court's previous decisions denying Section 230 immunity promoted pro-social corporate behavior such as keeping promises to users, abiding by democratically enacted laws, warning users of known risks to their safety, and designing smartphone applications in ways that will avoid obvious harmful behavior. Similarly, denying Meta Section 230 protections here will push Meta and other platforms to make pro-social design choices instead of always choosing the design that maximizes their profits while creating negative externalities for users and society.

Far from benefiting society, granting Meta Section 230 protections here would help create "a lawless no-man's-land on the Internet." *Roommates.com*, 521 F.3d at 1164. Finding for Meta would require the

Court to revert to the but-for test that it has repeatedly repudiated because it gives internet companies almost blanket immunity from regulation, as "publishing content is 'a but-for cause of just about everything' [an internet company] is involved in." *Lemmon*, 995 F.3d at 1092–93 (citing *Internet Brands*, 824 F.3d at 853). This would make online consumer protection nearly impossible and would also immunize online behavior that would not be immunized offline. Indeed, courts that have used the but-for test have immunized otherwise unlawful corporate behavior like failing to protect their users from stalkers, *Herrick v. Grindr, LLC*, 765 F. App'x 586, 590–91 (2d Cir. 2019), actively helping telemarketers to evade consumer laws, *United States v. Stratics Networks Inc.*, No. 23-CV-0313-BAS-KSC, 2024 WL 966380, at *14 (S.D. Cal. Mar. 6, 2024), helping drivers defeat emissions controls, *United States v. EZ Lynk Sezc*, No. 21-cv-1986 (MKV), 2024 WL 1349224, at *9–12 (S.D.N.Y. Mar. 28, 2024), and violating credit reporting requirements, *Dennis v. MyLife.Com, Inc.*, No. 20-cv-954, 2021 WL 6049830, at *6–7 (D.N.J. Dec. 20, 2021). Section 230 is not a get-out-of-jail-free card, it is a scalpel to be used on a specific type of speech-endangering claim—one that is not at issue in this case.

Forcing Meta to defend itself on the merits also does not mean that Meta will necessarily face liability. If the claims against Meta are unmeritorious, the courts may ultimately dismiss them. For instance, last year, a Ninth Circuit panel reversed a district court's decision to dismiss a case on Section 230 grounds but affirmed its grant of a motion to dismiss for failure to state a claim. *See Quinteros v. Innogames*, No. 22-35333, 2024 WL 132241, at *1–2 (9th Cir. Jan. 8, 2024). Indeed, courts often find it easier to dismiss unmeritorious claims than to determine whether Section 230 applies. The way the Supreme Court resolved *Gonzalez v. Google* and *Twitter v. Taamneh* exemplifies this. The Court "decline[d] to address the application of § 230" in *Gonzalez* because the complaint "appear[ed] to state little, if any, plausible claim for relief." *Gonzalez v. Google*, 598 U.S. 617, 622 (2023). Instead, it issued a merits decision in the factually identical *Twitter v. Taamneh*, finding that Twitter's (and likely Google's) algorithmic amplification of terrorist content did not meet the definition of associating or participating in a terrorist venture. *See Twitter, Inc. v. Taamneh*, 598 U.S. 471, 498–99 (2023). It then remanded *Gonzalez* with instructions

38

to issue a merits decision informed by *Taamneh*. *See Gonzalez*, 598 U.S. at 622.

Holding that Section 230 does not apply in this case also does not mean that Section 230 could never prohibit an unfair trade practice claim against a social media company. If the States had claimed that it is an unfair trade practice to provide a communications service that contains harmful content, then Section 230 might apply. This would be similar to the Ninth Circuit's treatment of the negligent undertaking claim in *Barnes*. 570 F.3d at 1102–03. If the alleged "trade practice" is disseminating user-generated content, and the "unfairness" is defined as hosting harmful content, then the alleged duty would spring from Meta's decision to host user-generated information, and the only way to discharge that duty would be to ensure no tortious content is posted. Such a claim would recreate the moderator's dilemma and be barred by Section 230. But the States' claims in the present case do not fit this pattern because they seek to hold Meta liable for business conduct that does not spring from, and does not impact, Meta's hosting or moderating of user-generated content.

## CONCLUSION

For the foregoing reasons, EPIC respectfully urges the Court to reverse in part and affirm in part the district court's decision.

**Date:**      June 30, 2025            /s/ Megan Iorio
Megan Iorio
Tom McBrien
ELECTRONIC PRIVACY
INFORMATION CENTER
1519 New Hampshire Ave. NW
Washington, DC 20036
(202) 483-1140

*Attorneys for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I am the attorney or self-represented party.

**This brief contains 7,020 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** */s/ Megan Iorio*          **Date:** June 30, 2025

41

## CERTIFICATE OF SERVICE

I certify that on June 30, 2025, this brief was e-filed through the CM/ECF System of the U.S. Court of Appeals for the Ninth Circuit. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

**Date:**     June 30, 2025          /s/ Megan Iorio
Megan Iorio
Tom McBrien
ELECTRONIC PRIVACY
INFORMATION CENTER
1519 New Hampshire Ave. NW
Washington, DC 20036
(202) 483-1140

*Attorneys for Amici Curiae*